## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION
www.flmb.uscourts.gov

| | |
|---|---|
| IN RE: | Chapter 11 Cases |
| | |
| RED LOBSTER MANAGEMENT LLC, [1] | Case No. 6:24-bk-02486-GER |
| | Lead Case |
| | |
| | Jointly Administered with |
| RED LOBSTER RESTAURANTS LLC, | Case No. 6:24-bk-02487-GER |
| RLSV, INC., | Case No. 6:24-bk-02488-GER |
| RED LOBSTER CANADA, INC., | Case No. 6:24-bk-02489-GER |
| RED LOBSTER HOSPITALITY LLC, | Case No. 6:24-bk-02490-GER |
| RL KANSAS LLC, | Case No. 6:24-bk-02491-GER |
| RED LOBSTER SOURCING LLC, | Case No. 6:24-bk-02492-GER |
| RED LOBSTER SUPPLY LLC, | Case No. 6:24-bk-02493-GER |
| RL COLUMBIA LLC, | Case No. 6:24-bk-02494-GER |
| RL OF FREDERICK, INC., | Case No. 6:24-bk-02495-GER |
| RED LOBSTER OF TEXAS, INC., | Case No. 6:24-bk-02496-GER |
| RL MARYLAND, INC., | Case No. 6:24-bk-02497-GER |
| RED LOBSTER OF BEL AIR, INC., | Case No. 6:24-bk-02498-GER |
| RL SALISBURY, LLC, | Case No. 6:24-bk-02499-GER |
| RED LOBSTER INTERNATIONAL HOLDINGS LLC, | Case No. 6:24-bk-02500-GER |
| | |
|      Debtors. | |
| _____/ | |

## CORRECTED[2] EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS (I) APPROVING POSTPETITION FINANCING, (II) AUTHORIZING THE USE OF CASH COLLATERAL, (III) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING AUTOMATIC STAY, (VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are Red Lobster Management LLC (6889); Red Lobster Sourcing LLC (3075); Red Lobster Supply LLC (9187); RL Kansas LLC (2396); Red Lobster Hospitality LLC (5297); Red Lobster Restaurants LLC (4308); RL Columbia LLC (7825); RL of Frederick, Inc. (9184); RL Salisbury, LLC (7836); RL Maryland, Inc. (7185); Red Lobster of Texas, Inc. (1424); Red Lobster of Bel Air, Inc. (2240); RLSV, Inc. (6180); Red Lobster Canada, Inc. (4569); and Red Lobster International Holdings LLC (4661). The Debtors' principal offices are located at 450 S. Orange Avenue, Suite 800, Orlando, FL 32801.

[2] Corrected solely to: (i) redact bank account information on the Payoff Letter that was attached as Exhibit D to the originally filed DIP Motion at ECF No. 43 ("DIP Motion") (a motion to restrict access to the DIP Motion is being filed simultaneously with this corrected DIP Motion); and (ii) replace the unsigned Payoff Letter attached as Exhibit D to the DIP Motion with a fully executed Payoff Letter, which is attached hereto as Exhibit "D."

**(Emergency Hearing Requested)**

**Basis for Requested Emergency Hearing**

The Debtors respectfully request the Court to conduct an emergency hearing on this Motion at its earliest available opportunity, consistent with Local Rule 2081-1(g)(1)-(2). The Debtors must have immediate access to postpetition financing to continue operating their businesses for the benefit of all stakeholders, while simultaneously preventing direct, immediate, and substantial harm to the Debtors' estates. The Debtors seek to continue to operate their businesses in the ordinary course, to preserve the value of the estates and to maximize recoveries for all stakeholders and parties-in-interest (including by preserving the jobs of over 35,000 employees). Without immediate approval of the Debtors' postpetition financing, which includes the use of cash collateral, the Debtors will not be able to meet payroll, cover the cost of foodservice products, or satisfy other obligations necessary for their day-to-day operations.

In support of this motion (this "Motion"), the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") rely on the *Declaration of Jonathan Tibus in Support of Debtors' Chapter 11 Petitions and First Day Relief* (the "First Day Declaration"), the *Declaration of Nicholas Haughey in Support of Debtors' Emergency Motion for Interim and Final Orders (I) Approving Postpetition Financing, (II) Authorizing the Use of Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "Haughey Declaration") and the *Declaration of Teri Stratton in Support of Debtors' Emergency Motion for Interim and Final Orders (I) Approving Postpetition Financing, (II) Authorizing the Use of Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "Stratton Declaration")[3] filed on or about the date hereof and respectfully state as follows:

**Relief Requested**

---

[3] True and correct copies of the Haughey Declaration and Stratton Declaration are attached to this Motion as **Exhibit E** and **Exhibit F**, respectively.

13024039-1

1.    By this Motion, the Debtors seek entry of interim and final orders, substantially in the form attached hereto as **Exhibit A** (the "<u>Interim Order</u>" and "<u>Final Order</u>,"[4] respectively, and collectively, the "<u>DIP Orders</u>"):

(a)    authorizing the Debtors to obtain senior secured postpetition financing on a super-priority basis pursuant to the terms and conditions of that certain Secured Superpriority Debtor-in-Possession Financing Agreement (as the same may be amended, restated, supplemented, or otherwise modified from time to time, the "<u>DIP Credit Agreement</u>"), by and among the Borrowers (as defined in the DIP Credit Agreement), the Guarantors (as defined in the DIP Credit Agreement), Fortress Credit Corp., as Administrative Agent and Collateral Agent (in such capacity, the "<u>DIP Agent</u>") for and on behalf of the lenders party thereto (collectively, the "<u>DIP Lenders</u>" and together with the DIP Agent, the "<u>DIP Secured Parties</u>"), pursuant to the copy of the proposed DIP Credit Agreement in substantially final form attached hereto as **Exhibit B**;

(b)    authorizing the Debtors to obtain from the DIP Secured Parties, during the interim period pending the entry of the Final Order, up to $40,000,000 in new money advances in accordance with the DIP Credit Agreement and the Interim Order (such amount, the "<u>Interim Availability Amount</u>");

(c)    authorizing the Debtors to obtain from the DIP Secured Parties, upon entry of the Final Order, total new money advances in an amount not to exceed a maximum outstanding principal amount of up to $60,000,000 (the "<u>Final Availability Amount</u>") in accordance with the DIP Credit Agreement, the DIP Documents (as defined herein), and the Final Order;

(d)    authorizing the Debtors, upon entry of the Interim Order, to convert to DIP Obligations (as defined herein) under the DIP Credit Agreement, a portion of the outstanding Prepetition Obligations (as defined below) held by the DIP Lenders (or their affiliates) on a pro rata basis according to each DIP Lenders' pro rata share of the outstanding DIP Delayed Draw Term Loans, in a ratio of 1.75:1 of the DIP Delayed Draw Term Loan funded up to the Interim Availability Amount (the "<u>Interim Roll-Up Term Loans</u>");

(e)    authorizing the Debtors, upon entry of the Final Order, to convert to DIP Obligations (as defined herein) under the DIP Credit Agreement, a portion of the outstanding Prepetition Obligations (as defined in the Prepetition Term Loan Financing Agreement described below) held by the DIP Lenders (or their affiliates) on a pro rata basis according to each DIP Lenders' pro rata share of the outstanding DIP Delayed Draw Term Loans, in a ratio of 1.75:1 of the DIP Delayed Draw Term Loans funded up to the Final Availability Amount (the "<u>Final Roll-Up Term Loans</u>" and together with the Interim Roll-Up Term Loans, the "<u>Roll-Up Term Loans</u>"; the Roll-Up Term Loans together with the DIP Delayed Draw Term Loans, the "<u>DIP</u>

---

[4] The Debtors will file a proposed Final Order prior to a final hearing on the Motion.

Loans"; and the credit facility in respect of such DIP Loans and governed by the DIP Credit Agreement, the "<u>DIP Facility</u>");

(f)    authorizing the Debtors to execute and deliver the DIP Credit Agreement, the other "Loan Documents" as described in the DIP Credit Agreement and any other agreements and documents related thereto (collectively with the DIP Credit Agreement, the "<u>DIP Documents</u>"), and to perform such other acts as may be necessary or desirable in connection with the DIP Documents and the transactions contemplated thereby;

(g)    subject to the Carve-Out (as defined in the Interim Order) and the Administration Charge against the Canadian Collateral (each as defined in the DIP Credit Agreement), granting to the DIP Secured Parties, on account of the DIP Facility and all obligations owing thereunder and under the DIP Documents, including the Roll-Up Term Loans (collectively, and including all "Obligations" as described in the DIP Credit Agreement, the "<u>DIP Obligations</u>"), an allowed super-priority administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code having priority over any and all expenses and claims specified in any other section of the Bankruptcy Code, including, without limitation, sections 105, 326, 328, 330, 331, 364, 503(a), 503(b), 507(a), and 507(b), 546(c), 546(d), 726, 1113, and 1114 of the Bankruptcy Code, in each of the Chapter 11 Cases and any Successor Cases (as defined in the Interim Order);

(h)    subject to the Carve-Out and the Administration Charge against the Canadian Collateral and the Prepetition Liens (as defined in the Interim Order), granting to the DIP Secured Parties, automatically perfected security interests in and senior liens on all of the DIP Collateral (as defined in the Interim Order), including, without limitation, all property constituting "Cash Collateral" as defined in section 363(a) of the Bankruptcy Code, which liens shall be subject to the priorities set forth in the DIP Credit Agreement and the Interim Order, as applicable;

(i)    authorizing and directing the Debtors to pay the principal, interest, fees, expenses and other amounts payable under the DIP Documents as such become due, including, without limitation, upfront fees, administrative agent's fees, exit fees, and the reasonable fees and disbursements of the DIP Secured Parties' attorneys, advisors, accountants and other consultants, all to the extent provided in, and in accordance with, the DIP Documents and the DIP Orders;

(j)    (i) authorizing the use of Cash Collateral of the Prepetition Term Secured Parties (as defined herein) pursuant to section 363 of the Bankruptcy Code and subject to the initial Approved Budget (as defined in the Interim Order), which is attached to the proposed Interim Order as **Exhibit C**, and (ii) subject to the Carve-Out and the Administration Charge against the Canadian Collateral, providing adequate protection to the Prepetition Term Secured Parties for any Diminution (as defined in the Interim Order) of their respective interests in the Prepetition Collateral (as defined in the DIP Credit Agreement), including the Cash Collateral, as a result of the relief granted herein;

13024039-1

(k)   authorizing the Debtors to make the payments using Cash Collateral and the proceeds of Delayed Draw DIP Term Loans to the Prepetition ABL Agent contemplated by that certain payoff letter (the "Payoff Letter"), dated May 17, 2024, by and among certain of the Debtors party thereto and the Prepetition ABL Secured Parties substantially in the form attached hereto as **Exhibit D**, which include (i) the payment of $250,000 in respect of the Expense Reserve (as defined in the Payoff Letter) to satisfy the fees, costs, expenses and any other amounts that are in each case Surviving Obligations (as defined in the Payoff Letter), (ii) the payment of $14,133,599.18 to cash collateralize the Letters of Credit Obligations (as defined herein), and (iii) the payment of $1,100,000 to cash collateralize the Bank Product Obligations (as defined herein) in accordance with the terms of the Payoff Letter and Orders (collectively, the "Payoff Letter Transactions");

(l)   subject to the provisions of the Carve-Out and entry of a Final Order, waiving certain rights of the Debtors to surcharge DIP Collateral or the Prepetition Collateral, as applicable, pursuant to section 506(c) of the Bankruptcy Code or otherwise, as to the DIP Secured Parties (as defined in the DIP Credit Agreement) or the Prepetition Term Secured Parties, respectively;

(m)   subject to entry of a Final Order, waiving (i) the application of the "equities of the case" exception under section 552(b) of the Bankruptcy Code with respect to proceeds, product, offspring or profits of any of the DIP Collateral or Prepetition Collateral, respectively; and (ii) the application of the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral or the Prepetition Collateral, as applicable, in each case as to the DIP Secured Parties or the Prepetition Term Secured Parties, respectively;

(n)   modifying and vacating the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and the Interim Order; and

(o)   granting related relief.

## Statement of Material Terms

2.   The following chart contains a summary of the material terms[5] of the proposed DIP Facility and Interim Order in accordance with Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B), and Local Rule 2081-1(g)(1)-(2):

---

[5] The summaries contained in this Motion are qualified in their entirety by the provisions of the documents referenced including, without limitation, the DIP Documents and the Interim Order. To the extent anything in this Motion is inconsistent with such documents, the terms of the applicable documents shall control. Capitalized terms used in this summary chart but not otherwise defined have the meanings ascribed to them in the DIP Documents or the Interim Order, as applicable.

13024039-1

| Bankruptcy Rule | Summary of Material Terms[6] |
|---|---|
| **Parties to the DIP Credit Agreement**<br><br>Bankruptcy Rule 4001(c)(1)(B) | **Administrative Borrower**: Red Lobster Management LLC (the "<u>Administrative Borrower</u>");<br><br>**Borrowers**: The Administrative Borrower and each other Debtor subsidiary of the Administrative Borrower identified in the DIP Credit Agreement (collectively, the "<u>Borrowers</u>");<br><br>**Guarantor(s)**: The Debtor subsidiaries of the Administrative Borrower identified in the DIP Credit Agreement (collectively, the "<u>Guarantors</u>" and together with the Borrowers, the "DIP <u>Loan Parties</u>");<br><br>**DIP Agent**: Fortress Credit Corp.<br><br>**DIP Lenders**: The lenders from time to time party to the DIP Credit Agreement.<br><br>*See* DIP Credit Agreement, Preamble. |
| **Term**<br><br>Bankruptcy Rules 4001(b)(l)(B)(iii), 4001(c)(1)(B) | The DIP Loans would be repaid in full, and the DIP Loan Commitment[7] would terminate on, the earliest to occur of the following:<br><br>(a)     the Interim Facility Maturity Date (but only if the Final DIP Order has not been entered on or before the Interim Facility Maturity Date);<br><br>(b)     September 16, 2024;<br><br>(c)     the effective date with respect to any plan of reorganization;<br><br>(d)     the closing date on which the sale of all or substantially all of the assets of the Debtors, taken as a whole, under section 363 of the Bankruptcy Code is consummated; and<br><br>(e)     the acceleration of the DIP Obligations under the DIP Facility and the termination of all Commitments (as defined in the DIP Credit Agreement) upon the occurrence of an Event of Default in accordance with the DIP Documents and the DIP Orders.<br><br>*See* DIP Credit Agreement, §1.01. |
| **Commitment**<br><br>Bankruptcy Rule 4001(c)(1)(B) | Extensions of credit not to exceed the principal amount of $275,000,000, which amount is comprised of the sum of (a) $100,000,000 of new money that the Debtors require for the continued operation of their businesses during the pendency of the Chapter 11 Cases <u>plus</u> (b) $175,000,000 of Roll-Up Term Loans.<br><br>*See* DIP Credit Agreement, §2.01. |

---

[6] The Interim Order contains references to the Canadian Priority Charges (as defined in the DIP Credit Agreement) expected to be granted in the CCAA Case by the CCAA Court (as such terms are defined in the DIP Credit Agreement).

[7] Capitalized terms not defined herein shall have the meaning ascribed to them in the DIP Credit Agreement.

13024039-1

| Bankruptcy Rule | Summary of Material Terms[6] |
|---|---|
| **Conditions of Borrowing**<br><br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Credit Agreement includes standard and customary conditions of borrowing, the satisfaction of which is a condition precedent to the obligations of each DIP Lender to make DIP Loans under the DIP Facility.<br><br>*See* DIP Credit Agreement, Art. V. |
| **Interest Rates**<br><br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Obligations will bear interest, at the option of the Administrative Borrower, as a Reference Rate Loan or a SOFR Loan. If a Loan is a Reference Rate Loan, such Loan shall bear interest on the principal amount thereof from time to time outstanding, from the date of such Loan until repaid, at a rate per annum equal to the Reference Rate <u>plus</u> the Applicable Margin, and if a Loan is a SOFR Loan, such Loan shall bear interest on the principal amount thereof from time to time outstanding, from the date of such Loan until repaid, at a rate per annum equal to Adjusted Term SOFR for the Interest Period in effect for such Loan <u>plus</u> the Applicable Margin.<br><br>"<u>Reference Rate</u>" means, for any period, the greatest of (a) 4.00% per annum, (b) the Federal Funds Rate <u>plus</u> 0.50% per annum, (c) Adjusted Term SOFR (which rate shall be calculated based upon an Interest Period of one (1) month and shall be determined on a daily basis) <u>plus</u> 1.00% per annum, and (d) the rate last quoted by The Wall Street Journal as the "Prime Rate" in the United States or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the Administrative Agent) or any similar release by the Federal Reserve Board (as determined by the Administrative Agent). Each change in the Reference Rate shall be effective from and including the date such change is publicly announced as being effective.<br><br>"<u>Applicable Margin</u>" means, as of any date of determination, with respect to the interest rate of the Term Loan (or any portion thereof), the respective level indicated below:<br><br>    Reference Rate Loans: 9.50%<br>    SOFR Loans: 10.50%<br><br>*See* DIP Credit Agreement, §2.04(a), 1.01 |
| **Use of DIP Facility and Cash Collateral**<br><br>Bankruptcy Rule 4001(b)(l)(B)(ii) | As set forth more fully in the DIP Credit Agreement, the proceeds of the DIP Loan will be used:<br><br>Solely in accordance with the Approved Budget (subject to Permitted Variances) and the DIP Orders:<br><br>(i)    Use the proceeds of the DIP Delayed Draw Term Loans solely, without duplication, (A) to cash collateralize in full all letter of credit obligations of the Prepetition ABL Secured Parties pursuant to Prepetition ABL Facility, (B) to pay transaction costs, fees and expenses that are incurred in connection with the DIP Documents, (C) to pay professional fees of the Debtors and their estates, (D) for working capital and other general corporate purposes of the Administrative Borrower and its Subsidiaries permitted under the DIP Documents, and (E) if necessary, to fund an amount equal to the Excluded Cash (as defined in the Stalking Horse Acquisition Agreement), in each case subject to the terms, requirements and limitations of the DIP |

| Bankruptcy Rule | Summary of Material Terms[6] |
|---|---|
| | Orders.<br><br>(ii)    Use the proceeds of the Roll-Up Term Loans solely to repay the Loans (as defined in the Prepetition Term Loan Financing Agreement) held by the DIP Delayed Draw Term Lenders (or their Affiliates), in their capacities as Prepetition Term Secured Parties, in an amount equal to the amount of such proceeds, which shall reduce the amount of the Prepetition Obligations under the Prepetition Term Loan Financing Agreement on a dollar-for-dollar basis.<br><br>See DIP Credit Agreement. §7.01(v). |
| **Limitations on Use of DIP Facility and Cash Collateral** | Except as otherwise permitted in the Interim Order and the Approved Budget (including with respect to the Investigation Budget), or the DIP Credit Agreement, the DIP Collateral, the Prepetition Collateral, the Cash Collateral, and the Carve-Out may not be used in connection with: (a) preventing, hindering, or delaying the DIP Secured Parties or the Prepetition Secured Parties' enforcement or realization upon any of the DIP Collateral or Prepetition Collateral; (b) using or seeking to use Cash Collateral or selling or otherwise disposing of DIP Collateral outside the ordinary course of business without the prior written consent of the Required Lenders; (c) outside the ordinary course of business, using or seeking to use any insurance proceeds constituting DIP Collateral without the prior written consent of the Required Lenders; (d) incurring any indebtedness without the prior written consent of the Required Lenders; (e) seeking to amend or modify any of the rights granted to the DIP Secured Parties or the Prepetition Secured Parties under the Interim Order, the DIP Documents, or the Prepetition Loan Documents; (f) objecting to or challenging in any way the DIP Liens, the DIP Obligations, the Prepetition Liens, the Prepetition Obligations, the DIP Collateral (including Cash Collateral) or, as the case may be, Prepetition Collateral, or any other claims or liens, held by or on behalf of any of the DIP Secured Parties or the Prepetition Secured Parties, respectively; (g) asserting, commencing, or prosecuting any claims or causes of action whatsoever, including, without limitation, any actions under chapter 5 of the Bankruptcy Code, applicable state law equivalents, any so-called "lender liability" claims and causes of action or other actions to recover or disgorge payments against the DIP Secured Parties, the Prepetition Secured Parties, or any of their respective affiliates, successors and assigns and the partners, shareholders, controlling persons, directors, officers, employees, agents, attorneys, advisors, and professionals); (h) litigating, objecting to, challenging, contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the DIP Obligations, the DIP Liens, the Prepetition Liens, the Prepetition Obligations, or any other rights or interests of the DIP Secured Parties or the Prepetition Secured Parties; or (i) seeking to subordinate, recharacterize, disallow, or avoid the DIP Obligations or the Prepetition Obligations.<br><br>*See* Interim Order, ¶ 45; DIP Credit Agreement §7.01(v). |
| **Entities with Interests in Cash Collateral**<br><br>Bankruptcy Rule 4001(b)(l)(B)(i) | The Prepetition Term Secured Parties and the Prepetition ABL Secured Parties each have an interest in Cash Collateral.<br><br>*See* Interim Order, ¶ G(v). |

| Bankruptcy Rule | Summary of Material Terms[6] |
|---|---|
| **Fees**<br><br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Facility includes the following fees:<br><br>• **DIP Upfront Fee:** A one-time fee equal to 1.00% of the aggregate principal amount of the DIP Delayed Draw Term Commitment as of the Effective Date, fully earned and payable on the Interim Order Entry Date, deducted from the amount of the DIP Delayed Draw Term Loans funded on the Interim Order Entry Date and shared ratably by the DIP Lenders.<br><br>• **DIP Exit Fee:** A one-time fee equal to 3.00% of the aggregate principal amount of the DIP Delayed Draw Term Commitment as of the Effective Date, fully earned as of the Interim Order Entry Date, payable in full in cash on the earliest to occur of (i) the date on which the DIP Delayed Draw Term Loans are Paid in Full, (ii) the date of acceleration of the Obligations under the Loan Facilities and the termination of all Commitments hereunder upon the occurrence of an Event of Default in accordance with the Loan Documents and the DIP Orders and (iii) the Final Maturity Date.<br><br>• **DIP Agent Fee:** A one-time fee of $100,000 payable to the DIP Agent, fully earned as of the Interim Order Entry Date and deducted from the amount of the DIP Delayed Draw Term Loans funded on the Interim Order Entry Date.<br><br>*See* DIP Credit Agreement, §2.06. |
| **Budget**<br><br>Bankruptcy Rule 4001 (c)(1)(B) | The use of cash and proceeds from the DIP Facility is subject to the Approved Budget, the initial form of which is attached to the Interim Order as Exhibit C.<br><br>*See* Interim Order, ¶ 19 |
| **Reporting Information**<br><br>Bankruptcy Rule 4001(c)(l)(B) | The DIP Credit Agreement requires customary financial and other informational reporting by the Administrative Borrower to the DIP Agent.<br><br>*See* Interim Order, ¶ 20-22; DIP Credit Agreement, §7.01(a) |
| **Budget Variance Covenant**<br><br>Bankruptcy Rule 4001(c)(l)(B) | The Debtors are required to comply with the Approved Budget, subject to the following "Permitted Variances": on each Budget Variance Test Date while any DIP Delayed Draw Term Loans are outstanding, the DIP Loan Parties shall not permit (A) a Receipts Variance for any Budget Variance Test Period to have a negative variance in excess of 15% for the first two (2) Budget Variance Test Periods and 10% for any Budget Variance Test Period thereafter (with negative variance meaning, for the avoidance of doubt, that actual receipts are less than projected receipts) or (B) a Disbursements Variance for any Budget Variance Test Period to have a positive variance in excess of 15% for the first two (2) Budget Variance Test Periods and 10% for any Budget Variance Test Period thereafter (with positive variance meaning, for the avoidance of doubt, that actual disbursements are greater than the projected disbursements).<br><br>*See* Interim Order, ¶ 20; DIP Credit Agreement §7.02(v)(ii). |
| **Chapter 11 Milestones** | It shall be a Termination Event if the Debtors fail to adhere to any of the following milestones with respect to the refinance of the DIP Obligations and Prepetition |

| Bankruptcy Rule | Summary of Material Terms[6] |
|---|---|
| Bankruptcy Rule 4001(c)(1)(B) | Obligations and/or the sale of all or substantially all of their assets (collectively, the "Transaction Milestones"):<br><br>(a)    no later than May 20, 2024, the DIP Loan Parties shall have commenced the Chapter 11 Cases;<br><br>(b)    no later than May 20, 2024, the DIP Loan Parties shall have executed the Stalking Horse Acquisition Agreement;<br><br>(c)    no later than one (1) day after the Petition Date, the DIP Loan Parties shall file with the Bankruptcy Court the Sale Motion;<br><br>(d)    no later than two (2) Business Days after the Petition Date, the Bankruptcy Court shall have entered the Financing Order on an interim basis;<br><br>(e)    no later than 30 days after the Petition Date, the Bankruptcy Court shall have entered the Financing Order on a final basis;<br><br>(f)    no later than 30 days after the Petition Date, the Bankruptcy Court shall have entered the Bidding Procedures Order;<br><br>(g)    no later than 65 days after the Petition Date, the DIP Loan Parties shall have held an auction in connection with the Sale;<br><br>(h)    no later than 70 days after the Petition Date, the Bankruptcy Court shall have entered the Sale Order; and<br><br>(i)    no later than 75 days after the Petition Date, the Restructuring shall have been consummated in accordance with the Sale Order; provided, however, that if the Sale Order is entered within 70 days after the Petition Date, such deadline shall be extended to 90 days after the Petition Date solely for the purpose of obtaining the regulatory approvals necessary to consummate the Restructuring.<br><br>*See* DIP Credit Agreement, Annex D. |
| **Liens and Priorities**<br><br>Bankruptcy Rule 4001(c)(l)(B)(i) | The DIP Liens securing the DIP Obligations are valid, automatically perfected, non-avoidable, senior in priority to the Prepetition Liens on the Prepetition Collateral and are superior to any security, mortgage, collateral interest, lien, or claim to any of the DIP Collateral (whether currently existing or hereafter created), except that the DIP Liens shall be subject only to (i) the Carve-Out, (ii) the Administration Charge against the Canadian Collateral, and (iii) the Prepetition Permitted Liens. Other than as set forth herein, in the DIP Orders or in the DIP Documents, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Cases, and shall be valid and enforceable against any trustee appointed in the Chapter 11 Cases or any Successor Cases, upon the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or upon the dismissal of any of the Chapter 11 Cases or Successor Cases. The DIP Liens shall not be subject to section 510, 549, or 550 of the Bankruptcy Code. No lien or interest avoided and preserved for the benefit of any Estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the DIP Liens. |

13024039-1

| Bankruptcy Rule | Summary of Material Terms[6] |
|---|---|
| | *See* Interim Order, ¶ 6. |
| **Carve Out**<br><br>Bankruptcy Rule 4001(c)(1)(B), Guidelines §II(B)(6) | The Interim Order provides a "Carve Out" of certain statutory fees and allowed professional fees of the Debtors and any official committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 328 or 1103 of the Bankruptcy Code.<br><br>*See* Interim Order, ¶ 38. |
| **Challenge Period**<br><br>Bankruptcy Rule 4001(c)(l)(B) | The Interim Order provides for a challenge period as follows: for all parties in interest, including the Committee, except to the extent such party in interest first obtains standing (including any chapter 11 trustee or if the Chapter 11 Cases are converted to cases under chapter 7 prior to the expiration of the Challenge Period (as defined below), the chapter 7 trustee in such Successor Case), the earlier of (x) sixty (60) calendar days after the Petition Date and (y) the date established by the Court for the submission of Qualified Bids (as defined in the 363 Sale Motion) to purchase the Debtors' assets (such time period established by the earlier of clauses (x) and (y) shall be referred to as the "Challenge Period"); *provided*, that the Challenge Period may be extended with respect to a particular party with the written consent of the Prepetition Term Loan Agent.<br><br>*See* Interim Order, ¶ 46. |
| **Adequate Protection**<br><br>Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii) | Subject to the challenge rights set forth in the Interim Order and pursuant to sections 361, 363(e), 364(d) and 507 of the Bankruptcy Code, the Prepetition Term Secured Parties are entitled to adequate protection of their respective interests in all Prepetition Collateral against any Diminution of such respective interests in the Prepetition Collateral:<br><br>*Adequate Protection Liens*: As adequate protection for any Diminution of the Prepetition Term Secured Parties' interest in the Prepetition Collateral resulting from the subordination of the Prepetition Liens to the DIP Liens, the Administration Charge against the Canadian Collateral, and the Carve-Out, the Prepetition Term Loan Agent shall receive, for the benefit of the Prepetition Term Secured Parties, continuing valid, binding, enforceable, and perfected postpetition liens and replacement liens pursuant to sections 361, 363(e), and 364(d)(l) of the Bankruptcy Code on the DIP Collateral, which shall be subject only to the Carve-Out, the DIP Liens, and Prepetition Permitted Liens (the "<u>Replacement Liens</u>") and which (x) shall otherwise be senior to all other security interests in, liens on, or claims against the DIP Collateral, and (y) shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Cases, shall be valid and enforceable against any trustee appointed in any of the Chapter 11 Cases or any Successor Cases, and shall not be subject to sections 510, 549, or 550 of the Bankruptcy Code.<br><br>*Adequate Protection Superpriority Claims*: As further adequate protection of the interests of: the Prepetition Term Secured Parties in the Prepetition Collateral against any Diminution of such interests in the Prepetition Collateral, the Prepetition Term Loan Agent, on behalf of itself and the other Prepetition Term Secured Parties, is to be granted, as and to the extent provided by section 507(b) of the Bankruptcy Code, administrative superpriority expense claims in each of the Chapter 11 Cases (the "<u>Adequate Protection Superpriority Claims</u>"), subject only to the Carve-Out, the Administration Charge against the Canadian Collateral, and the DIP Obligations (including the DIP Superpriority Claims), pursuant to section 507(b) with priority over |

| Bankruptcy Rule | Summary of Material Terms[6] |
|---|---|
| | any and all other administrative expenses, administrative expense claims and unsecured claims against the Debtors or their Estates, now existing or hereafter arising, of any kind or nature whatsoever as to and to the extent provided by sections 503(b) and 507(b) of the Bankruptcy Code.<br><br>***Adequate Protection Payments and Other Consideration***: As additional adequate protection to the Prepetition Term Secured Parties, the Debtors are authorized to:<br><br>(i)  make monthly payments of the Prepetition Term Loan Secured Parties' reasonable and documented out-of-pocket fees and expenses including the professional fees of Proskauer Rose LLP, Trenam, Kemker, Scharf, Barkin, Frye, O'Neill and Mullis, P.A., Deloitte Transactions & Business Analytics LLP, and any other Prepetition Professionals (in each case, without the need for the filing of formal fee applications, including as to any amounts arising before or after the Petition Date); and<br><br>(ii)  make monthly payment in kind of interest to the Prepetition Term Loan Lenders under the Prepetition Credit Agreement, calculated at the "Default Rate" as defined in the Prepetition Credit Agreement to the extent allowed under section 506(b) of the Bankruptcy Code; and<br><br>(iii) provide the Prepetition Term Loan Secured Parties with the right to credit bid the Prepetition Obligations in connection with any sale of Prepetition Collateral, including, without limitation, as set forth in the Interim Order;<br><br>*See* Interim Order, ¶ 14. |
| **Events of Default**<br><br>Bankruptcy Rule 4001(c)(1)(B) | The DIP Credit Agreement and Interim Order contain events of default that are usual and customary for debtor-in-possession financings and the use of cash collateral, including without limitation, failure to satisfy the Transaction Milestones.<br><br>*See* Interim Order, ¶ 31; DIP Credit Agreement, Art. IX. |
| **Remedies Notice Period** | Upon the occurrence and during the continuation of an Event of Default, notwithstanding the provisions of Bankruptcy Code section 362, without any application, motion or notice to, hearing before, or order from the Court, other than, subject to the terms of the Interim Order: (a) the DIP Agent (at the direction of the applicable Required Lenders, or as otherwise provided in the DIP Documents) may send a written notice to the Debtors, counsel to the Committee, the Prepetition ABL Agent, and the U.S. Trustee (any such declaration shall be referred to herein as a "Termination Declaration"), which shall be filed on the docket of the Chapter 11 Cases, declaring (1) all DIP Obligations owing under the DIP Documents to be immediately due and payable, (2) the commitment of each DIP Lender to make DIP Term Loans to be terminated, whereupon such commitments and obligation shall be terminated to the extent any such commitment remains under the DIP Facilities, (3) the termination of the DIP Facilities and the DIP Documents as to any future liability or obligation of the DIP Lenders or DIP Agent, but without affecting any of the DIP Liens or the DIP Obligations, and (4) the application of the Carve-Out has occurred following the delivery of the Carve Out Trigger Notice (as defined below) to the Borrower; (b) interest, including, where applicable, default interest, shall accrue and be paid as set forth in the DIP Documents; and (c) upon delivery of the Termination Declaration, the DIP Agent (at the direction of the Required Lenders) shall be deemed to have declared |

| Bankruptcy Rule | Summary of Material Terms[6] |
| --- | --- |
| | a termination, reduction, or restriction on the ability of the Debtors to use Cash Collateral, other than to pay expenses set forth in the Approved Budget that are necessary to avoid immediate and irreparable harm to the Debtors' estates. The earliest date on which a Termination Declaration is delivered by the DIP Agent (at the direction of the Required Lenders) and filed on the Docket shall be referred to herein as the "Termination Date." Following a Termination Date, neither the DIP Lenders or DIP Agent nor the Prepetition Secured Parties shall be required to consent to the use of any Cash Collateral or provide any loans or other financial accommodations under the DIP Facility, absent further order of the Court. The Termination Declaration shall be given by electronic mail (or other electronic means) to counsel to the Debtors, counsel to the Committee, and the U.S. Trustee.<br><br>Upon the delivery of a Termination Declaration, the Debtors, the Committee, if any, the DIP Lenders, the DIP Agent, and the Prepetition Secured Parties consent to a hearing on an expedited basis solely to consider whether an Event of Default has occurred and is continuing. During the five (5) calendar days following the date a Termination Declaration is delivered (such five (5) calendar day period, the "Remedies Notice Period"), the Debtors shall continue to have the right to use Cash Collateral in accordance with the terms of the Interim Order, solely to pay necessary expenses set forth in the Approved Budget to avoid immediate and irreparable harm to the Estates. At the end of the Remedies Notice Period, unless the Court has entered an order to the contrary, the Debtors' right to use Cash Collateral shall immediately cease, unless otherwise provided herein and the DIP Agent and DIP Lenders shall have the rights set forth immediately below.<br><br>*See* Interim Order, ¶¶ 33, 35. |
| **Waiver/Modification of Applicability of Nonbankruptcy Law Relating to Perfection or Enforceability of Liens**<br><br>Bankruptcy Rule 4001(c)(1)(B)(vii) | The Interim Order provides for a customary waiver/modification of applicability of nonbankruptcy law to the perfection or enforcement of liens.<br><br>*See* Interim Order, ¶ 24. |
| **Indemnification**<br><br>Bankruptcy Rule 4001(c)(1)(B)(ix) | The Debtors shall indemnify and hold harmless the DIP Secured Parties in accordance with the terms and conditions of the DIP Credit Agreement.<br><br>*See* Interim Order, ¶ 42. |
| **Limitations of Rights of Parties Under Section 506(c) of the Bankruptcy Code** | Subject to entry of a Final Order and the provisions of the Carve-Out and as a further condition of the DIP Facility and any obligation of the DIP Secured Parties to make credit extensions pursuant to the DIP Documents (and the prior written consent of the DIP Secured Parties to the payment of the Carve-Out to the extent provided in the Interim Order and the prior written consent of the Prepetition Term Secured Parties of the priming of the Prepetition Liens by the DIP Facility and the use of Cash Collateral) (a) no costs or expenses of administration of the Chapter 11 Cases or any Successor Cases shall be charged against or recovered from or against any or all of the DIP Secured Parties or the Prepetition Term Secured Parties with respect to the DIP Collateral or the Prepetition Collateral, in each case pursuant to section 105 or section |

| Bankruptcy Rule | Summary of Material Terms[6] |
|---|---|
| | 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the DIP Secured Parties or the Prepetition Term Secured Parties, as applicable and (b) no such consent shall be implied from any other action, inaction, or acquiescence of any or all of the DIP Secured Parties or the Prepetition Term Secured Parties. *See* Interim Order, ¶ 49. |
| **Granting of Lien on Claims/Causes of Action** | Subject to entry of the Final Order, the DIP Liens shall attach to and encumber the proceeds of any avoidance actions brought pursuant to Chapter 5 of the Bankruptcy Code or applicable state law equivalents. *See* Interim Order, ¶ 5. |
| **Granting of DIP Lien on Unencumbered Real Property** | The DIP Collateral includes a DIP Lien on unencumbered real property owned by Prepetition Loan Party Red Lobster Canada, Inc. located at 67 King George Road, Brantford, Ontario, N3R 5K2 |

## **Jurisdiction and Venue**

3.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334(b). This is a core proceeding pursuant to 28 U.S.C. § 157(b).

4.      Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

5.      The Debtors consent to the entry of a final order on this Motion if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

6.      The statutory and other bases for the relief sought in this Motion are sections 105, 361, 362, 363, 364, 503 and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (as amended, the "Bankruptcy Code"), rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules"), and rule 2081-1(g)(1)-(2) of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Middle District of Florida (as amended, the "Local Rules").

## **Background**

7.      On May 19, 2024 (the "<u>Petition Date</u>"), each of the Debtors commenced a Chapter 11 Case by filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code (the "<u>Chapter 11 Cases</u>").

8.      The Debtors continue to operate their businesses and manage their affairs as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

9.      For a detailed description of the Debtors, the circumstances leading to the commencement of these Chapter 11 Cases and information regarding the Debtors' businesses and capital structure, the Debtors respectfully refer the Court and all parties-in-interest to the First Day Declaration.

## **The Debtors' Prepetition Capital Structure**

### **Prepetition Term Loan Credit Facility**

10.     On January 22, 2021, Debtor Red Lobster Management LLC ("<u>Management</u>"), Fortress Credit Corp., as administrative agent (the "<u>Prepetition Term Loan Agent</u>"), certain other lenders thereto (the "<u>Prepetition Term Loan Lenders</u>" and together with the Prepetition Term Loan Agent, the "<u>Prepetition Term Secured Parties</u>"), and in their capacity as guarantors, each of the other co-Debtors (other than Red Lobster International Holdings LLC ("<u>International</u>"), and non-Debtor Red Lobster Intermediate Holdings LLC ("<u>Holdings</u>" and together with the Debtors, the "<u>Prepetition Loan Parties</u>"),[8] entered into that certain Financing Agreement (as amended by that certain Amendment No. 1 to Financing Agreement, dated as of September 22, 2022, as further amended by that certain Amendment No. 2 to Financing Agreement, dated as of February 29, 2024, as further amended by that certain Amendment No. 3 to Financing Agreement, dated as of

---

[8] Holdings is the direct parent of Management. Upon information and belief, Holdings does not own any material assets other than the membership interests of Management.

13024039-1

March 29, 2024, and as further restated, amended and restated, supplemented or otherwise modified from time to time, the "Prepetition Term Loan Financing Agreement"), which allowed the Debtors to refinance existing indebtedness and use for general working capital purposes (the "Prepetition Term Loan"). The Debtors' obligations under the Prepetition Term Loan Financing Agreement mature on January 22, 2026. *See* First Day Declaration ¶ 31.

11.    As of the Petition Date, the Prepetition Term Secured Parties are owed $264,722,258.55 (inclusive of accrued unpaid interest of $8,293,894.06) on account of the Prepetition Term Loan (collectively, with any other reimbursement obligations (contingent or otherwise) in respect of any other fees, expenses and disbursements (including, without limitation, attorneys' fees, accountants' fees, appraisers' fees and financial advisors' fees, and related expenses and disbursements), indemnification obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Prepetition Loan Parties' obligations pursuant to the Prepetition Term Loan Financing Agreement, including all "Obligations" as defined in the Prepetition Term Loan Financing Agreement, the "Prepetition Obligations"). *See* First Day Declaration ¶¶ 30-31.

12.    The Prepetition Term Loan Financing Agreement has been amended three times between 2021 and the Petition Date. The second amendment, executed February 29, 2024, allowed the Prepetition Loan Parties to receive an incremental term loan of $20,000,000 with terms identical to the existing Prepetition Term Loan. *See id.*  The proceeds of such incremental term loan were used for general corporate purposes, including to bolster working capital.

13.    The outstanding obligations under the Prepetition Term Loan Financing Agreement are secured in accordance with the terms of the Pledge and Security Agreement, dated as of January 22, 2021 (as amended, supplemented, or modified from time to time, the "Term Loan Security

13024039-1

Agreement"), and the other security documents specified in the Prepetition Term Loan Financing Agreement, pursuant to which the Prepetition Term Secured Parties are secured by first priority liens on "Term Priority Collateral" and second priority liens on "ABL Priority Collateral" (each as defined in the Intercreditor Agreement, defined and described below). *See id.* at ¶ 32.

14.     The Term Priority Collateral and ABL Priority Collateral do not include the real property located at 67 King George Road, Brantford, Ontario N3R 5K2 owned by Prepetition Loan Party Red Lobster Canada Inc., which is currently not subject to a mortgage in favor of the Prepetition Secured Parties and is unencumbered.  As set forth herein and in the DIP Orders, the DIP Collateral includes a lien on such property.

**ABL Credit Facility**

15.     As of the Petition Date, the Debtors have an ABL credit facility (the "Prepetition ABL") in place with an aggregate commitment of $100 million, including a $40 million sublimit for letters of credit (the "Letters of Credit"; and the obligations under the Prepetition ABL in respect thereof, the "Letters of Credit Obligations" ), under that certain Credit Agreement, dated as of January 22, 2021 (as amended on June 8, 2023, and as may be further amended, restated, supplemented or otherwise modified from time to time, the "Prepetition ABL Credit Agreement"), by and among Holdings, Management, (collectively, the "Prepetition ABL Borrowers"), each of the other Debtors (other than International) as a guarantors (each, a "Prepetition ABL Guarantor" and, collectively, the "Prepetition ABL Guarantors"), the lenders from time to time party thereto (each a "Prepetition ABL Lender" and, collectively, the "Prepetition ABL Lenders"), and Wells Fargo Bank, National Association, as administrative agent for the Prepetition ABL Secured Parties (the "Prepetition ABL Agent" and together with the Prepetition ABL Lenders, the "Prepetition ABL Secured Parties"; and together with the Prepetition Term Secured Parties, the "Prepetition Secured Parties"). The Prepetition ABL remains undrawn, and the Revolver Commitment

thereunder has been reduced to $0. The Debtors' obligations under the ABL Credit Agreement mature on January 22, 2026. As of the Petition Date, there are $29,276,399 in issued and outstanding Letters of Credit. *Id.* at ¶ 33. A list of the Letters of Credit is set forth on Schedule 1 of the Payoff Letter.

16. Debtor Red Lobster Management LLC ("RLM") entered into that certain WellsOne Commercial Card Agreement, dated on or around August 8, 2017 (as amended, restated, or otherwise modified from time to time, the "Card Agreement") with Wells Fargo Bank, National Association, pursuant to which Wells Fargo issued to RLM credit cards (including commercial cards (including so-called "purchase cards", "procurement cards" or "p-cards")) and provided other treasury management services, which contain a total credit limit of $1.0 million. The Card Agreement was entered into in connection with the ABL as a Bank Product, and the obligations under the Card Agreement of RLM to Wells Fargo, in its capacity as a "Bank Product Provider," are "Bank Product Obligations" under the ABL.

17. The outstanding obligations under the Prepetition ABL Credit Agreement are secured in accordance with the terms of the Guaranty and Security Agreement, dated as of January 22, 2021 (as amended, supplemented, or modified from time to time, the "ABL Security Agreement"), and the other security documents specified in the Prepetition ABL Credit Agreement, pursuant to which the Prepetition ABL Secured Parties are secured by first priority liens on "ABL Priority Collateral" and second priority liens on "Term Priority Collateral" (each as defined in the Intercreditor Agreement).

**Intercreditor Agreement**

18. The relative payment and lien priorities among the Prepetition ABL Secured Parties, on one hand, and the Prepetition Term Secured Parties, on the other, is governed by that certain Intercreditor Agreement (the "Intercreditor Agreement"), dated as of January 22, 2021, by

13024039-1

and among the Prepetition ABL Agent and the Prepetition Term Agent.  Among other things, the Intercreditor Agreement provides that (i) the Prepetition ABL Agent (for the benefit of the Prepetition ABL Lenders) has a first priority lien on "ABL Priority Collateral" as such term is defined in the Intercreditor Agreement; and (ii) the Prepetition Term Agent (for the benefit of the Prepetition Term Lenders) has a first priority lien on "Term Priority Collateral" as such term is defined in the Intercreditor Agreement.  The Prepetition Term Agent and Prepetition ABL Agent also have second priority liens on "ABL Priority Collateral" and the "Term Priority Collateral," respectively.

### Unsecured Debt

19.     The Debtors have no funded unsecured debt. In the ordinary course, the Debtors incur trade debt with certain vendors and suppliers in connection with the operation of their business.

### Forbearance Agreements

20.     The Prepetition Loan Parties' fiscal year runs from the calendar period beginning in June until the following May.  Pursuant to both the Prepetition Term Loan Financing Agreement and the ABL Credit Agreement, the Prepetition Loan Parties were required to provide an unqualified auditor's opinion with respect to the annual financial statements of the Prepetition Loan Parties. The Prepetition Loan Parties were unable to deliver an unqualified auditor's opinion regarding the Prepetition Loan Parties financial statements for the end of the 2023 fiscal year ending May 28, 2023. As a result, Events of Default were outstanding both the Prepetition Term Loan Financing Agreement and the ABL Credit Agreement.

21.     On September 26, 2023, the Prepetition Loan Parties entered into respective forbearance agreements with both the Prepetition Term Loan Lenders and the Prepetition ABL Lenders. In exchange for certain concessions from the Prepetition Loan Parties, including

temporary restrictions on new extensions of indebtedness, the Prepetition Lenders agreed to forbear from exercising remedies until October 26, 2023. On October 26, 2023, the Prepetition Term Loan Agent, on behalf of the Prepetition Term Loan Lenders issued a notice of default, identifying an additional notice of default after the Prepetition Term Loan Parties breached the minimum liquidity covenant required under the Prepetition Term Loan Financing Agreement.

22.     Following the end of the earlier forbearance period, additional events of default had occurred under both the Prepetition Term Loan Financing Agreement and the ABL Credit Agreement. On February 29, 2024, the Prepetition Loan Parties entered into new forbearance agreements with the both the Prepetition Term Secured Parties and the Prepetition ABL Secured Parties. As part of the forbearance agreements, both the Prepetition Term Secured Parties and the Prepetition ABL Secured Parties each agreed to forbear under their respective agreements until May 29, 2024.

23.     Under the terms of the ABL Guaranty Security Agreement, the ABL Agent is entitled to sweep cash contained in the blocked deposit account and apply such cash to satisfy the obligations during the "Cash Dominion Period" as a result of the outstanding Events of Default. The ABL Forbearance Agreement provided that the Debtors shall not be required to cash collateralize the outstanding Letters of Credit Obligations at any time in an amount greater than the result of (a) 103% of the then-existing outstanding letter of credit exposure minus (b) the aggregate amount of cash and cash equivalents held in the blocked deposit account.  In connection with the ABL Forbearance Agreement, the Debtors were required to deposit $10,000,000 in cash into a blocked deposit account subject to a control agreement in favor of the ABL Agent.  As per the terms of the February 29, 2024 Forbearance Agreement with the Prepetition ABL Secured Parties, the Debtors were required to increase the cash held in the blocked deposit account by an additional $3,000,000 in cash. Prior to the Petition Date, at the request of the Prepetition ABL

Agent, the Debtors agreed to increase the cash held in the blocked deposit account by an additional $3,000,000. Prior to the Petition Date, $16,021,091.79 previously held in the blocked deposit account was swept into a separate account of the Prepetition ABL Agent to cash collateralize the Letters of Credit Obligations (as further described below in the summary of the Payoff Letter).

**<u>Summary of Payoff Letter and Proposed Payoff Transactions</u>**

24.     In connection with negotiations among the Prepetition Secured Parties and Debtors with respect to consensual use of Cash Collateral and the proposed DIP financing, on May 17, 2024, the Debtors and the Prepetition ABL Secured Parties entered into the Payoff Letter. The Payoff Letter provides that in connection with the Debtors' commencement of these Chapter 11 Cases and entry into the proposed DIP Facility, the Debtors will use Cash Collateral and the Delayed Draw DIP Term Loans available upon entry of the Interim Order to make the following payments to the Prepetition ABL Agent:

- A payment in the amount of $250,000 to the Prepetition ABL Agent to satisfy fees, costs and expenses in connection with the Payoff Transactions and customary contingent obligations under the Prepetition ABL Documents that survive the discharge and termination of the Prepetition ABL Credit Agreement in accordance with the terms thereof and the Payoff Letter;

- A payment in the amount of $14,133,599,18 to cash collateralize the Letters of Credit Obligations to the be held by the Prepetition ABL Agent for the benefit of the Prepetition ABL Lenders (such funds, together with existing letter of credit cash collateral held by Prepetition ABL Agent in the amount of $16,021,091.79, the "<u>Letter of Credit Cash Collateral</u>"), (which amount is equal to 103% of the Letter of Credit Usage (as defined in the Prepetition ABL Credit Agreement) outstanding as of the date of the Payoff Letter), to a designated deposit account of the Prepetition ABL Agent set up to hold such Letter of Credit Cash Collateral; and

- A payment in the amount of $1,100,000 to cash collateralize the Bank Product Obligations to be held by the Prepetition ABL Agent for the benefit of the Prepetition ABL Lenders (such funds, the "Bank Product Cash Collateral") in a designated deposit account of the Prepetition ABL Agent set up to hold such Bank Product Cash Collateral.

25.     The Payoff Letter (and the payoff amounts set forth therein) assumes that the Payoff Transactions will occur by May 24, 2024, 2:00 pm (pacific time). If the Payoff Transactions do

13024039-1

not occur by such time, the Payoff Letter will automatically terminate and will have no further force or effect.   Upon consummation of the Payoff Transactions, the liens in favor of the ABL Agent will be released other than with respect to secure the specified obligations set forth in the Payoff Letter (i.e., the Surviving Obligations, the Letter of Credit Obligations and the Bank Product Obligations).

**<u>Summary of Amounts and Types of Cash Collateral</u>**

26.     As of the Petition Date, the Debtors hold approximately $14.7 million cash held in bank accounts subject to a control agreement in favor of the Prepetition Secured Parties and constitutes Cash Collateral.  A summary of such bank accounts and the amount of Cash Collateral held therein is set forth below pursuant to Local Rule 2081-1(g)(1)(A)(ii).

| Bank | Acct. No. | Cash Balance as of Petition Date |
|---|---|---|
| Wells Fargo | 1036 | $523,139.10 |
| Wells Fargo | 1028 | $426,509.86 |
| Wells Fargo | 1044 | $655,997.17 |
| Wells Fargo | 6978 | $6,659,218.76 |
| Wells Fargo | 6434 | $3,539,170.84 |
| Wells Fargo | 0823 | $367,742.88 |
| Wells Fargo | 6161 | $12,619.23 |
| US Bank | 2573 | $462,971.20 |
| US Bank | 2623 | $1,263,295.61 |
| Fifth Third Bank | 6782 | $362,641.09 |
| Fifth Third Bank | 6725 | $357,234.58 |

**The Debtors' Need for**
**<u>DIP Financing and Cash Collateral</u>**

27.     The Debtors require immediate access to the DIP Facility in addition to continued

13024039-1

use of the Cash Collateral in order to satisfy near-term and long-term expenses critical to the business and their chapter 11 efforts, which, in turn, will preserve and maximize the Debtors' enterprise value. The Debtors are unable to generate sufficient levels of operating cash flow in the ordinary course of business to cover their operating and capital costs and the projected costs of these Chapter 11 Cases absent immediate funding. *See* Haughey Declaration at ¶¶ 16-17.

28.     The Debtors require the funding available from the DIP Facility in order to, among other things, fund working capital, meet payroll obligations, pay suppliers, cover overhead costs, and make other essential payments for the continued management, operation, and preservation of the Debtors' business.  As set forth below, and as further described in the Haughey Declaration at ¶¶ 18-19, funding from the DIP Facility will also cash collateralize the Letters of Credit Obligations and Bank Product Obligations, which will allow the Debtors to use Cash Collateral to fund these Chapter 11 Cases and operations. The ability to make these payments when due is essential to the continued operation of the Debtors' business during the pendency of these Chapter 11 Cases. If the Debtors cannot quickly access the DIP Facility, based on the Debtors' financial forecasts and the Approved Budget, the Debtors will not be able to operate their business in the ordinary course until the hearing on the Final Order. This would negatively impact the Debtors' revenue, jeopardize the Debtors' stakeholders' confidence in the Debtors' business, and harm the value of the Debtors' estates to the detriment of all stakeholders. Based on the Debtors' financial forecasts and the Approved Budget, the liquidity provided by the DIP Facility should allow the Debtors to implement their business plan while they focus on a value maximizing sale process. *See id.* at ¶ 18.

29.     Therefore, absent immediate access to the DIP Facility and Cash Collateral, the Debtors could (a) face a severe interruption of their businesses; (b) lose the support of key constituencies, including the Debtors' workforce, key marketing partners, and customers; and (c)

13024039-1

be forced to significantly modify, or shut down entirely, their operations. To avoid those outcomes, it is imperative that the Debtors have access to the DIP Facility from the outset of these cases in order to signal to the Debtors' stakeholders, including their employees, marketing partners, vendors, and customers, that despite the filing the outlook for the Debtors and their stakeholders is strong, and that they have the liquidity necessary to meet their obligations in the ordinary course until the business is able to emerge from the chapter 11 process. *Id.*

30.     The Debtors require the essential infusion of liquidity that the DIP Facility provides in order to stabilize the Debtors' operations and pursue a transaction that will maximize value for all stakeholders. Absent funds available from the DIP Facility, access to Cash Collateral, and the cooperation of key business partners at this critical early stage, the Debtors would face a value-destructive interruption to their business and, simultaneously, eliminate their best chance for consummating an orderly sale process, to the detriment of the Debtors, their estates, and their creditors. For all these reasons, access to the proposed DIP Facility is a necessity. *Id.*

### The RSA and the Debtors' Efforts to Secure Postpetition Financing

31.     Prior to the commencement of these Chapter 11 Cases, the Debtors and their professionals and the Prepetition Term Secured Parties engaged in extensive discussions to structure and achieve consensus on a comprehensive restructuring transaction while ensuring the Debtors maintained liquidity to operate their businesses in the ordinary course. *See* First Day Declaration, ¶¶ 66-70. These efforts resulted in the Debtors and the Prepetition Term Secured Parties entering into the Restructuring Support Agreement on May 9, 2024 (the "RSA", as described more fully in, and attached to, the First Day Declaration). *See* First Day Declaration, ¶ 71-76; Haughey Declaration, ¶¶ 13-15.

32.     As part of the negotiation of the RSA and the transactions contemplated therein,

24

the Prepetition Term Secured Parties agreed to provide postpetition financing to the Debtors in the form of the DIP Facility while also agreeing to permit the Debtors to explore potentially better postpetition financing opportunities from other parties. *See* Stratton Declaration, ¶¶ 10-12. The Prepetition Term Secured Parties, however, did inform the Debtors that they would not consent to the priming of their liens by any third-party financing source. *See* First Day Declaration, ¶ 68. Given the Debtors' prepetition capital structure, including both senior and junior security interests in substantially all of the Debtors' collateral, the Debtors did not believe that a priming fight would be advisable under the circumstances. *Id.*; *see also* Stratton Declaration at ¶ 11.

33.     Accordingly, in March 2024, the Debtors' investment banker, Hilco Corporate Finance LLC ("HCF"), began the process of soliciting interest from third-party financing sources. *See* Stratton Declaration, ¶ 11. Specifically, HCF contacted 14 potential financing candidates, which included various institutions that routinely provide debtor-in-possession financing, including well-known commercial banks and specialty lenders. *See* Stratton Declaration, ¶ 12.

34.     Notwithstanding these efforts, no third party provided a term sheet or indication of interest, whether on a priming or non-priming basis. *See id.* Accordingly, the Debtors, with the assistance of their advisors, concluded that their best path to financing these Chapter 11 Cases was through the DIP Facility as contemplated by the RSA. *See id.* Over the course of the last few weeks, the Debtors and their advisors engaged in various good faith, arm's length negotiations with the Prepetition Term Secured Parties concerning the economics, milestones, covenants, and other provisions typical in debtor-in-possession financings and ultimately reached agreement on the terms set forth in the DIP Facility, including the structure and amount of the roll up of prepetition debt. *See* First Day Declaration, ¶¶ 71-76.

35.     Given these challenges and the anticipated funding needs of the Debtors during the Chapter 11 Cases, the Debtors believe that proceeding with the DIP Facility is the most efficient

13024039-1

and cost-efficient way to proceed and the best way in which to maximize value for all parties in interest.

<div align="center">**Basis for Relief Requested**</div>

**A.     The Debtors Should be Authorized to Obtain Postpetition Financing Through the DIP Documents**

**(i)     Standards for Approval Under Sections 364(c) and 364(d)(1) of the Bankruptcy Code**

36.     Section 364(c) of the Bankruptcy Code requires a finding, made after notice and a hearing, that a debtor seeking postpetition financing on a secured basis cannot "obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code] as an administrative expense." 11 U.S.C. § 364(c).

37.     In addition, under section 364(d)(1) of the Bankruptcy Code, courts may, after notice and a hearing, authorize a debtor to obtain postpetition credit secured by a "priming" lien from affected secured parties if (i) the debtor obtains the consent of such parties or (ii) the debtor cannot obtain credit elsewhere and the interests of existing lienholders are adequately protected. 11 U.S.C. § 364(d)(1). Specifically, section 364(d)(1) provides, in relevant part, that a court may, after notice and a hearing:

> authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if –
>
> (A)     the [debtor] is unable to obtain credit otherwise; and
>
> (B)     there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

38.     In evaluating proposed postpetition financing under sections 364(c) and 364(d)(1) of the Bankruptcy Code, courts perform a qualitative analysis and generally consider factors

<div align="center">26</div>

including whether:

  (a)  unencumbered credit or alternative financing without superpriority status is available to the debtor;

  (b)  the credit transactions are necessary to preserve assets of the estate;

  (c)  the terms of the credit agreement are fair, reasonable, and adequate;

  (d)  the proposed financing agreement was negotiated in good faith and at arm's-length and entry thereto is an exercise of sound and reasonable business judgment and in the best interest of the debtors' estate and their creditors; and

  (e)  the proposed financing agreement adequately protects prepetition secured creditors.

*See, e.g., In re Aqua Assoc.*, 123 B.R. 192 (Bankr. E.D. Pa. 1991) (applying the first three factors in making a determination under section 364(c)); *In re Crouse Group, Inc.*, 71 B.R. 544 (Bankr. E.D. Pa. 1987) (same); *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003) (applying all factors in making a determination under section 364(d)).

39.  For the reasons discussed below, the Debtors satisfy the standards required to access postpetition financing on a superpriority claim and priming lien basis under sections 364(c) and 364(d) of the Bankruptcy Code.

  **(ii)**  **The Terms of the DIP Facility are the Best Available Under the Circumstances, and DIP Financing on a Junior Secured or Unsecured Basis is Not Available**

40.  In demonstrating that credit was not available without the protections afforded by section 364(c) or 364(d) of the Bankruptcy Code, a debtor need only make a good faith effort. *See, e.g., In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) (approving financing facility and holding that debtor made reasonable efforts to satisfy the standards of section 364(c) to obtain less onerous terms where debtor approached four lending institutions, was rejected by two and selected the least onerous financing option from the remaining two lenders); *see also In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) ("[t]he statute imposes no duty to seek

credit from every possible lender before concluding that such credit is unavailable"); *In re Phoenix Steel Corp.*, 39 B.R. 218, 222 (D. Del. 1984) (holding the debtor satisfied its burden to show an inability to obtain credit on other terms through its time and effort spent trying to obtain credit on alternative terms and conditions); *In re Reading Tube Indus.,* 72 B.R. 329, 332 (Bankr. E.D. Pa 1987).

41.     Moreover, where few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom., Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met).

42.     The Debtors conducted a robust marketing process that confirmed the only actionable financing option was the DIP Facility. Following hard-fought, arm's-length negotiations with the Prepetition Term Secured Parties and a thorough marketing process, the Debtors determined that under the circumstances, the DIP Facility is fair, reasonable, and appropriate, meets the Debtors' business and financing needs for these Chapter 11 Cases, provides the most cost-effective and beneficial financing to the Debtors, and is the only reasonable option available to finance the chapter 11 process (in light of the fact that the Debtors received no other proposals for debtor-in-possession financing, including on a junior or unsecured basis) and allow the Debtors to pursue their restructuring goals and maximize the value of their estates.

**(iii)    The DIP Facility is Necessary to Preserve the Value of the Debtors' Estates**

43.     As debtors in possession, the Debtors have a fiduciary duty to protect and maximize

13024039-1

their estates' assets. *See In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004). The DIP Facility, if approved, will provide working capital critical to fund the Debtors' day-to-day operations and administration of the Chapter 11 Cases while the Debtors attempt to maximize the value of their estates through a sale process.

44.     The Debtors' preexisting cash balances and cash generated from operations are not sufficient to fund business operations and the administration of these Chapter 11 Cases. A significant cash infusion is a critical necessity to the continued operation of the Debtors' businesses, the preservation of going concern value, and the maintenance of the Debtors' valuable business relationships. The Debtors' ability to maintain business relationships with their vendors, suppliers, operators, and managers, to make capital expenditures and to satisfy other working capital and operational needs and otherwise finance their operations is essential to the continued viability of the Debtors' business.

45.     In short, the ability of the Debtors to sustain their operations and  to sell their business intact as a going-concern (a sale that will maximum the value of the Debtors' estates for the benefit of their stakeholders) is dependent upon obtaining adequate postpetition financing immediately and, absent the relief sought in the Interim Order, the Debtors and their estates will be immediately and irreparably harmed. Further, if the Debtors do not receive the funds available pursuant to the DIP Facility and access to Cash Collateral, it will destroy the possibility of conducting a robust marketing process that would benefit the Debtors and all parties in interest in these Chapter 11 Cases. Accordingly, the DIP Facility is necessary to preserve the Debtors' estates.

**(iv)     The Terms of the DIP Facility are Fair, Reasonable and Appropriate Under the Circumstances**

46.     In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the proposed

lender. *In re L.A. Dodgers LLC*, 457 B.R. 308, 312 (Bankr. D. Del. 2011) (stating that approval of the DIP facility transaction requires terms that are "fair, reasonable and adequate, given the circumstances of the debtor-borrower and the proposed lender"); *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.)*, 65 B.R. 358, 365 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds). The appropriateness of a proposed financing facility should also be considered in light of current market conditions. *See* Transcript of Record at 740:4-6, *In re Lyondell Chem. Co.*, No. 09-10023 (REG) (Bankr. S.D.N.Y. Feb. 27, 2009) ("[B]y reason of present market conditions, as disappointing as the [DIP] pricing terms are, I find the provisions [of a DIP that included a roll-up of prepetition secured debt] reasonable here and now.").

47.    The material terms of the DIP Facility are fair, reasonable, and appropriate under the circumstances. The terms of the DIP Facility reflect the Debtors' aggressive negotiations with the Prepetition Term Secured Parties, which have resulted in, among other things: (a) more new money debtor-in-possession financing and longer milestones/stated maturity to provide a longer case and sale process to maximize value for all stakeholders; and (b) materially improved economics well within market terms. *See* Haughey Declaration, ¶ 15. The DIP Facility provides the Debtors with $100,000,000 of new money that the Debtors have requested for the continued operation of their businesses during the pendency of the Chapter 11 Cases plus a roll-up of $175,000,000 of outstanding obligations under the Prepetition Term Loan Financing Agreement. In addition to solving the Debtors' immediate cash needs, the DIP Facility also contains appropriate adequate protection provisions and fees that satisfy the requirements of the Bankruptcy Code.

48.    Additionally, the proposed roll up—pursuant to which the Debtors will be deemed

to have paid down the Prepetition Loans with loans under the DIP Facility—is a common feature

in debtor-in-possession financing arrangements. In the present case, it was a necessary inducement

for the Prepetition Term Secured Parties to provide a DIP Facility (and in a sufficient amount) and

consent to the use of Cash Collateral, both of which are necessary to the viability of the Debtors'

Chapter 11 Cases and the Debtors' ultimate successful sale of their business as a going-concern.

The DIP Facility was necessary to provide the runway for the Debtors to run a robust marketing

and sale process for purposes of soliciting a higher and better purchase price for the Debtors' assets

than the credit bid of the Prepetition Secured Parties and DIP Secured Parties set forth in the

Stalking Horse Agreement.  The DIP Facility's 1.75:1.00 roll up ratio is supported by precedent.

Courts in numerous recent cases have approved roll ups with ratios of this size or larger.[9]

Moreover, when considered with the other material DIP financing terms, the DIP financing

package is well within what is market for the facts and circumstances of these cases.  Additionally,

given that the Stalking Horse Agreement contemplates that the DIP Secured Parties will be credit

bidding all of the DIP Obligations, including the Roll-Up Term Loans, the proposed roll up will

not burden the estate with incremental administrative expense liability for purposes of confirming

a plan of liquidation or reorganization.  Further, as set forth in the proposed Interim Order, the

proposed roll up is subject to a Successful Challenge.  Simply put, the Roll-Up Term Loans were

---

[9] *See e.g.*, *In re Vital Pharm., Inc.*, No. 22-17842 (PDR) (Bankr. S.D. Fla. Jan. 12, 2023) (approving postpetition financing with a 2.35-to-1 roll-up of $235 million in prepetition loans and $100 million in new money); *In re Phoenix Servs. Topco LLC*, No. 22-10906 (MFW) (Bankr. D. Del. Nov. 2, 2022) (authorizing postpetition financing with 3-to-1 roll-up of $150 million in prepetition loans and $50 million in new money); *In re Strike, LLC*, No. 21-90054 (DRJ) (Bankr. S.D. Tex. Jan. 4, 2022) (authorizing postpetition financing with 3.3-to-1 roll-up of $86.6 million in prepetition loans and $26 million in new money); *In re Nine Point Energy Holdings, Inc.*, No. 21-10570 (MFW) (Bankr. D. Del. Apr. 12, 2021) (authorizing postpetition financing with 3-to-1 roll-up of $59 million in prepetition loans and $20 million in new money); *In re Tailored Brands, Inc.,* No. 20-33916 (MI) (Bankr. S.D. Tex. Sept. 2, 2020) (authorizing postpetition financing with 3.9-to-1 roll-up of $398 million in prepetition loans and $102 million in new money); *In re GNC Holdings, Inc.*, No. 20-11662 (KBO) (Bankr. D. Del. July 21, 2020) (authorizing postpetition financing with 3.8-to-1 roll-up of $375 million in prepetition loans and $100 million in new money); *In re Colt Defense LLC*, Case No. 15-11296 (LSS) (Bankr. D. Del. July 10, 2015) (authorizing postpetition financing with 5.5-to-1 roll-up of $55 million in prepetition loans and $10 million in new money).

a necessary provision of the DIP Facility and will not prejudice other stakeholders.

49.     Ultimately, the bankruptcy process, including the sale of assets pursuant section 363 of the Bankruptcy Code pursuant to the Stalking Horse Agreement and Sale Motion, will permit the Debtors to maximize the value of their business for the benefit of all stakeholders. Given the facts and circumstances of these cases and the enormous benefit to the Debtors (and their stakeholders), the proposed roll up and the other terms and conditions of the DIP Facility are fair, reasonable, and appropriate, and should be approved.

**(v)     Entry into the DIP Documents Reflects the Debtors' Reasonable Business Judgment**

50.     A debtor's decision to enter into a postpetition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard. See *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del 1994) (noting that the interim loan, receivable facility and asset based facility were approved because they "reflect[ed] sound and prudent business judgment [were] reasonable under the circumstances and in the best interests of TWA and its creditors"); *Ames Dep't Stores, Inc.*, 115 B.R. at 40 ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest"); *Grp. of Institutional Holdings v. Chicago Mil. St. P. & Pac. Ry.*, 318 U.S. 523, 550 (1943); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court."); *In re Lifeguard Indus., Inc.*, 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same).

51.     Bankruptcy courts typically defer to a debtor's business judgment on the decision to borrow money unless such decision is arbitrary and capricious. *See In re Trans World Airlines,*

*Inc.*, 163 B.R. at 974. In fact, "[m]ore exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

52.     The Debtors' determination to move forward with the DIP Facility is a sound exercise of their sound business judgment following a robust marketing process and careful evaluation of alternatives.  Specifically, the Debtors and their advisors determined that the Debtors would require significant postpetition financing to support the administration of their Chapter 11 Cases and their ongoing operations. The Debtors negotiated the DIP Documents with the Prepetition Term Secured Parties in good faith, at arm's length, and with the assistance of their advisors, having gone to the market in search of alternative debtor-in-possession financing, and the Debtors believe that they have obtained the best financing available. *See* Haughey Declaration, ¶ 15. As discussed herein and in the Haughey Declaration, the Debtors determined that the DIP Facility is the best and only available financing after a robust marketing process. *See* Stratton Declaration ¶¶ 13-17. Accordingly, the Court should authorize the Debtors' entry into the DIP Documents as a reasonable exercise of the Debtors' business judgment.

(vi)    **The Proposed Adequate Protection is Appropriate**

53.     To the extent a secured creditor's interests in collateral constitute valid and perfected security interests and liens as of the Petition Date, section 364(d)(1)(B) of the Bankruptcy Code requires that the Debtors provide adequate protection to such creditor where a debtor-in-possession financing facility primes the liens of such secured creditor. While section 361 of the Bankruptcy Code provides a non-exclusive list of possible forms of adequate protection— including periodic cash payments, additional liens, replacement liens and other forms of relief— the Court must determine what constitutes adequate protection on a case-by-case basis. *See In re*

*Columbia Gas Sys., Inc.*, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir. 1987); *In re Martin*, 761 F.2d 472 (8th Cir. 1985). The focus of the adequate-protection requirement is to protect a secured creditor from the diminution in the value of its interest in the collateral during the period of use. *See Resolution Trust Corp. v. Swedeland Dev. Group, Inc. (In re Swedeland Dev. Group, Inc.)*, 16 F.3d 552, 564 (3d Cir. 1994) ("The whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy.") (internal citations omitted); *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process") (citation omitted).

54.     Here, Prepetition Term Secured Parties have conditioned the DIP Facility and use of Cash Collateral in exchange for the proposed adequate protection, which consists of Adequate Protection Liens, Adequate Protection Superpriority Claims, Adequate Protection Payments, and other consideration. The proposed adequate protection was bargained for at arm's length and includes terms that are commonplace in consensual debtor-in-possession financing and cash collateral arrangements. Accordingly, the Debtors submit that authority to provide the proposed adequate protection to the Prepetition Term Secured Parties is (a) fair and reasonable and (b) in the best interests of the Debtors and their estates.

**(vii)     The Debtors Should be Authorized to Pay the Interest and Fees Required by the DIP Secured Parties under the DIP Documents.**

55.     Under the DIP Documents, the Debtors have agreed, subject to Court approval, to pay certain interest and fees to the DIP Secured Parties. In particular, the Debtors have agreed to pay:

(a)     ***Delayed Draw Term Loan Interest Rate***: SOFR Loans, Adjusted Term SOFR + 10.50%, payable in cash on the last day of each Interest Period; Reference

Rate Loans, Reference Rate + 9.50%; payable in cash monthly, in arrears, on the first day of each month.[10]

(b) **Roll Up Loan Interest Rate**:  Adjusted Term SOFR + 10.50%, paid in kind, on the last day of each Interest Period.

(c) **DIP Agent Fee**: A one-time fee of $100,000 payable to the DIP Agent, non-refundable and deducted from the available proceeds of the initial funding of the DIP Facility.

(d) **DIP Upfront Fee**: A one-time fee equal to 1.00% of the aggregate principal amount of the DIP Delayed Draw Term Commitment as of the Effective Date, fully earned as of the Interim Order Entry Date, deducted from the amount of the DIP Delayed Draw Term Loans funded on the Interim Order Entry Date and shared ratably by the DIP Lenders.

(e) **DIP Exit Fee**: A one-time fee equal to 3.00% of the aggregate principal amount of the DIP Delayed Draw Term Commitment as of the Effective Date, fully earned as of the Interim Order Entry Date, payable in full in cash on the earliest to occur of (i) the date on which the DIP Delayed Draw Term Loans are Paid in Full, (ii) the date of acceleration of the Obligations under the Loan Facilities and the termination of all Commitments hereunder upon the occurrence of an Event of Default in accordance with the Loan Documents and the DIP Orders and (iii) the Final Maturity Date.

56.    As set forth in the Stratton Declaration, the Debtors believe that the interest and fees to be paid under the DIP Facility are consistent with the market and are reasonable and appropriate, particularly in light of the credit profile of the Debtors, the nature and extent of the collateral securing the facility, the state of the global economy and the Debtors' industry, and the relevant risks associated with lending in the postpetition financing context. *See* Stratton Declaration, ¶¶ 13-17. The Debtors considered the fees described above when determining, in their sound business judgment, that the DIP Facility constituted the best, and only, actionable terms on which the Debtors could obtain the postpetition financing necessary to continue their operations, prosecute their cases, and benefit the Debtors' estates. *See id.* Accordingly, the Court should authorize the Debtors to pay the interest and fees provided under the DIP Documents in connection

---

[10] Footnote to be included concerning expected interest rate of DIP Loans.

with the DIP Facility.

### (viii)   The Debtors Should be Authorized to Use Cash Collateral

57.     Section 363(c)(2) of the Bankruptcy Code provides that a debtor may not use, sell or lease cash collateral unless "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2).

58.     The Debtors have an urgent need for the immediate use of the Prepetition Collateral, including Cash Collateral, and seek to use all Cash Collateral existing on or after the Petition Date pursuant to the terms of the DIP Documents. The Debtors need Cash Collateral to pay operating expenses, including essential vendors and employees, in order to ensure a continued supply of goods and services essential to the Debtors' business. Indeed, absent such relief, the Debtors' business will be brought to a halt, with damaging consequences for the Debtors and their estates and creditors.

59.     The Debtors believe that the terms and conditions of their use of Cash Collateral (including the provision of adequate protection described above and provided in the DIP Orders) are appropriate and reasonable and, as described above, that such adequate protection is sufficient to secure any adequate protection obligations under the circumstances. As described above, the Debtors propose to use Cash Collateral to fund the orderly administration of the Chapter 11 Cases and a recapitalization or sale process designed to maximize the value of the Debtors' estates. The Prepetition Term Secured Parties consent to the use of Cash Collateral in light of the adequate protection provided, which, as noted above, the Debtors believe is necessary and sufficient. For the reasons set forth herein, the Debtors submit that they should be authorized to use Cash Collateral on the terms set forth in the DIP Documents.

### (ix)    Approval of Interim Relief is Appropriate

60.    Bankruptcy Rules 4001(b)(2) and 4001(c)(2) provide that a final hearing on a motion to use cash collateral or obtain credit, respectively, may not be commenced earlier than fourteen (14) days after the service of such motion. Upon request, however, the Court may conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral and the obtaining of credit on an interim basis "to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2), (c)(2).

61.    As set forth in the Haughey Declaration, the Debtors have an urgent and immediate need for access to the DIP Facility and Cash Collateral on an interim basis. *See* Haughey Declaration, ¶ 16. The Debtors require immediate access to $40,000,000 of cash in the form of debtor-in-possession financing, in addition to the use of Cash Collateral, to meet their obligations and avoid irreparable harm pending a final hearing. *Id*. Absent immediate access to the DIP Facility and Cash Collateral at this pivotal stage, among other things, the Debtors could (a) face a detrimental interruption of their business; (b) lose the support of key constituencies, including the Debtors' workforce, vendors, and customers on which the success of the chapter 11 cases depend; and (c) be forced to significantly modify, or shut down entirely, their operations, each of which could detrimentally affect the Debtors' ability to maximize the value of the estates. *See* First Day Declaration, ¶ 83.

62.    Moreover, immediate access to both the DIP Facility and Cash Collateral is the stabilizing assumption upon which the initial Approved Budget, attached hereto as Exhibit C, is based. Without such access, the Debtors could lose the confidence and cooperation of employees and key business partners, including creditors, vendors, and customers. *See id*., ¶ 84. In short, without immediate access to both the DIP Facility and Cash Collateral, the Debtors' would face a liquidity crisis and run out of cash, and the Debtors' estates would be significantly and irreparably

harmed. *See id*, ¶.

63.    The Debtors' ability to preserve and maximize the value of their estates and the business's continuing viability depend heavily upon the interim relief sought in this Motion.

**(x)    Request for a Final Hearing**

64.    The DIP Credit Agreement includes a maturity date that will occur within thirty days after entry of the Interim Order unless a Final Order approving the Motion has been entered. As such, pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, but in no event later than twenty-five (25) days following the Petition Date and fix the time and date prior to the Final Hearing for parties to file objections to the Motion.

**(xi)    Modification of the Automatic Stay is Warranted.**

65.    The relief requested herein contemplates a modification of the automatic stay to permit the Debtors to, among other things: (a) grant the security interests, liens, and super-priority claims described above by the Debtors in favor of the DIP Secured Parties, and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens; (b) upon the occurrence of an Event of Default (as defined in the DIP Credit Agreement), for the DIP Secured Parties to exercise any remedies available to them pursuant to the DIP Documents and the DIP Orders; and (c) implement the terms of the proposed DIP Orders, including payment of all amounts referred to in the DIP Documents. Stay modifications of this kind are ordinary and standard features of postpetition financing facilities and, in the Debtors' reasonable exercise of their business judgment, are appropriate under the present circumstances. *See, e.g., In re Delphi Behavioral Health Group, LLC, et al.*, Case No. 23-20945-PDR (Bankr. S.D. Fla. Mar. 7, 2023); *In re Vital Pharmaceuticals, Inc., et al.*, Case No 22-17842 (PDR) (Bankr. S.D. Fla. Jan. 12, 2023); *In re Tamarac 10200, LLC and Unipharma, LLC*, Case No. 20-bk-23346-PDR (Bankr. S.D. Fla.

13024039-1

Dec. 30, 2020); *In re Just One More Restaurant Corp., et al.*, Case No. 9:19-bk-1947 (Bankr. M.D. Fla. Feb. 14, 2020); *In re The Great Atl. & Pac. Tea Co., Inc.*, Case No. 15-23007 (RDD) (Bankr. S.D.N.Y. July 21, 2015) [Docket No. 88]. Accordingly, the Debtors respectfully request the Court to modify the automatic stay as requested herein.

> **(xii)     Bankruptcy Rule 4001(a)(3) Should be Waived.**

66.     The Debtors request a waiver of the stay of the effectiveness of the order approving this Motion under Bankruptcy Rule 4001(a)(3). Bankruptcy Rule 4001(a)(3) provides, "[an] order granting a motion for relief from an automatic stay made in accordance with Rule 4001(a)(1) is stayed until the expiration of fourteen days after entry of the order, unless the court orders otherwise." As explained herein, immediate access to the DIP Facility is essential to prevent irreparable damage to the Debtors' estates. Accordingly, ample cause exists to justify the waiver of the fourteen-day stay imposed by Bankruptcy Rule 4001(a)(3), to the extent such applies.

**B.     Approval Payoff Transactions  is Appropriate**

67.     As set forth in the Haughey Declaration, in connection with negotiations with the Prepetition Term Secured Parties and Prepetition ABL Secured Parties concerning the use of consensual Cash Collateral and DIP financing, the Debtors and the Prepetition Term Secured Parties believed it was in their respective best interests, and the interests of all of the other Debtors' stakeholders, to cash collateralize the Letters of Credit Obligations, the Bank Product Obligations, and the other surviving Prepetition ABL Obligations under the Prepetition ABL Loan Documents (including funding $250,000 into a non-interest bearing account maintained with Wells Fargo to fund the Expense Reserve).  As set forth in the Initial Budget and the Payoff Letter, it is contemplated that Delayed Draw DIP Term Loans funded from the Interim Availability Amount and Cash Collateral will be used to satisfy such obligations.

68.     As described above, per the terms of the Intercreditor Agreement, the Prepetition

ABL Obligations are secured by a first priority lien on ABL Priority Collateral, which includes, among other types of collateral, all of the Debtors current assets, including cash, accounts receivable, inventory, and credit card receivables.  As of the last business day prior to the Petition Date, according to the borrowing base calculation dated May 12, 2024 prepared by the Debtors based on their books and records, the Prepetition ABL Obligations are significantly oversecured. The aggregate amount contemplated to be paid to the Prepetition ABL Agent by the Payoff Letter to cash collateralize the Prepetition ABL Obligations of $15,483,599 is significantly less than the Prepetition ABL Agent's first priority collateral position as of the Petition Date of at least $55.3 million (exclusive of cash already held by the Prepetition ABL Agent collateralizing the Letters of Credit Obligations as described above).  Such first priority collateral position includes (i) cash and cash equivalents subject to control agreements constituting Cash Collateral of approximately $14.7 million, and (iii) accounts receivable and credit card receivables of approximately $40.6 million.

69.    Given that the Prepetition ABL Obligations are oversecured, the transactions contemplated by the Payoff Letter—essentially a refinancing of the Prepetition ABL Facility with proceeds from the DIP Facility and Cash Collateral of which the Prepetition ABL Secured Parties have a first priority security interest in—is completely neutral to the estate with respect to its potential effect on general unsecured creditors.  By satisfying the Prepetition ABL Obligations, the Debtors are able to use Cash Collateral at the outset of these cases and Cash Collateral from proceeds of what would otherwise be ABL Priority Collateral that would be applied to collateralize the Letters of Credit Obligations, Bank Product Obligations, and the Surviving Obligations into the Approved Budget.  Moreover, because the Prepetition ABL Agent will hold all cash to collateralize the Bank Product Obligations and the Letters of Credit Obligations, the Debtors' estates will not be prejudiced by the Payoff Transactions, as such funds may be subject to disgorgement upon a Successful Challenge.  Thus, entry into the Payoff Letter and use of Cash

Collateral and proceeds from Delayed Draw Term Loans is a proper exercise of the Debtors' business judgment and should be authorized by this Court. Further, in exchange for the Payoff Transactions, the Debtors will retain access to its credit cards with Wells Fargo under the Card Agreement, which will allow it to retain necessary business credit and continue operations in the ordinary course of business.

**C.    Immediate Relief is Required to Avoid Immediate and Irreparable Harm**

70.    Bankruptcy Rule 6003(b) provides that, to the extent relief is necessary to avoid immediate and irreparable harm, a bankruptcy court may issue an order granting "a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition" before twenty-one (21) days after filing of the petition. The Court may grant interim relief in respect of a motion filed pursuant to section 363(c) or 364 of the Bankruptcy Code and to repay obligations arising prior to the Petition Date where, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2), (c)(2). As described herein and in the First Day Declaration, the Debtors risk a significant disruption to their business operations and substantial harm to their enterprise absent an immediate infusion of liquidity via the DIP Facility. The Debtors have an immediate need for access to liquidity to, among other things, continue the operation of their business, maintain important client relationships, meet payroll, satisfy working capital and operational needs, all of which are required to preserve and maintain the Debtors' going concern value for the benefit of all parties in interest.

71.    The importance of a debtor's ability to secure postpetition financing to prevent immediate and irreparable harm to its estate has been repeatedly recognized in this district in similar circumstances. *See, e.g., In re Delphi Behavioral Health Group, LLC, et al.*, Case No. 23-20945-PDR (Bankr. S.D. Fla. Mar. 7, 2023); *In re Vital Pharmaceuticals, Inc., et al.*, Case No 22-

13024039-1

17842 (PDR) (Bankr. S.D. Fla. Jan. 12, 2023); *In re Tamarac 10200, LLC and Unipharma, LLC*, Case No. 20-bk-23346-PDR (Bankr. S.D. Fla. Dec. 30, 2020); *In re It'Sugar FL U LLC et al.*, Case No. 20-20259-RAM (Bankr. S.D. Fla. Oct. 1, 2020); *In re Midtown Campus Properties, LLC*, Case No. 20-1573-RAM (Bankr. S.D. Fla. May 26, 2020); *In re Cinemex USA Real Estate Holdings, Inc., et al.*, Case No. 20-14695-LMI (Bankr. S.D. Fla. May 18, 2020); *In re ProHCM Holdings, Inc.*, Case No. 18-23156-AJC (Bankr. S.D. Fla. Nov. 1, 2018); *In re Miami International Medical Center, LLC*, Case No. 18-12741-LMI (Bankr. S.D. Fla. Mar. 15, 2018); *In re Magnum Construction Management, LLC*, Case No. 19-12821-AJC (Bankr. S.D. Fla. Mar. 8, 2019); *In re Adinath Corp, et al.*, Case No. 15-16885-LMI (Bankr. S.D. Fla. Apr. 17, 2015).

**D.     Request For a Final Hearing**

72.     The Court may grant interim relief in respect of a motion filed pursuant to section 363(c) or 364 of the Bankruptcy Code where, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2), (c)(2). In examining requests for interim relief under this rule, courts generally apply the same business judgment standard applicable to other business decisions. *See In re Ames Dep't Stores*, 115 B.R. at 36. The Debtors request a date which is no later than twenty-five (25) days after the Petition Date, to hold a hearing to consider the relief sought in the Motion on a final basis pursuant to entry of the Final Order.

**E.     Waiver of Bankruptcy Rule 6004(H)**

73.     To implement the foregoing successfully, the Debtors request that the Court find that notice of the Motion is adequate under Bankruptcy Rule 6004(a) under the circumstances and waive the fourteen (14) day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h). As explained above and in the First Day Declaration, the relief requested herein is necessary to avoid immediate and irreparable harm to the Debtors and their

estates. By this Motion, the Debtors request that the order approving this Motion be effective immediately by providing that the fourteen (14) day stay under Bankruptcy Rule 6004(h) is waived, so that the Debtors may immediately use some or all of the DIP Facility in the manner requested herein and in accordance with the Approved Budget. Accordingly, ample cause exists to justify finding that the notice requirements under Bankruptcy Rule 6004(a) have been satisfied and to grant a waiver of the fourteen (14) day stay imposed by Bankruptcy Rule 6004(h), to the extent such notice requirements and such stay apply.

### **Reservation of Rights**

74.    Nothing contained in this Motion or any order granting the relief requested in this Motion, herein, and no action taken pursuant to such relief requested or granted, is intended as or shall be construed or deemed to be: (a) an admission as to the amount of, basis for, or validity of any claim against any of the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) an impairment or waiver of any Debtor's or any other party in interest's right to dispute any claim against, or interest in, any Debtor, its property, or its estate on any grounds; (c) a promise or requirement to pay any claim; (d) an assumption, adoption, or rejection of any agreement, contract, or lease under section 365 of the Bankruptcy Code; (e) an implication, admission or finding that any particular claim is an administrative expense claim, other priority claim or otherwise of a type specified or defined in this Motion or any order granting the relief requested by this Motion; (f) an implication, admission, or finding as to (i) the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on the property of any Debtor or its estate or (ii) a waiver or limitation on any party's ability to challenge, recharacterize as equity, void, claw back, or seek other relief with respect to any particular payments authorized hereunder; (g) an impairment or waiver of any claims or causes of action which may exist against any entity; or (h) a waiver of any Debtor's or any other party in interest's

43

rights under the Bankruptcy Code or any other applicable law.

<div align="center">**<u>Notice</u>**</div>

75.    The Debtors have provided notice of this Motion to (a) the Office of the United States Trustee for the Middle District of Florida; (b) the holders of the thirty (30)largest unsecured claims against the Debtors (on a consolidated basis); (c) the Prepetition Term Loan Agent and DIP Agent and its counsel; (d) the Prepetition ABL Agent and its counsel; (f) the United States Attorney's Office for the Middle District of Florida; (g) the Internal Revenue Service; (f) the United States Securities and Exchange Commission; (h) the state attorneys general for states in which the Debtors conduct business; and (i) all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002. The Debtors submit that, under the circumstances, no other or further notice is required.

**WHEREFORE**, the Debtors respectfully request that the Court enter the order in substantially the form attached hereto as **<u>Exhibit A</u>** (i) granting this Motion and the relief requested herein on an interim basis and, after a final hearing, on a final basis, (ii) authorizing the Debtors to enter into the DIP Credit Agreement and the other DIP Documents in order to sustain the Debtors' business and to fund these Chapter 11 Cases, and (iii) granting such other and further relief as the Court deems just and proper.

13024039-1

Dated:    May 20, 2024

Respectfully submitted,

*/s/ Paul Steven Singerman*
Paul Steven Singerman
Florida Bar No. 378860
**BERGER SINGERMAN LLP**
1450 Brickell Avenue, Suite 1900
Miami, FL 33131
Telephone:   (305) 755-9500
Email:   singerman@bergersingerman.com

-   and –

W. Austin Jowers (*pro hac vice* pending)
Jeffrey R. Dutson (*pro hac vice* pending)
Sarah Primrose (Bar No. 98742)
Christopher K. Coleman (*pro hac vice* pending)
Brooke L. Bean (*pro hac vice* pending)
Taeyeong Kim (*pro hac vice* pending)
**KING & SPALDING LLP**
1180 Peachtree Street, NE, Suite 1600
Atlanta, GA 30309
Telephone:   (404) 572-4600
Email:   ajowers@kslaw.com
             jdutson@kslaw.com
             sprimrose@kslaw.com
             christopher.coleman@kslaw.com
             bbean@kslaw.com
             tkim@kslaw.com

Nicolette C. Vilmos
Florida Bar No. 469051
**BERGER SINGERMAN LLP**
300 S. Orange Avenue, Suite 1000
Orlando, FL 32801
Telephone: (407) 749-7900
Email: nvilmos@bergersingerman.com

– and –

Michael Fishel (*pro hac vice* pending)
**KING & SPALDING LLP**
1100 Louisiana, Suite 4100
Houston, TX 77002
Telephone:   (713) 751-3200
Email:   mfishel@kslaw.com

*Filer's Attestation: Pursuant to Local Rule 1001-2(g)(3) regarding signatures, Paul Steven Singerman attests that concurrence in the filing of this paper has been obtained.*

13024039-1

**<u>Exhibit A</u>**

**(Proposed Interim Order)**

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**
www.flmb.uscourts.gov

| | |
|---|---|
| IN RE: | Chapter 11 Cases |
| | |
| RED LOBSTER MANAGEMENT LLC,[1] | Case No. 6:24-bk-_____ |
| RED LOBSTER RESTAURANTS LLC, | Case No. 6:24-bk-_____ |
| RLSV, INC., | Case No. 6:24-bk-_____ |
| RED LOBSTER CANADA, INC. | Case No. 6:24-bk-_____ |
| RED LOBSTER HOSPITALITY LLC | Case No. 6:24-bk-_____ |
| RL KANSAS LLC | Case No. 6:24-bk-_____ |
| RED LOBSTER SOURCING LLC | Case No. 6:24-bk-_____ |
| RED LOBSTER SUPPLY LLC | Case No. 6:24-bk-_____ |
| RL COLUMBIA LLC | Case No. 6:24-bk-_____ |
| RL OF FREDERICK, INC. | Case No. 6:24-bk-_____ |
| RED LOBSTER OF TEXAS, INC. | Case No. 6:24-bk-_____ |
| RL MARYLAND, INC. | Case No. 6:24-bk-_____ |
| RED LOBSTER OF BEL AIR, INC. | Case No. 6:24-bk-_____ |
| RL SALISBURY, LLC, | Case No. 6:24-bk-_____ |
| RED LOBSTER INTERNATIONAL HOLDINGS LLC, | Case No. 6:24-bk-_____ |
| | |
| Debtors. | (Joint Administration Pending) |
| _____/ | |

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN
POSTPETITION FINANCING, (II) AUTHORIZING THE DEBTORS TO USE
CASH COLLATERAL ON A LIMITED BASIS, (III) GRANTING LIENS AND
PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (IV)
GRANTING ADEQUATE PROTECTION, (V) MODIFYING THE AUTOMATIC STAY,
(VI) SCHEDULING A FINAL HEARING, AND (VII) GRANTING RELATED RELIEF**

Upon the motion, dated May 19, 2024 (the "Motion") of Red Lobster Management LLC

("RLM") and its affiliated debtors-in-possession (collectively, the "Debtors") in the above-

captioned chapter 11 cases (collectively, the "Chapter 11 Cases"), seeking entry of an interim order

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are Red Lobster Management LLC (6889); Red Lobster Sourcing LLC (3075); Red Lobster Supply LLC (9187); RL Kansas LLC (2396); Red Lobster Hospitality LLC (5297); Red Lobster Restaurants LLC (4308); RL Columbia LLC (7825); RL of Frederick, Inc. (9184); RL Salisbury, LLC (7836); RL Maryland, Inc. (7185); Red Lobster of Texas, Inc. (1424); Red Lobster of Bel Air, Inc. (2240); RLSV, Inc. (6180); Red Lobster Canada, Inc. (4569); and Red Lobster International Holdings LLC (4661). The Debtors' principal offices are located at 450 S. Orange Avenue, Suite 800, Orlando, FL 32801.

(this "Interim Order")[2] and a Final Order (as defined herein) pursuant to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d), 364(e), 503, 507, and 552 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2081-1(g)(1) and 2018-1(g)(2) of the Local Rules of Bankruptcy Procedure (the "Local Rules") for the United States Bankruptcy Court for the Middle District of Florida (the "Court"), *inter alia*:

(i)      authorizing the Debtors to obtain senior secured postpetition financing on a superpriority basis (the "DIP Facility") consisting of (a) a new money multiple draw term loan facility in the aggregate principal amount of $100.00 million (the "DIP Term Loan Commitments" and the loans pursuant thereto, the "DIP Term Loans") consisting of (1) $40.00 million in the form of an Interim DIP Term Loan to be made available to the Debtors in a single draw upon entry of the Interim Order (the "Interim Amount"), and (2) an additional $60.00 million in the form of a Final DIP Term Loan to be made available in up to two additional draws upon entry of the Final Order (the "Final Amount" and, together with the Interim Amount, the "New Money Amount"), and (b) a roll-up of certain Prepetition Obligations (as defined below) of the Roll-Up Amount (as defined below) on a cashless dollar-for-dollar basis into DIP Term Loans under the DIP Facility, in each case, pursuant to the terms and conditions of this Interim Order, the Final Order, the Approved Budget (as defined below), and that certain *Secured Superpriority Debtor-In-Possession Financing Agreement* attached hereto as **Exhibit A** (as the same may be amended, restated, supplemented, or otherwise modified from time to time, the "DIP Credit Agreement"), by and among RLM, as borrower, each affiliate of RLM that is a guarantor thereunder, Fortress Credit

---

[2] Capitalized terms used in this Interim Order but not defined herein shall have the meanings given to them in the DIP Credit Agreement (as defined below) or the Motion, as applicable.

Corp., as administrative agent and collateral agent (in such capacities, the "DIP Agent"), and the lenders party thereto from time to time (the "DIP Lenders," and together with the DIP Agent, the "DIP Secured Parties");

(ii)    approving the terms of and authorizing the Debtors party thereto to execute and deliver the DIP Credit Agreement and any other agreements, instruments, and documents related or in connection thereto (the "DIP Documents"), which shall be on terms consistent with the terms set forth in the DIP Credit Agreement and otherwise in form and substance acceptable to the Required Lenders (as that term is defined in the DIP Credit Agreement) (or as otherwise provided in the DIP Documents) to perform such other acts as may be necessary or desirable in connection with the DIP Documents;

(iii)    authorizing the Debtors to enter into the DIP Credit Agreement and to incur all obligations under the DIP Documents to the DIP Secured Parties, including  the Roll-Up Obligations (as defined below) (collectively, the "DIP Obligations"), and granting the DIP Agent and DIP Lenders allowed superpriority administrative expense claim status in each of the Chapter 11 Cases and any Successor Cases (as defined below), subject to the Carve-Out (as defined below) and the Administration Charge as against the Canadian Collateral;

(iv)    subject to the terms of this Interim Order, granting to the DIP Agent (on behalf of the DIP Secured Parties) automatically perfected security interests in and priming liens on all of the DIP Collateral (as defined below), including, without limitation, all property constituting "cash collateral" as such term is defined in section 363(a) of the Bankruptcy Code, (including, without limitation, all cash and cash equivalents and other amounts from time to time on deposit or maintained by the Debtors in any deposit or securities account or accounts as of the Petition Date)

or any cash or cash equivalents received by the Debtors after the Petition Date as proceeds of the Prepetition Collateral (together, "Cash Collateral");

(v)     authorizing the Debtors to use proceeds of the DIP Facility and Cash Collateral to: (a) provide financing for working capital and other general corporate purposes, including for bankruptcy-related costs and expenses, all to the extent provided in, and in accordance with, the Approved Budget, this Interim Order, and the DIP Documents; (b) make permitted adequate protection payments as specified below; (c) pay the principal, interest, fees, expenses, and other amounts payable and reimbursable under the DIP Documents or this Interim Order as such become due, including, without limitation, origination and transaction fees and the fees and disbursements of the DIP Professionals (as defined below), (d) provide Cash Collateral as set forth herein with respect to the Prepetition ABL Obligations, and (e) any other purposes agreed upon in the DIP Documents, in each case solely in accordance with the Approved Budget, this Interim Order, and the DIP Documents;

(vi)     authorizing the Debtors to use the Prepetition Collateral (as defined below), including the Cash Collateral on an interim basis in accordance with both the Approved Budget and the DIP Documents, and providing, among other things, adequate protection to the Prepetition Secured Parties (as defined below) for any Diminution (as defined below) of their interests in the Prepetition Collateral, including the Cash Collateral;

(vii)     authorizing the Debtors to consummate the Payoff Transactions contemplated by the Payoff Letter, and perform all such other and further acts as may be required in connection with the Payoff Letter, including, without limitation, to use proceeds of the DIP Facility to cash collateralize the Wells Fargo Letters of Credit, the Bank Product Obligations (as defined in the Payoff Letter), and the other Surviving Obligations (as defined in the Payoff Letter);

4

(viii)    modifying the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and this Interim Order;

(ix)    authorizing the DIP Agent, at the direction of the Required Lenders, upon the occurrence of an Event of Default (as defined below): to (1) terminate the funding obligations under the DIP Documents in accordance with their terms; (2) declare the DIP Obligations to be immediately due and payable in full, to the extent permitted by the terms thereof; and (3) subject to this Interim Order, be granted relief from the automatic stay to foreclose on the DIP Liens and DIP Collateral;

(x)    approving of certain stipulations in paragraph G of this Interim Order by the Debtors with respect to the Prepetition Loan Documents and the liens and security interests arising therefrom subject to the Challenge Period described in paragraph 46 hereof;

(xi)    authorizing payment of the DIP Fees (as defined below);

(xii)    waiving any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of this Interim Order and providing for the immediate effectiveness of this Interim Order; and

(xiii)    scheduling a final hearing (the "Final Hearing") to consider the relief requested in the Motion and approving the form of notice with respect to the Final Hearing.

The Court having considered the Motion, the exhibits attached thereto, the *Declaration of Jonathan Tibus in Support of Debtors' Chapter 11 Petitions and First-Day Pleadings* (the "First Day Declaration")*, the Declaration of Nicholas Haughey in Support of Motion of the Debtors and Debtors in Possession, Pursuant to Sections 105, 361, 362, 363, 364 and 507 of the Bankruptcy Code, Bankruptcy Rule 4001 and Local Rule 4001-2, for Interim and Final Orders (I) Authorizing*

*Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Scheduling Final Hearing and (IV) Granting Related Relief* (the "<u>Haughey Declaration</u>"), attached to the Motion as Exhibit E, the *Declaration of Teri Stratton in Support of Motion of the Debtors and Debtors in Possession, Pursuant to Sections 105, 361, 362, 363, 364 and 507 of the Bankruptcy Code, Bankruptcy Rule 4001 and Local Rule 4001-2, for Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Scheduling Final Hearing and (IV) Granting Related Relief* (the "<u>Stratton Declaration</u>"), attached to the Motion as Exhibit F, the DIP Credit Agreement, and any other DIP Documents, and the evidence submitted and argument made at the interim hearing (the "<u>Interim Hearing</u>"); and notice of the Interim Hearing having been provided in accordance with Bankruptcy Rules 2002, 4001(b), (c) and (d), and all applicable Local Rules; and the Interim Hearing having been held and concluded; and all objections, if any, to the interim relief requested in the Motion having been withdrawn, resolved or overruled by the Court; and it appearing that approval of the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates (the "<u>Estates</u>") pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtors, their Estates and all parties-in-interest, and is essential for the continued operation of the Debtors' business and the preservation of the value of the Debtors' assets; and the Court having determined that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and it appearing that the Debtors' entry into the DIP Documents is a sound and prudent exercise of the Debtors' business judgment; and after due deliberation and consideration, and good and sufficient cause appearing therefor;

Based upon the record established at the interim hearing, the Court makes the following findings of fact and conclusions of law:[3]

A.    <u>Disposition</u>.  The relief requested in the Motion is granted on an interim basis in accordance with the terms of this Interim Order.  Any objections to the Motion with respect to the entry of this Interim Order that have not been withdrawn, waived or settled, and all reservations of rights included therein, are hereby denied and overruled on the merits.  This Interim Order shall become effective immediately upon its entry and any applicable stay (including under Bankruptcy Rule 6004) is waived to permit such effectiveness.

B.    <u>Petition Date</u>.  On May 19, 2024 (the "<u>Petition Date</u>"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code with the Court.

C.    <u>Debtors in Possession</u>.  The Debtors are operating their businesses and properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  As of the date hereof, no trustee or examiner has been appointed.

D.    <u>Jurisdiction and Venue</u>.  This Court has jurisdiction over the Chapter 11 Cases, the Motion and the parties and property affected hereby pursuant to 28 U.S.C. § 1334. Consideration of the Motion constitutes a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  This Court may enter a final order consistent with Article III of the United States Constitution.  Venue for the Chapter 11 Cases and the proceedings on the Motion is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.  The bases for the relief sought in the Motion are sections 105, 361, 362, 363, 364, 507 and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014, and the Local Rules.

---

[3] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

E.      Committee.  As of the date hereof, no statutory committee has been appointed in these Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code (a "Committee").

F.      Notice.  Upon the record presented to the Court at the Interim Hearing, and under the exigent circumstances set forth therein, notice of the Motion and the relief requested thereby and this Interim Order has been provided in accordance with Bankruptcy Rules 4001(b) and 4001(c)(1) to: (a) the Office of the U.S. Trustee for the Middle District of Florida (the "U.S. Trustee"); (b) entities listed as holding the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the DIP Agent, (i) Proskauer Rose LLP, One International Place, Boston, MA, Attn: Charles A. Dale and Eleven Times Square, New York, NY 10036, Attn: Megan R. Volin and Dylan J. Marker, and (ii) Trenam, Kemker, Scharf, Barkin, Frye, O'Neill and Mullis, P.A., 101 E Kennedy Boulevard, Suite 2700, Tampa, FL 33602, Attn: Lara Roeske Fernandez, (d) the United States Attorney's Office for the Middle District of Florida; (e) the Internal Revenue Service; (f) the state attorneys general for states in which the Debtors conduct business; (g) counsel to Prepetition ABL Agent, (i) Goldberg Kohn Ltd., 55 E. Monroe Street, Suite 3300, Chicago, IL 60603, Attn: Randall L. Klein, and (ii) Burr & Forman LLP, 200 South Orange Avenue, Suite 800, Orlando, FL 32801, Attn: Eric S. Golden; and (h) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties"), which notice was appropriate under the circumstances and sufficient for the Motion.  No further notice of, or hearing regarding, the entry of this Interim Order and the relief set forth therein is necessary or required.  The interim relief granted herein is necessary to avoid immediate and irreparable harm to the Debtors and their Estates pending a Final Hearing.

G.      Debtors' Stipulations.  Subject to paragraph 46 hereof: (i) each stipulation, admission, and agreement contained in this Interim Order, including, without limitation, the

Debtors' Stipulations, shall be binding upon the Debtors, their Estates, and any successors thereto (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors) under all circumstances and for all purposes, and (ii) the Debtors are deemed to have irrevocably waived and relinquished all Challenges (as defined herein) as of the Petition Date. Without prejudice to the rights of parties in interest as set forth in paragraph 46 herein, the Debtors, in requesting the DIP Facility, and in exchange for and as a material inducement to the DIP Secured Parties to provide the DIP Facility, on their own behalf and on behalf of their Estates and all representatives of such Estates, admit, stipulate, acknowledge, and agree as follows (paragraphs G(i) through G(v) below are referred to, collectively, as the "<u>Debtors' Stipulations</u>"):

(i) *Prepetition Term Loan Facility*. Pursuant to that certain Financing Agreement, dated as of January 22, 2021 (as previously amended, restated, supplemented or otherwise modified, the "<u>Prepetition Credit Agreement</u>", and collectively with all other agreements, instruments and documents executed or delivered in connection therewith or otherwise evidencing or securing any Prepetition Term Loan Obligations, each as may be amended, restated, supplemented, or otherwise modified from time to time, the "<u>Prepetition Term Loan Documents</u>"), by and among (a) RLM, as the borrower, (b) the other Debtors, as guarantors, (c) the other borrowers and guarantors party thereto from time to time, (d) Fortress Credit Corp., as administrative agent and collateral agent (in such capacity, together with any successor thereto, the "<u>Prepetition Term Loan Agent</u>"), and (e) the lenders party thereto from time to time (the "<u>Prepetition Term Loan Lenders</u>," and together with the Prepetition Term Loan Agent, collectively, the "<u>Prepetition Term Loan Parties</u>"), the Prepetition Term Loan Lenders provided secured term loans to the Debtors (the "<u>Prepetition Term Loan Facility</u>").

(ii) *Prepetition Term Loan Obligations*. As of the Petition Date, the Debtors were indebted and jointly and severally liable to the Prepetition Term Loan Parties in the aggregate principal amount outstanding under the Prepetition Term Loan Facility of $[__] (together with accrued and unpaid interest, any fees, expenses and disbursements (including, without limitation, any accrued and unpaid attorneys' fees, accountants' fees, appraisers' fees and financial advisors' fees, and related expenses and disbursements), indemnification obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Debtors' obligations in connection with the Prepetition

Term Loan Facility pursuant to the Prepetition Term Loan Documents, the "<u>Prepetition Term Loan Obligations</u>").

(iii) *Prepetition ABL Facility*.  Pursuant to that certain Credit Agreement, dated as of January 22, 2021 (as previously amended, restated, supplemented or otherwise modified, the "<u>Prepetition ABL Credit Agreement</u>", and collectively with all other agreements, instruments and documents executed or delivered in connection therewith or otherwise evidencing or securing any Prepetition ABL Obligations, each as may be amended, restated, supplemented, or otherwise modified from time to time, the "<u>Prepetition ABL Loan Documents</u>", and together with the Prepetition Term Loan Documents, the "<u>Prepetition Loan Documents</u>"), by and among (a) RLM, as the borrower, (b) Red Lobster Intermediate Holdings LLC, (c) the other borrowers party thereto from time to time, (d) Wells Fargo Bank, National Association, as administrative agent for each member of the lender group and the Bank Product Providers (in such capacity, together with its successors and assigns in such capacity, the "<u>Prepetition ABL Agent</u>", and together with the Prepetition Term Loan Agent, the "<u>Prepetition Agents</u>"), and (e) the lenders party thereto from time to time (the "<u>Prepetition ABL Lenders</u>", and together with the Prepetition ABL Agent, the Issuing Lenders, and the Bank Product Providers (each as defined in the Prepetition ABL Credit Agreement), collectively, the "<u>Prepetition ABL Parties</u>" and together with the Prepetition Term Loan Parties, the "<u>Prepetition Secured Parties</u>"), the Prepetition ABL Lenders provided secured revolving loans to, and issued certain letters of credit in favor of, the Debtors (the "<u>Prepetition ABL Facility</u>", and together with the Prepetition Term Loan Facility, the "<u>Prepetition Facilities</u>").

(iv) *Prepetition ABL Obligations*.  As of the Petition Date, the Debtors were indebted and jointly and severally liable to the Prepetition ABL Parties in the aggregate principal amount outstanding under the Prepetition  ABL Facility of at least $29,276,399 (together with accrued and unpaid interest, any fees, expenses and disbursements (including, without limitation, any accrued and unpaid attorneys' fees, accountants' fees, appraisers' fees and financial advisors' fees, and related expenses and disbursements), indemnification obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the Debtors' obligations in connection with the Prepetition ABL Facility pursuant to the Prepetition ABL Loan Documents, the "<u>Prepetition ABL Obligations</u>", and together with the Prepetition Term Loan Obligations, the "<u>Prepetition Obligations</u>"). For the avoidance of doubt, as of the Petition Date, the Revolver Commitment (as defined in the Prepetition ABL Credit Agreement) has been reduced to $0 and no revolving loans made thereunder are outstanding.  Under the Prepetition ABL Credit Agreement, Wells Fargo Bank, National Association ("<u>Wells Fargo</u>"), in its capacity as an Issuing Bank (the "<u>L/C Issuer</u>"), issued letters of credit in the face amount of $29.2 million (the "<u>Letters of Credit</u>"). RLM entered into that certain WellsOne

Commercial Card Agreement, dated on or around August 8, 2017 (as amended, restated, or otherwise modified from time to time, the "Card Agreement") (as amended, restated, or otherwise modified from time to time, the "Card Agreement"), with Wells Fargo, National Association ("Wells Fargo"), pursuant to which Wells Fargo issued to RLM credit cards (including commercial cards (including so-called "purchase cards", "procurement cards" or "p-cards")) and provided other treasury management services. The obligations under the Card Agreement, which has a total credit limit of $1.0 million, are "Bank Product Obligations" under the Prepetition ABL Credit Agreement. The Letters of Credit and Bank Product Obligations are secured by funds on deposit in one or more cash collateral accounts held in the name of RLM at Wells Fargo into which such cash collateral may be transferred and held by Wells Fargo.

(v) *Prepetition Liens and Prepetition Collateral*. As more fully set forth in the Prepetition Loan Documents, prior to the Petition Date, to secure the Prepetition Obligations, the Debtors granted: (a) to the Prepetition Term Loan Agent for the benefit of the Prepetition Term Loan Parties and as security for the Prepetition Term Loan Obligations (the "Prepetition Term Loan Liens") security interests in and continuing liens as follows: (1) a first priority security interest in and continuing lien on the Term Loan Priority Collateral (as defined in the Intercreditor Agreement), and (2) a second priority security interest in and continuing lien on the ABL Priority Collateral (as defined in the Intercreditor Agreement); and (b) to the Prepetition ABL Agent for the benefit of the Prepetition ABL Lenders and as security for the Prepetition ABL Obligations (the "Prepetition ABL Liens" and, together with the Prepetition Term Loan Liens, the "Prepetition Liens"), security interests in and continuing liens as follows: (1) a first priority security interest in and continuing lien on the ABL Priority Collateral (as defined in the Intercreditor Agreement), and (2) a second priority security interest in and continuing lien on the Term Loan Priority Collateral (as defined in the Intercreditor Agreement), in each case subject to the Intercreditor Agreement.

(vi) *Validity, Extent, Perfection and Priority of Prepetition Liens and Prepetition Obligations.* As of the Petition Date: (a) the Prepetition Liens on all of the Debtors' right, title and interest in substantially all of their assets (the "Prepetition Collateral") were valid, binding, enforceable, non-avoidable, and properly perfected and were granted to, or for the benefit of, the Prepetition Secured Parties for fair consideration and reasonably equivalent value; (b) the Prepetition Liens were senior in priority over any and all other liens on the Prepetition Collateral, subject only to certain liens senior by operation of law and otherwise permitted by the Prepetition Loan Documents (solely to the extent any such permitted liens (1) were in existence on the Petition Date, (2) are valid, unavoidable and properly perfected as the Petition Date or perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code, (3) are senior in priority to the Prepetition Obligations, (4) are permitted to be incurred under the Prepetition Loan Documents, and (5) are expressly identified on a schedule to the DIP Documents, the "Prepetition Permitted Liens"); (c) the

Prepetition Obligations constitute legal, valid, binding, and non-avoidable obligations of the Prepetition Secured Parties enforceable in accordance with the terms of the applicable Prepetition Loan Documents; (d) no offsets, recoupments, challenges, objections, defenses, claims, or counterclaims of any kind or nature, whether arising at law or in equity, to any of the Prepetition Liens or Prepetition Obligations exist, and no portion of the Prepetition Liens or Prepetition Obligations is subject to any challenge or defense including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (e) the Debtors and their Estates have no claims, objections, challenges, causes of action, and/or choses in action, including without limitation, avoidance claims under chapter 5 of the Bankruptcy Code or applicable state law equivalents or actions for recovery or disgorgement, against any of the Prepetition Secured Parties or any of their respective affiliates, agents, attorneys, advisors, professionals, officers, consultants, directors, and employees arising out of, based upon or related to the Prepetition Facilities; (f) the Debtors have waived, discharged, and released any right to, and are forever barred from bringing any, Challenge (as defined below) to any of the Prepetition Obligations, the priority of the Prepetition Secured Parties' obligations thereunder, and the legality, validity, extent, and priority of the Prepetition Liens; (g) the Prepetition Obligations constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code; and (h) all or substantially all of the Debtors' cash and cash equivalents, including cash on deposit in any account or accounts as of the Petition Date, cash obtained at any time thereafter (including proceeds of the DIP Facility), securities or other property, wherever located, whether subject to control agreements or otherwise, whether as original collateral or proceeds of other Prepetition Collateral, constitutes Cash Collateral of the Prepetition Secured Parties.

(vii)    *Intercreditor Agreement.*  The Prepetition Term Loan Agent and Prepetition ABL Agent entered into that *Intercreditor Agreement*, dated as of January 22, 2021 (as amended, restated, supplemented, or otherwise modified in accordance with its terms, the "Intercreditor Agreement") to govern certain rights, interests, obligations, priority, and positions of the Prepetition Term Loan Parties and the Prepetition ABL Parties with respect to the assets and properties of the Prepetition Collateral and the Prepetition Liens.

(viii)    *No Control.*  None of the DIP Secured Parties or Prepetition Secured Parties controls the Debtors or their properties or operations, has authority to determine the manner in which any of the Debtors' operations are conducted, or is a control person or insider (as defined in the Bankruptcy Code) of the Debtors or any of their affiliates by virtue of any of the actions taken with respect to, in connection with, related to, or arising from this Interim Order, the DIP Facility, the DIP Liens, the DIP Obligations, the DIP Documents, Prepetition Facilities,

12

Prepetition Liens, Prepetition Obligations, Prepetition Loan Documents, or the transactions contemplated hereunder or thereunder.

H. <u>Releases</u>. Subject to paragraph 46 hereof, the Debtors, on behalf of themselves and their respective Estates (including any successor trustee or other estate representative in the Chapter 11 Cases and any Successor Cases (as defined herein), and any party acting by, through or under the Debtors or their Estates), hereby stipulate and agree that they absolutely and unconditionally release and forever and irrevocably discharge and acquit each of the DIP Secured Parties, the Prepetition Secured Parties and their respective affiliates and each of their respective former or current officers, partners, directors, managers, owners, members, principals, employees, agents, related funds, investors, financing sources, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals and the respective successors and assigns thereof (collectively, the "<u>Released Parties</u>") from any and all obligations and liabilities to the Debtors (and their successors and assigns) and from any and all claims, counterclaims, demands, debts, accounts, contracts, disputes, liabilities, allegations, suits, controversies, proceedings, actions and causes of action arising prior to the Petition Date (collectively, the "<u>Released Claims</u>") of any kind, nature or description, whether known or unknown, foreseen or unforeseen or liquidated or unliquidated, arising in law or equity or upon contract or tort or under any state or federal law or regulation or otherwise, arising out of or related to (as applicable) the DIP Documents, the Prepetition Loan Documents, the obligations owing and the financial obligations made thereunder, the negotiation thereof and of the transactions contemplated thereby and the obligations and financial obligations made thereunder or otherwise related to the Debtors, in each case that the Debtors at any time had, now have or may have, or that their successors or assigns hereafter can or may have against any of the Released Parties for or by reason of any act, omission, matter, cause or thing whatsoever arising at any time on or prior

to the date of this Interim Order.  The Debtors further waive and release any defense, right of counterclaim, right of set-off, or deduction to the payment of the Prepetition Obligations that the Debtors may now have or may claim to have against the Released Parties, arising out of, connected with, or relating to any and all acts, omissions, or events occurring prior to this Court entering this Interim Order relating to the Debtors' secured lending relationship with the Prepetition Secured Parties.

I.      Findings Regarding Postpetition Financing

(i)      *Request for Postpetition Financing*.  The Debtors seek authority to (a) enter into the DIP Facility on the terms described herein and in the DIP Documents, and (b) use Cash Collateral on the terms described herein to administer their Chapter 11 Cases and fund their operations in accordance with the Approved Budget (as defined below), DIP Credit Agreement, and DIP Documents.  At the Final Hearing, the Debtors will seek final approval of the proposed postpetition financing and use of Cash Collateral arrangements pursuant to a proposed final order (the "Final Order" and, together with this Interim Order, the "DIP Orders"), which shall be in form and substance acceptable to the DIP Agent.  Notice of the Final Hearing and Final Order will be provided in accordance with this Interim Order.

(ii)     *Priming of the Prepetition Liens*.  The priming of the Prepetition Liens on the Prepetition Collateral under section 364(d) of the Bankruptcy Code, as contemplated by the DIP Documents and as further described below, will enable the Debtors to obtain the DIP Facility and to continue to operate their businesses to the benefit of their Estates and creditors, and the Debtors would not be able to obtain debtor-in-possession financing in a sufficient amount without granting such priming liens.  Consistent with the requirements of section 364(d) of the Bankruptcy Code, the Prepetition Secured Parties shall receive adequate protection as set forth in this Interim

Order pursuant to sections 361, 363, and 364 of the Bankruptcy Code, against any post-petition diminution in value of the Prepetition Secured Parties' respective liens and interests in the Prepetition Collateral (including Cash Collateral) resulting from, among other things, (i) the use, sale, or lease by the Debtors of such collateral, (ii) the market value decline of such collateral, (iii) the use of Cash Collateral by each of the Debtors, (iv) the imposition of the automatic stay, (v) the subordination of the Prepetition Liens and Prepetition Secured Obligations to the Carve-Out, the Canadian Priority Charges, the DIP Liens, and the DIP Obligations, in each case, as set forth in this Interim Order and the Canadian DIP Recognition Order, and (vi) any other act or omission which causes diminution in the value of their respective liens or interests in the Prepetition Collateral (including Cash Collateral) (collectively, the "Diminution").

(iii)    *Need for Postpetition Financing and Use of Cash Collateral.* The Debtors have an immediate and critical need to obtain the financing pursuant to the DIP Facility and to continue to use the Prepetition Collateral (including Cash Collateral) in order to, among other things, (i) pay the fees, costs and expenses incurred in connection with the Chapter 11 Cases, (ii) fund any obligations benefitting from the Carve-Out and the Canadian Priority Charge, (iii) permit the orderly continuation of the operation of their businesses, (iv) maintain business relationships with customers, vendors and suppliers, (v) make payroll, (vi) cash collateralize the Wells Fargo Letters of Credit and p-cards, and related interest, fees, expenses, costs and other charges in accordance with the terms of the Payoff Letter, and (vii) satisfy other working capital and operational needs. The incurrence of new debt under the DIP Documents and use of Cash Collateral is necessary and vital to the preservation and maintenance of the going concern value of the Debtors. Immediate and irreparable harm will be caused to the Debtors and their Estates if immediate financing is not obtained and permission to use Cash Collateral is not granted. The

terms of the proposed financing are fair and reasonable, reflect the Debtors' exercise of prudent business judgment, and are supported by reasonably equivalent value and fair consideration. The adequate protection provided in this Interim Order and other benefits and privileges contained herein are consistent with and authorized by the Bankruptcy Code.

(iv)    *No Credit Available on More Favorable Terms*. The DIP Facility is the best source of debtor-in-possession financing available to the Debtors. Given their current financial condition, financing arrangements, capital structure, and the circumstances of these Chapter 11 Cases, the Debtors have been and continue to be unable to obtain financing from sources other than the DIP Lenders on terms more favorable than the DIP Facility. Further, the Prepetition Secured Parties are adequately protected and/or have consented to the Debtors incurring debtor-in-possession financing, the priming of the Prepetition Liens, and the use of their Cash Collateral, only on the terms and subject to the conditions set forth in the DIP Documents and this Interim Order. The Debtors are unable to obtain unsecured credit allowable under Bankruptcy Code section 503(b)(1) as an administrative expense. The Debtors have also been unable to obtain: (a) unsecured credit having priority over that of administrative expenses of the kind specified in sections 503(b), 507(a) and 507(b) of the Bankruptcy Code; (b) credit secured solely by a lien on property of the Debtors and their Estates that is not otherwise subject to a lien; or (c) credit secured solely by a junior lien on property of the Debtors and their Estates that is subject to a lien. Financing on a postpetition basis is not otherwise available without granting the DIP Secured Parties: (1) perfected security interests in and liens on (each as provided herein) all of the Debtors' existing and after-acquired assets with the priorities set forth herein; (2) superpriority claims and priming liens to the extent set forth in this Interim Order, the DIP Credit Agreement, and the DIP Documents; and (3) the other protections set forth in this Interim Order.

(v)     *Use of Cash Collateral and Proceeds of the DIP Facility.*  As a condition to the Debtors' entry into the DIP Documents, the extension of credit under the DIP Facility and the authorization to use Prepetition Collateral, including Cash Collateral, the Debtors have agreed that Cash Collateral and the proceeds of the DIP Facility shall be used solely in accordance with the terms and conditions of this Interim Order and the DIP Documents and in accordance with the Approved Budget (as defined below), subject to Permitted Variances (as defined below).

(vi)     *Application of Proceeds of Collateral.*  As a condition to entry into the DIP Documents, the extension of credit under the DIP Facility and authorization to use Cash Collateral, the Debtors have agreed that, as of and commencing on the date of entry of this Interim Order, the Debtors shall apply the proceeds of DIP Collateral in accordance with this Interim Order and the DIP Documents.

(vii) *Roll-Up of Prepetition Term Loan Obligations Into DIP Obligations.* Prepetition Term Loan Obligations held by the DIP Lenders (or their affiliates) shall be "rolled up" and converted on a cashless dollar-for-dollar basis into principal obligations constituting DIP Obligations, on a *pro rata* basis according to the DIP Lenders' term loan holdings under the DIP Facility (a) upon and following entry of this Interim Order, in a ratio of 1.75:1 of the DIP Term Loans advanced during the interim period upon each draw under the DIP Facility (the "Interim Roll-Up Amount"), and (b) upon entry of the Final Order, in a ratio of 1.75:1 of the DIP Term Loans advanced upon each draw under the DIP Facility (the "Final Roll-Up Amount" and together with the Interim Roll-Up Amount, the "Roll-Up Amount"). The Roll-Up Amount shall be converted on a cashless dollar-for-dollar basis into principal obligations constituting DIP Obligations, without any further action by the Debtors or any other party (the "Roll-Up Obligations"). The conversion (or "roll-up") shall be authorized as compensation for, in

consideration for, and solely on account of, the agreement of the Prepetition Term Loan Lenders as DIP Lenders to fund amounts, and provide other consideration to the Debtors under the DIP Facility and not as payments under, adequate protection for, or otherwise on account of, any Prepetition Term Loan Obligations. Notwithstanding any other provision of this Interim Order, the Final Order, or the DIP Documents, all rights of the Prepetition Secured Parties shall be fully preserved. The Roll-Up Obligations are an inextricable component of the DIP Facility, and the Prepetition Secured Parties would not otherwise consent to the use of their Cash Collateral or the subordination of the Prepetition Liens to the DIP Liens, and the DIP Agent and the DIP Lenders would not be willing to provide the DIP Facility or extend credit to the Debtors thereunder without the inclusion of the Roll-Up Obligations in the DIP Obligations. The Roll-Up Obligations will enable the Debtors to obtain urgently needed financing to administer these Chapter 11 Cases and fund their operations.

J.    Adequate Protection.  In exchange for their consent to (i) the priming of the Prepetition Liens by the DIP Liens and (ii) the use of Cash Collateral to the extent set forth in this Interim Order, the Prepetition Secured Parties shall receive adequate protection to the extent of any Diminution of their interests in the Prepetition Collateral, as more fully set forth in this Interim Order.

K.    Good Faith of the DIP Secured Parties.

(i)    *Willingness to Provide Financing*.  The DIP Secured Parties have committed to provide financing to the Debtors subject to: (a) entry of this Interim Order and the Final Order; (b) approval of the terms and conditions of the DIP Facility and those set forth in the DIP Documents; (c) satisfaction of the closing conditions set forth in the DIP Documents; and (d) findings by this Court that the DIP Facility is essential to the Debtors' estates, that the DIP

Lenders are extending credit to the Debtors pursuant to the DIP Documents in good faith, and that the DIP Secured Parties' claims, superpriority claims, security interests and liens and other protections granted pursuant to this Interim Order and the DIP Documents will have the protections provided by section 364(e) of the Bankruptcy Code.

(ii)     *Business Judgment and Good Faith Pursuant to Section 364(e).*  Based on the Motion, the *Declaration of Jonathan Tibus in Support of Debtors' Chapter 11 Petitions and First Day Relief*, the *Declaration of Teri Stratton in Support of Debtors' Emergency Motion for Interim and Final Orders (I) Approving Postpetition Financing, (II) Authorizing the Use of Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief*, and the record presented to the Court at the Interim Hearing, (i) the terms of the financing embodied in the DIP Facility, including the Roll-Up Obligations, fees, expenses, and other charges paid and to be paid thereunder or in connection therewith, (ii) the adequate protection authorized by the Interim Order and DIP Documents and (iii) the terms on which the Debtors may continue to use the Prepetition Collateral (including Cash Collateral), in each case pursuant to this Interim Order and the DIP Documents, are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, constitute reasonably equivalent value and fair consideration, and represent the best financing (and terms) available under the circumstances.

(iii)     *Good Faith Pursuant to Section 364(e).*  The terms and conditions of the DIP Facility and the use of Cash Collateral were negotiated in good faith and at arm's length among the Debtors, the DIP Secured Parties, and the Prepetition Secured Parties with the assistance and counsel of their respective advisors.  Use of Cash Collateral and credit to be extended under the

DIP Facility shall be deemed to have been allowed, advanced, made, or extended in good faith by the DIP Secured Parties and the Prepetition Secured Parties within the meaning of section 364(e) of the Bankruptcy Code.

(iv)    *Consent to DIP Facility and Use of Cash Collateral.* The Prepetition Secured Parties have consented to the Debtors' use of Cash Collateral and the other Prepetition Collateral, and the Debtors' entry into the DIP Documents solely in accordance with and subject to the terms and conditions in this Interim Order and the DIP Documents.

L.    <u>Good Cause</u>.  Good cause has been shown for immediate entry of this Interim Order, and the entry of this Interim Order is in the best interests of the Debtors, the Estates and their stakeholders.  Among other things, the relief granted herein will minimize disruption of the Debtors' business and permit the Debtors to fund payroll obligations, to pay amounts owed to vendors, suppliers, landlords and to satisfy other critical expenses, including the payment of premiums on insurance policies, each as necessary to maximize the value of the Estates.  The terms of the Debtors' DIP Facility, use of Cash Collateral and proposed adequate protection arrangements, as set forth in this Interim Order, are fair and reasonable under the circumstances, and reflect the Debtors' exercise of prudent business judgment.

M.    <u>Immediate Entry</u>.  Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and the applicable Local Rules.

Based upon the foregoing findings and conclusions, the Motion and the record before the Court with respect to the Motion, and after due consideration and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED THAT:

1.      <u>DIP Financing Approved</u>.  On an interim basis, entry into the DIP Credit Agreement and other DIP Documents is authorized and approved, and the use of Cash Collateral is authorized, in each case, subject to the terms and conditions set forth in this Interim Order.  All objections to this Interim Order to the extent not withdrawn, waived, settled, or resolved, and all reservations of rights included therein, are hereby denied and overruled on the merits.  This Interim Order shall become effective immediately upon its entry.

<div align="center">DIP Facility Authorization</div>

2.      <u>Authorization of the DIP Financing</u>.  The Debtors are expressly and immediately authorized and empowered to execute and deliver the DIP Documents and to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Interim Order and the DIP Documents, and to execute, deliver, and perform under all instruments, certificates, agreements, and documents which may be required or necessary for the performance by the Debtors under the DIP Documents and the creation and perfection of the DIP Liens described in and provided for by this Interim Order and the DIP Documents. The Debtors are hereby authorized and directed to pay, in accordance with this Interim Order, any principal, interest, fees, expenses, and other amounts described in the DIP Documents and this Interim Order, as such amounts become due and owing, without need to obtain further Court approval (except as otherwise provided herein or in the DIP Documents) subject to and in accordance with the terms hereof and thereof, including, without limitation, any closing fees and commitment fees, as well as any reasonable and documented fees and disbursements of Proskauer Rose LLP, Trenam, Kemker, Scharf, Barkin, Frye, O'Neill and Mullis, P.A., and Deloitte Transactions & Business Analytics LLP, as DIP Professionals (as defined below), as set forth herein and in the DIP Documents, whether or not such professional fees and disbursements arose before or after the Petition Date, and whether or not the transactions

<div align="center">21</div>

contemplated hereby are consummated, to implement all applicable reserves and to take any other actions that may be necessary or appropriate, all to the extent provided in this Interim Order and the DIP Documents. Upon execution and delivery, the DIP Documents shall represent legal, valid, and binding obligations of the Debtors, enforceable against each of the Debtors and their Estates in accordance with their terms. Each officer of a Debtor acting individually is hereby authorized to execute and deliver each of the DIP Documents, such execution and delivery to be conclusive evidence of such officer's respective authority to act in the name of and on behalf of the Debtors.

3.    <u>Authorization to Borrow</u>.  To prevent immediate and irreparable harm to the Debtors' Estates, and to enable the Debtors to continue to operate their business and preserve and maximize the value of their Estates, subject to the terms and conditions set forth in the DIP Documents and this Interim Order, the Debtors are hereby authorized to borrow the Interim Amount and the Interim Roll-Up Amount, subject to any limitations on, or conditions to, borrowing under the DIP Documents, which borrowings shall be used solely for purposes permitted under the DIP Documents, including, without limitation, to provide working capital for the Debtors and to pay interest, fees, costs, charges and expenses, in each case, in accordance with this Interim Order, the DIP Documents, and the Approved Budget.

4.    <u>DIP Obligations</u>.  The DIP Documents and this Interim Order shall constitute and evidence the validity and binding effect of the Debtors' DIP Obligations. All DIP Obligations shall be enforceable against the Debtors, their Estates, and any successors thereto, including without limitation, any trustee appointed in the Chapter 11 Cases, or in any case under chapter 7 of the Bankruptcy Code upon the conversion of any of the Chapter 11 Cases, or in any other proceedings superseding or related to any of the foregoing (collectively, the "<u>Successor Cases</u>"). Upon entry of this Interim Order, the DIP Obligations will include all loans, guarantees, reimbursement

obligations, and any other indebtedness or obligations, contingent or absolute, which may now or from time to time be owing by any of the Debtors to the DIP Secured Parties, including, without limitation, all principal, accrued interest, costs, charges, fees, expenses and other amounts under the DIP Documents.  The Debtors shall be jointly and severally liable for the DIP Obligations.  The DIP Obligations shall become due and payable, without notice or demand, on the Termination Date (as defined below).  No obligation, payment, transfer, or grant of collateral security hereunder or under the DIP Documents (including any DIP Obligation or DIP Liens) to the DIP Secured Parties, shall be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 544, and 547 to 550 of the Bankruptcy Code or under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or be subject to any disgorgement, avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), claim, counterclaim, charge, assessment, cross-claim, defense, or any other liability or challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity for any reason.

5.      <u>DIP Collateral</u>.  To secure the DIP Obligations, effective immediately upon entry of this Interim Order, pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the DIP Agent (for the benefit of the DIP Lenders), is hereby granted, continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected postpetition security interests in and liens on (collectively, the "<u>DIP Liens</u>") the DIP Collateral, and all cash and non-cash proceeds of DIP Collateral.[4]

---

[4] "<u>DIP Collateral</u>" means: all property of the estate under section 541 of the Bankruptcy Code, including all real and personal property, whether now existing or hereafter arising and wherever located, tangible and intangible, of each of the Debtors, including: (a) all cash, cash equivalents, deposit accounts, securities accounts, accounts, other receivables (including credit card receivables), chattel paper, contract rights, inventory (wherever located),

6. <u>DIP Liens</u>. The DIP Liens securing the DIP Obligations are valid, automatically perfected, non-avoidable, senior in priority to the Prepetition Liens on the Prepetition Collateral and are superior to any security, mortgage, collateral interest, lien, or claim to any of the DIP Collateral (whether currently existing or hereafter created), except that the DIP Liens shall be subject only to (i) the Carve-Out, (ii) the Administration Charge as against the Canadian Collateral, and (iii)  the Prepetition Permitted Liens. Other than as set forth herein or in the DIP Documents, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Cases, and shall be valid and enforceable against any trustee appointed in the Chapter 11 Cases or any Successor Cases, upon the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code (or in any other Successor Case), and/or upon the dismissal of any of the Chapter 11 Cases or Successor Cases. The DIP Liens shall not be subject to section 510, 549, or 550 of the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of any Estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the DIP Liens.

---

instruments, documents, securities (whether or not marketable) and investment property (including all of the issued and outstanding capital stock of each of its subsidiaries), hedge agreements, real estate (including, for the avoidance of doubt, that certain real property owned by Red Lobster Canada, Inc. located at 67 King George Road, Brantford, Ontario, N3R 5K2), furniture, fixtures, equipment (including documents of title), goods, franchise rights, trade names, trademarks, servicemarks, copyrights, patents, license rights, intellectual property, general intangibles (including, for the avoidance of doubt, payment intangibles), rights to the payment of money (including tax refunds and any other extraordinary payments), supporting obligations, guarantees, letter of credit rights, commercial tort claims, causes of action, and all substitutions, indemnification rights, all present and future intercompany debt, books and records related to the foregoing, accessions and proceeds of the foregoing, wherever located, including insurance or other proceeds; (b) all proceeds of leased real property; (c) subject to entry of a Final Order providing for such relief, the proceeds of any avoidance actions brought pursuant to Chapter 5 of the Bankruptcy Code or applicable state law equivalents; (d) proceeds from the Debtors' exercise of rights under section 506(c) and 550 of the Bankruptcy Code; (e) all Prepetition Collateral, (f) all property of the Debtors that was not otherwise subject to valid, perfected, enforceable and unavoidable liens on the Petition Date, and (g) all proceeds from the sale, assignment, or other disposition of (i) any commercial real estate leases and (ii) the Debtors' right to select, identify, and designate which commercial leases may be assumed and assigned under section 365 of the Bankruptcy Code. Notwithstanding the foregoing, DIP Collateral shall not include the Debtors' real property leases (but shall include all proceeds of such leases) solely to the extent that the grant of a DIP Lien is prohibited or restricted by the terms of such real property lease or applicable nonbankruptcy law to attach to any such real property lease.

7.      <u>DIP Superpriority Claims</u>.  Subject to the Carve-Out and the Administration Charge against the Canadian Collateral, upon entry of this Interim Order, the DIP Secured Parties are hereby granted, pursuant to section 364(c)(1) of the Bankruptcy Code, allowed superpriority administrative expense claims in each of the Chapter 11 Cases and any Successor Cases (collectively, the "<u>DIP Superpriority Claims</u>") for all DIP Obligations: (a) except as set forth herein (including with respect to the Carve-Out), with priority over any and all administrative expense claims and unsecured claims against the Debtors or their Estates in any of the Chapter 11 Cases and any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to Bankruptcy Code sections 105, 326, 328, 330, 331, 364, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114, and any other provision of the Bankruptcy Code, as provided under section 364(c)(1) of the Bankruptcy Code; and (b) which shall at all times be senior to the rights of the Debtors and their Estates, and any successor trustee or other estate representative to the extent permitted by law.

8.      <u>DIP Roll-Up Obligations</u>.  Upon entry of the Interim Order, and upon each draw on the DIP Facility prior to entry of the Final Order, Prepetition Term Loan Obligations in an aggregate amount equal to the Interim Roll-Up Amount shall be converted on a cashless dollar-for-dollar basis into principal obligations constituting DIP Obligations without any further action by the Debtors or any other party.   Upon entry of the Final Order, Prepetition Term Loan Obligations in an aggregate amount equal to the Final Roll-Up Amount shall be converted on a cashless dollar-for-dollar basis into principal obligations constituting DIP Obligations without any further action by the Debtors or any other party.

9.      <u>No Obligation to Extend Credit</u>.  The DIP Secured Parties shall have no obligation to make any loan or advance under the DIP Documents unless all of the conditions precedent under the DIP Documents and this Interim Order have been satisfied in full or waived by the Required Lenders in accordance with the terms of the DIP Documents.

10.      <u>Use of Proceeds of DIP Facility</u>.  From and after the Petition Date, the Debtors shall use advances of credit under the DIP Facility only for the purposes specifically set forth in this Interim Order and the DIP Documents, and only in compliance with the Approved Budget (subject to the Permitted Variances) and the terms and conditions in this Interim Order and the DIP Documents (a) to repay the obligations under that certain the Prepetition ABL Credit Agreement in full (including cash collateralization of Wells Fargo Letters of Credit, p-cards and Surviving Obligations (as defined in the Payoff Letter)) pursuant to the terms of the Payoff Letter, (b) to pay transaction costs, fees and expenses that are incurred in connection with the DIP Facility, (c) to pay professional fees of the Debtors and their Estates and the Committee, (d) for working capital and other general corporate purposes permitted by the DIP Documents, (e) to pay Statutory Fees (as defined herein at paragraph 38(i)), (f) if necessary, to fund the Excluded Cash (as that term is defined in the Stalking Horse Acquisition Agreement) subject to this Interim Order or the Final Order, as applicable.  The deemed proceeds of the Roll-Up Obligations shall be used to refinance an equal amount of the Prepetition Term Loan Obligations held by the DIP Lenders (or their affiliates) reducing the amount of the "Obligations" (as defined in the Prepetition Credit Agreement) by such amount.

11.      <u>No Monitoring Obligation</u>.  The DIP Secured Parties shall have no obligation or responsibility to monitor the Debtors' use of the DIP Facility, and the DIP Secured Parties may

rely upon the Debtors' representation that the use of the DIP Facility at any time is in accordance with the requirements of this Interim Order and the DIP Documents.

<div align="center">Authorization to Use Cash Collateral</div>

12.    <u>Authorization to Use Cash Collateral</u>.  Subject to the terms and conditions of this Interim Order and the DIP Documents, and in accordance with the Approved Budget (subject to the Permitted Variances), the Debtors are authorized to use Cash Collateral until the expiration of the Remedies Notice Period (as defined below) following the Termination Date.  Nothing in this Interim Order shall authorize the disposition of any assets of the Debtors outside the ordinary course of business, or any Debtor's use of any Cash Collateral or other proceeds resulting therefrom, except as permitted by this Interim Order and the DIP Documents, and in accordance with the Approved Budget (subject to the Permitted Variances), as applicable.

13.    <u>Consent of Prepetition Secured Parties</u>.  The Prepetition Secured Parties hereby consent to (a) the provisions of this Interim Order including the Debtors' entry into the DIP Facility on an interim basis, (b) the granting of the DIP Liens and DIP Superpriority Claims on the terms and subject to the conditions set forth herein (including the Carve-Out and the Administration Charge as against the Canadian Collateral), and (c) the Approved Budget.

14.    <u>Adequate Protection for Prepetition Term Loan Parties</u>.  As adequate protection for any Diminution of the Prepetition Term Loan Parties' interest in the Prepetition Collateral resulting from the subordination of the Prepetition Liens to the DIP Liens, the Canadian Priority Charges as against the Canadian Collateral, and the Carve-Out, the Prepetition Term Loan Agent shall receive, for the benefit of the Prepetition Term Loan Parties,

(a) continuing valid, binding, enforceable, and perfected postpetition liens and replacement liens pursuant to sections 361, 363(e), and 364(d)(l) of the

<div align="center">27</div>

Bankruptcy Code on the DIP Collateral, which shall be subject only to the Carve-Out, the DIP Liens, and Prepetition Permitted Liens (the "<u>Replacement Liens</u>") and which (x) shall otherwise be senior to all other security interests in, liens on, or claims against the DIP Collateral, and (y) shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Chapter 11 Cases or any Successor Cases, shall be valid and enforceable against any trustee appointed in any of the Chapter 11 Cases or any Successor Cases, and shall not be subject to sections 510, 549, or 550 of the Bankruptcy Code;

(b) administrative superpriority expense claims in each of the Chapter 11 Cases (the "<u>Adequate Protection Superpriority Claims</u>"), subject only to the Carve-Out and the DIP Obligations (including the DIP Superpriority Claims), pursuant to section 507(b) with priority over any and all other administrative expenses, administrative expense claims and unsecured claims against the Debtors or their Estates, now existing or hereafter arising, of any kind or nature whatsoever as to and to the extent provided by sections 503(b) and 507(b) of the Bankruptcy Code;

(c) (i) subject to the procedures set forth in paragraph 41 of this Interim Order, monthly payments of the Prepetition Term Loan Parties' reasonable and documented out-of-pocket fees and expenses including the professional fees of Proskauer Rose LLP, Trenam, Kemker, Scharf, Barkin, Frye, O'Neill and Mullis, P.A., Deloitte Transactions & Business Analytics LLP, and any other Prepetition Professionals (as defined below) (in each case, without the need for

28

the filing of formal fee applications, including as to any amounts arising before or after the Petition Date) and (ii) monthly payment in kind of interest to the Prepetition Term Loan Lenders under the Prepetition Credit Agreement, calculated at the "Default Rate" as defined in the Prepetition Credit Agreement to the extent allowed under section 506(b) of the Bankruptcy Code; and

(d) the right to credit bid the Prepetition Term Loan Obligations in connection with any sale of Prepetition Collateral, including, without limitation, as set forth in paragraph 43 hereof.

15.    <u>Satisfaction of Prepetition ABL Obligations</u>.    The Debtors are authorized to perform the obligations set forth in the Payoff Letter, and in furtherance thereof, the Prepetition ABL Agent shall receive, for the benefit of the Prepetition ABL Parties,

(a) From the Interim Amount drawn under the DIP Facility, the Debtors shall deposit with the Prepetition ABL Agent, (i) $14,133,599.18 to cash collateralize Letters of Credit Obligations at 103% of their face amount as cash collateral to be held by Prepetition ABL Agent for the benefit of the Prepetition ABL Lenders (together with the 16,021,091.79 held by the Prepetition ABL Agent to cash collateralize the Letters of Credit), (ii) $1,100,000 as cash collateral to be held by Prepetition ABL Agent for the benefit of the Bank Product Providers (as defined in the Payoff Letter) with respect to Bank Products, and (iii) $250,000 in respect of the Expense Reserve (as defined in the Payoff Letter) (such cash collateral, together with cash collateral held by the Prepetition ABL Agent as of the Petition Date, the "<u>Segregated Cash Collateral</u>");

(b) subject to the procedures set forth in paragraph 41 of this Interim Order, monthly payments of the Prepetition ABL Agent's reasonable and documented out-of-pocket fees and expenses including the professional fees of Goldberg Kohn Ltd. and Burr & Forman LLP, without the need for the filing of formal fee applications, including as to any amounts arising before or after the Petition Date); and

(c) In accordance with the Payoff Letter, upon satisfaction of the Payoff Conditions (as defined therein), the liens and security interests of the Prepetition ABL Agent in any and all of the Prepetition Collateral (but not the Segregated Cash Collateral) shall automatically, irrevocably and immediately be deemed to be released and terminated.

16.     _Adequate Protection Reservation_.  Nothing herein shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided to the Prepetition Secured Parties hereunder is insufficient to compensate for any Diminution of their respective interests in the Prepetition Collateral during the Chapter 11 Cases or any Successor Cases.  The receipt by the Prepetition Secured Parties of the adequate protection provided herein shall not be deemed an admission that the interests of the Prepetition Secured Parties are adequately protected, and this Interim Order shall not prejudice or limit the rights of the Prepetition Secured Parties to seek additional relief with respect to the use of Cash Collateral or for additional adequate protection.

17.     _Application of Segregated Cash Collateral_.

(i)     Notwithstanding anything to the contrary herein, Wells Fargo (as L/C Issuer) shall be authorized and entitled to (a) pursuant to the terms of the Prepetition ABL Loan

30

Documents (i) without notice or demand, and at any time or from time to time, charge, set off and otherwise apply all or any part of the Surviving Obligations, Letter of Credit Obligations, and Bank Product Obligations (each as defined in the Payoff Letter) against the Segregated Cash Collateral or any part thereof and (ii) exercise all other rights and remedies available to it thereunder in respect of the Letters of Credit and the Bank Products and (b) give written notice of non-extension of the Wells Fargo Letters of Credit to the beneficiaries thereof pursuant to the terms of the Wells Fargo Letters of Credit and, in each case, the automatic stay is hereby deemed lifted as necessary to permit such action without the need for any additional notice. The Segregated Cash Collateral secures all Surviving Obligations, Letter of Credit Obligations, and Bank Product Obligations (each as defined in the Payoff Letter), including Lender Group Expenses (as defined under the Prepetition ABL Credit Agreement) incurred in connection therewith. The Segregated Cash Collateral is not subject to turnover under section 543 of the Bankruptcy Code. For all purposes under this Interim Order and notwithstanding anything to the contrary contained herein, the Segregated Cash Collateral may only be used for purposes of satisfying the Surviving Obligations, Letter of Credit Obligations, and Bank Product Obligations (each as defined in the Payoff Letter) as set forth above, and for no other purpose, until such Surviving Obligations, Letter of Credit Obligations, and Bank Product Obligations (each as defined in the Payoff Letter) have been paid in full in cash.

(ii)    The Debtors may, and do, authorize Wells Fargo in its capacity as cash management service provider (including with respect to any purchasing card, procurement card or other credit or debit cards), and Wells Fargo may, without the need for further order of this Court, hold or otherwise set aside an amount of funds reasonably necessary to cover outstanding items and potential reversals, returns, refunds, or chargebacks of checks, deposited items, and other

debits credited to Debtor's account and any fees and costs in connection therewith or accruing with respect thereto, and Wells Fargo shall have valid and perfected, non-avoidable first-priority lien on the Segregated Cash Collateral.  Wells Fargo may debit or setoff against such funds for any outstanding cash management liabilities owing to it in accordance with the existing deposit agreements and other cash management agreements between Debtors and Wells Fargo. All payments to Wells Fargo authorized pursuant to this paragraph 17(ii) and all interest, fees, costs and other charges related thereto or accruing with respect thereto shall be accorded superpriority administrative expense status pursuant to section 503(b) of the Bankruptcy Code and shall be satisfied first from the Segregated Cash Collateral to the extent not paid by the Debtors.

(iii)    For the avoidance of doubt, the Segregated Cash Collateral is subject to the exclusive control and dominion of the Prepetition ABL Agent, and any interest of the DIP Secured Parties in the Segregated Cash Collateral is limited to the Debtors' residual interest in the Segregated Cash Collateral after all of the Surviving Obligations, Bank Product Obligations, and Letter of Credit Obligations (each as defined in the Payoff Letter) secured thereby pursuant to the Payoff Letter and this Interim Order are otherwise paid in full in cash.

<u>Provisions Common to DIP Financing and Use of Cash Collateral</u>

18.    <u>Amendment of the DIP Documents</u>.  The Debtors and the DIP Agent and Required Lenders (or as otherwise provided in the DIP Documents) may enter into one or more amendments, waivers, consents, or other modifications to and under the DIP Documents, in each case in accordance with the terms of the applicable DIP Documents and in such form as the Debtors, the DIP Agent, and the Required Lenders (or as otherwise provided in the DIP Documents) agree, in such applicable DIP Lenders' sole discretion, and no further approval of this Court shall be required for any amendment, waiver, consent, or other modification to and under the DIP

Documents (and any fees paid in connection therewith) that does not materially and adversely affect the Debtors or which does not (i) shorten the maturity of the DIP Facility, (ii) increase the principal amount of or the rate of interest on the DIP Facility, or (iii) change any event of default, add any covenants, or amend the covenants to be materially more restrictive; *provided*, *however*, any such material amendment, waiver, consent, or other modification shall be subject to further Court approval.  Copies of all amendments and modifications to and under the DIP Documents, regardless of materiality, shall be provided to the U.S. Trustee and the Committee.  No consent to any such amendment, waiver, consent, or modification shall be implied by any action, inaction, or acquiescence of the DIP Secured Parties.

19.    <u>Approved Budget</u>.

(i)    Attached to this Interim Order as **<u>Exhibit B</u>** is a 13-week budget approved by the DIP Agent, which sets forth, among other things, projected cash receipts and cash disbursements (the "<u>Approved Budget</u>").  After the Effective Date, on the first Friday of each fiscal month, commencing with the first Friday of the first full fiscal month ending after the Effective Date (each such date, an "<u>Updated Budget Delivery Date</u>"), the Debtors shall deliver to the DIP Agent a 13-week cash flow forecast beginning with the week immediately preceding such Updated Budget Delivery Date (each, an "<u>Updated Budget</u>"), in form substantially consistent with the Approved Budget annexed hereto at Exhibit B and in form and substance acceptable to the Required Lenders.  If such Updated Budget is in form and substance satisfactory to the DIP Agent (acting at the direction of the Required Lenders), and upon the approval in writing of any such updated budget by the DIP Agent (acting at the direction of the Required Lenders), it shall become the "Approved Budget" for purposes of the DIP Documents and the DIP Orders.  Any amendments, supplements, or modifications to the Approved Budget or an Approved Variance Report (as defined

below) shall be subject to the prior written approval of the DIP Agent (acting at the direction of the Required Lenders) prior to the implementation thereof.  Until any such updated budget, amendment, supplement, or modification has been approved by the DIP Agent (acting at the direction of the Required Lenders), the Debtors shall be subject to and be governed by the terms of the Approved Budget then in effect.

(ii)    The Approved Budget is approved on an interim basis.  The proceeds of the DIP Facility and Cash Collateral under this Interim Order shall be used by the Debtors solely in accordance with the Approved Budget (subject to Permitted Variances), this Interim Order, and the DIP Documents.

(iii)    Other than with respect to the Carve-Out and the funding of the Post-Trigger Reserve Account (defined below), and except as provided in paragraphs 33 and 35, none of the DIP Secured Parties' and the Prepetition Term Loan Parties' consent to, or acknowledgement of, the Approved Budget shall be construed as consent to use the proceeds of the DIP Facility or Cash Collateral beyond the Maturity Date or the occurrence of the Termination Date, regardless of whether the aggregate funds shown on the Approved Budget have been expended.

(iv)    Notwithstanding anything to the contrary herein, the Debtors shall pay the fees, costs and expenses of the DIP Professionals (as defined below) in accordance with the DIP Documents and this Interim Order without reference to the Approved Budget.

20.    <u>Budget Reporting</u>.  The Debtors shall at all times comply with the Approved Budget, subject to the Permitted Variances (as defined below).  By not later than 5:00 p.m. (Eastern Time) on Friday of the third full calendar week following the Petition Date (the "<u>First Report Date</u>"), and no later than 12:00 p.m. (Eastern Time) on each Friday thereafter (together with the First Report Date, each a "<u>Weekly Budget Variance Report Date</u>"), the Debtors shall deliver to the

DIP Agent a Weekly Budget Variance Report comparing for such Weekly Budget Variance Report Period (as defined below) the actual results against anticipated results under the Approved Budget, on an aggregate basis and in the same level of detail set forth in the applicable Approved Budget (an "Approved Variance Report") showing comparisons of (a) aggregate actual cumulative cash receipts for such Budget Variance Test Period compared to the aggregate projected cumulative cash receipts of the Debtors for such Budget Variance Test Period as set forth in the Approved Budget (any such difference, a "Receipts Variance") and (b) actual cumulative cash disbursements on a line by line basis of the Debtors for such Budget Variance Test Period compared to the projected cumulative cash disbursements on a line by line basis for such Budget Variance Test Period as set forth in the Approved Budget (any such difference, a "Disbursements Variance"). The term "Weekly Budget Variance Report Period" means the fiscal month to date period ending on each Friday of the weeks preceding the applicable Budget Variance Test Date (with initial partial periods as appropriate).

21.    Budget Testing.  After the Effective Date, the Budget Testing provided in this paragraph 21 shall be tested for each Budget Variance Test Period.  Within five (5) business days of the Budget Variance Test Date, the Debtors shall deliver to the DIP Agent a Fiscal Month Budget Variance Report.  On each Budget Variance Test Date while any DIP Term Loans remain outstanding, the Borrower shall not permit: (a) cumulative actual disbursements for such Budget Variance Test Period (excluding (i) estate professional fees and U.S. Trustee fees and (ii) fees and expenses payable to the DIP Agent's professionals under the DIP Documents) to be greater than (1) for the first two Budget Variance Test Periods, 115% of the forecasted total disbursements for such Budget Variance Test Period in the applicable Approved Budget and (2) for each Budget Variance Test Period thereafter, 110% of the forecasted total disbursements for such Budget

Variance Test Period in the applicable Approved Budget; and (b) cumulative actual receipts for such Budget Variance Test Period to be less than (1) for the first two Budget Variance Test Periods, 85% of the forecasted total receipts for such Budget Variance Test Period in the applicable Approved Budget and (2) for each Budget Variance Test Period thereafter, 90% of the forecasted total receipts for such Budget Variance Test Period in the applicable Approved Budget.

22.    <u>Additional Reporting</u>.  The Debtors shall deliver to the DIP Agent each of the reports and other information set forth in Section 7.01(a) of the DIP Credit Agreement within the timeframe set forth therein, in form and detail acceptable to the DIP Agent.  The Debtors shall also make the Debtors' professionals available upon reasonable notice, for in-person, telephonic, or virtual meetings to update the DIP Agent and the DIP Professionals on all matters affecting the Debtors and the Chapter 11 Cases, including with respect to the efforts to market and sell the DIP Collateral.

23.    <u>Modification of Automatic Stay</u>.  The automatic stay of section 362 of the Bankruptcy Code is hereby modified and vacated to the extent necessary to permit the Debtors, the DIP Secured Parties and the Prepetition Secured Parties to accomplish the transactions contemplated by this Interim Order.

24.    <u>Perfection of DIP Liens and Replacement Liens</u>.  This Interim Order shall be sufficient and conclusive evidence of the creation, validity, perfection, and priority of all liens granted herein, including the DIP Liens and the Replacement Liens, without the necessity of filing or recording any financing statement, mortgage, deed of trust, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the

36

DIP Liens and the Replacement Liens or to entitle the DIP Secured Parties and the Prepetition Secured Parties to the priorities granted herein. Notwithstanding the foregoing, the DIP Agent and the Prepetition Agents (for the benefit of the DIP Secured Parties and the Prepetition Secured Parties, respectively) are authorized, but not required, to file, as each deems necessary or advisable, such financing statements, security agreements, mortgages, notices of liens, and other similar documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence the DIP Liens and the Replacement Liens, and all such financing statements, mortgages, notices, and other documents shall be deemed to have been filed or recorded as of the Petition Date; *provided, however*, that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens or the Replacement Liens. The Debtors are authorized and directed to execute and deliver promptly upon demand to the DIP Agent and the Prepetition Agents all such financing statements, mortgages, notices and other documents as each may reasonably request. The DIP Agent and the Prepetition Agents may each, in its discretion, file a photocopy of this Interim Order as a financing statement with any filing or recording office or with any registry of deeds or similar office in addition to or in lieu of such financing statements, notices of lien or similar instruments. To the extent that either Prepetition Agent is, with respect to the DIP Collateral, the secured party under any security agreement, mortgage, leasehold mortgage, landlord waiver, credit card processor notices or agreements, bailee letters, custom broker agreements, financing statement, account control agreements, or any other Prepetition Loan Documents or is listed as loss payee, lenders' loss payee or additional insured under any of the Debtors' insurance policies, the DIP Agent (for the benefit of the DIP Secured Parties) shall also be deemed to be the secured party or mortgagee, as applicable, under such documents or to be the loss payee or additional insured, as applicable. The Prepetition Agents shall act as agent for the

DIP Secured Parties solely for purposes of perfecting the DIP Secured Parties' liens on all DIP Collateral that, without giving effect to the Bankruptcy Code and this Interim Order, is of a type such that perfection of a lien therein may be accomplished only by possession or control by a secured party (including any deposit account control agreement), and all of the Prepetition Agents' respective rights in such DIP Collateral shall inure to the benefit of and be exercisable exclusively by the DIP Agent until the DIP Obligations have been indefeasibly repaid in full in cash; *provided*, that the DIP Agent may, in its sole discretion, require the Debtors and the Prepetition Agents to (and the Debtors and the Prepetition Agents shall) use commercially reasonable efforts to provide the DIP Agent with such possession or control as is necessary to perfect the DIP Obligations and DIP Priority Liens.  Notwithstanding the foregoing, in the event any of the Chapter 11 Cases or Successor Cases are dismissed prior to the indefeasible payment in full of the DIP Obligations, such order dismissing any Chapter 11 Cases or Successor Cases shall not be effective for five (5) business days to permit the DIP Agent and the Prepetition Agents to enter into any agreements or file any documents (including credit agreements, financing statements, mortgages, or other notices or documents) evidencing the DIP Obligations and the perfection and priority of the DIP Liens and Replacement Liens, and during such period, the Debtors shall comply with all reasonable requests of the DIP Agent and the Prepetition Agents to ensure the perfection of the DIP Liens and the Replacement Liens, as applicable.

25.    <u>Access to Books and Records</u>.  The Debtors will (i) maintain books, records, and accounts to the extent and as required by the DIP Documents, (ii) cooperate with, consult with, and, subject to attorney-client privilege, work product doctrine, and any similar applicable protections, provide to the DIP Agent and the DIP Lenders all such information and documents that any or all of the Debtors are obligated to provide under the DIP Documents or the provisions

of this Interim Order or as otherwise reasonably requested by the DIP Agent and the DIP Lenders, (iii) during normal business hours, upon reasonable advance notice, permit consultants, advisors and other representatives (including third party representatives) of the DIP Agent and the DIP Lenders to visit and inspect any of the Debtors' respective properties, to examine and make abstracts or copies from any of their respective books and records, to conduct a collateral audit and analysis of their respective inventory and accounts, to tour the Debtors' business premises and other properties, and to discuss, and provide advice with respect to, their respective senior management independent public accountants to the extent required by the DIP Documents or the Prepetition Loan Documents, and (iv) permit the DIP Secured Parties, and the Prepetition Secured Parties, and their respective consultants, advisors and other representatives, to consult with the Debtors' management and advisors on matters concerning the Debtors' businesses, financial condition, operations and assets, as provided for in the DIP Documents.

26.    <u>Proceeds of Subsequent Financing</u>.  If the Debtors, any trustee, any examiner with expanded powers, or any responsible officer subsequently appointed in these Chapter 11 Cases or any Successor Cases, shall obtain credit or incur debt pursuant to Bankruptcy Code sections 364(b), 364(c) or 364(d) or in violation of the DIP Documents at any time prior to the indefeasible repayment in full in cash of all DIP Obligations and the termination of the DIP Lenders' obligation to extend credit under the DIP Facility, including subsequent to the confirmation of any plan with respect to any or all of the Debtors and the Debtors' Estates, and such facilities are secured by any DIP Collateral, then all cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Agent (for the benefit of the DIP Secured Parties) to be distributed in accordance with this Interim Order and the DIP Documents.  For the avoidance of doubt, if the Debtors, any trustee, any examiner with expanded powers, or any

responsible officer subsequently appointed in the Chapter 11 Cases, or any Successor Cases, shall obtain credit or incur debt (other than the DIP Facility) pursuant to Bankruptcy Code section 364(d) at any time prior to the indefeasible repayment in full of the Prepetition Obligations, the Prepetition Secured Parties' rights to object to the Debtors' use of Cash Collateral and assert a lack of adequate protection shall be fully preserved.

27.    <u>Cash Management</u>.  The Debtors shall maintain their cash management system consistent with the terms and conditions of any interim and/or final order, which shall be reasonably acceptable to the DIP Agent, the Prepetition Term Loan Agent, and the Prepetition ABL Agent, granting the Debtors authorization to continue their cash management systems and certain related relief (as amended, supplemented, or otherwise modified, the "<u>Cash Management Order</u>"), the DIP Documents, and this Interim Order.

28.    <u>Maintenance of DIP Collateral</u>.  Until the indefeasible payment in full in cash of all DIP Obligations, all Prepetition Obligations, and the termination of the DIP Lenders' obligation to extend credit under the DIP Facility, the Debtors shall: (a) insure the DIP Collateral as required under the DIP Documents or the Prepetition Loan Documents, as applicable; and (b) maintain the cash management system consistent with the terms and conditions of the Cash Management Order and the DIP Documents.

29.    <u>Disposition of DIP Collateral</u>.  The Debtors shall not sell, transfer, lease, encumber, or otherwise dispose of any portion of the DIP Collateral or Prepetition Collateral, other than in the ordinary course of business or as otherwise permitted by the DIP Documents, without the prior consent of the Required Lenders, or pursuant to a sale of all or substantially all of the Debtors' assets in accordance with the 363 Sale Motion and 363 Sale Transaction (each as defined in the DIP Credit Agreement).  Except as may be provided in the DIP Documents, the Debtors are

authorized and directed, upon the closing of a sale of any of the DIP Collateral, to immediately

pay all proceeds of any such sale to the DIP Agent, for the benefit of the DIP Secured Parties and

the Prepetition Agents, for the benefit of the Prepetition Secured Parties, first to satisfy the DIP

Obligations and then to satisfy the Prepetition Obligations in accordance with this Interim Order

and the DIP Documents, and any order approving the sale of such DIP Collateral shall provide that

the sale is conditioned upon the payment of the DIP Obligations and Prepetition Obligations

(except to the extent otherwise agreed in writing by the DIP Agent or Prepetition Agents in respect

of the applicable obligations owed to them), *provided*, that any such sale of DIP Collateral shall

exclude Segregated Cash Collateral until the Surviving Obligations, Bank Product Obligations,

and Letter of Credit Obligations secured thereby pursuant to the terms of the Payoff Letter or this

Interim Order are paid in full.

30.    <u>Termination Date</u>.  On the Termination Date (defined below), all DIP Obligations

shall be immediately due and payable, and all commitments to extend credit under the DIP Facility

will terminate other than as permitted by the Carve-Out.

31.    <u>Events of Default</u>.  Until the DIP Obligations are indefeasibly paid in full in cash

and all commitments thereunder are terminated in accordance with the DIP Documents, the

occurrence of any of the following events, unless waived by the Required Lenders (or as otherwise

provided in the DIP Documents) in writing (which may be by electronic mail) and in accordance

with the terms of the DIP Documents, shall constitute an event of default (collectively, the "<u>Events</u>

<u>of Default</u>"): (a) the failure of the Debtors to perform, in any material respect, any of the terms,

provisions, conditions, covenants, or obligations under this Interim Order, including, without

limitation, failure to make any payment under this Interim Order when due or comply with any

Milestones (as defined below) (except as waived by the Required Lenders); and (b) the occurrence

and continuation of any Event of Default under, and as defined in, the DIP Credit Agreement or any other DIP Documents (subject to any notice and cure periods set forth therein).

32.     <u>Milestones</u>. As a condition to the DIP Facility and the use of Cash Collateral, the Debtors have agreed to the Milestones (as defined in the DIP Credit Agreement). For the avoidance of doubt, unless waived in writing by the DIP Agent in its sole discretion, the failure of the Debtors to meet the Milestones by the applicable specified deadlines set forth therefor shall constitute an Event of Default under the DIP Documents and this Interim Order.

33.     <u>Rights and Remedies Upon Event of Default</u>. Upon the occurrence and during the continuation of an Event of Default, notwithstanding the provisions of Bankruptcy Code section 362, without any application, motion or notice to, hearing before, or order from the Court, other than, subject to the terms of this Interim Order: (a) the DIP Agent (at the direction of the applicable Required Lenders, or as otherwise provided in the DIP Documents) may send a written notice to the Debtors, counsel to the Committee, the Prepetition ABL Agent, and the U.S. Trustee (any such declaration shall be referred to herein as a "<u>Termination Declaration</u>"), which shall be filed on the docket of the Chapter 11 Cases, declaring (1) all DIP Obligations owing under the DIP Documents to be immediately due and payable, (2) the commitment of each DIP Lender to make DIP Term Loans to be terminated, whereupon such commitments and obligation shall be terminated to the extent any such commitment remains under the DIP Facilities, (3) the termination of the DIP Facilities and the DIP Documents as to any future liability or obligation of the DIP Lenders or DIP Agent, but without affecting any of the DIP Liens or the DIP Obligations, and (4) the application of the Carve-Out has occurred following the delivery of the Carve Out Trigger Notice (as defined below) to the Borrower; (b) interest, including, where applicable, default interest, shall accrue and be paid as set forth in the DIP Documents; and (c) upon delivery of the Termination Declaration,

the DIP Agent (at the direction of the Required Lenders) shall be deemed to have declared a termination, reduction, or restriction on the ability of the Debtors to use Cash Collateral, other than to pay expenses set forth in the Approved Budget that are necessary to avoid immediate and irreparable harm to the Debtors' estates. The earliest date on which a Termination Declaration is delivered by the DIP Agent (at the direction of the Required Lenders) and filed on the Docket shall be referred to herein as the "Termination Date." Following a Termination Date, neither the DIP Lenders or DIP Agent nor the Prepetition Secured Parties shall be required to consent to the use of any Cash Collateral or provide any loans or other financial accommodations under the DIP Facility, absent further order of the Court. The Termination Declaration shall be given by electronic mail (or other electronic means) to counsel to the Debtors, counsel to the Committee, and the U.S. Trustee.

34.    No Waiver by Failure to Seek Relief. The rights and remedies of the DIP Secured Parties and the Prepetition Secured Parties are cumulative and not exclusive of any rights or remedies that the DIP Secured Parties or the Prepetition Secured Parties may have under the DIP Documents, the Prepetition Loan Documents, applicable law, or otherwise. The failure or delay on the part of any of the DIP Secured Parties or the Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies under this Interim Order, the DIP Documents, the Prepetition Loan Documents, or applicable law, as the case may be, shall not constitute a waiver of any of their respective rights or be deemed as an admission that no Event of Default has occurred. No delay on the part of any party in the exercise of any right or remedy under this Interim Order, the DIP Documents, or the Prepetition Loan Documents shall preclude any other or further exercise of any such right or remedy or the exercise of any other right or remedy. Except as expressly set forth herein, none of the rights or remedies of any party under this Interim Order,

the DIP Documents, and the Prepetition Loan Documents shall be deemed to have been amended, modified, suspended, or waived unless such amendment, modification, suspension, or waiver is express, in writing and signed by the requisite parties under the DIP Documents and the requisite parties under the Prepetition Loan Documents, as applicable.  No consents required hereunder by any of the DIP Secured Parties or the Prepetition Secured Parties shall be implied by any inaction or acquiescence by any of the DIP Secured Parties or the Prepetition Secured Parties (as applicable).

35.    <u>Emergency Hearing</u>.  Upon the delivery of a Termination Declaration, the Debtors, the Committee, if any, the DIP Lenders, the DIP Agent, and the Prepetition Secured Parties consent to a hearing on an expedited basis solely to consider whether an Event of Default has occurred and is continuing.  During the five (5) calendar days following the date a Termination Declaration is delivered (such five (5) calendar day period, the "<u>Remedies Notice Period</u>"), the Debtors shall continue to have the right to use Cash Collateral in accordance with the terms of the Interim Order, solely to pay necessary expenses set forth in the Approved Budget to avoid immediate and irreparable harm to the Estates.  At the end of the Remedies Notice Period, unless the Court has entered an order to the contrary, the Debtors' right to use Cash Collateral shall immediately cease, unless otherwise provided herein and the DIP Agent and DIP Lenders shall have the rights set forth immediately below.

36.    <u>Certain Rights and Remedies Following Termination Date</u>.    Following a Termination Date and upon either the expiration of the Remedies Notice Period or pursuant to an order of the Court (which may authorize the remedies set forth in this paragraph or any other appropriate remedy as then determined by the Court) upon an emergency motion by the DIP Agent (at the direction of the Required Lenders) to be heard on no less than five (5) calendar days' notice

(and the Debtors shall not object to such shortened notice) (the "Termination Enforcement Order"), the DIP Agent shall be entitled to exercise all rights and remedies in accordance with the DIP Documents, the DIP Orders, and applicable law and shall be permitted to satisfy the relevant DIP Obligations and DIP Liens based on the priorities set forth in the DIP Documents, subject to the Carve-Out, the Administration Charge as against the Canadian Collateral and any Prepetition Permitted Liens.  Following entry of the Termination Enforcement Order, except as otherwise ordered by the Court (including in any Termination Enforcement Order): (a) the Debtors are hereby authorized and directed to, with the exclusion of the Carve-Out, remit to the DIP Agent (for the benefit of the DIP Lenders) one-hundred percent (100%) of all collections, remittances, and proceeds of the DIP Collateral in accordance with the DIP Documents; (b) the DIP Agent (at the direction of the Required Lenders or as otherwise provided in the DIP Documents) may compel the Debtors to seek authority to, (i) sell or otherwise dispose of all or any portion of the DIP Collateral (or any other property of the Debtors to the extent a lien is not permitted by law to attach to such property, the proceeds of which are DIP Collateral) pursuant to Bankruptcy Code section 363 (or any other applicable provision) on terms and conditions pursuant to Bankruptcy Code sections 363, 365, and other applicable provisions of the Bankruptcy Code, and (ii) assume and assign any lease or executory contract included in the DIP Collateral to the DIP Agent's designees in accordance with and subject to Bankruptcy Code section 365, (c) the DIP Agent (at the direction of the Required Lenders) may direct the Debtors to (and the Debtors shall comply with such direction to) dispose of or liquidate the DIP Collateral (or any other property of the Debtors to the extent a lien is not permitted by law to attach to such property, the proceeds which are DIP Collateral) via one or more sales of such DIP Collateral or property and/or the monetization of other DIP Collateral or property, (d) the DIP Agent may (at the direction of the Required Lenders),

or may direct the Debtors to (and the Debtors shall comply with such direction to), collect accounts receivable, (e) the DIP Agent (for the benefit of the DIP Lenders) shall be authorized to succeed to any of the Debtors' rights and interests under any licenses for the use of any intellectual property in order to complete the production and sale of any inventory with respect to the DIP Collateral, and (f) the Debtors shall take all action that is reasonably necessary to cooperate with the DIP Lenders in the exercise of their rights and remedies and to facilitate the realization of the DIP Collateral by the DIP Lenders in a manner consistent with the priorities set forth in the DIP Documents.

37.    <u>Access to DIP Collateral</u>.  Notwithstanding anything contained herein to the contrary and without limiting any other rights or remedies of the DIP Secured Parties under the Interim Order, the DIP Documents and applicable law, after the occurrence of a Termination Date and the entry of a Termination Enforcement Order, and subject to paragraph 35, for the purpose of exercising any remedy with respect to any of the DIP Collateral, the DIP Agent (or any of its employees, agents, consultants, contractors, or other professionals) (collectively, the "<u>Enforcement Agents</u>") shall have the right (to be exercised at the direction of the Required Lenders), to: (i) enter upon, occupy, and use any real or personal property, fixtures, equipment, leasehold interests, or warehouse arrangements owned or leased by the Debtors; (ii) enter into the premises of any Debtor in connection with the orderly sale or disposition of the DIP Collateral (including, without limitation, to complete any work in process); (iii) exercise any rights of the Debtors to access any DIP Collateral (including inventory) held by any third party; *provided*, *however*, the Enforcement Agents may only be permitted to do so in accordance with (a) existing rights under applicable non-bankruptcy law, including, without limitation, applicable leases, (b) any prepetition (and, if applicable, post-petition) landlord waivers or consents, or (c) further order of this Court on motion

and notice appropriate under the circumstances; and (iv) use any and all trademarks, tradenames, copyrights, licenses, patents, equipment or any other similar assets of the Debtors, or assets which are owned by or subject to a lien of any third party and which are used by the Debtors in their businesses; *provided*, *however*, the Enforcement Agents may use such assets to the extent permitted by applicable non-bankruptcy law.  The Enforcement Agents will be responsible for the payment of any applicable fees, rentals, royalties, or other amounts owing to such lessor, licensor or owner of such property (other than the Debtors) on a *per diem* basis and solely for the period of time that the Enforcement Agents actually occupy any real property or use the equipment or the intellectual property (but in no event for any accrued and unpaid fees, rentals, or other amounts owing for any period prior to the date that the Enforcement Agents actually occupy or use such assets or properties).  Nothing contained herein shall require the Enforcement Agents to assume any lease as a condition to the rights afforded in this paragraph.

38.    Carve-Out.  Each of the DIP Liens, the DIP Superpriority Claims, the Prepetition Liens, the Replacement Liens, and the Adequate Protection Superpriority Claims shall be subject to payment of the Carve-Out (excluding the Segregated Cash Collateral).

(i)    "Carve-Out" means, collectively, the following fees and expenses: (i) all statutory fees required to be paid to the Clerk of the Court and to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a) *plus* interest at the statutory rate, if any, pursuant to 31 U.S.C § 3717 (without regard to the Carve-Out Trigger Notice (as defined below)); (ii) reasonable fees and expenses incurred by a Trustee, if any, under section 726(b) of the Bankruptcy Code in an amount not exceeding $50,000 (without regard to the Carve-Out Trigger Notice) (the amounts in these clauses (i) and (ii), "Statutory Fees"); (iii) to the extent allowed at any time, all unpaid fees and expenses of the professionals retained by the Debtors and, subject to amounts set forth in

the Approved Budget, any Committee appointed in the Chapter 11 Cases, that (a) are incurred on

or prior to the third business day succeeding the date of delivery of the Carve-Out Trigger Notice,

or (b) are incurred after the third business day succeeding the date of delivery of a Carve-Out

Trigger Notice, subject to an aggregate cap of $750,000 for the Debtors' professionals and a

separate aggregate cap of $150,000 for the Committee's professionals, (each excluding any

restructuring, sale, success, or other transaction fee of any investment bankers or financial advisors

of the Debtors unless approved by the DIP Lenders) (the "Professional Fees") allowed by the Court

or another court of competent jurisdiction at any time, and incurred by persons or firms retained

by the Debtors or the Committee pursuant to section 327, 328, 363 or 1103 of the Bankruptcy Code

(the "Professional Persons"), the amounts set forth in this clause (iii)(b) being the "Post-Carve Out

Trigger Notice Cap").  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a

written notice delivered by the DIP Agent to the Debtors' lead counsel, the U.S. Trustee, and lead

counsel to the Committee, which notice may only be delivered following the occurrence and during

the continuation of an Event of Default, stating that the Post-Carve Out Trigger Notice Cap has

been invoked.   No portion of the Carve-Out, any Cash Collateral, any other DIP Collateral, or any

proceeds of the DIP Facility, including any disbursements set forth in the Approved Budget or

obligations benefitting from the Carve-Out, shall be used for the payment of Professional Fees

incurred by any person, including, without limitation, any Committee, in connection with

challenging the DIP Secured Parties' or the Prepetition Secured Parties' liens or claims, preventing,

hindering or delaying any of the DIP Secured Parties' or the Prepetition Secured Parties'

enforcement or realization upon any of the DIP Collateral, or initiating or prosecuting any claim

or action against any DIP Secured Party or Prepetition Secured Party; *provided* that,

notwithstanding the foregoing, proceeds from the DIP Facility and/or Cash Collateral not to exceed

$50,000 in the aggregate (the "<u>Investigation Budget</u>") may be used on account of Professional Fees incurred by Professional Persons of the Committee (if any) in connection with the investigation of avoidance actions or any other claims or causes of action (but not the prosecution of such actions) on account of the Prepetition Obligations and Prepetition Secured Parties (but not the DIP Facility and DIP Secured Parties).

(ii)     <u>Carve-Out Reserve</u>.  Contemporaneously with the initial funding of the DIP Term Loans, the Debtors will transfer cash proceeds from the DIP Facility in an amount equal to the total budgeted weekly fees and expenses incurred by the Debtors' retained Professional Persons for the first two weekly periods set forth in the Approved Budget, and thereafter on a weekly basis the Debtors will transfer cash proceeds from draws from the DIP Facility and/or cash on hand equal to the total budgeted weekly fees and expenses incurred by the Debtors' and Committee's (if appointed and as applicable) retained Professional Persons until receipt of a Carve-Out Trigger Notice, in each case, excluding any success or other transaction fees of any investment banker or financial advisor of the Debtors or Committee, into segregated trust account(s) at Debtors' counsel's law firm, Berger Singerman, LLP for the benefit of the Professional Persons (the "<u>Professional Fee Reserve</u>").  Upon the delivery of a Carve-Out Trigger Notice, the Carve-Out Trigger Notice shall (i) be deemed a request by the Debtors for, and the DIP Lenders shall fund DIP Loans under the DIP Facility, in an amount equal to (i) the aggregate amount of budgeted accrued and unpaid Professional Fees incurred before or on the first business day following delivery of a Carve-Out Trigger Notice (to the extent not previously funded to the Professional Fee Reserve) and (ii) the Post-Carve Out Trigger Notice Cap (less any amounts already funded into the Professional Fee Reserve in respect of such amounts) (any such amounts actually advanced shall constitute DIP Loans); and (ii) constitute a demand to the Debtors to utilize all cash on hand

as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to amounts set forth in clauses (i) and (ii) (less any amounts already funded into the Professional Fee Reserve in respect of such amounts). For the avoidance of doubt, the DIP Lenders shall have no obligation to fund aggregate fees and expenses in excess of DIP Commitments. Amounts funded into the Professional Fee Reserve shall be considered used by the Debtors at such time as they are deposited into the Professional Fee Reserve for distribution to Professional Persons in accordance with orders of the Bankruptcy Court. Any amounts remaining in the Professional Fee Reserve after payment of allowed fees and expenses shall be DIP Collateral. The Professional Fee Reserve shall not constitute a cap on the professional fees included in the Carve-Out.

(iii)    The Debtors shall use funds held in the Professional Fee Reserve exclusively to pay Professional Fees within the Carve-Out as set forth in clause (ii) of this paragraph 38 as they become allowed and payable pursuant to the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any interim or final orders of the Court; *provided* that when all Professional Fees and the other obligations that are a part of the Carve-Out have been paid in full (regardless of when such Professional Fees are allowed by the Court), any funds remaining in the Professional Fee Reserve shall revert to the DIP Agent for the benefit of the DIP Lenders. Funds transferred to the Professional Fee Reserve shall be subject to the DIP Liens, DIP Superpriority Claims, Replacement Liens, and Adequate Protection Superpriority Claims granted hereunder to the extent of such reversionary interest; *provided*, that, for the avoidance of doubt, such liens and claims shall be subject in all respects to the Carve-Out and the Administration Charge as against the Canadian Collateral.

(iv)    Notwithstanding anything to the contrary in the DIP Documents, this Interim Order, or any other Court order, the Professional Fee Reserve and the amounts on deposit in the Professional Fee Reserve shall be available and used only to satisfy Professional Fees accruing prior to the Termination Date benefitting from the Carve-Out, and the other obligations that are a part of the Carve-Out.  The failure of the Professional Fee Reserve to satisfy Professional Fees in full shall not affect the priority of the Carve-Out; *provided*, that, to the extent that the Professional Fee Reserve is actually funded, the Carve-Out shall be reduced by such funded amount dollar-for-dollar.   In no way shall the Carve-Out, Professional Fee Reserve, or the Approved Budget or any of the foregoing be construed as a cap or limitation on the amount of the allowed Debtor Professional Fees or Statutory Fees due and payable by the Debtors or that may be allowed by the Court at any time (whether by interim order, final order, or otherwise).

(v)    <u>No Direct Obligation to Pay Professional Fees; No Waiver of Right to Object to Fees</u>.  None of the DIP Secured Parties or Prepetition Secured Parties shall be responsible for the direct payment or reimbursement of any fees or disbursements of any of the Professional Persons incurred in connection with the Chapter 11 Cases or any Successor Cases under any chapter of the Bankruptcy Code.  Nothing in this Interim Order or otherwise shall be construed to obligate any of the DIP Secured Parties or Prepetition Secured Parties in any way to compensate, or to reimburse expenses of, any of the Professional Persons, or to guarantee that the Debtors or their Estates have sufficient funds to pay such compensation or reimbursement.  Nothing herein shall be construed as consent to the allowance of any professional fees or expenses of any of the Debtors, any Committee, any other official or unofficial committee in these Chapter 11 Cases or any Successor Cases, or of any other person or entity, or shall affect the right of any party to object to the allowance and payment of any such fees and expenses.

39.     <u>Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Interim Order</u>.  The DIP Secured Parties and the Prepetition Secured Parties have acted in good faith in connection with this Interim Order and are entitled to rely upon the protections granted herein and by section 364(e) of the Bankruptcy Code.  Based on the findings set forth in this Interim Order and the record made during the Interim Hearing, and in accordance with section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Interim Order are hereafter modified, amended, or vacated by a subsequent order of this Court or any other court, the DIP Secured Parties and Prepetition Secured Parties are entitled to the protections provided in section 364(e) of the Bankruptcy Code.  Any such modification, amendment, or vacatur shall not affect the validity and enforceability of any advances previously made or made hereunder, or lien, claim, or priority authorized or created hereby.

40.     <u>Approval of DIP Fees</u>.  In consideration for the DIP Financing and the consent to the use of Cash Collateral in accordance with the terms of this Interim Order, the DIP Secured Parties shall be paid all fees, expenses and other amounts payable under the DIP Documents as such become due, including, without limitation, the DIP Agent Fee and the DIP Upfront Fee, and all reasonable and documented out-of-pocket costs and expenses, including legal fees of the DIP Agent and the DIP Lenders, financial advisor fees, and other similar fees, costs and expenses incurred in connection with the DIP Facility and the Chapter 11 Cases, including, without limitation, the reasonable and documented fees and expenses of (a) counsel to the DIP Secured Parties, (b) specialty or local counsel to the DIP Secured Parties in each relevant jurisdiction and (c) in the case of an actual or perceived conflict of interest with respect to any of the foregoing counsel, one additional counsel to each group of affected DIP Lenders similarly situated and taken as a whole (all such fees, together, the "<u>DIP Fees</u>").  The DIP Fees shall be fully earned and payable

in accordance with the terms of the DIP Documents, without the need for any further order of this Court. The DIP Fees shall be part of the DIP Obligations. Any and all DIP Fees paid prior to the Petition Date by any of the Debtors to the DIP Secured Parties in connection with or with respect to the DIP Facility in each case is hereby approved in full.

41.     <u>Lender Professionals' Fees</u>.  Professionals for the DIP Secured Parties (the "<u>DIP Professionals</u>") and professionals for the Prepetition Term Loan Parties (the "<u>Prepetition Professionals</u>," and together with the DIP Professionals, the "<u>Lender Professionals</u>") shall not be required to comply with the U.S. Trustee fee guidelines or file applications or motions with, or obtain approval of, this Court for compensation and reimbursement of fees and expenses. The Lender Professionals shall submit copies of summary invoices to the Debtors, the U.S. Trustee, and counsel for any Committee. The summary invoices shall provide only the total aggregate number of hours billed and a summary description of services provided and the expenses incurred by the applicable party and/or professionals, and shall be subject to all applicable privilege and work product doctrines.  If the Debtors, U.S. Trustee, or any Committee object to the reasonableness of the fees and expenses of any Lender Professional and cannot resolve such objection within ten (10) days after receipt of such invoices, then the Debtors, U.S. Trustee, or the Committee, as the case may be, shall file with this Court and serve on such Lender Professional an objection (the "<u>Fee Objection</u>"), and any failure by any such party to file a Fee Objection within such ten (10) day period shall constitute a waiver of any right of such party to object to the applicable invoice. Notwithstanding any provision herein to the contrary, any objection to, and any hearing on an objection to, payment of any fees, costs, and expenses set forth in a professional fee invoice in respect of the Lender Professionals shall be limited to the reasonableness of the particular items or categories of the fees, costs, and expenses that are the subject of such objection.

The Debtors shall timely pay in accordance with the terms and conditions of this Interim Order (a) the undisputed fees, costs, and expenses reflected on any invoice to which a Fee Objection has been timely filed and (b) all fees, costs, and expenses on any invoice to which no Fee Objection has been timely filed.

42.     Indemnification.  The Debtors shall indemnify and hold harmless the DIP Secured Parties, each of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees past, present, and future, and their respective heirs, predecessors, successors and assigns in accordance with, and subject to, the terms and conditions of the DIP Documents except to the extent of such party's actual fraud or willful misconduct as determined in a final order by a court of competent jurisdiction.

43.     Right to Credit Bid. In connection with any sale or other disposition of the DIP Collateral or Prepetition Collateral including any sales occurring under or pursuant to section 363 of the Bankruptcy Code, any plan of reorganization or plan of liquidation under section 1129 of the Bankruptcy Code, or a sale or disposition by a chapter 7 trustee for any of the Debtors (any of the foregoing sales or dispositions, a "Sale"), the DIP Agent (at the direction of the Required Lenders) and the Prepetition Term Loan Agent (at the direction of the Required Lenders (as defined in the Prepetition Credit Agreement)) shall be authorized subject to section 363(k) of the Bankruptcy Code to credit bid on a dollar-for-dollar basis any or all of the full amount of the respective outstanding DIP Obligations and Prepetition Obligations up to the full amount of the DIP Obligations and Prepetition Obligations, respectively, including any accrued interest, expenses, and fees, in a Sale (including any deposit in connection with such sale) of any DIP

Collateral or Prepetition Collateral, whether such sale is effectuated through section 363 or 1129 of the Bankruptcy Code, by a chapter 7 trustee, or otherwise, without the need for further court authorization.  The DIP Agent (at the direction of the Required Lenders) and the Prepetition Term Loan Agent (at the direction of the Required Lenders (as defined in the Prepetition Credit Agreement)) shall each have the absolute right to assign, transfer, sell, or otherwise dispose of their respective rights to credit bid to any acquisition vehicle formed in connection with such bid or other designee.

44.     <u>Proofs of Claim</u>.  Neither the DIP Secured Parties nor the Prepetition Secured Parties will be required to file proofs of claim in any of the Chapter 11 Cases or Successor Cases for any claim arising under the DIP Documents or the Prepetition Loan Documents. The Debtors' stipulations, admissions, and acknowledgments and the provisions of this Interim Order shall be deemed to constitute timely filed proofs of claim for the DIP Secured Parties and the Prepetition Secured Parties with regard to all claims arising under the DIP Documents and the Prepetition Loan Documents, and, as a result, the Prepetition Obligations shall be deemed allowed for all purposes in accordance with section 502(a) of the Bankruptcy Code.

45.     <u>Limitations on Use of DIP Proceeds, Cash Collateral and Carve-Out</u>.  Except as otherwise permitted in this Interim Order and the Approved Budget (including with respect to the Investigation Budget), or the DIP Credit Agreement, the DIP Collateral, the Prepetition Collateral, the Cash Collateral, and the Carve-Out may not be used in connection with: (a) preventing, hindering, or delaying the DIP Secured Parties or the Prepetition Secured Parties' enforcement or realization upon any of the DIP Collateral or Prepetition Collateral; (b) using or seeking to use Cash Collateral or selling or otherwise disposing of DIP Collateral outside the ordinary course of business without the prior written consent of the Required Lenders; (c) outside the ordinary course

of business, using or seeking to use any insurance proceeds constituting DIP Collateral without the prior written consent of the Required Lenders; (d) incurring any indebtedness without the prior written consent of the Required Lenders; (e) seeking to amend or modify any of the rights granted to the DIP Secured Parties or the Prepetition Secured Parties under this Interim Order, the DIP Documents, or the Prepetition Loan Documents; (f) objecting to or challenging in any way the DIP Liens, the DIP Obligations, the Prepetition Liens, the Prepetition Obligations, the DIP Collateral (including Cash Collateral) or, as the case may be, Prepetition Collateral, or any other claims or liens, held by or on behalf of any of the DIP Secured Parties or the Prepetition Secured Parties, respectively; (g) asserting, commencing, or prosecuting any claims or causes of action whatsoever, including, without limitation, any actions under chapter 5 of the Bankruptcy Code, applicable state law equivalents, any so-called "lender liability" claims and causes of action or other actions to recover or disgorge payments against the DIP Secured Parties, the Prepetition Secured Parties, or any of their respective affiliates, successors and assigns and the partners, shareholders, controlling persons, directors, officers, employees, agents, attorneys, advisors, and professionals); (h) litigating, objecting to, challenging, contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the DIP Obligations, the DIP Liens, the Prepetition Liens, the Prepetition Obligations, or any other rights or interests of the DIP Secured Parties or the Prepetition Secured Parties; or (i) seeking to subordinate, recharacterize, disallow, or avoid the DIP Obligations or the Prepetition Obligations.

46.    <u>Effect of Stipulations on Third Parties</u>.  The Debtors' Stipulations contained in paragraph G and releases in paragraph H hereof shall be binding in all circumstances upon the Debtors upon entry of this Interim Order, and upon their Estates and any successor thereto in all circumstances for all purposes immediately upon entry of the Final Order.  The Debtors'

Stipulations shall be binding upon each other party-in-interest, including the Committee, except to the extent such party in interest *first* obtains standing (including any chapter 11 trustee or if the Chapter 11 Cases are converted to cases under chapter 7 prior to the expiration of the Challenge Period (as defined below), the chapter 7 trustee in such Successor Case), by no later than the earlier of (x) sixty (60) calendar days after the Petition Date and (y) the date established by the Court for the submission of Qualified Bids (as defined in the 363 Sale Motion) to purchase the Debtors' assets (such time period established by the earlier of clauses (x) and (y) shall be referred to as the "Challenge Period") and *second*, obtains a final, non-appealable order in favor of such party-in-interest sustaining any such Challenge (as defined below) in any such timely-filed contested matter or adversary proceeding (any such Challenge (as defined below) timely brought for which such a final and non-appealable order is so obtained, a "Successful Challenge").  For the purposes of this Interim Order, "Challenge" shall mean a  timely and properly filed contested matter or adversary proceeding challenging or otherwise objecting to the admissions, stipulations, findings, or releases set forth in this Interim Order, including stipulation contained in the Debtors' Stipulations, including but not limited to, those in relation to (a) the amount, validity, extent, priority, or perfection of the mortgages, security interests, and liens of the Prepetition Agents with respect to prepetition collateral; (b) the validity, allowability and priority of the Prepetition Obligations; and (c) any releases set forth or agreed to pursuant to the DIP Documents.  The Challenge Period shall terminate on the date that is the next calendar day after the expiration of the Challenge Period in the event that either (i) no Challenge is raised during the Challenge Period or (ii) with respect only to those parties who file a Challenge, such Challenge is fully and finally adjudicated (collectively, the "Challenge Period Termination Date"). The filing of a motion seeking standing to file a Challenge before expiration of the Challenge Period, which attaches a proposed Challenge, shall

extend the Challenge Period with respect to solely that party until two (2) business days after the Court approves the standing motion, or such other time period ordered by the Court in approving the standing motion.  Except as otherwise expressly provided herein, from and after the Challenge Period Termination Date and for all purposes in these Chapter 11 Cases and any Successor Cases (and after the dismissal of these Chapter 11 Cases or any Successor Cases), and without further notice, motion, or application to, order of, or hearing before this Court, (i) any and all payments made to or for the benefit of the Prepetition Secured Parties or otherwise authorized by this Interim Order (whether made prior to, on, or after the Petition Date) shall be indefeasible and not be subject to counterclaim, set-off, subordination, recharacterization, defense, disallowance, recovery, or avoidance by any party in interest, (ii) any and all such Challenges by any party-in-interest shall be deemed to be forever released, waived, and barred, (iii) all of the Prepetition Obligations shall be deemed to be fully allowed claims within the meaning of section 506 of the Bankruptcy Code, and (iv) the Debtors' Stipulations shall be binding on all parties in interest in these Chapter 11 Cases or any Successor Cases, including any Committee or chapter 11 or chapter 7 trustee. Notwithstanding the foregoing, to the extent any Challenge is timely asserted, the Debtors' Stipulations and the other provisions in clauses (i) through (iv) in the immediately preceding sentence shall nonetheless remain binding and preclusive on any Committee and on any other party-in-interest from and after the Challenge Period Termination Date, except to the extent that such Debtors' Stipulations or the other provisions in clauses (i) through (iv) of the immediately preceding sentence were expressly challenged in such Challenge and such Challenge becomes a Successful Challenge.  Notwithstanding any provision to the contrary herein, nothing in this Interim Order shall be construed to grant standing on any party in interest, including any Committee, to bring any Challenge on behalf of the Debtors' Estates.  The failure of any party-in-

interest, including any Committee, to obtain an order of this Court prior to the Challenge Period

Termination Date granting standing to bring any Challenge on behalf of the Debtors' estates shall

not be a defense to failing to commence a Challenge prior to the Challenge Period Termination

Date as required under this paragraph 46 or to require or permit an extension of the Challenge

Period Termination Date.  To the extent any such Challenge is timely and properly commenced,

the Prepetition Agents and any other Prepetition Secured Party shall be entitled to payment of the

related costs and expenses, including, but not limited to, reasonable attorneys' fees, incurred in

defending themselves and the other Prepetition Secured Parties in any such proceeding as adequate

protection, except if a Challenge results in a determination that any part of the pre-petition secured

liens or encumbrances are invalid.  Notwithstanding anything to the contrary herein, Challenges

may be brought against the Roll-Up Obligations prior to the Challenge Period Termination Date,

and the Court may order appropriate relief in the event of any Successful Challenge to the Roll-

Up Obligations.

47.    <u>No Third-Party Rights</u>.  Except as explicitly provided for herein or in any of the

DIP Documents, this Interim Order does not create any rights for the benefit of any third party,

creditor, equity holder, or direct, indirect, or incidental beneficiary.

48.    <u>No Lender Liability</u>.  In determining to make any loan (whether under the DIP

Documents or otherwise) or to permit the use of Cash Collateral or in exercising any rights or

remedies as and when permitted pursuant to this Interim Order or the DIP Documents or taking

any other act permitted under this Interim Order and the DIP Documents, none of the DIP Secured

Parties shall (i) be considered or deemed to be in control of the operations of the Debtors or to be

acting as a "responsible person" or "owner or operator" with respect to the operation or

management of the Debtors (as such terms, or any similar terms, are used in the *United States*

*Comprehensive Environmental Response, Compensation and Liability Act*, 42 U.S.C. §§ 9601 *et seq.*, as amended, or any similar federal, state or local statute or regulation), (ii) shall be considered or deemed to be a joint employer with any of the Debtors, or (iii) owe any fiduciary duty to the Debtors, their respective creditors, shareholders, or estates.  Furthermore, nothing in this Interim Order shall in any way be construed or interpreted to impose or allow the imposition upon any of the DIP Secured Parties or the Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their respective affiliates (as defined in section 101(2) of the Bankruptcy Code).

49.     Section 506(c) Claims.  Subject to entry of a Final Order and the provisions of the Carve-Out and as a further condition of the DIP Facility and any obligation of the DIP Lenders to make credit extensions pursuant to the DIP Documents (and the prior written consent of the DIP Secured Parties to the payment of the Carve-Out to the extent provided herein and the prior written consent of the Prepetition Secured Parties of the priming of the Prepetition Liens by the DIP Facility and the use of Cash Collateral) (a) no costs or expenses of administration of the Chapter 11 Cases or any Successor Cases shall be charged against or recovered from or against any or all of the DIP Secured Parties or the Prepetition Secured Parties with respect to the DIP Collateral or the Prepetition Collateral, in each case pursuant to section 105 or section 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the DIP Secured Parties or the Prepetition Secured Parties, as applicable and (b) no such consent shall be implied from any other action, inaction, or acquiescence of any or all of the DIP Secured Parties or the Prepetition Secured Parties.

50.     No Marshaling.  Subject to entry of the Final Order, the DIP Secured Parties and the Prepetition Secured Parties shall not be subject to the equitable doctrine of "marshaling" or

any other similar doctrine with respect to any of the DIP Collateral or the Prepetition Collateral, as applicable.

51.    <u>Section 552(b)</u>.  Subject to entry of the Final Order, the DIP Secured Parties and the Prepetition Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Secured Parties or the Prepetition Secured Parties, as applicable with respect to proceeds, product, offspring or profits of any of the DIP Collateral or Prepetition Collateral, as applicable.

52.    <u>Release of DIP Secured Parties</u>.  Upon entry of this Interim Order, the Debtors, on their own behalf and their Estates, forever and irrevocably: (i) release, discharge, and acquit each of the DIP Secured Parties and each of their former or current officers, employees, directors, agents, representatives, owners, members, partners, financial advisors, legal advisors, shareholders, managers, consultants, accountants, attorneys, affiliates, and predecessors-in-interest of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, of every type, including, without limitation, any so-called "lender liability" or equitable subordination claims or defenses, solely with respect to or relating to the negotiation and entry into the DIP Documents; and (ii) waive, discharge and release any and all defenses (including, without limitation, offsets and counterclaims of any nature or kind) as to the validity, perfection, priority, enforceability, and avoidability of the DIP Liens and the DIP Obligations.

53.    <u>Limitation on Liability</u>.  Nothing in this Interim Order or the DIP Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Secured Parties or Prepetition Secured Parties any liability for any claims arising from the prepetition or

postpetition activities of the Debtors, including with respect to the operation of their businesses, in connection with their restructuring efforts or administration of these Chapter 11 Cases.

54. <u>Insurance Proceeds and Policies</u>. Upon entry of this Interim Order and to the fullest extent provided by applicable law, the DIP Agent (for the benefit of the DIP Lenders), shall be, and shall be deemed to be, without any further action or notice, named as additional insured and loss payee on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral.

55. <u>No Waiver by Failure to Seek Relief</u>. The failure of the DIP Secured Parties or Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies under this Interim Order, the DIP Documents, the Prepetition Loan Documents or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise.

56. <u>Binding Effect of Interim Order</u>. Immediately upon entry of this Interim Order by this Court, the terms and provisions of this Interim Order shall become valid and binding upon and inure to the benefit of the Debtors, the DIP Secured Parties, the Prepetition Secured Parties, all other creditors of any of the Debtors, any Committee (or any other court appointed committee) appointed in the Chapter 11 Cases, and all other parties-in-interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in any of the Chapter 11 Cases, any Successor Cases, or upon dismissal of any Chapter 11 Case or Successor Case.

57. <u>Discharge</u>. Except as otherwise agreed in writing by the DIP Agent (acting at the direction of the Required Lenders) and the Prepetition Term Loan Agent (acting at the direction of the Required Lenders, as that term is defined in the Prepetition Credit Agreement), the DIP Obligations and the obligations of the Debtors with respect to the adequate protection provided herein shall not be discharged by the entry of an order confirming any plan of reorganization in

any of the Chapter 11 Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless such obligations have been indefeasibly paid in full in cash (and, in the case of DIP Obligations, "payment in full" as provided by the DIP Documents), on or before the effective date of such confirmed plan of reorganization.  If any of the Debtors propose or support any plan of reorganization or sale of all or substantially all of the Debtors' assets, or order confirming such plan or approving such sale, that is not conditioned upon the indefeasible payment (including by credit bid) of the DIP Obligations, and the payment of the Debtors' obligations with respect to the adequate protection provided for herein, in full in cash within a commercially reasonable period of time (and in no event later than the effective date of such plan of reorganization or sale) (a "Non-Consensual Plan or Sale") without the written consent of the DIP Agent (acting at the direction of the Required Lenders) and the Prepetition Term Loan Agent (acting at the direction of the Required Lenders, as defined in the Prepetition Credit Agreement), the Debtors' proposal or support of a Non-Consensual Plan or Sale, or the entry of an order with respect thereto, shall constitute an Event of Default hereunder and under the DIP Documents.

58.    Zurich Reservation of Rights. For the avoidance of doubt, and notwithstanding anything to the contrary set forth in this Interim Order or the DIP Documents, (i) the Debtors shall not grant to any other party any liens and/or security interests in any property (or the proceeds thereof) held by Zurich American Insurance Company and/or any of its affiliates (collectively, and together with each of their successors, "Zurich") as collateral to secure obligations under any insurance policies and/or related agreements issued and/or entered into by Zurich (the "Zurich Collateral"); (ii) this Interim Order does not grant the Debtors any right to use any of the Zurich Collateral; (iii) without altering or limiting any of the foregoing, none of the insurance policies issued by Zurich to or providing coverage to any of the Debtors and any rights and claims

thereunder shall be nor shall constitute DIP Collateral nor shall be subject to any liens granted pursuant to this Interim Order, and further,, the proceeds of any insurance policy issued by Zurich shall only constitute DIP Collateral to the extent such proceeds are actually paid to the Debtors (as opposed to a third party claimant) pursuant to the terms of any such applicable insurance policy; and (iv) nothing, including the DIP Documents and/or this Interim Order , alters or modifies the terms and conditions of any insurance policies issued by Zurich and/or any agreements related thereto.

59.    <u>Joint and Several</u>.    The Debtors are jointly and severally liable for the DIP Obligations and all other obligations hereunder.

60.    <u>Survival</u>.    The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered: (a) confirming any plan of reorganization in any of the Chapter 11 Cases; (b) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code; (c) dismissing any of the Chapter 11 Cases or any Successor Cases; or (d) pursuant to which this Court abstains from hearing any of the Chapter 11 Cases or Successor Cases.  The terms and provisions of this Interim Order, including the claims, liens, security interests and other protections granted to the DIP Secured Parties and the Prepetition Secured Parties pursuant to this Interim Order and the DIP Documents, shall continue in the Chapter 11 Cases, in any Successor Cases, or following dismissal of the Chapter 11 Cases or any Successor Cases, and shall maintain their priority as provided by this Interim Order until: (i) in respect of the DIP Facility, all the DIP Obligations, pursuant to the DIP Documents and this Interim Order, have been indefeasibly paid in full in cash (such payment being without prejudice to any terms or provisions contained in the DIP Facility which survive such discharge by their terms), and all commitments to extend credit under the DIP Facility are terminated; and (ii) in respect of

the Prepetition Facilities, all of the Prepetition Obligations pursuant to the Prepetition Loan Documents and this Interim Order, have been indefeasibly paid in full in cash. The terms and provisions concerning the indemnification of the DIP Secured Parties shall continue in the Chapter 11 Cases, in any Successor Cases, following dismissal of the Chapter 11 Cases or any Successor Cases, and following termination of the DIP Documents and/or the indefeasible repayment of the DIP Obligations. In addition, the terms and provisions of this Interim Order shall continue in full force and effect for the benefit of the Prepetition Secured Parties notwithstanding the repayment in full or termination of the DIP Obligations until such time as the Prepetition Obligations have been indefeasibly paid in full.

61.     <u>Final Hearing</u>.  **The Final Hearing on the Motion shall be held on [\_\_], 2024, at [\_]:00 [\_].m. (Eastern Time) at the United States Bankruptcy Court, George C. Young Federal Courthouse, 400 W. Washington Street, Courtroom \_\_\_\_\_, Orlando, FL 32801**; *provided* that the Final Hearing may be adjourned or otherwise postponed upon the Debtors filing a notice of such adjournment with the consent of the DIP Agent (acting at the direction of the Required Lenders). The Debtors shall promptly serve copies of this Interim Order (which shall constitute adequate notice of the Final Hearing) to the parties having been given notice of the Interim Hearing, and to any other party that has filed a request for notices with this Court. **Any objections or responses to entry of the Final Order shall be filed on or before [\_]:00 p.m. (Eastern Time), on [\_], 2024.**

62.     <u>Necessary Action</u>.  The Debtors are authorized to take any and all such actions and to make, execute and deliver any and all instruments as may be reasonably necessary to implement the terms and conditions of this Interim Order and the transactions contemplated hereby.

63.    <u>Enforceability</u>.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable immediately upon entry thereof.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, or 9014 of the Bankruptcy Rules, any applicable Local Rules, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Interim Order.

64.    <u>Headings</u>.  The headings in this Interim Order are for purposes of reference only and shall not limit or otherwise affect the meaning of this Interim Order.

65.    <u>Retention of Jurisdiction</u>.  This Court has and will retain jurisdiction to enforce this Interim Order according to its terms.

# **EXHIBIT A**

DIP Credit Agreement

**EXHIBIT B**

Approved Budget

**<u>Exhibit B</u>**

**(DIP Credit Agreement)**

**SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION FINANCING AGREEMENT**

Dated as of May [_____], 2024

by and among

**RED LOBSTER MANAGEMENT LLC**,
as Administrative Borrower, and

**EACH OTHER SUBSIDIARY OF THE ADMINISTRATIVE BORROWER
LISTED AS A BORROWER ON THE SIGNATURE PAGE HERETO,**
as Borrowers,

**EACH SUBSIDIARY AND AFFILIATE OF THE ADMINISTRATIVE BORROWER
LISTED AS A GUARANTOR ON THE SIGNATURE PAGES HERETO**,
as Guarantors,

**THE LENDERS FROM TIME TO TIME PARTY HERETO**,
as Lenders,

and

**FORTRESS CREDIT CORP.**,
as Administrative Agent and Collateral Agent

# Table of Contents

**Page**

ARTICLE I DEFINITIONS; CERTAIN TERMS ................................................................. 1
    Section 1.01    Definitions ................................................................................. 1
    Section 1.02    Terms Generally ..................................................................... 54
    Section 1.03    Certain Matters of Construction ............................................ 54
    Section 1.04    Accounting and Other Terms ................................................ 55
    Section 1.05    Time References ..................................................................... 56
    Section 1.06    Rates ....................................................................................... 56
    Section 1.07    Obligation to Make Payments in Dollars............................... 56

ARTICLE II THE LOANS ............................................................................................... 57
    Section 2.01    The Loans ............................................................................... 57
    Section 2.02    Making the Loans .................................................................. 58
    Section 2.03    Repayment of Loans; Evidence of Debt................................ 59
    Section 2.04    Interest ................................................................................... 60
    Section 2.05    Reduction of Commitment; Prepayment of Loans ............... 61
    Section 2.06    Fees........................................................................................ 63
    Section 2.07    SOFR Option ......................................................................... 64
    Section 2.08    Funding Losses ...................................................................... 67
    Section 2.09    Taxes...................................................................................... 67
    Section 2.10    Increased Costs and Reduced Return .................................... 71
    Section 2.11    Changes in Law; Impracticability or Illegality ..................... 72
    Section 2.12    Mitigation Obligations; Replacement of Lenders.................. 73
    Section 2.13    Tax Treatment........................................................................ 74

ARTICLE III [RESERVED] ............................................................................................ 74
ARTICLE IV APPLICATION OF PAYMENTS; DEFAULTING LENDERS; JOINT AND
    SEVERAL LIABILITY OF BORROWERS ....................................................... 74
    Section 4.01    Payments; Computations and Statements.............................. 74
    Section 4.02    Sharing of Payments.............................................................. 75
    Section 4.03    Apportionment of Payments.................................................. 75
    Section 4.04    Defaulting Lenders ................................................................ 76
    Section 4.05    Administrative Borrower; Joint and Several Liability of the
                 Borrowers .............................................................................. 77

ARTICLE V CONDITIONS TO LOANS ........................................................................ 79
    Section 5.01    Conditions Precedent to Effectiveness .................................. 79
    Section 5.02    Conditions to Final Availability Period.................................. 84
    Section 5.03    Conditions Precedent to All Borrowings ............................... 84

ARTICLE VI REPRESENTATIONS AND WARRANTIES............................................ 86
    Section 6.01    Representations and Warranties ............................................. 86

i

ARTICLE VII COVENANTS OF THE LOAN PARTIES AND OTHER COLLATERAL
MATTERS ................................................................................................................. 94
    Section 7.01    Affirmative Covenants ................................................. 94
    Section 7.02    Negative Covenants ................................................... 110

ARTICLE VIII CASH MANAGEMENT ARRANGEMENTS  AND OTHER COLLATERAL
MATTERS ................................................................................................................. 118
    Section 8.01    Cash Management Arrangements ............................... 118

ARTICLE IX EVENTS OF DEFAULT ................................................................. 119
    Section 9.01    Events of Default ....................................................... 119
    Section 9.02    Remedies Upon Event of Default. ............................. 125

ARTICLE X AGENTS ........................................................................................... 126
    Section 10.01    Appointment .............................................................. 126
    Section 10.02    Nature of Duties; Delegation ..................................... 127
    Section 10.03    Rights, Exculpation, Etc. ........................................... 128
    Section 10.04    Reliance .................................................................... 129
    Section 10.05    Indemnification .......................................................... 129
    Section 10.06    Agents Individually ................................................... 129
    Section 10.07    Successor Agent ......................................................... 129
    Section 10.08    Collateral Matters ..................................................... 130
    Section 10.09    Agency for Perfection ................................................ 132
    Section 10.10    No Reliance on any Agent's Customer Identification Program .................. 132
    Section 10.11    No Third Party Beneficiaries ..................................... 132
    Section 10.12    No Fiduciary Relationship .......................................... 132
    Section 10.13    Reports; Confidentiality; Disclaimers ....................... 133
    Section 10.14    Collateral Custodian ................................................. 133
    Section 10.15    [Reserved] ................................................................. 133
    Section 10.16    Collateral Agent May File Proofs of Claim ............... 134

ARTICLE XI GUARANTY ...................................................................................... 134
    Section 11.01    Guaranty ................................................................... 134
    Section 11.02    Guaranty Absolute ..................................................... 134
    Section 11.03    Waiver ...................................................................... 135
    Section 11.04    Continuing Guaranty; Assignments ........................... 136
    Section 11.05    Subrogation ............................................................... 136
    Section 11.06    Contribution .............................................................. 137

ARTICLE XII MISCELLANEOUS ......................................................................... 137
    Section 12.01    Notices, Etc. .............................................................. 137
    Section 12.02    Amendments, Etc. ...................................................... 140
    Section 12.03    No Waiver; Remedies, Etc. ........................................ 142
    Section 12.04    Expenses; Attorneys' Fees ......................................... 142
    Section 12.05    Right of Set-off ......................................................... 143

Section 12.06    Severability ................................................................................................ 144
Section 12.07    Assignments and Participations.................................................................. 144
Section 12.08    Counterparts; Electronic Execution .......................................................... 148
Section 12.09    GOVERNING LAW .................................................................................. 148
Section 12.10    CONSENT TO JURISDICTION; SERVICE OF PROCESS AND
                 VENUE..................................................................................................... 148
Section 12.11    WAIVER OF JURY TRIAL, ETC............................................................ 149
Section 12.12    Consent by the Agents and Lenders .......................................................... 150
Section 12.13    No Party Deemed Drafter .......................................................................... 150
Section 12.14    Reinstatement; Certain Payments.............................................................. 150
Section 12.15    Indemnification; Limitation of Liability for Certain Damages ................... 150
Section 12.16    Records ..................................................................................................... 151
Section 12.17    Binding Effect............................................................................................ 151
Section 12.18    Highest Lawful Rate .................................................................................. 151
Section 12.19    Confidentiality ........................................................................................... 152
Section 12.20    Public Disclosure ...................................................................................... 153
Section 12.21    Integration.................................................................................................. 154
Section 12.22    USA PATRIOT Act.................................................................................. 154
Section 12.23    Judgment Currency.................................................................................... 154
Section 12.24    Incorporation of DIP Orders by Reference................................................ 154

iii

ANNEXES

| | |
|---|---|
| Annex A | Lenders and Lenders' DIP Delayed Draw Term Commitments |
| Annex B | Initial Budget |
| Annex C | Interim DIP Order |
| Annex D | Milestones |

EXHIBITS

| | |
|---|---|
| Exhibit A | Form of Joinder Agreement |
| Exhibit B | Form of Assignment and Acceptance |
| Exhibit C | Form of Notice of Borrowing |
| Exhibit D | Form of SOFR Notice |
| Exhibit E | Form of Compliance Certificate |
| Exhibit F | Form of DIP Delayed Draw Term Note |
| Exhibit G | Form of Roll-Up Term Note |
| Exhibit 2.09(d)(1-4) | Forms of U.S. Tax Compliance Certificate |

DISCLOSURE LETTER SCHEDULES

| | |
|---|---|
| Schedule 1.01(B) | Facilities (Real Property) |
| Schedule 2.01(a) | Prepetition Obligations |
| Schedule 6.01(e) | Capitalization / Subsidiaries / Joint Ventures |
| Schedule 6.01(f) | Litigation |
| Schedule 6.01(i) | ERISA |
| Schedule 6.01(l) | Nature of Business |
| Schedule 6.01(o) | Leases |
| Schedule 6.01(p) | Employee and Labor Matters |
| Schedule 6.01(q) | Environmental Matters |
| Schedule 6.01(r) | Insurance |
| Schedule 6.01(u) | Intellectual Property |
| Schedule 6.01(v) | Material Contracts |
| Schedule 6.01(y) | Credit Card Agreements |
| Schedule 7.02(a) | Existing Liens |
| Schedule 7.02(b) | Existing Indebtedness |
| Schedule 7.02(e) | Existing Investments |
| Schedule 7.02(j) | Transactions with Affiliates |
| Schedule 7.02(k)(B) | Existing Agreements |
| Schedule 7.02(k)(G) | JV/Similar Agreements |
| Schedule 8.01 | Cash Management Accounts |

WEIL:\99575047\7\69369.0003

42010733.2

**SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION FINANCING AGREEMENT**

This SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION FINANCING AGREEMENT, dated as of May [_], 2024, is by and among Red Lobster Management LLC, a Delaware limited liability company (the "Company" and the "Administrative Borrower"), each other subsidiary of the Administrative Borrower listed as a "Borrower" on the signature pages hereto (together with the Administrative Borrower and each other Person that executes a joinder agreement and becomes a "Borrower" hereunder, each, a "Borrower" and, collectively, the "Borrowers"), each subsidiary and affiliate of the Administrative Borrower listed as a "Guarantor" on the signature pages hereto (together with each other Person that executes a joinder agreement and becomes a "Guarantor" hereunder, each a "Guarantor" and collectively, jointly and severally, the "Guarantors"), the lenders from time to time party hereto (each a "Lender" and collectively, the "Lenders"), Fortress Credit Corp., a Delaware corporation ("Fortress"), as collateral agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the "Collateral Agent"), and Fortress, as administrative agent for the Lenders (in such capacity, together with its successors and assigns in such capacity, the "Administrative Agent" and together with the Collateral Agent, each an "Agent" and collectively, the "Agents").

**RECITALS**

WHEREAS, on May 19, 2024 (the "Petition Date"), the Loan Parties commenced Chapter 11 case numbers [_____] (MFW) through [_____] (MFW), as jointly administered for procedural purposes at Chapter 11 case number [_____] (MFW) (each a "Case" and collectively, the "Cases") by filing with the United States Bankruptcy Court for the Middle District of Florida (the "Bankruptcy Court") voluntary petitions for relief under Chapter 11 of the Bankruptcy Code and have continued to operate their business as debtor-in-possession pursuant to Sections 1107 and 1108 thereof.

WHEREAS, one or more of the Loan Parties have sought recognition of the Cases of Red Lobster Management LLC, Red Lobster Hospitality LLC, and Red Lobster Canada, Inc. (the "CCAA Parties") under Part IV of the Companies' Creditors Arrangement Act (Canada) (the "CCAA") from the Ontario Superior Court of Justice [Commercial List] (the "CCAA Court").

WHEREAS, the Borrowers have requested and the Lenders have agreed to provide the Borrowers with a priming, secured superpriority debtor-in-possession credit facility in an aggregate principal amount not to exceed $275,000,000 (including Roll-Up Term Loans (as defined herein)) subject to the terms and conditions set forth in this Agreement and the DIP Orders (as defined herein), as applicable.

NOW THEREFORE, in consideration of the premises and the covenants and agreements contained herein, the parties hereto agree as follows:

**ARTICLE I**

**DEFINITIONS; CERTAIN TERMS**

Section 1.01    Definitions. As used in this Agreement, the following terms shall have the respective meanings indicated below:

"363 Sale Motion" means the Debtors' motion seeking approval of a 363 Sale Transaction, which motion shall be in form and substance acceptable to the Required Lenders.

1

"363 Sale Transaction" means the sale of all or substantially all of the Loan Parties' assets consummated under Section 363 of the Bankruptcy Code to: (a) the Purchaser on the terms set forth in the Stalking Horse Acquisition Agreement or (b) another Qualified Bidder pursuant to the terms of an Alternative Transaction on the same or substantially the same terms as set forth in the Stalking Horse Acquisition Agreement.

"Account" means, with respect to any Person, any and all rights of such Person to payment for goods sold or leased and/or services rendered, including accounts, general intangibles and any and all rights evidenced by chattel paper, instruments or documents, whether due or do become due and whether earned by performance, and whether now or hereafter acquired or arising in the future or any proceeds arising therefrom or relating thereto.

"Account Debtor" means, with respect to any Person, each debtor, customer or obligor in any way obligated on or in connection with any Account of such Person, including any Credit Card Issuer or Credit Card Processor.

"Acquisition" means the acquisition (whether by means of a merger, consolidation or otherwise) of all of the Equity Interests of any Person or all or substantially all of the assets of (or any division or business line of) any Person.

"Action" has the meaning specified therefor in Section 12.12.

"Additional Amount" has the meaning specified therefor in Section 2.09(a).

"Adequate Protection Obligations" means the Loan Parties' obligations to provide adequate protection to the Prepetition Secured Parties.

"Adequate Protection Superpriority Claims" has the meaning specified therefor in the DIP Orders.

"Adjusted Term SOFR" means, for purposes of any calculation, the rate per annum equal to (a) Term SOFR for such calculation plus (b) the Term SOFR Adjustment; provided that if Adjusted Term SOFR as so determined shall ever be less than the Floor, then Adjusted Term SOFR shall be deemed to be the Floor.

"Administration Charge" means the superpriority charge over the Canadian Collateral granted by the Canadian Court to secure payment of the fees and disbursements of Canadian counsel to the Debtors, the Information Officer and the Information Officer's counsel, the quantum of which shall be satisfactory to the Administrative Agent.

"Administrative Agent" has the meaning specified therefor in the preamble hereto.

"Administrative Agent's Account" means an account at a bank designated by the Administrative Agent from time to time as the account into which the Loan Parties shall make all payments to the Administrative Agent for the benefit of the Agents and the Lenders under this Agreement and the other Loan Documents.

2

"<u>Administrative Borrower</u>" has the meaning specified therefor in the preamble hereto.

"<u>Affiliate</u>" means, with respect to any Person, any other Person that directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such Person.  For purposes of this definition, "control" of a Person means the power, directly or indirectly, either to (a) vote 10% or more of the Equity Interests having ordinary voting power for the election of members of the Board of Directors of such Person or (b) direct or cause the direction of the management and policies of such Person whether by contract or otherwise.  Notwithstanding anything herein to the contrary, in no event shall (i) any Agent or any Lender be considered an "Affiliate" of any Loan Party and (ii) Fortress or any of its Affiliates or Related Funds be considered an "Affiliate" of SoftBank Group Corp. or any of its Affiliates.

"<u>Agent</u>" and "<u>Agents</u>" have the respective meanings specified therefor in the preamble hereto.

"<u>Aggregate Payments</u>" has the meaning specified therefor in <u>Section 11.06</u>.

"<u>Agreement</u>" means this Secured Superpriority Debtor-In-Possession Financing Agreement, including all supplements and any disclosure letters, exhibits or schedules to any of the foregoing, and shall refer to the Agreement as the same may be in effect at the time such reference becomes operative.

"<u>Alternative Transaction</u>" means a sale of all or substantially all of the Loan Parties' assets to a Qualified Bidder that submits the winning bid for such assets (other than the Purchaser under the Stalking Horse Acquisition Agreement).

"<u>Anti-Corruption Laws</u>" means all Requirements of Law concerning or relating to bribery or corruption, including, without limitation, the United States Foreign Corrupt Practices Act of 1977, as amended, the UK Bribery Act of 2010, the Corruption of Foreign Officials Act (Canada), and the anti-bribery and anti-corruption laws and regulations of those jurisdictions in which the Loan Parties do business.

"<u>Anti-Money Laundering Laws</u>" means all Requirements of Law concerning or relating to terrorism or money laundering, including, without limitation, the Money Laundering Control Act of 1986 (18 U.S.C. §§ 1956-1957), the USA PATRIOT Act, the Currency and Foreign Transactions Reporting Act (also known as the "Bank Secrecy Act", 31 U.S.C. §§ 5311-5332 and 12 U.S.C. §§ 1818(s), 1820(b) and §§ 1951-1959), the Proceeds of Crime (Money Laundering) and Terrorist Financing Act (Canada) and the rules and regulations thereunder, and any law prohibiting or directed against the financing or support of terrorist activities (*e.g.*, 18 U.S.C. §§ 2339A and 2339B).

"<u>Applicable Margin</u>" means, as of any date of determination, with respect to the interest rate of the Term Loan (or any portion thereof), the respective level indicated below:

3

| Reference Rate Loans | SOFR Loans |
|:---:|:---:|
| 9.50% | 10.50% |

"Approved Budget" has the meaning specified therefor in Section 6.01(ee).

"Approved Plan" has the meaning specified therefor in Section 9.01(u).

"Assignment and Acceptance" means an assignment and acceptance entered into by an assigning Lender and an assignee, and accepted by the Collateral Agent (and the Administrative Agent, if applicable), in accordance with Section 12.07 hereof and substantially in the form of Exhibit B hereto or such other form acceptable to the Collateral Agent.

"Assignment of Business Interruption Insurance" means an Assignment of Business Interruption Insurance, in form and substance satisfactory to the Collateral Agent, made by a Loan Party in favor of the Collateral Agent for the benefit of the Secured Parties securing the Obligations.

"Attributable Debt" means, in respect of a Sale and Leaseback Transaction, at the time of determination, the present value of the obligation of the Loan Party that acquires, leases or licenses back the right to use all or a material portion of the subject property for net rental, license or other payments during the remaining term of the lease, license or other arrangement included in such Sale and Leaseback Transaction including any period for which such lease, license or other arrangement has been extended or may, at the sole option of the other party (or parties) thereto, be extended.  Such present value shall be calculated using a discount rate equal to the rate of interest implicit in such transaction, determined in accordance with GAAP.

"Authorized Officer" means, with respect to any Person, the chief executive officer, chief operating officer, chief financial officer, treasurer or other financial officer performing similar functions, president or executive vice president of such Person.

"Automatic Stay" means the automatic stay imposed under Section 362 of the Bankruptcy Code.

"Available Tenor" means, as of any date of determination and with respect to the then-current Benchmark, as applicable, (a) if such Benchmark is a term rate, any tenor for such Benchmark (or component thereof) that is or may be used for determining the length of an interest period pursuant to this Agreement or (b) otherwise, any payment period for interest calculated with reference to such Benchmark (or component thereof) that is or may be used for determining any frequency of making payments of interest calculated with reference to such Benchmark pursuant to this Agreement, in each case, as of such date and not including, for the avoidance of doubt, any tenor for such Benchmark that is then-removed from the definition of "Interest Period" pursuant to Section 2.07(g)(iv).

"Bankruptcy Code" means Title 11 of the United States Code, as amended from time to time and any successor statute or any similar federal or state law for the relief of debtors.

4

"Bankruptcy Court" has the meaning specified therefor in the recitals of this Agreement.

"Benchmark" means, initially, the Term SOFR Reference Rate; provided that if a Benchmark Transition Event has occurred with respect to the Term SOFR Reference Rate or the then-current Benchmark, then "Benchmark" means the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to Section 2.07(g)(i).

"Benchmark Replacement" means, with respect to any Benchmark Transition Event, the sum of: (a) the alternate benchmark rate that has been selected by the Administrative Agent in consultation with the Administrative Borrower giving due consideration to (i) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement to the then-current Benchmark for Dollar-denominated syndicated credit facilities at such time and (b) the related Benchmark Replacement Adjustment; provided that, if such Benchmark Replacement as so determined would be less than the Floor, such Benchmark Replacement will be deemed to be the Floor for the purposes of this Agreement and the other Loan Documents.

"Benchmark Replacement Adjustment" means, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Administrative Agent in consultation with the Administrative Borrower giving due consideration to (a) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or (b) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for Dollar-denominated syndicated credit facilities at such time.

"Benchmark Replacement Date" means the earliest to occur of the following events with respect to the then-current Benchmark:

(a)      in the case of clause (a) or (b) of the definition of "Benchmark Transition Event," the later of (i) the date of the public statement or publication of information referenced therein and (ii) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide all Available Tenors of such Benchmark (or such component thereof); or

(b)      in the case of clause (c) of the definition of "Benchmark Transition Event," the first date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be non-representative; provided that such non-representativeness will be determined by reference to the most recent statement or publication referenced in such clause (c) and even if any Available Tenor of such Benchmark (or such component thereof) continues to be provided on such date.

For the avoidance of doubt, the "Benchmark Replacement Date" will be deemed to have occurred in the case of clause (a) or (b) with respect to any Benchmark upon the occurrence of the applicable event or events set forth therein with respect to all then-current Available Tenors of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Transition Event" means the occurrence of one or more of the following events with respect to the then-current Benchmark:

(a)    a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof), permanently or indefinitely; provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof);

(b)    a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Federal Reserve Board, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide all Available Tenors of such Benchmark (or such component thereof) permanently or indefinitely; provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide any Available Tenor of such Benchmark (or such component thereof); or

(c)    a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that all Available Tenors of such Benchmark (or such component thereof) are not, or as of a specified future date will not be, representative.

For the avoidance of doubt, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark if a public statement or publication of information set forth above has occurred with respect to each then-current Available Tenor of such Benchmark (or the published component used in the calculation thereof).

"Benchmark Transition Start Date" means, in the case of a Benchmark Transition Event, the earlier of (a) the applicable Benchmark Replacement Date and (b) if such Benchmark Transition Event is a public statement or publication of information of a prospective event, the 90th day prior to the expected date of such event as of such public statement or publication of information (or if the expected date of such prospective event is fewer than 90 days after such statement or publication, the date of such statement or publication).

"Benchmark Unavailability Period" means, the period (if any) (a) beginning at the time that a Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced

the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.07(g) and (b) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.07(g).

"Bidding Procedures Motion" means the Debtors' motion seeking approval of a Bidding Procedures Order, which motion shall be in form and substance reasonably acceptable to the Administrative Agent.

"Bidding Procedures Order" means an order entered by the Bankruptcy Court, in form and substance reasonably acceptable to the Administrative Agent, approving the bidding and auction procedures with respect to the sale by the Loan Parties of all or substantially all of the Loan Parties' assets, including designating the bid set forth in the Stalking Horse Acquisition Agreement as the "Stalking Horse Bid".

"Bidding Procedures Order Recognition Order" means an order of the CCAA Court reasonably acceptable to the Administrative Agent recognizing the Bidding Procedures Order and giving it full force and effect in Canada.

"Board" means the Board of Governors of the Federal Reserve System of the United States (or any successor).

"Board Materials" has the meaning specified therefor in Section 7.01(a)(xiv).

"Borrower" and "Borrowers" have the respective meanings specified therefor in the preamble hereto.

"Borrowing" means (a) a DIP Delayed Draw Term Borrowing or (b) a roll-up of a Prepetition Rolled Term Loan into a Roll-Up Term Loan, as the context may require.

"Borrowing Date" means (a) any date on which DIP Delayed Draw Term Loans are incurred in accordance with the terms and conditions set forth herein and (b) each date on which the Prepetition Rolled Term Loans are rolled up into Roll-Up Term Loans hereunder.

"Budget Variance Reports" means the Weekly Budget Variance Reports and the Fiscal Month Budget Variance Reports.

"Budget Variance Test Date" means each of the following dates: (a) June 28, 2024, (b) July 26, 2024, (c) August 23, 2024, and (d) September 27, 2024.

"Budget Variance Test Period" means, beginning with the Budget Variance Test Date occurring on June 28, 2024, each of the fiscal periods as follows:

    (a)    the five-week period ending June 28, 2024;

    (b)    the four-week period ending July 26, 2024;

    (c)    the four-week period ending August 23, 2024; and

    (d)    the five-week period ending September 27, 2024.

7

"Business Day" means (a) for all purposes other than as described in clause (b) below, any day other than a Saturday, Sunday or other day on which commercial banks in New York City, Florida and California are authorized or required to close, and (b) with respect to the borrowing, payment or continuation of, or determination of interest rate on, SOFR Loans, any U.S. Government Securities Business Day.

"Canadian Collateral" means the collateral of the CCAA Parties located in Canada.

"Canadian Information Officer" means the information officer appointed by the CCAA Court in the CCAA Case.

"Canadian Priority Charges" means the Administration Charge and the Directors Charge.

"Capital Expenditures" means, with respect to any Person for any period, the aggregate of all expenditures by such Person and its Subsidiaries during such period that are capital expenditures as determined in accordance with GAAP, whether such expenditures are paid in cash or financed, including all Capitalized Lease Obligations, obligations under synthetic leases and capitalized software costs that are paid or due and payable during such period; provided, that, with respect to the Loan Parties and their Subsidiaries, the term "Capital Expenditures" shall not include any such expenditures which constitute (a) expenditures that are accounted for as capital expenditures of such Person and that actually are paid for by a third party (excluding any Loan Party) and for which no Loan Party has provided or is required to provide or incur, directly or indirectly, any consideration or obligation to such third party or any other person (whether before, during or after such period), and (b) the purchase price of equipment that is purchased substantially contemporaneously with the trade in of existing equipment to the extent that the gross amount of such purchase price is reduced by the credit granted by the seller of such equipment for the equipment being traded in at such time.

"Capitalized Lease" means, with respect to any Person, any lease of (or other arrangement conveying the right to use) real or personal property by such Person as lessee that is required under GAAP to be capitalized on the balance sheet of such Person.

"Capitalized Lease Obligations" means, with respect to any Person, obligations of such Person and its Subsidiaries under Capitalized Leases, and, for purposes hereof, the amount of any such obligation shall be the capitalized amount thereof determined in accordance with GAAP; provided that Capitalized Lease Obligations shall not include amounts capitalized with respect to Retail Property Capital Leases.

"Carve-Out" has the meaning specified therefor in the DIP Orders.

"Case" or "Cases" has the meaning specified therefor in the recitals to this Agreement.

"Cash Equivalents" means:

(a)        (i) marketable direct obligations issued or unconditionally guaranteed by the United States Government or issued by any agency thereof and backed by the full faith and credit of the United States, in each case, maturing within thirteen months from the date of acquisition thereof, and

8

(ii) marketable direct obligations issued or fully guaranteed by any state of the United States or any political subdivision of any such state or any public instrumentality thereof maturing within thirteen months from the date of acquisition thereof and, at the time of acquisition, having a rating of at least A-2 from S&P or at least P-2 from Moody's;

(b)    (i) commercial paper, maturing not more than thirteen months after the date of issue rated P 1 by Moody's or A 1 by Standard & Poor's, and (ii) other corporate obligations maturing no more than thirteen months from the acquisition thereof and having, at the time of the acquisition thereof, a rating of at least AA from S&P or at least Aa2 from Moody's;

(c)    certificates of deposit maturing not more than thirteen months after the date of issue, issued by commercial banking institutions and money market or demand deposit accounts maintained at commercial banking institutions, each of which is a member of the Federal Reserve System and has a combined capital and surplus and undivided profits of not less than $100,000,000;

(d)    repurchase agreements having maturities of not more than 90 days from the date of acquisition which are entered into with major money center banks included in the commercial banking institutions described in clause (c) above and which are secured by readily marketable direct obligations of the United States Government or any agency thereof;

(e)    money market accounts maintained with mutual funds having assets in excess of $2,500,000,000, which assets are primarily comprised of Cash Equivalents described in another clause of this definition;

(f)    marketable Tax exempt securities rated A or higher by Moody's or A+ or higher by Standard & Poor's, in each case, maturing within one year from the date of acquisition thereof;

(g)    variable rate demand notes and auction rate securities maturing no more than thirteen months from the date of creation thereof and having, at the time of the acquisition thereof, a rating of at least AA from S&P or at least Aa2 from Moody's;

(h)    Investments in money market funds substantially all of whose assets are invested in the types of assets described in the preceding clauses (a) through (g); and

(i)    in the case of any Foreign Subsidiary, cash and cash equivalents that are substantially equivalent in such jurisdiction to those described in clauses (a) through (f) above in respect of each country that is a member of the Organization for Economic Co-operation and Development.

"Cash Management Accounts" means the bank accounts of each Loan Party maintained at one or more Cash Management Banks, including those existing on the Effective Date listed on Schedule 8.01 to the Disclosure Letter.

"Cash Management Bank" has the meaning specified therefor in Section 8.01(a).

9

"Cash Management Order" means an order entered by the Bankruptcy Court, in form and substance reasonably acceptable to the Administrative Agent, governing the Debtors' cash management system.

"Cash Management Order Recognition Order" means an order of the CCAA Court reasonably acceptable to the Administrative Agent recognizing the Cash Management Order and giving it full force and effect in Canada.

"CCAA" has the meaning specified therefor in the recitals hereto.

"CCAA Case" means the recognition proceeding for the Cases of the CCAA Parties commenced under the CCAA.

"CCAA Court" has the meaning specified therefor in the recitals hereto.

"CCAA Parties" has the meaning specified therefor in the recitals hereto.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation, judicial ruling, judgment or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (ii) all requests, rules, guidelines or directives concerning capital adequacy promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities shall, in each case, be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Change of Control" means, at any time:

(a)    either (i) the Permitted Holders cease to collectively have beneficial ownership (within the meaning of Rule 13d 3 of the Exchange Act as used in this definition), directly or indirectly, of greater than 50.00% on a fully diluted basis of the Equity Interests of the Administrative Borrower or (ii) Thai Union Group shall cease to have beneficial ownership, directly or indirectly, of at least 35% on a fully diluted basis of the Equity Interests of the Administrative Borrower; or

(b)    the Administrative Borrower shall cease to have direct or indirect beneficial ownership of 100% of the aggregate voting or economic power of the Equity Interests of each other Loan Party and each of their respective Subsidiaries (except with respect to such Subsidiaries disclosed on Schedule 6.01(e) to the Disclosure Letter on the Effective Date as non-wholly owned and other Permitted Joint Ventures, if any), free and clear of all Liens (other than the Prepetition Permitted Liens (if any)).

"CIP Regulations" has the meaning specified therefor in Section 10.10.

10

"Collateral" means all of the property and assets and all interests therein and proceeds thereof now owned or hereafter acquired by any Person upon which a Lien is granted or purported to be granted by such Person as security for all or any part of the Obligations; provided, that (a) the Collateral shall not include avoidance actions brought pursuant to Chapter 5 of the Bankruptcy Code or applicate state laws and, subject to the entry of the Final DIP Order, the Collateral shall include the proceeds of such avoidance actions; and (b) the Collateral shall include the proceeds of any Disposition of real property, including non-residential leasehold properties.

"Collateral Agent" has the meaning specified therefor in the preamble hereto.

"Collateral Agent Advances" has the meaning specified therefor in Section 10.08(a).

"Collateral Document" has the meaning specified therefor in Section 12.02(b)(iii).

"Collections" means all cash, checks, notes, instruments, and other items of payment (including insurance proceeds, proceeds of cash sales, rental proceeds, and Tax refunds).

"Committee" means an official creditors' committee of unsecured creditors holding unsecured claims, if any, appointed in the Cases pursuant to Section 1102(a) of the Bankruptcy Code.

"Commitments" means, with respect to each Lender, such Lender's DIP Delayed Draw Term Commitment.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Company" has the meaning specified therefor in the preamble.

"Company Owned Restaurant" means any Restaurant owned by a Borrower or any of its Subsidiaries.

"Company RSA" means that certain Restructuring Support Agreement, dated as of May 9, 2024, among the Administrative Borrower and its direct and indirect subsidiaries from time to time party thereto, Fortress, the other Consenting Lenders (as defined therein) and any Permitted Transferees (as defined therein), as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof.

"Compliance Certificate" means a Compliance Certificate, substantially in the form of Exhibit E, duly executed by an Authorized Officer of the Administrative Borrower.

"Conforming Changes" means, with respect to either the use or administration of Term SOFR or the use, administration, adoption or implementation of any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Reference Rate," the definition of "Business Day," the definition of "U.S. Government Securities Business Day," the definition of "Interest Period" or any similar or analogous definition (or the addition of a concept of "interest period"), timing and frequency of determining rates and making payments of interest, timing of borrowing

11

requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, the applicability of <u>Section 2.08</u> and other technical, administrative or operational matters) that the Administrative Agent decides may be necessary or appropriate to reflect the adoption and implementation of any such rate or to permit the use and administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent determines that no market practice for the administration of any such rate exists, in such other manner of administration as the Administrative Agent decides is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).

"<u>Connection Income Taxes</u>" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"<u>Consenting Lenders</u>" has the meaning specified therefor in the Company RSA.

"<u>Contingent Indemnity Obligations</u>" means any Obligation constituting a contingent, unliquidated indemnification obligation of any Loan Party, in each case, to the extent (a) such obligation has not accrued and is not yet due and payable and (b) no claim has been made or is reasonably anticipated to be made with respect thereto.

"<u>Contingent Obligation</u>" means, with respect to any Person, any obligation of such Person guaranteeing or intending to guarantee any Indebtedness, leases, dividends or other obligations ("primary obligations") of any other Person (the "primary obligor") in any manner, whether directly or indirectly, including, without limitation, (a) the direct or indirect guaranty, endorsement (other than for collection or deposit in the ordinary course of business), co-making, discounting with recourse or sale with recourse by such Person of the obligation of a primary obligor, (b) the obligation to make take-or-pay or similar payments, if required, regardless of nonperformance by any other party or parties to an agreement, and (c) any obligation of such Person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (A) for the purchase or payment of any such primary obligation or (B) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, assets, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof; <u>provided</u>, <u>however</u>, that the term "Contingent Obligation" shall not include any product warranties extended in the ordinary course of business. The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation with respect to which such Contingent Obligation is made (or, if less, the maximum amount of such primary obligation for which such Person may be liable pursuant to the terms of the instrument evidencing such Contingent Obligation) or, if not stated or determinable, the maximum reasonably anticipated liability with respect thereto (assuming such Person is required to perform thereunder), as determined by such Person in good faith.

"<u>Contractual Obligation</u>" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

<div align="center">12</div>

"Control Agreement" means, with respect to any deposit account, any securities account, commodity account, securities entitlement or commodity contract, an agreement, in form and substance satisfactory to the Collateral Agent, among the Collateral Agent, the financial institution or other Person at which such account is maintained or with which such entitlement or contract is carried and the Loan Party maintaining such account, effective to grant "control" (as defined under the applicable UCC) over such account to the Collateral Agent.

"Controlled Account" means each deposit account and securities account of any Loan Party which is subject to a Control Agreement.

"Controlled Investment Affiliate" means, as to any Person, any other Person that (a) directly or indirectly, is in control of, is controlled by, or is under common control with, such Person and (b) is organized by such Person primarily for the purpose of making equity or debt investments in one or more companies.  For purposes of this definition, "control" of a Person means the power, directly or indirectly, to direct or cause the direction of the management and policies of such Person whether by contract or otherwise.

"Credit Bid Direction Letter" means that certain Credit Bid Direction Letter, dated as of the Effective Date, among the Purchaser, the Administrative Agent and the Lenders party thereto.

"Credit Card Acknowledgments" means, with respect to the Loan Parties, individually and collectively, the agreements by Credit Card Issuers or Credit Card Processors who are parties to Credit Card Agreements in favor of the Collateral Agent acknowledging the Collateral Agent's lien on and security interest in the monies due and to become due to the Loan Parties (including credits and reserves) under the Credit Card Agreements of such Loan Parties, and agreeing to transfer all such amounts to a Cash Management Account subject to a Control Agreement, as the same now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

"Credit Card Agreements" means, with respect to the Loan Parties, all agreements (other than Credit Card Acknowledgments) now or hereafter entered into by any Loan Party with any Credit Card Issuer or any Credit Card Processor, as the same now exist or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced, including, without limitation, the agreements set forth on Schedule 6.01(y) to the Disclosure Letter.

"Credit Card Issuer" means any Person (other than any Loan Party) who issues or whose members issue credit or debit cards, including, MasterCard or VISA bank credit or debit cards or other bank credit or debit cards issued through MasterCard International, Inc., VISA, U.S.A., Inc. or Visa International and American Express, Discover, Diners Club, Carte Blanche and other non-bank credit or debit cards, including, credit or debit cards issued by or through American Express Travel Related Services Company, Inc. and Novus Services, Inc.

"Credit Card Processor" means, with respect to each Loan Party, any servicing or processing agent or any factor or financial intermediary who facilitates, services, processes or manages the credit authorization, billing transfer and/or payment procedures with respect to any of such Loan Party's

sales transactions involving credit card or debit card purchases by customers using credit cards or debit cards issued by any Credit Card Issuer.

"Debtor Relief Law" means the Bankruptcy Code, the CCAA and any other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief law of the United States, Canada or other applicable jurisdiction from time to time in effect.

"Debtors" means each of the Borrowers and each of the Guarantors in their capacities as debtors-in-possession in the Cases.

"Default" means an event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

"Defaulting Lender" means any Lender that:

(a)     has failed to (i) fund all or any portion of its Loans within 2 Business Days of the date such Loans were required to be funded hereunder unless such Lender notifies the Administrative Agent and the Administrative Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, or (ii) pay to the Administrative Agent or any other Lender any amount required to be paid by it hereunder within 2 Business Days of the date when due,

(b)     has notified the Administrative Borrower or the Administrative Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied),

(c)     has failed, within 3 Business Days after written request by the Administrative Agent or the Administrative Borrower, to confirm in writing to the Administrative Agent and the Administrative Borrower that it will comply with its prospective funding obligations hereunder (provided, that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent and the Administrative Borrower), or

(d)     has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, or (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity.

Notwithstanding anything to the contrary herein, a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any Equity Interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such

Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permits such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender.  Any determination by the Administrative Agent that a Lender is a Defaulting Lender under clauses (a) through (d) above shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender upon delivery of written notice of such determination to the Administrative Borrower and each Lender.

"DIP Agent Fee" has the meaning specified therefor in Section 2.06(c).

"DIP Charge" means the superpriority charge on the Canadian Collateral granted by the CCAA Court in favor of the Agents and the Lenders pursuant to the Interim DIP Order Recognition Order, which DIP Charge shall be subordinate to the Administration Charge.

"DIP Delayed Draw Availability Period" means the period commencing on the Effective Date and ending on the Final Maturity Date.

"DIP Delayed Draw Term Borrowing" means a borrowing consisting of simultaneous DIP Delayed Draw Term Loans made by each of the DIP Delayed Draw Term Lenders pursuant to Section 2.01(b).

"DIP Delayed Draw Term Commitment" means, as to each DIP Delayed Draw Term Lender, its obligation to make DIP Delayed Draw Term Loans to the Administrative Borrower pursuant to Section 2.01(b) in an aggregate principal amount at any one time outstanding not to exceed the amount set forth opposite such DIP Delayed Draw Term Lender's name on Annex A under the caption "DIP Delayed Draw Term Commitment" or in the Register, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement.

"DIP Delayed Draw Term Facility" means, at any time, the sum of (a) the aggregate amount of the DIP Delayed Draw Term Commitments at such time plus (b) the aggregate principal amount of the DIP Delayed Draw Term Loans of all DIP Delayed Draw Term Lenders outstanding at such time; provided that the DIP Delayed Draw Term Facility shall not exceed an amount equal to (i) during the Interim Availability Period, the Interim Availability Amount and (ii) during the Final Availability Period, the sum of the Interim Availability Amount plus the Final Availability Amount, in each case, reduced by the amount by which the DIP Delayed Draw Term Commitments have been terminated or reduced pursuant to Sections 2.05(a)(i) or 2.05(a)(ii), as applicable.

"DIP Delayed Draw Term Lender" means, at any time, (a) each Lender that has a DIP Delayed Draw Term Commitment at such time, and (b) each Lender that holds outstanding DIP Delayed Draw Term Loans at such time.

"DIP Delayed Draw Term Loan" has the meaning specified therefor in Section 2.01(b).

"DIP Delayed Draw Term Note" means a promissory note made by the Borrowers in favor of a DIP Delayed Draw Term Lender that has requested such a promissory note evidencing DIP Delayed Draw Term Loans made by such DIP Delayed Draw Term Lender, substantially in the form of Exhibit F.

15

"DIP Exit Fee" has the meaning specified therefor in Section 2.06(b).

"DIP Lien" has the meaning specified therefor in the DIP Orders.

"DIP Orders" means the Interim DIP Order and/or the Final DIP Order, as applicable, and the Interim DIP Order Recognition Order and the Final DIP Order Recognition Order, as applicable, as each may be amended, restated, amended and restated, supplemented or otherwise modified with the prior written consent of the Required Lenders.

"DIP Superpriority Claims" has the meaning specified therefor in the DIP Orders.

"DIP Upfront Fee" has the meaning specified therefor in Section 2.06(a).

"Directors Charge" means the superpriority charge on the Canadian Collateral granted by the CCAA Court securing the indemnity granted by Red Lobster Canada, Inc. to its directors and officers regarding certain statutory liabilities, the quantum of which shall be satisfactory to the Administrative Agent.

"Disbursements Variance" has the meaning specified therefor in Section 7.01(a)(xxiii).

"Disbursement Letter" means a disbursement letter, in form and substance satisfactory to the Agents, by and among the Loan Parties, the Agents, the Lenders and the other Persons party thereto, and the related funds flow memorandum describing the sources and uses of all cash payments in connection with the transactions contemplated to occur on the Effective Date.

"Disclosure Letter" means that certain Disclosure Letter, dated as of the Effective Date, delivered by the Loan Parties to the Administrative Agent and the Lenders.

"Disposition" means any transaction, or series of related transactions, pursuant to which any Person or any of its Subsidiaries sells, assigns, transfers, leases, licenses (as licensor) or otherwise disposes of any property or assets (whether now owned or hereafter acquired) to any other Person, in each case, whether or not the consideration therefor consists of cash, securities or other assets owned by the acquiring Person. For purposes of clarification, "Disposition" shall include (a) the sale or other disposition for value of any contracts, (b) any disposition of property through a "plan of division" under the Delaware Limited Liability Company Act or any comparable transaction under any similar law, (c) the early termination or modification of any contract resulting in the receipt by any Loan Party of a cash payment or other consideration in exchange for such event (other than payments in the ordinary course for accrued and unpaid amounts due through the date of termination or modification), (d) any sale of merchant accounts (or any rights thereto (including, without limitation, any rights to any residual payment stream with respect thereto)) by any Loan Party, and (e) any Sale and Leaseback Transaction.

"Disqualified Equity Interests" means any Equity Interest that, by its terms (or by the terms of any security or other Equity Interest into which it is convertible or for which it is exchangeable), or upon the happening of any event or condition, (a) matures or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, (b) is redeemable at the option of the holder thereof, in whole or in part, (c) provides for the scheduled payments of dividends or distributions in cash, or (d) is convertible into or

16

exchangeable for (i) Indebtedness or (ii) any other Equity Interests that would constitute Disqualified Equity Interests, in each case of <u>clauses (a)</u> through <u>(d)</u>, prior to the date that is 91 days after the Final Maturity Date.

"<u>Dollar</u>", "<u>Dollars</u>" and the symbol "<u>$</u>" each means lawful money of the United States of America.

"<u>Domestic Subsidiary</u>" means any Subsidiary that is organized and existing under the laws of the United States or any state or commonwealth thereof or under the laws of the District of Columbia.

"<u>Earn-Outs</u>" means unsecured and subordinated liabilities of a Loan Party arising under an agreement to make any deferred payment as a part of the purchase price for a Permitted Acquisition (other than working capital adjustments), including performance bonuses or consulting payments in any related services, employment or similar agreement, in an amount that is subject to or contingent upon the revenues, income, cash flow or profits (or the like) of the target of such Permitted Acquisition.

"<u>Effective Date</u>" means the later of (a) May [____], 2024 and (b) the date on which all of the conditions precedent set forth in Section 5.01 are satisfied.

"<u>Employee Plan</u>" means an employee benefit plan within the meaning of Section 3(3) of ERISA (other than a Multiemployer Plan), regardless of whether subject to ERISA, that any Loan Party or any of its ERISA Affiliates maintains, sponsors or contributes to or is obligated to contribute to.

"<u>Environmental Claim</u>" means any complaint, summons, citation, notice, directive, order, claim, litigation, investigation, judicial or administrative proceeding, judgment, letter or other communication from any Person or Governmental Authority involving any alleged or actual violation of or liability under any Environmental Law.

"<u>Environmental Law</u>" means any Requirement of Law relating to or concerning (i) the protection of the environment, natural resources, human health or safety, or (ii) the manufacture, use, handling, generation, transportation, storage, treatment, Release, threatened Release or disposal of or exposure to any Hazardous Material.

"<u>Environmental Liability</u>" means all liabilities (contingent or otherwise, known or unknown), monetary obligations, losses (including monies paid in settlement), damages, natural resource damages, costs and expenses (including all reasonable fees, costs, client charges and expenses of counsel, experts and consultants), fines, penalties, sanctions and interest arising directly or indirectly as a result of or based upon (a) any Environmental Claim; (b) any actual, alleged or threatened non-compliance with Environmental Law or Environmental Permit; (c) any actual, alleged or threatened Release of or exposure to Hazardous Materials; (d) any Remedial Action; (e) any environmental condition requiring investigation, remediation or mitigation; or (f) any contract, agreement, or other arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"<u>Environmental Lien</u>" means any Lien in favor of any Governmental Authority for Environmental Liability.

17

"Environmental Permit" means any permit, license, authorization, approval, registration or entitlement required by or issued pursuant to any Environmental Law or by any Governmental Authority pursuant to Environmental Law.

"Equity Holder" has the meaning specified therefor in the definition of "Excluded Equity Issuance".

"Equity Interests" means (a) all shares of capital stock (whether denominated as common stock or preferred stock), equity interests, beneficial, partnership or membership interests, joint venture interests, participations or other ownership or profit interests in or equivalents (regardless of how designated) of or in a Person (other than an individual), whether voting or non-voting and (b) all securities convertible into or exchangeable for any of the foregoing and all warrants, options or other rights to purchase, subscribe for or otherwise acquire any of the foregoing, whether or not presently convertible, exchangeable or exercisable; provided that any instruments evidencing Indebtedness convertible or exchangeable for Equity Interests shall not be deemed to be Equity Interests, unless and until any such instruments are so converted or exchanged.

"Equity Issuance" means either (a) the sale or issuance by any Loan Party or any of its Subsidiaries of any shares of its Equity Interests or (b) the receipt by the Administrative Borrower of any cash capital contributions.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute of similar import, and regulations thereunder, in each case, as in effect from time to time.  References to sections of ERISA shall be construed also to refer to any successor sections.

"ERISA Affiliate" means, with respect to any Person, any trade or business (whether or not incorporated) which is a member of a group of which such Person is a member and which would be deemed to be a "controlled group" or under "common control" within the meaning of Sections 414(b), (c), (m) or (o) of the Internal Revenue Code or Sections 4001(a)(14) or 4001(b)(1) of ERISA.

"ERISA Event" means:

(a)    the occurrence of a Reportable Event with respect to any Pension Plan;

(b)    the failure to meet the minimum funding standards of Section 412 or 430 of the Internal Revenue Code or Section 302 or 303 of ERISA with respect to any Pension Plan (whether or not waived in accordance with Section 412(c) of the Internal Revenue Code or Section 302(c) of ERISA) or the failure to make a contribution or installment required under Section 412 or Section 430(j) of the Internal Revenue Code with respect to any Pension Plan or the failure to make any required contribution to a Multiemployer Plan;

(c)    a determination that any Pension Plan is, or is expected to be, in "at risk" status (as defined in Section 430 of the Internal Revenue Code or Section 303 of ERISA);

(d)    a determination that any Multiemployer Plan is, or is expected to be, in "critical" or "endangered" status under Section 432 of the Internal Revenue Code or Section 305 of ERISA;

18

(e)     the filing of a notice of intent to terminate a Pension Plan or the treatment of an amendment to a Pension Plan as a termination under Section 4041 of ERISA;

(f)     the withdrawal by any Loan Party or any of its ERISA Affiliates from any Pension Plan with two or more contributing sponsors or the termination of any such Pension Plan resulting in liability to any Loan Party or any of its ERISA Affiliates pursuant to Section 4063 or 4064 of ERISA;

(g)     the institution by the PBGC of proceedings to terminate any Pension Plan, or the occurrence of any event or condition that might constitute grounds under ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan;

(h)     the imposition of liability on any Loan Party or any of its ERISA Affiliates pursuant to Section 4062(e) or 4069(a) of ERISA or by reason of the application of Section 4212(c) of ERISA;

(i)     the withdrawal of any Loan Party or any of its ERISA Affiliates in a complete or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) from any Multiemployer Plan or the receipt by any Loan Party or any of its ERISA Affiliates of notice from any Multiemployer Plan that it is in reorganization or insolvency pursuant to Section 4241 or 4245 of ERISA, or that it intends to terminate or has terminated under Section 4041A or 4042 of ERISA;

(j)     the occurrence of an act or omission which could give rise to the imposition on any Loan Party or any of its ERISA Affiliates of any fines, penalties, taxes or related charges under Sections 4975 or 4971 of the Internal Revenue Code or under Section 409, Section 502(c), (i) or (l), or Section 4071 of ERISA in respect of any Employee Plan;

(k)     the imposition of any liability under Title IV of ERISA, other than for contributions in the ordinary course and PBGC premiums due but not delinquent, upon any Loan Party or any of its ERISA Affiliates;

(l)     the assertion of a claim (other than routine claims for benefits) against any Employee Plan or the assets thereof, or against any Loan Party or any of its ERISA Affiliates in connection with any Employee Plan or Multiemployer Plan;

(m)     receipt from the Internal Revenue Service of notice of the failure of any Pension Plan (or any other Employee Plan intended to be qualified under Section 401(a) of the Internal Revenue Code) to qualify under Section 401(a) of the Internal Revenue Code, or the failure of any trust forming part of any such Pension Plan (or such other Employee Plan) to qualify for exemption from taxation under Section 501(a) of the Internal Revenue Code;

(n)     the imposition on any Loan Party of any material fine, excise tax or penalty with respect to any Employee Plan or Multiemployer Plan resulting from any noncompliance with any Requirements of Law;

(o)     the imposition of a Lien pursuant to Section 430(k) of the Internal Revenue Code or pursuant to ERISA with respect to any Pension Plan; or

19

(p)        the occurrence of any Foreign Plan Event.

"Event of Default" has the meaning specified therefor in Section 9.01.

"Excess Amount" has the meaning specified therefor in Section 7.02(g).

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Excluded Account" means:

(a)        any deposit account specifically and exclusively used for payroll, payroll Taxes and other employee wage and benefit payments to or for the benefit of any Loan Party's or Subsidiary's employees,

(b)        any Petty Cash Account,

(c)        any deposit account that is a zero balance account or a deposit account for which the balance of such deposit account is transferred at the end of each Business Day to a deposit account that is not an Excluded Account,

(d)        any deposit account specifically and exclusively used as a fiduciary account for a Person that is not an Affiliate of any Loan Party or any of its Subsidiaries,

(e)        any deposit account specifically and exclusively used as a trust or suspense account of any Loan Party holding royalty obligations,

(f)        any deposit account constituting a cash collateral account in respect of a Permitted Lien permitted under this Agreement, and

(g)        any deposit account specifically and exclusively used in relation to liquor licenses (i) owned by any Loan Party or (ii) otherwise used in the conduct of any Loan Party's business.

"Excluded Equity Issuance" means:

(a)        in the event that the Administrative Borrower or any of its Subsidiaries forms any Subsidiary in accordance with this Agreement, the issuance by such Subsidiary of Equity Interests to the Administrative Borrower or such Subsidiary, as applicable,

(b)        the issuance of Equity Interests by the Administrative Borrower to any Person that is an equity holder of the Administrative Borrower prior to such issuance (an "Equity Holder") so long as such Equity Holder did not acquire any Equity Interests of the Administrative Borrower so as to become an Equity Holder concurrently with, or in contemplation of, the issuance of such Equity Interests to such Equity Holder,

(c)        the issuance of Equity Interests of the Administrative Borrower to directors, officers and employees of the Administrative Borrower and its Subsidiaries pursuant to employee stock

20

option plans (or other employee incentive plans or other compensation arrangements) approved by the Board of Directors of the Administrative Borrower,

(d)    the issuance of Equity Interests by the Administrative Borrower the proceeds of which are (i) used to finance a Capital Expenditure and (ii) deposited in an account subject to a springing dominion Control Agreement and used exclusively to fund such expenditures, and

(e)    the issuance of Equity Interests by a Subsidiary of the Administrative Borrower to its parent or member in connection with the contribution by such parent or member to such Subsidiary of the proceeds of an issuance described in clauses (a) – (d) above.

"Excluded Subsidiary" means (a) any Foreign Subsidiary of any Loan Party with respect to which, in the reasonable judgment of the Collateral Agent, the cost (including any potential Tax liability) of providing a Guaranty shall be excessive in view of the benefits to be obtained by the Secured Parties therefrom and (b) any not-for-profit Subsidiary or captive insurance Subsidiary; provided that immediately upon the occurrence of any event or circumstance whereby any such Subsidiary described in clause (a) or clause (b) above no longer meets the criteria of an "Excluded Subsidiary" as set forth herein, such Subsidiary shall not be an Excluded Subsidiary and shall execute and deliver the agreements, instruments and other documents required by Section 7.01(b) in accordance with the terms thereof; provided, that no Subsidiary shall become an Excluded Subsidiary on or after the Effective Date to the extent such Subsidiary was not an "Excluded Subsidiary" under (and as defined in) the Prepetition Credit Agreement (it being acknowledged and agreed that there were no "Excluded Subsidiaries" under (and as defined in) the Prepetition Credit Agreement).  It is acknowledged and agreed that there are no Excluded Subsidiaries as of the Effective Date.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Borrowers under Section 2.12(b)) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.09, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to comply with Section 2.09(d) and (d) any U.S. federal withholding Taxes imposed under FATCA.

"Extraordinary Receipts" means any cash received by the Administrative Borrower or any of the other Loan Parties not in the ordinary course of business (and not consisting of proceeds described in Section 2.05(c)(ii) or (iii) hereof), including, without limitation, (a) foreign, United States, state or local Tax refunds, (b) pension plan reversions, (c) proceeds of insurance (other than (x) proceeds of casualty or liability insurance to the extent such proceeds are (i) immediately payable to a Person that is not the

21

Administrative Borrower or any of the other Loan Parties in accordance with applicable Requirements of Law or with Contractual Obligations entered into in the ordinary course of business or (ii) received by the Administrative Borrower or any of the other Loan Parties as reimbursement for any out-of-pocket costs incurred or made by such Person prior to the receipt thereof directly related to the event resulting from the payment of such proceeds and (y) proceeds of business interruption insurance arising solely as a result of a casualty or condemnation event), (d) judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action (other than to the extent such amounts are (i) immediately payable to a Person that is not an Affiliate of the Administrative Borrower or any of the other Loan Parties, (ii) received by the Administrative Borrower or any of the other Loan Parties as reimbursement for any costs previously incurred or any payment previously made by such Person, or (iii) otherwise required pursuant to any Requirements of Law to be used, retained or applied in any other manner), (e) condemnation awards (and payments in lieu thereof), (f) indemnity payments (other than to the extent such indemnity payments are (i) immediately payable to a Person that is not an Affiliate of the Administrative Borrower or any of the Loan Parties or (ii) received by the Administrative Borrower or any of the Loan Parties as reimbursement for any costs previously incurred or any payment previously made by such Person) and (g) any purchase price adjustment received in connection with any purchase agreement.

"Facility" means the real property in which the Administrative Borrower or any other Loan Party holds an interest (whether fee or leasehold) identified on Schedule 1.01(B) to the Disclosure Letter and any New Facility hereafter acquired by the Administrative Borrower or any other Loan Party, including, without limitation, the land on which each such facility is located, all buildings and other improvements thereon, and all fixtures located thereat or used in connection therewith.

"Fair Share" has the meaning specified therefor in Section 11.06.

"Fair Share Contribution Amount" has the meaning specified therefor in Section 11.06.

"FASB ASC" means the Accounting Standards Codification of the Financial Accounting Standards Board.

"FATCA" means Sections 1471 through 1474 of the Internal Revenue Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with) and any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Internal Revenue Code and any fiscal, Tax or regulatory legislation, rules or official practices adopted pursuant to any intergovernmental agreement entered into in connection with the implementation of Sections 1471 through 1474 of the Internal Revenue Code and the Treasury Regulations thereunder.

"Federal Funds Rate" means, for any period, a fluctuating interest rate per annum equal to, for each day during such period, the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"Final Availability Amount" means $60,000,000.

"Final Availability Period" means the period commencing on the Final Order Entry Date and ending on the Final Maturity Date.

"Final DIP Order" means an order of the Bankruptcy Court approving the Loans, the borrowings and the Loan Documents on a final basis, which order shall be (a) in form and substance reasonably acceptable to the Administrative Agent and (b) in full force and effect and shall not have been reversed, vacated, stayed or subject to appeal, and shall not have been amended, restated, amended and restated, supplemented or otherwise modified without the prior written consent of the Administrative Agent.

"Final DIP Order Recognition Order" means an order of the CCAA Court reasonably acceptable to the Administrative Agent recognizing the Final DIP Order and giving it full force and effect in Canada.

"Final Maturity Date" means the earliest of (a) the Interim Facility Maturity Date (but only if the Final DIP Order has not been entered on or before the Interim Facility Maturity Date), (b) September 16, 2024, (c) the effective date with respect to any plan of reorganization, (d) the closing date on which the sale of all or substantially all of the assets of the Debtors, taken as a whole, under section 363 of the Bankruptcy Code is consummated, and (e) the acceleration of the Obligations under the Loan Facilities and the termination of all Commitments hereunder upon the occurrence of an Event of Default in accordance with the Loan Documents and the DIP Orders.

"Final Order Entry Date" means the date on which the Final DIP Order is entered by the Bankruptcy Court.

"Final Roll-Up Term Facility" has the meaning specified therefor in Section 2.01(a)(ii).

"Final Roll-Up Term Loans" has the meaning specified therefor in Section 2.01(a)(ii).

"Financial Statements" means (a) the audited consolidated balance sheet of the Administrative Borrower and its Subsidiaries for the Fiscal Year ended May 28, 2023, and the related consolidated statement of operations, shareholders' equity and cash flows for the Fiscal Year then ended, (b) the unaudited consolidated balance sheet of the Administrative Borrower and its Subsidiaries for the nine (9) months ended February 25, 2024, and the related consolidated statement of operations, shareholder's equity and cash flows for the nine (9) months then ended, and (c) the unaudited consolidated balance sheet of the Administrative Borrower and its Subsidiaries, and the related consolidated statement of operations for each subsequent fiscal month ended at least 60 days prior to the Effective Date.

"Fiscal Month Budget Variance Report" has the meaning specified therefor in Section 7.01(a)(xxiii).

"Fiscal Year" means the fiscal year of the Administrative Borrower and its Subsidiaries ending on the last Sunday to occur in May of any calendar year; provided that if the Fiscal Year of the Administrative Borrower is changed in accordance with provisions of Section 7.01(k), "Fiscal Year" shall thereafter mean the respective fiscal year of the Administrative Borrower as so changed.

23

"Fiscal Year 24" means the Fiscal Year ending in May 2024.

"Fiscal Year 25" means the Fiscal Year ending in May 2025.

"Floor" means a rate of interest equal to 3.00% per annum.

"Foreign Lender" has the meaning specified therefor in Section 2.09(d)(i)(B).

"Foreign Plan" means any employee benefit plan, program, policy, arrangement or agreement maintained, sponsored or contributed to, or for which there is an obligation to contribute to, by any Loan Party or any of its ERISA Affiliates that is subject to any Requirements of Laws other than, or in addition to, the laws of the United States or any state thereof or the laws of the District of Columbia.

"Foreign Plan Event" means, with respect to any Foreign Plan, (a) the existence of unfunded liabilities in excess of the amount permitted under any Requirement of Law, or in excess of the amount that would be permitted absent a waiver from a Governmental Authority, (b) the failure to make any required contribution or payment under any Requirement of Law within the time permitted by any Requirement of Law for such contributions or payments, (c) the receipt of a notice from a Governmental Authority relating to the intention to terminate any such Foreign Plan or to appoint a trustee or similar official to administer any such Foreign Plan, or alleging the insolvency of any such Foreign Plan, (d) the incurrence of any liability by any Loan Party or any Subsidiary under any law on account of the complete or partial termination of such Foreign Plan or the complete or partial withdrawal of any participating employer therein, or (e) the occurrence of any transaction with respect to a Foreign Plan that is prohibited under any Requirement of Law and that could reasonably be expected to result in the incurrence of any liability by any Loan Party or any Subsidiary, or the imposition on any Loan Party or any Subsidiary of any fine, excise Tax or penalty with respect to a Foreign Plan resulting from any noncompliance with any Requirement of Law.

"Foreign Subsidiary" means any Subsidiary of the Administrative Borrower that is not a Domestic Subsidiary.

"Fortress" has the meaning specified therefor in the preamble hereto.

"Funding Losses" has the meaning specified therefor in Section 2.08.

"GAAP" means generally accepted accounting principles in effect from time to time in the United States, applied on a consistent basis.

"Governing Documents" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization, and the operating agreement; (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture, declaration or other applicable agreement or documentation evidencing or otherwise relating to its formation or organization, governance and capitalization; and (d) with respect to any of the entities described above, any other agreement,

24

instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization.

"Governmental Authority" means any nation or government, any foreign, Federal, state, territory, provincial, territorial, city, town, municipality, county, local or other political subdivision thereof or thereto and any department, commission, board, bureau, instrumentality, agency or other entity exercising executive, legislative, judicial, Taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Guaranteed Obligations" has the meaning specified therefor in Section 11.01.

"Guarantor" means (a) each Subsidiary of the Administrative Borrower listed as a "Guarantor" on the signature pages hereto, and (b) each other Person which guarantees, pursuant to Section 7.01(b) or otherwise, all or any part of the Obligations.

"Guaranty" means (a) the guaranty of each Guarantor party hereto contained in Article XI hereof and (b) each other guaranty, in form and substance satisfactory to the Collateral Agent, made by any other Guarantor in favor of the Collateral Agent for the benefit of the Agents and the Lenders guaranteeing all or part of the Obligations.

"Hazardous Material" means any element, compound or chemical that is defined, listed or otherwise classified as a contaminant, pollutant, toxic or hazardous substance, hazardous waste, special waste, or solid waste or words of similar import under any Environmental Law or that is otherwise regulated under or for which liability or standards of care are imposed pursuant to any Environmental Law, including, without limitation, petroleum, polychlorinated biphenyls; asbestos-containing materials, urea formaldehyde-containing materials radioactive materials and toxic mold.

"Hedging Agreement" means any interest rate, foreign currency, commodity or equity swap, collar, cap, floor or forward rate agreement, or other agreement or arrangement designed to protect against fluctuations in interest rates or currency, commodity or equity values (including, without limitation, any option with respect to any of the foregoing and any combination of the foregoing agreements or arrangements), and any confirmation executed in connection with any such agreement or arrangement.

"Highest Lawful Rate" means, with respect to any Agent or any Lender, the maximum non-usurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the Obligations under laws applicable to such Agent or such Lender which are currently in effect or, to the extent allowed by law, under such applicable laws which may hereafter be in effect and which allow a higher maximum non-usurious interest rate than applicable laws now allow.

"Holdout Lender" has the meaning specified therefor in Section 12.02(c).

"Illegality Notice" has the meaning specified therefor in Section 2.11(b).

25

"Indebtedness" means, with respect to any Person, without duplication:

(a)        all indebtedness of such Person for borrowed money;

(b)        all obligations of such Person for the deferred purchase price of property or services (including (i) any Earn-Out, purchase price adjustment or other similar obligation that is required to be reflected as a liability on the balance sheet of such Person in accordance with GAAP, (ii) any trade payable or other account payable incurred in the ordinary course of such Person's business that remains outstanding for more than 90 days after the date such payable was due and (iii) any rent obligation in respect of a real property lease that remains outstanding after the date such rent obligation was due);

(c)        all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments or upon which interest payments are customarily made;

(d)        all reimbursement, payment or other obligations and liabilities of such Person created or arising under any conditional sales or other title retention agreement with respect to property used and/or acquired by such Person, even though the rights and remedies of the lessor, seller and/or lender thereunder may be limited to repossession or sale of such property;

(e)        all Capitalized Lease Obligations and obligations under Retail Property Capital Leases;

(f)        all obligations and liabilities, contingent or otherwise, of such Person, in respect of letters of credit, acceptances and similar facilities;

(g)        all net obligations and liabilities of such Person under Hedging Agreements;

(h)        all monetary obligations under any receivables factoring, receivable sales or similar transactions and all monetary obligations under any synthetic lease, Tax ownership/operating lease, off-balance sheet financing or similar financing or any Attributable Debt;

(i)        all Contingent Obligations; and

(j)        all obligations referred to in clauses (a) through (i) of this definition of another Person secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) a Lien upon property owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness.

The Indebtedness of any Person shall include the Indebtedness of any partnership of or joint venture in which such Person is a general partner or a joint venture to the extent that such Person is liable therefor as a result of such Person being such a general partner or joint venturer, except to the extent the terms of such Indebtedness expressly provide that such Person is not liable therefor.  The amount of any net obligation under any Hedging Agreement on any date shall be deemed to be the Termination Value thereof as of such date.

"Indemnified Matters" has the meaning specified therefor in Section 12.15(a).

26

"<u>Indemnified Taxes</u>" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in clause (a), Other Taxes.

"<u>Indemnitees</u>" has the meaning specified therefor in <u>Section 12.15(a)</u>.

"<u>Initial Budget</u>" has the meaning specified therefor in <u>Section 6.01(ee)</u> and a copy of which is attached hereto as <u>Annex B</u>.

"<u>Initial CCAA Recognition Order</u>" means an order of the CCAA Court recognizing the Cases of the CCAA Parties.

"<u>Insolvency Proceeding</u>" means any proceeding commenced by or against any Person under any provision of any Debtor Relief Law.

"<u>Intellectual Property</u>" has the meaning specified therefor in the Security Agreement.

"<u>Intellectual Property Security Agreement</u>" means each security agreement, instrument or document that creates a Lien over any Intellectual Property in favor of the Collateral Agent for the benefit of the Secured Parties.

"<u>Intercompany Subordination Agreement</u>" means an Intercompany Subordination Agreement made by the Administrative Borrower and its Subsidiaries in favor of the Collateral Agent for the benefit of the Agents and the Lenders, in form and substance reasonably satisfactory to the Collateral Agent.

"<u>Interest Payment Date</u>" has the meaning specified therefor in <u>Section 2.04(d)</u>.

"<u>Interest Period</u>" means, with respect to each SOFR Loan, a period commencing on the date of the making of such SOFR Loan (or the continuation of a SOFR Loan or the conversion of a Reference Rate Loan to a SOFR Loan) and ending one (1), three (3) or six (6) months thereafter (in each case, subject to the availability thereof); <u>provided</u>, <u>however</u>, that (a) if any Interest Period would end on a day that is not a Business Day, such Interest Period shall be extended (subject to <u>clauses (c)</u>-<u>(e)</u> below) to the next succeeding Business Day, (b) interest shall accrue at the applicable rate based upon Adjusted Term SOFR from and including the first day of each Interest Period to, but excluding, the day on which any Interest Period expires, (c) any Interest Period that would end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day, (d) with respect to an Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period), the Interest Period shall end on the last Business Day of the calendar month that is one (1), three (3) or six (6) months after the date on which the Interest Period began, as applicable, (e) the Borrowers may not elect an Interest Period which will end after the Final Maturity Date and (f) no tenor that has been removed from this definition pursuant to <u>Section 2.07(g)(iv)</u> shall be available for specification in such Notice of Borrowing or SOFR Notice.

"Interim Availability Amount" means $40,000,000.

"Interim Availability Period" means the period commencing on the Interim Order Entry Date and ending on the date of, and immediately prior to, the Bankruptcy Court's entry of the Final DIP Order on the Final Order Entry Date.

"Interim DIP Order" means an interim order of the Bankruptcy Court approving the Loans, the borrowings and the Loan Documents on an interim basis, which order shall be substantially in the form attached hereto as Annex C (or in form and substance acceptable to the Administrative Agent).

"Interim DIP Order Recognition Order" means an order of the CCAA Court reasonably acceptable to the Administrative Agent recognizing the Interim DIP Order and giving it full force and effect in Canada and granting the DIP Charge, which order for greater certainty may be the supplemental recognition order granted by the CCAA Court concurrently with the Initial CCAA Recognition Order.

"Interim Facility Maturity Date" means June 20, 2024.

"Interim Order Entry Date" means the date on which the Interim DIP Order is entered by the Bankruptcy Court.

"Interim Roll-Up Term Facility" has the meaning specified therefor in Section 2.01(a)(i).

"Interim Roll-Up Term Loans" has the meaning specified therefor in Section 2.01(a)(i).

"Interim Stay Order" means an order of the CCAA Court reasonably acceptable to the Administrative Agent granting a temporary stay of proceedings in respect of the CCAA Parties in Canada until such time as the Initial CCAA Recognition Order is granted.

"Internal Revenue Code" means the Internal Revenue Code of 1986, as amended.

"Inventory" means, with respect to any Person, all goods and merchandise of such Person leased or held for sale or lease by such Person, including, without limitation, all raw materials, work-in-process and finished goods, and all packaging, supplies and materials of every nature used or usable in connection with the shipping, storing, advertising or sale of such goods and merchandise, whether now owned or hereafter acquired, and all such other property the sale or other disposition of which would give rise to an Account or cash.

"Investment" means, with respect to any Person, (a) any investment by such Person in any other Person (including Affiliates) in the form of loans, guarantees, advances or other extensions of credit (excluding Accounts arising in the ordinary course of business), capital contributions or acquisitions of Indebtedness (including, any bonds, notes, debentures or other debt securities), Equity Interests, or all or substantially all of the assets of such other Person (or of any division or business line of such other Person), (b) the purchase or ownership of any futures contract or liability for the purchase or sale of currency or other commodities at a future date in the nature of a futures contract, or (c) any investment in any other items that are or would be classified as investments on a balance sheet of such Person prepared in accordance with GAAP.

"Joinder Agreement" means a Joinder Agreement, substantially in the form of Exhibit A, duly executed by a Subsidiary of a Loan Party made a party hereto pursuant to Section 7.01(b).

"Lease" means any lease, sublease or license of, or other agreement granting a possessory interest in, real property to which any Loan Party or any of its Subsidiaries is a party as lessor, lessee, sublessor, sublessee, licensor or licensee.

"Lender" has the meaning specified therefor in the preamble hereto and shall include, as the context requires, each DIP Delayed Draw Term Lender and each Roll-Up Term Lender.

"Lien" means any mortgage, deed of trust, deed to secure debt, pledge, lien (statutory or otherwise), security interest, hypothecation, charge or other encumbrance or security or preferential arrangement of any nature, including, without limitation, any conditional sale or title retention arrangement, any Capitalized Lease and any assignment, deposit arrangement or financing lease intended as, or having the effect of, security.

"Loan" means any loan made by any Agent or any Lender to the Borrowers pursuant to Article II hereof in the form of a DIP Delayed Draw Term Loan or a Roll-Up Term Loan.

"Loan Account" means an account maintained hereunder by the Administrative Agent on its books of account at the Payment Office, and with respect to the Borrowers, in which the Borrowers will be charged with all Loans made to, and all other Obligations incurred by, the Borrowers.

"Loan Document" means this Agreement, any Control Agreement, the Disbursement Letter, any Assignment of Business Interruption Insurance, any Guaranty, any DIP Order, the Intercompany Subordination Agreement, any Joinder Agreement, any Mortgage, any Security Agreement, any landlord waiver, any collateral access agreement and any other agreement, instrument, certificate, report and other document executed and delivered pursuant hereto or thereto or otherwise evidencing or securing any Loan or any other Obligation.  In no event shall the Prepetition Credit Agreement or any other Prepetition Loan Document be deemed to be a Loan Document for any purpose under this Agreement.

"Loan Facility" means either or both the DIP Delayed Draw Term Facility and the Roll-Up Term Facility, as the context may require.

"Loan Party" means any Borrower and any Guarantor.

"Material Adverse Effect" means a material adverse effect on any of (a) the operations, assets, liabilities, or condition (financial or otherwise) of the Loan Parties taken as a whole, provided that, (i) the effect of the filing of the Cases and the events and conditions related to and/or leading up thereto and/or typically resulting from the filing of cases under Chapter 11 of the Bankruptcy Code, (ii) any actions required to be taken under the Loan Documents or the DIP Orders, (iii) any matters disclosed in the Loan Documents (including any schedules thereto and any disclosure letter) and/or publicly disclosed in any "first day" pleadings or declarations in the Cases, and (iv) any matters that affect the restaurant industry generally and that do not, in comparison to the restaurant industry as a whole, disproportionally affect the Loan Parties, in each case, shall be disregarded in determining whether a "Material Adverse Effect" has occurred, (b) the ability of the Loan Parties taken as a whole to perform any of their obligations under any

29

Loan Document to which they are party, (c) the legality, validity or enforceability of this Agreement or any other Loan Document, (d) the rights and remedies (taken as a whole) of any Agent or any Lender under any Loan Document, including, the legality, validity, binding effect or enforceability against any Borrower or any Guarantor of any Loan Document to which it is a party, or (e) the validity, enforceability or priority of the Liens purported to be created by the Collateral Documents or the DIP Orders, as applicable.

"Material Contract" means, with respect to any Person:

(a)    [reserved],

(b)    each Material Lease,

(c)    each contract or agreement with respect to Material Intellectual Property,

(d)    each contract or agreement to which such Person or any of its Subsidiaries is a party involving aggregate consideration payable to or by such Person or such Subsidiary of $7,500,000 or more in any Fiscal Year (other than purchase orders in the ordinary course of the business of such Person or such Subsidiary and other than contracts that by their terms may be terminated by such Person or Subsidiary in the ordinary course of its business upon less than 60 days' notice without penalty or premium), and

(e)    each other contract or agreement as to which the breach, nonperformance, cancellation or failure to renew by any party thereto could reasonably be expected to have a Material Adverse Effect.

"Material Intellectual Property" means intellectual property (including exclusive intellectual property licenses) material to the business of the Administrative Borrower and the Subsidiaries (taken as a whole).

"Material Lease" means any Lease to which any Loan Party or any of its Subsidiaries is a party as lessor or lessee and which relates to (a) the chief executive office of any Loan Party, (b) any location at which the books and records relating to the operation of the business of any Loan Party are stored, (c) any location at which assets of the Loan Parties with a fair market value in excess of $7,500,000 are located, or (d) any location that is the subject of a Permitted Sale and Leaseback Transaction.

"Milestone" means each milestone set forth in Annex D.

"Moody's" means Moody's Investors Service, Inc. and any successor thereto.

"Mortgage" means a mortgage (including, without limitation, a leasehold mortgage), deed of trust or deed to secure debt, in form and substance satisfactory to the Collateral Agent, made by a Loan Party in favor of the Collateral Agent for the benefit of the Agents and the Lenders, securing the Obligations and delivered to the Collateral Agent.

"Multiemployer Plan" means a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA to which any Loan Party or any of its ERISA Affiliates has contributed, or has been obligated to contribute, to at any time during the preceding the six calendar years.

"Net Cash Proceeds" means, with respect to any issuance or incurrence of any Indebtedness, any Equity Issuance, any Disposition or the receipt of any Extraordinary Receipts by any Person or any of its Subsidiaries, the aggregate amount of cash received (directly or indirectly) from time to time (whether as initial consideration or through the payment or disposition of deferred consideration) by or on behalf of such Person or such Subsidiary, in connection therewith after deducting therefrom only (a) in the case of any Disposition or the receipt of any Extraordinary Receipts consisting of insurance proceeds or condemnation awards, the amount of any Indebtedness secured by any Permitted Lien on any asset (other than Indebtedness assumed by the purchaser of such asset) which is required to be, and is, repaid in connection therewith (other than Indebtedness under this Agreement), (b) reasonable expenses related thereto (including, without limitation, appraisals, brokerage, legal, investment banking, accounting, appraisals, and sales commissions and expenses) incurred by such Person or such Subsidiary in connection therewith, (c) recording or transfer Taxes paid or to be paid to any Governmental Authorities by such Person or such Subsidiary in connection therewith, (d) net income Taxes to be paid in connection therewith (after taking into account any Tax credits or deductions and any Tax sharing arrangements), in each case, to the extent, but only to the extent, that the amounts so deducted are (i) actually paid or payable to a Person that, except in the case of reasonable out-of-pocket expenses, is not an Affiliate of such Person or any of its Subsidiaries and (ii) properly attributable to such transaction or to the asset that is the subject thereof, and (e) all amounts that are set aside as a reserve (i) for adjustments in respect of the purchase price of such assets, (ii) for any liabilities associated with such sale or casualty, to the extent such reserve is required by GAAP, and (iii) for the payment of unassumed liabilities relating to the assets sold or otherwise disposed of at the time of, or within 30 days after, the date of such sale or other disposition, to the extent that in each case the funds described above in this clause (e) are deposited into escrow with a third party escrow agent or set aside in a separate deposit account that is subject to a Control Agreement in favor of Collateral Agent.

"New Facility" has the meaning specified therefor in Section 7.01(m).

"Non-U.S. Lender" has the meaning specified therefor in Section 2.09(d).

"Notice of Borrowing" means a Notice of Borrowing in the form attached hereto as Exhibit C.

"Obligations" means all present and future indebtedness, obligations, and liabilities (including, without limitation, the Term Loan PIK Amount) of each Loan Party to the Agents and the Lenders arising under or in connection with this Agreement or any other Loan Document, whether or not the right of payment in respect of such claim is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, disputed, undisputed, legal, equitable, secured, unsecured, and whether or not such claim is discharged, stayed or otherwise affected by any proceeding referred to in Section 9.01. Without limiting the generality of the foregoing, the Obligations of each Loan Party under the Loan Documents include (a) the obligation (irrespective of whether a claim therefor is allowed in an Insolvency Proceeding) to pay principal (including, for the avoidance of doubt, any Term Loan PIK Amount paid in kind), interest, charges, expenses, fees, premiums, attorneys' fees and disbursements, indemnities and other amounts

31

payable by such Person under the Loan Documents, and (b) the obligation of such Person to reimburse any amount in respect of any of the foregoing that any Agent (in its sole discretion) may elect to pay or advance on behalf of such Person.

"OFAC" means the Office of Foreign Assets Control of the U.S. Department of the Treasury.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Currency" has the meaning specified therefor in Section 12.23.

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.12(b)).

"Outstanding Amount" means with respect to DIP Delayed Draw Term Loans and Roll-Up Term Loans, on any date, the aggregate outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments of DIP Delayed Draw Term Loans and/or Roll-Up Term Loans, as the case may be, occurring on such date.

"Parent" has the meaning specified therefor in the definition of Prepetition Credit Agreement.

"Participant Register" has the meaning specified therefor in Section 12.07(i).

"Payment in Full", "Paid in Full" or "Payment in Full of the Obligations" means (a) the payment in full in cash of all Obligations (other than contingent indemnification claims for which no claim has been asserted), together with all accrued and unpaid interest and fees thereon, (b) the Commitments shall have terminated or expired, and (c) all claims of the Loan Parties against any Agent or any Lender arising on or before the payment date shall have been released on terms reasonably acceptable to the Administrative Agent.

"Payment Office" means the Administrative Agent's office located at 1345 Avenue of the Americas, 46th Floor, New York, New York, 10105, or at such other office or offices of the Administrative Agent as may be designated in writing from time to time by the Administrative Agent to the Collateral Agent and the Administrative Borrower.

"PBGC" means the Pension Benefit Guaranty Corporation or any successor thereto.

"Pension Plan" means an Employee Plan that is subject to Section 412 of the Internal Revenue Code, Section 302 of ERISA or Title IV of ERISA maintained, sponsored or contributed to, or for which there is an obligation to contribute to, by any Loan Party or any of its ERISA Affiliates at any time during the preceding six calendar years.

"Periodic Term SOFR Determination Day" has the meaning specified therefor in the definition of "Term SOFR".

"Permitted Acquisition" means a "Permitted Acquisition" (as defined in the Prepetition Credit Agreement) consummated prior to the Effective Date.

"Permitted Disposition" means:

(a)    any sale of Inventory in the ordinary course of business;

(b)    any Disposition of obsolete, surplus, uneconomical, worn-out or damaged property in the ordinary course of business or, in the reasonable business judgment of a Loan Party, of property no longer used in the conduct of the business of the Loan Parties;

(c)    to the extent permitted by the DIP Orders, (i) the lapse of Registered Intellectual Property of the Administrative Borrower and its Subsidiaries to the extent not economically desirable in the conduct of their business or (ii) the abandonment of Intellectual Property rights in the ordinary course of business so long as (in each, case under clauses (i) and (ii)), with respect to copyrights, such copyrights are not material revenue generating copyrights;

(d)    any involuntary loss, damage or destruction of property;

(e)    any involuntary condemnation, seizure or taking, by exercise of the power of eminent domain or otherwise, or confiscation or requisition of use of property;

(f)    so long as no Event of Default has occurred and is continuing or would result therefrom, any transfer of assets (i) from the Administrative Borrower or any of its Subsidiaries (other than the Borrowers) to a Loan Party and (ii) from any Subsidiary of the Administrative Borrower that is not a Loan Party to any other Subsidiary of the Administrative Borrower;

(g)    any Disposition of cash, Cash Equivalents and marketable securities, and dispositions or discounts of overdue accounts receivable arising in the ordinary course of business for collection or compromise purposes;

(h)    the unwinding of any Hedging Agreement;

(i)    [reserved];

(j)    [reserved];

(k)    [reserved];

33

(l)      (i) the licensing or sublicensing of patents, trademarks, copyrights, and other Intellectual Property rights in the ordinary course of business (including ordinary course non-royalty based licenses and perpetual licenses), (ii) [reserved] and (iii) licenses in the ordinary course of business for the conduct of third party retail licensed departments within a Restaurant operated by a Loan Party in exchange for royalty fees relating thereto;

(m)      licenses, sublicenses, space leases, leases or subleases with respect to any real or personal property or assets granted to third Persons in the ordinary course of business; provided that (i) the same do not in any material respect interfere with the business of the Borrowers and their Subsidiaries, taken as a whole, or materially detract from the use or value of the relative assets of the Borrowers and their Subsidiaries, taken as a whole, or (ii) such transaction is at arm's length;

(n)      any bulk sale or other Disposition of the inventory and equipment of a Loan Party or its Subsidiaries not in the ordinary course of business in connection with a Restaurant closing so long as such transaction is on an arm's length basis;

(o)      [reserved];

(p)      Dispositions of equipment or real property to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property, or (ii) the proceeds of such Disposition are promptly applied to the purchase price of such replacement property; provided, that to the extent the property being transferred constitutes Collateral, such replacement property shall constitute Collateral;

(q)      any exchange of property of the Loan Parties or any Subsidiary (other than Equity Interests or other Investments) which qualifies as a like kind exchange pursuant to and in compliance with Section 1031 of the Internal Revenue Code; provided that (i) such property is useful to the business of such Loan Party or such Subsidiary, (ii) such Loan Party or such Subsidiary shall receive reasonably equivalent or greater market value for such property and (iii) such property will be received by such Loan Party or such Subsidiary substantially concurrently with its delivery of property to be exchanged;

(r)      [reserved];

(s)      [reserved];

(t)      Dispositions (i) as authorized by the Bankruptcy Court after notice and a hearing and with the written consent of the Required Lenders or (ii) contemplated by the Approved Budget or the DIP Orders (solely to the extent permitted under the Approved Budget);

(u)      the making of Permitted Restricted Payments; and

(v)      the making of Permitted Investments.

"Permitted Holder" means each of Thai Union Group and Seafood Alliance Limited.

34

"Permitted Indebtedness" means:

(a)     any Indebtedness owing to any Agent or any Lender under this Agreement and the other Loan Documents;

(b)     any Indebtedness listed on Schedule 7.02(b) to the Disclosure Letter, provided that the aggregate amount of all such Indebtedness and the amount of each individual item of Indebtedness identified on Schedule 7.02(b) to the Disclosure Letter at any one time outstanding shall not exceed the amount of such Indebtedness outstanding as of the Effective Date;

(c)     [reserved];

(d)     Permitted Intercompany Investments (if any);

(e)     Indebtedness in respect of performance bonds, bid bonds, appeal bonds, surety bonds, performance and completion guarantees, import and export custom and duty guarantees and similar obligations, or obligations in respect of letters of credit or bank acceptances or similar instruments related thereto, in each case provided in the ordinary course of business or with the construction, operation or improvement of Restaurants;

(f)     [reserved];

(g)     [reserved];

(h)     Indebtedness owed to any Person providing property, casualty, liability, or other insurance to the Loan Parties, so long as the amount of such Indebtedness is not in excess of the amount of the unpaid cost of, and shall be incurred only to defer the cost of, such insurance for the period in which such Indebtedness is incurred and such Indebtedness is outstanding only during such period;

(i)     the incurrence by any Loan Party of Indebtedness under Hedging Agreements that are incurred for the bona fide purpose of hedging the interest rate, commodity, or foreign currency risks associated with such Loan Party's operations and not for speculative purposes;

(j)     Indebtedness incurred in respect of cash management obligations, including netting services, automatic clearinghouse arrangements, overdraft protections, credit cards, credit card processing services, debit cards, stored value cards, purchase cards (including so-called "procurement cards" or "P-cards") or other similar cash management services, in each case, incurred in the ordinary course of business;

(k)     [reserved];

(l)     [reserved];

(m)     [reserved];

35

(n)      Indebtedness arising in connection with the endorsement of instruments or other payment items for deposit;

(o)      [reserved];

(p)      unsecured Indebtedness incurred in respect of netting services, overdraft protection, and other like services, in each case, incurred in the ordinary course of business;

(q)      Indebtedness consisting of take-or-pay obligations contained in supply arrangements incurred in the ordinary course of business;

(r)      Indebtedness owed to any Person providing workers' compensation, health, disability, or other employee benefits or property, casualty or liability insurance or similar obligations, pursuant to reimbursement or indemnification obligations to such Person, in each case incurred in the ordinary course of business;

(s)      [reserved];

(t)      [reserved];

(u)      [reserved]; and

(v)      Prepetition Obligations outstanding on (and as of) the Effective Date.

"Permitted Intercompany Investments" means Investments made by (a) a Loan Party to or in another Loan Party, (b) a Subsidiary that is not a Loan Party to or in another Subsidiary that is not a Loan Party, and (c) a Subsidiary that is not a Loan Party to or in a Loan Party, so long as, in the case of a loan or advance, the parties thereto are party to the Intercompany Subordination Agreement.

"Permitted Investments" means:

(a)      Investments in cash and Cash Equivalents;

(b)      Investments in negotiable instruments deposited or to be deposited for collection in the ordinary course of business;

(c)      advances or deposits made in connection with purchases of goods or services in the ordinary course of business;

(d)      Investments received in settlement of amounts due to any Loan Party or any of its Subsidiaries effected in the ordinary course of business or owing to any Loan Party or any of its Subsidiaries as a result of Insolvency Proceedings involving an Account Debtor or upon the foreclosure or enforcement of any Lien in favor of a Loan Party or its Subsidiaries;

(e)      [reserved];

(f)      Permitted Intercompany Investments (if any);

36

(g)      Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business;

(h)      [reserved];

(i)      Investments arising under Hedging Agreements that are incurred for the bona fide purpose of hedging the interest rate, commodity, or foreign currency risks associated with such Loan Party's operations and not for speculative purposes;

(j)      [reserved];

(k)      [reserved];

(l)      [reserved];

(m)      [reserved];

(n)      [reserved];

(o)      [reserved];

(p)      [reserved]; and

(q)      Investments existing on the Effective Date and set forth on Schedule 7.02(e) to the Disclosure Letter (but not, for the avoidance of doubt, any renewals or extensions thereof unless disclosed in the Disclosure Letter (provided that the amount of any such Investments that are renewed or extended is not increased from the original amount of such Investment other than due to fluctuations in the value of the Investment not involving additional Investment by any Loan Party or any of its Subsidiaries) or otherwise consented to in writing by the Required Lenders).

"Permitted Joint Venture" means, with respect to any Loan Party, a joint venture by such Loan Party in any other Person engaged in a Similar Business, so long as (a) such Loan Party beneficially owns greater than 50% of the outstanding Equity Interests of such Person, (b) such Person constitutes a Subsidiary of such Loan Party, (c) such Loan Party and such Person comply with Section 7.01(b) and Section 7.01(t) of this Agreement, and (d) such joint venture exists on the Effective Date.

"Permitted Liens" means:

(a)      Liens securing the Obligations;

(b)      Liens for Taxes, assessments and governmental charges (i) the payment of which is not required under Section 7.01(c)(ii) and (ii) the nonpayment of which is permitted or required by the Bankruptcy Code;

(c)      Liens imposed by law, such as carriers', warehousemen's, landlords', mechanics', materialmen's, laborers', or suppliers' and other similar Liens arising in the ordinary course of business and securing obligations (other than Indebtedness for borrowed money) that are not overdue by more than

37

90 days or are being contested in good faith and by appropriate proceedings promptly initiated and diligently conducted, and a reserve or other appropriate provision, if any, as shall be required by GAAP shall have been made therefor;

(d)    Liens described on <u>Schedule 7.02(a)</u> to the Disclosure Letter, <u>provided</u>, that any such Lien shall only secure the Indebtedness that it secures on the Effective Date (but not any renewals, extensions or changes of such Indebtedness, including, without limitation, (i) a change in the property covered, (ii) any increase in the amount secured or benefited thereby or (iii) a change in any direct or contingent obligor unless disclosed in the Disclosure Letter or otherwise consented to in writing by the Required Lenders);

(e)    [reserved];

(f)    deposits, prepayments or pledges of cash securing (i) obligations incurred in respect of workers' compensation, health, disability, unemployment insurance or other forms of governmental insurance or benefits or other insurance-related obligations (including, but not limited to, in respect of deductibles, self-insured retention amounts and premiums and adjustments thereto), (ii) the performance of bids, tenders, leases, contracts (other than for the payment of money) and statutory obligations or (iii) obligations on surety, stay, customs or appeal bonds, performance bonds and other obligations of alike nature, but only to the extent such deposits or pledges are made or otherwise arise in the ordinary course of business and secure obligations not past due;

(g)    (i) easements, covenants, conditions, restrictions, building code laws, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially detract from the value of the affected property or materially interfere with the ordinary conduct of business of a Loan Party and such other minor title defects or survey matters that are disclosed by current surveys that, in each case, do not materially interfere with the current use of the real property and (ii) encumbrances set forth in any title insurance policy issued to, and accepted by, the Collateral Agent insuring any Mortgage;

(h)    Liens of landlords and mortgagees of landlords (i) arising by statute or under any Lease or related Contractual Obligation entered into in the ordinary course of business, (ii) on fixtures and movable tangible property located on the real property leased or subleased from such landlord or (iii) for amounts not yet due or that are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves or other appropriate provisions are maintained on the books of such Person in accordance with GAAP;

(i)    the title and interest of a lessor, sublessor, or licensor (other than licensors of Intellectual Property rights) in and to personal property leased, subleased, or licensed (other than through a Capitalized Lease), in each case extending only to such personal property;

(j)    non-exclusive licenses of Intellectual Property rights in the ordinary course of business;

(k)    judgment liens securing judgments and other proceedings not constituting an Event of Default under <u>Section 9.01(j)</u>;

38

(l)    (i) rights of set-off or bankers' liens (whether statutory or contractual) upon deposits of cash or securities in favor of banks or other depository institutions or securities intermediaries, solely to the extent incurred in connection with the maintenance of such deposit or securities accounts in the ordinary course of business, and (ii) Liens of a collection bank arising under Section 4-208 of the UCC;

(m)    Liens granted in the ordinary course of business on the unearned portion of insurance premiums securing the financing of insurance premiums to the extent the financing is permitted under the definition of Permitted Indebtedness;

(n)    [reserved];

(o)    [reserved];

(p)    [reserved];

(q)    [reserved];

(r)    Liens arising from precautionary UCC financing statements, PPSA financing statements or similar filings made in respect of leases entered into by the Borrowers and their Subsidiaries;

(s)    Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods in the ordinary course of business;

(t)    pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations, other than any Lien imposed by ERISA;

(u)    [reserved];

(v)    Liens arising out of conditional sale, title retention, consignment or similar arrangements for sale of goods entered into in the ordinary course of business or Liens arising by operation of law under Article 2 of the Uniform Commercial Code;

(w)    [reserved];

(x)    Prepetition Permitted Liens; and

(y)    Replacement Liens.

"Permitted Refinancing Indebtedness" means the extension of maturity, refinancing or modification of the terms of Indebtedness so long as:

(a)    after giving effect to such extension, refinancing or modification, the amount of such Indebtedness is not greater than the amount of Indebtedness outstanding immediately prior to such extension, refinancing or modification (other than by the amount of premiums paid thereon and the fees

39

and expenses incurred in connection therewith and by the amount of unfunded commitments with respect thereto);

(b)      such extension, refinancing or modification does not result in a shortening of the average weighted maturity (measured as of the extension, refinancing or modification) of the Indebtedness so extended, refinanced or modified;

(c)      such extension, refinancing or modification is pursuant to terms that are not less favorable to the Loan Parties and the Lenders than the terms of the Indebtedness (including, without limitation, terms relating to the collateral (if any) and subordination (if any)) being extended, refinanced or modified; and

(d)      the Indebtedness that is extended, refinanced or modified is not recourse to any Loan Party or any of its Subsidiaries that is liable on account of the obligations other than those Persons which were obligated with respect to the Indebtedness that was refinanced, renewed or extended.

"Permitted Restricted Payments" means any of the following Restricted Payments made by:

(a)      any Loan Party to the Administrative Borrower in amounts necessary to pay customary expenses as and when due and owing by the Administrative Borrower in the ordinary course of its business in the Administrative Borrower's capacity as a holding company (including salaries and related reasonable and customary expenses incurred by employees of the Administrative Borrower), so long as (i) no Event of Default shall have occurred and be continuing or would result from the making of such payment and (ii) the aggregate amount of all such payments shall not exceed $500,000 in any Fiscal Year;

(b)      [reserved];

(c)      any Subsidiary of any Borrower to such Borrower or another Subsidiary of such Borrower that is a Loan Party;

(d)      [reserved];

(e)      [reserved];

(f)      [reserved];

(g)      [reserved];

(h)      [reserved]; and

(i)      [reserved].

"Permitted Sale and Leaseback Obligations" means the obligations of the Administrative Borrower and its Subsidiaries under any leases created pursuant to the Permitted Sale and Leaseback Transactions.

40

"Permitted Sale and Leaseback Transactions" means any Sale and Leaseback Transactions consummated prior to the Effective Date.

"Permitted Variance" has the meaning specified therefor in Section 7.02(v).

"Person" means an individual, corporation, limited liability company, partnership, association, joint-stock company, trust, unincorporated organization, joint venture or other enterprise or entity or Governmental Authority.

"Petition Date" has the meaning specified therefor in the recitals hereto.

"Petitions" means the voluntary petitions for relief under Chapter 11 of the Bankruptcy Code filed by the Loan Parties with the Bankruptcy Court.

"Petty Cash Accounts" means Cash Management Accounts with deposits at any time in an aggregate amount not in excess of $500,000 for any one account and $5,000,000 in the aggregate for all such accounts.

"Post-Default Rate" means a rate of interest per annum equal to the rate of interest otherwise in effect from time to time pursuant to the terms of this Agreement plus 3.00%, or, if a rate of interest is not otherwise in effect, interest at the highest rate specified herein for any Loan then outstanding prior to an Event of Default plus 3.00%.

"PPSA" means the *Personal Property Security Act* (Ontario) and the regulations thereunder, as from time to time in effect, provided, however, if attachment, perfection or priority of the Collateral Agent's security interests in any Collateral are governed by the personal property security laws of any jurisdiction in Canada other than Ontario, "PPSA" shall mean those personal property security laws (including but not limited to the Civil Code of Québec) in such other jurisdiction for the purposes of the provisions hereof relating to such attachment, perfection or priority and for the definitions related to such provisions.

"Prepetition Agent" means Fortress Credit Corp., in its capacity as administrative agent and collateral agent for the Prepetition Secured Parties under the Prepetition Credit Agreement.

"Prepetition Collateral" means any and all "Collateral" (as defined under the Prepetition Credit Agreement) that any Loan Party or the Parent (each as defined in the Prepetition Credit Agreement) has pledged, or purported to have pledged, to secure the Prepetition Obligations.

"Prepetition Credit Agreement" means that certain Financing Agreement dated as of January 22, 2021, among Red Lobster Intermediate Holdings LLC, a Delaware limited liability company (the "Parent"), the Administrative Borrower, the Prepetition Lenders, the Prepetition Agent and the other parties party thereto from time to time, as amended by that certain Amendment No. 1 to Financing Agreement, dated as of September 22, 2022, as further amended by that certain Amendment No. 2 to Financing Agreement, dated as of February 29, 2024, as further amended by that certain Amendment No. 3 to Financing Agreement, dated as of March 29, 2024, and as the same has been further amended, restated, amended and restated, supplemented or otherwise modified on or before the date hereof.

"Prepetition Lenders" means the "Lenders" under and as defined in the Prepetition Credit Agreement.

"Prepetition Lien" has the meaning specified therefor in the DIP Orders.

"Prepetition Loan Documents" means the Prepetition Credit Agreement and the "Loan Documents" under and as defined in the Prepetition Credit Agreement as in effect as of the date hereof, as such Prepetition Loan Documents have been amended, restated, amended and restated, supplemented or otherwise modified on or before the date hereof.

"Prepetition Obligations" means the "Obligations" (as defined in the Prepetition Credit Agreement).

"Prepetition Permitted Liens" has the meaning specified in the DIP Orders and are expressly indicated as "Prepetition Permitted Liens" on Schedule 7.02(a) to the Disclosure Letter; provided, however, Prepetition Permitted Liens shall not include the Prepetition Liens.

"Prepetition Rolled Term Loans" means the Prepetition Obligations held by the respective DIP Delayed Draw Term Lenders (or their Affiliates or Related Funds), in their capacities as Prepetition Secured Parties.

"Prepetition Secured Parties" means the "Secured Parties" as defined in the Prepetition Credit Agreement.

"Professional Fees" means fees and expense reimbursements of Professional Persons.

"Professional Person" means (a) a Person who is an attorney, accountant, appraiser, auctioneer or financial advisor or other professional person who is retained with approval of the Bankruptcy Court by any Debtor or Committee pursuant to Section 327, 328 or 363 of the Bankruptcy Code or (b) the Canadian Information Officer and its counsel.

"Pro Rata Share" means, with respect to:

(a)    a Lender's obligation to make the DIP Delayed Draw Term Loan, the percentage obtained by dividing (i) such Lender's DIP Delayed Draw Term Commitment, by (ii) the Total DIP Delayed Draw Term Commitment;

(b)    a Lender's right to receive payments of interest, fees, and principal and other rights and obligations with respect to the DIP Delayed Draw Term Loan, the percentage of the DIP Delayed Draw Term Facility represented by dividing (i) such DIP Delayed Draw Term Lender's Outstanding Amount of DIP Delayed Draw Term Loans at such time, by (ii) the Outstanding Amount of all DIP Delayed Draw Term Loans at such time;

(c)    a Lender's right to receive payments of interest, fees, and principal and other rights and obligations with respect to the Roll-Up Term Loan, the percentage of the Roll-Up Term Facility

42

represented by <u>dividing</u> (i) such Roll-Up Lender's Outstanding Amount of Roll-Up Term Loans at such time <u>by</u> (ii) the Outstanding Amount of all Roll-Up Term Loans at such time;

(d)        all other matters (including, without limitation, the indemnification obligation arising under <u>Section 10.05</u>) relating to the Lenders rights and obligations, the percentage obtained by <u>dividing</u> (i) (x) the aggregate unpaid principal amount of such Lender's portion of the Loans <u>plus</u> (y) such Lender's unused DIP Delayed Draw Term Commitment, <u>by</u> (ii) (x) the aggregate unpaid principal amount of the Loans plus (y) the aggregate unused DIP Delayed Draw Term Commitment.

"<u>Purchaser</u>" means RL Purchaser LLC, a Delaware limited liability company.

"<u>Qualified Bidder</u>" means a bidder or any combination of bidders who submit an unconditional bid or bids for all or substantially all of the Loan Parties' assets in accordance with the Sale Procedures Order (as defined in the Stalking Horse Acquisition Agreement).

"<u>Qualified Equity Interests</u>" means, with respect to any Person, all Equity Interests of such Person that are not Disqualified Equity Interests.

"<u>Real Property Deliverables</u>" means each of the following agreements, instruments and other documents in respect of each Facility, each in form and substance reasonably satisfactory to the Collateral Agent:

(a)        a Mortgage duly executed by the applicable Loan Party,

(b)        evidence of the recording of each Mortgage in such office or offices as may be necessary or, in the reasonable opinion of the Collateral Agent, desirable to perfect the Lien purported to be created thereby or to otherwise protect the rights of the Collateral Agent and the Lenders thereunder;

(c)        a Title Insurance Policy with respect to each Mortgage;

(d)        if required by the Collateral Agent, in its sole discretion, a current ALTA survey and a surveyor's certificate, certified to the Collateral Agent and to the issuer of the Title Insurance Policy with respect thereto by a professional surveyor licensed in the state in which such Facility is located and reasonably satisfactory to the Collateral Agent;

(e)        in the case of a leasehold interest, (i) a certified copy of the Lease between the landlord and such Person with respect to such real property in which such Person has a leasehold interest, and the certificate of occupancy with respect thereto, and (ii) if required by the Collateral Agent, in its sole discretion, an attornment and nondisturbance agreement between the landlord (and any fee mortgagee) and the applicable Loan Party with respect to such leasehold interest and the Collateral Agent;

(f)        if required by the Collateral Agent, in its sole discretion, a zoning report issued by a provider reasonably satisfactory to the Collateral Agent or a copy of each letter issued by the applicable Governmental Authority, evidencing each Facility's compliance with all applicable Requirements of Law, together with a copy of all certificates of occupancy issued with respect to each Facility;

43

(g)    if required by the Collateral Agent, in its sole discretion, an opinion of counsel, satisfactory to the Collateral Agent, in the state where such Facility is located with respect to the enforceability of the Mortgage to be recorded and such other matters as the Collateral Agent may reasonably request;

(h)    an ASTM 1527-13 Phase I Environmental Site Assessment (and if reasonably requested by the Collateral Agent based upon the results of such Phase I Environmental Site Assessment, a Phase II Environmental Site Assessment), by an independent firm reasonably satisfactory to the Collateral Agent; and

(i)    such other agreements, instruments, appraisals and other documents (including guarantees and opinions of counsel) as the Collateral Agent may reasonably require.

"Recipient" means any Agent and any Lender, as applicable.

"Receipts Variance" has the meaning specified therefor in Section 7.01(a)(xxiii).

"Reference Rate" means, for any period, the greatest of (a) 4.00% per annum, (b) the Federal Funds Rate plus 0.50% per annum, (c) Adjusted Term SOFR (which rate shall be calculated based upon an Interest Period of one (1) month and shall be determined on a daily basis) plus 1.00% per annum, and (d) the rate last quoted by The Wall Street Journal as the "Prime Rate" in the United States or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the Administrative Agent) or any similar release by the Federal Reserve Board (as determined by the Administrative Agent).  Each change in the Reference Rate shall be effective from and including the date such change is publicly announced as being effective.

"Reference Rate Loan" means each Loan that bears interest at a rate determined by reference to the Reference Rate.

"Reference Rate Term SOFR Determination Day" has the meaning specified therefor in the definition of "Term SOFR".

"Register" has the meaning specified therefor in Section 12.07(f).

"Registered Intellectual Property" means Intellectual Property that is issued, registered, renewed or the subject of a pending application for registration by a Governmental Authority.

"Registered Loans" has the meaning specified therefor in Section 12.07(f).

"Regulation T", "Regulation U" and "Regulation X" mean, respectively, Regulations T, U and X of the Board or any successor, as the same may be amended or supplemented from time to time.

"Related Fund" means, with respect to any Person, an Affiliate of such Person, or a fund or account managed by such Person or an Affiliate of such Person.

44

"Related Parties" means, with respect to any Person, such Person's Affiliates and the direct and indirect equityholders, partners, directors, officers, employees, agents, consultants, trustees, administrators, managers, advisors and representatives of such Person and of such Person's Affiliates.

"Related Party Register" has the meaning specified therefor in Section 12.07(f).

"Release" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, seeping, migrating, dumping or disposing of any Hazardous Material (including the abandonment or discarding of barrels, containers and other closed receptacles containing any Hazardous Material) into the indoor or outdoor environment, including, without limitation, the movement of Hazardous Materials through or in the ambient air, soil, surface or ground water, or property.

"Replacement Liens" has the meaning ascribed to such term in the DIP Orders.

"Relevant Governmental Body" means the Federal Reserve Board or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board or the Federal Reserve Bank of New York, or any successor thereto.

"Remedial Action" means any action (a) to correct or address any actual, alleged or threatened non-compliance with any Environmental Law or Environmental Permit, or (b) to clean up, remove, remediate, contain, treat, monitor, assess, evaluate, investigate, prevent, minimize or in any other way address any environmental condition that is reasonably likely to result in an Environmental Liability, or the presence, Release or threatened Release of any Hazardous Material (including the performance of pre-remedial studies and investigations and post-remedial operation and maintenance activities).

"Replacement Lender" has the meaning specified therefor in Section 12.02(c).

"Reportable Event" means an event described in Section 4043 of ERISA (other than an event not subject to the provision for 30-day notice to the PBGC under the regulations promulgated under such Section).

"Required Lenders" means Lenders whose Pro Rata Shares (calculated in accordance with clause (d) of the definition thereof) aggregate at least 50.1%; provided that, if at any time there are two (2) or more Lenders who are not Affiliates or Related Funds of one another, solely for the purposes of directing an Agent to credit bid on behalf of the Lenders any DIP Delayed Draw Term Loan, any Roll-Up Term Loan and any Prepetition Obligations held by the Lenders, as applicable, in connection with any sale or disposition of assets in the Cases, "Required Lenders" shall include at least two (2) Lenders who are not Affiliates or Related Funds of one another.

"Required Prepayment Date" shall have the meaning assigned to such term in Section 2.05(g).

"Requirements of Law" means, with respect to any Person, collectively, the common law and all federal, state, provincial, local, foreign, multinational or international laws, statutes, codes, treaties, standards, rules and regulations, guidelines, ordinances, orders, judgments, writs, injunctions, decrees (including administrative or judicial precedents or authorities) and the interpretation or administration

45

thereof by, and other determinations, directives, requirements or requests of, any Governmental Authority, in each case that are applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Resignation Effective Date" has the meaning specified therefor in Section 10.07(a).

"Restaurant" means any restaurant (which may include any real property, fixtures, equipment, inventory and other property related thereto) operated, or to be operated, by any Loan Party or any of its Subsidiaries.

"Restricted Payment" means:

(a)     the declaration or payment of any dividend or other distribution, direct or indirect, on account of any Equity Interests of any Loan Party or any of its Subsidiaries, now or hereafter outstanding, together with any payment or distribution pursuant to a "plan of division" under the Delaware Limited Liability Company Act or any comparable transaction under any similar law,

(b)     the making of any repurchase, redemption, retirement, defeasance, sinking fund or similar payment, purchase or other acquisition for value, direct or indirect, of any Equity Interests of any Loan Party or any direct or indirect parent of any Loan Party, now or hereafter outstanding,

(c)     the making of any payment to retire, or to obtain the surrender of, any outstanding warrants, options or other rights for the purchase or acquisition of shares of any class of Equity Interests of any Loan Party, now or hereafter outstanding,

(d)     the making of any distribution of property, assets, shares of Equity Interests, warrants, rights, options, obligations or securities, or the return of any Equity Interests, to any shareholders or other equity holders of any Loan Party or any of its Subsidiaries, or

(e)     the payment of any management, consulting, monitoring or advisory fees or any other fees or expenses (including the reimbursement thereof by any Loan Party or any of its Subsidiaries) pursuant to any management, consulting, monitoring, advisory or other services agreement to any of the shareholders or other equityholders of any Loan Party or any of its Subsidiaries or other Affiliates, or to any other Subsidiaries or Affiliates of any Loan Party.

"Retail Property Capital Lease" means a real property lease for a Company Owned Restaurant that is required to be capitalized for financial reporting purposes in accordance with GAAP.

"Roll-Up Term Facility" has the meaning specified therefor in Section 2.01(a)(ii).

"Roll-Up Term Lender" means each Lender that has Roll-Up Term Loans outstanding, which shall include each Lender in a Specified Roll-Up Term Lender Group.

"Roll-Up Term Loans" has the meaning specified therefor in Section 2.01(a)(ii).

46

"Roll-Up Term Note" means a promissory note made by the Borrowers in favor of a Roll-Up Term Lender evidencing Roll-Up Term Loans made by such Roll-Up Term Lender, substantially in the form of Exhibit G.

"RSA Definitive Documentation" and "RSA Definitive Documents" means the "In-Court Restructuring Documents" as defined in the Company RSA.

"RSA Transactions" means the "Restructuring Transactions" as defined in the Company RSA.

"Sale and Leaseback Transaction" means, with respect to the Administrative Borrower or any of its Subsidiaries, any arrangement, directly or indirectly, with any Person whereby the Administrative Borrower or any of its Subsidiaries shall sell or transfer any property used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property being sold or transferred.

"Sanctioned Country" means, at any time, a country or territory that is the subject or target of any Sanctions that broadly prohibit dealings with that country or territory (which, as of the Effective Date, include, without limitation, Crimea, Cuba, Iran, North Korea, Sudan and Syria).

"Sanctioned Person" means, at any time, (a) any Person listed in OFAC's Specially Designated Nationals and Blocked Persons List, OFAC's Sectoral Sanctions Identification List, and any other Sanctions-related list of designated Persons maintained by OFAC, the U.S. Department of State, the United Nations Security Council, the European Union, or His Majesty's Treasury of the United Kingdom, Germany, Canada, Australia, or other relevant sanctions authority, (b) a Person that resides in, is organized in or located in, or has a place of business in, a country or territory named on any list referred to in clause (a) of this definition or a country or territory that is designated as a "Non-Cooperative Jurisdiction" by the Financial Action Task Force on Money Laundering, or whose subscription funds are transferred from or through any such jurisdiction (each of the foregoing in this clause (b), a "Sanction Target"), or a Person that owns 50% or more of the Equity Interests of, or is otherwise controlled by, or is acting on behalf of, one or more Sanction Targets, (c) any Person with whom or with which a U.S. Person is prohibited from dealing under any of the Sanctions, or (d) any Person owned or controlled by any Person or Persons described in clause (a) or (b).

"Sanctions" means Requirements of Law concerning or relating to economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by OFAC, the U.S. Department of State, the European Union, the government of Canada, Trade and Development Canada, Public Safety Canada or His Majesty's Treasury of the United Kingdom, or other relevant sanctions authority.

"Seafood Alliance Limited" means the investment vehicle owned by each of Double P Consultants Co.; Intero Investment GmbH; Rit Thirakomen and Vineyard Ventures Limited.

"SEC" means the Securities and Exchange Commission or any other similar or successor agency of the Federal government administering the Securities Act.

"Secured Party" means any Agent and any Lender.

"Securities Act" means the Securities Act of 1933, as amended, or any similar Federal statute, and the rules and regulations of the SEC thereunder, all as the same shall be in effect from time to time.

"Securitization" has the meaning specified therefor in Section 12.07(l).

"Security Agreement" means that certain Superpriority Pledge and Security Agreement, in form and substance satisfactory to the Collateral Agent, dated as of the date hereof, made by the Loan Parties in favor of the Collateral Agent for the benefit of the Secured Parties securing the Obligations.

"Seller" has the meaning specified therefor in the Stalking Horse Acquisition Agreement.

"Similar Business" means any business engaged in by the Loan Parties or any of their Subsidiaries on the Effective Date and any business or other activities that are reasonably similar, ancillary, complementary or related to, or a reasonable extension, development or expansion of, the businesses in which the Loan Parties and their Subsidiaries are engaged on the Effective Date.

"SOFR" means a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

"SOFR Administrator" means the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

"SOFR Borrowing" means, as to any borrowing, the SOFR Loans comprising such Loans.

"SOFR Deadline" has the meaning specified therefor in Section 2.07(a).

"SOFR Loan" means a Loan that bears interest at a rate based on Adjusted Term SOFR, other than pursuant to clause (c) of the definition of "Reference Rate".

"SOFR Notice" means a written notice substantially in the form of Exhibit D.

"SOFR Option" has the meaning specified therefor in Section 2.07(a).

"Solvent" means, with respect to any Person and its Subsidiaries on a consolidated basis, on a particular date, that on such date (a) the fair value of the property of such Person and its Subsidiaries on a consolidated basis is not less than the total amount of the liabilities of such Person and its Subsidiaries on a consolidated basis, (b) the present fair salable value of the assets of such Person and its Subsidiaries on a consolidated basis is not less than the amount that will be required to pay the probable liability of such Person and its Subsidiaries on a consolidated basis on its existing debts as they become absolute and matured, (c) such Person and its Subsidiaries on a consolidated basis are able to pay the debts and other liabilities, contingent obligations and other commitments of such Person and its Subsidiaries as they mature in the normal course of business, (d) such Person and its Subsidiaries on a consolidated basis do not intend to, and do not believe that they will, incur debts or liabilities beyond such Person's ability to pay as such

48

debts and liabilities mature, and (e) such Person and its Subsidiaries on a consolidated basis are not engaged in business or a transaction, and are not about to engage in business or a transaction, for which such Person's and its Subsidiaries' assets, on a consolidated basis property, would constitute unreasonably small capital after giving due consideration to the prevailing practices in the industry in which such Person is engaged. For the purposes hereof, the amount of any contingent liability at any time shall be computed as the amount that, in light of all of the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability (irrespective of whether such contingent liabilities meet the criteria for accrual under Statement of Financial Accounting Standard No. 5).

"Specified DIP Delayed Draw Term Lender" means each Lender specified as such under the caption "Specified DIP Delayed Draw Term Lender" in the Specified Roll-Up Term Lender Group Table.

"Specified Roll-Up Term Lender Group" means, with respect to each Specified DIP Delayed Draw Term Lender, each Roll-Up Term Lender set forth opposite such Specified DIP Delayed Draw Term Lender's name under the caption "Specified Roll-Up Term Lender Group" in the Specified Roll-Up Term Lender Group Table.

"Specified Roll-Up Term Lender Group Table" means the following table:

| | Specified DIP Delayed Draw Term Lender | Specified Roll-Up Term Lender Group | Specified Roll-Up Term Loan Percentage |
|---|---|---|---|
| 1. | Fortress Lending I Holdings L.P. | Fortress Lending I Holdings L.P. | 45.4471% |
| | | Fortress Credit Opportunities XVII CLO Limited | 20.7121% |
| | | FLF I Securities L.P. | 33.8408% |
| 2. | Fortress Lending II Holdings L.P. | Fortress Lending II Holdings L.P. | 8.0334% |
| | | FLF II GMS Holdings Finance L.P. | 33.4987% |
| | | FLF II Holdings Finance L.P. | 30.4666% |
| | | FLF II Securities L.P. | 28.0013% |
| 3. | Fortress Lending Fund II MA-CRPTF LP | Fortress Lending Fund II MA-CRPTF LP | 8.0334% |
| | | FLF II MA-CRPTF Holdings Finance L.P. | 91.9666% |

49

|  | **Specified DIP Delayed Draw Term Lender** | **Specified Roll-Up Term Lender Group** | **Specified Roll-Up Term Loan Percentage** |
|---|---|---|---|
| 4. | TCW DL VII Financing LLC | TCW DL VII Financing LLC | During the Interim Availability Period, 100.00%, and thereafter, 0.00% |
|  |  | TCW Direct Lending VII, LLC | During the Interim Availability Period, 0.00%, and thereafter, 100.00% |

"Specified Roll-Up Term Loan Percentage" means, with respect to each Roll-Up Term Lender in a Specified Roll-Up Term Lender Group, the percentage set forth opposite such Roll-Up Term Lender's name under the caption "Specified Roll-Up Term Loan Percentage" in the Specified Roll-Up Term Lender Group Table.

"Stalking Horse Acquisition Agreement" means that certain Asset Purchase Agreement, dated as of May 19, 2024, by and among the Administrative Borrower, the other Subsidiaries and Affiliates of the Administrative Borrower party thereto, and the Purchaser, as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time with the prior written consent of the Required Lenders.

"Standard & Poor's" means Standard & Poor's Ratings Services, a division of The McGraw Hill Companies, Inc. and any successor thereto.

"Subordinated Indebtedness" means Indebtedness of any Loan Party the terms of which (including, without limitation, payment terms, interest rates, covenants, remedies, defaults and other material terms) are reasonably satisfactory to the Collateral Agent and the Required Lenders and which is unsecured and has been expressly subordinated in right of payment to all Indebtedness of such Loan Party under the Loan Documents (a) by the execution and delivery of a subordination agreement, in form and substance reasonably satisfactory to the Collateral Agent and the Required Lenders, or (b) otherwise on terms and conditions reasonably satisfactory to the Collateral Agent and the Required Lenders.

"Subsidiary" means, with respect to any Person at any date, any corporation, limited or general partnership, limited liability company, trust, estate, association, joint venture or other business entity (a) the accounts of which would be consolidated with those of such Person in such Person's consolidated financial statements if such financial statements were prepared in accordance with GAAP or (b) of which more than 50% of (i) the outstanding Equity Interests having (in the absence of contingencies) ordinary voting power to elect a majority of the Board of Directors (or equivalent body) of such Person, (ii) in the case of a partnership or limited liability company, the interest in the capital or profits of such partnership or limited liability company or (iii) in the case of a trust, estate, association, joint venture or other entity, the beneficial interest in such trust, estate, association, joint venture or other entity is, at the time of determination, owned or controlled directly or indirectly through one or more intermediaries, by

50

Case 6:24-bk-02486-GER    Doc 79    Filed 05/20/24    Page 171 of 317

such Person. References to a Subsidiary shall mean a Subsidiary of the Administrative Borrower unless the context expressly provides otherwise.

"Tax" or "Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Term Loan" means, with respect to each Lender, each of such Lender's (a) DIP Delayed Draw Term Loans and (b) Roll-Up Term Loans.

"Term Loan Commitment" means, with respect to each Lender, as applicable, such Lender's DIP Delayed Draw Term Commitment.

"Term Loan PIK Amount" means, for any Roll-Up Term Loan, an amount equal to all interest that has accrued on such Roll-Up Term Loan and paid in kind pursuant to Section 2.04(d) of this Agreement.

"Term SOFR" means:

(a)    for any calculation with respect to a SOFR Loan, the Term SOFR Reference Rate for a tenor comparable to the applicable Interest Period on the day (such day, the "Periodic Term SOFR Determination Day") that is two (2) U.S. Government Securities Business Days prior to the first day of such Interest Period, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any Periodic Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day, and

(b)    for any calculation with respect to a Reference Rate Loan on any day, the Term SOFR Reference Rate for a tenor of one month on the day (such day, the "Reference Rate Term SOFR Determination Day") that is two (2) U.S. Government Securities Business Days prior to such day, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any Reference Rate Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Reference Rate Term SOFR Determination Day.

42010733.2

"Term SOFR Adjustment" means, for any calculation with respect to a Reference Rate Loan or a SOFR Loan, a percentage per annum as set forth below for the applicable type of such Loan and (if applicable) Interest Period therefor:

Reference Rate Loans: 0.11448%

SOFR Loans:

| Interest Period | Percentage |
|---|---|
| One month | 0.11448% |
| Three months | 0.26161% |
| Six Months | 0.42826% |

"Term SOFR Administrator" means CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by the Administrative Agent in its reasonable discretion).

"Term SOFR Reference Rate" means the forward-looking term rate based on SOFR.

"Termination Date" means the first date on which all of the Obligations are Paid In Full in cash and the Commitments of the Lenders are terminated.

"Termination Declaration" has the meaning specified therefor in Section 9.02(a).

"Termination Value" means, in respect of any one or more Hedging Agreements, after taking into account the effect of any legally enforceable netting agreement relating to such Hedging Agreements, (a) for any date on or after the date such Hedging Agreements have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Hedging Agreements, as determined based upon one or more mid-market or other readily available quotations provided by any nationally recognized dealer in such Hedging Agreements (which may include a Lender or any Affiliate of a Lender).

"Thai Union Group" means Thai Union Group Public Company Limited and any of its Controlled Investment Affiliates, including, to the extent applicable, Thai Union Investments North America LLC.

"Title Insurance Policy" means a mortgagee's loan policy, in form and substance reasonably satisfactory to the Collateral Agent, together with all endorsements made from time to time thereto, issued to the Collateral Agent by or on behalf of a title insurance company selected by or otherwise satisfactory to the Collateral Agent, insuring the Lien created by a Mortgage in an amount and on terms and with such endorsements reasonably satisfactory to the Collateral Agent, delivered to the Collateral Agent.

"Total DIP Delayed Draw Outstandings" means the aggregate Outstanding Amount of all DIP Delayed Draw Term Loans.

"Total DIP Delayed Draw Term Commitment" means the sum of the amounts of the Lenders' DIP Delayed Draw Term Commitments.

"Transactions" means the extension of credit under and in accordance with the Loan Documents and the DIP Orders.

"Unadjusted Benchmark Replacement" means the applicable Benchmark Replacement excluding the related Benchmark Replacement Adjustment.

"Uniform Commercial Code" or "UCC" has the meaning specified therefor in Section 1.04.

"United States Trustee" means the United States Trustee appointed under Title 28 Section 586(a)(3) of the Bankruptcy Code to supervise the administration of the Cases.

"Updated Budget" has the meaning specified therefor in Section 7.01(a)(xxi).

"Updated Budget Delivery Date" has the meaning specified therefor in Section 7.01(a)(xxi).

"USA PATRIOT Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (PATRIOT) Act of 2001 (Title III of Pub. L. 107-56, Oct. 26, 2001) as amended by the USA Patriot Improvement and Reauthorization Act of 2005 (Pub. L. 109-177, March 9, 2006) and as the same may have been or may be further renewed, extended, amended, or replaced.

"U.S." means the United States of America.

"U.S. Government Securities Business Day" means any day except for (a) a Saturday, (b) a Sunday or (c) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"U.S. Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Internal Revenue Code.

"U.S. Tax Compliance Certificate" has the meaning specified therefor in Section 2.09(d)(i)(B)(3).

"Waivable Mandatory Prepayment" shall have the meaning specified therefor in Section 2.05(g).

"WARN" has the meaning specified therefor in Section 6.01(p).

"<u>Weekly Budget Variance Report</u>" has the meaning specified therefor in <u>Section 7.01(a)(xxii)</u>.

"<u>Weekly Budget Variance Report Date</u>" has the meaning specified therefor in <u>Section 7.01(a)(xxii)</u>.

"<u>Weekly Budget Variance Report Period</u>" means the fiscal month to date period ending each Friday of the weeks preceding the applicable Budget Variance Test Date (with initial partial periods as appropriate).

"<u>Withholding Agent</u>" means any Loan Party and the Administrative Agent.

Section 1.02    <u>Terms Generally</u>.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall".  Unless the context requires otherwise, (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, amended and restated, supplemented or otherwise modified (subject to any restrictions on such amendments, restatements, amendment and restatements, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein", "hereof" and "hereunder", and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any right or interest in or to assets and properties of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible.

Section 1.03    <u>Certain Matters of Construction</u>.    References in this Agreement to "determination" by any Agent include good faith estimates by such Agent (in the case of quantitative determinations) and good faith beliefs by such Agent (in the case of qualitative determinations).  A Default or Event of Default shall be deemed to exist at all times during the period commencing on the date that such Default or Event of Default occurs to the date on which such Default or Event of Default is waived in writing pursuant to this Agreement or, in the case of a Default, is cured within any period of cure expressly provided for in this Agreement; and an Event of Default shall "continue" or be "continuing" until such Event of Default has been waived in writing by the Required Lenders.  Any Lien referred to in this Agreement or any other Loan Document as having been created in favor of any Agent, any agreement entered into by any Agent pursuant to this Agreement or any other Loan Document, any payment made by or to or funds received by any Agent pursuant to or as contemplated by this Agreement or any other Loan Document, or any act taken or omitted to be taken by any Agent, shall, unless otherwise expressly provided, be created, entered into, made or received, or taken or omitted, for the benefit or account of the Agents and the Lenders.  Wherever the phrase "to the knowledge of any Loan Party" or words of similar import relating to the knowledge or the awareness of any Loan Party are used in this Agreement or any other Loan Document, such phrase shall mean and refer to (i) the actual knowledge or awareness of an Authorized

54

Officer of any Loan Party or (ii) the knowledge that an Authorized Officer could reasonably be expected to have obtained if such officer had engaged in good faith and reasonably diligent performance of such officer's duties. All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or otherwise within the limitations of, another covenant shall not avoid the occurrence of a default if such action is taken or such condition exists. In addition, all representations and warranties hereunder shall be given independent effect so that if a particular representation or warranty proves to be incorrect or is breached, the fact that another representation or warranty concerning the same or similar subject matter is correct or is not breached will not affect the incorrectness of a breach of a representation or warranty hereunder.

Section 1.04    Accounting and Other Terms.

(a)    Unless otherwise expressly provided herein, each accounting term used herein shall have the meaning given it under GAAP. For purposes of determining compliance with any incurrence or expenditure tests set forth in Section 7.01 and Section 7.02, any amounts so incurred or expended (to the extent incurred or expended in a currency other than Dollars) shall be converted into Dollars on the basis of the exchange rates (as shown on the Bloomberg currency page for such currency or, if the same does not provide such exchange rate, by reference to such other publicly available service for displaying exchange rates as may be reasonably selected by the Agents or, in the event no such service is selected, on such other basis as is reasonably satisfactory to the Agents) as in effect on the date of such incurrence or expenditure under any provision of any such Section that has an aggregate Dollar limitation provided for therein (and to the extent the respective incurrence or expenditure test regulates the aggregate amount outstanding at any time and it is expressed in terms of Dollars, all outstanding amounts originally incurred or spent in currencies other than Dollars shall be converted into Dollars on the basis of the exchange rates (as shown on the Bloomberg currency page for such currency or, if the same does not provide such exchange rate, by reference to such other publicly available service for displaying exchange rates as may be reasonably selected by the Agents or, in the event no such service is selected, on such other basis as is reasonably satisfactory to the Agents) as in effect on the date of any new incurrence or expenditures made under any provision of any such Section that regulates the Dollar amount outstanding at any time). Notwithstanding the foregoing, (i) with respect to the accounting for leases as either operating leases or capital leases and the impact of such accounting in accordance with FASB ASC 842 on the definitions and covenants herein, GAAP as in effect on December 31, 2018 shall be applied and (ii) for purposes of determining compliance with any covenant (including the computation of any financial covenant) contained herein, Indebtedness of the Administrative Borrower and its Subsidiaries shall be deemed to be carried at 100% of the outstanding principal amount thereof, and the effects of FASB ASC 825 and FASB ASC 470-20 on financial liabilities shall be disregarded. A breach of a financial covenant contained in Article VI shall be deemed to have occurred as of the last day of any specified measurement period, regardless of when the financial statements reflecting such breach are delivered or required to be delivered to any Agent or any Lender.

(b)    All terms used in this Agreement which are defined in Article 8 or Article 9 of the Uniform Commercial Code as in effect from time to time in the State of New York (the "Uniform Commercial Code" or the "UCC") and which are not otherwise defined herein shall have the same meanings herein as set forth therein, provided that terms used herein which are defined in the Uniform Commercial Code as in effect in the State of New York on the date hereof shall continue to have the same meaning

55

notwithstanding any replacement or amendment of such statute except as any Agent may otherwise determine.

Section 1.05    Time References. Unless otherwise indicated herein, all references to time of day refer to Eastern Standard Time or Eastern daylight saving time, as in effect in New York City on such day.  For purposes of the computation of a period of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each means "to but excluding"; provided, however, that with respect to a computation of fees or interest payable to any Secured Party, such period shall in any event consist of at least one full day.  When payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or required on a day that is not a Business Day, the date of such payment (other than as described in the definition of "Interest Period") or performance shall extend to the immediately succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.

Section 1.06    Rates. The Administrative Agent does not warrant or accept responsibility for, and shall not have any liability with respect to (a) the continuation of, administration of, submission of, calculation of or any other matter related to the Reference Rate, the Term SOFR Reference Rate, Adjusted Term SOFR or Term SOFR, or any component definition thereof or rates referred to in the definition thereof, or any alternative, successor or replacement rate thereto (including any Benchmark Replacement), including whether the composition or characteristics of any such alternative, successor or replacement rate (including any Benchmark Replacement) will be similar to, or produce the same value or economic equivalence of, or have the same volume or liquidity as, the Reference Rate, the Term SOFR Reference Rate, Adjusted Term SOFR, Term SOFR or any other Benchmark prior to its discontinuance or unavailability, or (b) the effect, implementation or composition of any Conforming Changes.  The Administrative Agent and its Affiliates or other related entities may engage in transactions that affect the calculation of the Reference Rate, the Term SOFR Reference Rate, Term SOFR, Adjusted Term SOFR, any alternative, successor or replacement rate (including any Benchmark Replacement) or any relevant adjustments thereto, in each case, in a manner adverse to the Borrowers.  The Administrative Agent may select information sources or services in its reasonable discretion to ascertain the Reference Rate, the Term SOFR Reference Rate, Term SOFR, Adjusted Term SOFR or any other Benchmark, in each case pursuant to the terms of this Agreement, and shall have no liability to any Borrower, any Lender or any other Person for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service.

Section 1.07    Obligation to Make Payments in Dollars.  All payments to be made by any Loan Party of principal, interest, fees and other Obligations under any Loan Document shall be made in Dollars in same day funds, and no obligation of any Loan Party to make any such payment shall be discharged or satisfied by any payment other than payments made in Dollars in same day funds.

## ARTICLE II

## THE LOANS

Section 2.01     The Loans.

(a)     Roll-Up Term Loans.

(i)     Effective upon the Interim Order Entry Date, without any further action by any party to this Agreement or any other Person, Prepetition Rolled Term Loans held by each DIP Delayed Draw Term Lender (or its Affiliates or Related Funds) in an amount equal to 175% of the aggregate principal amount of the DIP Delayed Draw Term Loans funded by such DIP Delayed Draw Term Lender during the Interim Availability Period shall be automatically "rolled-up" and substituted and exchanged for (and repaid on a cashless basis by) loans issued hereunder (the "Interim Roll-Up Term Loans") and shall be deemed funded by such DIP Delayed Draw Term Lender on the date of funding of such DIP Delayed Draw Term Loans; provided that, in the case of a Specified DIP Delayed Draw Term Lender, such Interim Roll-Up Term Loans shall be allocated among the Lenders in the applicable Specified Roll-Up Term Lender Group based on the respective Specified Roll-Up Term Loan Percentage on such date. The Interim Roll-Up Term Loans shall constitute and be deemed to be Loans hereunder, and shall constitute a portion of the outstanding Obligations owing to the Secured Parties hereunder (the foregoing "roll-up" and substitution and exchange of such Prepetition Rolled Term Loans into the Interim Roll-Up Term Loans shall be referred to herein as the "Interim Roll-Up Term Facility"). The aggregate principal amount of the Interim Roll-Up Term Loans deemed funded hereunder shall be $70,000,000 (assuming, for the avoidance of doubt, that $40,000,000 of DIP Delayed Draw Term Loans are funded). Schedule 2.01(a) to the Disclosure Letter sets forth the Prepetition Obligations owing to each Roll-Up Term Lender which shall be deemed Interim Roll-Up Term Loans as of the Effective Date.

(ii)     Effective upon the Final Order Entry Date, without any further action by any party to this Agreement or any other Person, Prepetition Rolled Term Loans held by each DIP Delayed Draw Term Lender (or its Affiliates or Related Funds) in an amount equal to 175% of the aggregate principal amount of the DIP Delayed Draw Term Loans funded by such DIP Delayed Draw Term Lender during the Final Availability Period shall be automatically "rolled-up" and substituted and exchanged for (and repaid on a cashless basis by) loans issued hereunder (the "Final Roll-Up Term Loans"; together with the Interim Roll-Up Term Loans, collectively, the "Roll-Up Term Loans") and shall be deemed funded by such DIP Delayed Draw Term Lender on the date of funding of such DIP Delayed Draw Term Loans; provided that, in the case of a Specified DIP Delayed Draw Term Lender, such Final Roll-Up Term Loans shall be allocated among the Lenders in the applicable Specified Roll-Up Term Lender Group based on the respective Specified Roll-Up Term Loan Percentage on such date. The Final Roll-Up Term Loans shall constitute and be deemed to be Loans hereunder, and shall constitute a portion of the outstanding Obligations owing to the Secured Parties hereunder (the foregoing "roll-up" and substitution and exchange of such Prepetition Rolled Term Loans into the Final Roll-Up Term Loans shall be referred to herein as the "Final Roll-Up Term Facility"; together with the Interim Roll-Up Term Facility, collectively, the "Roll-Up Term Facility"). The maximum aggregate principal amount of Final Roll-Up Term Loans that may be deemed funded hereunder shall be $105,000,000 (assuming, for the avoidance of doubt, that $60,000,000 of DIP Delayed Draw Term Loans are funded). Schedule 2.01(a) to the Disclosure Letter sets forth the maximum principal amount of Prepetition Obligations owing to each Roll-Up Term Lender which may be deemed Final Roll-Up Term Loans upon the funding in full of the Final Availability Amount.

(b)     DIP Delayed Draw Term Loans.

(i)     Subject to the terms and conditions set forth herein and in any DIP Order, each DIP Delayed Draw Term Lender severally and not jointly agrees to make loans (each such loan, a "DIP Delayed Draw Term Loan") to the Administrative Borrower in Dollars from time to time, on any Business Day during the DIP Delayed Draw Availability Period, in an aggregate amount not to exceed at any time outstanding the amount of such DIP Delayed Draw Term Lender's DIP Delayed Draw Term Commitment; provided, however, that (A) the amount of DIP Delayed Draw Term Loans to be borrowed for any DIP Delayed Draw Term Borrowing shall be in an aggregate principal amount not to exceed the amount required pursuant to the Approved Budget (subject to Permitted Variances) as then in effect and (B) after giving effect to any DIP Delayed Draw Term Borrowing, the Total DIP Delayed Draw Outstandings shall not exceed the DIP Delayed Draw Term Facility.

(ii)     Notwithstanding anything herein or in any other Loan Document, (A) during the Interim Availability Period, only DIP Delayed Draw Term Loans in a single draw in an amount up to the Interim Availability Amount may be advanced by the applicable DIP Delayed Draw Term Lenders, and (B) during the Final Availability Period, DIP Delayed Draw Term Loans in two (2) separate draws in an aggregate amount up to the Final Availability Amount may be advanced by the applicable DIP Delayed Draw Term Lenders; provided, that in no event shall the aggregate amount of DIP Delayed Draw Term Loans advanced exceed $100,000,000.

(iii)     Any principal amount of the Term Loans which is repaid or prepaid may not be reborrowed.

Section 2.02     Making the Loans.

(a)     Each Borrowing of the DIP Delayed Draw Term Loans shall be made upon the Administrative Borrower's irrevocable notice to the Administrative Agent, which may be given by the delivery by the Administrative Borrower of a Notice of Borrowing.  Except for any Notice of Borrowing from the Administrative Borrower for a DIP Delayed Draw Term Borrowing on the Effective Date, which such Notice of Borrowing may be delivered not later than 11:00 a.m. one (1) Business Day prior to the Effective Date, each such Notice of Borrowing must be received by the Administrative Agent not later than 11:00 a.m. five (5) Business Days prior to the requested date of any Borrowing.  Each Borrowing of DIP Delayed Draw Term Loans shall be in a minimum principal amount of $250,000 or a whole multiple of $50,000 in excess thereof.  Each Notice of Borrowing shall specify (i) the requested date of the Borrowing (which shall be a Business Day) and (ii) the principal amount of DIP Delayed Draw Term Loans to be borrowed (which shall be in an amount not greater than what is permitted hereunder). Notwithstanding anything herein or in any other Loan Document, the DIP Delayed Draw Term Facility shall only be available to be drawn by the Administrative Borrower in three (3) Borrowings of DIP Delayed Draw Term Loans and each such Borrowing shall be made in accordance with the Approved Budget (subject to Permitted Variances).

(b)     Following receipt of a Notice of Borrowing for a DIP Delayed Draw Term Loan, the Administrative Agent shall promptly notify each Lender under such Loan Facility of the amount of its Pro Rata Share of the applicable DIP Delayed Draw Term Loan being requested.  Each such Lender shall make the amount of its portion of such DIP Delayed Draw Term Loan available to the Administrative Agent in immediately available funds at the Payment Office not later than 1:00 p.m. on the Business Day specified in the applicable Notice of Borrowing.  Upon satisfaction of the applicable conditions set forth in Sections 5.01, 5.02 and 5.03, as applicable, the Administrative Agent shall make all funds so received available to

58

the Borrowers in like funds as received by the Administrative Agent either by wire transfer of such funds, in each case, in accordance with instructions provided to (and reasonably acceptable to) the Administrative Agent by the Administrative Borrower.

(c)    All DIP Delayed Draw Term Loans under this Section 2.02 shall be made by the DIP Delayed Draw Term Lenders simultaneously and proportionately to their Pro Rata Shares of the DIP Delayed Draw Term Commitment, it being understood that no Lender shall be responsible for any default by any other Lender in that other Lender's obligation to make a Loan requested hereunder, nor shall the DIP Delayed Draw Term Commitment of any Lender be increased or decreased as a result of the default by any other Lender in that Lender's obligation to make a DIP Delayed Draw Term Loan requested hereunder, and each DIP Delayed Draw Term Lender shall be obligated to make the DIP Delayed Draw Term Loans required to be made by it by the terms of this Agreement regardless of the failure by any other Lender.

Section 2.03    Repayment of Loans; Evidence of Debt.

(a)    The outstanding unpaid principal amount of the Term Loan, and all accrued and unpaid interest thereon, shall be due and payable on the earlier of (i) the Final Maturity Date and (ii) the date on which the Term Loan is declared due and payable pursuant to the terms of this Agreement.

(b)    Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the Indebtedness of the Borrowers to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(c)    The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrowers to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(d)    The entries made in the accounts maintained pursuant to Section 2.03(b) or Section 2.03(c) shall be prima facie evidence of the existence and amounts of the obligations recorded therein; provided that (i) the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrowers to repay the Loans in accordance with the terms of this Agreement and (ii) in the event of any conflict between the entries made in the accounts maintained pursuant to Section 2.03(b) and the accounts maintained pursuant to Section 2.03(c), the accounts maintained pursuant to Section 2.03(c) shall govern and control.

(e)    Any Lender may request that Loans made by it be evidenced by a promissory note. In such event, the Borrowers shall execute and deliver to such Lender a promissory note payable to the order of such Lender (or, if requested by such Lender, to such Lender and its registered assigns) in the form of a DIP Delayed Draw Term Note or Roll-Up Term Note, as applicable.  Thereafter, the Loans evidenced by such promissory note and interest thereon shall at all times (including after assignment pursuant to Section 12.07) be represented by one or more promissory notes in such form payable to the order of the

payee named therein (or, if such promissory note is a registered note, to such payee and its registered assigns).

Section 2.04    Interest.

(a)    [Reserved].

(b)    Loans.  Subject to the terms of this Agreement, at the option of the Administrative Borrower, the Loans (including, for the avoidance of doubt, any Term Loan PIK Amount paid in kind) or any portion thereof shall be either a Reference Rate Loan or a SOFR Loan.  If a Loan is a Reference Rate Loan, such Loan shall bear interest on the principal amount thereof from time to time outstanding, from the date of such Loan until repaid, at a rate per annum equal to the Reference Rate plus the Applicable Margin, and if a Loan is a SOFR Loan, such Loan shall bear interest on the principal amount thereof from time to time outstanding, from the date of such Loan until repaid, at a rate per annum equal to Adjusted Term SOFR for the Interest Period in effect for such Loan plus the Applicable Margin.

(c)    Default Interest.  To the extent permitted by law and notwithstanding anything to the contrary in this Section, upon the occurrence and during the continuance of an Event of Default, the principal of, and all accrued and unpaid interest on, all Loans, fees, indemnities or any other Obligations of the Loan Parties under this Agreement and the other Loan Documents, shall bear interest, from the date such Event of Default occurred until the date such Event of Default is cured or waived in writing in accordance herewith, at a rate per annum equal at all times to the Post-Default Rate.

(d)    Interest Payment.  Interest on each Loan shall be payable (each such date, an "Interest Payment Date") (i) in the case of a Reference Rate Loan, monthly, in arrears, on the first day of each month, commencing on the first day of the month following the month in which such Loan is made, (ii) in the case of a SOFR Loan, on the last day of each Interest Period applicable to such Loan and, if applicable, on each date during such Interest Period occurring every three months from the first day of such Interest Period, and (iii) in the case of each Loan, at maturity (whether upon demand, by acceleration or otherwise); provided that (A) all interest payable pursuant to the foregoing clauses (i) and (ii) on any DIP Delayed Draw Term Loan shall be paid in cash on each Interest Payment Date and (B) all interest payable pursuant to the foregoing clauses (i) and (ii) on any Roll-Up Term Loan shall be paid in kind (in lieu of payment in cash) on each Interest Payment Date by adding such interest to the outstanding principal amount of such Roll-Up Term Loan and, at all times thereafter, such Term Loan PIK Amount shall bear interest as principal of such Roll-Up Term Loan as provided under the Loan Documents as if such Term Loan PIK Amount had originally been part of the outstanding principal amount of such Roll-Up Term Loan. Interest at the Post-Default Rate shall be payable on demand.  Each Borrower hereby authorizes the Administrative Agent to, and the Administrative Agent may, from time to time, charge the Loan Account pursuant to Section 4.01 with the amount of any interest payment due hereunder.

(e)    General.  All interest shall be computed on the basis of a year of 360 days for the actual number of days, including the first day but excluding the last day, elapsed.

Section 2.05       Reduction of Commitment; Prepayment of Loans.

(a)       Reduction of Commitments.

(i)       Optional Reduction of Commitments.  The Administrative Borrower may, upon notice to the Administrative Agent, terminate the DIP Delayed Draw Term Commitments or from time to time permanently reduce the DIP Delayed Draw Term Commitments in whole or in part; provided that (A) any such notice shall be received by the Administrative Agent not later than 11:00 a.m. five (5) Business Days prior to the date of termination or reduction (or such shorter period of time as may be agreed by the Administrative Agent) and (B) any such partial reduction shall be in an aggregate amount of $1,000,000 or any whole multiple of $1,000,000 in excess thereof or, if less, the entire principal amount thereof.  The Administrative Agent will promptly notify the Lenders of any termination or reduction of the DIP Delayed Draw Term Commitments under this Section 2.05(a)(i).

(ii)       Mandatory Reduction of Commitments.  The aggregate DIP Delayed Draw Term Commitments shall be automatically and permanently reduced by the amount of any DIP Delayed Draw Term Borrowing.

(iii)       Application of Commitment Reductions; Payment of Fees.  Upon any reduction of the DIP Delayed Draw Term Commitments pursuant to Section 2.05(a)(i) or Section 2.05(a)(ii), the DIP Delayed Draw Term Commitment of each DIP Delayed Draw Term Lender shall be reduced by such Lender's Pro Rata Share of such reduction amount (which shall be determined by such DIP Delayed Draw Term Lender's Pro Rata Share of the DIP Delayed Draw Term Facility).  All fees and other payments in respect of the DIP Delayed Draw Term Facility accrued until the effective date of any termination of the DIP Delayed Draw Term Facility shall be paid on the effective date of such termination.

(b)       Optional Prepayment of Loans.

(i)       The Borrowers may, at any time and from time to time, upon at least five (5) Business Days' prior written notice to the Administrative Agent, prepay the principal of the Loans, in whole or in part (which notice may be conditioned upon the occurrence of other events, in which case such notice may be revoked by the Administrative Borrower (by notice to the Administrative Agent prior to the specified effective date of such event) if such condition is not satisfied).  Each prepayment made pursuant to this Section 2.05(b)(i) shall be accompanied by the payment of accrued interest to the date of such payment on the amount prepaid.  Each such prepayment shall be applied in accordance with Section 2.05(d).

(ii)       The Borrowers may, upon at least five (5) Business Days' prior written notice to the Administrative Agent, terminate this Agreement, subject to the Payment in Full of the Obligations to the Administrative Agent.  If the Administrative Borrower has sent a notice of termination pursuant to this Section 2.05(b)(ii), then the Lenders' obligations to extend credit hereunder shall terminate and the Borrowers shall provide for the Payment in Full of the Obligations on the date set forth as the date of termination of this Agreement in such notice.

(c)       Mandatory Prepayment.

(i)       [Reserved].

61

(ii)    Immediately upon any Disposition (other than a Permitted Disposition described under clauses (a), (c), (d), (e), (f), (g), (p), (q), (t)(ii) (only if a mandatory prepayment in respect of proceeds from such Disposition is not contemplated by the Approved Budget), (u) or (v) of the definition of Permitted Disposition) by any Loan Party or its Subsidiaries, the Borrowers shall prepay the outstanding principal amount of the Loans in accordance with Section 2.05(d) in an amount equal to 100% of the Net Cash Proceeds received by such Person in connection with such Disposition.  Nothing contained in this Section 2.05(c)(ii) shall permit any Loan Party or any of its Subsidiaries to make a Disposition of any property other than in accordance with Section 7.02(c)(ii).

(iii)    Upon the issuance or incurrence by any Loan Party or any of its Subsidiaries of any Indebtedness (other than Permitted Indebtedness), or upon an Equity Issuance (other than any Excluded Equity Issuance), the Borrowers shall prepay the outstanding principal amount of the Loans in accordance with Section 2.05(d) in an amount equal to 100% of the Net Cash Proceeds received by such Person in connection therewith.  The provisions of this Section 2.05(c)(iii) shall not be deemed to be implied consent to any such issuance, incurrence or sale otherwise prohibited by the terms and conditions of this Agreement.

(iv)    Upon the receipt by any Loan Party or any of its Subsidiaries of any Extraordinary Receipts, the Borrowers shall prepay the outstanding principal amount of the Loans in accordance with Section 2.05(d) in an amount equal to 100% of the Net Cash Proceeds received by such Person in connection therewith.

(v)    [Reserved.]

(vi)    [Reserved].

(d)    Application of Payments.  Each prepayment of the Obligations made under this Section 2.05 shall be applied as follows:

(i)    First, to the outstanding DIP Delayed Draw Term Loans (including any accrued interest thereon) on a pro rata basis;

(ii)    Second, to the outstanding Roll-Up Term Loans (including any accrued interest thereon) on a pro rata basis; and

(iii)    Third, to the ratable payment of all other Obligations then due and payable.

Notwithstanding the foregoing, and subject to the DIP Orders, after the occurrence and during the continuance of an Event of Default, if the Administrative Agent has elected, or has been directed by the Collateral Agent or the Required Lenders, to apply payments and other Proceeds of Collateral in accordance with Section 4.03(b) all prepayments required under Section 2.05(c) shall be applied in the manner set forth in Section 4.03(b).

(e)    Interest and Fees.  Any prepayment made pursuant to this Section 2.05 shall be accompanied by (i) accrued interest on the principal amount being prepaid to the date of prepayment, and (ii) any Funding Losses payable pursuant to Section 2.08.

(f)    <u>Cumulative Prepayments</u>.  Except as otherwise expressly provided in this <u>Section 2.05</u>, payments with respect to any subsection of this <u>Section 2.05</u> are in addition to payments made or required to be made under any other subsection of this <u>Section 2.05</u>.

(g)    <u>Waivable Mandatory Prepayments</u>.  Anything contained herein to the contrary notwithstanding, in the event that the Borrowers are required to make any mandatory prepayment (a "<u>Waivable Mandatory Prepayment</u>") of the Loans pursuant to <u>Section 2.05(c)</u>, not less than two Business Days prior to the date on which the Borrowers are required to make such Waivable Mandatory Prepayment (the "<u>Required Prepayment Date</u>"), the Administrative Borrower shall notify the Administrative Agent in writing of the amount of such prepayment, and the Administrative Agent will promptly thereafter notify each Lender of the amount of such Lender's Pro Rata Share of such Waivable Mandatory Prepayment and such Lender's option to refuse such amount.  Each such Lender may exercise such option by giving written notice to the Administrative Borrower and the Administrative Agent of its election to do so on or before 12:00 noon (New York City time) one (1) Business Day prior to the Required Prepayment Date (it being understood that any Lender that does not notify the Administrative Borrower and the Administrative Agent of its election to exercise such option on or before 12:00 noon (New York City time) one Business Day prior to the Required Prepayment Date shall be deemed to have elected, as of such date, not to exercise such option).  On the Required Prepayment Date, the Borrowers shall pay to the Administrative Agent the amount of the Waivable Mandatory Prepayment, which amount shall be applied (i) in an amount equal to that portion of the Waivable Mandatory Prepayment payable to those Lenders that have elected not to exercise such option, to prepay the Loans of such Lenders (which prepayment shall be applied to prepay the outstanding principal amount of the Obligations in accordance with <u>Section 2.05(d)</u>) and (ii) to the extent of any excess, to the Borrowers for working capital and general corporate purposes.

Section 2.06    <u>Fees</u>.

(a)    <u>DIP Upfront Fee</u>.  The Borrowers shall pay to the Administrative Agent, for the account of each Lender in accordance with its Pro Rata Share of the DIP Delayed Draw Term Facility, an upfront fee in an amount equal to 1.0% of the aggregate principal amount of the DIP Delayed Draw Term Commitment as of the Effective Date (the "<u>DIP Upfront Fee</u>").  The DIP Upfront Fee shall be fully earned, due and payable in full on the Interim Order Entry Date and shall be deducted by the Administrative Agent from the amount of the DIP Delayed Draw Term Loans funded on the Interim Order Entry Date.

(b)    <u>DIP Exit Fee</u>.  The Borrowers shall pay to the Administrative Agent, for the account of each Lender in accordance with its Pro Rata Share of the DIP Delayed Draw Term Facility, an exit fee in an amount equal to 3.0% of the aggregate principal amount of the DIP Delayed Draw Term Commitment as of the Effective Date (the "<u>DIP Exit Fee</u>").  The DIP Exit Fee shall be fully earned on the Interim Order Entry Date and due and payable in full in cash on the earliest to occur of (i) the date on which the DIP Delayed Draw Term Loans are Paid in Full, (ii) the date of acceleration of the Obligations under the Loan Facilities and the termination of all Commitments hereunder upon the occurrence of an Event of Default in accordance with the Loan Documents and the DIP Orders and (iii) the Final Maturity Date.

(c)    <u>DIP Agent Fee</u>.  The Borrowers shall pay to the Administrative Agent, for its own account, an agency fee in an amount equal to $100,000 (the "<u>DIP Agent Fee</u>"), which shall be fully earned, due and payable in full on the Interim Order Entry Date and shall be deducted from the amount of the DIP Delayed Draw Term Loans funded on the Interim Order Entry Date.

Section 2.07    SOFR Option.

(a)    The Borrowers may, at any time and from time to time, so long as no Default or Event of Default has occurred and is continuing, elect to have interest on all or a portion of the Loans be charged at a rate of interest based upon Adjusted Term SOFR (the "SOFR Option") by notifying the Administrative Agent prior to 11:00 a.m. (New York City time) at least three Business Days prior to (i) the proposed borrowing date of a Loan (as provided in Section 2.02), (ii) in the case of the conversion of a Reference Rate Loan to a SOFR Loan, the commencement of the proposed Interest Period or (iii) in the case of the continuation of a SOFR Loan as a SOFR Loan, the last day of the then current Interest Period (the "SOFR Deadline"). Notice of the Borrowers' election of the SOFR Option for a permitted portion of the Loans and an Interest Period pursuant to this Section 2.07(a) shall be made by delivery to the Administrative Agent of (A) a Notice of Borrowing (in the case of the initial making of a Loan) in accordance with Section 2.02 or (B) a SOFR Notice prior to the SOFR Deadline. Promptly upon its receipt of each such SOFR Notice, the Administrative Agent shall provide a copy thereof to each of the Lenders. Each SOFR Notice shall be irrevocable and binding on the Borrowers.

(b)    Interest on SOFR Loans shall be payable in accordance with Section 2.04(d). On the last day of each applicable Interest Period, unless the Borrowers properly have exercised the SOFR Option with respect thereto, the interest rate applicable to such SOFR Loans automatically shall convert to the rate of interest then applicable to another SOFR Loan of the same tenor. At any time that a Default or an Event of Default has occurred and is continuing, the Borrowers no longer shall have the option to request that the Loans bear interest at Adjusted Term SOFR and the Administrative Agent shall have the right to convert the interest rate on all outstanding SOFR Loans to the rate of interest then applicable to Reference Rate Loans of the same type hereunder on the last day of the then current Interest Period.

(c)    Notwithstanding anything to the contrary contained in this Agreement, the Borrowers (i) shall have not more than 5 SOFR Loans in effect at any given time, and (ii) may only exercise the SOFR Option for SOFR Loans in an amount of at least $250,000 and integral multiples of $50,000 in excess thereof.

(d)    The Borrowers may prepay SOFR Loans at any time; provided, however, that in the event that SOFR Loans are prepaid on any date that is not the last day of the Interest Period applicable thereto, including as a result of any mandatory prepayment pursuant to Section 2.05(c) or any application of payments or proceeds of Collateral in accordance with Section 4.03 or Section 4.04 or for any other reason, including early termination of the term of this Agreement or acceleration of all or any portion of the Obligations pursuant to the terms hereof, the Borrowers shall indemnify, defend, and hold the Agents and the Lenders and their participants harmless against any and all Funding Losses in accordance with Section 2.08.

(e)    In connection with the use or administration of Term SOFR, the Administrative Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document. The Administrative Agent will promptly notify the Borrowers and the Lenders of the effectiveness of any Conforming Changes in connection with the use or administration of

64

Term SOFR.  Anything to the contrary contained herein notwithstanding, neither Administrative Agent, nor any Lender, nor any of their participants, is required actually to match fund any Obligation as to which interest accrues at Adjusted Term SOFR or the Term SOFR Reference Rate.

(f)        Subject to clause (g) below, if on or prior to the first day of any Interest Period for any SOFR Loan,

(i)        the Administrative Agent determines (which determination shall be conclusive and binding absent manifest error) that "Adjusted Term SOFR" cannot be determined pursuant to the definition thereof, or

(ii)        the Required Lenders determine that for any reason in connection with any request for a SOFR Loan or a conversion thereto or a continuation thereof that Adjusted Term SOFR for any requested Interest Period with respect to a proposed SOFR Loan does not adequately and fairly reflect the cost to such Lenders of making and maintaining such Loan, and the Required Lenders have provided notice of such determination to the Administrative Agent,

then the Administrative Agent shall give written notice to the Administrative Borrower and to the Lenders as soon as practicable thereafter.

Upon notice thereof by the Administrative Agent to the Administrative Borrower, any obligation of the Lenders to make SOFR Loans, and any right of the Administrative Borrower to continue SOFR Loans or to convert Reference Rate Loans to SOFR Loans, shall be suspended (to the extent of the affected SOFR Loans or affected Interest Periods) until the Administrative Agent revokes such notice.  Upon receipt of such notice, (A) the Administrative Borrower may revoke any pending request for a borrowing of, conversion to or continuation of SOFR Loans (to the extent of the affected SOFR Loans or affected Interest Periods) or, failing that, the Administrative Borrower will be deemed to have converted any such request into a request for a borrowing of or conversion to Reference Rate Loans in the amount specified therein and (B) any outstanding affected SOFR Loans will be deemed to have been converted into Reference Rate Loans at the end of the applicable Interest Period.  Upon any such conversion, the Administrative Borrower shall also pay accrued interest on the amount so converted, together with any additional amounts required pursuant to Section 2.08.  Subject to Section 2.07(g), if the Administrative Agent determines (which determination shall be conclusive and binding absent manifest error) that "Adjusted Term SOFR" cannot be determined pursuant to the definition thereof on any given day, the interest rate on Reference Rate Loans shall be determined by the Administrative Agent without reference to clause (c) of the definition of "Reference Rate" until the Administrative Agent revokes such determination.

(g)        Benchmark Replacement.

(i)        Notwithstanding anything to the contrary herein or in any other Loan Document, upon the occurrence of a Benchmark Transition Event, the Administrative Agent and the Administrative Borrower may amend this Agreement to replace the then-current Benchmark with a Benchmark Replacement.  Any such amendment with respect to a Benchmark Transition Event will become effective at 5:00 p.m. (New York City time) on the fifth (5th) Business Day after the Administrative Agent has posted such proposed amendment to all affected Lenders and the Administrative Borrower so long as

65

the Administrative Agent has not received, by such time, written notice of objection to such amendment from Lenders comprising the Required Lenders. No replacement of a Benchmark with a Benchmark Replacement pursuant to this Section 2.07(g)(i) will occur prior to the applicable Benchmark Transition Start Date. No swap agreement shall be deemed to be a "Loan Document" for purposes of this Section 2.07(g).

(ii)    In connection with the use, administration, adoption or implementation of a Benchmark Replacement, the Administrative Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.

(iii)    The Administrative Agent will promptly notify the Administrative Borrower and the Lenders of (A) the implementation of any Benchmark Replacement and (B) the effectiveness of any Conforming Changes in connection with the use, administration, adoption or implementation of a Benchmark Replacement. The Administrative Agent will notify the Administrative Borrower of (1) the removal or reinstatement of any tenor of a Benchmark pursuant to Section 2.07(g)(iv) and (2) the commencement of any Benchmark Unavailability Period. Any determination, decision or election that may be made by the Administrative Agent or, if applicable, any Lender (or group of Lenders) pursuant to this Section 2.07(g), including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Loan Document, except, in each case, as expressly required pursuant to this Section 2.07(g).

(iv)    Notwithstanding anything to the contrary herein or in any other Loan Document, at any time (including in connection with the implementation of a Benchmark Replacement), (A) if the then-current Benchmark is a term rate (including the Term SOFR Reference Rate) and either (1) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion or (2) the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is not or will not be representative, then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for any Benchmark settings at or after such time to remove such unavailable or non-representative tenor and (B) if a tenor that was removed pursuant to clause (A) above either (1) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (2) is not, or is no longer, subject to an announcement that it is not or will not be representative for a Benchmark (including a Benchmark Replacement), then the Administrative Agent may modify the definition of "Interest Period" (or any similar or analogous definition) for all Benchmark settings at or after such time to reinstate such previously removed tenor.

(v)    Upon the Administrative Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, the Administrative Borrower may revoke any pending request for a SOFR Borrowing of, conversion to or continuation of SOFR Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, the Administrative

66

Borrower will be deemed to have converted any such request into a request for a borrowing of or conversion to Reference Rate Loans. During a Benchmark Unavailability Period or at any time that a tenor for the then-current Benchmark is not an Available Tenor, the component of Reference Rate based upon the then-current Benchmark or such tenor for such Benchmark, as applicable, will not be used in any determination of Reference Rate.

Section 2.08    Funding Losses. In the event of (a) the payment of any principal of any SOFR Loan other than on the last day of the Interest Period applicable thereto (including as a result of a Default or an Event of Default or any mandatory prepayment required pursuant to Section 2.05(c)), (b) the conversion of any SOFR Loan other than on the last day of the Interest Period applicable thereto (including as a result of a Default or an Event of Default), (c) the failure to borrow, convert, continue or prepay any SOFR Loan on the date specified in any notice delivered pursuant hereto, or (d) the assignment of any SOFR Loan other than on the last day of the Interest Period applicable thereto as a result of a request by the Collateral Agent pursuant to Section 12.02(c), then, in any such event, the Borrowers shall compensate each Lender for any loss, cost and expense ("Funding Losses") attributable to such event, including any loss, cost or expense arising from the liquidation or redeployment of funds or from any fees payable. A certificate of any Lender setting forth any amount or amounts that such Lender is entitled to receive pursuant to this Section 2.08 shall be delivered to the Administrative Borrower and shall be conclusive absent manifest error. The Borrowers shall pay such Lender the amount shown as due on any such certificate upon demand after receipt thereof.

Section 2.09    Taxes.

(a)    Any and all payments by or on account of any obligation of any Loan Party hereunder or under any other Loan Document shall be made free and clear of and without deduction or withholding for any and all Taxes, except as required by applicable law. If any applicable law (as determined in the good faith discretion of any Withholding Agent) requires the deduction or withholding of any Taxes from or in respect of any such payment, (i) the applicable Withholding Agent shall make such deduction or withholding, (ii) the applicable Withholding Agent shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law and (iii) if such Tax is an Indemnified Tax, then the sum payable by the applicable Loan Party shall be increased by the amount (an "Additional Amount") necessary such that after making all required deductions and withholdings (including deductions and withholdings applicable to additional sums payable under this Section 2.09) the applicable Recipient receives the amount equal to the sum it would have received had no such deduction or withholding been made. As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Authority pursuant to this Section 2.09, such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(b)    In addition, each Loan Party shall pay to the relevant Governmental Authority in accordance with applicable law any Other Taxes, or at the option of the Administrative Agent timely reimburse it for the payment of any Other Taxes by any Secured Party. Each Loan Party shall deliver to each Secured Party official receipts in respect of any Taxes or Other Taxes payable hereunder promptly after payment of such Taxes or Other Taxes.

67

(c)     The Loan Parties hereby jointly and severally indemnify and agree to hold each Secured Party harmless from and against Indemnified Taxes (including, without limitation, Indemnified Taxes imposed on any amounts payable under this <u>Section 2.09</u>) paid or payable by such Secured Party or required to be withheld or deducted from a payment to such Secured Party and any expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally asserted. Such indemnification shall be paid within 10 days from the date on which any such Person makes written demand therefore specifying in reasonable detail the nature and amount of such Indemnified Taxes. A certificate as to the amount of such payment or liability delivered to the Administrative Borrower by a Secured Party (with a copy to the Administrative Agent) or by the Administrative Agent on its own behalf or on behalf of another Secured Party shall be conclusive absent manifest error.

(d)     Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Administrative Borrower and the Administrative Agent, at the time or times reasonably requested by the Administrative Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Administrative Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by the Administrative Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Administrative Borrower or the Administrative Agent as will enable the Administrative Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in <u>Section 2.09(d)(i)(A)</u>, <u>2.09(d)(i)(B)</u> and <u>(i)(D)</u> below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(i)     Without limiting any of the foregoing,

(A)     any Lender that is a U.S. Person shall deliver to the Administrative Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Administrative Borrower or the Administrative Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding Tax;

(B)     any Lender that is not a U.S. Person (a "<u>Foreign Lender</u>") shall, to the extent it is legally entitled to do so, deliver to the Administrative Borrower and the Administrative Agent (in such number of copies as shall be reasonably requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Administrative Borrower or the Administrative Agent), whichever of the following is applicable:

(1)     in the case of a Foreign Lender claiming the benefits of an income Tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN or W-8BEN-E establishing an exemption

68

from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such Tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such Tax treaty;

(2)    executed copies of IRS Form W-8ECI;

(3)    in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Internal Revenue Code, (x) a certificate substantially in the form of Exhibit 2.09(d)-1 hereto to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Internal Revenue Code, a "10 percent shareholder" of the Borrowers within the meaning of Section 881(c)(3)(B) of the Internal Revenue Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) and 864(d)(4) of the Internal Revenue Code or a conduit entity participating in a conduit financing arrangement as defined in Treasury Regulation 1.881-3 (a "U.S. Tax Compliance Certificate") and (y) executed copies of IRS Form W-8BEN or W-8BEN-E; or

(4)    to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN or W-8BEN-E, a U.S. Tax Compliance Certificate substantially in the form of Exhibit 2.09(d)-2 or Exhibit 2.09(d)-3, IRS Form W-9, or other certification documents from each beneficial owner, as applicable; provided, that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit 2.09(d)-4 on behalf of each such direct and indirect partner;

(C)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Administrative Borrower and the Administrative Agent (in such number of copies as shall be reasonably requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Administrative Borrower or the Administrative Agent), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Administrative Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)    if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Internal Revenue Code, as applicable), such Lender shall deliver to the Administrative Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Administrative Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Internal Revenue Code) and such additional documentation reasonably requested by the Administrative Borrower or the Administrative Agent as may be necessary for the Administrative Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's

69

obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Administrative Borrower and the Administrative Agent in writing of its legal inability to do so.

(e)      Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Loan Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 12.07(i) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (e).

(f)      If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 2.09 (including by the payment of Additional Amounts pursuant to this Section 2.09), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 2.09 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).  Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (f) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this paragraph (f), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (f) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(g)      Each party's obligations under this Section 2.09 shall survive resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

70

Section 2.10        Increased Costs and Reduced Return.

(a)        If any Secured Party shall have determined that any Change in Law shall (i) subject such Secured Party, or any Person controlling such Secured Party to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes, and (C) Connection Income Taxes), duty or other charge with respect to this Agreement or any Loan made by such Agent or such Lender, (ii) impose, modify or deem applicable any reserve, special deposit or similar requirement against any Loan or against assets of or held by, or deposits with or for the account of, or credit extended by, such Secured Party or any Person controlling such Secured Party or (iii) impose on such Secured Party or any Person controlling such Secured Party any other condition regarding this Agreement or any Loan, and the result of any event referred to in clauses (i), (ii) or (iii) above shall be to increase the cost to such Secured Party of making any Loan or agreeing to make any Loan, or to reduce any amount received or receivable by such Secured Party hereunder, then, upon demand by such Secured Party, the Borrowers shall pay to such Secured Party such additional amounts as will compensate such Secured Party for such increased costs or reductions in amount.

(b)        If any Secured Party shall have determined that any Change in Law either (i) affects or would affect the amount of capital required or expected to be maintained by such Secured Party or any Person controlling such Secured Party, and such Secured Party determines that the amount of such capital is increased as a direct or indirect consequence of any Loans made or maintained, such Secured Party's or such other controlling Person's other obligations hereunder, or (ii) has or would have the effect of reducing the rate of return on such Secured Party's or such other controlling Person's capital to a level below that which such Secured Party or such controlling Person could have achieved but for such Change in Law as a consequence of any Loans made or maintained, or any agreement to make Loans, or such Secured Party's or such other controlling Person's other obligations hereunder (in each case, taking into consideration, such Secured Party's or such other controlling Person's policies with respect to capital adequacy), then, upon demand by such Secured Party, the Borrowers shall pay to such Secured Party from time to time such additional amounts as will compensate such Secured Party for such cost of maintaining such increased capital or such reduction in the rate of return on such Secured Party's or such other controlling Person's capital.

(c)        All amounts payable under this Section 2.10 shall bear interest from the date that is 10 days after the date of demand by any Secured Party until payment in full to such Secured Party at the Reference Rate.  A certificate of such Secured Party claiming compensation under this Section 2.10, specifying the event herein above described and the nature of such event shall be submitted by such Secured Party to the Administrative Borrower, setting forth the additional amount due and an explanation of the calculation thereof, and such Secured Party's reasons for invoking the provisions of this Section 2.10, and shall be final and conclusive absent manifest error.

(d)        Failure or delay on the part of any Lender to demand compensation pursuant to the foregoing provisions of this Section 2.10 shall not constitute a waiver of such Lender's right to demand such compensation; provided, that the Borrowers shall not be required to compensate a Lender pursuant to the foregoing provisions of this Section 2.10 for any increased costs incurred or reductions suffered more than 9 months prior to the date that such Lender notifies the Administrative Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation

71

therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 9-month period referred to above shall be extended to include the period of retroactive effect thereof).

(e)     The obligations of the Loan Parties under this Section 2.10 shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

Section 2.11     Changes in Law; Impracticability or Illegality.

(a)     Adjusted Term SOFR may be adjusted by the Administrative Agent with respect to any Lender on a prospective basis to take into account any increased costs due to changes in applicable law occurring subsequent to the commencement of the then applicable Interest Period, including changes in tax laws (except changes of general applicability in corporate income tax laws) and changes in the reserve requirements imposed by the Board of Governors of the Federal Reserve System (or any successor), which additional or increased costs would increase the cost of funding loans bearing interest at Adjusted Term SOFR.    In any such event, the affected Lender shall give the Administrative Borrower and the Administrative Agent notice of such a determination and adjustment and the Administrative Agent promptly shall transmit the notice to each other Lender and, upon its receipt of the notice from the affected Lender, the Administrative Borrower may, by notice to such affected Lender (i) require such Lender to furnish to the Administrative Borrower a statement setting forth the basis for adjusting such Adjusted Term SOFR and the method for determining the amount of such adjustment or (ii) repay the SOFR Loans with respect to which such adjustment is made (together with any amounts due under Section 2.09).

(b)     If any Lender determines that any Requirement of Law has made it unlawful, or that any Governmental Authority has asserted that it is unlawful, for any Lender or its applicable lending office to make, maintain or fund Loans whose interest is determined by reference to SOFR, the Term SOFR Reference Rate, Adjusted Term SOFR or Term SOFR, or to determine or charge interest based upon SOFR, the Term SOFR Reference Rate, Adjusted Term SOFR or Term SOFR, then, upon notice thereof by such Lender to the Borrowers (through the Administrative Agent) (an "Illegality Notice"), (i) any obligation of the Lenders to make SOFR Loans, and any right of the Borrowers to continue SOFR Loans or to convert Reference Rate Loans to SOFR Loans, shall be suspended, and (ii) the interest rate on which Reference Rate Loans shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to clause (c) of the definition of "Reference Rate", in each case until each affected Lender notifies the Administrative Agent and the Borrowers that the circumstances giving rise to such determination no longer exist.    Upon receipt of an Illegality Notice, the Borrowers shall, if necessary to avoid such illegality, upon demand from any Lender (with a copy to the Administrative Agent), prepay or, if applicable, convert all SOFR Loans to Reference Rate Loans (the interest rate on which Reference Rate Loans shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to clause (c) of the definition of "Reference Rate"), on the last day of the Interest Period therefor, if all affected Lenders may lawfully continue to maintain such SOFR Loans to such day, or immediately, if any Lender may not lawfully continue to maintain such SOFR Loans to such day, in each case until the Administrative Agent is advised in writing by each affected Lender that it is no longer illegal for such Lender to determine or charge interest rates based upon SOFR, the Term SOFR Reference Rate, Adjusted Term SOFR or Term SOFR.    Upon any such prepayment or conversion, the Borrowers shall also pay accrued interest on the amount so prepaid or converted, together with any additional amounts required pursuant to Section 2.08.

(c)     The obligations of the Loan Parties under this <u>Section 2.11</u> shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

Section 2.12     <u>Mitigation Obligations; Replacement of Lenders</u>.

(a)     If any Lender requires the Borrowers to pay any Additional Amounts under <u>Section 2.09</u> or requests compensation under <u>Section 2.10</u>, then such Lender shall (at the request of the Administrative Borrower) use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to such Section in the future, and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  The Borrowers hereby agree to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)     If any Lender requires the Borrowers to pay any Additional Amounts under <u>Section 2.09</u> or requests compensation under <u>Section 2.10</u> and, in each case, such Lender has declined or is unable to designate a different lending office in accordance with <u>clause (a)</u> above, or if any Lender is a Defaulting Lender, then the Administrative Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, <u>Section 12.07</u>), all of its interests, rights and obligations under this Agreement and the other Loan Documents to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); <u>provided</u> that:

(i)     the Borrowers shall have paid to the Agents any assignment fees specified in <u>Section 12.07</u>;

(ii)     such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents (including any amounts under <u>Section 2.08</u> and <u>Section 2.09</u>) from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrowers (in the case of all other amounts);

(iii)     in the case of any such assignment resulting from payments required to be made pursuant to <u>Section 2.09</u> or a claim for compensation under <u>Section 2.10</u>, such assignment will result in a reduction in such compensation or payments thereafter; and

(iv)     such assignment does not conflict with applicable law.

Prior to the effective date of such assignment, the assigning Lender shall execute and deliver an Assignment and Acceptance, subject only to the conditions set forth above.  If the assigning Lender shall refuse or fail to execute and deliver any such Assignment and Acceptance prior to the effective date of such assignment, the assigning Lender shall be deemed to have executed and delivered such Assignment and Acceptance. Any such assignment shall be made in accordance with the terms of <u>Section 12.07</u>.

73

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Administrative Borrower to require such assignment and delegation cease to apply.

Section 2.13    Tax Treatment.  The Borrowers and the Lenders each agree (a) that the Loans shall be treated as debt for U.S. federal income tax purposes (b) that the Loans are not governed by the rules set out in Treasury Regulations Section 1.1275-4 and (c) to adhere to this Agreement for U.S. federal income tax purposes and not to take any action or file any tax return, report or declaration inconsistent herewith, unless otherwise required pursuant to a final "determination" within the meaning of Section 1313(a) of the Internal Revenue Code.  The inclusion of this Section 2.13 is not an admission by any Lender that it is subject to U.S. taxation.

# ARTICLE III

# [RESERVED]

# ARTICLE IV

## APPLICATION OF PAYMENTS; DEFAULTING LENDERS;
## JOINT AND SEVERAL LIABILITY OF BORROWERS

Section 4.01    Payments; Computations and Statements.

(a)    The Borrowers will make each payment under this Agreement not later than 12:00 noon (New York City time) on the day when due, in lawful money of the United States of America and in immediately available funds, to the Administrative Agent's Account.  All payments received by the Administrative Agent after 12:00 noon (New York City time) on any Business Day will be credited to the Loan Account on the next succeeding Business Day.  All payments shall be made by the Borrowers without set-off, counterclaim, recoupment, deduction or other defense to the Agents and the Lenders.  Except as provided in Section 2.02, after receipt, the Administrative Agent will promptly thereafter cause to be distributed like funds relating to the payment of principal ratably to the Lenders in accordance with their Pro Rata Shares and like funds relating to the payment of any other amount payable to any Lender to such Lender, in each case to be applied in accordance with the terms of this Agreement, provided, that the Administrative Agent will cause to be distributed all interest and fees received from or for the account of the Borrowers not less than once each month and in any event promptly after receipt thereof.  The Lenders and the Borrowers hereby authorize the Administrative Agent to, and the Administrative Agent may, from time to time, charge the Loan Account of the Borrowers with any amount due and payable by the Borrowers under any Loan Document.  Each of the Lenders and the Borrowers agrees that the Administrative Agent shall have the right to make such charges whether or not any Default or Event of Default shall have occurred and be continuing or whether any of the conditions precedent in Article V have been satisfied.  Any amount charged to the Loan Account of the Borrowers shall be deemed an Obligation hereunder.  Whenever any payment to be made under any such Loan Document shall be stated to be due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall in such case be included in the computation of interest or fees, as the case may be.  All computations of fees shall be made by the Administrative Agent on the basis of a year of 360 days for the actual number of days.

74

Each determination by the Administrative Agent of an interest rate or fees hereunder shall be conclusive and binding for all purposes in the absence of manifest error.

(b)      The Administrative Agent shall provide the Administrative Borrower, promptly after the end of each calendar month, a summary statement (in the form from time to time used by the Administrative Agent) of the opening and closing daily balances in the Loan Account of the Borrowers during such month, the amounts and dates of all Loans made to the Borrowers during such month, the amounts and dates of all payments on account of the Loans to the Borrowers during such month and the Loans to which such payments were applied, the amount of interest accrued on the Loans to the Borrowers during such month, and the amount and nature of any charges to the Loan Account made during such month on account of fees, commissions, expenses and other Obligations.  All entries on any such statement shall be presumed to be correct and, 30 days after the same is sent, shall be final and conclusive absent manifest error.

Section 4.02      Sharing of Payments.  If any Lender shall obtain any payment (whether voluntary, involuntary, through the exercise of any right of set-off, or otherwise) on account of any Obligation in excess of its ratable share of payments on account of similar obligations obtained by all the Lenders, such Lender shall forthwith purchase from the other Lenders such participations in such similar obligations held by them as shall be necessary to cause such purchasing Lender to share the excess payment ratably with each of them; provided, however, that (a) if all or any portion of such excess payment is thereafter recovered from such purchasing Lender, such purchase from each Lender shall be rescinded and each Lender shall repay to the purchasing Lender the purchase price to the extent of such recovery together with an amount equal to such Lender's ratable share (according to the proportion of (i) the amount of such Lender's required repayment to (ii) the total amount so recovered from the purchasing Lender) of any interest or other amount paid by the purchasing Lender in respect of the total amount so recovered and (b) the provisions of this Section shall not be construed to apply to (i) any payment made by the Borrowers pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from the existence of a Defaulting Lender and any payment of an amendment, consent or waiver fee to consenting Lenders pursuant to an effective amendment, consent or waiver with respect to this Agreement), or (ii) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans, other than to any Loan Party or any Subsidiary thereof (as to which the provisions of this Section shall apply).  The Borrowers agree that any Lender so purchasing a participation from another Lender pursuant to this Section may, to the fullest extent permitted by law, exercise all of its rights (including the Lender's right of set-off) with respect to such participation as fully as if such Lender were the direct creditor of the Borrowers in the amount of such participation.

Section 4.03      Apportionment of Payments.

(a)      All payments of principal and interest in respect of outstanding Loans, all payments of fees (other than the fees set forth in Section 2.06 hereof) and all other payments in respect of any other Obligations, shall be allocated by the Administrative Agent among such of the Lenders as are entitled thereto, in proportion to their respective Pro Rata Shares or otherwise as provided herein or, in respect of payments not made on account of Loans, as designated by the Person making payment when the payment is made.

(b)        After the occurrence and during the continuance of an Event of Default, the Administrative Agent may, and upon the direction of the Collateral Agent or the Required Lenders shall, apply all payments in respect of any Obligations, including without limitation, all proceeds of the Collateral, subject to the provisions of this Agreement, (i) <u>first</u>, ratably to pay the Obligations in respect of any fees, expense reimbursements, indemnities and other amounts then due and payable to the Agents until paid in full; (ii) <u>second</u>, to pay interest then due and payable in respect of the Collateral Agent Advances until paid in full; (iii) <u>third</u>, to pay principal of the Collateral Agent Advances until paid in full; (iv) <u>fourth</u>, ratably to pay the Obligations in respect of any fees, expense reimbursements, indemnities and other amounts then due and payable to the Lenders until paid in full; (v) <u>fifth</u>, ratably to pay interest then due and payable in respect of the Loans until paid in full; (vi) <u>sixth</u>, ratably to pay principal (including, for the avoidance of doubt, any Term Loan PIK Amount paid in kind) of the Loans until paid in full; and (vii) <u>seventh</u>, to the ratable payment of all other Obligations then due and payable.

(c)        For purposes of <u>Section 4.03(b)</u> (other than <u>clause (vii)</u> thereof), "paid in full" means payment in cash of all amounts owing under the Loan Documents (for the avoidance of doubt, not including Contingent Indemnity Obligations) according to the terms thereof, including loan fees, service fees, professional fees, interest (and specifically including interest accrued after the commencement of any Insolvency Proceeding), default interest, interest on interest, and expense reimbursements, whether or not same would be or is allowed or disallowed in whole or in part in any Insolvency Proceeding, except to the extent that default or overdue interest (but not any other interest) and loan fees, each arising from or related to a default, are disallowed in any Insolvency Proceeding; <u>provided</u>, <u>however</u>, that for the purposes of <u>clause (vii)</u>, "paid in full" means payment in cash of all amounts (for the avoidance of doubt, not including Contingent Indemnity Obligations) owing under the Loan Documents according to the terms thereof, including loan fees, service fees, professional fees, interest (and specifically including interest accrued after the commencement of any Insolvency Proceeding), default interest, interest on interest, and expense reimbursements, whether or not the same would be or is allowed or disallowed in whole or in part in any Insolvency Proceeding.

(d)        In the event of a direct conflict between the priority provisions of this <u>Section 4.03</u> and other provisions contained in any other Loan Document, it is the intention of the parties hereto that both such priority provisions in such documents shall be read together and construed, to the fullest extent possible, to be in concert with each other.  In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of <u>Section 4.03</u> shall control and govern.

Section 4.04        <u>Defaulting Lenders</u>.  Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as such Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

(a)        Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in <u>Section 12.02</u>.

(b)        The Administrative Agent shall not be obligated to transfer to such Defaulting Lender any payments made by any Borrowers to the Administrative Agent for such Defaulting Lender's benefit, and, in the absence of such transfer to such Defaulting Lender, the Administrative Agent shall transfer any such payments to each other non-Defaulting Lender ratably in accordance with their Pro Rata

Shares (without giving effect to the Pro Rata Shares of such Defaulting Lender) (but only to the extent that such Defaulting Lender's Loans were funded by the other Lenders) or, if so directed by the Administrative Borrower and if no Default or Event of Default has occurred and is continuing (and to the extent such Defaulting Lender's Loans were not funded by the other Lenders), retain the same to be re-advanced to the Borrowers as if such Defaulting Lender had made such Loans to the Borrowers. Subject to the foregoing, the Administrative Agent may hold and, in its discretion, re-lend to the Borrowers for the account of such Defaulting Lender the amount of all such payments received and retained by the Administrative Agent for the account of such Defaulting Lender.

(c)    Any such failure to fund by any Defaulting Lender shall constitute a material breach by such Defaulting Lender of this Agreement and shall entitle the Borrowers to replace the Defaulting Lender with one or more substitute Lenders, and the Defaulting Lender shall have no right to refuse to be replaced hereunder. Such notice to replace the Defaulting Lender shall specify an effective date for such replacement, which date shall not be later than 15 Business Days after the date such notice is given. Prior to the effective date of such replacement, the Defaulting Lender shall execute and deliver an Assignment and Acceptance, subject only to the Defaulting Lender being repaid its share of the outstanding Obligations without any premium or penalty of any kind whatsoever. If the Defaulting Lender shall refuse or fail to execute and deliver any such Assignment and Acceptance prior to the effective date of such replacement, the Defaulting Lender shall be deemed to have executed and delivered such Assignment and Acceptance. The replacement of any Defaulting Lender shall be made in accordance with the terms of Section 12.07.

(d)    The operation of this Section shall not be construed to increase or otherwise affect the Commitments of any Lender, to relieve or excuse the performance by such Defaulting Lender or any other Lender of its duties and obligations hereunder, or to relieve or excuse the performance by any Borrower of its duties and obligations hereunder to the Administrative Agent or to the Lenders other than such Defaulting Lender.

(e)    This Section shall remain effective with respect to such Lender until either (i) the Obligations under this Agreement shall have been declared or shall have become immediately due and payable or (ii) the non-Defaulting Lenders, the Agents, and the Administrative Borrower shall have waived such Defaulting Lender's default in writing, and the Defaulting Lender makes its Pro Rata Share of the applicable defaulted Loans and pays to the Agents all amounts owing by such Defaulting Lender in respect thereof; provided, that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrowers while such Lender was a Defaulting Lender; provided, further, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from such Lender's having been a Defaulting Lender.

Section 4.05    Administrative Borrower; Joint and Several Liability of the Borrowers.

(a)    Each Borrower hereby irrevocably appoints Red Lobster Management LLC as the borrowing agent and attorney-in-fact for the Borrowers, which appointment shall remain in full force and effect unless and until the Agents shall have received prior written notice signed by all of the Borrowers that such appointment has been revoked and that another Borrower has been appointed as the borrowing

77

agent and attorney-in-fact.  Each Borrower hereby irrevocably appoints and authorizes the Administrative Borrower (i) to provide to the Agents and receive from the Agents all notices with respect to Loans obtained for the benefit of any Borrower and all other notices and instructions under this Agreement and (ii) to take such action as the Administrative Borrower deems appropriate on its behalf to obtain Loans and to exercise such other powers as are reasonably incidental thereto to carry out the purposes of this Agreement.  It is understood that the handling of the Loan Account and Collateral of the Borrowers in a combined fashion, as more fully set forth herein, is done solely as an accommodation to the Borrowers in order to utilize the collective borrowing powers of the Borrowers in the most efficient and economical manner and at their request, and that neither the Agents nor the Lenders shall incur liability to the Borrowers as a result hereof. Each Borrower expects to derive benefit, directly or indirectly, from the handling of the Loan Account and the Collateral in a combined fashion since the successful operation of each Borrower is dependent on the continued successful performance of the integrated group.

(b)     Each Borrower hereby accepts joint and several liability hereunder and under the other Loan Documents in consideration of the financial accommodations to be provided by the Agents and the Lenders under this Agreement and the other Loan Documents, for the mutual benefit, directly and indirectly, of each of the Borrowers and in consideration of the undertakings of the other Borrowers to accept joint and several liability for the Obligations.  Each of the Borrowers, jointly and severally, hereby irrevocably and unconditionally accepts, not merely as a surety but also as a co-debtor, joint and several liability with the other Borrowers, with respect to the payment and performance of all of the Obligations (including, without limitation, any Obligations arising under this Section 4.05), it being the intention of the parties hereto that all of the Obligations shall be the joint and several obligations of each of the Borrowers without preferences or distinction among them.  If and to the extent that any of the Borrowers shall fail to make any payment with respect to any of the Obligations as and when due or to perform any of the Obligations in accordance with the terms thereof, then in each such event, the other Borrowers will make such payment with respect to, or perform, such Obligation.  Subject to the terms and conditions hereof, the Obligations of each of the Borrowers under the provisions of this Section 4.05 constitute the absolute and unconditional, full recourse Obligations of each of the Borrowers, enforceable against each such Person to the full extent of its properties and assets, irrespective of the validity, regularity or enforceability of this Agreement, the other Loan Documents or any other circumstances whatsoever.

(c)     The provisions of this Section 4.05 are made for the benefit of the Agents, the Lenders and each of their successors and assigns, and may be enforced by them from time to time against any or all of the Borrowers as often as occasion therefor may arise and without requirement on the part of the Agents, the Lenders or such successors or assigns first to marshal any of its or their claims or to exercise any of its or their rights against any of the other Borrowers or to exhaust any remedies available to it or them against any of the other Borrowers or to resort to any other source or means of obtaining payment of any of the Obligations hereunder or to elect any other remedy.  The provisions of this Section 4.05 shall remain in effect until all of the Obligations (other than Contingent Indemnity Obligations) shall have been Paid in Full.

(d)     Each of the Borrowers hereby agrees that it will not enforce any of its rights of contribution or subrogation against the other Borrowers with respect to any liability incurred by it hereunder or under any of the other Loan Documents, any payments made by it to the Agents or the Lenders with respect to any of the Obligations or any Collateral, until such time as all of the Obligations (other than

78

Contingent Indemnity Obligations) have been Paid in Full. Any claim which any Borrower may have against any other Borrower with respect to any payments to the Agents or the Lenders hereunder or under any other Loan Documents are hereby expressly made subordinate and junior in right of payment, without limitation as to any increases in the Obligations arising hereunder or thereunder, to the prior payment in full in cash of the Obligations (other than Contingent Indemnity Obligations).

<div align="center">

**ARTICLE V**

**CONDITIONS TO LOANS**

</div>

Section 5.01    <u>Conditions Precedent to Effectiveness</u>.    The effectiveness of this Agreement and the obligation of each Lender to make any Borrowing during the Interim Availability Period hereunder is subject to satisfaction or waiver by the Required Lenders of the following conditions precedent:

(a)    <u>Payment of Fees, Etc.</u>  The Borrowers shall have paid on or before the Effective Date all fees, costs, expenses and Taxes then payable pursuant to <u>Sections 2.06</u> and <u>12.04</u>.

(b)    <u>Representations and Warranties; No Event of Default</u>.  The following statements shall be true and correct:  (i) the representations and warranties contained in <u>Article VI</u> and in each other Loan Document, certificate or other writing delivered to any Secured Party pursuant hereto or thereto on or prior to the Effective Date are true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations or warranties that are already qualified or modified as to materiality or "Material Adverse Effect" in the text thereof, which representations and warranties shall be true and correct in all respects subject to such qualification) on and as of the Effective Date as though made on and as of such date, except to the extent that any such representation or warranty expressly relates solely to an earlier date (in which case such representation or warranty shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations or warranties that are already qualified or modified as to materiality or "Material Adverse Effect" in the text thereof, which representations and warranties shall be true and correct in all respects subject to such qualification) on and as of such earlier date) and (ii) no Default or Event of Default shall have occurred and be continuing on the Effective Date or would result from this Agreement or the other Loan Documents becoming effective in accordance with its or their respective terms.

(c)    <u>Legality</u>.  The making of the initial Loans shall not contravene any law, rule or regulation applicable to any Secured Party.

(d)    <u>Delivery of Documents</u>.  The Collateral Agent shall have received on or before the Effective Date the following, each in form and substance satisfactory to the Collateral Agent and, unless indicated otherwise, dated the Effective Date and, if applicable, duly executed by the Persons party thereto:

(i)    this Agreement;

(ii)    a Security Agreement, together with the original stock certificates representing all of the Equity Interests and all promissory notes required to be pledged thereunder,

<div align="center">79</div>

accompanied by undated stock powers and allonges, as applicable, executed in blank and other proper instruments of transfer;

(iii)     UCC-1 financing statements and PPSA financing statements (or other registrations of the Security Agreements, or notice thereof) as may be necessary or, in the opinion of the Collateral Agent, desirable to perfect the first priority priming security interests (subject only to the Carve-Out, the Administration Charge and the Prepetition Permitted Liens (if any)) purported to be created by each Security Agreement and in form to be duly filed in the UCC-1 filing office or Canadian filing office (as applicable) and/or in the appropriate jurisdiction; provided, that the Administrative Agent shall not be required to file any financing statements, mortgages, notices of Lien or similar instruments in any jurisdiction or filing office or to take any other action in order to validate or perfect the Lien and security interest granted by or pursuant to (A) any Collateral Document or (B) any DIP Order;

(iv)     the results of searches for any effective UCC financing statements, PPSA financing statements, United States Patent and Trademark Office filings, United States Copyright Office filings, Canadian Intellectual Property Office filings, Tax Liens or judgment Liens filed against any Loan Party or its property, which results shall not show any Liens (other than Permitted Liens acceptable to the Collateral Agent);

(v)     each Intellectual Property Security Agreement;

(vi)     the Disbursement Letter;

(vii)     the Credit Bid Direction Letter;

(viii)     the Intercompany Subordination Agreement (subject to, in the case of Subsidiaries located and/or incorporated in the People's Republic of China, Section 7.01(aa))(vi));

(ix)     [reserved];

(x)     a Notice of Borrowing;

(xi)     [reserved];

(xii)     [reserved];

(xiii)     a certificate of an Authorized Officer of each Loan Party, certifying (A) as to copies of the Governing Documents of such Loan Party, together with all amendments thereto (including, without limitation, a true and complete copy of the charter, certificate of formation, certificate of limited partnership or other publicly filed organizational document of each Loan Party certified as of a recent date not more than 30 days prior to the Effective Date by an appropriate official of the jurisdiction of organization of such Loan Party which shall set forth the same complete name of such Loan Party as is set forth herein and the organizational number of such Loan Party, if an organizational number is issued in such jurisdiction), (B) as to a copy of the resolutions or written consents of such Loan Party authorizing (1) the borrowings hereunder and the transactions contemplated by the Loan Documents to which such Loan Party is or will be a party, and (2) the execution, delivery and performance by such

80

Loan Party of each Loan Document to which such Loan Party is or will be a party and the execution and delivery of the other documents to be delivered by such Person in connection herewith and therewith, (C) the names and true signatures of the representatives of such Loan Party authorized to sign each Loan Document (in the case of a Borrower, including, without limitation, Notices of Borrowing, SOFR Notices and all other notices under this Agreement and the other Loan Documents) to which such Loan Party is or will be a party and the other documents to be executed and delivered by such Loan Party in connection herewith and therewith, together with evidence of the incumbency of such authorized officers and (D) as to the matters set forth in Sections 5.01(b), (e), and (l);

(xiv)    [reserved];

(xv)    [reserved];

(xvi)    a certificate of an Authorized Officer of the Administrative Borrower certifying that all Material Contracts as in effect on the Effective Date remain in full force and effect and there are no continuing breaches or defaults by the Loan Parties under such agreements other than (i) with respect to any Bankruptcy-Related Default (as defined in the Stalking Horse Acquisition Agreement) or payment default or (ii) as otherwise disclosed on Schedule 6.01(v);

(xvii)    a certificate of the appropriate official(s) of the jurisdiction of organization and, except to the extent such failure to be so qualified could not reasonably be expected to have a Material Adverse Effect, each jurisdiction of foreign qualification of each Loan Party certifying as of a recent date not more than 30 days prior to the Effective Date as to the subsistence in good standing of, and the payment of Taxes by, such Loan Party in such jurisdictions;

(xviii)    an opinion of (A) King & Spalding LLP, as special counsel to the Loan Parties, and (B) Stinson LLP, as Kansas counsel to RL Kansas LLC, a Kansas limited liability company, in each case as to such matters as the Collateral Agent may reasonably request and in form and substance reasonably satisfactory to the Agents;

(xix)    evidence of the insurance coverage required by Section 7.01 and the terms of each Security Agreement and each Mortgage and such other insurance coverage with respect to the business and operations of the Loan Parties as the Collateral Agent may reasonably request, in each case, where requested by the Collateral Agent, provided that such endorsements as to the named insureds or loss payees thereunder as the Collateral Agent may request and providing that such policy may be terminated or canceled (by the insurer or the insured thereunder) only upon 30 days' prior written notice to the Collateral Agent and each such named insured or loss payee, together with evidence of the payment of all premiums due in respect thereof for such period as the Collateral Agent may request, may be delivered within thirty (30) days of the Effective Date;

(xx)    evidence of the payment in full of all Indebtedness under the Working Capital Credit Agreement (as defined in the Prepetition Credit Agreement) substantially concurrently with the initial Borrowing of DIP Delayed Draw Term Loans during the Interim Availability Period, together with (A) a termination and release agreement with respect to the Working Capital Credit Agreement (as defined in the Prepetition Credit Agreement) and all related documents, duly executed by

81

the Loan Parties and the Working Capital Agent (as defined in the Prepetition Credit Agreement), (B) a termination of security interest in Intellectual Property for each assignment for security recorded by the Existing Lenders at the United States Patent and Trademark Office, the United States Copyright Office or the Canadian Intellectual Property Office and covering any intellectual property of the Loan Parties, (C) a termination of all account control agreements, blocked account agreements or similar instruments in favor of the Working Capital Agent (as defined in the Prepetition Credit Agreement) and (D) UCC 3 termination statements for all UCC-1 financing statements and PPSA discharges for all PPSA registrations filed by the Working Capital Agent (as defined in the Prepetition Credit Agreement) and covering any portion of the Collateral;

(xxi)    the Stalking Horse Acquisition Agreement; and

(xxii)    such other agreements, instruments, approvals, opinions and other documents, each in form and substance satisfactory to the Agents, as any Agent may reasonably request upon reasonable prior written notice.

(e)    Material Adverse Effect.  Since the Petition Date, no change, occurrence or development shall have occurred or become known to the Loan Parties that has had or could reasonably be expected to have a Material Adverse Effect.

(f)    363 Sale Motion.  The Stalking Horse Acquisition Agreement shall have been duly executed and the Debtors shall have filed the 363 Sale Motion.

(g)    Approvals.  All consents, authorizations and approvals of, and filings and registrations with, and all other actions in respect of, any Governmental Authority or other Person required in connection with the making of the Loans, or the conduct of the Loan Parties' business, or the consummation of any of the underlying transactions, including, without limitation, the Interim DIP Order, shall have been obtained and shall be in full force and effect.

(h)    [Reserved].

(i)    [Reserved].

(j)    Due Diligence.  The Agents shall have completed their business, legal and collateral due diligence with respect to each Loan Party and the results thereof shall be acceptable to the Agents, in their sole and absolute discretion.

(k)    Security Interests.  The Collateral Agent shall have a valid first priority priming perfected Lien on the Collateral, subject only to the Carve-Out, the Administration Charge, and the Prepetition Permitted Liens (if any).

(l)    Litigation.  Other than the Cases, there shall exist no claim, action, suit, investigation, litigation or proceeding (including, without limitation, shareholder or derivative litigation) pending or threatened in any court or before any arbitrator or Governmental Authority which relates to the Loans or which, in the opinion of the Collateral Agent, is reasonably likely to be adversely determined, and that, if adversely determined, would reasonably be expected to have a Material Adverse Effect.

82

(m)      Interim Stay Order. The Interim Stay Order (i) shall have been granted by the CCAA Court prior to the Effective Date, and (ii) shall be in full force and effect and shall not have been vacated, stayed, reversed, overturned, modified or amended in any respect without the prior written consent of the Administrative Agent.

(n)      KYC. The Agents and the Lenders shall have each received (to the extent requested prior to the Effective Date) a W-9 and all documentation and other information required by regulatory authorities with respect to the Loan Parties under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the PATRIOT Act, in form and substance satisfactory to the Agents and the Lenders.

(o)      Initial Budget.  The Administrative Agent shall have received, and the Required Lenders shall have approved, the Initial Budget.

(p)      First Day Pleadings.  The Petition Date shall have occurred and all filed "first day" pleadings and "first day" orders filed on the Petition Date which relate to the Loan Facility shall be in form and substance reasonably acceptable to the Required Lenders, and all other filed "first day" pleadings and "first day" orders filed on the Petition Date shall not be inconsistent, in any material respect, with the terms hereof.

(q)      Interim DIP Order.  The Interim DIP Order (i) shall have been entered on the docket of the Bankruptcy Court prior to the Effective Date, (ii) shall be in full force and effect and shall not have been vacated, stayed, reversed, overturned, modified or amended in any respect without the prior written consent of the Required Lenders and (iii) the Debtors shall be in compliance in all respects with the Interim DIP Order.

(r)      Milestones.  Each Milestone that is required to be complied with prior to or concurrently with entry of the Interim DIP Order shall have been complied with, unless waived or extended in writing by the Required Lenders.

(s)      Trustee.  (i) No trustee or examiner with enlarged powers (beyond those set forth in Bankruptcy Code sections 1106(a)(3) and (4)) shall have been appointed with respect to the Debtors or their respective properties and (ii) no trustee under Chapter 7 of the Bankruptcy Code or under Chapter 11 of the Bankruptcy Code shall have been appointed in the Cases.

(t)      Cash Management Order.  A Cash Management Order reasonably acceptable to the Required Lenders shall be in full force and effect and shall not have been reversed, vacated, stayed or subject to appeal, and shall not have been amended, restated, amended and restated, supplemented or otherwise modified without the prior written consent of the Required Lenders.

(u)      Non-Violation.  Upon entry of the Interim DIP Order, the entry into this Agreement shall not violate any applicable Law and shall not be enjoined, temporarily, preliminarily or permanently.

(v)      Company RSA.  The Company RSA shall be in full force and effect as to all parties thereto.

Section 5.02    Conditions to Final Availability Period.  The obligation of each Lender to make any Borrowings during the Final Availability Period hereunder is subject to satisfaction or waiver by the Required Lenders of the following conditions precedent:

(a)    Final Order Entry Date.  The Final Order Entry Date shall have occurred and the conditions set forth in Section 5.01 shall have been satisfied.

(b)    Final DIP Order and Cash Management Order.  The Final DIP Order and the Cash Management Order shall be in full force and effect and shall not have been reversed, modified, amended, stayed, vacated or subject to a stay pending appeal, in the case of any modification, amendment or stay pending appeal, in any manner, or relating to any matter, that is adverse to the interests of the Agents or Lenders.

(c)    Compliance with Final DIP Order.  The Debtors shall be in compliance with the Final DIP Order.

(d)    Milestones.  The Loan Parties shall have satisfied all Milestones which are required to be satisfied on or prior to such Borrowing Date.

(e)    Final DIP Order.  The Final DIP Order (i) shall have been entered on the docket of the Bankruptcy Court on the date that is on or before the Interim Facility Maturity Date, and (ii) shall be in full force and effect and shall not have been vacated, stayed, reversed, overturned or modified in any respect without the written consent of the Required Lenders.

(f)    Approved Budget.  The Administrative Agent and the Lenders shall have received, and the Required Lenders shall have approved, the Approved Budget that is in effect as of the Final Order Entry Date.

(g)    Payment of Fees, Etc.  The Borrowers shall have paid to the Administrative Agent (and its relevant affiliates) and the Lenders all costs, fees and expenses (including, without limitation, reasonable and documented legal fees and expenses) then payable, in accordance with this Agreement and the DIP Orders.

(h)    Receipt of Certificate.  On such Borrowing Date, the Administrative Agent shall have received a certificate, dated as of the Borrowing Date and signed on behalf of the Borrowers by an Authorized Officer of the Administrative Borrower, certifying on behalf of the Borrowers that each of the conditions specified in this Section 5.02 have been satisfied.

Section 5.03    Conditions Precedent to All Borrowings.  The obligation of each Lender to honor any request for a Borrowing is subject to the following conditions precedent:

(a)    Representations and Warranties; No Event of Default.  The following statements shall be true and correct:  (i) the representations and warranties contained in Article VI and in each other Loan Document, certificate or other writing delivered to any Secured Party pursuant hereto or thereto on or prior to the date hereof are true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations or warranties that are already qualified or modified as to materiality or "Material Adverse Effect" in the text thereof, which representations and warranties shall be true and correct in all respects subject to such qualification) on and as of the date of the relevant Borrowing as though made on and as of such date, except to the extent that any such representation or warranty

84

expressly relates solely to an earlier date (in which case such representation or warranty shall be true and correct in all material respects (except that such materiality qualifier shall not be applicable to any representations or warranties that are already qualified or modified as to materiality or "Material Adverse Effect" in the text thereof, which representations and warranties shall be true and correct in all respects subject to such qualification) on and as of such earlier date) and (ii) no Default or Event of Default shall have occurred and be continuing on the Borrowing Date or would result from the Borrowing.

       (b)      [Reserved].

       (c)      Notice of Borrowing.  The Administrative Agent shall have received a Notice of Borrowing in accordance with Section 2.02 and the other requirements hereof.

       (d)      Other Conditions Precedent.  With respect to any DIP Delayed Draw Term Loan (i) made during the Interim Availability Period, the conditions specified in Section 5.01 shall have been satisfied and (ii) made during the Final Availability Period, the conditions specified in Sections 5.01 and 5.02 shall have been satisfied.

       (e)      Receipt of Certificate.  On each Borrowing Date, the Administrative Agent shall have received a certificate, dated as of the Borrowing Date and signed on behalf of the Borrowers by an Authorized Officer of the Administrative Borrower, certifying on behalf of the Borrowers that each of the conditions specified in this Section 5.03 have been satisfied.

       (f)      Status of Bankruptcy Cases.  The Cases shall not have been dismissed or converted under Chapter 7 of the Bankruptcy Code.

       (g)      Trustees.  (i) No trustee or examiner with enlarged powers (beyond those set forth in Bankruptcy Code sections 1106(a)(3) and (4)) shall have been appointed with respect to the Debtors or their respective properties and (ii) no trustee under Chapter 7 of the Bankruptcy Code or under Chapter 11 of the Bankruptcy Code shall have been appointed in the Cases.

       (h)      Milestones.  Each Milestone that is required to be complied with prior to or concurrently with the Borrowing shall have been complied with.

       (i)      Interim DIP Order and Final DIP Order.  The Debtors shall be in compliance with the Interim DIP Order and the Final DIP Order, as applicable.

       (j)      Approved Budget.  The Initial Budget or the Approved Budget, as applicable, shall be in full force and effect on and as of the proposed Borrowing Date, and the making of any DIP Delayed Draw Term Loan on any such Borrowing Date shall be in accordance with the Initial Budget or the Approved Budget (or as otherwise approved in advance in writing by the Required Lenders), as applicable, and in compliance with Section 7.01(a)(xxi).

       Each request for a Borrowing submitted by the Administrative Borrower shall be deemed to be a representation and warranty that the conditions specified in this Article V have been satisfied on and as of the date of the applicable Borrowing.

85

## ARTICLE VI

## REPRESENTATIONS AND WARRANTIES

Section 6.01    Representations and Warranties.  Each Loan Party hereby represents and warrants to the Secured Parties as follows:

(a)    Organization, Existence, Good Standing, Etc.  Each Loan Party (i) is a corporation, limited liability company or limited partnership duly organized, validly existing and in good standing (to the extent such concept exists) under the laws of the state or jurisdiction of its organization, (ii) has all requisite power and authority to conduct its business as now conducted and as presently contemplated and, subject to the entry of the DIP Orders, to make the borrowings hereunder, and to execute and deliver each Loan Document to which it is a party, and to consummate the transactions contemplated thereby, and (iii) is, to the extent applicable, duly qualified to do business and is in good standing in each jurisdiction in which the character of the properties owned or leased by it or in which the transaction of its business makes such qualification necessary, except (solely for the purposes of this subclause (iii)) where the failure to be so qualified and in good standing could not reasonably be expected to have a Material Adverse Effect.

(b)    Authorization, Etc.  Subject to the entry of the DIP Orders, the execution, delivery and performance by each Loan Party of each Loan Document to which it is or will be a party, (i) have been duly authorized by all necessary action, (ii) do not and will not contravene (A) any of its Governing Documents, (B) any applicable Requirement of Law or (C) any Contractual Obligation binding on or otherwise affecting it or any of its properties, (iii) do not and will not result in or require the creation of any Lien (other than any Permitted Lien) upon or with respect to any of its properties, and (iv) do not and will not result in any default, noncompliance, suspension, revocation, impairment, forfeiture or nonrenewal of any permit, license, authorization or approval applicable to its operations or any of its properties, except, in the case of clauses (ii)(B), (ii)(C) and (iv), to the extent where such contravention, default, noncompliance, suspension, revocation, impairment, forfeiture or nonrenewal could not reasonably be expected to have a Material Adverse Effect.

(c)    Governmental and Other Approvals.  Subject to the entry of the DIP Orders, no authorization or approval or other action by, and no notice to or filing with, any Governmental Authority is required in connection with the due execution, delivery and performance by any Loan Party of any Loan Document to which it is or will be a party other than filings and recordings with respect to Collateral to be made, or otherwise delivered to the Collateral Agent for filing or recordation, on the Effective Date.

(d)    Enforceability of Loan Documents.  This Agreement has been, and each other Loan Document, when delivered hereunder, will have been, duly executed and delivered by each Loan Party that is party thereto.  Subject to the entry of the DIP Orders, this Agreement is, and each other Loan Document to which any Loan Party is or will be a party, when delivered hereunder, will be, a legal, valid and binding obligation of such Person, enforceable against such Person in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and by general principles of equity.

(e)    Capitalization.  On the Effective Date, after giving effect to the transactions contemplated hereby to occur on the Effective Date, the authorized Equity Interests of the Administrative

Borrower and each of its Subsidiaries and the issued and outstanding Equity Interests of the Administrative Borrower and each of its Subsidiaries are as set forth on Schedule 6.01(e) to the Disclosure Letter.  All of the issued and outstanding shares of Equity Interests of the Administrative Borrower and each of its Subsidiaries have been validly issued and, to the extent applicable, are fully paid and nonassessable, and the holders thereof are not entitled to any preemptive, first refusal or other similar rights.  All Equity Interests of such Subsidiaries of the Administrative Borrower are owned by the Administrative Borrower free and clear of all Liens (subject only to the Carve-Out, the Administration Charge, and the Prepetition Permitted Liens (if any)).  As of the Effective Date, there are no outstanding debt or equity securities of the Administrative Borrower or any of its Subsidiaries and no outstanding obligations of the Administrative Borrower or any of its Subsidiaries convertible into or exchangeable for, or warrants, options or other rights for the purchase or acquisition from the Administrative Borrower or any of its Subsidiaries, or other obligations of the Administrative Borrower or any of its Subsidiaries to issue, directly or indirectly, any Equity Interests of the Administrative Borrower or any of its Subsidiaries.

(f)    Litigation.  Other than the Cases, except as set forth in Schedule 6.01(f) to the Disclosure Letter, there is no pending or, to the knowledge of any Loan Party, threatened in writing action, suit or proceeding affecting any Loan Party or any of its properties before any court or other Governmental Authority or any arbitrator that (i) if adversely determined, could reasonably be expected to have a Material Adverse Effect or (ii) relates to this Agreement or any other Loan Document or any transaction contemplated hereby or thereby.

(g)    Financial Statements.

(i)    The Financial Statements, copies of which have been delivered to each Agent and each Lender, fairly present in all material respects the consolidated financial condition of the Administrative Borrower and its Subsidiaries as at the respective dates thereof and the consolidated results of operations of the Administrative Borrower and its Subsidiaries for the fiscal periods ended on such respective dates, all in accordance with GAAP (subject in the case of unaudited financial statements to the absence of footnotes and to year-end adjustments).  All material indebtedness and other liabilities (including, without limitation, Indebtedness, liabilities for Taxes, long-term leases and other unusual forward or long-term commitments), direct or contingent, of the Administrative Borrower and its Subsidiaries are set forth in the Financial Statements to the extent required in accordance with GAAP (subject in the case of unaudited financial statements to the absence of footnotes and to year-end adjustments).  Since the Petition Date, no event or development has occurred that has had or could reasonably be expected to have a Material Adverse Effect.

(ii)    [Reserved].

(h)    Compliance with Law, Etc.  No Loan Party or any of its Subsidiaries is in violation of (i) any of its Governing Documents, (ii) any Requirement of Law, except where the failure to so comply could not reasonably be expected to have a Material Adverse Effect, or (iii) any term of any Contractual Obligation (including, without limitation, any Material Contract) binding on or otherwise affecting it or any of its properties, except where the failure to so comply could not reasonably be expected to have a Material Adverse Effect.

(i)      ERISA.  Except as set forth on <u>Schedule 6.01(i)</u> to the Disclosure Letter, (i) each Loan Party and each Employee Plan is in compliance with all Requirements of Law in all material respects, including ERISA, the Internal Revenue Code and the Patient Protection and Affordable Care Act of 2010, as amended by the Health Care and Education Reconciliation Act of 2010, (ii) no material ERISA Event has occurred nor is reasonably expected to occur with respect to any Employee Plan or Multiemployer Plan, (iii) the most recent annual report (Form 5500 Series) with respect to each Pension Plan, including any required Schedule B (Actuarial Information) thereto, copies of which have been filed with the Internal Revenue Service and delivered to the Agents, is complete and correct and fairly presents the funding status of such Pension Plan, and since the date of such report, there has been no material adverse change in such funding status, (iv) copies of each agreement entered into with the PBGC, the U.S. Department of Labor or the Internal Revenue Service with respect to any Employee Plan have been delivered to the Agents, and (v) each Employee Plan that is intended to be a qualified plan under Section 401(a) of the Internal Revenue Code has received a favorable determination letter from the Internal Revenue Service that has not expired or is entitled to rely on an opinion letter or advisory letter issued by the Internal Revenue Service to a pre-approved plan provider, and all required amendments and restatements have been timely adopted.  No Loan Party or any of its ERISA Affiliates has incurred any liability to the PBGC which remains outstanding other than the payment of premiums, and there are no premium payments which have become due which are unpaid.  There are no pending or, to the best knowledge of any Loan Party, threatened claims, actions, proceedings or lawsuits (other than claims for benefits in the normal course) asserted or instituted against (A) any Employee Plan or its assets, (B) any fiduciary with respect to any Employee Plan, or (C) any Loan Party or any of its ERISA Affiliates with respect to any Employee Plan.  Except as required by Section 4980B of the Internal Revenue Code, no Loan Party or any of its ERISA Affiliates maintains an employee welfare benefit plan (as defined in Section 3(1) of ERISA) that provides health benefits (through the purchase of insurance or otherwise) for any retired or former employee of any Loan Party or any of its ERISA Affiliates or has any obligation to provide any such benefits for any current employee after such employee's termination of employment.

(j)      Taxes, Etc.  (i) All U.S. federal income and other material state and local and foreign income Tax returns and other material reports required by applicable Requirements of Law to be filed by any Loan Party have been timely filed (taking into account any valid extensions) and (ii) all Taxes imposed upon any Loan Party or its Subsidiaries or any property of any Loan Party or its Subsidiaries which have become due and payable on or prior to the Effective Date, as shown to be due and payable on said returns, have been paid, except (A) Taxes contested in good faith by proper proceedings diligently conducted which stay the imposition of any Lien resulting from the non-payment thereof and with respect to which adequate reserves have been set aside for the payment thereof on the Financial Statements in accordance with GAAP and (B) other Taxes in an aggregate amount not to exceed $1,000,000 at any one time outstanding.

(k)      Regulations T, U and X.  No Loan Party is or will be engaged in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation T, U or X), and no proceeds of any Loan will be used to purchase or carry any margin stock or to extend credit to others for the purpose of purchasing or carrying any margin stock or for any purpose that violates, or is inconsistent with, the provisions of Regulation T, U and X.

88

(l)     Nature of Business.

(i)     No Loan Party is engaged in any business other than as set forth on Schedule 6.01(l) to the Disclosure Letter, together with businesses reasonably related or ancillary thereto.

(ii)    The Administrative Borrower does not have any material liabilities (other than liabilities arising under the Loan Documents), own any material assets (other than the Equity Interests of its Subsidiaries) or engage in any operations or business (other than the ownership of its Subsidiaries).

(m)    Adverse Agreements, Etc. No Loan Party or any of its Subsidiaries is a party to any Contractual Obligation or subject to any restriction or limitation in any Governing Document or any judgment, order, regulation, ruling or other requirement of a court or other Governmental Authority, which (either individually or in the aggregate) has, or in the future could reasonably be expected (either individually or in the aggregate) to have, a Material Adverse Effect.

(n)     Permits, Etc.  Each Loan Party has, and is in compliance with, all permits, licenses, authorizations, approvals, entitlements and accreditations required for such Person lawfully to own, lease, manage or operate, or to acquire, each business and Facility currently owned, leased, managed or operated, or to be acquired, by such Person, except to the extent the failure to have or be in compliance therewith could not reasonably be expected to have a Material Adverse Effect.  No condition exists or event has occurred which, in itself or with the giving of notice or lapse of time or both, would result in the suspension, revocation, impairment, forfeiture or non-renewal of any such permit, license, authorization, approval, entitlement or accreditation, and there is no claim that any thereof is not in full force and effect, except where such suspension, revocation, impairment, forfeiture or non-renewal could not reasonably be expected to have a Material Adverse Effect.

(o)     Properties.  Each Loan Party has good and marketable title to, valid leasehold interests in, or valid licenses to use, all property and assets material to its business, free and clear of all Liens, except the Prepetition Permitted Liens (if any).  All such properties and assets are in good working order and condition, ordinary wear and tear excepted, except as could not reasonably be expected to have a Material Adverse Effect.  Set forth on Schedule 6.01(o) to the Disclosure Letter is a complete and correct listing of all leases for real property of all Loan Parties and the status thereof as of the Effective Date.

(p)     Employee and Labor Matters.  Except as set forth on Schedule 6.01(p) to the Disclosure Letter, (i) each Loan Party and its Subsidiaries is in compliance with all Requirements of Law in all material respects pertaining to employment and employment practices, terms and conditions of employment, wages and hours, and occupational safety and health, (ii) no Loan Party or any Subsidiary is party to any collective bargaining agreement, nor has any labor union been recognized as the representative of the employees of any Loan Party of Subsidiary, (iii) there is no unfair labor practice complaint pending or, to the knowledge of any Loan Party, threatened against any Loan Party or any Subsidiary before any Governmental Authority and no grievance or arbitration proceeding pending or threatened against any Loan Party or any Subsidiary which arises out of or under any collective bargaining agreement, (iv) there has been no strike, work stoppage, slowdown, lockout, or other labor dispute pending or threatened against any Loan Party or any Subsidiary, and (v) to the knowledge of each Loan Party, no labor organization or group of employees has made a pending demand for recognition or certification, and there are no representation

89

or certification proceedings or petitions seeking a representation proceeding presently pending or threatened to be brought or filed, with the National Labor Relations Board or any other labor relations tribunal or authority.  No Loan Party or Subsidiary has incurred any liability or obligation under the Worker Adjustment and Retraining Notification Act ("WARN") or any similar Requirement of Law, which remains unpaid or unsatisfied.  All material payments due from any Loan Party or Subsidiary on account of wages and employee health and welfare insurance and other benefits have been paid or accrued as a liability on the books of such Loan Party or Subsidiary.

(q)     Environmental Matters.  Except as set forth on Schedule 6.01(q) to the Disclosure Letter, (i) no Loan Party or any of its Subsidiaries is in violation of any Environmental Law, except to the extent any such violation could not reasonably be expected to result in a material Environmental Claim or Environmental Liability, (ii) each Loan Party and its Subsidiaries has, and is in compliance with, all Environmental Permits for its respective operations and businesses, except to the extent any failure to have or be in compliance therewith could not reasonably be expected to result in a material Environmental Claim or Environmental Liability; (iii) there has been no Release of Hazardous Materials at any properties currently or formerly owned, leased or operated by any Loan Party, its Subsidiaries or a respective predecessor in interest or at any disposal or treatment facility which received Hazardous Materials generated by any Loan Party, its Subsidiaries or any respective predecessor in interest, which in any case of the foregoing could reasonably be expected to result in a material Environmental Claim or Environmental Liability; (iv) there are no pending or threatened Environmental Claims against, or Environmental Liability of, any Loan Party, its Subsidiaries or any respective predecessor in interest that could reasonably be expected to result in any adverse consequence to any Loan Party (other than immaterial consequences) or any Secured Party; (v) neither any Loan Party nor any of its Subsidiaries is performing or responsible for any Remedial Action that could reasonably be expected to result in any material Environmental Claim or Environmental Liability; and (vi) the Loan Parties have made available to the Collateral Agent and Lenders true and complete copies of all material environmental reports, audits, and investigations in the possession or control of any Loan Party or any of its Subsidiaries with respect to the operations and business of the Loan Parties and its Subsidiaries.

(r)     Insurance.  Each Loan Party maintains all insurance required by Section 7.01(h). Schedule 6.01(r) to the Disclosure Letter sets forth a list of all such insurance maintained by or for the benefit of each Loan Party on the Effective Date.

(s)     Use of Proceeds.  The proceeds of the DIP Delayed Draw Term Loans shall be used solely in a manner permitted pursuant to Section 7.01(v).

(t)     [Reserved].

(u)     Intellectual Property.  Except as set forth on Schedule 6.01(u) to the Disclosure Letter, each Loan Party owns or licenses or otherwise has the right to use all Intellectual Property rights that are necessary for the operation of its business, without infringement upon or conflict with the rights of any other Person with respect thereto, except for such infringements and conflicts which, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.  Set forth on Schedule 6.01(u) to the Disclosure Letter is a complete and accurate list as of the Effective Date of (i) each item of Registered Intellectual Property owned by each Loan Party; (ii) each material work of authorship

90

owned by each Loan Party and which is not Registered Intellectual Property, and (iii) each material Intellectual Property Contract to which each Loan Party is bound.  To the knowledge of any Loan Party, no trademark or other advertising device, product, process, method, substance, part or other material now employed by any Loan Party infringes upon or conflicts with any rights owned by any other Person, and no claim or litigation regarding any of the foregoing is pending or, to the knowledge of any Loan Party, threatened in writing, except for such infringements and conflicts which could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  To the knowledge of each Loan Party, no patent, invention, device, application, principle or any statute, law, rule, regulation, standard or code pertaining to Intellectual Property is pending or proposed, which, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

(v)    Material Contracts.  Set forth on Schedule 6.01(v) to the Disclosure Letter is a complete and correct listing of all Material Contracts and the status thereof as of the Effective Date.

(w)    Investment Company Act.  None of the Loan Parties is (i) required to register as an "investment company", as such term is defined in the Investment Company Act of 1940, as amended, or (ii) subject to regulation under any Requirement of Law that limits in any respect its ability to incur Indebtedness or which may otherwise render all or a portion of the Obligations unenforceable.

(x)    Suppliers.  There exists no actual or threatened termination, cancellation or limitation of, or modification to or change in, the business relationship between any Loan Party, on the one hand, and any supplier or any group thereof, on the other hand; and there exists no present state of facts or circumstances that could give rise to or result in any such termination, cancellation, limitation, modification or change, except in each case where the same could not reasonably be expected to have a Material Adverse Effect.

(y)    Credit Card Agreements.  Set forth in Schedule 6.01(y) to the Disclosure Letter is a correct and complete list of (i) all of the Credit Card Agreements existing as of the Effective Date between and/or among any Loan Party, any of its Affiliates, the Credit Card Issuers, the Credit Card Processors and any of their affiliates, and (ii) the term of such Credit Card Agreements.  As of the Effective Date, the Credit Card Agreements set forth in Schedule 6.01(y) to the Disclosure Letter constitute all of such agreements necessary for each Loan Party to operate its business as presently conducted with respect to credit cards and debit cards, and no Account of the Loan Parties arises from purchases by customers of Inventory (including, among other things, food and beverages) with credit cards or debit cards, other than those which are issued by Credit Card Issuers with whom any Loan Party has entered into one of the Credit Card Agreements set forth on Schedule 6.01(y) to the Disclosure Letter.  Each of the Credit Card Agreements constitutes the legal, valid and binding obligations of such Loan Party, enforceable against such Loan Party in accordance with their respective terms except as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws of general applicability affecting the enforcement of creditors' rights.  To the knowledge of each Loan Party, no default or event of default, or act, condition or event which after notice or passage of time or both, would constitute a default or an event of default under any of the Credit Card Agreements exists or has occurred and is continuing.  Each Loan Party and, to each Loan Party's knowledge, the other parties thereto, have complied in all material respects with all of the terms and conditions of the Credit Card Agreements to the extent necessary for such Loan Party to be entitled to receive all payments thereunder.

91

(z)    Liens.  The Collateral Agent's Lien under each Collateral Document shall constitute a fully perfected priming Lien on, and security interest in, all right, title and interest of the Loan Parties in the Collateral, as security for the Obligations, in each case prior to the Liens of any other Person upon the entry of the DIP Orders (subject only to the Carve-Out, the Administration Charge, and the Prepetition Permitted Liens (if any)).

(aa)    DIP Superpriority Claims.  Pursuant to the terms of the DIP Orders, the joint and several Obligations of the Loan Parties under this Agreement constitute DIP Superpriority Claims and shall be allowed administrative expense claims in the Cases under section 364(c) of the Bankruptcy Code, having priority over all administrative expense claims and unsecured claims against such Loan Parties now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code and all super-priority administrative expense claims granted to any other Person, subject only to the terms of the DIP Orders, the Administration Charge, and the Carve-Out.

(bb)    Sanctions; Anti-Corruption and Anti-Money Laundering Laws.  None of any Loan Party, any Subsidiary thereof, any of their respective directors, officers, or employees, shareholders or owners, nor, to the knowledge of any Loan Party, any of their respective agents or Affiliates, (i) is a Sanctioned Person or currently the subject or target of any Sanctions, (ii) has assets located in a Sanctioned Country, (iii) conducts any business with or for the benefit of any Sanctioned Person, (iv) directly or indirectly derives revenues from investments in, or transactions with, Sanctioned Persons, (v) is a "Foreign Shell Bank" within the meaning of the USA PATRIOT Act, i.e., a foreign bank that does not have a physical presence in any country and that is not affiliated with a bank that has a physical presence and an acceptable level of regulation and supervision, or (vi) is a Person that resides in or is organized under the laws of a jurisdiction designated by the United States Secretary of the Treasury under Section 311 or 312 of the USA PATRIOT Act as warranting special measures due to money laundering concerns.  Each Loan Party and its Subsidiaries has implemented and maintains in effect policies and procedures designed to ensure compliance by each Loan Party and its Subsidiaries and their respective directors, officers, employees, agents and Affiliates with all Anti-Corruption Laws and Anti-Money Laundering Law.  Each Loan Party and each Subsidiary is in compliance with all Sanctions, Anti-Money Laundering Laws and Anti-Corruption Laws.  Each Loan Party and, to the knowledge of any Loan Party, each Affiliate, officer, employee or director acting on behalf of any Loan Party is (and is taking no action that would result in any such Person not being) in compliance with (A) all applicable OFAC rules and regulations, (B) all applicable United States of America, United Kingdom, United Nations, European Union, German, Canadian, Australian and all other internationally respected national autonomous sanctions, embargos and trade restrictions and (C) all applicable provisions of the USA PATRIOT Act.  In addition, no Loan Party or any Subsidiary is engaged in any kind of activities or business of or with any Person or in any country or territory that is subject to any sanctions administered by OFAC, the United Kingdom, the European Union, Germany, Canada, Australia or the United Nations.

(cc)    Anti-Bribery and Corruption.

(i)    Neither any Loan Party nor, to the knowledge of any Loan Party, any director, officer, employee, or any other Person acting on behalf of any Loan Party, has offered, promised, paid, given or authorized the payment or giving of any money or other thing of value, directly or indirectly,

to or for the benefit of any Person, including without limitation, any employee, official or other Person acting on behalf of any Governmental Authority, or otherwise engaged in any activity that may violate any Anti-Corruption Law.

(ii)     Neither any Loan Party nor, to the knowledge of any Loan Party, any director, officer, employee, or any other Person acting on behalf of any Loan Party, has engaged in any activity that would breach any Anti-Corruption Laws.

(iii)    To the best of each Loan Party's knowledge and belief, there is no pending or, to the knowledge of any Loan Party, threatened action, suit, proceeding or investigation before any court or other Governmental Authority against any Loan Party or any of its directors, officers, employees or other Person acting on its behalf that relates to a potential violation of any Anti-Corruption Laws, Anti-Money Laundering Laws or Sanctions.

(iv)    The Loan Parties will not directly or indirectly use, lend or contribute the proceeds of the Loans for any purpose that would breach the Anti-Corruption Laws.

(dd)    <u>Full Disclosure</u>.

Each Loan Party has disclosed to the Agents all agreements, instruments and corporate or other restrictions to which it is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.  None of the reports, financial statements, certificates or other information furnished by or on behalf of any Loan Party to the Agents in writing (other than forward-looking information and projections and information of a general economic nature and general information about Borrowers' industry) in connection with the negotiation of this Agreement or delivered hereunder (as modified or supplemented by other information so furnished), when taken together, contains any material misstatement of fact or, omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which it was made, not misleading.

(ee)    <u>Initial Budget</u>.  On or prior to the Effective Date, the Loan Parties have prepared and delivered a thirteen (13) week cash flow forecast in form and substance acceptable to the Required Lenders (the "<u>Initial Budget</u>"), setting forth cash revenues, receipts, expenses, professional fees and other disbursements (including, without limitation, any payments with respect to real property leases), net cash flows, inventory receipts and other items on a line-item basis (including all necessary and required expenses which the Loan Parties expect to incur and anticipated uses of proceeds of draws under the Loan Facility and any other post-petition financing arrangements) on a weekly basis for the period beginning as of the week of the Petition Date through and including the thirteenth (13th) week after such week, as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time only with the prior written consent of the Required Lenders.  The Initial Budget shall be deemed the "Approved Budget" for all purposes under this Agreement and the other Loan Documents until superseded by any Updated Budget that subsequently is approved in writing by the Required Lenders, at which point it shall become the Approved Budget (and which itself will only be superseded by a subsequent Updated Budget that is approved in writing by the Required Lenders) (each such budget, the "<u>Approved Budget</u>").

(ff)    <u>Other Bankruptcy Matters</u>.

93

(i)       The Cases were commenced on the Petition Date, in accordance with applicable law and proper notice thereof under the circumstances, and proper notice under the circumstances of (A) the motion seeking approval of the Loan Documents and (B) entry of the DIP Orders, as applicable and the hearings for the approval of the Interim DIP Order have been held by the Bankruptcy Court.

(ii)      The Interim Stay Order was obtained from the CCAA Court within one (1) Business Day of the Petition Date, in accordance with applicable law and proper notice thereof under the circumstances and the Initial CCAA Recognition Order will be obtained within seven (7) Business Days of the Petition Date. Proper notice under the circumstances of issuance of each of the Interim DIP Order Recognition Order and the Final DIP Order Recognition Order and the hearings for approval of the Interim DIP Order Recognition Order has been held by the CCAA Court within the timeframes provided herein.

(iii)     Upon the entry of the DIP Orders and solely with respect to any assets located in Canada upon issuance of the Interim DIP Order Recognition Order and the Final DIP Order Recognition Order, as the case may be, each such DIP Order and the Loan Documents are sufficient to provide that the Obligations will constitute superpriority administrative expense claims and the Liens and security interests securing the Obligations shall be senior secured, valid, enforceable and automatically and properly perfected priming liens, having the priorities set forth herein but subject to the Carve-Out, the Administration Charge, and the Prepetition Permitted Liens (if any).

(iv)     Each DIP Order, once entered, and solely with respect to the Canadian Collateral, each of the Interim DIP Order Recognition Order and the Final DIP Order Recognition Order, once issued, is in full force and effect and has not been reversed, modified, amended, stayed or vacated absent the written consent of the Required Lenders.

(v)      The Loan Parties are in compliance in all material respects with all agreements entered into, and all orders entered by the Bankruptcy Court and the CCAA Court, from the Petition Date.

## ARTICLE VII

## COVENANTS OF THE LOAN PARTIES AND OTHER COLLATERAL MATTERS

Section 7.01   <u>Affirmative Covenants</u>. So long as any principal of or interest on any Loan or any other Obligation (whether or not due) shall remain unpaid (other than Contingent Indemnity Obligations) or any Lender shall have any Commitment hereunder, each Loan Party will, unless the Required Lenders shall otherwise consent in writing:

(a)     <u>Reporting Requirements</u>. Furnish to each Agent and each Lender:

(i)      as soon as available, and in any event within 30 days after the end of each fiscal month of the Administrative Borrower and its Subsidiaries commencing with the first fiscal month of the Administrative Borrower and its Subsidiaries ending after the Effective Date, (A) internally prepared consolidated and consolidating balance sheets and statements of operations as at the end of such fiscal month, setting forth in each case in comparative form the figures for the corresponding date or period set

forth in the financial statements for the immediately preceding Fiscal Year, all in reasonable detail and certified by an Authorized Officer of the Administrative Borrower as fairly presenting, in all material respects, the financial position of the Administrative Borrower and its Subsidiaries as at the end of such fiscal month and the results of operations of the Administrative Borrower and its Subsidiaries for such fiscal month, in accordance with GAAP applied in a manner consistent with that of the most recent audited financial statements furnished to the Agents and the Lenders, subject to the absence of footnotes and normal year-end adjustments and (B) a monthly reporting package with respect to the business of the Borrowers (which shall include, without limitation, reporting on system-wide comparable store sales (traffic and ticket), the operating and other expenses of the Borrowers and their Subsidiaries (disaggregated into cost of goods sold, direct labor, other operating expenses, marketing expenses and general administrative expenses), and off-premise and on-premise sales splits) in form and substance reasonably satisfactory to the Administrative Agent;

(ii)     as soon as available and in any event within 45 days after the end of each fiscal quarter of the Administrative Borrower and its Subsidiaries commencing with the first fiscal quarter of the Administrative Borrower and its Subsidiaries ending after the Effective Date, (A) consolidated and consolidating balance sheets and statements of operations and consolidated statements of retained earnings and cash flows of the Administrative Borrower and its Subsidiaries as at the end of such quarter, and for the period commencing at the end of the immediately preceding Fiscal Year and ending with the end of such quarter, setting forth in each case in comparative form the figures for the corresponding date or period set forth in the financial statements for the immediately preceding Fiscal Year, all in reasonable detail and certified by an Authorized Officer of the Administrative Borrower as fairly presenting, in all material respects, the financial position of the Administrative Borrower and its Subsidiaries as of the end of such quarter and the results of operations and cash flows of the Administrative Borrower and its Subsidiaries for such quarter and for such year-to-date period, in accordance with GAAP applied in a manner consistent with that of the most recent audited financial statements of the Administrative Borrower and its Subsidiaries furnished to the Agents and the Lenders, subject to the absence of footnotes and normal year-end adjustments, (B) a management discussion and analysis of the statements of operations of the Administrative Borrower and its Subsidiaries as at the end of such fiscal quarter and discussing the figures for the corresponding period in the previous Fiscal Year and (C) a quarterly reporting package with respect to the business of the Borrowers (which shall include, without limitation, reporting on store level performance data and store closures and openings) in form and substance reasonably satisfactory to the Administrative Agent;

(iii)     as soon as available, and in any event within 120 days after the end of each Fiscal Year of the Administrative Borrower and its Subsidiaries, (A) consolidated balance sheets and statements of operations and consolidated statements of retained earnings and cash flows of the Administrative Borrower and its Subsidiaries as at the end of such Fiscal Year, all in reasonable detail and prepared in accordance with GAAP, and accompanied by a report and an opinion, prepared in accordance with generally accepted auditing standards, of independent certified public accountants of recognized standing selected by the Administrative Borrower and reasonably satisfactory to the Agents (which report and opinion shall not include (x) any qualification, exception or explanatory paragraph expressing substantial doubt about the ability of the Administrative Borrower or any of its Subsidiaries to continue as a going concern or any qualification or exception as to the scope of such audit, or (y) any qualification which relates to the treatment or classification of any item and which, as a condition to the removal of such

95

qualification, would require an adjustment to such item), in each case, with respect to the foregoing clauses (x) and (y), other than with respect to qualifications, exceptions or explanatory paragraphs directly caused by the filing of the Cases or resulting from obligations with respect to which the Bankruptcy Code prohibits the Loan Parties from complying or permits the Loan Parties not to comply, (B) a management discussion and analysis of the statements of operations of the Administrative Borrower and its Subsidiaries as at the end of such Fiscal Year and discussing the figures for the previous Fiscal Year, and (C) additional information setting forth in each case in comparative form the figures set forth in the audited financial statements to the corresponding date or period set forth in the financial statements for the immediately preceding Fiscal Year;

(iv)       simultaneously with the delivery of the financial statements of the Administrative Borrower and its Subsidiaries required by clauses (i), (ii) and (iii) of this Section 7.01(a), a Compliance Certificate:

(A)       stating that such Authorized Officer has reviewed the provisions of this Agreement and the other Loan Documents and has made or caused to be made under his or her supervision a review of the condition and operations of the Administrative Borrower and its Subsidiaries during the period covered by such financial statements with a view to determining whether the Administrative Borrower and its Subsidiaries were in compliance with all of the provisions of this Agreement and such Loan Documents at the times such compliance is required hereby and thereby, and that such review has not disclosed, and such Authorized Officer has no knowledge of, the occurrence and continuance during such period of an Event of Default or Default or, if an Event of Default or Default had occurred and continued or is continuing, describing the nature and period of existence thereof and the action which the Administrative Borrower and its Subsidiaries propose to take or have taken with respect thereto,

(B)       [reserved], and

(C)       in the case of the delivery of the financial statements of the Administrative Borrower and its Subsidiaries required by clause (iii) of this Section 7.01(a), attaching a summary of all material insurance coverage maintained as of the date thereof by any Loan Party or any of its Subsidiaries and evidence that such insurance coverage meets the requirements set forth in Section 7.01(h), each Security Agreement and each Mortgage, together with such other related documents and information as the Administrative Agent may reasonably require;

(v)       [reserved];

(vi)       [reserved];

(vii)       [reserved];

(viii)       promptly after submission to any Governmental Authority, all documents and information furnished to such Governmental Authority in connection with any investigation of any Loan Party other than routine inquiries by such Governmental Authority;

(ix)       as soon as possible, and in any event within two (2) Business Days after the occurrence of an Event of Default or Default or the occurrence of any event or development that could

96

reasonably be expected to have a Material Adverse Effect, the written statement of an Authorized Officer of the Administrative Borrower setting forth the details of such Event of Default or Default or other event or development having a Material Adverse Effect and the action which the affected Loan Party proposes to take with respect thereto;

(x)      as soon as possible and in any event: (A) at least 10 days prior to any event or development that could reasonably be expected to result in or constitute an ERISA Event, and, to the extent not reasonably expected, within five (5) days after the occurrence of any ERISA Event, notice of such ERISA Event (in reasonable detail), (B) within 3 days after receipt thereof by any Loan Party or any of its ERISA Affiliates from the PBGC, copies of each notice received by any Loan Party or any of its ERISA Affiliates of the PBGC's intention to terminate any Pension Plan or to have a trustee appointed to administer any Pension Plan, (C) within 10 days after the filing thereof with the Internal Revenue Service, copies of each Schedule B (Actuarial Information) to the annual report (Form 5500 Series) with respect to each Pension Plan, (D) within 3 days after receipt thereof by any Loan Party or any of its ERISA Affiliates from a sponsor of a Multiemployer Plan or from the PBGC, a copy of each notice received by any Loan Party or any of its ERISA Affiliates concerning the imposition or amount of withdrawal liability under Section 4202 of ERISA or indicating that such Multiemployer Plan may enter reorganization status under Section 4241 of ERISA, and (E) within 10 days after any Loan Party sends notice of a plant closing or mass layoff (as defined in WARN) to employees, copies of each such notice sent by such Loan Party;

(xi)      other than the Cases, promptly after the commencement thereof but in any event not later than five (5) days after service of process with respect thereto on, or the obtaining of knowledge thereof by, any Loan Party, notice of each action, suit or proceeding before any court or other Governmental Authority or other regulatory body or any arbitrator which, if adversely determined, could reasonably be expected to have a Material Adverse Effect;

(xii)      concurrently with the execution, receipt or delivery thereof (but without duplication of any notices provided to the Agents and the Lenders under this Agreement), (A) copies of all material notices (including, without limitation, default notices), reports (including, without limitation, borrowing base reports), statements or other material information that any Loan Party executes, receives or delivers in connection with any Material Contract and (B) copies of any amendments, restatements, supplements or other modifications, waivers, consents or forbearances that any Loan Party executes, receives or delivers with respect to any Material Contract;

(xiii)      as soon as possible and in any event within five (5) days after execution, receipt or delivery thereof, copies of any material notices that any Loan Party executes or receives in connection with the sale or other Disposition of the Equity Interests of, or all or substantially all of the assets of, any Loan Party;

(xiv)      promptly and in any event within 5 Business Days after the same is provided to its Board of Directors, any written materials so provided to its Board of Directors ("Board Materials"); provided, however, that each Loan Party may exclude any portion of such Board Materials if such Loan Party determines in good faith that (A) such exclusion is reasonably necessary to preserve the attorney-client or work product privilege between the Loan Parties, any Affiliates or equityholders thereof, and their respective counsel, (B) such Board Materials relate to the Loan Parties or their respective

Affiliates' or equityholders' relationship, contractual or otherwise, with the Agents and the Lenders or their respective Affiliates or any actual or potential transactions between or involving the Loan Parties and their Subsidiaries, Affiliates or equityholders and the Agents and the Lenders or their Affiliates, (C) such exclusion is necessary to avoid a conflict of interest or disclosure that is restricted by any agreement to which any Loan Party, any Subsidiary thereof, or any of their respective Affiliates or equityholders is a party or otherwise bound (<u>provided</u> that such confidentiality obligations are not entered into in contemplation of the rights hereunder) and (D) such Board Materials include employee information, including information related to compensation, performance, or other confidential or personal information of such employee;

        (xv)    promptly after (A) the sending or filing thereof, copies of all statements, reports and other information any Loan Party sends to any holders of its Indebtedness or its securities or files with the SEC or any national (domestic or foreign) securities exchange and (B) the receipt thereof, a copy of any material notice received from any holder of its Indebtedness;

        (xvi)    within three (3) Business Days after receipt thereof, copies of all final financial reports (including, without limitation, management letters), if any, submitted to any Loan Party by its auditors in connection with any annual or interim audit of the books thereof;

        (xvii)    promptly upon request, any certification or other evidence requested from time to time by any Lender in its sole discretion, confirming the Borrowers' compliance with <u>Section 7.02(r)</u>;

        (xviii)  [reserved];

        (xix)    simultaneously with the delivery of the financial statements of the Administrative Borrower and its Subsidiaries required by <u>clauses (i)</u>, <u>(ii)</u> and <u>(iii)</u> of this <u>Section 7.01(a)</u>, if, as a result of any change in accounting principles and policies from those used in the preparation of the Financial Statements that is permitted by <u>Section 7.02(q)</u>, the consolidated financial statements of the Administrative Borrower and its Subsidiaries delivered pursuant to <u>clauses (i)</u>, <u>(ii)</u> and <u>(iii)</u> of this <u>Section 7.01(a)</u> will differ from the consolidated financial statements that would have been delivered pursuant to such subdivisions had no such change in accounting principles and policies been made, then, together with the first delivery of such financial statements after such change, one or more statements of reconciliation for all such prior financial statements in form and substance satisfactory to the Agents;

        (xx)    promptly upon request, such other information concerning the condition or operations, financial or otherwise, of any Loan Party as any Agent may from time to time may reasonably request;

        (xxi)    on or before 12:00 p.m. New York City time on the first Friday of each fiscal month, commencing with the first full fiscal month ending after the Effective Date (each such date, an "<u>Updated Budget Delivery Date</u>"), a supplement to the Initial Budget (or the previously supplemented Approved Budget, as the case may be), covering the subsequent 13-week period that commences with the week immediately preceding such Updated Budget Delivery Date, consistent with the form and level of detail set forth in the Initial Budget and otherwise in form and substance acceptable to the Required Lenders

<div align="center">98</div>

(each such supplemental budget, an "Updated Budget").  Upon (and subject to) the approval in writing of any such Updated Budget by the Required Lenders, such Updated Budget shall constitute the then-approved Approved Budget; provided that unless and until the Required Lenders approve such supplemental budget, the then-current Approved Budget shall remain in effect.  The Debtors shall comply with the Approved Budget (subject to Permitted Variances) at all times;

(xxii)    commencing with the third full calendar week following the Petition Date and for each calendar week thereafter, by no later than 12:00 p.m. New York City time on the Friday of each such calendar week (each such Friday, a "Weekly Budget Variance Report Date"), a weekly variance report (each, a "Weekly Budget Variance Report") for the applicable Weekly Budget Variance Report Period setting forth, in reasonable detail, any differences between (A) the cumulative actual cash receipts on an aggregate basis for such Weekly Budget Variance Report Period compared to the projected cash receipts on an aggregate basis and in the same level of detail set forth in the Approved Budget for such Weekly Budget Variance Report Period and (B) the cumulative actual cash disbursements on an aggregate basis for such Weekly Budget Variance Report Period compared to the projected cash disbursements on an aggregate basis and in the same level of detail set forth in the Approved Budget for such Weekly Budget Variance Report Period, together with a statement from the Administrative Borrower's chief financial officer certifying the information contained in such Weekly Budget Variance Report and compliance with Section 7.02(v) hereof.  Each Weekly Budget Variance Report shall also provide a reasonably detailed explanation for any variance on a cumulative basis;

(xxiii)   within five (5) Business Days of each Budget Variance Test Date, a variance report (each, a "Fiscal Month Budget Variance Report") for the applicable Budget Variance Test Period setting forth, in reasonable detail, any differences between (A) the cumulative actual cash receipts on an aggregate basis for such Budget Variance Test Period compared to the projected cash receipts on an aggregate basis and in the same level of detail set forth in the Approved Budget for such Budget Variance Test Period (any such difference, a "Receipts Variance") and (B) the cumulative actual cash disbursements on an aggregate basis for such Budget Variance Test Period (excluding estate professional fees and U.S. Trustee fees, and fees and expenses payable to Agents' professionals and advisors) compared to the projected cash disbursements (excluding estate professional fees and U.S. Trustee fees, and fees and expenses payable to Agents' professionals and advisors) on an aggregate basis and in the same level of detail set forth in the Approved Budget for such Budget Variance Test Period (any such difference, a "Disbursements Variance"), together with a statement from the Administrative Borrower's chief financial officer certifying the information contained in such Fiscal Month Budget Variance Report and compliance with Section 7.02(v) hereof.  Each Fiscal Month Budget Variance Report shall also provide a reasonably detailed explanation for any variance on a cumulative basis;

(xxiv)   for informational purposes only, and not for purposes of approval or variance testing required by Section 7.02(v) hereof, on or before 12:00 p.m. New York City time on the Friday of each calendar week following the Petition Date, a 13-week cash flow forecast, or a weekly update thereto, showing updated actuals and variances;

(xxv)    for informational purposes only, and not for purposes of approval or variance testing required by Section 7.02(v) hereof, on or before 12:00 p.m. New York City time on the Friday of each calendar week following the Petition Date, a Weekly Budget Variance Report for the

99

applicable Weekly Budget Variance Report Period which shall also set forth, in reasonable detail, any differences between (A) the actual cash receipts on a line-item basis for all categories shown in the Approved Budget for such Weekly Budget Variance Report Period compared to the projected cash receipts on a line-item basis set forth in the Approved Budget for such Weekly Budget Variance Report Period and (B) the actual cash disbursements on a line-item basis for all categories shown in the Approved Budget for such Weekly Budget Variance Report Period compared to the projected cash disbursements on a line-item basis set forth in the Approved Budget for such Weekly Budget Variance Report Period;

(xxvi)  for informational purposes only, and not for purposes of approval or variance testing required by Section 7.02(v) hereof, within five (5) Business Days of each Budget Variance Test Date, a Fiscal Month Budget Variance Report for the applicable Budget Variance Test Period which shall also set forth, in reasonable detail, any differences between (A) the actual cash receipts on a line-item basis for all categories shown in the Approved Budget for such Budget Variance Test Period compared to the projected cash receipts on a line-item basis set forth in the Approved Budget for such Budget Variance Test Period and (B) the actual cash disbursements on a line-item basis for all categories shown in the Approved Budget for such Budget Variance Test Period compared to the projected cash disbursements on a line-item basis set forth in the Approved Budget for such Budget Variance Test Period;

(xxvii)  promptly, and in any event within one (1) Business Day after receipt thereof by the Administrative Borrower or any Subsidiary thereof, copies of all material written reports and presentations delivered by or on behalf of any Loan Party to the Committee or any other party in interest in the Cases that have not been filed publicly on the Bankruptcy Court's docket within such period; provided that the Loan Parties shall be entitled to withhold any such reports and presentations if such reports and presentations contain sensitive or confidential information (as determined by the Loan Parties in consultation with their advisors in their reasonable business judgment);

(xxviii)  promptly, and in any event within one (1) Business Day after a Loan Party receives notice or becomes aware thereof, notice of any party seeking relief from the Automatic Stay other than as expressly authorized under the DIP Orders; and

(xxix)  (i) as soon as practicable, and in any event not less than three (3) Business Days, in advance of filing with the Bankruptcy Court, the CCAA Court or delivering to the Committee appointed in the Cases, if any, or to the United States Trustee, as the case may be, (A) the Final DIP Order and (B) all other material proposed orders and pleadings that may be (1) adverse to the interests of the Administrative Agent or the Lenders or (2) inconsistent with the Approved Budget or the terms of the Loan Documents, in each case, relating to any of (x) the Cases, (y) the Prepetition Credit Agreement, this Agreement or the credit facilities contemplated thereby and hereby, or (z) any sale contemplated in accordance with the Milestones, any plan of reorganization or any disclosure statement related thereto, and (ii) substantially simultaneously with the filing with the Bankruptcy Court, the CCAA Court or delivering to the Committee appointed in any Case, if any, or to the United States Trustee, as the case may be, monthly operating reports and all other notices, filings, motions, pleadings or other information concerning the financial condition of the Loan Parties or their Subsidiaries or the Cases that may be filed with the Bankruptcy Court, the CCAA Court or delivered to the Committee appointed in any Case, if any, or to the United States Trustee.

100

(b)     Additional Borrowers, Guarantors and Collateral Security.   Subject to Section 7.02(t) (and, for the avoidance of doubt, without limiting or otherwise waiving the requirements of such Section) and the DIP Orders, cause:

(i)      each Subsidiary (other than an Excluded Subsidiary) of any Loan Party (x) not in existence on the Effective Date or (y) that ceases to be an Excluded Subsidiary after the Effective Date, to execute and deliver to the Collateral Agent promptly and in any event within 30 days (or such longer period as the Collateral Agent may agree to in writing in its sole discretion) after the formation, acquisition or change in status thereof:

(A)      a Joinder Agreement, pursuant to which such Subsidiary shall be made a party to this Agreement as a Borrower or a Guarantor,

(B)      a supplement to the Security Agreement, together with (1) certificates evidencing all of the certificated Equity Interests of any Person owned by such Subsidiary required to be pledged under the terms of the Security Agreement, (2) undated stock powers for such certificated Equity Interests executed in blank, and (3) such opinions of counsel as the Collateral Agent may reasonably request,

(C)      to the extent required under the terms of this Agreement, one or more Mortgages creating on the real property of such Subsidiary a perfected, first priority Lien (in terms of priority, subject only to the Prepetition Permitted Liens (if any)) on such real property and such other Real Property Deliverables as may be required by the Collateral Agent with respect to each such real property,

(D)      Credit Card Acknowledgements in form and substance satisfactory to the Administrative Agent with respect to any Credit Card Agreements of such Subsidiary and

(E)      such other agreements, instruments, approvals or other documents reasonably requested by the Collateral Agent in order to create, perfect, establish the first priority of or otherwise protect any Lien purported to be covered by any such Security Agreement or Mortgage or otherwise to effect the intent that such Subsidiary shall become bound by all of the terms, covenants and agreements contained in the Loan Documents and that all property and assets of such Subsidiary shall become Collateral for the Obligations to the extent required by any Loan Document; and

(ii)      each Loan Party that is a direct owner of (x) the Equity Interests of any Subsidiary not in existence on the Effective Date (other than any Equity Interests constituting Excluded Property (as defined in the Security Agreement)) or (y) any Equity Interests that cease to be Excluded Property (as defined in the Security Agreement) after the Effective Date to execute and deliver promptly and in any event within 30 days (or such longer period as the Collateral Agent may agree to in writing in its sole discretion) after the formation, acquisition or change in status of such Subsidiary, a Pledge Amendment (as defined in the Security Agreement), together with (A) certificates evidencing all of the certificated Equity Interests of such Subsidiary required to be pledged under the terms of the Security Agreement, (B) undated stock powers or other appropriate instruments of assignment for such certificated Equity Interests executed in blank, (C) such opinions of counsel as the Collateral Agent may reasonably

101

request and (D) such other agreements, instruments, approvals or other documents requested by the Collateral Agent.

Notwithstanding the foregoing, no Excluded Subsidiary shall be required to become a Guarantor hereunder (and, as such, shall not be required to deliver the documents required by <u>clause (b)(i)</u> above); <u>provided</u>, <u>however</u>, that if the Equity Interests of an Excluded Subsidiary are owned by a Loan Party, such Loan Party shall deliver all such documents, instruments, agreements (including, without limitation, at the reasonable request of the Collateral Agent, a pledge agreement governed by the laws of the jurisdiction of organization of such Excluded Subsidiary) and certificates described in <u>clause (b)(ii)</u> above to the Collateral Agent, and take all commercially reasonable actions reasonably requested by the Collateral Agent or otherwise necessary to grant and to perfect a first-priority Lien (subject to the Permitted Liens (if any)) in favor of the Collateral Agent, for the benefit of the Agents and the Lenders, in 100% of the Equity Interests of such Excluded Subsidiary owned by such Loan Party.

(c)     <u>Compliance with Laws; Payment of Taxes</u>.

(i)     Comply, and cause each of its Subsidiaries to comply, with all Requirements of Law, judgments and awards (including any settlement of any claim that, if breached, could give rise to any of the foregoing), except to the extent the failure to so comply could not reasonably be expected to have a Material Adverse Effect.

(ii)     Pay, and cause each of its Subsidiaries to pay, in full before delinquency or before the expiration of any extension period, all Taxes imposed upon any Loan Party or any of its Subsidiaries or any property of any Loan Party or any of its Subsidiaries, except (A) Taxes contested in good faith by proper proceedings diligently conducted which stay the imposition of any Lien resulting from the non-payment thereof and with respect to which adequate reserves have been set aside for the payment thereof in accordance with GAAP and (B) other Taxes in an aggregate amount not to exceed $1,000,000 at any one time outstanding.

(d)     <u>Preservation of Existence, Etc.</u>  Maintain and preserve, and cause each of its Subsidiaries to maintain and preserve, its existence, rights and privileges, and become or remain, and cause each of its Subsidiaries to become or remain, duly qualified and in good standing in each jurisdiction in which the character of the properties owned or leased by it or in which the transaction of its business makes such qualification necessary, except to the extent that the failure to be so qualified could not reasonably be expected to have a Material Adverse Effect.

(e)     <u>Keeping of Records and Books of Account</u>.  Keep, and cause each of its Subsidiaries to keep, adequate records and books of account, with complete entries made to permit the preparation of financial statements in accordance with GAAP.

(f)     <u>Inspection Rights</u>.  Permit, and cause each of its Subsidiaries to permit, the agents and representatives of any Agent at any time and from time to time during normal business hours and, so long as no Event of Default has occurred and is continuing, with reasonable notice, at the expense of the Borrowers, to examine and make copies of and abstracts from its records and books of account, to visit and inspect its properties, to verify materials, leases, notes, accounts receivable, deposit accounts and its other

102

assets, to conduct audits, physical counts, valuations, appraisals, Phase I Environmental Site Assessments (and, if requested by the Collateral Agent based upon the results of any such Phase I Environmental Site Assessment, a Phase II Environmental Site Assessment) or examinations and to discuss its affairs, finances and accounts with any of its directors, officers, managerial employees, independent accountants or any of its other representatives.  In furtherance of the foregoing, each Loan Party hereby authorizes its independent accountants, and the independent accountants of each of its Subsidiaries, to discuss the affairs, finances and accounts of such Person (independently or together with representatives of such Person) with the agents and representatives of any Agent in accordance with this <u>Section 7.01(f)</u>.  Notwithstanding the foregoing, (i) any visit or inspection shall be conducted only through the Agents, (ii) unless an Event of Default shall have occurred and be continuing, such visits and inspections shall be limited to one (1) time in any twelve month period, and (iii) nothing in this <u>Section 7.01(f)</u> shall require the Administrative Borrower or its Subsidiaries to take any action that would violate any confidentiality agreement or waive any attorney-client privilege.

(g)     <u>Maintenance of Properties, Etc.</u>  Maintain and preserve, and cause each of its Subsidiaries to maintain and preserve, all of its properties which are necessary or useful in the proper conduct of its business in good working order and condition, ordinary wear and tear and casualty excepted, and comply, and cause each of its Subsidiaries to comply, at all times with the provisions of all leases to which it is a party as lessee or under which it occupies property, so as to prevent any loss or forfeiture thereof or thereunder, except to the extent the failure to so maintain and preserve or so comply could not reasonably be expected to have a Material Adverse Effect.

(h)     <u>Maintenance of Insurance</u>.  Maintain, and cause each of its Subsidiaries to maintain, insurance with responsible and reputable insurance companies or associations (including, without limitation, comprehensive general liability, hazard, flood, rent, worker's compensation and business interruption insurance) with respect to the Collateral and its other properties (including all real property leased or owned by it) and business, in such amounts and covering such risks as is (i) carried generally in accordance with sound business practice by companies in similar businesses similarly situated, (ii) required by any Requirement of Law, (iii) required by any Material Contract and (iv) in any event in amount, adequacy and scope reasonably satisfactory to the Collateral Agent.  All policies covering the Collateral are to be made payable to the Collateral Agent for the benefit of the Agents and the Lenders, as their interests may appear, in case of loss, under a standard noncontributory "lender" or "secured party" clause and are to contain such other provisions as the Collateral Agent may require to fully protect the Lenders' interest in the Collateral and to any payments to be made under such policies.  All certificates of insurance are to be delivered to the Collateral Agent and the policies are to be premium prepaid, with the lender's loss payable and additional insured endorsement in favor of the Collateral Agent for the benefit of the Agents and the Lenders, as their respective interests may appear, and such other Persons as the Collateral Agent may designate from time to time, and shall provide for not less than 30 days' (10 days' in the case of non-payment) prior written notice to the Collateral Agent of the exercise of any right of cancellation.  If any Loan Party or any of its Subsidiaries fails to maintain such insurance, the Collateral Agent may arrange for such insurance, but at the Borrowers' expense and without any responsibility on the Collateral Agent's part for obtaining the insurance, the solvency of the insurance companies, the adequacy of the coverage, or the collection of claims.  Upon the occurrence and during the continuance of an Event of Default, the Collateral Agent shall have the sole right, in the name of the Lenders, any Loan Party and its Subsidiaries, to file claims under any insurance policies, to receive receipt and give acquittance for any payments that may be

103

payable thereunder, and to execute any and all endorsements, receipts, releases, assignments, reassignments or other documents that may be necessary to effect the collection, compromise or settlement of any claims under any such insurance policies.

(i)     Obtaining of Permits, Etc.  Obtain, maintain and preserve, and cause each of its Subsidiaries to obtain, maintain and preserve, and take all necessary action to timely renew, all permits, licenses, authorizations, approvals, entitlements and accreditations that are necessary or useful in the proper conduct of its business, except to the extent the failure to obtain, maintain, preserve or take such action could not reasonably be expected to have a Material Adverse Effect.

(j)     Environmental.

(i)     Keep the Collateral free of any Environmental Lien.

(ii)     Obtain, maintain and preserve, and cause each of its Subsidiaries to obtain, maintain and preserve, and take all necessary action to timely renew, all Environmental Permits that are necessary or useful in the proper conduct of its business, and comply, and cause each of its Subsidiaries to comply, with all Environmental Laws and Environmental Permits, except to the extent the failure to so obtain, maintain, preserve or comply could not reasonably be expected to result in a material Environmental Claim or Environmental Liability.

(iii)     Take all commercially reasonable steps to prevent any Release of Hazardous Materials in violation of any Environmental Law or Environmental Permit at, on, under or from any property owned, leased or operated by any Loan Party or its Subsidiaries that could reasonably be expected to result in any material Environmental Claim or Environmental Liability.

(iv)     Provide the Collateral Agent with written notice within 10 days of any of the following:  (A) discovery by any Loan Party or its respective, agent, employee, representative, or consultant of any Release of a Hazardous Material or environmental condition at, on, under or from any property currently or formerly owned, leased or operated by any Loan Party, Subsidiary or predecessor in interest or any violation of Environmental Law or Environmental Permit that in any case could reasonably be expected to result in any material Environmental Claim or Environmental Liability; (B) notice received by any Loan Party that an Environmental Lien has been filed against any Collateral; or (C) notice received by any Loan Party of any material Environmental Claim or Environmental Liability; and provide such reports, documents and information as the Collateral Agent may reasonably request from time to time with respect to any of the foregoing.

(k)     Fiscal Year.  Cause the Fiscal Year of the Administrative Borrower and its Subsidiaries to end on the last Sunday in the calendar month of May of each calendar year unless the Agents consent to a change in such Fiscal Year (and appropriate related changes to this Agreement).

(l)     Landlord Waivers; Collateral Access Agreements.  Subject to Section 7.01(aa) of this Agreement, at any time (i) any headquarters location of any Loan Party, (ii) any books and records location of any Loan Party (to the extent such books and records are not duplicated or accessible at the headquarters location of such Loan Party) or (iii) any Collateral with a book value in excess of $500,000 (when aggregated with all other Collateral at the same location) is located on any real property (other than

a Restaurant) of a Loan Party (whether such real property is now existing or acquired after the Effective Date) which is not owned by a Loan Party, or is stored on the premises of a bailee, warehouseman, or similar party, obtain written subordinations or waivers or collateral access agreements, as the case may be, in form and substance satisfactory to the Collateral Agent.

(m)    After Acquired Real Property.  Upon the acquisition by it after the Effective Date of any interest (whether fee or leasehold) in any real property (wherever located) (each such interest being a "New Facility"), immediately so notify the Collateral Agent, setting forth with specificity a description of the interest acquired, the location of the real property, any structures or improvements thereon and either an appraisal or such Loan Party's good-faith estimate of the current value of such real property.  The Collateral Agent shall have the right, in its sole discretion, by notice to the applicable Loan Party, to require a Mortgage (and any other Real Property Deliverables) with respect to (A) each of the Facilities listed on Schedule 1.01(B) to the Disclosure Letter on the Effective Date and (B) any New Facility; provided that no Mortgage shall be required with respect to any New Facility that is subject to a Permitted Sale and Leaseback Transaction within 180 days of the acquisition of such New Facility.  Upon receipt of such notice requesting a Mortgage (and any other Real Property Deliverables), the applicable Loan Party that owns such Facility or has acquired such New Facility shall promptly furnish the same to the Collateral Agent. The Borrowers shall pay all fees and expenses, including, without limitation, reasonable attorneys' fees and expenses, and all title insurance charges and premiums, in connection with each Loan Party's obligations under this Section 7.01(m).

(n)    Anti-Corruption Laws; Anti-Money Laundering Laws; Sanctions.

(i)    Maintain, and cause each of its Subsidiaries to maintain, policies and procedures designed to promote compliance by each Loan Party, its Subsidiaries and their respective directors, officers, employees and agents with all Anti-Corruption Laws and Anti-Money Laundering Laws.

(ii)    Comply, and cause each of its Subsidiaries to comply, with all applicable Anti-Corruption Laws, Anti-Money Laundering Laws and Sanctions.

(iii)    Neither Loan Party nor, to the knowledge of any Loan Party, any director, officer, employee or any Person acting on behalf of any Loan Party will engage in any activity that would breach any Anti-Corruption Law.

(iv)    Promptly notify the Administrative Agent of any action, suit or investigations by any court or Governmental Authority in relation to an alleged breach of the Anti-Corruption Law.

(v)    Not directly or indirectly use, lend or contribute the proceeds of any Loan for any purpose that would breach any Anti-Corruption Law.

(vi)    Each Loan Party and Affiliate, officer, employee or director, acting on behalf of the Loan Party is (and will take no action which would result in any such Person not being) in compliance with (A) all applicable OFAC rules and regulations, (B) all applicable United States of America, United Kingdom, United Nations, European Union, German, Canadian, Australian and all other reasonable internationally respected national autonomous sanctions, embargos and trade restrictions and

105

(C) all applicable provisions of the USA PATRIOT Act.  In addition, none of the activities or business of any Loan Party includes any kind of activities or business of or with any Person or in any country or territory that is subject to any Sanctions.

(vii)    In order to comply with the "know your customer/borrower" requirements of the Anti-Money Laundering Laws, promptly provide to the Administrative Agent upon its reasonable request from time to time (A) information relating to individuals and entities affiliated with any Loan Party that maintain a business relationship with the Administrative Agent, and (B) such identifying information and documentation as may be available for such Loan Party in order to enable the Administrative Agent or any Lender to comply with Anti-Money Laundering Laws.

(o)    Lender Meetings.  Upon the request of any Agent or the Required Lenders, participate in a meeting with the Agents and the Lenders (and their respective advisors) at the Borrowers' corporate offices (or at such other location as may be agreed to by the Administrative Borrower and such Agent or the Required Lenders) or, at the Administrative Agent's discretion, participate in a telephonic meeting in lieu of an in-person meeting, at such time as may be agreed to by the Administrative Borrower and such Agent or the Required Lenders, in each case, in order to discuss any Budget Variance Report, the Cases, the financial and operational performance of the Loan Parties, and such other matters as may be reasonably requested with reasonable advance notice.

(p)    [Reserved]

(q)    [Reserved].

(r)    Compliance with Material Contracts.  (i) Perform, comply with and observe in all material respects all terms and provisions of each Material Contract to be performed, complied with or observed by it, (ii)  maintain each Material Contract in full force and effect in accordance with its terms and (iii)  enforce each Material Contract in accordance with its terms, except in the case of each of clauses (ii) and (iii), to the extent the failure to do any of the foregoing could not reasonably be expected to have a Material Adverse Effect.

(s)    Credit Card Agreements.  Each of the Loan Parties shall:

(i)    observe and perform all material terms, covenants, conditions and provisions of the Credit Card Agreements to be observed and performed by it at the times set forth therein;

(ii)    not do, permit, suffer or refrain from doing anything, as a result of which there could be a material default under or material breach of any of the terms of any of the Credit Card Agreements;

(iii)    at all times maintain in full force and effect the Credit Card Agreements and not terminate, cancel, surrender or materially modify, amend, waive or release any of the Credit Card Agreements, or consent to or permit to occur any of the foregoing, except that (A) any such Loan Party may terminate or cancel any of the Credit Card Agreements in the ordinary course of the business of such Loan Party; provided that such Loan Party shall give the Agents not less than 15 days' prior written notice of its intention to so terminate or cancel any of the Credit Card Agreements and (B) any Loan Party may

106

modify or amend any of the Credit Card Agreement, so long as such modification or amendment does not give the Credit Card Issuer or Credit Card Processor party thereto greater rights to set-off against amounts otherwise payable to such Loan Party or greater rights to cease or suspend payments to such Loan Party;

(iv)    not enter into any new Credit Card Agreements with any new Credit Card Issuer or Credit Card Processor unless (A) the Agents shall have received not less than 30 days' prior written notice of the intention of such Loan Party to enter into such agreement (together with such other information with respect thereto as the Agents may request) and (B) such Loan Party delivers, or causes to be delivered to the Agents, a Credit Card Acknowledgment in favor of the Collateral Agent; and

(v)    furnish to the Agents, promptly upon the request of any Agent, such information and evidence as any Agent may reasonably require from time to time concerning the observance, performance and compliance by such Loan Party or the other party or parties thereto with the terms, covenants or provisions of the Credit Card Agreements.

(t)    <u>Further Assurances</u>.  Take such action and execute, acknowledge and deliver, and cause each of its Subsidiaries to take such action and execute, acknowledge and deliver, at its sole cost and expense, such agreements, instruments or other documents as any Agent may reasonably require from time to time in order (i) to carry out more effectively the purposes of this Agreement and the other Loan Documents, (ii) to subject to valid and perfected first priority Liens any of the Collateral or any other property of any Loan Party and its Subsidiaries, (iii) to establish and maintain the validity and effectiveness of any of the Loan Documents and the validity, perfection and priority of the Liens intended to be created thereby, and (iv) to better assure, convey, grant, assign, transfer and confirm unto each Secured Party the rights now or hereafter intended to be granted to it under this Agreement or any other Loan Document (including, without limitation, upon the occurrence of an Event of Default, causing each Credit Card Issuer and Credit Card Processor to direct all payments (due to any Loan Party) of all credit card charges submitted by any Loan Party to such Credit Card Issuer and Credit Card Processor to the Cash Management Accounts).  In furtherance of the foregoing, to the maximum extent permitted by applicable law, to the extent a Loan Party fails to comply with this <u>Section 7.01(t)</u>, each Loan Party (i) authorizes each Agent to execute any such agreements, instruments or other documents in such Loan Party's name and to file such agreements, instruments or other documents in any appropriate filing office, (ii) authorizes each Agent to file any financing statement required hereunder or under any other Loan Document, and any continuation statement or amendment with respect thereto, in any appropriate filing office without the signature of such Loan Party, and (iii) ratifies the filing of any financing statement, and any continuation statement or amendment with respect thereto, filed without the signature of such Loan Party prior to the date hereof.

(u)    [Reserved].

(v)    <u>Use of Proceeds</u>.  Solely in accordance with the Approved Budget and the DIP Orders:

(i)    Use the proceeds of the DIP Delayed Draw Term Loans solely, without duplication, (A) to repay in full all Indebtedness under the Working Capital Credit Agreement (as defined in the Prepetition Credit Agreement), (B) to pay transaction costs, fees and expenses that are incurred in connection with the Loan Documents, (C) to pay professional fees of the Debtors and their estates in

107

accordance with the terms of this Agreement and the DIP Orders, (D) for working capital and other general corporate purposes of the Administrative Borrower and its Subsidiaries permitted under the Loan Documents, (E) to cash collateralize the Wells Fargo Letters of Credit and the Bank Product Obligations as required by the Wells Fargo Payoff Letter (each as defined in the DIP Orders) and as set forth in paragraph 15 of the DIP Orders and (F) if necessary, to fund an amount equal to the Excluded Cash (as defined in the Stalking Horse Acquisition Agreement), in each case subject to the terms, requirements and limitations of the DIP Orders.

(ii)     Use the proceeds of the Roll-Up Term Loans solely to repay the Loans (as defined in the Prepetition Credit Agreement) held by the DIP Delayed Draw Term Lenders (or their Affiliates), in their capacities as Prepetition Secured Parties, in an amount equal to the amount of such proceeds, which shall reduce the amount of the Prepetition Obligations under the Prepetition Credit Agreement on a dollar-for-dollar basis.

Notwithstanding anything to the contrary contained in any Loan Document, but subject to the provisions of the DIP Orders, none of the proceeds of the Loans and none of the Obligations, the cash collateral, the Collateral or the Carve-Out may be used for any of the following purposes: to (1) object, contest or raise any defense to, the validity, perfection, priority, extent or enforceability of any amount due under the Loan Documents or the Prepetition Loan Documents, or the liens, security interests or claims granted under the DIP Orders, this Agreement, the other Loan Documents or the Prepetition Loan Documents, (2) investigate, initiate or prosecute any claims and defenses or causes of action against any of the Agents, the Lenders, the Prepetition Lenders, the Prepetition Secured Parties, or their respective agents, affiliates, representatives, attorneys or advisors under or relating to the Prepetition Obligations, the Prepetition Loan Documents, the Prepetition Collateral or the Loan Documents, in each case, other than by the Committee (if appointed) from the Investigation Budget (as defined in the DIP Orders) in accordance with paragraph 38 of the DIP Orders, (3) prevent, hinder or otherwise delay any Agent's or any Lender's assertion, enforcement or realization on the cash collateral or the Collateral in accordance with the Loan Documents, (4) seek to modify any of the rights granted to the Agents, the Lenders, the Prepetition Lenders or the Prepetition Secured Parties hereunder or under the other Loan Documents or under the Prepetition Loan Documents, in each of the foregoing cases without such parties' prior written consent or (5) pay any amount on account of any claims arising prior to the Petition Date, to fund acquisitions, capital expenditures, capital leases, or any other expenditure, unless such payments or expenditures are (x) approved by an order of the Bankruptcy Court and (y) in accordance with this Agreement and any relevant Approved Budget.

(w)     <u>Cash Management; Payment of Professional Fees</u>.  Maintain all deposit accounts and securities accounts as Controlled Accounts, other than any Excluded Account, and deposit all receivables, securities, cash and Cash Equivalents into Controlled Accounts.  The cash management system of the Loan Parties shall otherwise be maintained in a manner reasonably acceptable to the Administrative Agent and the Required Lenders. The Cash Management Order shall not be modified in any material respect without the prior written consent of the Required Lenders.  All Professional Fees at any time paid by the Loan Parties, or any of them, shall be paid by the Loan Parties pursuant to an order of the Bankruptcy Court, including, without limitation, the DIP Orders and pursuant to the Approved Budget.

(x)     <u>Milestones</u>.  Comply with all Milestones.

108

(y)     Other Bankruptcy Matters.

(i)     Comply in all material respects with all of the requirements and obligations set forth in the DIP Orders and in all material respects with any other orders entered in the Cases to the extent relevant to the interests of the Agents or the Lenders, in each case, after the entry thereof.

(ii)     Deliver to the Administrative Agent and the Lenders (and each of their respective advisors, including, without limitation, Proskauer Rose LLP or such other counsel as they may direct) as soon as reasonably practicable, but in no event less than three (3) Business Days prior to any filing, copies of all material proposed pleadings, motions, applications, orders, financial information and other documents to be filed by or on behalf of the Loan Parties with the Bankruptcy Court or the CCAA Court in the Cases or the CCAA Case, as applicable, that affect or may affect the Agents or the Lenders, or distributed by or on behalf of the Loan Parties to any official or unofficial committee appointed or appearing in the Cases or any other party in interest, including, without limitation, the DIP Orders, any plan of reorganization or liquidation and any disclosure statements related to such plan, in the Cases (each of which must be in form and substance acceptable to the Required Lenders).

(iii)     If not otherwise provided through the Bankruptcy Court's electronic docketing system, as soon as available, deliver to the Agents and the Lenders (and each of their respective counsel), copies of all final pleadings, motions, applications, orders, financial information and other documents distributed by or on behalf of the Loan Parties to any official or unofficial committee appointed or appearing in the Cases.

(iv)     Except as otherwise permitted by the DIP Orders, provide prior written notice as soon as reasonably practicable to the Agents and the Lenders (and each of their respective counsel) prior to any assumption or rejection of any Loan Party's or any Subsidiary's material contracts or material non-residential real property leases pursuant to Section 365 of the Bankruptcy Code, and no such contract or lease shall be assumed or rejected if such assumption or rejection adversely impacts the Collateral, any Liens thereon or any DIP Superpriority Claims payable therefrom (including, without limitation, any sale or other disposition of Collateral or the priority of any such Liens or DIP Superpriority Claims), if the Administrative Agent informs the Borrowers in writing within five (5) Business Days of receipt of the notice from the Administrative Borrower referenced above that it objects to such assumption or rejection, as applicable.

(v)     Maintain the engagement of Alvarez and Marsal as their financial advisor or retain such other financial advisor reasonably acceptable to the Required Lenders.

(z)     [Reserved].

(aa)     Post-Closing Obligations.

(i)     Deliver, or cause to be delivered, to the Agents (A) the Interim DIP Order Recognition Order no later than the date that is seven (7) Business Days following entry of the Interim DIP Order and (B) the Cash Management Order Recognition Order, no later than the date that is seven (7) Business Days following the entry of the Cash Management Order.

109

(ii)      Deliver, or cause to be delivered, to the Agents the Final DIP Order Recognition Order no later than the date that is seven (7) Business Days following the Final Order Entry Date.

(iii)      Deliver or cause to be delivered to the Agents the Assignment of Business Interruption Insurance no later than the date that is ten (10) Business Days following the Effective Date.

(iv)      Deliver or cause to be delivered to the Agents the insurance endorsements and other deliverables set forth in Section 5.01(d)(xix) hereof no later than the date that is thirty (30) days following the Effective Date.

(v)      Deliver or cause to be delivered to the Agents an opinion of (A) Blake, Cassels & Graydon LLP, as special Alberta and Ontario local counsel to the Loan Parties and (B) special Manitoba and Saskatchewan local counsel to the Loan Parties, in each case as to such matters as the Collateral ,Agent may reasonably request and in form and substance reasonably satisfactory to the Agents no later than the date that is five (5) Business Days following the Effective Date.

(vi)      Deliver, or cause to be delivered, to the Agents the executed counterpart of the Intercompany Subordination Agreement by the Subsidiaries located and/or incorporated in the People's Republic of China no later than the date that is ten (10) Business Days following the Effective Date.

Section 7.02    Negative Covenants.  So long as any principal of or interest on any Loan or any other Obligation (whether or not due) shall remain unpaid (other than Contingent Indemnity Obligations) or any Lender shall have any Commitment hereunder, each Loan Party shall not, unless the Required Lenders shall otherwise consent in writing:

(a)      Liens, Etc.  Create, incur, assume or suffer to exist, or permit any of its Subsidiaries to create, incur, assume or suffer to exist, any Lien upon or with respect to any of its properties, whether now owned or hereafter acquired; file or suffer to exist under the Uniform Commercial Code, the PPSA or any Requirement of Law of any jurisdiction, a financing statement (or the equivalent thereof) that names it or any of its Subsidiaries as debtor; sign or suffer to exist any security agreement authorizing any secured party thereunder to file such financing statement (or the equivalent thereof) other than, as to all of the above, Permitted Liens.  Notwithstanding the foregoing, in accordance with the DIP Orders, all Permitted Liens (other than the Carve-Out, the Administration Charge, and Prepetition Permitted Liens (if any)), while any portion of the Obligations remain outstanding, shall at all times be junior and subordinate to the Liens granted under the Loan Documents and the DIP Orders, which prohibition specifically restricts, without limitation, any Loan Party, the Committee, or any other party-in-interest in the Cases or any successor case, from priming or creating Liens pari passu with any Liens of the Administrative Agent and the Lenders (other than the Carve-Out, the Administration Charge, and the Prepetition Permitted Liens (if any)) irrespective of whether such Liens may be "adequately protected".

(b)      Indebtedness.  Create, incur, assume, guarantee or suffer to exist, or otherwise become or remain liable with respect to, or permit any of its Subsidiaries to create, incur, assume, guarantee or suffer to exist or otherwise become or remain liable with respect to, any Indebtedness other than

110

Permitted Indebtedness.  Notwithstanding the foregoing, in accordance with the DIP Orders, and except for the Carve-Out and the Administration Charge as provided in the DIP Orders, no Indebtedness (other than any Indebtedness owing to any Agent or any Lender under this Agreement and the other Loan Documents) permitted under this <u>Section</u> shall be permitted to have an administrative expense claim status under the Bankruptcy Code senior to or pari passu with (x) the DIP Superpriority Claims and (y) the superpriority administrative expense claims of the Prepetition Agent and the Prepetition Secured Parties, in each case, as set forth herein and in the DIP Orders.

(c)    <u>Fundamental Changes; Dispositions</u>.

(i)    Wind-up, liquidate or dissolve, or merge, consolidate or amalgamate with any Person, including by means of a "plan of division" under the Delaware Limited Liability Company Act or any comparable transaction under any similar law, or permit any of its Subsidiaries to do (or agree to do) any of the foregoing; or

(ii)    Make any Disposition, whether in one transaction or a series of related transactions, of all or any part of its business, property or assets, whether now owned or hereafter acquired (or agree to do any of the foregoing), or permit any of its Subsidiaries to do any of the foregoing; <u>provided, however</u>, that any Loan Party and its Subsidiaries may make Permitted Dispositions.

(d)    <u>Change in Nature of Business</u>.

(i)    Make, or permit any of its Subsidiaries to make, any change in the nature of its business as described in <u>Section 6.01(l)</u>.

(ii)    Permit the Administrative Borrower to have any material liabilities (other than liabilities arising under the Loan Documents), own any material assets (other than the Equity Interests of its Subsidiaries) or engage in any operations or business (other than the ownership of its Subsidiaries).

(e)    <u>Loans, Advances, Investments, Etc.</u>  Make or commit or agree to make, or permit any of its Subsidiaries make or commit or agree to make, any Investment in any other Person except for Permitted Investments.

(f)    <u>Sale and Leaseback Transactions</u>.  Enter into, or permit any of its Subsidiaries to enter into or be party to, any Sale and Leaseback Transaction other than a Permitted Sale and Leaseback Transaction.

(g)    [Reserved]

(h)    <u>Restricted Payments</u>.  Make or permit any of its Subsidiaries to make any Restricted Payment other than Permitted Restricted Payments.

(i)    <u>Federal Reserve Regulations</u>.  Permit any Loan or the proceeds of any Loan under this Agreement to be used for any purpose that would cause such Loan to be a margin loan in violation of the provisions of Regulation T, U or X of the Board.

(j)    <u>Transactions with Affiliates</u>.  Enter into, renew, extend or be a party to, or permit any of its Subsidiaries to enter into, renew, extend or be a party to, any transaction or series of related transactions (including, without limitation, the purchase, sale, lease, transfer or exchange of property or assets of any kind or the rendering of services of any kind) with any Affiliate, except, in each case, to the extent permitted by the DIP Orders:

(i)    transactions among the Administrative Borrower and its Subsidiaries that are expressly permitted by the other provisions of this Agreement,

(ii)    transactions permitted by <u>Section 7.02(e)</u>,

(iii)    [reserved],

(iv)    transactions existing on the Effective Date and described on <u>Schedule 7.02(j)</u> to the Disclosure Letter,

(v)    reasonable and customary director and officer compensation (including bonuses and stock option programs), benefits and indemnification arrangements, in each case approved by the Board of Directors (or a committee thereof) of such Loan Party or such Subsidiary,

(vi)    agreements for the non-exclusive licensing of Intellectual Property, or distribution of products, in each case among the Loan Parties and their Subsidiaries for the purpose of the counterparty thereof operating its business, and agreements for the assignment of Intellectual Property from any Loan Party or any of its Subsidiaries to any Loan Party,

(vii)    [reserved], and

(viii)    [reserved].

Notwithstanding anything to the contrary in the Approved Budget, the Administrative Borrower shall not, nor shall it permit any of its Subsidiaries to, enter into or materially increase any management bonus or other incentive compensation plan or agreement in favor of any officer, member of management, director or any employee that is not in effect as of the Effective Date absent the prior written consent of the Required Lenders.

(k)    <u>Limitations on Dividends and Other Payment Restrictions Affecting Subsidiaries</u>. Create or otherwise cause, incur, assume, suffer or permit to exist or become effective any consensual encumbrance or restriction of any kind on the ability of any Subsidiary of any Loan Party (i) to pay dividends or to make any other distribution on any shares of Equity Interests of such Subsidiary owned by any Loan Party or any of its Subsidiaries, (ii) to pay or prepay or to subordinate any Indebtedness owed to any Loan Party or any of its Subsidiaries, (iii) to make loans or advances to any Loan Party or any of its Subsidiaries or (iv) to transfer any of its property or assets to any Loan Party or any of its Subsidiaries, or permit any of its Subsidiaries to do any of the foregoing; <u>provided</u>, <u>however</u>, that nothing in any of <u>clauses (i)</u> through <u>(iv)</u> of this <u>Section 7.02(k)</u> shall prohibit or restrict compliance with:

(A)    this Agreement and the other Loan Documents;

112

(B)     any agreement in effect on the date of this Agreement and described on Schedule 7.02(k)(B) to the Disclosure Letter (but not any extension, replacement or continuation of any such agreement);

(C)     any applicable law, rule or regulation (including, without limitation, applicable currency control laws and applicable state corporate statutes restricting the payment of dividends in certain circumstances);

(D)     in the case of clause (iv), (1) customary restrictions on the subletting, assignment or transfer of any specified property or asset set forth in a lease, license, asset sale agreement or similar contract for the conveyance of such property or asset and (2) any instrument or other document evidencing a Permitted Lien (or the Indebtedness secured thereby) from restricting on customary terms the transfer of any property or assets subject thereto;

(E)     customary restrictions on dispositions of real property interests in reciprocal easement agreements;

(F)     customary restrictions in agreements for the sale of assets on the transfer or encumbrance of such assets during an interim period prior to the closing of the sale of such assets;

(G)     customary restrictions in joint venture and similar agreements described on Schedule 7.02(k)(G) to the Disclosure Letter;

(H)     restrictions binding on a Subsidiary of the Administrative Borrower at the time such Subsidiary first becomes a Subsidiary of the Administrative Borrower, so long as such Contractual Obligations were not entered into in contemplation of such Person becoming a Subsidiary of the Administrative Borrower;

(I)     restrictions on cash or other deposits imposed by contracts entered into in the ordinary course of business or with respect to Permitted Investments;

(J)     customary net worth provisions or similar financial maintenance provisions contained in real property leases entered into by a Subsidiary, so long as the Administrative Borrower has determined in good faith that such net worth provisions could not reasonably be expected to impair the ability of the Loan Parties to meet their ongoing obligations under the Loan Documents;

(K)     customary restrictions in contracts that prohibit the assignment of such contract; and/or

(L)     restrictions imposed by the Bankruptcy Court, and any restrictions imposed pursuant to the DIP Orders, the RSA Definitive Documentation and/or the 363 Sale Transaction and related documentation.

(l)     Limitations on Negative Pledges.  Enter into, incur or permit to exist, or permit any Subsidiary to enter into, incur or permit to exist, directly or indirectly, any agreement, instrument, deed,

113

lease or other arrangement that prohibits, restricts or imposes any condition upon the ability of any Loan Party or any Subsidiary of any Loan Party to create, incur or permit to exist any Lien in favor of the Collateral Agent upon any of its property or revenues, whether now owned or hereafter acquired, or that requires the grant of any security for an obligation if security is granted for another obligation, except the following:

(i)        this Agreement and the other Loan Documents,

(ii)        restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted by Section 7.02(b) if such restrictions or conditions apply only to the property or assets securing such Indebtedness,

(iii)        any customary restrictions and conditions contained in agreements relating to the sale or other disposition of assets pending such sale or other disposition; provided, that such restrictions and conditions apply only to the assets to be sold or disposed of and such sale or disposition is permitted hereunder,

(iv)        [reserved],

(v)        customary provisions in leases restricting the assignment or sublet thereof, and

(vi)        restrictions imposed by the Bankruptcy Court, and any restrictions imposed pursuant to the DIP Orders, the RSA Definitive Documentation and/or the 363 Sale Transaction and related documentation.

(m)        Modifications of Indebtedness, Organizational Documents and Certain Other Agreements; Etc.

(i)        Amend, modify or otherwise change (or permit the amendment, modification or other change in any manner of) any of the provisions of any of its or its Subsidiaries' Subordinated Indebtedness, or of any instrument or agreement (including, without limitation, any purchase agreement, indenture, loan agreement or security agreement) relating to any such Subordinated Indebtedness, if such amendment, modification or change would shorten the final maturity or average life to maturity of, or require any payment to be made earlier than the date originally scheduled on, such Subordinated Indebtedness, would increase the interest rate applicable to such Subordinated Indebtedness, would add any covenant or event of default, would change the subordination provision of such Subordinated Indebtedness, or would otherwise be adverse to the Lenders or the issuer of such Subordinated Indebtedness in any respect;

(ii)        except for the Obligations and any Indebtedness constituting Permitted Intercompany Investments, (A) make any voluntary or optional payment (including, without limitation, any payment of interest in cash that, at the option of the issuer, may be paid in cash or in kind), prepayment, redemption, defeasance, sinking fund payment or other acquisition for value of any of its or its Subsidiaries' Indebtedness (including, without limitation, by way of depositing money or securities with the trustee therefor before the date required for the purpose of paying any portion of such Indebtedness when due),

114

(B) refund, refinance, replace or exchange any of its or its Subsidiaries' Indebtedness for any other Indebtedness (other than Permitted Refinancing Indebtedness), (C) make any payment, prepayment, redemption, defeasance, sinking fund payment or repurchase of any Subordinated Indebtedness in violation of the subordination provisions thereof or any subordination agreement with respect thereto, or (D) make any payment, prepayment, redemption, defeasance, sinking fund payment or repurchase of any of its or its Subsidiaries' Indebtedness as a result of any asset sale, change of control, issuance and sale of debt or equity securities or similar event, or give any notice with respect to any of the foregoing;

(iii)    amend, modify or otherwise change any of its Governing Documents (including, without limitation, by the filing or modification of any certificate of designation, or any agreement or arrangement entered into by it) with respect to any of its Equity Interests (including any shareholders agreement), or enter into any new agreement with respect to any of its Equity Interests;

(iv)    agree to any amendment, modification, termination or other change to or waiver of any of its rights under any Material Contract if such amendment, modification, termination, change or waiver would be adverse in any material respect to any Loan Party or any of its Subsidiaries or the Agents and the Lenders;

(v)    assume, reject, amend, restate, supplement or otherwise modify, or breach, cancel or otherwise terminate (or, as relevant, repay or prepay in its entirety) (whether pursuant to Section 365 of the Bankruptcy Code or any other applicable law or otherwise) (A) any contract or lease, or (B) the Prepetition Credit Agreement, in each case, except to the extent such assumption, rejection, amendment, restatement, supplement, modification, breach, cancellation, termination, repayment or prepayment would not be materially adverse to the interests of the Agents or the Lenders or is permitted or directed under the Stalking Horse Acquisition Agreement; or

(vi)    [reserved].

(n)    <u>Investment Company Act of 1940</u>.  Engage in any business, enter into any transaction, use any securities or take any other action or permit any of its Subsidiaries to do any of the foregoing, that would cause it or any of its Subsidiaries to become subject to the registration requirements of the Investment Company Act of 1940, as amended, by virtue of being an "investment company" not entitled to an exemption within the meaning of such Act.

(o)    <u>ERISA</u>.  (i) Cause or fail to prevent, or permit any of its ERISA Affiliates to cause or fail to prevent, an ERISA Event, or (ii) adopt, or permit any of its ERISA Affiliates to adopt, any employee welfare benefit plan within the meaning of Section 3(1) of ERISA that provides benefits to employees after termination of employment other than as required by Section 601 of ERISA or other Requirements of Law.

(p)    <u>Environmental</u>.  Permit the use, handling, generation, storage, treatment, Release or disposal of Hazardous Materials at any property owned, leased or operated by it or any of its Subsidiaries, except in compliance with Environmental Laws (other than any noncompliance that could not reasonably be expected to result in any material Environmental Claim or Environmental Liability).

(q)    <u>Accounting Methods</u>.  Modify or change, or permit any of its Subsidiaries to modify or change, (i) its Fiscal Year or (ii) its method of accounting or accounting principles from those utilized in the preparation of the Financial Statements (other than as may be required to conform to GAAP).

(r)    <u>Sanctioned Persons; Anti-Corruption Laws; Anti-Money Laundering Laws</u>.

(i)    Conduct, nor permit any of its Subsidiaries to conduct, any business or engage in any transaction or deal with or for the benefit of any Sanctioned Person, including the making or receiving of any contribution of funds, goods or services to, from or for the benefit of any Sanctioned Person; or

(ii)    Use, nor permit any of its Subsidiaries to use, directly or indirectly, any of the proceeds of any Loan, (A) to fund any activities or business of or with any Sanctioned Person or in any other manner that would result in a violation of any Sanctions by any Person (including by any Person participating in any Loan, whether as underwriter, advisor, investor or otherwise), or (B) for the purpose of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Law.

(s)    [<u>Reserved</u>].

(t)    <u>New Subsidiaries and Unit Locations</u>.  Notwithstanding anything to the contrary contained in this Agreement or in any other Loan Document, (i) designate any Subsidiary as an "Excluded Subsidiary" or (ii) create or acquire any new Subsidiary;

(u)    [<u>Reserved</u>].

(v)    <u>Disbursements; DIP Budget Variance</u>.

(i)    Make any disbursements other than those set forth in the Approved Budget (subject to the Permitted Variances) (or as otherwise permitted in accordance with the terms of the DIP Orders).

(ii)    On each Budget Variance Test Date while any DIP Delayed Draw Term Loans are outstanding, the Loan Parties shall not permit (A) a Receipts Variance for any Budget Variance Test Period to have a negative variance in excess of 15% for the first two (2) Budget Variance Test Periods and 10% for any Budget Variance Test Period thereafter (with negative variance meaning, for the avoidance of doubt, that actual receipts are less than projected receipts) or (B) a Disbursements Variance for any Budget Variance Test Period to have a positive variance in excess of 15% for the first two (2) Budget Variance Test Periods and 10% for any Budget Variance Test Period thereafter (with positive variance meaning, for the avoidance of doubt, that actual disbursements are greater than the projected disbursements) (any variances permitted under this clause (ii), the "<u>Permitted Variances</u>").

(w)    <u>Case Matters</u>.

(i)    Assert, file or seek, or consent to the filing or the assertion of or joinder in, or use any portion of the proceeds of the Loans, Obligations, the Collateral, the Carve-Out or cash

116

collateral to compensate services rendered or expenses incurred in connection with, any claim, counterclaim, action, proceeding, order, application, pleading, motion, objection, any other papers or documents, defense (including offsets and counterclaims of any nature or kind), or other contested matter (including any of the foregoing the purpose of which is to seek or the result of which would be to obtain any order, judgment, determination, declaration, or similar relief):

(A)      avoiding, re-characterizing, recovering, reducing, subordinating (except pursuant to the DIP Orders), disallowing, or otherwise challenging (under Sections 105, 506(c), 542, 543, 544, 545, 547, 548, 549, 550, 551, 552(b), or 553 of the Bankruptcy Code or applicable non-bankruptcy law), in each case, in whole or in part, the Obligations, the DIP Liens, the Prepetition Obligations, the Prepetition Loan Documents or the Prepetition Liens; or reversing, modifying, amending, staying or vacating the DIP Orders, without the prior written consent of the Required Lenders;

(B)      granting priority for any administrative expense, secured claim or unsecured claim against the Borrower or any of the Guarantors (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation, any administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 327, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 and 1114 of the Bankruptcy Code) equal or superior to the priority of the Administrative Agent and the Lenders in respect of the Obligations, except as provided under the Carve-Out or to the extent expressly permitted under the DIP Orders;

(C)      granting or imposing, under Section 364(c) or 364(d) of the Bankruptcy Code or otherwise, any additional financing under such sections or any Lien equal or superior to the priority of the DIP Liens except to the extent expressly permitted under the DIP Orders;

(D)      permitting the use of cash collateral as defined in Section 363 of the Bankruptcy Code, except as expressly permitted by the DIP Orders or this Agreement;

(E)      modifying, altering, or impairing in any manner any of the DIP Liens or the Prepetition Liens, or any of the Agents', the Lenders' or the Prepetition Secured Parties' rights or remedies under the DIP Orders, this Agreement, any of the other Loan Documents, any of the Prepetition Loan Documents or any documents related thereto (including the right to demand payment of all Obligations and Adequate Protection Obligations, as applicable, and to enforce its Liens and security interests in the Collateral and the Prepetition Collateral, as applicable), whether by plan of reorganization or liquidation, order of confirmation, or any financings of, extensions of credit to, or incurring of debt by any Loan Party or otherwise, whether pursuant to Section 364 of the Bankruptcy Code or otherwise;

(ii)      Without the prior written consent of the Required Lenders, seek or consent to any order (A) dismissing any of the Cases under Sections 105, 305 or 1112 of the Bankruptcy Code or otherwise; (B) converting any of the Cases to cases under Chapter 7 of the Bankruptcy Code; (C) appointing a Chapter 11 trustee in any of the Cases; (D) appointing an examiner with enlarged powers beyond those set forth in sections 1104(d) and 1106(a)(3) and (4) of the Bankruptcy Code in any of the Cases; or (E) granting a change of venue with respect to any Case or any related adversary proceeding.

117

(iii)     Make any payments or transfer any property on account of claims asserted by any vendors of any Loan Party for reclamation in accordance with Section 2-702 of any applicable UCC and Section 546(c) of the Bankruptcy Code, unless otherwise ordered by the Bankruptcy Court upon prior notice to the Administrative Agent or unless otherwise consented to by the Required Lenders.

(iv)     Return any inventory or other property to any vendor pursuant to Section 546(g) of the Bankruptcy Code, unless otherwise ordered by the Bankruptcy Court in accordance with Section 546(g) of the Bankruptcy Code upon prior notice to the Administrative Agent or unless otherwise consented to by the Required Lenders.

(v)     Except as set forth in the 363 Sale Motion and Bidding Procedures Motion, propose to the Bankruptcy Court, or otherwise, a sale of all or substantially all of the Collateral, without the prior written consent of the Required Lenders.

(x)     Restructuring Support Matters.

(i)     Object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the RSA Transactions.

(ii)     Take any action that is inconsistent in any material respect with, or is intended to frustrate or impede approval, implementation, and consummation of the RSA Transactions described in the Company RSA.

(iii)     File any motion, pleading, or RSA Definitive Documents with the Bankruptcy Court or any other court (including any modifications or amendments thereof) that, in whole or in part, is not materially consistent with the Company RSA.

(iv)     Except as contemplated and permitted hereby, by the Company RSA or the DIP Orders, engage in any merger, consolidation, disposition, acquisition, investment, dividend, incurrence of indebtedness or other similar transaction outside the ordinary course of business, other than the transactions contemplated hereby, in the Company RSA and in the DIP Orders and on the terms contemplated hereby, thereby and in the DIP Orders without the consent of the Consenting Lenders.

# ARTICLE VIII

## CASH MANAGEMENT ARRANGEMENTS
## AND OTHER COLLATERAL MATTERS

Section 8.01     Cash Management Arrangements.

(a)     The Loan Parties shall (i) establish and maintain cash management services of a type and on terms reasonably satisfactory to the Agents at one or more of the banks set forth on Schedule 8.01 to the Disclosure Letter and each other bank added pursuant to Section 8.01(d) (each a "Cash Management Bank") and (ii) except as otherwise provided under Section 8.01(b), deposit or cause to be deposited promptly, and in any event no later than the next Business Day after the date of receipt thereof, all proceeds in respect of any Collateral, all Collections (of a nature susceptible to a deposit in a bank

118

account) and all other amounts received by any Loan Party (including payments made by Account Debtors directly to any Loan Party) into a Cash Management Account (unless such Loan Party maintains only Excluded Accounts).

(b)      The Loan Parties shall not maintain, and shall not permit any of their Subsidiaries to maintain, cash, Cash Equivalents or other amounts in any deposit account or securities account, unless the Collateral Agent shall have received a Control Agreement in respect of each such Cash Management Account (other than (i) any Excluded Account and (ii) any Cash Management Account in Canada for which the Loan Parties shall have used commercially reasonable efforts to deliver a Control Agreement but for which such Control Agreement has not been obtained).

(c)      Upon the terms and subject to the conditions set forth in a springing dominion Control Agreement with respect to a Cash Management Account, all amounts received in such Cash Management Account shall at the Administrative Agent's direction and subject to the terms of the DIP Orders be wired each Business Day into the Administrative Agent's Account, except that, so long as no Event of Default has occurred and is continuing, the Administrative Agent will not direct the Cash Management Bank to transfer funds in such Cash Management Account to the Administrative Agent's Account.

(d)      So long as no Default or Event of Default has occurred and is continuing, the Borrowers may amend Schedule 8.01 to the Disclosure Letter to add or replace a Cash Management Bank or Cash Management Account; provided, however, that (i) such prospective Cash Management Bank shall be reasonably satisfactory to the Collateral Agent and the Collateral Agent shall have consented in writing in advance to the opening of such Cash Management Account with the prospective Cash Management Bank, and (ii) prior to the time of the opening of such Cash Management Account, each Loan Party and such prospective Cash Management Bank shall have executed and delivered (or, solely with respect to any Cash Management Accounts in Canada, shall have used commercially reasonable efforts to deliver) to the Collateral Agent a springing dominion Control Agreement.

## ARTICLE IX

## EVENTS OF DEFAULT

Section 9.01      Events of Default.  Each of the following events shall constitute an event of default (each, an "Event of Default"):

(a)      any Borrower shall fail to pay, (i) when due (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise), all or any portion of the principal of any Loan, or (ii) within 3 Business Days of when due, any interest on any Loan, any Collateral Agent Advance, or any fee, indemnity or other amount payable under this Agreement or any other Loan Document;

(b)      any representation or warranty made or deemed made by or on behalf of any Loan Party or by any officer of the foregoing under or in connection with any Loan Document or under or in connection with any certificate or other writing delivered to any Secured Party pursuant to any Loan Document shall have been incorrect in any material respect (or in any respect if such representation or

119

warranty is qualified or modified as to materiality or "Material Adverse Effect" in the text thereof) when made or deemed made;

(c)    (i) any Loan Party shall fail to perform or comply with any covenant or agreement contained in <u>Section 5.02</u>, <u>Section 5.03</u>, <u>Section 7.01(a)</u>, <u>Section 7.01(b)</u>, <u>Section 7.01(c)</u>, <u>Section 7.01(d)</u>, <u>Section 7.01(f)</u>, <u>Section 7.01(h)</u>, <u>Section 7.01(k)</u>, <u>Section 7.01(m)</u>, <u>Section 7.01(o)</u>, <u>Section 7.01(p)</u>, <u>Section 7.01(v)</u>, <u>Section 7.01(w)</u>, <u>Section 7.01(x)</u>, <u>Section 7.01(y)</u>. <u>Section 7.01(z)</u>, <u>Section 7.01(aa)</u>,  <u>Section 7.02</u>, or <u>Article VIII</u>, or (ii) any Loan Party shall fail to perform or comply with any covenant or agreement contained in any Security Agreement to which it is a party or any Mortgage to which it is a party;

(d)    any Loan Party shall fail to perform or comply with any other term, covenant or agreement contained in any Loan Document to be performed or observed by it and, except as set forth in subsections (a), (b) and (c) of this <u>Section 9.01</u>, such failure, if capable of being remedied, shall remain unremedied for 30 days after the date of occurrence thereof;

(e)    the Administrative Borrower or any of its Subsidiaries shall fail to pay when due (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise) any principal, interest or other amount payable in respect of Indebtedness (excluding Indebtedness evidenced by this Agreement) having an aggregate amount outstanding in excess of $5,000,000, and such failure shall continue after the applicable grace period, if any, specified in the agreement or instrument relating to such Indebtedness, or any other default under any agreement or instrument relating to any such Indebtedness, or any other event, shall occur and shall continue after the applicable grace period, if any, specified in such agreement or instrument, if the effect of such default or event is to accelerate, or to permit the acceleration of, the maturity of such Indebtedness; or any such Indebtedness shall be declared to be due and payable, or required to be prepaid (other than by a regularly scheduled required prepayment), redeemed, purchased or defeased or an offer to prepay, redeem, purchase or defease such Indebtedness shall be required to be made, in each case, prior to the stated maturity thereof;

(f)    [reserved];

(g)    [reserved];

(h)    any material provision of any Loan Document shall at any time for any reason (other than pursuant to the express terms thereof) cease to be valid and binding on or enforceable against any Loan Party or any of its Subsidiaries intended to be a party thereto, or the validity or enforceability thereof shall be contested by any party thereto, or a proceeding shall be commenced by any Loan Party, any of its Subsidiaries or any Governmental Authority having jurisdiction over any of them, seeking to establish the invalidity or unenforceability thereof, or any Loan Party or any of its Subsidiaries shall deny in writing that it has any liability or obligation purported to be created under any Loan Document;

(i)    any Security Agreement, any Mortgage or any other security document, after delivery thereof pursuant hereto, shall for any reason fail or cease to create a valid and perfected and, except to the extent permitted by the terms hereof or thereof, or as a result of acts or omissions of the Agents or the Lenders (which does not arise from a breach by a Loan Party of its obligations under any Collateral

Document or any other Loan Document), first priority Lien in favor of the Collateral Agent for the benefit of the Agents and the Lenders on any Collateral purported to be covered thereby;

(j)      one or more judgments, orders or awards (or any settlement of any litigation or other proceeding that, if breached, could result in a judgment, order or award) for the payment of money exceeding $5,000,000 in the aggregate (except to the extent fully covered (other than to the extent of customary deductibles) by insurance pursuant to which the insurer has been notified and has not denied coverage) shall be rendered against the Administrative Borrower or any of its Subsidiaries and remain unsatisfied and (i) enforcement proceedings shall have been commenced by any creditor upon any such judgment, order, award or settlement or (ii) there shall be a period of 15 consecutive days after entry thereof during which (A) a stay of enforcement thereof is not be in effect or (B) the same is not vacated, discharged, stayed or bonded pending appeal;

(k)      the Administrative Borrower or any of its Subsidiaries is enjoined, restrained or in any way prevented by the order of any court or any Governmental Authority from conducting, or otherwise ceases to conduct for any reason whatsoever, all or any material part of its business for more than 30 days;

(l)      any material damage to, or loss, theft or destruction of, any Collateral, whether or not insured, or any strike, lockout, labor dispute, embargo, condemnation, act of God or public enemy, or other casualty which causes, for more than 30 consecutive days, the cessation or substantial curtailment of revenue producing activities at any facility of any Loan Party;

(m)      the loss, suspension or revocation of, or failure to renew, any license or permit now held or hereafter acquired by the Administrative Borrower or any of its Subsidiaries, if such loss, suspension, revocation or failure to renew could reasonably be expected to have a Material Adverse Effect;

(n)      the indictment of the Administrative Borrower or any of its Subsidiaries under any criminal statute, or any commencement of criminal or civil proceedings against the Administrative Borrower or any of its Subsidiaries, pursuant to which statute or proceedings the penalties or remedies sought or available include forfeiture to any Governmental Authority of any material portion of the property of such Person;

(o)      (i) there shall occur one or more ERISA Events that individually or in the aggregate results in, or could reasonably be expected to result in, liability or other loss to any Loan Party or any of its ERISA Affiliates in excess of $5,000,000, or (ii) there exists any fact or circumstance that could reasonably be expected to result in the imposition of a Lien pursuant to Section 430(k) of the Internal Revenue Code or Section 4068 of ERISA upon the property or rights to property of any Loan Party or any of its ERISA Affiliates;

(p)      (i) there shall occur and be continuing any "Event of Default" (or any comparable term) under, and as defined in the documents evidencing or governing any Subordinated Indebtedness, (ii) any of the Obligations for any reason shall cease to be "Senior Indebtedness" or "Designated Senior Indebtedness" (or any comparable terms) under, and as defined in the documents evidencing or governing any Subordinated Indebtedness, (iii) any Indebtedness other than the Obligations shall constitute "Designated Senior Indebtedness" (or any comparable term) under, and as defined in, the documents

121

evidencing or governing any Subordinated Indebtedness, (iv) any holder of Subordinated Indebtedness shall fail to perform or comply with any of the subordination provisions of the documents evidencing or governing such Subordinated Indebtedness, or (v) the subordination provisions of the documents evidencing or governing any Subordinated Indebtedness shall, in whole or in part, terminate, cease to be effective or cease to be legally valid, binding and enforceable against any holder of the applicable Subordinated Indebtedness;

(q)    [reserved];

(r)    a Change of Control shall have occurred; or

(s)    [reserved];

(t)    <u>Liens</u>.  Any Lien granted to the Administrative Agent, for the benefit of the Secured Parties, with respect to any material portion of the Collateral intended to be secured thereby (i) ceases to be, or is not at any time, valid, perfected and prior to all other Liens (other than Liens granted in respect of the Carve-Out, the Administration Charge, and the Prepetition Permitted Liens (if any) or otherwise authorized pursuant to the DIP Orders) or (ii) is terminated, revoked, or declared void (unless released or terminated pursuant to the terms of this Agreement);

(u)    <u>Chapter 11 Cases</u>. Any of the following shall have occurred in the Cases:

(i)    the failure of the Debtors to comply with any of the Milestones; provided, that the Required Lenders may agree to an extension of any of the Milestone dates in writing (including e-mail);

(ii)    the bringing of a motion or application by any Debtor in the Cases, or the entry of any order by the Bankruptcy Court in the Cases: (A) to obtain additional post-petition financing under section 364(c) or (d) of the Bankruptcy Code that does not provide for the repayment of all Obligations under this Agreement in full in cash immediately upon the consummation of such financing without the prior written consent of the Required Lenders; (B) to grant any Lien other than Liens expressly permitted under this Agreement or the DIP Orders upon or affecting any Collateral; (C) except as provided in this Agreement or the DIP Orders, to use cash collateral of the Secured Parties under section 363(c) of the Bankruptcy Code without the prior written consent of the Administrative Agent (at the direction of the Required Lenders) or the Required Lenders; or (D) that (in the case of any Debtor) requests or seeks authority for or that (in the case of an order entered by the Bankruptcy Court) approves or provides authority to take any other action or actions adverse to the rights and remedies of the Agents or the Lenders hereunder or their interest in the Collateral;

(iii)    the filing of any plan of reorganization or disclosure statement attendant thereto, or any amendment, modification or supplement to such plan or disclosure statement, by any Debtor, other than a Chapter 11 plan that is acceptable to the Required Lenders, unless such plan or disclosure statement contains provision for Payment in Full of the Obligations under this Agreement and the Prepetition Obligations under the Prepetition Credit Agreement (an "<u>Approved Plan</u>");

122

(iv)　　the termination or modification of any Debtor's exclusive right to file and solicit acceptances of a plan of reorganization;

(v)　　the entry of an order in any of the Cases approving a disclosure statement in respect of a plan other than an Approved Plan, or the entry of an order confirming a plan or plans of reorganization other than an Approved Plan;

(vi)　　the entry of an order in the Cases amending, supplementing, staying, vacating or otherwise modifying any Loan Document in a manner adverse to the economic interests of the Lenders without the prior written consent of the Required Lenders;

(vii)　　the payment of, or application by any Debtor for authority to pay, any prepetition claim without the prior written consent of the Required Lenders other than amounts set forth in the Approved Budget;

(viii)　　the entry of an order by the Bankruptcy Court appointing, or the filing of a motion or application by any Debtor for an order seeking the appointment of, in either case, without the prior consent of the Required Lenders, an interim or permanent trustee in the Cases or the appointment of a receiver or an examiner under section 1104 of the Bankruptcy Code in the Cases, with expanded powers (beyond those set forth in sections 1106(a)(3) and 1106(a)(4) of the Bankruptcy Code) to operate or manage the financial affairs, the business, or reorganization of the Administrative Borrower or with the power to conduct an investigation of (or compel discovery);

(ix)　　a sale (other than the 363 Sale Transaction)  without the prior written consent of the Required Lenders, of any of the Debtors' assets either through a sale under section 363 of the Bankruptcy Code, through a plan of reorganization confirmed by the Bankruptcy Court in the Cases, or otherwise, except to the extent that such sale indefeasibly results in the Payment in Full of the Obligations;

(x)　　the dismissal of any of the Cases or the termination of the CCAA Case, or if any Debtor files a motion or other pleading seeking the dismissal of the Cases or the CCAA Case, in each case, without the prior written consent of the Required Lenders;

(xi)　　the conversion of any of the Cases from one under Chapter 11 of the Bankruptcy Code to one under Chapter 7 of the Bankruptcy Code, or if any Debtor files a motion or other pleading seeking the conversion of any of the Cases under section 1112 of the Bankruptcy Code or otherwise;

(xii)　　any Debtor files, without the prior written consent of the Required Lenders, a motion or application seeking, or the entry of an order by the Bankruptcy Court, as applicable, granting relief from or modifying the automatic stay of section 362 of the Bankruptcy Code (A) to allow any creditor to execute upon or enforce a Lien on any Collateral not in accordance with the terms hereof, or (B) with respect to any Lien of or the granting of any Lien on any Collateral to any state or local environmental or regulatory agency or authority having priority over the Liens in favor of any Agent or any Prepetition Agent;

123

(xiii)    any Debtor files a motion or application seeking, or the entry of an order in the Cases challenging, subordinating, disgorging, avoiding or requiring repayment of any portion of the payments made on account of the Obligations owing under this Agreement, the other Loan Documents or the Prepetition Loan Documents;

(xiv)    the failure of any Debtor to perform any of its obligations under the DIP Orders or any violation of any of the terms of the DIP Orders, subject to any applicable grace or cure periods set forth therein;

(xv)    the challenge by any Debtor to the validity, extent, perfection or priority of any liens granted under or obligations arising under the Loan Documents or the Prepetition Loan Documents;

(xvi)    the remittance, use or application of proceeds of the Loans, cash collateral or other cash or funds of any Debtor other than in accordance with the DIP Orders;

(xvii)    any Debtor files a motion or application seeking, or the entry of an order in any of the Cases granting any other superpriority administrative claim or Lien equal or superior to that granted to any Agent, on behalf of itself and the Lenders, without the prior written consent of the Required Lenders (other than any such superpriority administrative claim or lien that is expressly permitted to have such priority hereunder);

(xviii)    the filing of a motion or application by any Debtor requesting, or the entry of any order granting, any super-priority claim which is senior or pari passu with the Agents' or the Lenders' claims under the Loan Documents or with the claims of the Prepetition Secured Parties under the Prepetition Loan Documents, as applicable, not in accordance with the terms hereof;

(xix)    any Debtor files a motion or application seeking, or the entry of an order precluding any Agent or any Prepetition Agent (or its respective designee) from having the right to or being permitted to "credit bid" with respect to the assets of the Debtors;

(xx)    any attempt by any Debtor to reduce (other than a reduction in accordance with the terms of this Agreement), avoid, set off or subordinate the Obligations or the Liens securing such Obligations to any other debt, including, without limitation, the Prepetition Obligations;

(xxi)    the modification, reversal, vacation or stay of the effectiveness of the DIP Orders or any provision thereof without the prior written consent of the Required Lenders;

(xxii)    the payment of or granting adequate protection (except for the Adequate Protection Superiority Claims) with respect to any Prepetition Obligations (other than with respect to payment permitted under the DIP Orders) without the prior written consent of the Required Lenders;

(xxiii)    [Reserved];

(xxiv) any Debtor commences, or supports any Person, in any litigation challenging or seeking to challenge the DIP Liens against the Agents or the Lenders, except as may be permitted under the DIP Orders;

(xxv) if the confirmation order with respect to a plan of reorganization other than an Approved Plan is entered in form and substance which is not reasonably acceptable to the Required Lenders in respect of the treatment of the claims of the Agents and the Lenders;

(xxvi) unless consented to by the Required Lenders, any Debtor shall make any payment or grant any form of adequate protection with respect to Indebtedness existing prior to the Petition Date (other than, in each case, as permitted under this Agreement, the DIP Orders or an Approved Plan or relief sought in any "first day" motions filed on the Petition Date);

(xxvii) an application for any of the orders described in this Section 9.01(u) including, without limitation, clauses (i), (iv), (v), (vi), (vii), (ix), (xi), (xii), (xvi), (xvii) or (xviii) shall be made by a Person other than the Administrative Agent or the Required Lenders and such application is not, to the extent requested upon reasonable prior written notice by the Administrative Agent or the Required Lenders, contested by the Administrative Borrower in good faith and the relief requested is granted in an order that is not stayed pending appeal;

(xxviii) the cessation of Liens or superpriority claims granted with respect to this Agreement to be valid, perfected and enforceable in all respects; or the Bankruptcy Court shall cease to have exclusive jurisdiction with respect to all matters relating to the exercise of rights and remedies under the Loan Documents, the DIP Orders, the Liens granted under the Collateral Documents and the Collateral; or

(xxix) (A) termination of the Company RSA by any Loan Party (other than as a result of a breach of the Company RSA by any Consenting Lender) pursuant to Section 13.2 thereof, (B) termination of the Company RSA by the Required Consenting Lenders pursuant to Section 13.1 thereof, or (C) the Company RSA is modified, amended or waived in any manner materially adverse to the Secured Parties without the written consent of the Required Lenders.

Section 9.02    Remedies Upon Event of Default.

(a) If any Event of Default occurs and is continuing, the Administrative Agent, in its discretion or at the direction of the Required Lenders, shall deliver a written notice to the Administrative Borrower (a "Termination Declaration"), that, pursuant to the DIP Orders and subject to the terms thereof, the automatic stay provision of Section 362 of the Bankruptcy Code shall be deemed vacated and modified to the extent necessary to permit the Agents and the Lenders to take any one or more of the following actions: (i) declare the commitment of each Lender to make Loans to be terminated, whereupon such commitments and obligation shall be terminated; (ii) declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrowers; (iii) declare that the application of the Carve-Out has occurred; (iv) terminate this Agreement and the other Loan Documents as

to any future liability or obligation of the Loan Parties, but without affecting any of the Agents' Liens in the Collateral and without affecting the Obligations; and (v) immediately terminate, reduce or restrict the Loan Parties' use of any cash collateral.

(b)     Following the delivery of a Termination Declaration and upon further order of the Bankruptcy Court on no less than five (5) days' notice (and the Loan Parties and the Committee (if any) and any other party-in-interest shall not object to such shortened notice) in accordance with the terms of the DIP Orders, any Agent may, at the direction of the Required Lenders (i) exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents or applicable Law; (ii) freeze monies or balances in the Loan Parties' Deposit Accounts and Securities Accounts and sweep all funds contained in the Controlled Accounts for application in accordance with Section 4.03(b); (iii) immediately set-off any and all amounts in accounts maintained by the Loan Parties with the Agents or the Lenders against the Obligations, or otherwise enforce any and all rights against the Collateral in the possession of any Agent or any Lender, including, without limitation, disposition of the Collateral solely for application towards the Obligations; (iv) obtain an order from the Bankruptcy Court approving bid procedures for a sale of substantially all of the Loan Parties' assets pursuant to section 363 of the Bankruptcy Code; (v) in connection with an Event of Default that is continuing in respect of a breach of Section 7.02(v), at the written direction of the Required Lenders, immediately commence the sale of all or substantially all of the Collateral pursuant to section 363 of the Bankruptcy Code and the Loan Parties and their advisors will cooperate therewith, including by delivering an Updated Budget that contemplates the liquidation of all of the Loan Parties' assets in form and substance acceptable to the Required Lenders; and (vi) take any other actions or exercise any other rights or remedies permitted under the DIP Orders, the Loan Documents or applicable Law or equity.

## ARTICLE X

## AGENTS

Section 10.01   Appointment.  Each Lender (and each subsequent maker of any Loan by its making thereof) hereby irrevocably appoints, authorizes and empowers the Administrative Agent and the Collateral Agent to perform the duties of each such Agent as set forth in this Agreement and the other Loan Documents, together with such actions and powers as are reasonably incidental thereto, including: (i) to receive on behalf of each Lender any payment of principal of or interest on the Loans outstanding hereunder and all other amounts accrued hereunder for the account of the Lenders and paid to such Agent, and, subject to Section 2.02, to distribute promptly to each Lender its Pro Rata Share of all payments so received; (ii) to distribute to each Lender copies of all material notices and agreements received by such Agent and not required to be delivered to each Lender pursuant to the terms of this Agreement, provided, that the Agents shall not have any liability to the Lenders for any Agent's inadvertent failure to distribute any such notices or agreements to the Lenders; (iii) to maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Obligations, the Loans, and related matters and to maintain, in accordance with its customary business practices, ledgers and records reflecting the status of the Collateral and related matters; (iv) to execute or file any and all financing or similar statements or notices, amendments, renewals, supplements, documents, instruments, proofs of claim, notices and other written agreements with respect to this Agreement or any other Loan Document; (v) to make the Loans and Collateral Agent Advances, for such Agent or on behalf of the applicable Lenders as provided in this

126

Agreement or any other Loan Document; (vi) to perform, exercise, and enforce any and all other rights and remedies of the Lenders with respect to the Loan Parties, the Obligations, or otherwise related to any of same to the extent reasonably incidental to the exercise by such Agent of the rights and remedies specifically authorized to be exercised by such Agent by the terms of this Agreement or any other Loan Document; (vii) to incur and pay such fees necessary or appropriate for the performance and fulfillment of its functions and powers pursuant to this Agreement or any other Loan Document; (viii) subject to Section 10.03, to take such action as such Agent deems appropriate on its behalf to administer the Loans and the Loan Documents and to exercise such other powers delegated to such Agent by the terms hereof or the other Loan Documents (including, without limitation, the power to give or to refuse to give notices, waivers, consents, approvals and instructions and the power to make or to refuse to make determinations and calculations); and (ix) to act with respect to all Collateral under the Loan Documents, including for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations.  As to any matters not expressly provided for by this Agreement and the other Loan Documents (including, without limitation, enforcement or collection of the Loans), the Agents shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), and such instructions of the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents) shall be binding upon all Lenders and all makers of Loans; provided, however, the Agents shall not be required to take any action which, in the reasonable opinion of any Agent, exposes such Agent to liability or which is contrary to this Agreement or any other Loan Document or applicable law.

Section 10.02    Nature of Duties; Delegation.

(a)    The Agents shall have no duties or responsibilities except those expressly set forth in this Agreement or in the other Loan Documents.  The duties of the Agents shall be mechanical and administrative in nature.  The Agents shall not have by reason of this Agreement or any other Loan Document a fiduciary relationship in respect of any Lender.  Nothing in this Agreement or any other Loan Document, express or implied, is intended to or shall be construed to impose upon the Agents any obligations in respect of this Agreement or any other Loan Document except as expressly set forth herein or therein.  Each Lender shall make its own independent investigation of the financial condition and affairs of the Loan Parties in connection with the making and the continuance of the Loans hereunder and shall make its own appraisal of the creditworthiness of the Loan Parties and the value of the Collateral without reliance upon any Agent or any other Lender or any of their Related Parties, and neither the Agents nor any of their Related Parties shall have any duty or responsibility, either initially or on a continuing basis, to provide any Lender with any credit or other information with respect thereto, whether coming into their possession before the initial Loan hereunder or at any time or times thereafter, provided, that upon the reasonable request of a Lender, each Agent shall provide to such Lender any documents or reports delivered to such Agent by the Loan Parties pursuant to the terms of this Agreement or any other Loan Document.  If any Agent seeks the consent or approval of the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents) to the taking or refraining from taking any action hereunder, such Agent shall send notice thereof to each Lender.  Each Agent shall promptly notify each Lender any time that the Required Lenders (or such other number or

127

percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents) have instructed such Agent to act or refrain from acting pursuant hereto.

(b)     Each Agent may, upon any term or condition it specifies, delegate or exercise any of its rights, powers and remedies under, and delegate or perform any of its duties or any other action with respect to, any Loan Document by or through any of its Related Parties or any other trustee, co-agent or other Person (including any Lender).  Any such Related Party, trustee, co-agent or other Person shall benefit from this Article X to the extent provided by the applicable Agent.

Section 10.03    Rights, Exculpation, Etc.  The Agents and their Related Parties shall not be liable for any action taken or omitted to be taken by them under or in connection with this Agreement or the other Loan Documents, except for their own gross negligence or willful misconduct as determined by a final non-appealable judgment of a court of competent jurisdiction.  Without limiting the generality of the foregoing, the Agents (i) may treat the payee of any Loan as the owner thereof until the Collateral Agent receives written notice of the assignment or transfer thereof, pursuant to Section 12.07 hereof, signed by such payee and in form satisfactory to the Collateral Agent; (ii) may consult with legal counsel (including, without limitation, counsel to any Agent or counsel to the Loan Parties), independent public accountants, and other experts selected by any of them and shall not be liable for any action taken or omitted to be taken in good faith by any of them in accordance with the advice of such counsel or experts; (iii) make no warranty or representation to any Lender and shall not be responsible to any Lender for any statements, certificates, warranties or representations made in or in connection with this Agreement or the other Loan Documents; (iv) shall not have any duty to ascertain or to inquire as to the performance or observance of any of the terms, covenants or conditions of this Agreement or the other Loan Documents on the part of any Person, the existence or possible existence of any Default or Event of Default, or to inspect the Collateral or other property (including, without limitation, the books and records) of any Person; (v) shall not be responsible to any Lender for the due execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement or the other Loan Documents or any other instrument or document furnished pursuant hereto or thereto; and (vi) shall not be deemed to have made any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the Collateral Agent's Lien thereon, or any certificate prepared by any Loan Party in connection therewith, nor shall the Agents be responsible or liable to the Lenders for any failure to monitor or maintain any portion of the Collateral.  The Agents shall not be liable for any apportionment or distribution of payments made in good faith pursuant to Section 4.03, and if any such apportionment or distribution is subsequently determined to have been made in error, and the sole recourse of any Lender to whom payment was due but not made shall be to recover from other Lenders any payment in excess of the amount which they are determined to be entitled.  The Agents may at any time request instructions from the Lenders with respect to any actions or approvals which by the terms of this Agreement or of any of the other Loan Documents the Agents are permitted or required to take or to grant, and if such instructions are promptly requested, the Agents shall be absolutely entitled to refrain from taking any action or to withhold any approval under any of the Loan Documents until they shall have received such instructions from the Required Lenders.  Without limiting the foregoing, no Lender shall have any right of action whatsoever against any Agent as a result of such Agent acting or refraining from acting under this Agreement or any of the other Loan Documents in accordance with the instructions of the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents).

128

Section 10.04    Reliance.  Each Agent shall be entitled to rely upon any written notices, statements, certificates, orders or other documents or any telephone message believed by it in good faith to be genuine and correct and to have been signed, sent or made by the proper Person, and with respect to all matters pertaining to this Agreement or any of the other Loan Documents and its duties hereunder or thereunder, upon advice of counsel selected by it.

Section 10.05    Indemnification.  To the extent that any Agent or any Related Party is not reimbursed and indemnified by any Loan Party, and whether or not such Agent has made demand on any Loan Party for the same, the Lenders will, within five (5) days of written demand by such Agent, reimburse such Agent and such Related Parties for and indemnify such Agent and such Related Parties from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including, without limitation, client charges and expenses of counsel or any other advisor to such Agent and such Related Parties), advances or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against such Agent and the Related Parties in any way relating to or arising out of this Agreement or any of the other Loan Documents or any action taken or omitted by such Agent and such Related Parties under this Agreement or any of the other Loan Documents, in proportion to each Lender's Pro Rata Share, including, without limitation, advances and disbursements made pursuant to Section 10.08; provided, however, that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, advances or disbursements for which there has been a final non-appealable judicial determination that such liability resulted from such Agent's or such Related Party's gross negligence or willful misconduct.  The obligations of the Lenders under this Section 10.05 shall survive the payment in full of the Loans and the termination of this Agreement.

Section 10.06    Agents Individually.  With respect to its Pro Rata Share of the Total DIP Delayed Draw Term Commitment hereunder and the Loans made by it (to the extent applicable), each Agent shall have and may exercise the same rights and powers hereunder and is subject to the same obligations and liabilities as and to the extent set forth herein for any other Lender or maker of a Loan.  The terms "Lenders" or "Required Lenders" or any similar terms shall, unless the context clearly otherwise indicates, include each Agent in its individual capacity as a Lender or one of the Required Lenders.  Each Agent and its Affiliates may accept deposits from, lend money to, and generally engage in any kind of banking, trust or other business with any Borrower as if it were not acting as an Agent pursuant hereto without any duty to account to the other Lenders.

Section 10.07    Successor Agent.

(a)    Any Agent may at any time give at least 30 days prior written notice of its resignation to the Lenders and the Administrative Borrower.  Upon receipt of any such notice of resignation, the Required Lenders shall have the right, in consultation with the Administrative Borrower, to appoint a successor Agent.  If no such successor Agent shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation (or such earlier day as shall be agreed by the Required Lenders) (the "Resignation Effective Date"), then the retiring Agent may (but shall not be obligated to), on behalf of the Lenders, appoint a successor Agent.  Whether or not a successor Agent has been appointed, such resignation shall become effective in accordance with such notice on the Resignation Effective Date.

129

(b)     With effect from the Resignation Effective Date, (i) the retiring Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any Collateral held by such Agent on behalf of the Lenders under any of the Loan Documents, the retiring Agent shall continue to hold such collateral security until such time as a successor Agent is appointed) and (ii) all payments, communications and determinations provided to be made by, to or through such retiring Agent shall instead be made by or to each Lender directly, until such time, if any, as a successor Agent shall have been appointed as provided for above.  Upon the acceptance of a successor Agent's appointment as Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents.  After the retiring Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article, Section 12.04 and Section 12.15 shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by it while the retiring Agent was acting as Agent.

Section 10.08    Collateral Matters.

(a)     The Collateral Agent may from time to time make such disbursements and advances ("Collateral Agent Advances") which the Collateral Agent, in its sole discretion, deems necessary or desirable to preserve, protect, prepare for sale or lease or dispose of the Collateral or any portion thereof, to enhance the likelihood or maximize the amount of repayment by the Borrowers of the Loans and other Obligations or to pay any other amount chargeable to the Borrowers pursuant to the terms of this Agreement, including, without limitation, costs, fees and expenses as described in Section 12.04.  The Collateral Agent Advances shall be repayable on demand and be secured by the Collateral and shall bear interest at a rate per annum equal to the rate then applicable to Loans that are Reference Rate Loans.  The Collateral Agent Advances shall constitute Obligations hereunder which may be charged to the Loan Account in accordance with Section 4.01.  The Collateral Agent shall notify each Lender and the Administrative Borrower in writing of each such Collateral Agent Advance, which notice shall include a description of the purpose of such Collateral Agent Advance.  Without limiting its obligations pursuant to Section 10.05, each Lender agrees that it shall make available to the Collateral Agent, upon the Collateral Agent's demand, in Dollars in immediately available funds, the amount equal to such Lender's Pro Rata Share of each such Collateral Agent Advance.  If such funds are not made available to the Collateral Agent by such Lender, the Collateral Agent shall be entitled to recover such funds on demand from such Lender, together with interest thereon for each day from the date such payment was due until the date such amount is paid to the Collateral Agent, at the Federal Funds Rate for 3 Business Days and thereafter at the Reference Rate.

(b)     The Lenders hereby irrevocably authorize the Collateral Agent, at its option and in its discretion, to release any Lien granted to or held by the Collateral Agent upon any Collateral upon termination of the Total DIP Delayed Draw Term Commitment and payment and satisfaction of all Loans and all other Obligations (other than Contingent Indemnity Obligations) in accordance with the terms hereof; or constituting property being sold or disposed of in the ordinary course of any Loan Party's business or otherwise in compliance with the terms of this Agreement and the other Loan Documents; or constituting property in which the Loan Parties owned no interest at the time the Lien was granted or at any time thereafter; or if approved, authorized or ratified in writing by the Lenders in accordance with Section

130

12.02.  Upon request by the Collateral Agent at any time, the Lenders will confirm in writing the Collateral Agent's authority to release particular types or items of Collateral pursuant to this Section 10.08(b).

(c)    Without in any manner limiting the Collateral Agent's authority to act without any specific or further authorization or consent by the Lenders (as set forth in Section 10.08(b)), each Lender agrees to confirm in writing, upon request by the Collateral Agent, the authority to release Collateral conferred upon the Collateral Agent under Section 10.08(b).  Upon receipt by the Collateral Agent of confirmation from the Lenders of its authority to release any particular item or types of Collateral, and upon prior written request by any Loan Party, the Collateral Agent shall (and is hereby irrevocably authorized by the Lenders to) execute such documents as may be necessary to evidence the release of the Liens granted to the Collateral Agent for the benefit of the Agents and the Lenders upon such Collateral; provided, however, that (i) the Collateral Agent shall not be required to execute any such document on terms which, in the Collateral Agent's opinion, would expose the Collateral Agent to liability or create any obligations or entail any consequence other than the release of such Liens without recourse or warranty, and (ii) such release shall not in any manner discharge, affect or impair the Obligations or any Lien upon (or obligations of any Loan Party in respect of) all interests in the Collateral retained by any Loan Party.

(d)    Anything contained in any of the Loan Documents to the contrary notwithstanding, the Loan Parties, each Agent and each Lender hereby agree that (i) no Lender shall have any right individually to realize upon any of the Collateral under any Loan Document or to enforce any Guaranty, it being understood and agreed that all powers, rights and remedies under the Loan Documents may be exercised solely by the Collateral Agent for the benefit of the Lenders in accordance with the terms thereof, (ii) in the event of a foreclosure by the Collateral Agent on any of the Collateral pursuant to a public or private sale, the Administrative Agent, the Collateral Agent or any Lender may be the purchaser of any or all of such Collateral at any such sale and (iii) the Collateral Agent, as agent for and representative of the Agents and the Lenders (but not any other Agent or any Lender or Lenders in its or their respective individual capacities unless the Required Lenders shall otherwise agree in writing) shall, with the prior written consent or at the written direction of the Required Lenders, be entitled (either directly or through one or more acquisition vehicles) for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral to be sold (A) at any public or private sale, (B) at any sale conducted by the Collateral Agent under the provisions of the Uniform Commercial Code (including pursuant to Sections 9-610 or 9-620 of the Uniform Commercial Code) or the PPSA, as applicable, (C) at any sale or foreclosure conducted by the Collateral Agent (whether by judicial action or otherwise) in accordance with applicable law or (D) any sale conducted pursuant to the provisions of any Debtor Relief Law (including Section 363 of the Bankruptcy Code), to use and apply all or any of the Obligations as a credit on account of the purchase price for any Collateral payable by the Collateral Agent at such sale.

(e)    The Collateral Agent shall have no obligation whatsoever to any Lender to assure that the Collateral exists or is owned by the Loan Parties or is cared for, protected or insured or has been encumbered or that the Lien granted to the Collateral Agent pursuant to this Agreement or any other Loan Document has been properly or sufficiently or lawfully created, perfected, protected or enforced or is entitled to any particular priority, or to exercise at all or in any particular manner or under any duty of care, disclosure or fidelity, or to continue exercising, any of the rights, authorities and powers granted or available to the Collateral Agent in this Section 10.08 or in any other Loan Document, it being understood and agreed that in respect of the Collateral, or any act, omission or event related thereto, the Collateral Agent may act

131

in any manner it may deem appropriate, in its sole discretion, given the Collateral Agent's own interest in the Collateral as one of the Lenders and that the Collateral Agent shall have no duty or liability whatsoever to any other Lender, except as otherwise provided herein.

Section 10.09    Agency for Perfection.  Each Agent and each Lender hereby appoints each other Agent and each other Lender as agent and bailee for the purpose of perfecting the security interests in and liens upon the Collateral in assets which, in accordance with Article 9 of the Uniform Commercial Code or the PPSA, as applicable, can be perfected only by possession or control (or where the security interest of a secured party with possession or control has priority over the security interest of another secured party) and each Agent and each Lender hereby acknowledges that it holds possession of or otherwise controls any such Collateral for the benefit of the Agents and the Lenders as secured party. Should the Administrative Agent or any Lender obtain possession or control of any such Collateral, the Administrative Agent or such Lender shall notify the Collateral Agent thereof, and, promptly upon the Collateral Agent's request therefor shall deliver such Collateral to the Collateral Agent or in accordance with the Collateral Agent's instructions.  In addition, the Collateral Agent shall also have the power and authority hereunder to appoint such other sub-agents as may be necessary or required under applicable state law or otherwise to perform its duties and enforce its rights with respect to the Collateral and under the Loan Documents.  Each Loan Party by its execution and delivery of this Agreement hereby consents to the foregoing.

Section 10.10    No Reliance on any Agent's Customer Identification Program.  Each Lender acknowledges and agrees that neither such Lender, nor any of its Affiliates, participants or assignees, may rely on any Agent to carry out such Lender's, Affiliate's, participant's or assignee's customer identification program, or other requirements imposed by the USA PATRIOT Act or the regulations issued thereunder, including the regulations set forth in 31 C.F.R. §§ 1010.100(yy), (iii), 1020.100, and 1020.220 (formerly 31 C.F.R. § 103.121), as hereafter amended or replaced ("CIP Regulations"), or any other Anti-Money Laundering Laws, including any programs involving any of the following items relating to or in connection with any of the Loan Parties, their Affiliates or their agents, the Loan Documents or the transactions hereunder or contemplated hereby:  (1) any identity verification procedures, (2) any recordkeeping, (3) comparisons with government lists, (4) customer notices or (5) other procedures required under the CIP Regulations or other regulations issued under the USA PATRIOT Act. Each Lender, Affiliate of a Lender, participant or assignee subject to Section 326 of the USA PATRIOT Act will perform the measures necessary to satisfy its own responsibilities under the CIP Regulations.

Section 10.11    No Third Party Beneficiaries.  The provisions of this Article are solely for the benefit of the Secured Parties, and no Loan Party shall have rights as a third-party beneficiary of any of such provisions.

Section 10.12    No Fiduciary Relationship.  It is understood and agreed that the use of the term "agent" herein or in any other Loan Document (or any other similar term) with reference to any Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law.  Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

132

Section 10.13   <u>Reports; Confidentiality; Disclaimers</u>.   By becoming a party to this Agreement, each Lender:

(a)      is deemed to have requested that each Agent furnish such Lender, promptly after it becomes available, a copy of each field audit or examination report with respect to the Administrative Borrower or any of its Subsidiaries (each, a "<u>Report</u>") prepared by or at the request of such Agent, and each Agent shall so furnish each Lender with each such Report,

(b)      expressly agrees and acknowledges that the Agents (i) do not make any representation or warranty as to the accuracy of any Reports, and (ii) shall not be liable for any information contained in any Reports,

(c)      expressly agrees and acknowledges that the Reports are not comprehensive audits or examinations, that any Agent or other party performing any audit or examination will inspect only specific information regarding the Administrative Borrower and its Subsidiaries and will rely significantly upon the Administrative Borrower's and its Subsidiaries' books and records, as well as on representations of their personnel,

(d)      agrees to keep all Reports and other material, non-public information regarding the Administrative Borrower and its Subsidiaries and their operations, assets, and existing and contemplated business plans in a confidential manner in accordance with <u>Section 12.19</u>, and

(e)      without limiting the generality of any other indemnification provision contained in this Agreement, agrees:  (i) to hold any Agent and any other Lender preparing a Report harmless from any action the indemnifying Lender may take or fail to take or any conclusion the indemnifying Lender may reach or draw from any Report in connection with any loans or other credit accommodations that the indemnifying Lender has made or may make to the Borrowers, or the indemnifying Lender's participation in, or the indemnifying Lender's purchase of, a loan or loans of the Borrowers, and (ii) to pay and protect, and indemnify, defend and hold any Agent and any other Lender preparing a Report harmless from and against, the claims, actions, proceedings, damages, costs, expenses, and other amounts (including, attorneys' fees and costs) incurred by any such Agent and any such other Lender preparing a Report as the direct or indirect result of any third parties who might obtain all or part of any Report through the indemnifying Lender.

Section 10.14   <u>Collateral Custodian</u>.  Upon the occurrence and during the continuance of any Default or Event of Default, the Collateral Agent or its designee may at any time and from time to time employ and maintain on the premises of any Loan Party a custodian selected by the Collateral Agent or its designee who shall have full authority to do all acts necessary to protect the Agents' and the Lenders' interests.  Each Loan Party hereby agrees to, and to cause its Subsidiaries to, cooperate with any such custodian and to do whatever the Collateral Agent or its designee may reasonably request to preserve the Collateral.  All costs and expenses incurred by the Collateral Agent or its designee by reason of the employment of the custodian shall be the responsibility of the Borrowers and charged to the Loan Account.

Section 10.15   <u>[Reserved]</u>.

Section 10.16    <u>Collateral Agent May File Proofs of Claim</u>.  In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, the Collateral Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether any Agent shall have made any demand on the Borrowers) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

(a)      to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Secured Parties (including any claim for the compensation, expenses, disbursements and advances of the Secured Parties and their respective agents and counsel and all other amounts due the Secured Parties hereunder and under the other Loan Documents) allowed in such judicial proceeding; and

(b)      to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Secured Party to make such payments to the Collateral Agent and, in the event that the Collateral Agent shall consent to the making of such payments directly to the Secured Parties, to pay to the Collateral Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Collateral Agent and its agents and counsel, and any other amounts due the Collateral Agent hereunder and under the other Loan Documents.

## ARTICLE XI

## GUARANTY

Section 11.01    <u>Guaranty</u>.    Each Guarantor hereby jointly and severally and unconditionally and irrevocably guarantees the punctual payment when due, whether at stated maturity, by acceleration or otherwise, of all Obligations of the Borrowers now or hereafter existing under any Loan Document, whether for principal, interest (including, without limitation, all interest that accrues after the commencement of any Insolvency Proceeding of any Borrower, whether or not a claim for post-filing interest is allowed in such Insolvency Proceeding), fees, commissions, expense reimbursements, indemnifications or otherwise (such obligations, to the extent not paid by the Borrowers, being the "<u>Guaranteed Obligations</u>"), and agrees to pay any and all expenses (including reasonable counsel fees and expenses) incurred by the Secured Parties in enforcing any rights under the guaranty set forth in this <u>Article XI</u>.  Without limiting the generality of the foregoing, each Guarantor's liability shall extend to all amounts that constitute part of the Guaranteed Obligations and would be owed by the Borrowers to the Secured Parties under any Loan Document but for the fact that they are unenforceable or not allowable due to the existence of an Insolvency Proceeding involving any Borrower.  In no event shall the obligation of any Guarantor hereunder exceed the maximum amount such Guarantor could guarantee under any Debtor Relief Law.

Section 11.02    <u>Guaranty Absolute</u>.  Each Guarantor jointly and severally guarantees that the Guaranteed Obligations will be paid strictly in accordance with the terms of the Loan Documents,

134

regardless of any law, regulation or order now or hereafter in effect in any jurisdiction affecting any of such terms or the rights of the Secured Parties with respect thereto.  Each Guarantor agrees that this Article XI constitutes a guaranty of payment when due and not of collection and waives any right to require that any resort be made by any Agent or any Lender to any Collateral.  The obligations of each Guarantor under this Article XI are independent of the Guaranteed Obligations, and a separate action or actions may be brought and prosecuted against each Guarantor to enforce such obligations, irrespective of whether any action is brought against any Loan Party or whether any Loan Party is joined in any such action or actions.  The liability of each Guarantor under this Article XI shall be irrevocable, absolute and unconditional irrespective of, and, to the extent permitted by applicable law, each Guarantor hereby irrevocably waives any defenses it may now or hereafter have in any way relating to, any or all of the following:

(a)    any lack of validity or enforceability of any Loan Document or any agreement or instrument relating thereto;

(b)    any change in the time, manner or place of payment of, or in any other term of, all or any of the Guaranteed Obligations, or any other amendment or waiver of or any consent to departure from any Loan Document, including, without limitation, any increase in the Guaranteed Obligations resulting from the extension of additional credit to any Loan Party or otherwise;

(c)    any taking, exchange, release or non-perfection of any Collateral, or any taking, release or amendment or waiver of or consent to departure from any other guaranty, for all or any of the Guaranteed Obligations;

(d)    the existence of any claim, set-off, defense or other right that any Guarantor may have at any time against any Person, including, without limitation, any Secured Party;

(e)    any change, restructuring or termination of the corporate, limited liability company or partnership structure or existence of any Loan Party; or

(f)    any other circumstance (including, without limitation, any statute of limitations) or any existence of or reliance on any representation by the Secured Parties that might otherwise constitute a defense available to, or a discharge of, any Loan Party or any other guarantor or surety.

This Article XI shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the Guaranteed Obligations is rescinded or must otherwise be returned by Secured Parties or any other Person upon the insolvency, bankruptcy or reorganization of any Borrower or otherwise, all as though such payment had not been made.

Section 11.03    Waiver.  To the extent permitted by applicable law, each Guarantor hereby waives (i) promptness and diligence, (ii) notice of acceptance and any other notice with respect to any of the Guaranteed Obligations and this Article XI and any requirement that the Secured Parties exhaust any right or take any action against any Loan Party or any other Person or any Collateral, (iii) any right to compel or direct any Secured Party to seek payment or recovery of any amounts owed under this Article XI from any one particular fund or source or to exhaust any right or take any action against any other Loan Party, any other Person or any Collateral, (iv) any requirement that any Secured Party protect, secure, perfect or insure any security interest or Lien on any property subject thereto or exhaust any right to take

135

any action against any Loan Party, any other Person or any Collateral, and (v) any other defense available to any Guarantor.  Each Guarantor agrees that the Secured Parties shall have no obligation to marshal any assets in favor of any Guarantor or against, or in payment of, any or all of the Obligations.  Each Guarantor acknowledges that it will receive direct and indirect benefits from the financing arrangements contemplated herein and that the waiver set forth in this Section 11.03 is knowingly made in contemplation of such benefits.  Each Guarantor hereby waives any right to revoke this Article XI, and acknowledges that this Article XI is continuing in nature and applies to all Guaranteed Obligations, whether existing now or in the future.

Section 11.04    Continuing Guaranty; Assignments.    This Article XI is a continuing guaranty and shall (a) remain in full force and effect until the later of the cash payment in full of the Guaranteed Obligations (other than Contingent Indemnity Obligations) and all other amounts payable under this Article XI and the Final Maturity Date, (b) be binding upon each Guarantor, its successors and assigns and (c) inure to the benefit of and be enforceable by the Secured Parties and their successors, pledgees, transferees and assigns.  Without limiting the generality of the foregoing clause (c), any Lender may pledge, assign or otherwise transfer all or any portion of its rights and obligations under this Agreement (including, without limitation, all or any portion of its Commitments, its Loans owing to it) to any other Person, and such other Person shall thereupon become vested with all the benefits in respect thereof granted such Lender herein or otherwise, in each case as provided in Section 12.07.

Section 11.05    Subrogation.    No Guarantor will exercise any rights that it may now or hereafter acquire against any Loan Party or any other guarantor that arise from the existence, payment, performance or enforcement of such Guarantor's obligations under this Article XI, including, without limitation, any right of subrogation, reimbursement, exoneration, contribution or indemnification and any right to participate in any claim or remedy of the Secured Parties against any Loan Party or any other guarantor or any Collateral, whether or not such claim, remedy or right arises in equity or under contract, statute or common law, including, without limitation, the right to take or receive from any Loan Party or any other guarantor, directly or indirectly, in cash or other property or by set-off or in any other manner, payment or security solely on account of such claim, remedy or right, unless and until all of the Guaranteed Obligations (other than Contingent Indemnity Obligations) and all other amounts payable under this Article XI shall have been paid in full in cash and the Termination Date shall have occurred; provided, however, that such claims, remedies and rights of any Guarantor shall remain waived and released at any time the Collateral Agent or any of the other Secured Parties (with or through their designees) have acquired all or any portion of the Collateral by credit bid, strict foreclosure or through any other exercise of remedies available to the Collateral Agent or the other Secured Parties pursuant to this Agreement or the other Loan Documents.  If any amount shall be paid to any Guarantor in violation of the immediately preceding sentence at any time prior to the later of the payment in full in cash of the Guaranteed Obligations (other than Contingent Indemnity Obligations) and all other amounts payable under this Article XI and the Final Maturity Date, such amount shall be held in trust for the benefit of the Secured Parties and shall forthwith be paid to the Secured Parties to be credited and applied to the Guaranteed Obligations and all other amounts payable under this Article XI, whether matured or unmatured, in accordance with the terms of this Agreement, or to be held as Collateral for any Guaranteed Obligations or other amounts payable under this Article XI thereafter arising.  If (i) any Guarantor shall make payment to the Secured Parties of all or any part of the Guaranteed Obligations, (ii) all of the Guaranteed Obligations and all other amounts payable under this Article XI shall be paid in full in cash and (iii) the Final Maturity Date shall have occurred, the

136

Secured Parties will, at such Guarantor's request and expense, execute and deliver to such Guarantor appropriate documents, without recourse and without representation or warranty, necessary to evidence the transfer by subrogation to such Guarantor of an interest in the Guaranteed Obligations resulting from such payment by such Guarantor.

Section 11.06   Contribution.  All Guarantors desire to allocate among themselves, in a fair and equitable manner, their obligations arising under this Guaranty.  Accordingly, in the event any payment or distribution is made on any date by a Guarantor under this Guaranty such that its Aggregate Payments exceeds its Fair Share as of such date, such Guarantor shall be entitled to a contribution from each of the other Guarantors in an amount sufficient to cause each Guarantor's Aggregate Payments to equal its Fair Share as of such date.  "Fair Share" means, with respect to any Guarantor as of any date of determination, an amount equal to (a) the ratio of (i) the Fair Share Contribution Amount with respect to such Guarantor, to (ii) the aggregate of the Fair Share Contribution Amounts with respect to all Guarantors multiplied by, (b) the aggregate amount paid or distributed on or before such date by all Guarantors under this Guaranty in respect of the obligations Guaranteed.  "Fair Share Contribution Amount" means, with respect to any Guarantor as of any date of determination, the maximum aggregate amount of the obligations of such Guarantor under this Guaranty that would not render its obligations hereunder subject to avoidance as a fraudulent transfer or conveyance under Section 548 of Title 11 of the United States Code or any comparable applicable provisions of state law; provided, solely for purposes of calculating the "Fair Share Contribution Amount" with respect to any Guarantor for purposes of this Section 11.06, any assets or liabilities of such Guarantor arising by virtue of any rights to subrogation, reimbursement or indemnification or any rights to or obligations of contribution hereunder shall not be considered as assets or liabilities of such Guarantor.  "Aggregate Payments" means, with respect to any Guarantor as of any date of determination, an amount equal to (A) the aggregate amount of all payments and distributions made on or before such date by such Guarantor in respect of this Guaranty (including, without limitation, in respect of this Section 11.06), minus (B) the aggregate amount of all payments received on or before such date by such Guarantor from the other Guarantors as contributions under this Section 11.06.  The amounts payable as contributions hereunder shall be determined as of the date on which the related payment or distribution is made by the applicable Guarantor.  The allocation among Guarantors of their obligations as set forth in this Section 11.06 shall not be construed in any way to limit the liability of any Guarantor hereunder.  Each Guarantor is a third party beneficiary to the contribution agreement set forth in this Section 11.06.

## ARTICLE XII

## MISCELLANEOUS

Section 12.01   Notices, Etc.

(a)      Notices Generally.  All notices and other communications provided for hereunder shall be in writing and shall be delivered by hand, sent by registered or certified mail (postage prepaid, return receipt requested), overnight courier, or email.  In the case of notices or other communications to any Loan Party, Administrative Agent or the Collateral Agent, as the case may be, they shall be sent to the

137

respective address set forth below (or, as to each party, at such other address as shall be designated by such party in a written notice to the other parties complying as to delivery with the terms of this Section 12.01):

If to any Loan Party, to it at the following address:

Red Lobster Management LLC
450 S. Orange Ave, 8th Floor
Orlando, FL 32801
Attention:  Lawrence Hirsch, Jonathan Tibus
Email:  lhirsh9999@gmail.com, JTibus@alvarezandmarsal.com

in each case, with a copy (which shall not constitute notice) to:

King & Spalding LLP
1185 Avenue of the Americas
34th Floor

New York, NY 10036
Attention:  Michael R. Handler
Telephone:  212-556-2286
Email:  k&sredlobsterteam@kslaw.com


If to any Agent, to it at the following address:

Fortress Credit Corp.
c/o Fortress Investment Group
1345 Avenue of the Americas, 45th Fl
New York, New York 10105
Attn: Constantine Dakolias
Dean@fortress.com

Fortress Credit Corp.
c/o Fortress Investment Group
3290 Northside Parkway NW
Suite 350
Atlanta, GA 30327 USA
Attn: Morgan McClure
mmcclure@fortress.com

For legal notices only:

Fortress Credit Corp.
c/o Fortress Investment Group
1345 Avenue of the Americas, 46th Fl
New York, New York 10105
Attn: General Counsel, Credit
Gc.credit@fortress.com

in each case, with a copy (which shall not constitute notice) to:

Proskauer Rose LLP
Eleven Times Square
New York, NY 10036
Attention:  Michael M. Mezzacappa
Telephone:  212-969-3037
Email:  mmezzacappa@proskauer.com

All notices or other communications sent in accordance with this Section 12.01, shall be deemed received on the earlier of the date of actual receipt or 3 Business Days after the deposit thereof in the mail; provided, that (i) notices sent by overnight courier service shall be deemed to have been given when received and (ii) notices by email shall be deemed to have been given as provided in Section 12.01(b), provided, further that notices to any Agent pursuant to Article II shall not be effective until received by such Agent.

(b)      Electronic Communications.

(i)      Each Agent and the Administrative Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided, that approval of such procedures may be limited to particular notices or communications.  Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Agents, provided, that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender has notified the Agents that it is incapable of receiving notices under such Article by electronic communication.

(ii)      Unless the Administrative Agent otherwise prescribes, (A) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), and (B) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient, at its e-mail address as described in the foregoing clause (A), of notification that such notice or communication is available and identifying the website address therefor; provided, that for both clauses (A) and (B) above, if such notice, email or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient.

139

Section 12.02    <u>Amendments, Etc.</u>

(a)    No amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by any Loan Party therefrom, shall in any event be effective unless the same shall be in writing and signed (x) in the case of an amendment, consent or waiver to cure any ambiguity, omission, defect or inconsistency or granting a new Lien for the benefit of the Agents and the Lenders or extending an existing Lien over additional property, by the Agents and the Borrowers (or by the Administrative Borrower on behalf of the Borrowers), (y) in the case of any other waiver or consent, by the Required Lenders (or by the Collateral Agent with the consent of the Required Lenders) and (z) in the case of any other amendment, by the Required Lenders (or by the Collateral Agent with the consent of the Required Lenders) and the Borrowers (or by the Administrative Borrower on behalf of the Borrowers), and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; <u>provided</u>, <u>however</u>, that no amendment, waiver or consent shall:

(i)    increase the Commitment of any Lender, reduce the principal of, or interest on, the Loans payable to any Lender, reduce the amount of any fee payable for the account of any Lender, or postpone or extend any scheduled date fixed for any payment of principal of, or interest or fees on, the Loans payable to any Lender, in each case, without the written consent of such Lender;

(ii)    increase the Total DIP Delayed Draw Term Commitment without the written consent of each Lender;

(iii)    change the percentage of the Commitments or of the aggregate unpaid principal amount of the Loans that is required for the Lenders or any of them to take any action hereunder without the written consent of each Lender;

(iv)    amend the definition of "Required Lenders" or "Pro Rata Share" without the written consent of each Lender;

(v)    release all or a material portion of the Collateral (except as otherwise provided in this Agreement and the other Loan Documents), subordinate any of the Obligations or any Lien granted in favor of the Collateral Agent for the benefit of the Agents and the Lenders, or release any Borrower or any Guarantor (except in connection with a Disposition of the Equity Interests thereof permitted by <u>Section 7.02(c)(ii)</u>), in each case, without the written consent of each Lender; or

(vi)    amend, modify or waive <u>Section 2.05(d)</u>, <u>Section 4.02</u>, <u>Section 4.03</u> or this <u>Section 12.02</u> of this Agreement without the written consent of each Lender.

(b)    Notwithstanding anything to the contrary in <u>Section 12.02</u>:

(i)    no amendment, waiver or consent shall, unless in writing and signed by an Agent, affect the rights or duties of such Agent (but not in its capacity as a Lender) under this Agreement or the other Loan Documents;

(ii)    any amendment, waiver or consent to any provision of this Agreement (including <u>Sections 4.01</u> and <u>4.02</u>) that permits any Loan Party, any Permitted Holder (or other direct or

indirect equity holder of the Administrative Borrower) or any of their respective Affiliates to purchase Loans on a non-pro rata basis, become an eligible assignee pursuant to <u>Section 12.07</u> and/or make offers to make optional prepayments on a non-pro rata basis shall require the prior written consent of the Required Lenders rather than the prior written consent of each Lender directly affected thereby;

        (iii)     any Control Agreement, Guaranty, Mortgage, Security Agreement, Intellectual Property Security Agreement, Assignment of Business Interruption Insurance, collateral access agreement, landlord waiver or other agreement or document purporting to create or perfect a security interest in any of the Collateral (a "<u>Collateral Document</u>") may be amended, waived or otherwise modified with the consent of the applicable Agent and the applicable Loan Party without the need to obtain the consent of any Lender or any other Person if such amendment, modification, supplement or waiver is delivered in order (A) to comply with local Requirements of Law (including foreign law or regulatory requirements) or advice of local counsel, (B) to cure any ambiguity, inconsistency, omission, mistake or defect or (C) to cause such Collateral Document to be consistent with this Agreement and the other Loan Documents, and if the Administrative Agent and the Administrative Borrower shall have jointly identified an ambiguity, inconsistency, omission, mistake or defect, in each case, in any provision of any Loan Document (other than a Collateral Document), then the Administrative Agent and the Administrative Borrower shall be permitted to amend such provision; any amendment, waiver or modification pursuant to this paragraph shall become effective without any further action or consent of any other party to any Loan Document if the same is not objected to in writing by the Required Lenders within five (5) Business Days following receipt of notice thereof;

        (iv)     no consent of any Loan Party shall be required to change any order of priority set forth in <u>Section 2.05(d)</u> and <u>Section 4.03</u>;

        (v)     the Administrative Agent and the Administrative Borrower may enter into an amendment to this Agreement pursuant to <u>Section 2.07(g)</u> to reflect an alternate service or index rate and such other related changes to this Agreement as may be applicable;

        (vi)     no Defaulting Lender, Loan Party, Permitted Holder (or other direct or indirect equity holder of the Administrative Borrower) or any of their respective Affiliates that is a Lender shall have any right to approve or disapprove, in its capacity as a Lender, any amendment, waiver or consent under the Loan Documents and any Loans held by such Person for purposes hereof shall be automatically deemed to be voted pro rata according to the Loans of all other Lenders in the aggregate (other than such Defaulting Lender, Loan Party, Permitted Holder (or other direct or indirect equity holder of the Administrative Borrower) or Affiliate); and

        (vii)     [reserved].

        (c)     If any action to be taken by the Lenders hereunder requires the consent, authorization, or agreement of all of the Lenders or any Lender affected thereby, and a Lender (the "<u>Holdout Lender</u>") fails to give its consent, authorization, or agreement, then the Collateral Agent, upon at least 5 Business Days prior irrevocable notice to the Holdout Lender, may permanently replace the Holdout Lender with one or more substitute lenders (each, a "<u>Replacement Lender</u>"), and the Holdout Lender shall have no right to refuse to be replaced hereunder.  Such notice to replace the Holdout Lender shall specify

<div align="center">141</div>

an effective date for such replacement, which date shall not be later than 15 Business Days after the date such notice is given.  Prior to the effective date of such replacement, the Holdout Lender and each Replacement Lender shall execute and deliver an Assignment and Acceptance, subject only to the Holdout Lender being repaid its share of the outstanding Obligations without any premium or penalty of any kind whatsoever.  If the Holdout Lender shall refuse or fail to execute and deliver any such Assignment and Acceptance prior to the effective date of such replacement, the Holdout Lender shall be deemed to have executed and delivered such Assignment and Acceptance.  The replacement of any Holdout Lender shall be made in accordance with the terms of Section 12.07.  Until such time as the Replacement Lenders shall have acquired all of the Obligations, the Commitments, and the other rights and obligations of the Holdout Lender hereunder and under the other Loan Documents, the Holdout Lender shall remain obligated to make its Pro Rata Share of Loans.

Notwithstanding anything to the contrary herein, any Milestone may be amended, waived, extended or otherwise modified from time to time by the Required Lenders by electronic mail.

Section 12.03    No Waiver; Remedies, Etc.  No failure on the part of any Agent or any Lender to exercise, and no delay in exercising, any right hereunder or under any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right under any Loan Document preclude any other or further exercise thereof or the exercise of any other right.  The rights and remedies of the Agents and the Lenders provided herein and in the other Loan Documents are cumulative and are in addition to, and not exclusive of, any rights or remedies provided by law.  The rights of the Agents and the Lenders under any Loan Document against any party thereto are not conditional or contingent on any attempt by the Agents and the Lenders to exercise any of their rights under any other Loan Document against such party or against any other Person.

Section 12.04    Expenses; Attorneys' Fees.  The Borrowers will pay on demand, all reasonable and documented costs and expenses incurred by or on behalf of each Agent (and, in the case of clauses (b) through (m) below, each Lender), regardless of whether the transactions contemplated hereby are consummated, including, without limitation, reasonable and documented fees, costs, client charges and expenses of counsel for each Agent (and, in the case of clauses (b) through (m) below, each Lender), accounting, due diligence, periodic field audits, physical counts, valuations, investigations, searches and filings, monitoring of assets, appraisals of Collateral, the rating of the Loans, title searches and reviewing environmental assessments, miscellaneous disbursements, examination, travel, lodging and meals, arising from or relating to:  (a) the negotiation, preparation, execution, delivery, performance and administration of this Agreement and the other Loan Documents (including, without limitation, the preparation of any additional Loan Documents pursuant to Section 7.01(b) or the review of any of the agreements, instruments and documents referred to in Section 7.01(f)), (b) any requested amendments, waivers or consents to this Agreement or the other Loan Documents whether or not such documents become effective or are given, (c) the preservation and protection of the Agents' or any of the Lenders' rights under this Agreement or the other Loan Documents, (d) the defense of any claim or action asserted or brought against any Agent or any Lender by any Person that arises from or relates to this Agreement, any other Loan Document, the Agents' or the Lenders' claims against any Loan Party, or any and all matters in connection therewith, (e) the commencement or defense of, or intervention in, any court proceeding arising from or related to this Agreement or any other Loan Document, (f) the filing of any petition, complaint, answer, motion or other pleading by any Agent or any Lender, or the taking of any action in respect of the Collateral or other

142

security, in connection with this Agreement or any other Loan Document, (g) the protection, collection, lease, sale, taking possession of or liquidation of, any Collateral or other security in connection with this Agreement or any other Loan Document, (h) any attempt to enforce any Lien or security interest in any Collateral or other security in connection with this Agreement or any other Loan Document, (i) following the occurrence and during the continuance of an Event of Default, any attempt to collect from any Loan Party, (j) any Environmental Claim, Environmental Liability or Remedial Action arising from or in connection with the past, present or future operations of, or any property currently, formerly or in the future owned, leased or operated by, any Loan Party, any of its Subsidiaries or any predecessor in interest, (k) any Environmental Lien, (l) the rating of the Loans by one or more rating agencies in connection with any Lender's Securitization, or (m) the receipt by any Agent or any Lender of any advice from professionals with respect to any of the foregoing.  Without limitation of the foregoing or any other provision of any Loan Document:  (x) the Borrowers agree to pay all broker fees that may become due in connection with the transactions contemplated by this Agreement and the other Loan Documents and (y) if the Borrowers fail to perform any covenant or agreement contained herein or in any other Loan Document, any Agent may itself perform or cause performance of such covenant or agreement, and the expenses of such Agent incurred in connection therewith shall be reimbursed on demand by the Borrowers; provided, however, that the Borrowers shall not have any obligation pursuant to this <u>Section 12.04</u> for any cost or expense that is caused by the gross negligence or willful misconduct of an Agent or a Lender, as determined by a final non-appealable judgment of a court of competent jurisdiction.  The obligations of the Borrowers under this <u>Section 12.04</u> shall survive the repayment of the Obligations and discharge of any Liens granted under the Loan Documents.

Section 12.05    <u>Right of Set-off</u>.  Upon the occurrence and during the continuance of any Event of Default, any Agent or any Lender may, and is hereby authorized to, at any time and from time to time, without notice to any Loan Party (any such notice being expressly waived by the Loan Parties) and to the fullest extent permitted by law, set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other Indebtedness at any time owing by such Agent or such Lender or any of their respective Affiliates to or for the credit or the account of any Loan Party against any and all obligations of the Loan Parties either now or hereafter existing under any Loan Document, irrespective of whether or not such Agent or such Lender shall have made any demand hereunder or thereunder and although such obligations may be contingent or unmatured; <u>provided</u>, that in the event that any Defaulting Lender shall exercise any such right of set-off, (a) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of <u>Section 4.04</u> and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Agents and the Lenders, and (b) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of set-off.  Each Agent and each Lender agrees to notify such Loan Party in writing promptly after any such set-off and application made by such Agent or such Lender or any of their respective Affiliates; <u>provided</u>, that the failure to give such notice shall not affect the validity of such set-off and application.  The rights of the Agents and the Lenders under this <u>Section 12.05</u> are in addition to the other rights and remedies (including other rights of set-off) which the Agents and the Lenders may have under this Agreement or any other Loan Documents of law or otherwise.

143

Section 12.06    Severability.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining portions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

Section 12.07    Assignments and Participations.

(a)    This Agreement and the other Loan Documents shall be binding upon and inure to the benefit of each Loan Party and each Agent and each Lender and their respective successors and assigns; provided, however, that none of the Loan Parties may assign or transfer any of its rights hereunder or under the other Loan Documents without the prior written consent of each Lender and any such assignment without the Lenders' prior written consent shall be null and void.

(b)    Subject to the conditions set forth in clause (c) below, each Lender may assign to one or more other lenders or other entities all or a portion of its rights and obligations under this Agreement with respect to all or a portion of its Term Loan Commitment and any Loan made by it with the written consent of the Collateral Agent and the Administrative Borrower (such consent not to be unreasonably withheld, conditioned or delayed); provided, that no written consent of the Collateral Agent or the Administrative Borrower shall be required (i) in connection with any assignment by a Lender to a Lender, an Affiliate (including any limited partner) of such Lender or a Related Fund of such Lender or (ii) if such assignment is in connection with any merger, consolidation, sale, transfer, or other disposition of all or any substantial portion of the business or loan portfolio of such Lender; provided, further, that (A) no written consent of the Administrative Borrower shall be required to the extent an Event of Default has occurred and is continuing at the time of such assignment and (B) the Administrative Borrower shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Collateral Agent within 5 Business Days after having received written notice thereof.

(c)    Assignments shall be subject to the following additional conditions:

(i)    Each such assignment shall be in an amount which is at least $5,000,000 or a multiple of $1,000,000 in excess thereof (or the remainder of such Lender's Commitment) (except such minimum amount shall not apply to an assignment by a Lender to (A) a Lender, an Affiliate of such Lender or a Related Fund of such Lender or (B) a group of new Lenders, each of whom is an Affiliate or Related Fund of each other to the extent the aggregate amount to be assigned to all such new Lenders is at least $5,000,000 or a multiple of $1,000,000 in excess thereof);

(ii)    Except as provided in the last sentence of this Section 12.07(c)(ii), the parties to each such assignment shall execute and deliver to the Collateral Agent (and the Administrative Agent, if applicable), for its acceptance, an Assignment and Acceptance, together with any promissory note subject to such assignment and such parties shall deliver to the Collateral Agent, for the benefit of the Collateral Agent, a processing and recordation fee of $5,000 (except the payment of such fee shall not be required in connection with an assignment by a Lender to a Lender, an Affiliate of such Lender or a Related Fund of such Lender).  Notwithstanding anything to the contrary contained in this Section 12.07(c)(ii), a Lender may assign any or all of its rights under the Loan Documents to an Affiliate of such Lender or a Related Fund of such Lender without delivering an Assignment and Acceptance to the Agents or to any

144

other Person; provided, however, that (A) the Borrowers and the Administrative Agent may continue to deal solely and directly with such assigning Lender until an Assignment and Acceptance has been delivered to the Administrative Agent for recordation on the Register, (B) the Collateral Agent may continue to deal solely and directly with such assigning Lender until receipt by the Collateral Agent of a copy of the fully executed Assignment and Acceptance pursuant to Section 12.07(g), (C) the failure of such assigning Lender to deliver an Assignment and Acceptance to the Agents shall not affect the legality, validity, or binding effect of such assignment, and (D) an Assignment and Acceptance between the assigning Lender and an Affiliate of such Lender or a Related Fund of such Lender shall be effective as of the date specified in such Assignment and Acceptance and recordation on the Related Party Register referred to in the last sentence of Section 12.07(f) below; and

(iii)     No such assignment shall be made to (A) any Loan Party, any Permitted Holder (or other direct or indirect equity holder of the Administrative Borrower) or any of their respective Affiliates or (B) any Defaulting Lender or any of its Affiliates, or any Person who, upon becoming a Lender hereunder, would constitute any of the foregoing Persons described in this clause (B), in the case of each of clause (A) and (B), without the prior written consent of the Required Lenders.

(d)     Upon such execution, delivery and acceptance, from and after the effective date specified in each Assignment and Acceptance and recordation on the Register, which effective date shall be at least 3 Business Days after the delivery thereof to the Collateral Agent (or such shorter period as shall be agreed to by the Collateral Agent and the parties to such assignment), (A) the assignee thereunder shall become a "Lender" hereunder and, in addition to the rights and obligations hereunder held by it immediately prior to such effective date, have the rights and obligations hereunder that have been assigned to it pursuant to such Assignment and Acceptance and (B) the assigning Lender thereunder shall, to the extent that rights and obligations hereunder have been assigned by it pursuant to such Assignment and Acceptance, relinquish its rights and be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all or the remaining portion of an assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto).

(e)     By executing and delivering an Assignment and Acceptance, the assigning Lender and the assignee thereunder confirm to and agree with each other and the other parties hereto as follows: (i) other than as provided in such Assignment and Acceptance, the assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement or any other Loan Document or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement or any other Loan Document furnished pursuant hereto; (ii) the assigning Lender makes no representation or warranty and assumes no responsibility with respect to the financial condition of any Loan Party or any of its Subsidiaries or the performance or observance by any Loan Party of any of its obligations under this Agreement or any other Loan Document furnished pursuant hereto; (iii) such assignee confirms that it has received a copy of this Agreement and the other Loan Documents, together with such other documents and information it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance; (iv) such assignee will, independently and without reliance upon the assigning Lender, any Agent or any Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement and the other Loan Documents; (v) such assignee appoints and authorizes the Agents to take such action as agents on its

145

behalf and to exercise such powers under this Agreement and the other Loan Documents as are delegated to the Agents by the terms hereof and thereof, together with such powers as are reasonably incidental hereto and thereto; and (vi) such assignee agrees that it will perform in accordance with their terms all of the obligations which by the terms of this Agreement and the other Loan Documents are required to be performed by it as a Lender.

(f)      The Administrative Agent shall, acting solely for this purpose as a non-fiduciary agent of the Borrowers, maintain, or cause to be maintained at the Payment Office, a copy of each Assignment and Acceptance delivered to and accepted by it and a register (the "Register") for the recordation of the names and addresses of the Lenders and the Commitments of, and the principal amount of the Loans (and stated interest thereon) (the "Registered Loans") owing to each Lender from time to time. The entries in the Register shall be conclusive and binding for all purposes, absent manifest error, and the Borrowers, the Agents and the Lenders shall treat each Person whose name is recorded in the Register as a Lender hereunder for all purposes of this Agreement. The Register shall be available for inspection by the Administrative Borrower and any Lender at any reasonable time and from time to time upon reasonable prior notice. In the case of an assignment pursuant to the last sentence of Section 12.07(c)(ii) as to which an Assignment and Acceptance is not delivered to the Administrative Agent, the assigning Lender shall, acting solely for this purpose as a non-fiduciary agent of the Borrowers, maintain, or cause to be maintained, a register (the "Related Party Register") comparable to the Register on behalf of the Borrowers. The Related Party Register shall be available for inspection by the Borrowers and any Lender at any reasonable time and from time to time upon reasonable prior notice.

(g)      Upon receipt by the Administrative Agent of a completed Assignment and Acceptance, and subject to any consent required from the Administrative Agent or the Collateral Agent pursuant to Section 12.07(b) (which consent of the applicable Agent must be evidenced by such Agent's execution of an acceptance to such Assignment and Acceptance), the Administrative Agent shall accept such assignment, record the information contained therein in the Register (as adjusted to reflect any principal payments on or amounts capitalized and added to the principal balance of the Loans and/or Commitment reductions made subsequent to the effective date of the applicable assignment, as confirmed in writing by the corresponding assignor and assignee in conjunction with delivery of the assignment to the Administrative Agent) and provide to the Collateral Agent a copy of the fully executed Assignment and Acceptance.

(h)      A Registered Loan (and the registered note, if any, evidencing the same) may be assigned or sold in whole or in part only by registration of such assignment or sale on the Register or the Related Party Register (and each registered note shall expressly so provide). Any assignment or sale of all or part of such Registered Loan (and the registered note, if any, evidencing the same) may be effected only by registration of such assignment or sale on the Register or the Related Party Register, together with the surrender of the registered note, if any, evidencing the same duly endorsed by (or accompanied by a written instrument of assignment or sale duly executed by) the holder of such registered note, whereupon, at the request of the designated assignee(s) or transferee(s), one or more new registered notes in the same aggregate principal amount shall be issued to the designated assignee(s) or transferee(s).

(i)      If any Lender sells participations in a Registered Loan, such Lender shall, acting for this purpose as a non-fiduciary agent on behalf of the Borrowers, maintain, or cause to be maintained,

146

a register, on which it enters the name of all participants in the Registered Loans held by it and the principal amount (and stated interest thereon) of the portion of the Registered Loan that is the subject of the participation (the "Participant Register").  A Registered Loan (and the registered note, if any, evidencing the same) may be participated in whole or in part only by registration of such participation on the Participant Register (and each registered note shall expressly so provide).  Any participation of such Registered Loan (and the registered note, if any, evidencing the same) may be effected only by the registration of such participation on the Participant Register.  No Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any participant or any information relating to a participant's interest in any Commitments, Loans, or its other Obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such Commitment, Loan, or other Obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes under this Agreement notwithstanding any notice to the contrary.

(j)      Any Non-U.S. Lender who purchases or is assigned or participates in any portion of such Registered Loan shall comply with Section 2.09(d).

(k)      Each Lender may sell participations to one or more banks or other entities in or to all or a portion of its rights and obligations under this Agreement and the other Loan Documents (including, without limitation, all or a portion of its Commitments and the Loans made by it); provided, that (i) such Lender's obligations under this Agreement (including without limitation, its Commitments hereunder) and the other Loan Documents shall remain unchanged; (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, and the Borrowers, the Agents and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and the other Loan Documents; and (iii) a participant shall not be entitled to require such Lender to take or omit to take any action hereunder except (A) actions directly effecting an extension of the maturity dates or decrease in the principal amount of the Loans, (B) actions directly effecting an extension of the due dates or a decrease in the rate of interest payable on the Loans or the fees payable under this Agreement, or (C) actions directly effecting a release of all or a substantial portion of the Collateral or any Loan Party (except as set forth in Section 10.08 or any other Loan Document).  The Loan Parties agree that each participant shall be entitled to the benefits of Section 2.09 and Section 2.10 with respect to its participation in any portion of the Commitments and the Loans as if it was a Lender.

(l)      Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or loans made to, or other indebtedness issued by, such Lender pursuant to a securitization transaction (including any structured warehouse credit facility, collateralized loan obligation transaction or similar facility or transaction, and including any further securitization of the indebtedness or equity issued under such a transaction) (a "Securitization"); provided, that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.  The Loan Parties shall cooperate with such Lender and its Affiliates to effect a Securitization, including, without limitation, by providing

147

such information as may be reasonably requested by such Lender in connection with the rating of its Loans or any Securitization.

Notwithstanding any other provision in this Agreement or any other Loan Document, no assignment pursuant to this <u>Section 12.07</u> shall be permitted unless such assignment complies with the terms of the Company RSA, the proposed assignee executes and delivers a joinder to the Company RSA and the proposed assignee otherwise consents to the 363 Sale Transaction.

Section 12.08   <u>Counterparts; Electronic Execution</u>.

(a)     This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement.  Delivery of an executed counterpart of this Agreement by electronic mail shall be equally as effective as delivery of an original executed counterpart of this Agreement.  Any party delivering an executed counterpart of this Agreement by electronic mail also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.  The foregoing shall apply to each other Loan Document *mutatis mutandis*.

(b)     The words "execution," "signed," "signature," and words of like import in this Agreement and the other Loan Documents, including any Assignment and Acceptance, shall be deemed to include electronic signatures or electronic records, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

Section 12.09   <u>GOVERNING LAW</u>.  EXCEPT TO THE EXTENT GOVERNED BY THE BANKRUPTCY CODE, THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (UNLESS EXPRESSLY PROVIDED TO THE CONTRARY IN ANOTHER LOAN DOCUMENT IN RESPECT OF SUCH OTHER LOAN DOCUMENT) SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN THE STATE OF NEW YORK.

Section 12.10   <u>CONSENT TO JURISDICTION; SERVICE OF PROCESS AND VENUE</u>.

(a)     ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT MAY BE BROUGHT IN THE BANKRUPTCY COURT AND, IF THE BANKRUPTCY COURT ABSTAINS FROM HEARING OR REFUSES TO EXERCISE JURISDICTION, THE COURTS OF THE STATE OF NEW YORK IN THE COUNTY OF NEW YORK OR OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH LOAN PARTY HEREBY IRREVOCABLY ACCEPTS IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE AFORESAID COURTS.  EACH LOAN PARTY

148

HEREBY IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF ANY OF THE AFOREMENTIONED COURTS AND IN ANY SUCH ACTION OR PROCEEDING BY ANY MEANS PERMITTED BY APPLICABLE LAW, INCLUDING, WITHOUT LIMITATION, BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO THE ADMINISTRATIVE BORROWER AT ITS ADDRESS FOR NOTICES AS SET FORTH IN <u>SECTION 12.01</u>, SUCH SERVICE TO BECOME EFFECTIVE 10 DAYS AFTER SUCH MAILING. THE LOAN PARTIES AGREE THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING HEREIN SHALL AFFECT THE RIGHT OF THE AGENTS AND THE LENDERS TO SERVICE OF PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST ANY LOAN PARTY IN ANY OTHER JURISDICTION. EACH LOAN PARTY HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE JURISDICTION OR LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN ANY SUCH COURT REFERRED TO ABOVE AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. TO THE EXTENT THAT ANY LOAN PARTY HAS OR HEREAFTER MAY ACQUIRE ANY IMMUNITY FROM JURISDICTION OF ANY COURT OR FROM ANY LEGAL PROCESS (WHETHER THROUGH SERVICE OR NOTICE, ATTACHMENT PRIOR TO JUDGMENT, ATTACHMENT IN AID OF EXECUTION OR OTHERWISE) WITH RESPECT TO ITSELF OR ITS PROPERTY, EACH LOAN PARTY HEREBY IRREVOCABLY WAIVES SUCH IMMUNITY IN RESPECT OF ITS OBLIGATIONS UNDER THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS.

(b)     Each Loan Party irrevocably and unconditionally agrees that it will not commence any action or proceeding of any kind or description, whether in law or equity, whether in contract or in tort or otherwise, against any Agent, any Lender or any Related Party of the foregoing in any way relating to this Agreement or any other Loan Document or the transactions relating hereto or thereto, in any forum other than the courts of the State of New York sitting in New York County, and of the United States District Court of the Southern District of New York, and any appellate court from any thereof.

Section 12.11    <u>WAIVER OF JURY TRIAL, ETC.</u>    EACH LOAN PARTY, EACH AGENT AND EACH LENDER HEREBY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM CONCERNING ANY RIGHTS UNDER THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS, OR UNDER ANY AMENDMENT, WAIVER, CONSENT, INSTRUMENT, DOCUMENT OR OTHER AGREEMENT DELIVERED OR WHICH IN THE FUTURE MAY BE DELIVERED IN CONNECTION THEREWITH, OR ARISING FROM ANY FINANCING RELATIONSHIP EXISTING IN CONNECTION WITH THIS AGREEMENT, AND AGREES THAT ANY SUCH ACTION, PROCEEDINGS OR COUNTERCLAIM SHALL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. EACH LOAN PARTY CERTIFIES THAT NO OFFICER, REPRESENTATIVE, AGENT OR ATTORNEY OF ANY AGENT OR ANY LENDER HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT ANY AGENT OR ANY LENDER WOULD NOT, IN THE EVENT OF ANY ACTION, PROCEEDING OR COUNTERCLAIM, SEEK TO ENFORCE THE FOREGOING WAIVERS. EACH LOAN PARTY HEREBY ACKNOWLEDGES

THAT THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE AGENTS AND THE LENDERS ENTERING INTO THIS AGREEMENT.

Section 12.12    Consent by the Agents and Lenders.  Except as otherwise expressly set forth herein to the contrary or in any other Loan Document, if the consent, approval, satisfaction, determination, judgment, acceptance or similar action (an "Action") of any Agent or any Lender shall be permitted or required pursuant to any provision hereof or any provision of any other agreement to which any Loan Party is a party and to which any Agent or any Lender has succeeded thereto, such Action shall be required to be in writing and may be withheld or denied by such Agent or such Lender, in its sole discretion, with or without any reason, and without being subject to question or challenge on the grounds that such Action was not taken in good faith.

Section 12.13    No Party Deemed Drafter.  Each of the parties hereto agrees that no party hereto shall be deemed to be the drafter of this Agreement.

Section 12.14    Reinstatement; Certain Payments.  If any claim is ever made upon any Secured Party for repayment or recovery of any amount or amounts received by such Secured Party in payment or on account of any of the Obligations, such Secured Party shall give prompt notice of such claim to each other Agent and Lender and the Administrative Borrower, and if such Secured Party repays all or part of such amount by reason of (i) any judgment, decree or order of any court or administrative body having jurisdiction over such Secured Party or any of its property, or (ii) any good faith settlement or compromise of any such claim effected by such Secured Party with any such claimant, then and in such event each Loan Party agrees that (A) any such judgment, decree, order, settlement or compromise shall be binding upon it notwithstanding the cancellation of any Indebtedness hereunder or under the other Loan Documents or the termination of this Agreement or the other Loan Documents, and (B) it shall be and remain liable to such Secured Party hereunder for the amount so repaid or recovered to the same extent as if such amount had never originally been received by such Secured Party.

Section 12.15    Indemnification; Limitation of Liability for Certain Damages.

(a)    In addition to each Loan Party's other Obligations under this Agreement, each Loan Party agrees to, jointly and severally, defend, protect, indemnify and hold harmless each Secured Party and all of their respective Related Parties (collectively called the "Indemnitees") from and against any and all losses, damages, liabilities, obligations, penalties, fees, reasonable costs and expenses (including, without limitation, reasonable attorneys' fees, costs and expenses) incurred by such Indemnitees, whether prior to or from and after the Effective Date, whether direct, indirect or consequential, as a result of or arising from or relating to or in connection with any of the following:  (i) the negotiation, preparation, execution or performance or enforcement of this Agreement, any other Loan Document or of any other document executed in connection with the transactions contemplated by this Agreement, (ii) any Agent's or any Lender's furnishing of funds to the Borrowers under this Agreement or the other Loan Documents, including, without limitation, the management of any such Loans or the Borrowers' use of the proceeds thereof, (iii) the Agents and the Lenders relying on any instructions of the Administrative Borrower or the handling of the Loan Account and Collateral of the Borrowers as herein provided, (iv) any matter relating to the financing transactions contemplated by this Agreement or the other Loan Documents or by any document executed in connection with the transactions contemplated by this Agreement or the

150

other Loan Documents, or (v) any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any Indemnitee is a party thereto (collectively, the "Indemnified Matters"); provided, however, that the Loan Parties shall not have any obligation to any Indemnitee under this subsection (a) for any Indemnified Matter caused by the gross negligence or willful misconduct of such Indemnitee, as determined by a final non-appealable judgment of a court of competent jurisdiction.

(b)       The indemnification for all of the foregoing losses, damages, fees, costs and expenses of the Indemnitees set forth in this Section 12.15 are chargeable against the Loan Account. To the extent that the undertaking to indemnify, pay and hold harmless set forth in this Section 12.15 may be unenforceable because it is violative of any law or public policy, each Loan Party shall, jointly and severally, contribute the maximum portion which it is permitted to pay and satisfy under applicable law, to the payment and satisfaction of all Indemnified Matters incurred by the Indemnitees.

(c)       No Loan Party shall assert, and each Loan Party hereby waives, any claim against the Indemnitees, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) (whether or not the claim therefor is based on contract, tort or duty imposed by any applicable legal requirement) arising out of, in connection with, as a result of, or in any way related to, this Agreement or any other Loan Document or any agreement or instrument contemplated hereby or thereby or referred to herein or therein, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof or any act or omission or event occurring in connection therewith, and each Loan Party hereby waives, releases and agrees not to sue upon any such claim or seek any such damages, whether or not accrued and whether or not known or suspected to exist in its favor.

(d)       The indemnities and waivers set forth in this Section 12.15 shall survive the repayment of the Obligations and discharge of any Liens granted under the Loan Documents.

Section 12.16     Records.  The unpaid principal of and interest on the Loans, the interest rate or rates applicable to such unpaid principal and interest, the duration of such applicability, the Commitments, and the accrued and unpaid fees payable pursuant to Section 2.06 hereof, shall at all times be ascertained from the records of the Agents, which shall be conclusive and binding absent manifest error.

Section 12.17     Binding Effect.  This Agreement shall become effective when it shall have been executed by each Loan Party, each Agent and each Lender and when the conditions precedent set forth in Section 5.01 hereof have been satisfied or waived in writing by the Agents, and thereafter shall be binding upon and inure to the benefit of each Loan Party, each Agent and each Lender, and their respective successors and assigns, except that the Loan Parties shall not have the right to assign their rights hereunder or any interest herein without the prior written consent of each Agent and each Lender, and any assignment by any Lender shall be governed by Section 12.07 hereof.

Section 12.18     Highest Lawful Rate.  It is the intention of the parties hereto that each Agent and each Lender shall conform strictly to usury laws applicable to it.  Accordingly, if the transactions contemplated hereby or by any other Loan Document would be usurious as to any Agent or any Lender under laws applicable to it (including the laws of the United States of America and the State of New York or any other jurisdiction whose laws may be mandatorily applicable to such Agent or such Lender notwithstanding the other provisions of this Agreement), then, in that event, notwithstanding anything to

151

the contrary in this Agreement or any other Loan Document or any agreement entered into in connection with or as security for the Obligations, it is agreed as follows:  (i) the aggregate of all consideration which constitutes interest under law applicable to any Agent or any Lender that is contracted for, taken, reserved, charged or received by such Agent or such Lender under this Agreement or any other Loan Document or agreements or otherwise in connection with the Obligations shall under no circumstances exceed the maximum amount allowed by such applicable law, any excess shall be canceled automatically and if theretofore paid shall be credited by such Agent or such Lender on the principal amount of the Obligations (or, to the extent that the principal amount of the Obligations shall have been or would thereby be paid in full, refunded by such Agent or such Lender, as applicable, to the Borrowers); and (ii) in the event that the maturity of the Obligations is accelerated by reason of any Event of Default under this Agreement or otherwise, or in the event of any required or permitted prepayment, then such consideration that constitutes interest under law applicable to any Agent or any Lender may never include more than the maximum amount allowed by such applicable law, and excess interest, if any, provided for in this Agreement or otherwise shall, subject to the last sentence of this <u>Section 12.18</u>, be canceled automatically by such Agent or such Lender, as applicable, as of the date of such acceleration or prepayment and, if theretofore paid, shall be credited by such Agent or such Lender, as applicable, on the principal amount of the Obligations (or, to the extent that the principal amount of the Obligations shall have been or would thereby be paid in full, refunded by such Agent or such Lender to the Borrowers).  All sums paid or agreed to be paid to any Agent or any Lender for the use, forbearance or detention of sums due hereunder shall, to the extent permitted by law applicable to such Agent or such Lender, be amortized, prorated, allocated and spread throughout the full term of the Loans until payment in full so that the rate or amount of interest on account of any Loans hereunder does not exceed the maximum amount allowed by such applicable law.  If at any time and from time to time (x) the amount of interest payable to any Agent or any Lender on any date shall be computed at the Highest Lawful Rate applicable to such Agent or such Lender pursuant to this <u>Section 12.18</u> and (y) in respect of any subsequent interest computation period the amount of interest otherwise payable to such Agent or such Lender would be less than the amount of interest payable to such Agent or such Lender computed at the Highest Lawful Rate applicable to such Agent or such Lender, then the amount of interest payable to such Agent or such Lender in respect of such subsequent interest computation period shall continue to be computed at the Highest Lawful Rate applicable to such Agent or such Lender until the total amount of interest payable to such Agent or such Lender shall equal the total amount of interest which would have been payable to such Agent or such Lender if the total amount of interest had been computed without giving effect to this <u>Section 12.18</u>.

For purposes of this <u>Section 12.18</u> and the definition of "Highest Lawful Rate", the term "applicable law" shall mean that law in effect from time to time and applicable to the loan transaction between the Borrowers, on the one hand, and the Agents and the Lenders, on the other, that lawfully permits the charging and collection of the highest permissible, lawful non-usurious rate of interest on such loan transaction and this Agreement, including laws of the State of New York and, to the extent controlling, laws of the United States of America.

The right to accelerate the maturity of the Obligations does not include the right to accelerate any interest that has not accrued as of the date of acceleration.

Section 12.19   <u>Confidentiality</u>.  Each Agent and each Lender agrees (on behalf of itself and its Related Parties) to use reasonable precautions to keep confidential, in accordance with its customary

152

procedures for handling confidential information of this nature and in accordance with safe and sound practices of comparable commercial finance companies, any information supplied to it by the Loan Parties pursuant to this Agreement or the other Loan Documents which is identified in writing by the Loan Parties as being confidential at the time the same is delivered to such Person (and which at the time is not, and does not thereafter become, publicly available or available to such Person from another source not known to be subject to a confidentiality obligation to such Person not to disclose such information), provided, that nothing herein shall limit the disclosure by any Agent or any Lender of any such information (i) to its Affiliates, its Related Parties or the Related Parties of any Person described in clause (ii) or (iii) below (it being understood that the Persons to whom such disclosure is made either will be informed of the confidential nature of such information and instructed to keep such information confidential in accordance with this Section 12.19 or is subject to other customary confidentiality obligations), provided that such Agent or Lender shall remain liable for such Person's breach of this Section 12.19; (ii) to any other party hereto; (iii) to any assignee or participant (or prospective assignee or participant) or any party to a Securitization, so long as such assignee or participant (or prospective assignee or participant) or party to a Securitization agrees, in writing, to be bound by or is otherwise subject to customary confidentiality obligations (including, without limitation, confidentiality provisions similar in substance to this Section 12.19); (iv) to the extent required by any Requirement of Law or judicial process or as otherwise required by any Governmental Authority; (v) to the National Association of Insurance Commissioners or any similar organization, any examiner, auditor or accountant or any nationally recognized rating agency; (vi) in connection with any litigation to which any Agent or any Lender is a party; (vii) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder; (viii) to any other Person if such information is general portfolio information that does not identity the Loan Parties, or (ix) with the consent of the Administrative Borrower.  In addition, the Agents and the Lenders may disclose the existence of this Agreement and information about this Agreement to market data collectors, similar service providers to the lending industry and service providers to any Agent or any Lender in connection with the administration of this Agreement, the other Loan Documents and the Commitments.

      Section 12.20   Public Disclosure.  Each Loan Party agrees that neither it nor any of its Affiliates will now or in the future issue any press release or other public disclosure using the name of an Agent, any Lender or any of their respective Affiliates or referring to this Agreement or any other Loan Document without the prior written consent of such Agent or such Lender, except to the extent that such Loan Party or such Affiliate is required to do so under applicable law (in which event, such Loan Party or such Affiliate will consult with such Agent or such Lender before issuing such press release or other public disclosure).  Each Loan Party hereby authorizes each Agent and each Lender, after consultation with the Borrowers, to advertise the closing of the transactions contemplated by this Agreement, and to make appropriate announcements of the financial arrangements entered into among the parties hereto, as such Agent or such Lender shall deem appropriate, including, without limitation, on a home page or similar place for dissemination of information on the Internet or worldwide web, or in announcements commonly known as tombstones, in such trade publications, business journals, newspapers of general circulation and to such selected parties as such Agent or such Lender shall deem appropriate.

Section 12.21    Integration.  This Agreement, together with the other Loan Documents, reflects the entire understanding of the parties with respect to the transactions contemplated hereby and shall not be contradicted or qualified by any other agreement, oral or written, before the date hereof.

Section 12.22    USA PATRIOT Act.  Each Lender that is subject to the requirements of the USA PATRIOT Act hereby notifies the Borrowers that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies the entities composing the Borrowers, which information includes the name and address of each such entity and other information that will allow such Lender to identify the entities composing the Borrowers in accordance with the USA PATRIOT Act.  Each Loan Party agrees to take such action and execute, acknowledge and deliver at its sole cost and expense, such instruments and documents as any Lender may reasonably require from time to time in order to enable such Lender to comply with the USA PATRIOT Act.

Section 12.23    Judgment Currency.  This is an international financial transaction in which the specification of a currency and payment in New York is of the essence.  Dollars shall be the currency of account in the case of all payments pursuant to or arising under this Agreement or under any other Loan Document, and all such payments shall be made to the Administrative Agent's Account in New York in immediately available funds.  To the fullest extent permitted by applicable law, the obligations of each Loan Party to the Secured Parties under this Agreement and under the other Loan Documents shall not be discharged by any amount paid in any other currency or in a place other than to the Administrative Agent's Account in New York to the extent that the amount so paid after conversion under this Agreement and transfer to New York does not yield the amount of Dollars in New York due under this Agreement and under the other Loan Documents.  If, for the purposes of obtaining judgment in any court, it is necessary to convert a sum due hereunder in Dollars into another currency (the "Other Currency"), to the fullest extent permitted by applicable law, the rate of exchange used shall be that at which the Administrative Agent could, in accordance with normal procedures, purchase Dollars with the Other Currency on the Business Day preceding that on which final judgment is given.  The obligation of each Loan Party in respect of any such sum due from it to the Secured Parties hereunder shall, notwithstanding any judgment in such Other Currency, be discharged only to the extent that, on the Business Day immediately following the date on which the Administrative Agent receives any sum adjudged to be so due in the Other Currency, the Administrative Agent may, in accordance with normal banking procedures, purchase Dollars with the Other Currency.  If the Dollars so purchased are less than the sum originally due to the Secured Parties in Dollars, each Loan Party agrees, as a separate obligation and notwithstanding any such judgment, to indemnify the Secured Parties against such loss, and if the Dollars so purchased exceed the sum originally due to the Secured Parties in Dollars, the Secured Parties agree to remit to the Loan Parties such excess.

Section 12.24    Incorporation of DIP Orders by Reference.  Each of the Loan Parties, the Agents and the Lenders agrees that any reference contained herein to (a) the Interim DIP Order shall include all terms, conditions, and provisions of such Interim DIP Order and that the Interim DIP Order is incorporated herein for all purposes, and (b) the Final DIP Order shall include all terms, conditions, and provisions of the Final DIP Order and that the Final DIP Order is incorporated herein for all purposes. To the extent there is any inconsistency between the terms of this Agreement and the terms of the DIP Orders, the terms of the DIP Orders shall govern.

[SIGNATURE PAGES BEGIN ON THE FOLLOWING PAGE]

155

## Exhibit C

**(The Initial Approved Budget)**

1

**Red Lobster**  DIP Budget - FILING VERSION

$ in 000s

| Week Number | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Actual / Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | |
| Week Beginning | 5/18/2024 | 5/25/2024 | 6/1/2024 | 6/8/2024 | 6/15/2024 | 6/22/2024 | 6/29/2024 | 7/6/2024 | 7/13/2024 | 7/20/2024 | 7/27/2024 | 8/3/2024 | 8/10/2024 | 8/17/2024 | Total |
| Week Ending | 5/24/2024 | 5/31/2024 | 6/7/2024 | 6/14/2024 | 6/21/2024 | 6/28/2024 | 7/5/2024 | 7/12/2024 | 7/19/2024 | 7/26/2024 | 8/2/2024 | 8/9/2024 | 8/16/2024 | 8/23/2024 | Chapter 11 |
| **Total Receipts** | $ 41,327 | $ 43,979 | $ 35,182 | $ 34,541 | $ 35,753 | $ 39,277 | $ 42,947 | $ 39,184 | $ 35,304 | $ 36,078 | $ 37,042 | $ 32,858 | $ 36,849 | $ 44,804 | $ 535,123 |
| **Disbursements** | | | | | | | | | | | | | | | |
| Payroll & Benefits | (20,274) | (16,732) | (13,731) | (13,868) | (14,304) | (19,813) | (17,205) | (15,515) | (14,052) | (14,591) | (17,489) | (13,130) | (14,652) | (18,275) | (223,630) |
| Food & Beverage | (14,663) | (16,310) | (13,404) | (10,488) | (10,778) | (11,181) | (11,638) | (14,494) | (12,679) | (10,663) | (10,879) | (12,063) | (9,411) | (8,923) | (167,573) |
| Rent & Utilities | (5,922) | (12,055) | (409) | (549) | (452) | (3,543) | (12,851) | (1,387) | (1,596) | (4,680) | (12,858) | (669) | (1,361) | (1,510) | (60,691) |
| Sales Tax | (4,275) | (569) | (213) | (908) | (10,714) | (843) | (160) | (682) | (10,257) | (2,059) | (669) | (199) | (8,278) | (1,589) | (41,418) |
| Other Operating Expenses | (4,891) | (5,121) | (5,586) | (5,769) | (5,591) | (8,256) | (4,778) | (5,937) | (3,231) | (10,241) | (5,296) | (2,973) | (4,149) | (11,899) | (83,718) |
| **Total Operating Disbursements** | $ (50,025) | $ (50,786) | $ (33,341) | $ (31,582) | $ (41,839) | $ (43,636) | $ (46,633) | $ (38,016) | $ (41,815) | $ (42,234) | $ (47,191) | $ (29,884) | $ (37,851) | $ (42,196) | $ (577,029) |
| **Restructuring Disbursements** | | | | | | | | | | | | | | | |
| Professional Fees | (3,351) | (3,648) | (1,388) | (1,613) | (1,343) | (1,766) | (3,769) | (1,510) | (1,510) | (1,788) | (3,791) | (1,532) | (1,782) | - | (28,790) |
| DIP Facility Interest & Fees | (1,292) | - | - | - | - | (800) | - | - | - | (1,202) | - | - | - | (779) | (4,074) |
| **Total Restructuring Disbursements** | $ (4,643) | $ (3,648) | $ (1,388) | $ (1,613) | $ (1,343) | $ (2,566) | $ (3,769) | $ (1,510) | $ (1,510) | $ (2,990) | $ (3,791) | $ (1,532) | $ (1,782) | $ (779) | $ (32,864) |
| **Total Disbursements** | $ (54,668) | $ (54,434) | $ (34,729) | $ (33,195) | $ (43,182) | $ (46,202) | $ (50,402) | $ (39,526) | $ (43,325) | $ (45,224) | $ (50,982) | $ (31,416) | $ (39,633) | $ (42,975) | $ (609,893) |
| **Net Cash Flow** | $ (13,342) | $ (10,455) | $ 452 | $ 1,345 | $ (7,429) | $ (6,925) | $ (7,455) | $ (342) | $ (8,020) | $ (9,146) | $ (13,940) | $ 1,442 | $ (2,785) | $ 1,829 | $ (74,770) |
| **Cash Balances** | | | | | | | | | | | | | | | |
| Beginning Cash Balance | $ 13,061 | $ 24,236 | $ 13,781 | $ 14,234 | $ 11,974 | $ 44,545 | $ 37,620 | $ 30,165 | $ 49,823 | $ 41,802 | $ 32,657 | $ 18,717 | $ 20,158 | $ 17,374 | $ 13,061 |
| Net Cash Flow | (13,342) | (10,455) | 452 | 1,345 | (7,429) | (6,925) | (7,455) | (342) | (8,020) | (9,146) | (13,940) | 1,442 | (2,785) | 1,829 | (74,770) |
| Funding / DIP Draws | 40,000 | - | - | - | 40,000 | - | - | - | 20,000 | - | - | - | - | - | 100,000 |
| Less: Restricted Cash / Collateralization | (15,484) | - | - | (3,605) | - | - | - | - | - | - | - | - | - | - | (19,089) |
| **Ending Book Cash (excl. restricted cash)** | $ 24,236 | $ 13,781 | $ 14,234 | $ 11,974 | $ 44,545 | $ 37,620 | $ 30,165 | $ 49,823 | $ 41,802 | $ 32,657 | $ 18,717 | $ 20,158 | $ 17,374 | $ 19,203 | $ 19,203 |
| Restricted Cash / Collateralization | 31,505 | 31,505 | 31,505 | 35,110 | 35,110 | 35,110 | 35,110 | 35,110 | 35,110 | 35,110 | 35,110 | 35,110 | 35,110 | 35,110 | 35,110 |
| **Ending Book Cash (Incl. restricted cash)** | $ 55,741 | $ 45,286 | $ 45,738 | $ 47,084 | $ 79,655 | $ 72,730 | $ 65,274 | $ 84,932 | $ 76,912 | $ 67,766 | $ 53,826 | $ 55,268 | $ 52,483 | $ 54,313 | $ 54,313 |

**NOTES:**

**(1)** Case timeline based on milestones pursuant to Stalking Horse APA.

**(2)** Beginning global (US and Canada) cash of $13.1 million reflects cash on hand available for the management team to fund and operate the business.

**(3)** Professional fees to be escrowed on a weekly basis with final true-up occurring upon filing of final fee applications.

**Red Lobster**

**Weekly Professional Fee Summary**

$ in 000s

| WEEKLY PROFESSIONAL FEES | | | | | | | | | | | | | | | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PROFESSIONAL | 5/24/24 | 5/31/24 | 6/7/24 | 6/14/24 | 6/21/24 | 6/28/24 | 7/5/24 | 7/12/24 | 7/19/24 | 7/26/24 | 8/2/24 | 8/9/24 | 8/16/24 | 8/23/24 | Chapter 11 |
| Debtor Professionals | $2,982 | $1,204 | $1,204 | $1,179 | $1,179 | $1,594 | $1,338 | $1,338 | $1,338 | $1,616 | $1,360 | $1,360 | $1,360 | -- | $19,052 |
| Lender Professionals | 276 | 2,314 | 54 | 54 | 54 | 62 | 2,321 | 62 | 62 | 62 | 2,321 | 62 | 62 | -- | 7,763 |
| **Debtor / Lender Professionals** | **$3,257** | **$3,517** | **$1,258** | **$1,233** | **$1,233** | **$1,656** | **$3,659** | **$1,400** | **$1,400** | **$1,678** | **$3,681** | **$1,422** | **$1,422** | **--** | **$26,815** |
| | | | | | | | | | | | | | | | |
| UCC Restructuring Counsel | -- | $58 | $58 | $58 | $58 | $58 | $58 | $58 | $58 | $58 | $58 | $58 | $58 | -- | $700 |
| UCC Financial Advisor | -- | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | 25 | -- | 300 |
| U.S. Trustee | -- | -- | -- | 250 | -- | -- | -- | -- | -- | -- | -- | -- | 250 | -- | 500 |
| Information Officer | 49 | 24 | 24 | 24 | 14 | 14 | 14 | 14 | 14 | 14 | 14 | 14 | 14 | -- | 250 |
| Information Officer - Counsel | 45 | 23 | 23 | 23 | 13 | 13 | 13 | 13 | 13 | 13 | 13 | 13 | 13 | -- | 225 |
| **UCC / Other Professionals** | **$94** | **$130** | **$130** | **$380** | **$110** | **$110** | **$110** | **$110** | **$110** | **$110** | **$110** | **$110** | **$360** | **--** | **$1,975** |
| | | | | | | | | | | | | | | | |
| **Total Professional Fees** | **$3,351** | **$3,648** | **$1,388** | **$1,613** | **$1,343** | **$1,766** | **$3,769** | **$1,510** | **$1,510** | **$1,788** | **$3,791** | **$1,532** | **$1,782** | **--** | **$28,790** |

**NOTES:**

[1] Excludes transaction fees for Keen Summit / HCF.

[2] Assumes UCC formation 20 days after filing with activity completed upon sale at end of August.

**Exhibit D**

**(Payoff Letter)**

May 17, 2024

c/o Administrative Borrower
Red Lobster Management LLC
450 S. Orange Ave., Suite 800
Orlando, FL 32801
Attn: Nick Haughey

Re: Red Lobster Intermediate Holdings LLC, a Delaware limited liability company ("Parent"), Red Lobster Management LLC, a Delaware limited liability company ("Borrower"), Red Lobster Hospitality LLC, a Delaware limited liability company ("RL Hospitality"), Red Lobster Canada, Inc., a Delaware corporation ("RL Canada"), Red Lobster Restaurants LLC, a Delaware limited liability company ("RL Restaurants"), Red Lobster Sourcing LLC, a Delaware limited liability company ("RL Sourcing"), Red Lobster Supply LLC, a Delaware limited liability company ("RL Supply"), RLSV, Inc., a Florida corporation ("RLSV"), Red Lobster of Bel Air, Inc., a Maryland corporation ("RL Bel Air"), Red Lobster of Texas, Inc., a Texas corporation ("RL Texas"), RL Columbia LLC, a Maryland limited liability company ("RL Columbia"), RL Kansas LLC, a Kansas limited liability company ("RL Kansas"), RL Maryland, Inc., a Maryland corporation ("RL Maryland"), RL of Frederick, Inc., a Maryland corporation ("RL Frederick"), and RL Salisbury, a Maryland limited liability company ("RL Salisbury", together with RL Hospitality, RL Canada, RL Restaurants, RL Sourcing, RL Supply, RLSV, RL Bel Air, RL Texas, RL Columbia, RL Kansas, RL Maryland and RL Frederick, collectively, the "Guarantors" and each individually a "Guarantor"; Parent, Borrower and Guarantors, are collectively, the "Loan Parties" and each individually a "Loan Party")

Ladies and Gentlemen:

Reference is hereby made to that certain Credit Agreement dated as of January 22, 2021 (as amended, restated, supplemented or otherwise modified to date, the "Prepetition Credit Agreement") by and among the Loan Parties, Wells Fargo Bank, National Association ("Wells Fargo"), as administrative agent (in such capacity, the "Agent") for the Prepetition Lenders (as defined below), and the lenders party thereto (the "Prepetition Lenders"). Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to such terms in the Prepetition Credit Agreement.

Agent has been informed by the Loan Parties that the Loan Parties intend to commence chapter 11 cases in the U.S. Bankruptcy Court for the Middle District of Florida (the "Bankruptcy Court") and, in connection thereto, to enter into debtor-in-possession financing and stalking horse purchase agreement for the acquisition of substantially all of their assets with the agent and lenders (and/or their designated affiliates) under the Term Loan Credit Agreement (as defined in the Prepetition Credit Agreement). In connection with such debtor-in-possession financing, the Loan Parties have requested that Agent enter into this letter to provide for the payment in full in cash all of the liabilities, obligations and indebtedness owing by the Loan Parties to Agent and the Prepetition Lenders under the Prepetition Credit Agreement, other than the "Letter

of Credit Obligations" (as defined below), the "Surviving Obligations" (as defined below), and the "Bank Product Obligations" (as defined below). If received by 1:00 p.m. (Pacific time) on May 24, 2024, the amount necessary to pay all of the liabilities, obligations and indebtedness owing by Loan Parties to Agent and the Prepetition Lenders under the Prepetition Credit Agreement (other than the Letter of Credit Obligations, Surviving Obligations, and Bank Product Obligations) is $102,668.70 (the "Payoff Amount"). "Letter of Credit Obligations" means the obligations of the Loan Parties under the Prepetition Credit Agreement and other Loan Documents in respect of Letters of Credit issued and outstanding on the date hereof (the "Specified Letters of Credit") set forth on Schedule I hereto, including the reimbursement obligations with respect to future honored drawings and fees, charges, costs and expenses, in each case arising after the Payoff Date (as defined below), in respect of the Specified Letters of Credit required to be paid under the provisions of the Prepetition Credit Agreement. "Surviving Obligations" means the obligations of the Loan Parties under the Prepetition Credit Agreement and the Loan Documents (including, in each case, indemnification obligations) that by the express terms of the Prepetition Credit Agreement and the Loan Documents survive the termination of the Prepetition Credit Agreement, and other obligations of the Loan Parties under this letter to reimburse the Agent and the Prepetition Lenders for costs and expenses that may become due and payable hereunder after the date hereof. "Bank Product Obligations" means, collectively, the obligations of the Loan Parties under the Prepetition Credit Agreement, the Loan Documents and the Bank Product Agreements (as defined in the Prepetition Credit Agreement) in respect of Bank Product Obligations (as defined in the Prepetition Credit Agreement).

This payoff letter (this "Payoff Letter") will confirm that upon (A) receipt by Agent by wire transfer of the Payoff Amount plus $250,000 in respect of the Expense Reserve (as hereinafter defined) to the following account:

> Bank: Wells Fargo Bank, N.A.
> 420 Montgomery Street, San Francisco, CA 94104
> ABA Number: ████████
> Account Name: Wells Fargo Bank, N.A.
> A/C Number: ████████
> Reference: Red Lobster Management LLC

; (B) receipt by Agent by wire transfer of immediately available funds in the aggregate amount of $14,133,599.18 in respect of the Letter of Credit Obligations (such funds, together with existing letter of credit cash collateral held by Agent in the amount of $16,021,091.79 the "Letter of Credit Cash Collateral") as cash collateral to be held by Agent for the benefit of Prepetition Lenders (which amount is equal to 103% of the Letter of Credit Usage (as defined in the Prepetition Credit Agreement) existing on the Payoff Date), to the account listed above in clause (A) (and the Deposit Account holding such Letter of Credit Cash Collateral shall be referred to herein as the "L/C Deposit Account"); (C) receipt by Agent by wire transfer of immediately available funds in the aggregate amount of $1,100,000 (the "Bank Product Cash Collateral") as cash collateral to be held by Agent for the benefit of the Bank Product Providers with respect to Bank Products, to the account listed above in clause (A) (and the Deposit Account holding such Bank Product Cash Collateral shall be referred to herein as the "Bank Product Deposit Account"); and (D) a fully-executed Control Agreement with respect to the Bank Product Deposit Account

holding the Bank Product Cash Collateral, in the form circulated by Agent to Borrower upon request from Agent (the conditions described in the foregoing clauses (A), (B), (C), and (D), collectively the "Payoff Conditions"), (1) the liens and security interests of Agent in any and all of the real, mixed and personal property of Loan Parties granted under each of the Prepetition Credit Agreement and the Loan Documents shall automatically, irrevocably and immediately be deemed to be released and terminated, (2) all liabilities, obligations, guaranties and indebtedness owing by Loan Parties or any of their affiliates to Agent and the Prepetition Lenders under each of the Prepetition Credit Agreement and the Loan Documents (other than the Surviving Obligations, Letter of Credit Obligations, and Bank Product Obligations), shall automatically, irrevocably and immediately be deemed to have been satisfied in full and discharged, and (3) all Loan Documents (including, without limitation, the Intercreditor Agreement) shall automatically, irrevocably and immediately terminate and have no further force or effect, other than with respect to the Surviving Obligations; provided, that (i) Section 12 of the Prepetition Credit Agreement relating to governing law, consent to jurisdiction and jury trial waiver, shall remain in full force and effect with respect to the Surviving Obligations, Letter of Credit Obligations and Bank Product Obligations except for any matters otherwise subject to the jurisdiction of the Bankruptcy Court, (ii) all provisions of the Prepetition Credit Agreement regarding Specified Letters of Credit shall remain in full force and effect with respect to Specified Letters of Credit, including, without limitation, reimbursement obligations of any Loan Party (and/or any guaranties thereof by the Loan Parties) under any Loan Document in connection with any Specified Letters of Credit (including, without limitation, (y) the Letter of Credit Fee set forth in Section 2.6(b) of the Prepetition Credit Agreement, and (z) any and all other charges, commissions, fees and/or costs incurred in connection therewith pursuant to the terms of any Loan Document) shall (as the same may be expressly modified by the provisions of this Payoff Letter) remain in full force and effect, (iii) any Bank Product Agreements (as defined in the Prepetition Credit Agreement) that are allowed by the respective Bank Product Provider to remain outstanding after the Payoff Date shall remain in full force and effect, (iv) the security interest granted to Agent in the Letter of Credit Cash Collateral and the L/C Deposit Account pursuant to this Payoff Letter shall continue in full force and effect on and after the date of this Payoff Letter until the unapplied amount of the Letter of Credit Cash Collateral is returned by Agent to Borrower and (v) the security interest granted to Agent in the Bank Product Cash Collateral and the Bank Product Deposit Account pursuant to this Payoff Letter shall continue in full force and effect on and after the date of this Payoff Letter until the unapplied amount of the Bank Product Cash Collateral is returned by Agent to Borrower.

The Business Day upon which all of the Payoff Conditions have been satisfied is the "Payoff Date".

Each Loan Party understands, acknowledges and agrees that the Payoff Conditions includes a fee, cost, and expense reserve in the amount of $250,000 (the "Expense Reserve"), which will be used to satisfy the fees, costs, expenses and any other amounts that are in each case Surviving Obligations or payable by the Loan Parties to Agent and/or any other member of the Lender Group (as such term is defined in the Prepetition Credit Agreement, collectively the "Specified Lender Group") in connection with the Loan Documents, the termination of the Loan Documents, the performance of the parties under this Payoff Letter or the monitoring of the Loan Parties' chapter 11 cases. If the Specified Lender Group incurs fees, costs, expenses or other amounts with respect to the Loan Documents, the termination of the Loan Documents, any Specified Letter of Credit, any Bank Product Agreements or the performance of the parties under

this Payoff Letter, or the monitoring of the Loan Parties' chapter 11 cases, that exceed the Expense Reserve after the Expense Reserve has been applied to pay such obligations, or if the Specified Lender Group incurs fees, costs, expenses or other amounts described above or otherwise constituting Surviving Obligations after the balance of the Expense Reserve has been remitted to Borrower, the Loan Parties shall reimburse the Agent and the other members of the Specified Lender Group, promptly after receipt of a demand therefor (and in any event within five (5) Business Days of the date of such demand by Agent), for the full amount of all such fees, costs, expenses or other amounts.

Each Loan Party understands, acknowledges and agrees that the Letter of Credit Fee set forth in Section 2.6(b) of the Prepetition Credit Agreement will continue to accrue with respect to any Specified Letter of Credit, so long as such Specified Letter of Credit remains outstanding after the Payoff Date.  Additionally, other charges, commissions, fees and/or costs relating to the Specified Letters of Credit and payable in accordance with the terms of the Prepetition Credit Agreement will continue to accrue while any Specified Letter of Credit remains outstanding after the Payoff Date.  Each Loan Party understands, acknowledges and agrees that all of such charges, commissions, fees and/or costs (including, without limitation, the Letter of Credit Fee set forth in Section 2.6(b) of the Prepetition Credit Agreement) shall be reimbursed to the Agent and/or the applicable Issuing Bank promptly after receipt of a written demand therefor by Agent (and in any event within five (5) Business Days of the date of such written demand by Agent).  In addition to the foregoing, each Loan Party understands, acknowledges and agrees that any such charges, commissions, fees and/or costs (including, without limitation, the Letter of Credit Fee set forth in Section 2.6(b) of the Prepetition Credit Agreement) may be satisfied (i) by Agent utilizing the Expense Reserve, and/or (ii) by Agent drawing such amount from the Letter of Credit Cash Collateral, and if Borrower directs the payment of such amounts owed from the amounts described in clause (ii), Agent shall apply such amounts from the Letter of Credit Cash Collateral to pay or reimburse such owed amounts.  Each Loan Party hereby grants to Agent a security interest in the Letter of Credit Cash Collateral and the L/C Deposit Account to secure the obligations of such Loan Party to Agent and/or the applicable Issuing Bank in respect of any Specified Letters of Credit and any other amounts described in this paragraph.  Each Loan Party understands, acknowledges and agrees that the Letter of Credit Cash Collateral shall be held by Agent for such purpose until all of the amounts in respect of any Specified Letters of Credit and any other obligations described in this paragraph with respect to the Specified Letters of Credit have been satisfied.

Each Loan Party hereby grants to Agent a security interest in the Bank Product Cash Collateral and the Bank Product Deposit Account to secure the obligations of such Loan Party to Agent and/or any other member of the Specified Lender Group in respect of any Bank Products (as such term is defined in the Prepetition Credit Agreement) that will remain outstanding after the Payoff Date, and agrees that Agent may apply the Bank Product Cash Collateral to satisfy any Bank Product Obligations, and if Borrower directs any debtor-in-possession financing agent to make payment of such Bank Product Obligations owed from the Bank Product Cash Collateral (except in the case of Bank Product Obligations related to purchase cards or credit cards, unless the line of credit under such purchase cards or credit cards has been closed and no further borrowings may be made thereunder), Agent shall apply such amounts from the Bank Product Cash Collateral to pay or reimburse such owed Bank Product Obligations.  Each Loan Party understands, acknowledges and agrees that the Bank Product Cash Collateral shall be held by

Agent for such purpose until all of the Bank Product Obligations described in this paragraph have been satisfied, no Bank Products remain outstanding and Agent has determined in its reasonable discretion that any debtor-in-possession financing agent does not expect any further Bank Product Obligations to arise with respect to such terminated Bank Products, or otherwise determines in its reasonable discretion that such Bank Product Cash Collateral is no longer required to secure any such Bank Product Obligations. Thereafter, any remaining Bank Product Cash Collateral shall be remitted by Agent to a deposit account of the Borrower that is not the L/C Deposit Account or the Bank Product Deposit Account promptly following the Borrower's detailed written request therefor.

This letter shall not be effective if all of the Payoff Conditions have not been satisfied on or before 2:00 p.m. (Pacific time) on May 24, 2024 (the "Termination Time"). Subject to the timely satisfaction of all of the Payoff Conditions, (i) Agent authorizes Loan Parties or their designees to terminate the UCC Financing Statements listed on Exhibit A attached hereto, (ii) Agent authorizes Loan Parties or their designees to terminate the PPSA Financing Statements listed on Exhibit B attached hereto, (iii) on the Payoff Date, Agent shall execute and electronically deliver to Borrower trademark releases and copyright releases in the forms circulated by Agent to the Loan Parties prior to the date hereof with respect to filings against trademarks and copyrights of the Loan Parties filed by Agent under the Loan Documents with the United States Patent and Trademark Office and United States Copyright Office, as applicable (and the Loan Parties and their designees are on such date and thereafter authorized to file such trademark releases and copyright releases with the applicable intellectual property office), (iv) the Agent shall execute and deliver the terminations of deposit account control agreements with respect to deposit accounts (other than the L/C Deposit Account and the Bank Product Deposit Account) in the forms delivered by Agent to the Loan Parties prior to the date hereof (it being understood that Agent is not responsible for causing Term Loan Agent to countersign such terminations), (vi) the Loan Parties are authorized to deliver this letter to any landlord or bailee to evidence the repayment in full of the Obligations and the termination of any landlord waiver or other collateral access agreement executed in connection with the Loan Documents, and (vii) Agent shall subsequently deliver to Borrower without recourse, representation or warranty, and at the sole cost and expense of Borrower, any other lien releases, terminations or further instruments pertaining to the liens and security interests of Agent (or any Prepetition Lender) in any of the property of the Loan Parties, as Borrower may reasonably request, in connection with Agent's above-described release and termination of its security interests and liens in the property of the Loan Parties (and the Loan Parties and their designees are thereafter authorized to file or deliver to the applicable third party such lien releases or further instruments).

Loan Parties agree to jointly and severally reimburse Agent, promptly upon demand (and in any event within ten (10) Business Days after such demand), for any reasonable and documented out-of-pocket costs and expenses incurred by Agent in connection with the release and termination of its liens (including, without limitation, reasonable and documented attorneys' fees and expenses). Subject to the terms and conditions of this letter, Loan Parties shall continue to be obligated with respect to the Letter of Credit Obligations, Surviving Obligations and Bank Product Obligations. Notwithstanding anything contained herein to the contrary, the terms of the Prepetition Credit Agreement and the Loan Documents that expressly survive the repayment of the Prepetition Obligations (defined below) and termination of the Prepetition Credit Agreement shall remain in full force and effect.

Each Loan Party acknowledges and agrees that:

(i)    the amounts referred to in this letter as monetary obligations of the Loan Parties are enforceable obligations of the Loan Parties payable to Agent and the Prepetition Lenders pursuant to the provisions of the Prepetition Credit Agreement and the Loan Documents, without any deduction, offset, defense or counterclaim;

(ii)    prior to the Payoff Date, nothing contained herein shall constitute a waiver of any Default or Event of Default or of Agent's and the Prepetition Lenders' rights and remedies under the Prepetition Credit Agreement or any other Loan Document; and

(iii)    as of the date hereof, the Agent, the Prepetition Lenders, the Issuing Bank (as such term is defined in the Prepetition Credit Agreement, collectively the "Specified Issuing Lenders") and their respective participants, if any, shall have no further (A) commitment to provide loans or letters of credit or other financial accommodations under the Prepetition Credit Agreement or the Loan Documents, or (B) obligation, duty or responsibility under the Prepetition Credit Agreement, any Loan Document, or any other document or agreement executed and/or deliver in connection therewith.

In the event that in calculating the Payoff Amount, Agent gave credit to any check or other item of payment received from the Loan Parties or constituting proceeds of Collateral (as defined in the Prepetition Credit Agreement) or Collateral by applying the amount thereof to the Obligations (as defined in the Prepetition Credit Agreement, the "Prepetition Obligations") and such check or other item of payment is subject to a claim or refund, or is reversed or returned for any reason (including insufficient funds or non-payment), the Loan Parties jointly and severally agree to reimburse and pay, on demand, to Agent the amount of any such check or other item of payment, together with any losses, liabilities, charges, expenses and fees associated therewith.  The Loan Parties jointly and severally further agree to reimburse and pay, on demand, to Agent any amounts required to be paid by Agent, whether as an indemnification payment or otherwise, under any lockbox, blocked account or account control arrangement entered into by Agent in connection with the Prepetition Credit Agreement or the Loan Documents, together with any losses, liabilities, charges, expenses and fees associated therewith.

The parties hereto agree that no further Revolving Loans or other extension of credit may be made or requested, and no further Letters of Credit may be requested or issued, on or after the date hereof.

Each Loan Party, on behalf of itself and its successors, assigns, and other legal representatives (each Loan Party and all such other parties collectively, the "Releasors" and individually, a "Releasor"), hereby jointly, severally, and jointly and severally, absolutely, unconditionally and irrevocably releases, remises and forever discharges each Agent-Related Person, each Lender-Related Person, each other member of the Lender Group, each Participant, and each Bank Product Provider, together with each of their respective successors and assigns, and each of their respective present and former shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees, agents and other representatives (each Agent-Related Person, each Lender-Related Person, each other member of the Lender Group, each Participant, each Bank Product Provider and all such other parties collectively, the "Releasees" and each a "Releasee"), of and from all demands, actions, causes of action, suits, covenants,

contracts, controversies, agreements, promises, sums of money, accounts, bills, reckonings, damages and any and all other claims, counterclaims, defenses, rights of set-off, demands and liabilities whatsoever (individually, a "Claim" and collectively, "Claims") of every name and nature, known or unknown, suspected or unsuspected, both at law and in equity, which any Releasor may now or hereafter own, hold, have or claim to have against the Releasees or any of them for, upon, or by reason of any nature, cause or thing whatsoever which arises at any time on or prior to the date of this Payoff Letter, for or on account of, or in relation to, or in any way in connection with the Prepetition Credit Agreement or any other Loan Document, as amended and supplemented through the date hereof (other than in respect of the Releasees' obligations under this Payoff Letter, the Surviving Obligations, the Letter of Credit Obligations and the Bank Product Obligations). Each Loan Party understands, acknowledges and agrees that the release set forth above may be pleaded as a full and complete defense and may be used as a basis for an injunction against any action, suit or other proceeding which may be instituted, prosecuted or attempted in breach of the provisions of such release. Each Loan Party agrees that no fact, event, circumstance, evidence or transaction which could now be asserted or which may hereafter be discovered shall affect in any manner the final, absolute and unconditional nature of the release set forth above. Releasors represent and warrant to Releasees, that they have not purported to transfer, assign or otherwise convey any right, title or interest of the Releasors in any Claims to any other person or persons, and that the foregoing constitutes a full and complete release of all Claims.

All of the Specified Letters of Credit contain terms regarding the automatic extension of the expiration dates set forth therein. Each Loan Party understands, acknowledges and agrees that (a) it is not Agent's intention to extend any expiration date in any Specified Letter of Credit, and (b) that Agent may give written notice of non-extension of any Specified Letter of Credit to the beneficiaries thereof pursuant to the terms of such Specified Letter of Credit. Each Loan Party understands, acknowledges and agrees that the outstanding obligations owing to Agent with respect to any Specified Letter of Credit that have not been satisfied in full on the expiration date set forth in such Specified Letter of Credit (plus any charges, commissions, fees and/or costs that have accrued and are unpaid with respect to such Specified Letter of Credit on such date) may be satisfied from the Letter of Credit Cash Collateral and/or the Expense Reserve, and if the Borrower directs the payment of such amounts owed from the Letter of Credit Cash Collateral, Agent shall apply such amounts from the Letter of Credit Cash Collateral to pay or reimburse such owed amounts.

Notwithstanding anything herein to the contrary, if any payment or transfer (or any portion thereof) to Agent, any Prepetition Lender, any Specified Issuing Lender or any of their respective participants shall be subsequently invalidated, declared to be fraudulent or a fraudulent conveyance or preferential, avoided, rescinded, set aside or otherwise required to be returned or repaid, whether in bankruptcy, reorganization, insolvency or similar proceedings involving any Loan Party or otherwise, then the obligations purportedly satisfied with such payment or transfer shall immediately be reinstated, without need for any action by any Person, and shall be enforceable against the Loan Parties and their successors and assigns as if such payment had never been made (in which case this Payoff Letter shall in no way impair the claims of Agent, the Prepetition Lenders, Specified Issuing Lenders and their respective participants with respect to such payment or transfer).

Notwithstanding anything contained herein to the contrary, nothing contained herein shall affect the liabilities, obligations or indebtedness of any of the Loan Parties to Wells Fargo or any of its Affiliates with respect to any deposit accounts or cash management arrangements, any purchasing cards or other Bank Product Obligations.

THIS LETTER SHALL BE SUBJECT TO THE PROVISIONS REGARDING CHOICE OF LAW AND VENUE AND JURY TRIAL WAIVER SET FORTH IN ARTICLE 12 OF THE PREPETITION CREDIT AGREEMENT, AND SUCH PROVISIONS ARE INCORPORATED HEREIN BY THIS REFERENCE, *MUTATIS MUTANDIS.*

[signature pages follow]

This letter may be signed in multiple counterparts, each of which shall constitute an original and all of which, taken together, shall constitute one and the same instrument. One or more counterparts of this letter may be delivered by facsimile, electronic mail or other electronic transmission, with the intention that they shall have the same effect as an original counterpart thereof.

Very truly yours,

**WELLS FARGO BANK, NATIONAL ASSOCIATION**, a national banking association, in its capacity as Agent

By: _Dlle Baldill_
Name: _Danielle Baldinelli_
Its: _Managing Director_

Accepted and agreed as of the date first written above by:

RED LOBSTER MANAGEMENT LLC, a Delaware limited liability company, as Borrower

By:_____
Name:   Jonathan Tibus
Title:   Chief Executive Officer


RED LOBSTER INTERMEDIATE HOLDINGS LLC, a Delaware limited liability company, as Parent

By:_____
Name:   Jonathan Tibus
Title:   Chief Executive Officer


RED LOBSTER HOSPITALITY LLC, a Delaware limited liability company, as a Guarantor

By:_____
Name:   Jonathan Tibus
Title:   Chief Executive Officer


RED LOBSTER CANADA, INC., a Delaware corporation, as a Guarantor

By:_____
Name:   Jonathan Tibus
Title:   Chief Executive Officer

RED LOBSTER RESTAURANTS LLC,
a Delaware limited liability company, as a Guarantor

By:_____
Name:  Jonathan Tibus
Title:   Chief Executive Officer


RED LOBSTER SOURCING LLC,
a Delaware limited liability company, as a Guarantor

By:_____
Name:  Jonathan Tibus
Title:   Chief Executive Officer


RED LOBSTER SUPPLY LLC,
a Delaware limited liability company, as a Guarantor

By:_____
Name:  Jonathan Tibus
Title:   Chief Executive Officer


RLSV, INC., a Florida corporation, as a Guarantor

By:_____
Name:  Jonathan Tibus
Title:   Chief Executive Officer


RED LOBSTER OF BEL AIR, INC.,
a Maryland corporation, as a Guarantor

By:_____
Name:  Jonathan Tibus
Title:   Chief Executive Officer

RL COLUMBIA LLC,
a Maryland limited liability company, as a Guarantor

By:
Name:  Jonathan Tibus
Title:   Chief Executive Officer


RL KANSAS LLC,
a Kansas limited liability company, as a Guarantor

By:
Name:  Jonathan Tibus
Title:   Chief Executive Officer


RL MARYLAND, INC.,
a Maryland corporation, as a Guarantor

By:
Name:  Jonathan Tibus
Title:   Chief Executive Officer


RL OF FREDERICK, INC.,
a Maryland corporation, as a Guarantor

By:
Name:  Jonathan Tibus
Title:   Chief Executive Officer


RL SALISBURY, LLC,
a Maryland limited liability company, as a Guarantor

By:
Name:  Jonathan Tibus
Title:   Chief Executive Officer

# SCHEDULE I

## Specified Letters of Credit

| Product Type | Product Sub Type Name | Instrument Ref # | Liability Amount | CCY | Issue Date | Current Expiry Date | Customer Name | Beneficiary Name |
|---|---|---|---|---|---|---|---|---|
| Letter of Credit | Standby LC | IS000049672U-A | $5,730,736.00 | USD | 07/27/2018 | 07/27/2024 | RED LOBSTER MANAGEMENT LLC | LIBERTY MUTUAL INSURANCE COMPANY |
| Letter of Credit | Standby LC | IS000103616U-A | $1,500,000.00 | USD | 10/23/2019 | 10/23/2024 | RED LOBSTER MANAGEMENT LLC | ZURICH AMERICAN INSURANCE COMPANY |
| Letter of Credit | Standby LC | IS000140259U-A | $175,000.00 | USD | 08/24/2020 | 08/24/2024 | RED LOBSTER HOSPITALITY LLC | TXU ENERGY RETAIL COMPANY LLC |
| Letter of Credit | Standby LC | IS000173994U | $20,900,000.00 | USD | 02/23/2021 | 02/23/2025 | RED LOBSTER MANAGEMENT LLC | ZURICH AMERICAN INSURANCE COMPANY |
| Letter of Credit | Standby LC | IS000182178U | $150,000.00 | USD | 04/21/2021 | 04/21/2025 | RED LOBSTER MANAGEMENT LLC | WESTERN SURETY COMPANY |
| Letter of Credit | Standby LC | IS000208057U | $273,080.00 | USD | 07/23/2021 | 07/23/2024 | RED LOBSTER HOSPITALITY LLC | ENGIE RESOURCES LLC |
| Letter of Credit | Standby LC | IS000212124U | $325,000.00 | USD | 09/10/2021 | 09/09/2024 | RED LOBSTER HOSPITALITY LLC | CONSTELLATION NEWENERGY, INC. |
| Letter of Credit | Standby LC | IS000239418U | $222,583.00 | USD | 11/19/2021 | 10/31/2024 | RED LOBSTER HOSPITALITY LLC | SS SMALL MOUTH PARKERSBURG LLC |

**EXHIBIT A**

UCC Financing Statements

| Debtor | Jurisdiction | File Number | File Date |
|---|---|---|---|
| Red Lobster Intermediate Holdings LLC | DE-SOS | 20210585753 | 01/22/2021 |
| Red Lobster Management LLC | DE-SOS | 20210585779 | 01/22/2021 |
| Red Lobster Canada, Inc. | DE-SOS | 20210585761 | 01/22/2021 |
| Red Lobster Hospitality LLC | DE-SOS | 20210585787 | 01/22/2021 |
| Red Lobster Restaurants LLC | DE-SOS | 20210585811 | 01/22/2021 |
| Red Lobster Sourcing LLC | DE-SOS | 20210585837 | 01/22/2021 |
| Red Lobster Supply LLC | DE-SOS | 20210586017 | 01/22/2021 |
| Red Lobster of Bel Air, Inc. | MD-SOS | 210122-1437005 | 01/22/2021 |
| RL Columbia LLC | MD-SOS | 210122-1437002 | 01/22/2021 |
| RL Maryland, Inc. | MD-SOS | 210122-1437000 | 01/22/2021 |
| RL Frederick, Inc. | MD-SOS | 210122-1437001 | 01/22/2021 |
| RL Salisbury, LLC | MD-SOS | 210122-1437003 | 01/22/2021 |
| RL Kansas LLC | KS-SOS | 117737411 | 01/22/2021 |
| Red Lobster of Texas, Inc. | TX-SOS | 21-0003053418 | 01/22/2021 |
| RLSV, Inc. | FL-SOS | 202105958336 | 01/22/2021 |

**EXHIBIT B**

PPSA Financing Statements

| Debtor | Jurisdiction | File Number | File Date |
|---|---|---|---|
| Red Lobster Management LLC | Province of BC | 726986M | 01/25/2021 |
| Red Lobster Management LLC | Province of ON | 769413915 | 01/25/2021 |
| Red Lobster Sourcing, LLC | Province of BC | 726975M | 01/25/2021 |
| Red Lobster of Canada, Inc. | Province of ON | 769413879 | 01/25/2021 |

## Exhibit E

**(Haughey Declaration)**

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**
www.flmb.uscourts.gov

| | |
|---|---|
| IN RE: | Chapter 11 Cases |
| RED LOBSTER MANAGEMENT LLC,[1] | Case No. 6:24-bk-_____ |
| RED LOBSTER RESTAURANTS LLC, | Case No. 6:24-bk-_____ |
| RLSV, INC., | Case No. 6:24-bk-_____ |
| RED LOBSTER CANADA, INC. | Case No. 6:24-bk-_____ |
| RED LOBSTER HOSPITALITY LLC | Case No. 6:24-bk-_____ |
| RL KANSAS LLC | Case No. 6:24-bk-_____ |
| RED LOBSTER SOURCING LLC | Case No. 6:24-bk-_____ |
| RED LOBSTER SUPPLY LLC | Case No. 6:24-bk-_____ |
| RL COLUMBIA LLC | Case No. 6:24-bk-_____ |
| RL OF FREDERICK, INC. | Case No. 6:24-bk-_____ |
| RED LOBSTER OF TEXAS, INC. | Case No. 6:24-bk-_____ |
| RL MARYLAND, INC. | Case No. 6:24-bk-_____ |
| RED LOBSTER OF BEL AIR, INC. | Case No. 6:24-bk-_____ |
| RL SALISBURY, LLC, | Case No. 6:24-bk-_____ |
| RED LOBSTER INTERNATIONAL HOLDINGS LLC, | Case No. 6:24-bk-_____ |
| Debtors. | (Joint Administration Pending) |
| _____/ | |

**DECLARATION OF NICHOLAS HAUGHEY IN SUPPORT OF DEBTORS'**
**EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS**
**(I) APPROVING POSTPETITION FINANCING, (II) AUTHORIZING**
**THE USE OF CASH COLLATERAL, (III) GRANTING LIENS AND**
**PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS,**
**(IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING**
**AUTOMATIC STAY, (VI) SCHEDULING A FINAL HEARING,**
**AND (VII) GRANTING RELATED RELIEF**

Pursuant to 28 U.S.C. § 1746, I, Nicholas Haughey, hereby declare that the following is

true and correct to the best of my knowledge, information, and belief:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are Red Lobster Management LLC (6889); Red Lobster Sourcing LLC (3075); Red Lobster Supply LLC (9187); RL Kansas LLC (2396); Red Lobster Hospitality LLC (5297); Red Lobster Restaurants LLC (4308); RL Columbia LLC (7825); RL of Frederick, Inc. (9184); RL Salisbury, LLC (7836); RL Maryland, Inc. (7185); Red Lobster of Texas, Inc. (1424); Red Lobster of Bel Air, Inc. (2240); RLSV, Inc. (6180); Red Lobster Canada, Inc. (4569); and Red Lobster International Holdings LLC (4661). The Debtors' principal offices are located at 450 S. Orange Avenue, Suite 800, Orlando, FL 32801.

1.      I currently serve as Chief Restructuring Officer ("CRO") for the Debtors in these Chapter 11 Cases. Additionally, I am a Senior Director in the North American Commercial Restructuring team at Alvarez & Marsal ("A&M").

2.      I submit this declaration (the "Declaration") in support of the Debtors' *Emergency Motion for Interim and Final Orders (I) Approving Postpetition Financing, (II) Authorizing the Use of Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expenses Status, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "DIP Motion").

3.      Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by the Debtors' employees, advisors, or attorneys, or based upon my experience, knowledge, and information concerning the Company's operations.

4.      Pursuant to the DIP Motion, the Debtors request authority to (i) enter into a secured superpriority debtor-in-possession loan facility in an aggregate principal amount of up to $275 million (the "DIP Facility") with the DIP Agent[2] on behalf of the DIP Lenders, comprised of $100,000,000 of new money DIP Delayed Draw Term Loans and $175,000,000 of Roll-Up Term Loans; (ii) to use Cash Collateral of the DIP Lenders (and to continue to use the Cash Collateral of the Prepetition Term Secured Parties under the terms of the Interim Order); (iii) grant adequate protection to the DIP Lenders, the Prepetition Term Secured Parties, and the Prepetition ABL Lenders and (iv) grant related relief in connection therewith, including, but not limited to, approval of the Payoff Letter and the Payoff Transactions contemplated thereby. It is my opinion, based on

---

[2] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the DIP Motion, the DIP Credit Agreement, and the Interim Order, as applicable.

my experience as detailed below, that the proposed DIP Facility is the product of arm's length negotiations, which culminated in the finalization and anticipated execution of the DIP Credit Agreement and other DIP Documents and that entering into the DIP Facility is in the best interest of the Debtors, the Debtors' estates, and all parties in interest.

## Qualifications

5.      I received a bachelor's degree in finance from Wofford College as well as a Master of Science in Accountancy degree from The University of Notre Dame. I am a member of the Turnaround Management Association and the American Bankruptcy Institute.

6.      I have over fifteen years of experience advising on turnaround management, financial restructuring, performance improvement, and corporate finance to publicly traded and middle market companies across many industries.

7.      In addition to working with the Debtors in the above-captioned cases, I led the contingency planning and chapter 11 preparation efforts for (i) Dean Foods, a leading food and beverage company and the largest processor and direct-to-store distributor of fresh fluid milk and other dairy and dairy case products in the United States with 58 processing facilities across 29 states, and (ii) GT Real Estate Holdings, a specialty real estate investment company created to develop and construct a new headquarters and practice facility for the Carolina Panthers NFL team. I also have experience in a chapter 11 context directing the claims reconciliation and negotiation process with vendors to achieve recovery for unsecured creditors.

8.      In addition to my restructuring experience, I have also advised private equity-backed companies to improve operating performance by implementing rapid reforecast tools for both cash and EBITDA monitoring and forecasting, reducing costs, and streamlining organizational structures and processes.

9.      I was appointed CRO of the Debtors effective as of March 26, 2024. Commencing in January 2024, and prior to my appointment as the Debtors' CRO, alongside the A&M team I served as financial advisor to the Debtors in connection with our efforts to analyze the business affairs of the Debtors and their finances and operations.

10.     I have advised the Debtors on, among other things, the Debtors' cash flow forecasting and the necessity and sizing of debtor-in-possession ("DIP") financing in connection therewith. After discussions with the CEO and board leadership regarding strategy, I worked with other members of the Debtors management team and the Debtors' financial and legal advisors to begin negotiating a term sheet for DIP financing with the Debtors' prepetition secured lenders. I have previously advised other debtors in the sizing and negotiation of financings of distressed companies in out-of-court restructurings, in private merger and acquisition transactions, and in at least one other DIP financing.

**The Debtors' Liquidity Constraints and Need for DIP Financing and Cash Collateral**

11.      The Debtors' prepetition capital structure is described in detail in the First Day Declaration.

12.     After the Debtors retained A&M in January 2024, I and my team immediately set out to build independent and reliable revenue projections and cash flow forecasts for the Debtors. It was immediately apparent that the Debtors' liquidity would continue to deteriorate and that the Debtors would be cash flow negative from January 2024 to June 2024. As a result, the Debtors, with the assistance of their advisors, began to examine whether an out-of-court restructuring of the Debtors' businesses could be effectuated before the Debtors' liquidity would run out. As described in the First Day Declaration, those negotiations with the Prepetition Term Secured Parties broke down in March 2024.

13. On March 22, 2024, the Debtors retained Hilco Corporate Finance, LLC as investment banker to assist the Debtors in initiating a marketing process, targeting strategic and financial buyers, in hope of securing a buyer that could recapitalize the Debtors.

14. Because the Debtors' liquidity was quickly deteriorating and no additional funding would be provided from either the equity holders or the Prepetition Term Secured Parties, the Debtors began preparing for a potential chapter 11 filing. As part of the preparation for these Chapter 11 Cases, I worked with the Debtors' board, CEO, senior leadership, and advisors to design and implement a strategy in which the Debtors would file voluntary bankruptcy petitions under chapter 11 with the intent to continue the ongoing sale process and effectuate a sale.

15. As part of that process, I worked with the Debtors and the Debtors' advisors to prepare a budget for these Chapter 11 Cases. It was determined that the Debtors would require $100 million of additional liquidity to adequately fund the Chapter 11 Cases, inclusive of the operating funding needs through the low revenue generation season.

16. As CRO, I led the DIP financing negotiations and use of consensual Cash Collateral with the Prepetition Term Secured Parties and the Prepetition ABL Secured Parties, with the assistance of the Debtors' advisors and in consultation with the Debtors' CEO, senior leadership team, and board.

17. Negotiations of DIP financing were part of global discussions with the Prepetition Term Secured Parties regarding the sale process, including the stalking horse bid, and the timing of the Chapter 11 Cases. Those negotiations culminated in a restructuring support agreement (the "RSA"), which was approved by the Debtors' board and executed on May 9, 2024. The RSA includes as an exhibit a term sheet setting out the economic terms of the DIP Facility (the "DIP Term Sheet"), for purposes of negotiating the DIP Credit Agreement. The terms of the DIP Facility

were reached in connection with the Debtors' RSA negotiations, which resulted in, among other things: (a) more new money DIP financing to fund the Debtors' operations through an orderly sale process; and (b) a longer maturity and milestones to facilitate the Debtors' pursuit of a sale transaction after running a robust pre- and post-petition marketing process.

18.     In connection with preparing a budget for the proposed DIP financing and through discussions with the Prepetition Term Secured Parties and Prepetition ABL Secured Parties concerning the use of Cash Collateral, the Debtors recognized that it was in their best interests to agree to the ABL Secured Parties' request to cash collateralize the outstanding Letters of Credit Obligations and the Bank Product Obligations as set forth in the Payoff Letter attached to, and described in, the DIP Motion using Cash Collateral and the proceeds of DIP Delayed Draw Term Loans. Based on the Debtors' borrowing base as of May 12, 2024, the Prepetition ABL Secured Parties are significantly oversecured relative to their exposure. The proposed payments contemplated as part of the Payoff Transactions total $15,483,599 in the aggregate, which is significantly less than the Prepetition ABL Secured Parties' total first priority lien collateral position of at least $55.3 million (exclusive of cash already held by the Prepetition ABL Agent collateralizing the Letters of Credit Obligations).  Such first priority collateral position includes (i) cash and cash equivalents subject to control agreements constituting Cash Collateral of approximately $14.7 million[3] and (ii) accounts receivable and credit card receivables of approximately $40.6 million.[4]

19.     Given that the Prepetition ABL Obligations are oversecured and are being paid from their collateral, I do not think the Payoff Transactions are harmful to the Debtors' estates.

---

[3] The DIP Motion sets forth an accurate chart summarizing the various accounts in which the ABL Secured Parties have a first priority collateral position.

[4] Accounts receivable and credit card receivable figures are as of May 12, 2024.

Rather, they are beneficial because they will allow the Debtors to have access to continued use of Cash Collateral during the Chapter 11 Cases (and the timeline contemplated by the DIP Credit Agreement and RSA.

### The Debtors Need Immediate Access to the DIP Facility

20.      Obtaining DIP financing is necessary to maintain the Debtors' business operations and to facilitate a robust marketing process in the Chapter 11 Cases. In the current operating environment, it is critical for the Debtors to maintain sufficient liquidity to fund operations and give confidence to their vendors that they are able to make payments in the normal course in order to avoid any acceleration in trade terms, which would negatively impact liquidity.

21.      As of the Petition Date, the Debtors will have $13.10 million in cash on hand.[5] If the Debtors are not able to access DIP financing, there is a substantial risk that their ability to continue operating as a going concern will be negatively impacted, resulting in significant deterioration in the value of the estate assets, and immediate and irreparable harm to the Debtors and their stakeholders.  The Debtors anticipate that they will run out of operating liquidity by the first week of June, which may move up in time if net cash flow is less than forecast.

22.      As identified in the DIP Budget, a copy of which is attached as Exhibit C to the proposed Interim DIP Order, the Debtors' cumulative receipts will be insufficient to cover their necessary disbursements in the first week. Without immediate access to the interim DIP Facility and ability to use Cash Collateral in the amount of $40 million, the Debtors will not be able to make necessary payments in the ordinary course, including wages, fresh goods and food stuffs, insurance, rent, and other priority pre-petition and postpetition obligations. Further, the Debtors

---

[5] As set forth in the Cash Management Motion, $13.10 million is operating cash in bank accounts to which the Debtors have immediate access. There is additional cash held in restaurant depository accounts and liquor accounts that are not immediately available to the Debtors.

will not be able to consummate the Payoff Transactions, which may jeopardize the Debtors'
continued use of Cash Collateral on a consensual basis.  Absent immediate access to the DIP
Facility and Cash Collateral at this pivotal stage, among other things, the Debtors could (a) face a
detrimental interruption of their business; (b) lose the support of key constituencies, including the
Debtors' workforce, vendors, and customers on which the success of the chapter 11 cases depend;
and (c) be forced to significantly modify, or shut down entirely, their operations, each of which
would detrimentally affect the Debtors' ability to maximize the value of the estates.

23.     The DIP financing and the DIP Credit Agreement were the subject of arms' length
and spirited negotiations and were conducted in good faith by the Debtors and the DIP Lenders,
and there not undisclosed terms in respect thereof.

<u>**Conclusion**</u>

24.     Based on the information I have as CRO of the Debtors, as well as my experience
with DIP financing transactions, I believe that the proposed DIP Facility is the Debtors' best and
only available source of postpetition funding under the circumstances, and that the terms of the
DIP Facility are fair, reasonable and appropriate under the circumstances. The proposed DIP
Facility, together with the RSA, provide financing for an orderly sale process that will maximize
the value of the Debtors' enterprise for all stakeholders and preserve jobs for the Debtors' 36,000
employees and a trading partner for the Debtors' creditors. Without immediate access to the DIP
Facility on an interim basis, including the use of Cash Collateral, the Debtors would face
significant deterioration in the value of the estate assets, which would result in immediate and
irreparable harm to the Debtors and their stakeholders.

25.    Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that, to the best of my information, knowledge, and belief, and after reasonable inquiry, the foregoing Declaration is true and correct.

*[Remainder of Page Intentionally Left Blank]*

Executed this 19th day of May, 2024

Nicholas Haughey
Chief Restructuring Officer
Senior Director, Alvarez & Marsal

**<u>Exhibit F</u>**

**(Stratton Declaration)**

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**
www.flmb.uscourts.gov

| | |
|---|---|
| IN RE: | Chapter 11 Cases |
| | |
| RED LOBSTER MANAGEMENT LLC,[1] | Case No. 6:24-bk-_____ |
| RED LOBSTER RESTAURANTS LLC, | Case No. 6:24-bk-_____ |
| RLSV, INC., | Case No. 6:24-bk-_____ |
| RED LOBSTER CANADA, INC. | Case No. 6:24-bk-_____ |
| RED LOBSTER HOSPITALITY LLC | Case No. 6:24-bk-_____ |
| RL KANSAS LLC | Case No. 6:24-bk-_____ |
| RED LOBSTER SOURCING LLC | Case No. 6:24-bk-_____ |
| RED LOBSTER SUPPLY LLC | Case No. 6:24-bk-_____ |
| RL COLUMBIA LLC | Case No. 6:24-bk-_____ |
| RL OF FREDERICK, INC. | Case No. 6:24-bk-_____ |
| RED LOBSTER OF TEXAS, INC. | Case No. 6:24-bk-_____ |
| RL MARYLAND, INC. | Case No. 6:24-bk-_____ |
| RED LOBSTER OF BEL AIR, INC. | Case No. 6:24-bk-_____ |
| RL SALISBURY, LLC, | Case No. 6:24-bk-_____ |
| RED LOBSTER INTERNATIONAL HOLDINGS LLC, | Case No. 6:24-bk-_____ |
| | |
| Debtors. | (Joint Administration Pending) |
| _____/ | |

**DECLARATION OF TERI STRATTON IN SUPPORT OF DEBTORS'**
**EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS**
**(I) APPROVING POSTPETITION FINANCING, (II) AUTHORIZING**
**THE USE OF CASH COLLATERAL, (III) GRANTING LIENS AND**
**PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS,**
**(IV) GRANTING ADEQUATE PROTECTION, (V) MODIFYING**
**AUTOMATIC STAY, (VI) SCHEDULING A FINAL HEARING,**
**AND (VII) GRANTING RELATED RELIEF**

Pursuant to 28 U.S.C. § 1746, I, Teri Stratton, hereby declare that the following is true and

correct to the best of my knowledge, information, and belief:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are Red Lobster Management LLC (6889); Red Lobster Sourcing LLC (3075); Red Lobster Supply LLC (9187); RL Kansas LLC (2396); Red Lobster Hospitality LLC (5297); Red Lobster Restaurants LLC (4308); RL Columbia LLC (7825); RL of Frederick, Inc. (9184); RL Salisbury, LLC (7836); RL Maryland, Inc. (7185); Red Lobster of Texas, Inc. (1424); Red Lobster of Bel Air, Inc. (2240); RLSV, Inc. (6180); Red Lobster Canada, Inc. (4569); and Red Lobster International Holdings LLC (4661). The Debtors' principal offices are located at 450 S. Orange Avenue, Suite 800, Orlando, FL 32801.

1.      I am a Senior Managing Director and the National Practice Leader for Restructuring and Special Situations at Hilco Corporate Finance LLC ("HCF"), the investment banking division of Hilco Global. I have over two decades of experience in advising on distressed sell-side and buy-side mergers and acquisitions transactions, recapitalizations, and restructuring transactions to middle market companies across many industries.

2.      I submit this declaration (the "Declaration") in support of the Debtors' *Emergency Motion for Interim and Final Orders (I) Approving Postpetition Financing, (II) Authorizing the Use of Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* (the "DIP Motion").[2]

3.      Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by the Debtors' employees, advisors, or attorneys, or based upon my experience, knowledge, and information concerning the Company's operations.

4.      Pursuant to the DIP Motion, the Debtors request authority to (i) enter into a senior secured debtor-in-possession loan facility in an aggregate principal amount of up to $275 million (the "DIP Facility") with the DIP Agent on behalf of the DIP Secured Parties, comprised of $100,000,000 of new money DIP Delayed Draw Term Loans and $175,000,000 of Roll-Up Term Loans; (ii) to use Cash Collateral of the DIP Secured Parties (and to continue to use the Cash Collateral of the Prepetition Term Secured Parties); and (iii) grant adequate protection to the DIP Secured Parties, the Prepetition Term Secured Parties, and the Prepetition ABL Secured Parties,

---

[2] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the DIP Motion, the DIP Credit Agreement, and the Interim Order, as applicable.

in each case under the terms of the proposed DIP Loan Documents and Interim Order. It is my opinion, based on my experience as detailed below, that the proposed DIP Facility is the product of arm's length negotiations and represents the best (and only) debtor-in-possession ("DIP") financing available to the Debtors given the circumstances of these Chapter 11 Cases, and that entering into the DIP Facility is in the best interest of the Debtors, the Debtors' estates, and all parties in interest.

### Qualifications

5.      I received a bachelor's degree in economics from the University of California at Los Angeles as well as a Master of Business Administration degree in finance, with honors, from the Anderson School at UCLA. I am a Certified Insolvency and Restructuring Advisor, a member of the Turnaround Management Association, and a member of the Association of Insolvency and Restructuring Advisors and the American Bankruptcy Institute.

6.      Prior to joining HCF in 2022, I held investment banking positions at both Piper Sandler and Macquarie Capital Advisors (and its predecessor firms) where I focused on providing debt advisory, equity private placements, capital markets, mergers and acquisitions, and restructuring advisory services to middle market companies across many industries, including consumer products (restaurants, food and agriculture), industrials, and healthcare. I also have experience in corporate banking, serving in both credit administration and special assets.

7.      I have more than twenty years' experience in financial advisory and investment banking services and have been involved in numerous financial and operational restructurings, valuations, solvency analyses and fraudulent transfer disputes, investment banking and corporate finance transactions, and trouble company due diligence investigations.

8.      In addition to working with the Debtors in the above-captioned cases, my restructuring and financial advisory engagements have included representations of debtors and unsecured creditors' committees in the following chapter 11 cases: *In re CBC Restaurant Corp.*, No. 23-10245 (KBO) (Bankr. D. Del. Feb. 22, 2023); *In re Meredian Restaurants Unlimited, LC*, No. 23-20731 (KRA) (Bankr. D. Utah Mar. 2, 2023); *In re RealMex Restaurants, Inc.*, No. 11-13122 (BLS) (Bankr. D. Del. Oct. 4, 2011); *In re California Pizza Kitchen, Inc. et al.*, No. 20-33752 (MI) (Bankr. S.D. Tex. Jan. 25, 2021); *In re The Krystal Company*, No. 20-61065 (PWB) (Bankr. N.D. Ga. Jan. 19, 2020); *In re HRI Holding Corp.,* No. 19-12415 (MFW) (Bankr. D. Del. Nov. 14, 2019); *In re Kona Grill Inc.*, No. 19-10953 (CSS) (Bankr. D. Del. May 28, 2019); *In re FoodFirst Global Restaurants, Inc.*, No. 20-02159 (LVV) (Bankr. M.D. Fla. Apr. 10, 2020); *In re Ignite Restaurant Group, Inc.*, No. 17-33550 (DRJ) (Bankr. S.D. Tex. Jun. 6, 2017); *In re Garden Fresh Restaurant Corporation*, No. 20-02477 (JLS) (Bankr. S.D. Cal. May 14, 2020); *In re Claim Jumper Acquisition Company LLC*, No. 22-21941 (GLT) (Bankr. W.D. Pa. Oct. 3, 2022); *In re Chi-Chi's, Inc.*, No. 03-13063 (KJC (Bankr. D. Del. Oct. 8, 2003); *In re FTD Companies*, No. 19-11240 (LSS) (Bankr. D. Del. Jun. 3, 2019); *In re Central Grocers, Inc.*, No. 17-13886 (PSH) (Bankr. N.D. Ill. May 4, 2017); *In re Golden County Foods*, No. 15-11062 (KG) (Bankr. D. Del. May 15, 2015); *In re Mi Pueblo San Jose*, No. 13-53893 (STJ) (Bankr. N.D. Cal. Jul. 22, 2013); *In re C&K Markets*, No. 13-64561 (FRA) (Bankr. D. Or. Nov. 19, 2013); *In re Eurofresh Farms, Inc.*, No. 09-07970 (CGC) (Bankr. D. Ariz. Apr. 21, 2009); *In re Chef Solutions Holdings, LLC*, No. 11-13139 (KG) (Bankr. D. Del. Oct. 4, 2011); *In re Brooks Food Group, Inc.*, No. 12-62000 (JRC) (Bankr. W.D. Va. Aug. 28, 2012); *In re Sun World International, Inc.*, No. 94-23212 (DN) (Bankr. C.D. Cal. Oct. 3, 1994); *In re CTI Foods, LLC*, No. 19-10497 (CSS) (Bankr. D. Del. Mar. 11, 2019); *In re Brown & Cole Stores, LLC*, No. 06-13950 (SJS) (Bankr. W.D. Wash. Nov. 7,

2006); *In re Hoop Holdings, LLC*, No. 08-10544 (BLS) (Bankr. D. Del. Mar. 26, 2008); *In re Synergy Pharmaceuticals*, No. 18-14010 (LGB) (Bankr. S.D. N.Y. Dec. 12, 2018); *In re VIVUS, Inc.*, No. 20-11779 (LSS) (Bankr. D. Del. Jul. 7, 2020); *In re Neogenix Oncology, Inc.*, No. 12-23557 (TJC) (Bankr. D. Md. Jul. 23, 2012); *In re Arabella Petroleum Company, LLC*, No. 15-70098 (TMD) (Bankr. W.D. Tex. Jul. 10, 2015); *In re Sotera Wireless*, No. 16-05968 (LST) (Bankr. S.D. Cal. Sept. 30, 2016); *In re Rotary Drilling Tools USA, LLC*, No. 16-33433 (MI) (Bankr. S.D. Tex. Jul. 6, 2016); *In re Malibu Lighting Corporation*, No. 15-12080 (KG) (Bankr. D. Del. Oct. 8, 2015); *In re Willowood USA Holdings, LLC*, No. 19-11079 (KHT) (Bankr. D. Colo. Feb. 15, 2019); *In re Portrait Innovations*, No. 17-31455 (JCW) (Bankr. W.D. N.C. Sept. 1, 2017); *In re Safety-Kleen Corp.*, No. 00-02303 (PJW) (Bankr. D. Del. Jun. 6, 2000); *In re Cineworld Group PLC*, No. 22-90168 (MI) (Bankr. S.D. Tex. Sept. 9, 2022), as well as numerous private transactions.

9.      I have advised the Debtors on, among other things, the proposed DIP financing. After discussions with the Debtors' management and other advisors regarding strategy and the Debtors' financing needs, my colleagues and I facilitated a robust marketing process to determine whether there was any third-party interest in providing DIP financing to the Debtors on better terms than are being provided by the proposed DIP Secured Parties, which constituted the Prepetition Secured Parties.

### The Debtors' Efforts to Obtain DIP Financing

10.      As set forth more fully in the First Day Declaration, Red Lobster's dwindling liquidity across the second half of 2023, among other things, resulted in certain Events of Default under the Prepetition Term Loan Financing Agreement and Prepetition ABL Credit Agreement.

11.     The Debtors engaged HCF in March 2024 as investment banker to advise the Company on a sale process. HCF provides investment banking advisory services which include exploring financing options to address the Debtors' liquidity constraints. As noted in the DIP Motion, prior to commencing any DIP financing marketing process, the Debtors recognized that it would be particularly difficult to secure financing from a new third party lender because all of the Debtors' material assets are encumbered by existing liens. The Prepetition Secured Parties indicated that they would not consent to a priming DIP financing provided by a third party. Moreover, the Debtors explored a potential junior DIP financing that would be junior to the Prepetition Term Credit Facility but senior to the Prepetition ABL Facility. However, the Debtors did not believe there was a sufficient ability to satisfy the standards required for a priming lien to secure financing from a third party. And in any event, (i) there would be substantial costs incurred in contesting any claim that a sufficient equity cushion exists and that the Debtors could carry their burden to establish adequate protection of the Prepetition Secured Parties, and (ii) the proposed DIP financing provided by the Prepetition Term Secured Parties as part of funding an orderly sale process and making a stalking horse credit bid for substantially all of the Debtors' assets was in the Debtors' and the Debtors' stakeholders' best interests.

12.     Notwithstanding the foregoing, the Debtors engaged with parties outside of their existing capital structure to obtain DIP financing. Specifically, the Debtors, with the assistance of HCF, contacted 14 third-party financial institutions that routinely provide DIP financing, including both well-known commercial banks, specialty lenders, and a few parties from the sale process, to determine the extent to which third parties would be willing to provide DIP financing to the Debtors and, if so, on what proposed terms. Only one of these parties signed a non-disclosure agreement to obtain information. Notwithstanding these efforts, none of these parties (including

the party that signed a non-disclosure agreement) provided a term sheet or indication of interest, whether on a priming, pari, or junior basis. Accordingly, the Debtors, with the assistance of their advisors, concluded that their best path to financing these Chapter 11 Cases was through the DIP Facility as contemplated by the RSA. Over the course of the last few weeks, the Debtors and their advisors engaged in good faith, arm's length negotiations with the Prepetition Term Secured Parties concerning the economics, milestones, covenants, and other provisions typical in DIP financings and ultimately reached agreement on the terms set forth in the DIP Facility.

**The DIP Facility is the Best DIP Financing Available to the Debtors**

13.     Based on my experience with DIP financing transactions, as well as my involvement in the above-mentioned solicitation of the potential financing alternatives, I believe that the proposed DIP Facility is the Debtors' best and only available source of postpetition funding under the circumstances.

14.     First, the DIP Facility will provide the Debtors with access to the amount of capital that the Debtors, in consultation with their advisors, believe is necessary to effectively and efficiently administer these Chapter 11 Cases and pursue the transactions set forth in the RSA (including a value-maximizing sale process). *See* First Day Declaration, ¶¶ 71-76; Haughey Declaration, ¶¶ 14-15.

15.     Second, as described above, the Debtors, with the assistance of HCF, solicited various other sources of DIP financing to determine whether the Debtors could obtain DIP financing on better terms. In the course of this solicitation process, however, the Debtors did not receive any proposals for DIP financing. Based on the foregoing, because the vast majority of the Debtors' assets are encumbered, I do not believe that any alternative sources of financing with terms as favorable as those contained in the DIP Facility are currently available to the Debtors.

16.     Third, I believe that the principal economic terms proposed under the DIP Facility

are appropriate and in line with market terms for the particular circumstances of these Chapter 11

Cases. Under the DIP Facility, the Debtors will, subject to Court approval, pay certain interest and

fees to each of the DIP Secured Parties and DIP Agent, including interest set at the Reference Rate[3]

or Applicable Margin,[4] at the Administrative Borrower's option, the DIP Upfront Fee, the DIP

Exit Fee, and the DIP Agent Fee. The DIP Upfront Fee is equal to 1.00% of the aggregate principal

amount of the DIP Commitments, which shall be earned, due and payable to the DIP Secured

Parties on a pro rata basis upon entry of the proposed Interim Order and non-refundable when paid,

to be netted against the initial borrowings of DIP Loans upon entry of the proposed Interim Order.

The Agent Fee is $100,000, which shall be deemed fully earned upon the entry of the proposed

Interim Order. The DIP Exit Fee is equal to 3.00% of the aggregate principal amount of the DIP

Commitments, which shall be fully earned as of the Interim Order Entry Date, payable in full in

cash on the earliest to occur of (i) the date on which the DIP Delayed Draw Term Loans are Paid

in Full, (ii) the date of acceleration of the Obligations under the Loan Facilities and the termination

of all Commitments hereunder upon the occurrence of an Event of Default in accordance with the

Loan Documents and the DIP Orders and (iii) the Final Maturity Date. I believe that the interest

---

[3] Per the DIP Credit Agreement, "Reference Rate" means, for any period, the greatest of (a) 4.00% per annum, (b) the Federal Funds Rate plus 0.50% per annum, (c) Adjusted Term SOFR (which rate shall be calculated based upon an Interest Period of one (1) month and shall be determined on a daily basis) plus 1.00% per annum, and (d) the rate last quoted by The Wall Street Journal as the "Prime Rate" in the United States or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined by the Administrative Agent) or any similar release by the Federal Reserve Board (as determined by the Administrative Agent).

[4] Per the DIP Credit Agreement, "Applicable Margin" means, as of any date of determination, with respect to the interest rate of the Term Loan (or any portion thereof), the respective level indicated below:

Reference Rate Loans: 9.50%
SOFR Loans: 10.50%

rate and fees payable under the proposed DIP Facility are customary and reasonable under the circumstances. Additionally I believe that the fees are comparable to fees agreed upon in similar DIP financings and should not be viewed separately, but rather as a part of the overall, substantial benefits provided under the DIP Facility. Each of the economic terms were all negotiated at arm's length and are, in the aggregate, generally consistent with the cost of DIP financings in comparable circumstances.

17.    Finally, the negotiations around the Debtors' proposed DIP Facility started in March and extended until May, and, based on my observations, were conducted at arms' length and in good faith.

**The Roll-Up Component is Consistent with Market Terms**

18.    As part of the DIP Facility, a portion of the Prepetition Term Loan debt will be "rolled up" into the DIP Facility at a rate of $1.75 for every $1.00 of new money drawn under the DIP Delayed Draw Term Loan, which includes the draws made on an interim basis under the Interim Order as well as on subsequent draws made after the Final Order is entered. In the event that the Roll Up Term Loans, including, specifically, the Interim Roll Up Term Loans, are not approved as part of the DIP Order, then (i) the Interim Availability Amount (approximately $40 million) will not be made available to the Debtors and (ii) the Debtors will not have access to the subsequent draws under the DIP Delayed Draw Term Loan that are scheduled to be made after the Final Order is entered. Access to greater liquidity pursuant to the DIP Facility, including the Interim Availability Amount, will send a positive and credible message to the Debtors' workforce and commercial counterparties that the Debtors will have sufficient liquidity to maintain ordinary course operations and meet their financial commitments throughout the course of the Chapter 11

Cases. Having a strong liquidity position will send a further positive message to the Debtors' vendors and other business partners.

19.     In my experience, the "roll up" component of the DIP Facility, including the 1.75:1.00 ratio and the requirement that the Interim Availability Amount only be made available if there is also an interim roll up of the Interim Roll Up Term Loans, is consistent with market expectations for DIP financing by prepetition lenders to middle market companies providing similarly-sized DIP facilities. As part of this analysis, HCF examined the terms and conditions of the DIP Facility's roll-up component and compared it with other recent middle-market DIP financings, and found that the DIP Facility in these Chapter 11 Cases contains a comparable roll up-to-new money ratio to similar DIP financings and that the interim roll-up requirement is within market terms.

<u>**Conclusion**</u>

20.     Based on my experience with DIP financing transactions, as well as my involvement in the above-mentioned solicitation of the potential financing alternatives, I believe that the proposed DIP Facility is the Debtors' best and only available source of postpetition funding and that the terms of the DIP Facility are reasonable and appropriate under the circumstances. The proposed DIP Facility, together with the RSA, provide a potential path to an expeditious exit from chapter 11 bankruptcy.

21.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that, to the best of my information, knowledge, and belief, and after reasonable inquiry, the foregoing is true and correct.


*[Remainder of Page Intentionally Left Blank]*

Executed this ___19___ day of May, 2024

_____

Teri Stratton
Senior Managing Director
Hilco Corporate Finance LLC