## Exhibit Cover Sheet

**Party
submitting:** <u>**Debtors and Debtors-in-Possession**</u>          **Ex. # 1** <u>          </u>


**Admitted: Yes    or    No    (circle one)**

**Debtors:**       **Red Lobster Management LLC**
           **Red Lobster Restaurants LLC**
           **RLSV, Inc.**
           **Red Lobster Canada, Inc.**
           **Red Lobster Hospitality LLC**
           **RL Kansas LLC**
           **Red Lobster Sourcing LLC**
           **Red Lobster Supply LLC**
           **RL Columbia LLC**
           **RL Frederick, Inc.**
           **Red Lobster of Texas, Inc.**
           **RL Maryland, Inc.**
           **Red Lobster of Bel Air, Inc.**
           **RL Salisbury, LLC**
           **Red Lobster International Holdings LLC**

**Case No.  6:24-bk-02486-GER**

**Adv. Pro No.:** <u>**N/A**</u>

**Nature of Hearing/
Docket No.:  First Day Hearings – ECF Nos. 8, 11, 13, 15, 17, 19, 21, 23, 25, 27, 29, 30, 33, 34, 37, 39, 41 and 43**


**United States Bankruptcy Court
Middle District of Florida**

**Dated:** <u>                    </u>**, 2024.**

**By:** <u>                         </u>**, Deputy Clerk**

# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION
www.flmb.uscourts.gov

| | |
|---|---|
| IN RE: | Chapter 11 Cases |
| | |
| RED LOBSTER MANAGEMENT LLC,[1] | Case No. 6:24-bk-_____ |
| RED LOBSTER RESTAURANTS LLC, | Case No. 6:24-bk-_____ |
| RLSV, INC., | Case No. 6:24-bk-_____ |
| RED LOBSTER CANADA, INC. | Case No. 6:24-bk-_____ |
| RED LOBSTER HOSPITALITY LLC | Case No. 6:24-bk-_____ |
| RL KANSAS LLC | Case No. 6:24-bk-_____ |
| RED LOBSTER SOURCING LLC | Case No. 6:24-bk-_____ |
| RED LOBSTER SUPPLY LLC | Case No. 6:24-bk-_____ |
| RL COLUMBIA LLC | Case No. 6:24-bk-_____ |
| RL OF FREDERICK, INC. | Case No. 6:24-bk-_____ |
| RED LOBSTER OF TEXAS, INC. | Case No. 6:24-bk-_____ |
| RL MARYLAND, INC. | Case No. 6:24-bk-_____ |
| RED LOBSTER OF BEL AIR, INC. | Case No. 6:24-bk-_____ |
| RL SALISBURY, LLC, | Case No. 6:24-bk-_____ |
| RED LOBSTER INTERNATIONAL HOLDINGS LLC, | Case No. 6:24-bk-_____ |
| | |
| Debtors. | (Joint Administration Pending) |
| _____/ | |

## DECLARATION OF JONATHAN TIBUS IN SUPPORT OF
## DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY RELIEF

Pursuant to 28 U.S.C. § 1746, I, Jonathan Tibus, hereby declare that the following is true and correct to the best of my knowledge, information, and belief:

1.     I am the Chief Executive Officer ("CEO") of Red Lobster Management LLC ("Red Lobster Management") and all of its direct and indirect wholly-owned subsidiaries as debtors and debtors-in-possession in the above-captioned chapter 11 cases (collectively, the "Debtors" and,

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are Red Lobster Management LLC (6889); Red Lobster Sourcing LLC (3075); Red Lobster Supply LLC (9187); RL Kansas LLC (2396); Red Lobster Hospitality LLC (5297); Red Lobster Restaurants LLC (4308); RL Columbia LLC (7825); RL of Frederick, Inc. (9184); RL Salisbury, LLC (7836); RL Maryland, Inc. (7185); Red Lobster of Texas, Inc. (1424); Red Lobster of Bel Air, Inc. (2240); RLSV, Inc. (6180); Red Lobster Canada, Inc. (4569); and Red Lobster International Holdings LLC (4661). The Debtors' principal offices are located at 450 S. Orange Avenue, Suite 800, Orlando, FL 32801.

together with certain non-Debtor affiliates, "Red Lobster" or the "Company"). I was appointed CEO of Red Lobster in March of 2024. Prior to that, I served from January 2024 to March 2024 as chief restructuring officer ("CRO"), as described in greater detail below.

2.      I am also a Managing Director at Alvarez & Marsal North America, LLC (together with employees of its affiliates—all of which are wholly-owned by its parent company and employees—its wholly-owned subsidiaries, and independent contractors, "A&M").

3.      I have been a full-time restructuring advisor for 27 years. I received a bachelor's degree from Florida State University and an MBA from The University of Florida. I am also a Certified Insolvency and Restructuring Advisor with a Certification in Distressed Business Valuation and am a member of the American Bankruptcy Institute, the Association of Insolvency and Restructuring Advisors, and the Turnaround Management Association.

4.      I have been employed by A&M for 22 years. A&M is a preeminent consulting firm with extensive experience and an excellent reputation for providing high quality, specialized management and restructuring advisory services to debtors and distressed companies. A&M's core services include turnaround advisory services, interim and crisis management, revenue enhancement, claims management, and creditor and risk management advisory services. A&M provides a wide range of debtor advisory services targeted at stabilizing and improving a company's financial position, including, developing or validating forecasts, business plans and related assessments of strategic position; monitoring and managing cash, cash flow, and supplier relationships; assessing and recommending cost reduction strategies; and designing and negotiating financial restructuring packages. Additionally, A&M provides advice on specific aspects of the turnaround process and helps manage complex constituency relations and communications. A&M is known for its ability to work alongside company management and key

2

constituents during chapter 11 restructurings. Some notable, publicly disclosed restructuring assignments that I have personally advised on include Ignite Restaurant Group, Inc. (including its Joe's Crab Shack and Brickhouse Tavern restaurant brands), California Pizza Kitchen, Kona Grill, Real Mex Restaurants, Inc., Last Call Operating Co., Krystal Company, Quiznos, Max & Erma's, and Garden Fresh (d/b/a/ Souplantation and Sweet Tomatoes).

5.    I submit this declaration (this "Declaration") to assist the Court and parties in interest in understanding the events and circumstances that led to the commencement of these chapter 11 cases and in support of the motions and applications that the Debtors have filed with the Court, including the "first day" pleadings filed concurrently herewith (the "First Day Pleadings"). I am authorized to submit this Declaration on behalf of the Debtors. Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by the Debtors' employees, advisors, or attorneys, or based upon my experience, knowledge, and information concerning the Company's operations and the restaurant industry. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

6.    On May 19, 2024 (the "Petition Date"), each of the Debtors commenced a voluntary bankruptcy case in this Court (collectively, the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (as amended, the "Bankruptcy Code"). Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors continue to operate their businesses and manage their affairs as debtors-in-possession. As described in further detail below, immediately prior to commencing these Chapter 11 Cases, the Debtors entered into a stalking-horse asset purchase agreement, which provides for the sale of substantially all of their assets as a going concern.

7.    To minimize any adverse effects on their estates as a result of the commencement of these Chapter 11 Cases, the Debtors have filed First Day Pleadings, applications and other pleadings seeking various types of customary "first day" relief. Specifically, the Debtors are requesting, among other things, that the Court: (a) approve the Debtors' entry into a debtor-in-possession financing facility and use of cash collateral, which will provide the liquidity necessary for the Debtors to continue to operate their business during the Chapter 11 Cases; (b) authorize the Debtors to pay in full and in the ordinary course of business certain prepetition claims, including employee wage, benefit, and expense reimbursement claims and the claims of certain vendors that provide goods and services to the Debtors; (c) authorize the Debtors to continue using their existing cash management system, including their existing bank accounts; and (d) authorize the implementation of certain administrative procedures to minimize any disruption to the Debtors' business as a result of the commencement of the Chapter 11 Cases. The First Day Pleadings are more fully described in Part V of this Declaration below. The relief sought in the First Day Pleadings is crucial to preserve and maximize value for all stakeholders and will position the Debtors for success as they transition into chapter 11.

8.    I have reviewed the Debtors' chapter 11 petitions and the First Day Pleadings, or otherwise had the contents thereof explained to me, and to the best of my knowledge, and after reasonable inquiry, believe that the relief sought in each First Day Pleading: (i) is necessary to enable the Debtors to efficiently enter into, and to operate in, chapter 11 with minimal disruption or loss of productivity or value; (ii) constitutes a critical element to the Debtors' efforts to preserve value and maximize creditor and stakeholder recoveries; and (iii) best serves the Debtors' estates and all parties in interest. Further, it is my belief that the relief sought in the First Day Pleadings

is narrowly tailored and necessary to achieve the goals of these Chapter 11 Cases. The facts set forth in each of the First Day Pleadings are incorporated herein by reference.

9. This Declaration is organized into the following sections: **Part I** provides an overview of Red Lobster's rich history and dominant market presence; **Part II** describes the Company's corporate organization and capital structure; **Part III** summarizes the financial and operational challenges leading to the commencement of the Debtors' Chapter 11 Cases; **Part IV** describes the Prepetition Turnaround Efforts and the Chapter 11 Cases; and **Part V** provides a summary of the First Day Pleadings, the factual bases for the relief requested therein, and other information related to these Chapter 11 Cases.

**Part I**
**Red Lobster Past and Present**

10. Red Lobster is a $2 billion revenue international, iconic seafood restaurant chain with a rich history that spans over seven decades. Red Lobster is known the world over for providing guests with an exceptional dining experience featuring quality seafood, friendly service, and a vibrant and inviting seaside-inspired atmosphere.

11. Founded in 1968 and headquartered in Orlando, the Company has steadily grown over time from its modest roots as a single, family-owned restaurant in Lakeland, Florida into one of the world's largest and most well-known seafood restaurants, with approximately 551 U.S. restaurant locations currently in operation across forty-four states as well as 27 restaurant locations in Canada. Red Lobster also has 27 franchised locations outside the United States that operate under the Red Lobster™ brand, including locations in Mexico, Ecuador, Japan, and Thailand.



12.     Today, **Red Lobster is <u>the largest</u> casual dining seafood chain** in the United States, **serving over 64 million customers per year and accounting for more than half of all casual dining seafood chain locations**. Red Lobster wields significant upstream influence on the global seafood industry. For example, each year Red Lobster purchases 20% of all North American lobster tails and 16% of all rock lobsters sold worldwide.

13.     Originally marketed as "A Harbor for Seafood Lovers," the Company has gone from a privately-owned enterprise, to part of a publicly-traded organization, and then back to private again. In 1970, two years after Bill Darden opened the first "Red Lobster Inns of America," Red Lobster caught the attention of General Mills, which acquired the Company and fueled Red Lobster's rapid growth from coast to coast. With its initial success, Red Lobster expanded rapidly, opening additional locations throughout Florida. In 1970, the chain ventured beyond the state's borders, opening its first out-of-state restaurant in Georgia. By the end of the decade, Red Lobster had expanded to over 100 locations across the United States. During the 1980s, Red Lobster's popularity continued to grow, fueled by its commitment to providing customers with affordable and delicious seafood. The chain introduced popular menu items such as its famous Cheddar Bay Biscuits, creating a loyal fan base.



14.     Having successfully expanded across the United States in just two decades, Red Lobster took its menu north to Ontario, Canada in 1983. In 1995, General Mills spun off its restaurant division as Darden Restaurants, Inc. ("Darden"), a publicly traded company, which included other well-known restaurant brands. Darden's expertise and resources empowered Red Lobster to further expand its reach and market share. In May 2014, Darden sold Red Lobster in a leveraged buyout transaction to Golden Gate Capital.

15.     In 2016, Thai Union Group Public Company Limited (and, together with its subsidiaries, excluding the Debtors, "Thai Union") made a $575 million strategic investment in Red Lobster through its acquisition of a 49% stake in the Company. In 2020, Thai Union, former members of the Red Lobster management team, and certain investors operating under the name Seafood Alliance, acquired Golden Gate's remaining equity stake in Red Lobster.

16.     Over the years, Red Lobster continued to innovate and adapt to changing consumer preferences. It introduced new menu options, including lighter seafood dishes, to cater to health-conscious customers. Additionally, the Company launched popular promotions that became highly anticipated annual events, such as Crabfest™ and Lobsterfest™.



17.     Today, Red Lobster operates hundreds of locations across the United States and in several international markets. It remains a beloved seafood destination, known for its commitment to quality, value, and a diverse menu that caters to a wide range of tastes and preferences. Red Lobster has not only maintained its focus on guest experience; it has also put at the forefront key initiatives to show support for its employees, including the establishment of an Employee Emergency Assistance Fund, known today as Red Lobster Cares, in which the Company and its employees help fellow employees facing financial hardship. These efforts have been recognized in recent years, including on the Forbes list of America's Best Large Employers.

18.     Red Lobster leads the seafood and casual dining industries in its commitment to environmental stewardship and marine conservation. In 2018, Red Lobster unveiled its "Seafood with Standards" initiative, and it partners with other organizations to help drive continuous improvement in the seafood industry supply chain. As stewards of the oceans and environment, Red Lobster partners with Ocean Conservancy®, a leading ocean conservation nonprofit, and has focused in recent years on two key initiatives: (i) The Global Ghost Gear Initiative, which focuses on driving solutions to the problem of lost and abandoned fishing gear, and (ii) the Trash Free Seas Alliance®, which is dedicated to innovative and pragmatic solutions to rid the ocean of plastic pollution and other forms of marine debris. Throughout its history, Red Lobster has stayed true to its mission of providing guests with a memorable seafood dining experience, which has continued to make it a staple in the restaurant industry for seafood enthusiasts worldwide.

19.     As of the Petition Date, Red Lobster's workforce is comprised of approximately 36,000 employees. The Debtors have approximately 34,000 employees in the United States and approximately 2,000 employees in Canada, with the vast majority of the employees serving in part-time roles. The Debtors' operations in Canada include 155 unionized employees that are employed pursuant to two separate Collective Bargaining Agreements—a collective bargaining agreement with United Food and Commercial Workers Canada (Local 1006A) and a collective bargaining agreement with United Food and Commercial Workers Canada Union (Local 401).



20.     Red Lobster's business is labor intensive, and its workforce includes personnel who are intimately familiar with the Company's operations, processes, and systems. The Company's employees perform a wide variety of functions that are critical to the Debtors' operations and cannot be easily replaced due to their unique skill and experience with core business segments. The shrinking labor market of willing individuals and the costs associated with hiring replacements on an expedited basis further underscore the importance of the Company's current workforce.

21.     In addition to the restaurants operated by the Debtors, Red Lobster has entered into franchise agreements whereby third-party franchisees operate 28 additional restaurants in four countries around the world. With certain exceptions, the franchisees of these restaurants generally remit 5.5% of sales as royalties to the Debtors. In fiscal year 2023, franchised units generated approximately $1 million in royalties.

22.     Several years ago, Red Lobster created the infrastructure for a streamlined to-go order business, which has culminated in the "Red Lobster To Go" website and in-store dedication to curbside convenience. Fueled by the pandemic and the rise of third-party food delivery services,

Red Lobster's off-premises business segment accounts for hundreds of millions of dollars in annual revenue.

23.     In recent years, Red Lobster has also built up a steady consumer products line, which it is in the process of further expanding. The Company maintains relationships with licensees to sell Red Lobster™ Cheddar Bay Biscuits as well as select seafood products, which generates millions of dollars annually for the Company.

## Part II
## Corporate Organization and Capital Structure

### A.     Corporate Structure

24.     An organizational chart illustrating the corporate structure of the Debtors and their relationship to the Debtors' equity holders is annexed hereto as **Exhibit A**. None of the Debtors' equity securities are publicly traded. All of the Debtors are direct or indirect subsidiaries of Red Lobster Management's ultimate non-debtor parent, Red Lobster Master Holdings, L.P. ("Holdings LP"). Non-debtors Thai Union, RL Management Investors LLC, RL Management Holdings LLC, and Seafood Alliance Limited are, directly or indirectly, the ultimate owners of Holdings LP. Thai Union and Seafood Alliance indirectly hold a majority of the Debtors' equity interests. Thai Union indirectly holds approximately 47% of common equity interests and 100% of the preferred equity units, and Seafood Alliance indirectly holds approximately 38% of the common equity interests. The remaining common equity interests are indirectly held by former Red Lobster management in two entities, RL Management Investors LLC and, indirectly, RL Management Holdings LLC.

25.     As of the Petition Date, the boards of managers and boards of directors, as applicable, of each Debtor are comprised of one independent director: Lawrence Hirsh. The independent director is not affiliated with or employed by any of the Company's shareholders, lenders, or other major stakeholders.

26.     As of the Petition Date, the Debtors' executive leadership team is comprised of the following individuals:

| Name | Position |
|---|---|
| Jonathan Tibus | Chief Executive Officer |
| Nicholas Haughey | Chief Restructuring Officer |
| Stephanie Medley | Chief Financial Officer |
| Sara Bittorf | Chief Experience Officer |
| Matt Livesay | Chief Supply Chain Officer |
| Susan Pavel | Chief People Officer |
| Shawn Harrs | Chief Information Officer |

**B.  Capital Structure**

27.     As of the Petition Date, the Debtors are party to two prepetition credit agreements with outstanding prepetition funded debt obligations in the amount of approximately $294 million in the aggregate:

| Facility | Approximate Principal Outstanding |
|---|---|
| Prepetition Term Loan | $264,720,000 |
| Outstanding Letters of Credit (ABL Facility) | $ 29,276,399 |
| **Total** | $293,996,399 |

**i.      Prepetition Term Loan Credit Facility**

28.     On January 22, 2021, Debtor Red Lobster Management LLC ("Management"), Fortress Credit Corp., as administrative agent (the "Prepetition Term Loan Agent"), certain other lenders thereto (the "Prepetition Term Loan Lenders"), each of the other co-Debtors (other than Red Lobster International Holdings LLC ("International")), and non-Debtor Red Lobster Intermediate Holdings LLC ("Holdings"),[2] entered into that certain Financing Agreement (as amended or otherwise modified from time to time, the "Prepetition Term Loan Credit

---

[2] Holdings is the direct parent of Management. Holdings does not own any assets other than the membership interests of Management.

Agreement"). Pursuant to the Prepetition Term Loan Credit Agreement, the Prepetition Term Loan Lenders extended loans to the Debtors to refinance existing indebtedness and for general working capital purposes. As of the Petition Date, the Prepetition Term Loan Lenders are owed approximately $264,720,000. The outstanding obligations under the Prepetition Term Loan Credit Agreement are secured by substantially all of the Debtors' assets.

### ii. ABL Credit Facility

29.     The Debtors also have an asset-based loan facility (the "ABL Facility") in place with an aggregate commitment of $100 million, including a $40 million sublimit for letters of credit. The administrative agent under the ABL Facility is Wells Fargo Bank, National Association ("Wells Fargo"). As of the Petition Date, no loans are outstanding under the ABL Facility. However, Wells Fargo has issued letters of credit with an aggregate face amount of $29,276,399, which remain outstanding. In addition, there are approximately $1,100,000 of outstanding obligations in connection with a commercial card agreement (or "p-card" agreement) between Wells Fargo and the Debtors. The outstanding obligations under the ABL Facility are secured by substantially all of the Debtors assets, including certain cash collateral accounts held by Wells Fargo.

30.     Pursuant to an intercreditor agreement between Wells Fargo and the Prepetition Term Loan Agent, Wells Fargo has a senior lien on certain current assets (e.g., cash, cash accounts, inventory and credit card receivables) and the Prepetition Term Loan Agent has a senior lien on all other assets of the Debtors.

### Part III
### Financial and Operational Challenges Leading to the Chapter 11 Cases

31.     Recently, the Debtors have faced a number of financial and operational challenges, including a difficult macroeconomic environment, a bloated and underperforming restaurant

footprint, failed or ill-advised strategic initiatives, and increased competition within the restaurant industry.

32.     I was initially retained on January 11, 2024, as part of a team from A&M in which I served as CRO and A&M served as financial advisor to the Company. We were initially tasked with performing a wholesale assessment of the Company and providing an operational improvement plan that the Company's senior leadership would implement with A&M's assistance and with the support of the Prepetition Lenders. The key observations from our financial and operational assessment are summarized below.

## A. **Flagging Performance**

33.     It was immediately clear that Red Lobster's performance was deteriorating and had been doing so for several years. For example, Red Lobster's annual guest count has declined by approximately 30% since 2019 and has only marginally improved from pandemic levels seen during 2020 and 2021. Although Red Lobster's net sales increased by approximately 25% from 2021 to 2023 (which itself represents modest recoveries following the COVID-19 pandemic), net sales have begun to show material decline during the last twelve months. Similarly, the Company's consolidated adjusted EBITDA over the last twelve months fell by more than 60%, which all but erased any ground Red Lobster recovered following the pandemic. The latest symptom of this decline is Red Lobster's $76 million net loss during fiscal year 2023.

34.     This has resulted in a significant decrease in the Debtors' cash position. In May 2023, the Debtors held approximately $100 million in cash. However, from June 2023 to September 2023, the Company experienced operating cash losses of approximately $31 million. Over this same period, the Company transitioned to a vendor-managed inventory program, which resulted in a corresponding decline in its borrowing base under the ABL Facility. As a result, Red Lobster was forced to pay down $27 million in debt owed under the ABL Facility. Finally, across

fiscal year 2023, Red Lobster was required to make $32 million of interest payments. Over the course of approximately six months, the Debtors' cash position declined from $100 million to less than $30 million.

35.     Due the Company's rapid loss of liquidity over this period, the Company was forced to quickly institute holds on vendor payments to maintain cash. When the Company began to hold vendor payments in 2023, it expected that the issue would resolve by December 2023, when the Company typically generates a significant amount of cash. However, by the end of 2023 it became clear that the Company's liquidity crisis would not be cured by the seasonal bump in revenue.

**B.  Operational Challenges**

**i.     Inflationary Pressure**

36.     Red Lobster has been weighed down in recent years by macroeconomic factors that have negatively impacted the Company. Casual dining restaurants are acutely impacted by consumer sensitivities to eating out versus staying in. And because of inflationary pressures, restaurant menu prices across the industry have risen significantly faster than grocery and other consumer prices. Typically, when labor inflation runs ahead of commodity inflation, restaurant prices tend to outpace grocery pricing. As a result, consumers are less inclined to eat out.

37.     In addition to inflationary costs imposed on the labor force, 50% of states have increased minimum hourly wages in 2024. Restaurant average hourly wages have outpaced the restaurant industry's ability to increase prices, putting pressure on margins.

**ii.     Unfavorable Leases & Underperforming Locations**

38.     A material portion of the Company's leases are priced above market rates. The Company currently leases 687 locations (247 in Master Leases and 440 individual property leases). In 2023, the Company spent approximately $190.5 million in lease obligations, over $64,000,000

of which relate to underperforming stores. Given the Company's operational headwinds and financial position, payment of lease obligations associated with non-performing leases has caused significant strains on the Company's liquidity.

### iii. Marketing and Operational Missteps

39.     Certain operational decisions by former management have harmed the Debtors' financial situation in recent years. Historically, the Debtors' Ultimate Endless Shrimp ("UES") promotion was utilized as a limited-time promotion. In May 2023, however, Paul Kenny, the Debtors' former CEO,[3] made the decision to add UES as a permanent $20 item to the menu despite significant pushback from other members of the Company's management team. This decision created both operational and financial issues for the Debtors, costing the Debtors $11 million and saddling the Company with burdensome supply obligations, particularly with its equity sponsor, Thai Union. The Debtors are currently investigating the circumstances around these decisions.

40.     The Debtors are also investigating whether Thai Union and Mr. Kenny encouraged excessive merchandising of the UES promotion in-store (including heavy in-store promotion), which was atypical for the Company. The excessive merchandising decision led to supply issues resulting in major shortages of shrimp with restaurants often going days or weeks without certain types of shrimp. Moreover, the Debtors are investigating whether Mr. Kenny's decision-making process circumvented the Company's normal supply chain and demand planning processes.

41.     Furthermore, I understand Red Lobster's supply process was strained by virtue of its relationship with Thai Union, which, in addition to being the Company's equity sponsor and 100% owner of Red Lobster Master Holdings GP, has historically been a large-scale supplier to

---

[3] At the direction of Thai Union, Mr. Kenny became acting interim CEO following the resignation of the previous permanent CEO in April 2022.

Red Lobster. I understand that Thai Union exercised an outsized influence on the Company's shrimp purchasing, as indicated by, for example, Mr. Kenny's April 2023 purported direction to Thai Union to continue producing shrimp for Red Lobster that did not flow through the traditional supply process or bid cycle or adhere to the Company's demand projections. I also understand that in apparent coordination with Thai Union and under the guise of a "quality review," Mr. Kenny made a series of decisions that eliminated two of the Company's breaded shrimp suppliers, leaving Thai Union with an exclusive deal that led to higher costs to Red Lobster.

42.     The Debtors are exploring the impact of the control Thai Union exerted, in concert with Mr. Kenny and other Thai Union-affiliated entities and individuals, and whether actions taken in light of these parties' varying interests were appropriate and consistent with applicable duties and obligations to Red Lobster.

**Part IV**
**Prepetition Turnaround Efforts and The Chapter 11 Cases**

A. **Attempt to Restructure Out of Court**

43.     In December 2023, after the occurrence of events of default, the Prepetition Term Loan Agent exercised equity proxy rights granted to it by Holdings in connection with the Prepetition Term Loan Agreement and related loan documents. This gave the Prepetition Term Loan Agent the contractual ability to replace the Debtors' existing directors (or managers, in the case of limited liability companies). At that time, the Prepetition Term Loan Agent removed all existing managers and directors of the Debtors and replaced them with Lawrence Hirsh, an independent director with more than thirty years of restructuring expertise.

44.     Following the appointment of Mr. Hirsh, the Debtors and the Prepetition Term Loan Lenders were engaged in discussions aimed at effectuating an out-of-court restructuring of the Debtors' capital structure. Thai Union and the Debtors (who, at that time, were advised by

different professionals) engaged in negotiations with the Prepetition Term Loan Lenders to create a new equity structure in which the Prepetition Term Loan Lenders would acquire approximately 80% of the restructured company, with Thai Union retaining a minority equity interest. These negotiations were ultimately unsuccessful.

45.　　Around the same time, the Debtors' chief executive officer, Horace Dawson, decided to retire after more than 30 years of service to the restaurant industry, 20 of which were spent in various roles within Red Lobster. The Board then asked me to assume the role of CEO to implement the operational turnaround strategy described above, and my colleague Nicholas Haughey became CRO.

46.　　To date, the Company has been unable to obtain additional capital from Thai Union. In February 2024, the Prepetition Term Loan Lenders made incremental loans of $20 million to the Company for working capital purposes, but without financial support from Thai Union, the Prepetition Term Loan Lenders were not willing to make any further loans to the Company on an out-of-court basis. With no meaningful ability to raise fresh capital, it became evident that the Company needed to consider a chapter 11 process. As a result, the Debtors determined that a comprehensive operational restructuring and value maximizing sale inside of a chapter 11 process would likely be the best possible alternative under the circumstances.

## B. **Operational Initiatives**

47.　　With the help of my A&M team, in February 2024 I developed a three-prong strategic priority plan designed to improve the Company's operations. In the months leading up to the Petition Date, the Company's management team has been working hard to put this strategic plan into action.

48.　　First and foremost, ensuring that Red Lobster is a great place to work remains a central focus of the Company's management. As part of this goal, the Company continues to work

to develop one standard for store operations across its active stores. It is critical that the employee and customer experience is consistently excellent across all locations. The Debtors are seeking to implement, among other things, a comprehensive upgrade to their current information technology systems and targeted investments in their facilities. To help with employee culture and retention, the Debtors are redoubling their efforts to cultivate and sustain a culture of reward and recognition. This will include modernizing hiring processes and developing individualized plans for Red Lobster's directors and senior directors of operations.

49.     Second, the Company is working to ensure that Red Lobster remains a great place to eat by providing consistent experiences and excellent customer service. The Company has begun to execute internal strategies to make its brand even more compelling by leveraging its partners to extend the Company's voice, presence, and impact within the market. As part of that process, the Company intends to simplify Red Lobster's menu by implementing a core menu that balances efficiency and appeal. Moreover, the Company will implement a sensible promotional calendar with fewer "limited time offers."

50.     Third, the Debtors have already begun to reduce their cost structure without compromising quality by rationalizing the Debtors' restaurant footprint. On May 13, 2024, the Debtors made the difficult decision to close and vacate 93 stores. Where possible, Red Lobster attempted to relocate employees of closed stores to a nearby location, and reorganized mid-level management accordingly. These 93 stores were deemed to be non-performing because of rent costs and/or financial performance, such that operating those stores was deemed to be financially burdensome to the rest of the Company. The Company is also working to identify and eliminate nonproductive spending across all departments.

**C. Marketing Process, DIP Financing, and Stalking Horse Asset Purchase Agreement**

51.     In March, when it became clear that an out-of-court solution to recapitalize the Company was not feasible, the Company retained an investment banker, Hilco Corporate Finance ("Hilco"), to formally initiate a marketing and sale process. Hilco then commenced an extensive marketing effort and solicited indications of interest from strategic and financial buyers with the financial and operational wherewithal to complete a transaction with the Debtors.

52.     At that same time, as the Debtors continued to review strategic alternatives, it became apparent that the commencement of these Chapter 11 Cases would likely be necessary. The Debtors, with the assistance of their advisors, first set out to develop a robust chapter 11 strategy and corresponding budget. As a result of those efforts, the Debtors determined that they needed $100 million to fund these Chapter 11 Cases to ensure that the Debtors can sustain their operations. As a result, the Debtors focused on obtaining debtor-in-possession ("DIP") financing.

53.     To secure the necessary financing, the Debtors: (i) sought to enter into a restructuring support agreement (the "RSA") with their Prepetition Term Loan Lenders; and (ii) pursued financing from other potential third-party sources. Ultimately, the Debtors were unable to obtain third-party financing. However, after significant negotiations, the Debtors executed the RSA with the Prepetition Term Loan Lenders on May 9, 2024. An accurate and complete copy of the RSA is attached hereto as **Exhibit B**.

54.     Importantly, the RSA set forth: (i) the terms upon which the Prepetition Term Loan Lenders would provide the necessary DIP financing to the Debtors; (ii) the terms upon which the Prepetition Term Loan Lenders would serve as a stalking horse bidder for the sale of substantially all of the Debtors' assets (the "Stalking Horse Bid"); and (iii) an agreed timeline for the commencement and prosecution of these Chapter 11 Cases.

55. Immediately prior to commencing these Chapter 11 Cases, the Debtors: (a) finalized a DIP financing facility (the "DIP Facility") governed by that certain Secured Superpriority Debtor-in-Possession Financing Agreement (the "DIP Credit Agreement"); and (b) entered into that certain Asset Purchase Agreement with RL Purchaser LLC (a newly formed entity organized and controlled by the Prepetition Term Loan Lenders) (the "Stalking Horse APA"). Because the terms of the RSA are now contained in the Stalking Horse APA and the DIP Credit Agreement (both of which have been filed contemporaneously with this Declaration). The Debtors are not seeking to assume the Restructuring Support Agreement in connection with the commencement of the Chapter 11 Cases.

56. The Debtors have targeted the following dates in order to satisfy the terms of the DIP Credit Agreement:

| Milestones | |
|---|---|
| | |
| Entry of Interim DIP Financing Order | **Tuesday, May 21, 2024** (Petition Date + 2 Business Days) |
| Entry of Final DIP Financing Order | **Tuesday, June 18, 2024** (Petition Date + 30 Days) |
| Entry of Bidding Procedures Order | **Tuesday, June 18, 2024** (Petition Date + 30 Days) |
| Auction Held, if necessary | **Tuesday, July 23, 2024** (Petition Date + 65 Days) |
| Entry of Sale Order | **Monday, July 29, 2024** (Petition Date + 71 Days)[4] |
| Sale Consummation | **Friday, August 2, 2024** (Petition Date + 75 Days)[5] |

---

[4] The Prepetition Term Loan Lenders have agreed under the RSA to a one day extension of this milestone.

[5] Provided, however, that if the Sale Order is entered within 75 days after the Petition Date, such deadline shall be extended to 90 days after the Petition Date solely for the purpose of obtaining the regulatory approvals necessary to consummate the Restructuring.

57.     The Debtors believe this timeline minimizes the potential adverse impact a chapter 11 case may have on the Debtors' operations, vendors, and employees, while at the same time provides adequate opportunity to market the Company and secure executable bids for the Debtors' business for the highest or best value. The proposed timeline outlined above appropriately balances the Debtors' need to effectuate their sale strategy quickly with their need to adequately market test the value of their businesses and account for the benefits that will be received through the business transformation initiatives, including by rejecting or renegotiating burdensome leases.

58.     The amount of work done prior to the Petition Date by the Debtors and their professionals in connection with the marketing process supports the ability to complete the overarching sale process on the timeframe proposed. The Debtors believe that proceeding with the marketing process is preferable to any of their other alternatives and will inure to the benefit of all constituents, including their employees, vendors, and customers.

**Part V**
**Summary of First Day Pleadings**

59.     Contemporaneously herewith, the Debtors have filed with the Court certain First Day Pleadings seeking orders granting various forms of relief intended to stabilize the Debtors' business operations, facilitate the efficient administration of these Chapter 11 Cases, and expedite the marketing process.[6]

60.     Several of the First Day Pleadings request authority to pay certain prepetition claims against the Debtors. I understand that Rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first twenty-one (21) days following the filing of a chapter 11 case, except to the

---

[6] All capitalized terms used but not defined in Part V shall have the meaning ascribed to them in the applicable First Day Pleadings.

extent relief is necessary to avoid immediate and irreparable harm. In light of this requirement, the Debtors have narrowly tailored their requests for immediate authority to pay certain prepetition claims to those instances where the failure to pay would cause immediate and irreparable harm to the Debtors and their estates. Furthermore, in response to certain limited concerns raised by counsel to the United States Trustee, the Debtors have further revised and tailored the relief sought in the First Day Pleadings.

61.     The First Day Pleadings include the following:

**A. *Debtors' Ex Parte Motion for Authorization to File Consolidated Chapter 11 Case Management Summary***

62.     I am advised that in accordance with Local Rule 2081-1(b), the debtor in possession in a Chapter 11 case is directed to file with the Court and serve a completed local form Chapter 11 Case Management Summary providing certain information regarding the assets, liabilities and financial affairs of Chapter 11 debtors.

63.     Pursuant to the *Debtors' Ex Parte Motion for Authorization to File Consolidated Chapter 11 Case Management Summary* filed contemporaneously herewith (the "Consolidated Case Management Summary Motion"), the Debtors request that the Court authorize them to file a consolidated Case Management Summary, reflecting the assets, liabilities and financial information of each of the Debtors. I believe that the Debtors' request for authority to file a consolidated Case Management Summary is justified, as the filing of a separate Case Management Summary for each of the fifteen Debtors would be, in significant part, burdensome. In brief, the filing of a consolidated Case Management Summary is more efficient and will provide the Court and parties-in-interest with adequate disclosures regarding the assets and liabilities of each Debtor.

**B. *Debtors' Ex Parte Motion for Joint Administration***

64.     Pursuant to the *Debtors' Ex Parte Motion for Joint Administration* filed contemporaneously herewith (the "Joint Administration Motion"), the Debtors request entry of an order directing joint administration of the Chapter 11 Cases for procedural purposes only.

65.     It will be more efficient for the administration of these cases if joint administration is authorized. Joint administration of the Debtors' Chapter 11 Cases will save the Debtors and their estates substantial time and expense by removing the need to prepare, replicate, file, and serve duplicative notices, applications, and orders. Further, I believe that joint administration would relieve the Court of entering duplicative orders and maintaining duplicative files and dockets. Consequently, joint administration would reduce costs and facilitate the economical, efficient and convenient administration of the Debtors' estates.

66.     I believe that joint administration would not adversely affect any creditors' rights because the Debtors' motion requests only the administrative consolidation of these cases for procedural purposes. The Debtors filed the Joint Administration Motion on an *ex parte* basis as contemplated by Local Rule 1015-1.

**C. *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to File (A) a Consolidated Creditor Matrix and (B) Consolidated List of the Top Thirty Unsecured Creditors; and (II) Authorizing the Debtors to Suppress Certain Personally Indentifiable Information for Individual Creditors, Employees and Parties in Interest***

67.     Pursuant to the *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to File (A) a Consolidated Creditor Matrix and (B) a Consolidated List of the Top Thirty Unsecured Creditors; and (II) Authorizing the Debtors to Suppress Certain Personally Identifiable Information for Individual Creditors, Employees and Parties in Interest* filed contemporaneously herewith (the "Consolidated Creditor Matrix Motion"), the Debtors request authority to file and maintain a consolidated list of creditors in lieu of submitting a separate mailing matrix for each Debtor. Permitting the Debtors to maintain a consolidated list of their creditors in electronic format

only, in lieu of filing a separate creditor matrix for each Debtor, is warranted under the circumstances of the Chapter 11 Cases. Because the Debtors have over one hundred thousand creditors and other parties in interest, converting the Debtors' computerized information to a format compatible with the matrix requirements would be a burdensome task and would greatly increase the risk of error.

68.     The Debtors, working together with Epiq (the Debtors' proposed claims, noticing, and solicitation agent), have prepared a single, consolidated list of the Debtors' creditors in electronic format. The Debtors are prepared to make that list available in electronic form to any party in interest who so requests (or in non-electronic form at such requesting party's sole cost and expense) in lieu of submitting a separate mailing matrix for each Debtor to the Court's clerk's office.

69.     The Debtors also request authority to file a single consolidated list of their 30 largest general unsecured creditors in lieu of filing a separate list of the top twenty unsecured creditors for each Debtor. The Debtors share financial and operational systems and also share many of the same creditors. The Consolidated Top 30 List will help alleviate administrative burdens, costs, and the possibility of duplicative service.

70.     The Debtors also respectfully submit that it is appropriate to authorize the Debtors to suppress from any paper filed with the Court in these Chapter 11 Cases, the names, residential addresses and email addresses of individuals that are creditors, employees, and parties in interest because disclosure risks violating applicable privacy laws, exposing the Debtors to potential civil liability and significant financial penalties. Pursuant to Section 107(c) and privacy protection regulations being enacted in key jurisdictions, such as the California Consumer Privacy Act of 2018, it is appropriate to authorize the Debtors to suppress from any paper filed with the Court in

these Chapter 11 Cases, the names, residential addresses and email addresses of the Debtors' individual creditors, employees, and parties in interest as such violations would expose the Debtors to potential civil liability and significant financial penalties. Epiq will maintain a list of the suppressed individuals so that the Debtors can track and will also be made available to the Court and US Trustee upon request.

**D.  *Debtors' Emergency Motion for an Order Establishing Certain Notice Procedures***

71.     Pursuant to the *Debtors' Emergency Motion for an Order Establishing Certain Notice Procedures* filed concurrently herewith (the "Notice Procedures Motion"), the Debtors seek entry of an order approving the form and manner for implementing certain proposed notice procedures, for notifying creditors of the commencement and the administration of Debtors' complex chapter 11 bankruptcy cases through an expedited plan confirmation process, and for granting related relief.

72.     Collectively, the fifteen Debtors have over one hundred thousand potential creditors or other parties in interest entitled to service of certain pleadings in these Chapter 11 Cases. As of the Petition Date, the Debtors employ approximately 36,000 employees, approximately 34,000 of whom are in the United States and approximately 2,000 of whom are in Canada. The Debtors also estimate that they have approximately 100,000 former employees that may receive service of certain pleadings throughout these Chapter 11 Cases. In order to alleviate the enormous and costly burden of serving over one hundred thousand creditors and parties-in-interest with each filing, in some cases voluminous filings, made in these complex chapter 11 case, the Debtors propose to create and utilize a Master Service List to serve pleadings and other documents upon parties-in-interest and current or former Employees by e-mail where available, or by U.S. mail or hand delivery if required. The proposed notice procedures will control over the applicable noticing rules contained in the Bankruptcy Rules and the Local Rules.

73.     The Debtors further propose that all filings will be made available to all parties-in-interest and employees on a public website maintained by the Debtor's claims and noticing agent Epiq Corporate Restructuring, LLC ("Epiq"). I believe that this relief requested is necessary and in the best interests of the Debtors' complex chapter 11 bankruptcy cases, and will allow for a more efficient and cost saving case administration, which is in the best interests of the Debtors' estates and all the parties-in-interest.

**E.**  ***Debtors' Emergency Motion for Approval of Form of Notice of Commencement and Proof of Claim***

74.     Pursuant to the *Debtors' Emergency Motion for Approval of Form of Notice of Commencement and Proof of Claim* filed concurrently herewith (the "Approval of Form and Manner of Notice of Commencement Motion"), the Debtors request the entry of an order setting the bar dates for the filing of Proofs of Claims and approving the form and manner of notice of the commencement of these Chapter 11 cases and the bar dates for filing Proofs of Claim.

75.     In order to facilitate the filing of proofs of claims, procedures need to be established for a consistent and uniform process so that everyone who may potentially wish to file one has received notice and an equal opportunity to do so. I believe that this relief requested is necessary and in the best interests of the Debtors' complex chapter 11 bankruptcy cases and will allow for a more efficient and cost saving case administration, which is in the best interests of the Debtors' estates and all the parties-in-interest.

**F.**  ***Emergency Application of the Debtors Pursuant to 11 U.S.C. §§ 105(a) and 363(b) to (I) Retain Alvarez & Marsal North America, LLC to Provide the Debtors a Chief Executive Officer, a Chief Restructuring Officer, and Certain Additional Personnel, (II) Designate Jonathan Tibus as Chief Executive Officer, and (III) Designate Nicholas Haughey as Chief Restructuring Officer for the Debtors, in Each Case, Effective as of the Petition Date***

76.     Pursuant to the *Emergency Application of the Debtors Pursuant to 11 U.S.C. §§ 105(a) and 363(b) to (I) Retain Alvarez & Marsal North America, LLC to Provide the Debtors a*

Chief Executive Officer, a Chief Restructuring Officer, and Certain Additional Personnel, (II) Designate Jonathan Tibus as Chief Executive Officer, and (III) Designate Nicholas Haughey as Chief Restructuring Officer for the Debtors, in Each Case, Effective as of the Petition Date filed contemporaneously herewith (the "A&M Retention Application"), the Debtors seek approval of an agreement with Alvarez & Marsal North America, LLC ("A&M") to provide (i) myself, Jonathan Tibus, as the CEO of the Debtors; (ii) Nicholas Haughey as the CRO of the Debtors and (iii) the services of certain support personnel, as required.

77.     Additional factual support is set forth in the A&M Retention Application and the declarations attached thereto.

### G.  Debtors' Emergency Application for Entry of Order Authorizing Debtors to Employ and Retain Epiq Corporate Restructuring, LLC as Notice, Claims and Solicitation Agent Effective as of the Petition Date

78.     Pursuant to the Debtors' Emergency Application for Entry of Order Authorizing Debtors to Employ and Retain Epiq Corporate Restructuring, LLC as Notice, Claims and Solicitation Agent Effective as of the Petition Date filed contemporaneously herewith (the "Epiq Retention Application"), the Debtors seek an order authorizing the Debtors to employ and retain Epiq as claims and noticing agent in the Chapter 11 Cases. I believe that such relief is prudent in light of the thousands of known creditors, potential unknown creditors, and parties in interest to whom certain notices will be sent. Accordingly, I believe that the most effective and efficient manner by which to give notice and process claims in the Chapter 11 Cases is to engage Epiq, an independent third party with significant experience in this role, to act as an agent of the Court.

79.     Additional factual support is set forth in the Epiq Retention Application and the declarations attached thereto.

**H. *Emergency Motion of Debtors for an Order Authorizing Red Lobster Management LLC to Act as Foreign Representative of the Debtors***

80.　　Pursuant to the *Emergency Motion of Debtors for an Order Authorizing Red Lobster Management LLC to Act as Foreign Representative of the Debtors* filed contemporaneously herewith (the "Foreign Representative Motion"), the Debtors request authority for Debtor Red Lobster Management LLC ("RL Management") to act as the foreign representative on behalf of the Debtors' estates in insolvency recognition proceedings in Canada and in any other judicial or other proceeding in a foreign country pursuant to section 1505 of the Bankruptcy Code. The Debtors further request that, as foreign representative, RL Management be expressly authorized to (i) seek recognition of these chapter 11 cases and certain of this Court's orders in Canada, and (ii) seek any other appropriate relief from the Canadian Court that is just and proper in furtherance of the protection of the Debtors' estates.

81.　　In addition to their operations in the United States, the Debtors, through Debtor Red Lobster Canada, Inc. ("RL Canada"), a Delaware corporation, operate 27 restaurants in Canada and own certain assets in Canada. RL Canada employs all of the Debtors' Canadian employees, owns one parcel of real property in Canada and leases the remaining restaurant space for the Canadian operations. Additionally, the Debtors share financial resources, management services and infrastructure between their U.S. and Canadian operations.

**I. *Debtors' Emergency Motion for Interim and Final Orders Authorizing Debtors to (I) Pay Prepetition Wages, Salaries, Employee Benefits, and Other Employee Obligations, (II) Maintain Employee Benefit Programs and (III) for Related Relief***

82.　　Pursuant to the *Debtors' Emergency Motion for Interim and Final Orders Authorizing Debtors to (I) Pay Prepetition Wages, Salaries, Employee Benefits, and Other Employee Obligations, (II) Maintain Employee Benefit Programs and (III) for Related Relief* filed contemporaneously herewith (the "Wages Motion"), the Debtors request, among other things,

authority, but not direction, to (a) pay prepetition wages, salaries, reimbursable expenses, and other obligations on account of the Compensation and Benefits Programs in the ordinary course of business as provided herein and (b) continue the Compensation and Benefits Programs.

83.     As described more fully in the Wages Motion, the Debtors employ approximately 36,000 employees, approximately 34,000 of which are located in the United States and approximately 2,000 of which are located in Canada. The Debtors' workforce includes employees and independent contractors. Without the workforce's continued, uninterrupted services, the Debtors cannot continue to operate in a chapter 11 proceeding. In the ordinary course of their operations, the Debtors incur a number of obligations to, or on account of, their employees, including those related to compensation and benefits.

84.     The relief requested in the Wages Motion is essential to the viability of the Debtors' businesses. Any delay in paying the employees' compensation, deductions, or benefits will fundamentally harm the Debtors' relationships with their employees and irreparably impair employee morale at the very time when dedication, confidence, and cooperation are most critical. Absent immediate authority to tender the payments described in the Wages Motion, the Debtors operations will be severely impaired. Employee support for the Debtors' sale efforts is crucial, particularly given the employees' unique knowledge of the Debtors' operations. At this critical stage of the Chapter 11 Cases, the Debtors cannot risk the substantial business disruptions that would inevitably attend any decline in work force morale attributable to the Debtors' failure to pay employee compensation, deductions, and benefits in the ordinary course.

85.     The requested relief will enable the Debtors to maintain their current operations without interruption, thereby preserving the value of the business, and, at the same time, maintaining Employee morale. Without the relief requested, the Debtors' ability to preserve the

assets of the estates for the benefit of all creditors and stakeholders will be dramatically impaired. Therefore, a grant of the requested relief is in the best interest of the Debtors, their estates and creditors.

86.     The Debtors are not seeking relief to pay prepetition employee obligations to any individual employee or independent contractor in excess of the cap imposed by section 507(a)(4) of the Bankruptcy Code. Also, the total amount sought to be paid by the Wages Motion is modest compared to the magnitude of the Debtors' overall business. Furthermore, the Debtors have sufficient funds to pay the employee obligations in the ordinary course using cash maintained by the Debtors and cash generated through operations as well as through access to the DIP Facility.

**J.    *Debtors' Emergency Motion for Interim and Final Orders Authorizing Debtors to Pay Prepetition Sales, Use, Trust Fund, Property, Foreign, and Other Taxes and Similar Obligations***

87.     Pursuant to the *Debtors' Emergency Motion for Interim and Final Orders Authorizing Debtors to Pay Prepetition Sales, Use, Trust Fund, Property, Foreign, and Other Taxes and Similar Obligations* filed contemporaneously herewith (the "Taxes Motion"), the Debtors request authority, among other things, to pay, in the Debtors' sole discretion, sales, use, trust fund, property, foreign and other taxes and similar obligations, in the ordinary course of the Debtors' businesses, without regard to whether such obligations accrued or arose before or after the Petition Date.

88.     In the ordinary course of operating their businesses, the Debtors (a) incur certain sales, use, trust fund, property, foreign, and other taxes, and (b) are charged amounts for fees and other similar charges and assessments by various licensing authorities. I understand that the Debtors are generally current with respect to its tax obligations, but that approximately $34,634,000 in unpaid taxes and fees have accrued as of the Petition Date.

89.     The Debtors must continue to pay certain taxes and fees to continue operating in certain jurisdictions and to avoid potential penalties and distractions during the Chapter 11 Cases. The Debtors' failure to pay the taxes and fees described the in the Taxes Motion could adversely affect the Debtors' business operations because governmental authorities may assert liens on the Debtors' property, assert penalties or interest on past-due taxes, cancel liquor licenses crucial to the Debtors' business or commence personal liability actions against directors, officers, and other employees in connection with non-payment.

K.  **Debtors' Emergency Motion for Authorization to (I) Continue to Administer Insurance Policies, Surety Bonds and Related Agreements; (II) Honor Certain Obligations in Respect Thereof; and (III) for Related Relief**

90.     Pursuant to the *Debtors' Emergency Motion for Authorization to (I) Continue to Administer Insurance Policies, Surety Bonds and Related Agreements; (II) Honor Certain Obligations in Respect Thereof; and (III) for Related Relief* (the "Insurance Motion") filed contemporaneously herewith, the Debtors request authority, among other things, to maintain, renew, modify, supplement or purchase, in their sole discretion the insurance policies described in the Insurance Motion and their surety bond program and agreements relating thereto.

91.     The Debtors' insurance policies are crucial to the preservation of the value of the Debtors' business, properties, and assets. In many cases, the insurance coverage provided by the insurance policies is required by diverse regulations, laws, and contracts, as well as the Office of the United States Trustee. Therefore, I believe that it is essential for the Debtors to maintain the insurance policies for the Debtors. Moreover, if the insurance policies are allowed to lapse, the Debtors risk exposure to substantial liability for any damages resulting to persons or property of the Debtors and others, and the Debtors would have to bear the costs and expenses of defense litigation. The Debtors' continued operations, combined with the Debtors' efforts to undertake an

orderly sale and reorganization process, require that the insurance policies be maintained on an ongoing and uninterrupted basis.

**L.** ***Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Enter Into the New Insurance Program, (II) Authorizing Assumption of the Existing Insurance Program, and (III) Granting Related Relief***

92.    As described in the *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Enter Into the New Insurance Program, (II) Authorizing Assumption of the Existing Insurance Program, and (III) Granting Related Relief* filed concurrently herewith (the "Zurich Motion"), the Debtors request authorization to enter into the New Insurance Program and to assume the Existing Insurance Program.

93.    In the ordinary course of business, the Debtors maintain numerous insurance policies. The Debtors' insurance policies are essential to the preservation of the value of the Debtors' business, property, and assets. In many states, insurance coverage is required by the diverse regulations, laws and contracts that govern the Debtors' commercial activities, which is further mandated by the U.S. Trustee Guidelines requiring to maintain insurance coverage throughout their chapter 11 proceedings.

94.    The applicable agreements for the Existing Insurance Program and the New Insurance Program with Zurich require that the Debtors must: (a) file the Zurich Motion and request the relief outlined in the Zurich Motion at the first-day hearing in these chapter 11 cases; and (b) in the event that the Court declines to rule on at the first-day hearing (or grants the relief only on an interim basis), obtain the relief requested on a final basis within 22 calendar days after the Petition Date. Zurich has indicated that if the Debtors fail to do either of these, it reserves all rights, including the right to seek termination of the Existing Insurance Program and the right to refuse to proceed with the New Insurance Program.

95.     The Existing Insurance Program provides coverage for, inter alia, workers'
compensation, general liability, automobile liability, commercial umbrella liability, and certain
other insurance for specified policy periods. The workers' compensation, general liability,
automobile liability, and commercial umbrella liability coverage under the Existing Insurance
Program is set to expire on June 30, 2024, at 12:01 a.m. (prevailing Eastern Time).

96.     The Policies are customary for a company of the Debtors' size, and any lapse in
coverage for workers' compensation, general liability, automobile liability, and commercial
umbrella liability would be disruptive and could have an adverse and irreparable impact on the
Debtors and their estates.

**M. *Debtors' Emergency Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105(a) and 366(b) and Local Rule 2081-1(g)(7): (I) Prohibiting Utilities from Altering, Refusing, or Discontinuing Services, (II) Deeming Utilities Adequately Assured of Future Performance, (III) Establishing Procedures for Determining Adequate Assurance of Payment, and (IV) Granting Related Relief***

97.     Pursuant to the *Debtors' Emergency Motion for Entry of an Order Pursuant to 11
U.S.C. §§ 105(a) and 366(b) and Local Rule 2081-1(g)(7): (I) Prohibiting Utilities from
Refusing, or Discontinuing Services, (II) Deeming Utilities Adequately Assured of Future
Performance, (III) Establishing Procedures for Determining Adequate Assurance of Payment, and
(IV) Granting Related Relief* filed contemporaneously herewith (the "Utilities Motion"), the
Debtors seek entry of an order, among other things: (i) prohibiting its utility service providers (the
"Utility Companies") from altering, refusing or discontinuing service ("Utility Services") on
account of prepetition amounts outstanding or on account of any perceived inadequacy of the
Debtors' proposed adequate assurance; and (ii) approving the Debtors' proposed adequate
assurance and related procedures.

98.     In connection with the operation of their business in the United States, the Debtors
obtain electricity, natural gas, telecommunications, water, waste management (including sewer

and trash), internet, and other similar services from a number of utility providers or brokers to facilitate their business operations. Certain Utility Services are aggregated and processed through a third party. Based on a monthly average for the trailing twelve months prior to the Petition Date, the Debtors estimate that the cost of all Utility Services for the next thirty (30) days will be approximately $6,612,000.00.

99.     The Debtors intend to satisfy postpetition obligations owed to the Utility Companies in the ordinary course of business and in a timely manner. The Debtors believe that cash held by the Debtors, generated in the ordinary course of business, as well as cash made available to the Debtors under the DIP Facility will provide sufficient liquidity to pay the Utility Companies for Utility Services in accordance with their prepetition practice during the pendency of their Chapter 11 Cases. To provide additional assurance of payment, the Debtors propose to deposit $2,082,000.00 into a segregated account, which represents an amount equal to two (2) weeks' cost of Utility Services provided by all Utility Companies in the aggregate (less any deposit, letter of credit, or surety bond held by such Utility Company), calculated using the historical average for such payments during the twelve (12) months prior to the Petition Date.

100.    Additionally, the Debtors seek approval of their proposed Adequate Assurance Procedures. These procedures set forth a streamlined process for Utility Companies to address potential concerns with respect to the Proposed Adequate Assurance, while allowing the Debtors to continue their operations uninterrupted.

**N.** ***Debtors' Emergency Motion for Entry of an Order (I) Authorizing Debtors to (A) Maintain and Administer Prepetition Customer Programs, Promotions, and Practices and (B) Honor Prepetition Obligations Related Thereto and (II) Granting Related Relief***

101.    Pursuant to the *Debtors' Emergency Motion for Entry of an Order (I) Authorizing Debtors to (A) Maintain and Administer Prepetition Customer Programs, Promotions, and Practices and (B) Honor Prepetition Obligations Related Thereto and (II) Granting Related Relief*

35

filed contemporaneously herewith (the "Customer Programs Motion") the Debtors request authority, among other things, to continue, renew, replace, implement or terminate customer-related programs, promotions, and practices (the "Customer Programs").

102. As owners, operators, or franchisors of hundreds of restaurants across the United States and around the globe, to attract new customers (and reward and provide incentives to existing customers), the Debtors employ certain programs, promotions, and practices described herein. The Customer Programs include: (i) coupons and sales promotions; (ii) a gift card program; (iii) the My Red Lobster Rewards Loyalty Program; and (iv) the Debtors' ordinary course refund policy. The Customer Programs promote customer satisfaction and inure to the goodwill of the Debtors' business and the value of their brand. Maintaining the goodwill of their customers is critical to the Debtors' ongoing operations in these chapter 11 cases and is necessary to maximize value for the benefit of all of the Debtors' stakeholders. Continued use of the Customer Programs will also enable the Debtors to protect their customer base and revenue growth opportunities.

103. As of the Petition Date, the Debtors estimate that there are approximately $121 million of prepetition obligations outstanding related to the Customer Programs. The Debtors seek authority to continue the Customer Programs only in the ordinary course of their business, which the Debtors estimate will translate to comparatively modest recognition of such liabilities on a weekly basis. By contrast, failure to continue the Customer Programs would generate bad publicity and sap customer goodwill at a precarious time for the Debtors and their restaurant business.

**O. *Debtors' Emergency Motion for Entry of an Order (I) Authorizing Debtors to Pay Certain Prepetition Claims of Lien Claimants in the Ordinary Course of Business, and (II) Granting Related Relief***

104. Pursuant to the *Debtors' Emergency Motion for Entry of an Order (I) Authorizing Debtors to Pay Certain Prepetition Claims of Lien Claimants in the Ordinary Course of Business, and (II) Granting Related Relief* filed contemporaneously herewith (the "Lien Claimants Motion")

the Debtors seek authority, but not direction, to pay certain lien claims in an aggregate amount not to exceed $93,000 and only on such terms and conditions as are appropriate, in the Debtors' business judgment, to minimize any disruptions to the Debtors' businesses.

105.    The Debtors retain vendors to perform a number of services, including construction, installation, maintenance, servicing, delivery and/or storage of equipment, facilities, supplies, and products that are essential to the Debtors' restaurant enterprise, including the warehousing of a subset of the Debtors' inventory. The Debtors are also responsible for covering the costs of improvements and repairs to their properties. They also rely upon vendors and repairmen to service certain of their equipment used in the operation of their businesses. With the Debtors' required ongoing service, repair, and maintenance obligations of their store locations and equipment, the Debtors depend on continuing business relationships with, and services provided by, certain lien claimants. Failure to pay amounts owed to these parties when due could result in, among other things, these vendors asserting liens against certain of the Debtors' assets under applicable state law, which could prevent the Debtors from maximizing recoveries for all stakeholders in these Chapter 11 Cases. Moreover, various state laws would permit such claimants to assert statutory liens against the Debtors' equipment and/or merchandise (or underlying property) in their possession and the subject of any delinquent charges.

**P.  *Debtors' Emergency Motion for Entry of an Order (I) Authorizing Debtors to Pay Certain Section 503(b)(9) Claims in the Ordinary Course of Business, and (II) Granting Related Relief***

106.    Pursuant to the *Debtors' Emergency Motion for Entry of an Order (I) Authorizing Debtors to Pay Certain Section 503(b)(9) Claims in the Ordinary Course of Business, and (II) Granting Related Relief* filed contemporaneously herewith (the "503(b)(9) Motion"), the Debtors seek entry of an order: (i) authorizing the Debtors to pay in the ordinary course of business prepetition amounts owed to certain vendors solely for goods delivered to the Debtors within

twenty (20) days of the Petition Date and whose prepetition claims are thus entitled to administrative expense priority status under section 503(b)(9) of the Bankruptcy Code; (ii) confirming administrative expense priority status for all undisputed obligations of the Debtors arising out of outstanding orders for goods not yet delivered as of the Petition Date; and (iii) granting related relief. The Debtors request authority to pay the 503(b)(9) Claims (as defined below) in an amount not to exceed $49,838,000 as they become due in the ordinary course of business. For the avoidance of doubt, the Debtors do not seek relief to pay any 503(b)(9) Vendor for any prepetition claim that is not entitled to administrative expense priority pursuant to section 503(b)(9) of the Bankruptcy Code.

107.    To operate their restaurants, the Debtors rely on various vendors, suppliers, and distributors to provide the Debtors with various perishable and nonperishable items (such vendors, suppliers, and distributors, each a "503(b)(9) Vendor" and collectively, the "503(b)(9) Vendors" and their prepetition claims, each a "503(b)(9) Claim" and collectively, the "503(b)(9) Claims"). In the past twelve months, the Debtors paid approximately $750 million in the ordinary course of business to purchase perishable and nonperishable goods from approximately 4,000 vendors.

108.    Within the 20-day period before the Petition Date and in the ordinary course of business, the Debtors received goods (including food and beverages) from approximately 450 503(b)(9) Vendors totaling approximately $49,838,000. Failure to pay the 503(b)(9) Vendors at the outset of these Chapter 11 Cases on account of their 503(b)(9) Claims—100% of which claims are entitled to administrative expense priority under section 503(b)(9)—could result in the 503(b)(9) Vendors refusing to do business with the Debtors moving forward.

109.    Absent timely payment of their 503(b)(9) Claims, the 503(b)(9) Vendors may also impose stricter payment terms on the Debtors, negatively impacting their liquidity position. The

503(b)(9) Vendors are all important to the Debtors' businesses and, accordingly, a delay in their services could cause irreparable harm to the Debtors' revenue, goodwill, and market share.

**Q.** ***Debtors' Emergency Motion for Interim and Final Orders (A) Authorizing the Debtors to (I) Continue to Use Existing Cash Management System, (II) Maintain Bank Accounts and Continue Use of Existing Business Forms and Checks, (III) Honor Certain Related Prepetition and Postpetition Obligations, and (IV) Perform Intercompany Transactions, (B) Granting a Waiver of Certain Investment and Deposit Guidelines, and (C) Granting Related Relief***

110.　Pursuant to the *Debtors' Emergency Motion for Interim and Final Orders (A) Authorizing the Debtors to (I) Continue to Use Existing Cash Management System, (II) Maintain Bank Accounts and Continue Use of Existing Business Forms and Checks, (III) Honor Certain Related Prepetition and Postpetition Obligations, and (IV) Perform Intercompany Transactions, (B) Granting a Waiver of Certain Investment and Deposit Guidelines, and (C) Granting Related Relief* filed contemporaneously herewith (the "Cash Management Motion"), the Debtors request (a) authority to: (i) continue to maintain the Debtors' existing cash management system, including, without limitation, to continue to maintain the Debtors' existing bank accounts and business forms and checks, (ii) honor certain prepetition and postpetition obligations related thereto, (iii) continue to perform intercompany transactions in the ordinary course, (b) waiving investment and deposit guidelines of section 345 of the Bankruptcy Code and the *Operating Guidelines and Reporting Requirements for Debtors in Possession and Chapter 11 Trustees* (revised 1/01/2020) (the "Guidelines") issued by the Office of the United States Trustee; and (c) providing any additional relief required in order to effectuate the foregoing.

111.　The United States Trustee has established Guidelines for debtors-in-possession in order to supervise the administration of Chapter 11 cases. These Guidelines require Chapter 11 debtors to, among other things, close all existing bank accounts and open new debtor-in-possession ("DIP") bank accounts, establish one DIP account for all estate monies required for the payment

of taxes (including payroll taxes), maintain a separate DIP account for cash collateral, and obtain checks for all DIP accounts that bear the designation "debtor-in-possession," the bankruptcy case number, and the type of account. These requirements are designed to provide a clear line of demarcation between prepetition and post-petition transactions and operations and to prevent the inadvertent post-petition payment of prepetition claims. In the Cash Management Motion, the Debtors seek a waiver of these requirements so that their operations are not further disrupted by the need to alter the Cash Management System as it would create unnecessary administrative burdens and hardship and would cause unnecessary expense, utilization of resources, and delay.

112.    The Cash Management System is comprised of 714 deposit accounts across nine financial institutions, pursuant to which the Debtors manage cash receipts and disbursements. As set forth in the Cash Management Motion, the Debtors' Cash Management System has three primary categories of Bank Accounts: (i) depository accounts into which cash generated from the Debtors' operations are deposited (collectively, the "Depository Accounts"); (ii) operating/concentration accounts into which receipts from the Depository Accounts are channeled and out of which Disbursement Accounts (defined therein) draw funds (collectively, the "Operating Accounts"); and (iii) disbursement accounts for designated disbursements. An average of $20 million in receipts and disbursements flows through the Cash Management System each banking day.

113.    The Cash Management System operates in accordance with ordinary, usual, and essential business practices. It allows the Debtors to efficiently track and report the location and amount of funds, which, in turn, enable the Debtors to track and control such funds, ensure cash availability, and reduce administrative costs through a method of coordinating the collection and movement of funds. The Debtors' existing Bank Accounts function smoothly and permit the

efficient collections and disbursements of cash for the benefit of the Debtors and all parties in interest. The Debtors' transition into Chapter 11 will be significantly less disruptive if its Cash Management System and existing bank accounts are maintained following the commencement of these cases with the same account numbers.

114.    The Debtors' operations require the Cash Management System to continue during the pendency of the Chapter 11 Cases. If the Debtors were required to create and implement a new cash management system, their operations would be severely disrupted, which would have an adverse impact on the Debtors and would result in substantial additional costs to the Debtors' bankruptcy estates.

115.    The Debtors request further relief from the UST Operating Guidelines to the extent that they require the Debtors to make all disbursements by check. Considering the complexity of the Debtors' operations, the Debtors must conduct transactions by debit, wire, or ACH payments and other similar methods, and to deny the Debtors the opportunity to conduct transactions by debit, wire or ACH payments or other similar methods would interfere with the Debtors' performance of their contracts and unnecessarily disrupt the Debtors' business operations, as well as create additional costs to the Debtors.

116.    The Debtors also request authority to engage in certain Intercompany Transactions post-petition. If the Court grants this relief, the Debtors will continue recording all such transactions in their books and records consistent with past practice prior to the Petition Date.

**R. *Debtors' First and Second Omnibus Emergency Motions for Order Authorizing (A) Rejection of Unexpired Leases of Non-Residential Real Property Effective as of the Petition Date, (B) Abandonment of Any Remaining Personal Property Located at the Leased Premises, and (C) Fixing a Bar Date for Claims of Counterparties***

117.    Pursuant to the (i) *Debtors' First Omnibus Emergency Motion for Order Authorizing (A) Rejection of Unexpired Leases of Non-Residential Real Property Effective as of*

the Petition Date, (B) Abandonment of Any Remaining Personal Property Located at the Leased Premises, and (C) Fixing a Bar Date for Claims of Counterparties filed contemporaneously herewith (the "First Lease Rejection Motion"), and (ii) Debtors' Second Omnibus Emergency Motion for Order Authorizing (A) Rejection of Unexpired Leases of Non-Residential Real Property Effective as of the Petition Date, (B) Abandonment of Any Remaining Personal Property Located at the Leased Premises, and (C) Fixing a Bar Date for Claims of Counterparties filed contemporaneously herewith (the "Second Lease Rejection Motion" and together with the First Lease Rejection Motion, the "Lease Rejection Motions"), the Debtors seek entry of orders, pursuant to section 365 of the Bankruptcy Code and Bankruptcy Rule 6006, (a) authorizing and approving the Debtors' rejection of 108 Rejected Leases in the aggregate, effective as of the Petition Date, (b) confirming that any Personal Property remaining at each location not removed by the Petition Date or otherwise within the time agreed upon by and among the Debtors and the counterparty of the applicable location (unless extended by agreement among the Debtors and the applicable counterparty) are deemed abandoned by the Debtors pursuant to section 554 of the Bankruptcy Code without the applicable counterparty incurring liability to any person or entity. Upon such abandonment at the time of the rejection of the applicable Rejected Lease, the applicable counterparty shall be permitted to use or dispose of such abandoned Personal Property remaining at the locations without notice or liability to the Debtors or any third person or entity.

118.     The Debtors are lessees of non-residential real estate, who have ceased operations at the subject premises and are no longer occupying and deriving any benefit from the use of such premises. The Debtors closed nearly 100 restaurant locations in the weeks leading up to the Petition Date. Where possible, the Debtors have sought to remove Personal Property to repurpose in other stores or sell in an auction setting. As described in the Lease Rejection Motions, the Debtors seek

authority to abandon any property remaining in the 108 locations and allow the landlord counterparty to remove and/or dispose of Personal Property.

**S.** ***Emergency Motion for Interim and Final Orders (I) Approving Postpetition Financing, (II) Authorizing the Use of Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief***

119. As described in the *Debtors' Emergency Motion for Interim and Final Orders (I) Approving Postpetition Financing, (II) Authorizing the Use of Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* filed contemporaneously herewith (the "DIP Financing Motion"), the Debtors are in immediate need of debtor-in-possession financing to maintain ongoing business operations as the Debtors transition into the Chapter 11 Cases. Without such immediate financing, the Debtors project, after consultation with their advisors, that they will be unable to make payments essential to continue going concern operations—each as highlighted in the other first day pleadings as described herein—resulting in immediate and irreparable harm to the Debtors' businesses. Accordingly, the proposed postpetition, superpriority secured delayed draw term loan facility, pursuant to the terms of that certain Secured Superpriority Debtor-in-Possession Financing Agreement is critical to the Debtors ability to administer the Chapter 11 Cases and to pursue the restructuring transactions as contemplated by the RSA.

120. Additional factual support is set forth in the DIP Financing Motion and the declarations attached thereto.

### Conclusion

121.     This Declaration illustrates the factors that have precipitated the commencement of these Chapter 11 Cases and the Debtors' critical need for the protections and tools provided to debtors under chapter 11 of the Bankruptcy Code.

122.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

*[Remainder of Page Intentionally Left Blank]*

Executed this __19th__ day of May, 2024

Jonathan Tibus
Chief Executive Officer

Red Lobster Management LLC and each of
its Affiliated Debtors

# EXHIBIT A

**[Corporate Organization Chart]**



**EXHIBIT B**

**[Restructuring Support Agreement]**

*Execution Version*

**THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS OR PROVISIONS OF THE BANKRUPTCY CODE. NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE AGREEMENT EFFECTIVE DATE ON THE TERMS DESCRIBED HEREIN, DEEMED BINDING ON ANY OF THE PARTIES HERETO.**

## RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (including all exhibits, annexes, and schedules hereto in accordance with Section 16.2, this "<u>Agreement</u>") is made and entered into as of May 9, 2024, by and among the following parties (each of the Entities described in sub-clauses (i) through (iii) of this preamble and any person or entity that subsequently becomes a party hereto, an "<u>RSA Party</u>," and collectively, the "<u>RSA Parties</u>"):[1]

    i.    Red Lobster Management LLC and each of its direct or indirect subsidiaries that files a voluntary petition under the Bankruptcy Code (the "<u>Company</u>"); and

    ii.    the undersigned holders (or beneficial holders) of, or investment advisors, sub-advisors, or managers of funds or discretionary accounts that hold, Loan Claims that have executed and delivered counterpart signature pages to this Agreement, a Restructuring Support Agreement Joinder, or a Transfer Agreement Joinder to counsel to the Company (each a "<u>Lender</u>" and collectively, the "<u>Consenting Lenders</u>").

### *RECITALS*

WHEREAS, the RSA Parties seek to pursue and consummate the transactions described herein (the "<u>Restructuring Transactions</u>") through a sale of the Company's assets and business pursuant to section 363 of the Bankruptcy Code in cases commenced under chapter 11 of the Bankruptcy Code (the "<u>Chapter 11 Cases</u>") in the Bankruptcy Court (the "<u>Restructuring</u>"); and

WHEREAS, in furtherance of the Restructuring Transactions, the RSA Parties have agreed to use commercially reasonable efforts to enter into definitive documentation reflecting the terms and conditions set forth in this Agreement;

NOW, THEREFORE, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of each of which is hereby acknowledged, each RSA Party, intending to be legally bound, agrees as follows:

---

[1]    Capitalized terms used but not defined in the preamble and recitals to this Agreement shall have the meanings ascribed to them in Section 1.

## AGREEMENT

**Section 1.** <u>**Definitions and Interpretation**</u>.

1.1 <u>Definitions</u>. The following terms shall have the following definitions:

"<u>Agent</u>" means any administrative agent, collateral agent, or similar Entity acting in such capacity under the Credit Agreement, including any successors thereto.

"<u>Agreement</u>" has the meaning set forth in the preamble to this Agreement and, for the avoidance of doubt, includes all of the exhibits, annexes, and schedules hereto in accordance with Section 14.2 of this Agreement (including the Term Sheets).

"<u>Agreement Effective Date</u>" means the date on which each of the RSA Parties has executed this Agreement.

"<u>Agreement Effective Period</u>" means, with respect to any RSA Party, the period from the Agreement Effective Date to the Termination Date applicable to that RSA Party.

"<u>Alternative Restructuring Proposal</u>" means any inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to a sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, financing proposal, debt investment, equity investment, liquidation, tender offer, recapitalization, plan of reorganization, share exchange, business combination, or similar transaction or series of transactions involving the Company or the debt, equity, or other interests in the Company, in each case, that is inconsistent with or represents an alternative to one or more of the Restructuring Transactions or any part thereof.

"<u>Approved Budget</u>" means any operational budget of the Company that is agreed to by each of the RSA Parties.

"<u>Approved Sale</u>" means a Sale that results in net proceeds allocated to the DIP Collateral sufficient to repay the DIP Obligations and Loans in full in cash (or which otherwise shall be reasonably satisfactory to the Consenting Lenders).

"<u>Asset Purchase Agreement</u>" means an asset purchase agreement consistent with the terms and conditions of the Stalking Horse Term Sheet.

"<u>Bankruptcy Code</u>" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

"<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the Middle District of Florida.

"Bidding Procedures Order" means an order of the Bankruptcy Court approving procedures governing the solicitation of bids for the Company's assets and business and scheduling an auction and hearing on the Sale.

"Business Day" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

"Causes of Action" means any action, Claim, cross-claim, counterclaim, third-party claim, cause of action, controversy, demand, right, action, lien, indemnity, Equity Interest, guaranty, suit, obligation, liability, loss, debt, recoupment, damage, judgment, account, defense, objection, remedies, offset, power, privilege, license, and franchise of any kind or character whatsoever, whether known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or noncontingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, in contract or in tort, in law or in equity, or pursuant to any other theory of law (including, without limitation, under any state or federal securities laws).

"Chapter 11 Cases" has the meaning set forth in the recitals to this Agreement.

"Chosen Court" means (a) before the Company commences the Chapter 11 Cases, federal or state courts located in the State of New York, and (b) after commencement of the Chapter 11 Cases, the Bankruptcy Court.

"Claim" has the meaning ascribed to it in section 101(5) of the Bankruptcy Code.

"Company" means Red Lobster Management LLC and each of its direct or indirect subsidiaries that files a voluntary petition under the Bankruptcy Code.

"Company Claims or Interests" means any Claim against, or Equity Interest in, the Company, including the Loan Claims.

"Company Lease" means any real property lease entered into by the Company.

"Confidentiality Agreement" means an executed confidentiality agreement, including with respect to material non-public information, in connection with any proposed Restructuring Transactions.

"Consenting Lenders" has the meaning set forth in the recitals.

"Credit Agreement" means that certain Financing Agreement, dated as of January 22, 2021 (as previously amended, amended and restated, supplemented or otherwise modified, including pursuant to that certain Amendment No. 1 to Financing Agreement dated as of September 22, 2022, that certain Amendment No. 2 to Financing Agreement, dated as of February 29, 2024, and that certain Amendment No. 3 to Financing Agreement, dated as of March 29, 2024).

"DIP Collateral" has the meaning set forth in the DIP Term Sheet.

"DIP Credit Agreement" means the debtor in possession credit agreement having terms and conditions consistent with the terms and conditions set forth in the DIP Term Sheet.

"DIP Facility" means the new senior secured superpriority debtor in possession financing facility provided to the Company in the DIP Credit Agreement.

"DIP Loan" means the loans provided under the DIP Facility.

"DIP Obligations" has the meaning set forth in the DIP Term Sheet.

"DIP Term Sheet" means the term sheet attached hereto as **Exhibit A** summarizing the material terms of a proposed debtor in possession financing facility to be provided by the Lenders to the Company.

"Effective Date" means the date of consummation of the Restructuring Transactions, on which date the Company shall provide written notice to counsel to each of the RSA Parties in accordance with Section 16.11 of this Agreement confirming the Sale Closing has occurred. The failure to give such notice shall not affect whether the Effective Date has occurred. Any contrary provision hereof notwithstanding, the Effective Date shall not occur unless either (i) the Sale has been consummated and the Company has been acquired by Reorganized Holdco in accordance with the Asset Purchase Agreement or (ii) in the event the Company pursues an Alternative Restructuring Proposal, all obligations owed under the Credit Agreement and DIP Credit Agreement have been paid in full in cash.

"Entity" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

"Equity Interests" means, collectively, the shares, common stock, preferred stock, limited liability company interests, and any other equity, ownership, or profits interests of the Company, and options, warrants, rights, or other securities or agreements to acquire or subscribe for, or which are convertible into the shares of, common stock, preferred stock, limited liability company interests, or other equity, ownership, or profits interests of the Company (in each case whether or not arising under or in connection with any employment agreement).

"Fiduciary Out" means the Company's right to terminate this Agreement pursuant to Section 13.2(c).

"Fiduciary Out Period" means the five (5) Business Day period prior to the effective date of the Company's termination of this Agreement pursuant to Section 13.2(c).

"Financing Order" means any order entered in the Chapter 11 Cases authorizing debtor in possession financing or the use of cash collateral (whether interim or final).

"First Day Papers" means the motions, orders, pleadings, or other papers that the Company files with the Bankruptcy Court in connection with the commencement of the Chapter 11 Cases.

"Governance Documents" means the organizational and governance documents for the Reorganized Company and its subsidiaries, including, without limitation, certificates of incorporation, certificates of formation or certificates of limited partnership (or equivalent organizational documents), bylaws, limited liability company agreements, and limited partnership agreements (or equivalent governing documents), as applicable, which shall implement a Restructuring upon terms and conditions consistent with this Agreement.

"Law" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

"Lender" has the meaning set forth in the recitals.

"Loans" means the loans outstanding under the Credit Agreement.

"Loan Claims" means the Claims and Causes of Action arising under or related to the Loans.

"Milestones" means the milestones set forth in **Exhibit E**.

"Permitted Transferee" means each transferee of any Company Claim or Interest who meets the requirements of Section 10.1 of this Agreement.

"Petition Date" means the date on which the Company files a petition for relief commencing the Chapter 11 Cases.

"Qualified Marketmaker" means an entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Company Claims or Interests (or enter with customers into long and short positions in Company Claims or Interests), in its capacity as a dealer or market marker in Company Claims or Interests and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"Related Parties" means, with respect to any entity, such entity's predecessors, successors, assigns, and present and former affiliates (whether by operation of Law or otherwise) and subsidiaries, and each of their respective managed accounts or funds or investment vehicles, and each of their respective current and former equity holders, officers, directors, managers, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, in each case acting in such capacity, including in their capacity as directors of the Company, as applicable.

"Release" means the releases given by the Releasing Parties to the Released Parties under Section 15.

"Released Party" means the Company, the Reorganized Company, each of the Consenting Lenders and each of their respective Related Parties.

"Releasing Party" means the Company, the Reorganized Company, each of the Consenting Lenders and each of their respective Related Parties.  For the avoidance of doubt, each of the Releasing Parties shall grant the Release in all of its capacities, including on behalf of each of their affiliates, in each case, in accordance with the terms and conditions set forth in this Agreement.

"Reorganized Company" means the Reorganized HoldCo and its direct and indirect subsidiaries from and after the Effective Date (*i.e.*, upon the consummation of the Restructuring Transactions).

"Reorganized HoldCo" means an entity to be formed by the Consenting Lenders to acquire the Company.

"Required Consenting Lenders" means the Consenting Lenders that hold at least 50.1% of the outstanding principal amount of the Loans.

"Restructuring" has the meaning set forth in the preamble to this Agreement.

"Restructuring Documents" means the documents listed in Section 3.1.

"Restructuring Support Agreement Joinder" means a joinder to this Agreement substantially in the form attached hereto as **Exhibit C**.

"Restructuring Transactions" has the meaning set forth in the recitals to this Agreement.

"Rules" means Rule 501(a)(1), (2), (3), and (7) of the Securities Act.

"Sale" means a sale of substantially all assets of the Company pursuant to section 363 of the Bankruptcy Code.

"Sale Closing" means the closing of the Sale.

"Sale Motion" means a motion seeking entry of the Bidding Procedures Order and the Sale Order, which motion shall include proposed bidding procedures and stalking horse bid protections in form and substance consistent with the Stalking Horse Term Sheet.

"Sale Order" means an order of the Bankruptcy Court authorizing an Approved Sale.

"Securities Act" means the Securities Act of 1933, as amended.

"Stalking Horse Term Sheet" means the term sheet attached hereto as **Exhibit B** summarizing the material terms of a Sale, including bidding procedures.

"Term Sheets" means the DIP Term Sheet and the Stalking Horse Term Sheet.

"Termination Date" means, as to any RSA Party, the date on which termination of this Agreement as to such RSA Party is effective in accordance with Section 13.

"Termination Event" means any event set forth in Section 13 giving rise to an RSA Party's right to terminate this Agreement.

"Transfer" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales or other transactions).

"Transfer Agreement Joinder" means an executed form of the transfer agreement joinder, substantially in the form attached hereto as **Exhibit D**, providing, among other things, that a transferee is bound by the terms of this Agreement.

1.2     Interpretation.  For purposes of this Agreement:

(a)     in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender;

(b)     unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions;

(c)     unless otherwise specified, any reference herein to an existing document, schedule, or exhibit shall mean such document, schedule, or exhibit, as it may have been or may be amended, restated, supplemented, or otherwise modified from time to time; provided, that any capitalized terms herein which are defined with reference to another agreement, are defined with reference to such other agreement as of the date of this Agreement, without giving effect to any termination of such other agreement or amendments to such capitalized terms in any such other agreement following the date hereof;

(d)     unless otherwise specified, all references herein to "Sections" are references to Sections of this Agreement;

(e)     the words "herein," "hereof," and "hereto" refer to this Agreement in its entirety rather than to any particular portion of this Agreement;

(f)     captions and headings to Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Agreement;

(g)    references to "shareholders," "directors," or "officers" shall also include "members" or "managers," as applicable, as such terms are defined under the applicable limited liability company Laws;

(h)    the use of "include" or "including" is without limitation, whether stated or not; and

(i)    the phrase "counsel to the RSA Parties" refers in this Agreement to each counsel to each of the RSA Parties specified in Section 16.11.

**Section 2.    Effectiveness of this Agreement.**

This Agreement shall become effective and binding upon each of the RSA Parties at 12:00 a.m., prevailing Eastern Time, on the Agreement Effective Date.

**Section 3.    Restructuring Documents.**

3.1    The "Restructuring Documents," shall consist of any document required to be filed or approved to implement the Restructuring Transactions, including but not limited to, the following: (a) the Asset Purchase Agreement; (b) the First Day Papers; (c) the Sale Motion; (d) the Bidding Procedures Order; (e) the Sale Order; (f) the Financing Orders; (g) the DIP Credit Agreement (and any related financing documentation); and (h) such other motions, orders, agreements, and documentation necessary to consummate and document the Restructuring Transactions contemplated by this Agreement.

3.2    The Restructuring Documents remain subject to negotiation and completion by and shall otherwise be in form and substance acceptable to the Company and the Required Consenting Lenders; *provided, however*, solely with respect to any term or provision in a Restructuring Document that materially and adversely affects any RSA Party (including provisions pertaining to the Term Sheets), such term or provision shall be reasonably acceptable to the affected RSA Party. Upon completion, the Restructuring Documents and every other document, deed, agreement, filing, notification, letter or instrument related to the Restructuring Transactions shall contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement, including the Term Sheets, as they may be modified, amended, or supplemented in accordance with Section 14.

**Section 4.    Milestones.**

4.1    Restructuring Milestones.    The RSA Parties agree to pursue the Restructuring pursuant to the Milestones set forth in **Exhibit E** unless such Milestones are extended or waived, in writing, by the Required Consenting Lenders.

4.2    Failure to Meet Restructuring Milestones.  Unless extended or waived in writing by the Required Consenting Lenders, the Company's failure to satisfy any Milestone contained in **Exhibit E** shall constitute a Termination Event pursuant to Section 13.1.

**Section 5**.  **Commitments of the Consenting Lenders**.

5.1  General Commitments, Forbearances, and Waivers.

(a)  During the Agreement Effective Period, each of the Consenting Lenders agrees to:

(i)  take all commercially reasonable actions in furtherance and support of consummating the Restructuring Transactions contemplated in this Agreement;

(ii)  negotiate in good faith the terms and conditions of, execute, perform its obligations under and deliver the Restructuring Documents contemplated by this Agreement in a manner consistent with the Term Sheets and within the time frames specified herein;

(iii)  subject to the entry of a Financing Order, use commercially reasonable efforts to negotiate, execute and deliver the DIP Credit Agreement and to consummate the DIP Facility;

(iv)  use commercially reasonable efforts to cooperate with and assist the Company in obtaining additional support for the Restructuring Transactions from the Company's other stakeholders;

(v)  give any notice, order, instruction, or direction to the applicable Agents necessary to give effect to the Restructuring Transactions and the terms of this Agreement; *provided* that none of the Consenting Lenders shall be obligated to waive (to the extent waivable) any condition to the consummation of any part of the Restructuring Transactions set forth in any Restructuring Document; and

(vi)  negotiate in good faith with the Company concerning the protection of its Canadian business under Canadian law, including but not limited to the commencement of a proceeding under Part IV of the *Companies' Creditors Arrangement Act* (Canada) for the recognition of the Chapter 11 Cases, and any amendments to this Agreement necessary to facilitate and reflect such recognition proceeding.

(b)  During the Agreement Effective Period, the Consenting Lenders agree to not directly or indirectly:

(i)  object to, delay, impede, or take any other action to interfere with acceptance, approval, implementation, or consummation of the Restructuring Transactions;

(ii)  solicit, propose, file, support, vote for, or consent to any Alternative Restructuring Proposal;

(iii)  file any motion, pleadings, or other document with any court (including any modification or amendments to any motion, pleadings, or other document with any court) that, in whole or in part, violates the terms of this Agreement;

9

(iv)    exercise, or direct any other person to exercise, any right or remedy for the enforcement, collection, or recovery of any Claims against or Equity Interests in the Company;

(v)    initiate, or have initiated on its behalf, any litigation or proceeding of any kind with respect to the Chapter 11 Cases, this Agreement, or the Restructuring Transactions against the other RSA Parties other than to enforce this Agreement, any Restructuring Document, or as otherwise permitted under this Agreement;

(vi)    object to, delay, impede, or take any other action to interfere with the Company's ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code, except as set forth in the DIP Term Sheet and Financing Orders; or

(vii)    take any other action that is inconsistent with this Agreement or any Restructuring Document or that would or would reasonably be expected to, prevent, interfere with, delay or impede the acceptance, approval, implementation or consummation of the Restructuring Transactions in any material manner.

5.2    <u>Commitments with Respect to the Chapter 11 Cases</u>. In addition to the foregoing:

(a)    During the Agreement Effective Period, if the Sale is consummated pursuant to a Sale Order, each Consenting Lender agrees that it shall support, and not oppose, the Sale and the Bankruptcy Court's entry of the Sale Order.

(b)    During the Agreement Effective Period, each Consenting Lender agrees severally, and not jointly, that it shall support, and will not directly or indirectly object to, delay, impede, or take any other action to interfere with any motion or other pleading or document filed by the Company in the Bankruptcy Court that is consistent with this Agreement, other than to enforce this Agreement, any Restructuring Document, or as otherwise permitted under this Agreement.

(c)    During the Agreement Effective Period, each Consenting Lender that is the holder of a Loan or a DIP Loan (if applicable) shall not agree, consent to or direct any person (including the Agent) to amend, modify, waive or take any action with respect to any rights, remedies, terms or conditions contained in the Credit Agreement or DIP Credit Agreement (if applicable) unless such amendment, modification, waiver or action is approved by holders of at least 50.1% of the aggregate outstanding principal amount of the Loans.

**Section 6**.    **<u>Additional Provisions Regarding the Commitments of the Consenting Lenders</u>.**

Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall:

(a)    affect the ability of any Consenting Lender to consult with any other Consenting Lender, the Company, or any other party in interest in the Chapter 11 Cases;

(b)     impair or waive the rights of any Consenting Lender to assert or raise any objection not prohibited by this Agreement in connection with the Restructuring Transactions;

(c)     prevent any Consenting Lender from enforcing this Agreement or any Restructuring Document, or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement or any Restructuring Document; or

(d)     require any Consenting Lender to incur, assume, become liable in respect of or suffer to exist any expenses, liabilities or other obligations, or agree to or become bound by any commitments, undertakings, concessions, indemnities or other arrangements that could result in expenses, liabilities or other obligations to such Consenting Lender other than as expressly described in this Agreement.

**Section 7.**     [Reserved]

**Section 8.     Commitments of the Company.**

8.1     <u>Affirmative Commitments</u>.  Except as set forth in Section 9.1, unless agreed or waived in writing by the Required Consenting Lenders, during the Agreement Effective Period, the Company agrees to:

(a)     take all commercially reasonable actions in furtherance and support of consummating the Restructuring Transactions contemplated in this Agreement;

(b)     use commercially reasonable efforts to obtain, file, submit or register any and all required governmental, regulatory or third-party approvals, filings, registrations or notices that are necessary or advisable for the implementation or consummation of the Restructuring Transactions;

(c)     comply with the Milestones set forth in **Exhibit E** of this Agreement;

(d)     use commercially reasonable efforts to timely oppose and object to the efforts of any person seeking in any manner to object to, delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Restructuring Transactions (including, the timely filing of objections or written responses in the Chapter 11 Cases) to the extent such opposition or objection is reasonably necessary or desirable to facilitate implementation of the Restructuring Transactions;

(e)     support a formal objection to any motion, application, or adversary proceeding challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any portion of the Loan Claims;

(f)     negotiate in good faith the terms and conditions of, execute, perform its obligations under and deliver the Restructuring Documents contemplated by this Agreement in a matter consistent with the Term Sheets and within the time frames specified herein, and any other agreements necessary to effectuate and consummate the Restructuring Transactions as contemplated by this Agreement;

(g)    use commercially reasonable efforts to seek additional support for the Restructuring Transactions from their other material stakeholders;

(h)    inform counsel to each Consenting Lender as to: (i) the status and progress of the Restructuring Transactions, including progress in relation to the negotiations of the Restructuring Documents; and (ii) the status of obtaining any necessary authorizations (including any consents) from, each as and if applicable, the boards of the Company, each other RSA Party, any competent judicial body, governmental authority, banking, taxation, supervisory, or regulatory body or any stock exchange;

(i)    inform the applicable counsel to each other RSA Party as soon as it becomes aware of: (i) any event or circumstance that has occurred, or that is reasonably likely to occur (and if it did so occur), that would constitute a default under the Credit Agreement or DIP Credit Agreement or that would permit any RSA Party to terminate, or would result in the termination of, this Agreement; (ii) any matter or circumstance which it knows to be a material impediment to the implementation or consummation of the Restructuring Transactions; (iii) any notice of any commencement of any involuntary insolvency proceedings, legal suit for payment of debt or securement of security from or by any person in respect of the Company; (iv) a breach of this Agreement (including a breach by the Company); (v) any representation or statement made or deemed to be made by the Company under this Agreement which is or proves to have been materially incorrect or misleading in any respect when made or deemed to be made; (vi) the initiation, institution or commencement of any lawsuit, action or other proceeding by any person or entity (A) involving the Company (including any assets, permits, licenses, businesses, operations or activities of the Company) or any of its respective current or former officers, employees, managers, directors, members or equity holders (in their capacities as such), or (B) challenging the validity of the Restructuring Transactions contemplated by this Agreement or any Restructuring Document or seeking to enjoin, restrain or prohibit this Agreement or any Restructuring Document or the consummation of the transactions contemplated hereby or thereby; (vii) the happening or existence of any fact, event or circumstance that shall have made any of the conditions precedent to any RSA Party's obligations set forth in (or to be set forth in) any of the Restructuring Documents incapable of being satisfied on a timely basis; and (viii) the receipt of notice from any person or entity alleging that the consent of such person or entity is or may be required under any contract, agreement, permit, Law or otherwise in connection with the consummation of any part of the Restructuring Transactions;

(j)    use commercially reasonable efforts to maintain its good standing under the Laws of the state or other jurisdiction in which they are incorporated or organized;

(k)    provide draft copies of all material motions or applications the Company intends to file with the Bankruptcy Court to counsel to each of the Consenting Lenders two (2) Business Days prior to the date when the Company intends to file any such pleading or other document; provided, that if and to the extent, due to exigent circumstances, the Company needs to file a document on an expedited basis and is therefore unable to provide a draft at least two (2) Business Days prior to the date it intends to file such document, the Company may provide such draft as soon as reasonably practicable before the date the Company intends to file the document, and

consult in good faith with such counsel regarding the form and substance of any such proposed filing with the Bankruptcy Court;

(l) (i) promptly respond to all reasonable legal, financial and other requests for information by the Agent and its professional advisors, and (ii) provide ongoing written financial reports (including weekly actual to budget variance reporting) in a form and in frequency acceptable to the Agent; provided, however, that the Company shall not be obligated to disclose pursuant to this subsection (l) any information or communications that are subject to a legal privilege or confidentiality protections agreed to by or otherwise imposed upon the Company;

(m) use commercially reasonable efforts to (i) maintain the current business operations of the Company, keep available the services of its current officers and material employees (in each case, other than voluntary resignations, terminations for cause, or terminations consistent with applicable fiduciary duties) and preserve in all material respects its relationships with customers, sales representatives, suppliers, distributors, and others, in each case, having material business dealings with the Company (other than terminations for cause or consistent with applicable fiduciary duties); (ii) maintain its respective books and records on a basis consistent with prior practice; (iii) maintain its physical assets, equipment, properties and facilities in their condition and repair as of the Agreement Effective Date; (iv) maintain all of its respective licenses and permits in full force and effect (including by filing all reports, notifications and filings with, and paying all fees to, the applicable governmental entities necessary to maintain all such licenses and permits in full force and effect); (v) maintain all necessary insurance policies, or suitable replacements therefor, in full force and effect, and (vi) with respect to any store closures, wind down the operations of such stores in a manner consistent with (i) through (v) herein and applicable law, to the extent commercially feasible, provided that any store closure shall be in accordance with any Approved Budget;

(n) operate its business in the ordinary course in a manner that is consistent with past practices and in compliance with applicable law, provided that nothing in this provision shall operate to prevent the Company from closing any stores in accordance with any Approved Budget;

(o) subject to the provisions of any bid procedures order entered by the Bankruptcy Court to the contrary, if the Company receives an Alternative Restructuring Proposal, as soon as reasonably practicable upon the receipt of such Alternative Restructuring Proposal, and in any event within one (1) Business Day following receipt, provide the Consenting Lenders with a copy of such Alternative Restructuring Proposal, and thereafter promptly update the Consenting Lenders regarding the occurrence and substance of any material discussions, negotiations, changes or other developments related to such Alternative Restructuring Proposal; and

(p) negotiate in good faith with the Consenting Lenders concerning the protection of the Company's Canadian business under Canadian law, including but not limited to the commencement of a proceeding under Part IV of the *Companies' Creditors Arrangement Act* (Canada) for the recognition of the Chapter 11 Cases, and any amendments to this Agreement necessary to facilitate and reflect such recognition proceeding.

8.2    Negative Commitments. Except as set forth in Section 9.1, unless agreed or waived in writing by the Required Consenting Lenders, during the Agreement Effective Period, the Company shall not directly or indirectly:

(a)    other than the DIP Facility, incur any debt for borrowed money, including loans guaranteed or sponsored by any federal, state or local government or government agency;

(b)    object to, delay, impede, or take any other action to interfere with acceptance, implementation, or consummation of the Restructuring Transactions or otherwise commence any proceeding opposing any of the terms of this Agreement or any of the other Restructuring Documents;

(c)    other than the marketing process to be implemented in connection with the Sale, take any action, or encourage any other person or entity to take any action, that is inconsistent in any material respect with, or is intended or would reasonably be expected to frustrate or impede approval, implementation and consummation of, the Restructuring Transactions;

(d)    (i) seek discovery in connection with or prepare or commence an avoidance action or other legal proceeding that challenges: (A) the amount, validity, allowance, character, enforceability or priority of any Claims against, or Interests in, the Company of the Consenting Lenders, including the Loan Claims, or any of them, or (B) the validity, enforceability or perfection of any lien or other encumbrance securing any Claims against, or Interests in, the Company of the Consenting Lenders, including the Loan Claims, or (ii) support any third party in connection with any of the acts described in clause (d)(i); or

(e)    execute, deliver or file any Restructuring Document (including any amendment, supplement or modification of, or any waiver to, any such document) that, in whole or in part, is not consistent in all material respects with this Agreement or is not otherwise acceptable to the applicable Consenting Lenders (as set forth in Section 3.2), or file any pleading seeking authorization to accomplish or effect any of the foregoing.

8.3    [Reserved]

8.4    The Company acknowledges, agrees, and shall not dispute that after the commencement of the Chapter 11 Cases, the giving of notice of default or termination by any RSA Party pursuant to this Agreement shall not be a violation of the automatic stay of section 362 of the Bankruptcy Code (and the Company hereby waives, to the extent legally possible, the applicability of the automatic stay solely with respect to the giving of such notice and attendant termination); *provided* that nothing herein shall prejudice any RSA Party's rights to argue that the giving of notice of default or termination was not proper under the terms of this Agreement.

**Section 9.    Additional Provisions Regarding the Company's Commitments.**

9.1    Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require the Company or the board of directors, board of managers, restructuring committee of the board of managers or similar governing body of the Company to take any action

or to refrain from taking any action with respect to the Restructuring Transactions to the extent it determines in good faith, upon the advice of outside counsel, that the taking or failing to take such action would violate applicable Law or be in breach of its fiduciary obligations under applicable Law, and any such action or inaction pursuant to this Section 9.1 shall not be deemed to constitute a breach of this Agreement.  The Company shall promptly notify each of the Consenting Lenders of any such determination within twenty-four (24) hours following such determination.  Notwithstanding anything to the contrary herein, each Consenting Lender reserves its rights to challenge any action taken in the exercise of such fiduciary duties.

9.2     Notwithstanding anything to the contrary in this Agreement, the Company and their respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives shall have the right to: (a) consider, respond to, and discuss unsolicited Alternative Restructuring Proposals; (b) provide access to non-public information concerning the Company to any Entity that (i) provides an unsolicited Alternative Restructuring Proposal; (ii) executes and delivers a Confidentiality Agreement; and (iii) requests such information; (c) maintain or continue discussions or negotiations with respect to any unsolicited Alternative Restructuring Proposal if (x) the board of directors, board of managers, restructuring committee of the board of managers or similar governing body of the Company determines in good faith, upon the advice of outside legal counsel, that failure to take such action would violate applicable Law or be in breach of its fiduciary obligations under applicable Law, (y) the board of directors, board of managers, restructuring committee of the board of managers or similar governing body of the Company has determined, upon the advice of outside legal counsel and/or the Company's investment banker, that such Alternative Restructuring Proposal is reasonably likely to lead to a transaction that is more favorable to the holders of Claims against, or Interests in, the Company than the Restructuring Transactions and is reasonably capable of being completed in accordance with its terms, taking into account all legal, financial, financing, conditionality, timing and other aspects of such Alternative Restructuring Proposal in a timely manner, and (z) such Alternative Restructuring Proposal is reasonably likely to provide for the payment in full in cash of all obligations owed under the Credit Agreement and DIP Credit Agreement; and (d) enter into or continue discussions or negotiations with holders of Claims against, or Interests in, the Company, or any other entity regarding the Restructuring Transactions.

9.3     Nothing in this Agreement shall: (a) impair or waive the rights of the Company to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; (b) prevent the Company from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement or the Term Sheets; or (c) create any additional fiduciary obligations or duties on the part of the Company or any members, managers, directors or officers of the Company that did not exist prior to the date of this Agreement.

**Section 10.     Transfer of Interests and Securities.**

10.1     During the Agreement Effective Period, no Consenting Lender shall Transfer any ownership (including any beneficial ownership as defined in the Rule 13d-3 under the Securities Exchange Act of 1934, as amended) in Loan Claims to any affiliated or unaffiliated party, including any party in which it may hold a direct or indirect beneficial interest, unless: either (a)

the transferee executes and delivers to counsel to each RSA Party at or before the time of the proposed Transfer, a Transfer Agreement Joinder; or (b) the transferee is an RSA Party and the transferee provides notice of such Transfer to counsel to each other RSA Party at or before the time of the proposed Transfer (such transferee, a "Permitted Transferee").

10.2    Upon compliance with the requirements of Section 10.1 of this Agreement, the transferor shall be deemed to relinquish its rights (and be released from its obligations) under this Agreement to the extent of the rights and obligations in respect of such transferred Loan Claims. Any Transfer in violation of Section 10.1 shall be void *ab initio*.

10.3    This Agreement shall in no way be construed to preclude the Consenting Lenders from acquiring additional Company Claims or Interests; *provided*, that (a) any additional Loan Claims acquired shall automatically and immediately upon acquisition by a Consenting Lender be deemed subject to the terms of this Agreement (regardless of when or whether notice of such acquisition is given to counsel to the RSA Parties) and (b) such Consenting Lender must provide notice of such acquisition (including the amount and type of Company Claim/Interest acquired) to counsel to each other RSA Party promptly upon such acquisition.

10.4    Notwithstanding Section 10.1 of this Agreement, a Qualified Marketmaker that acquires any Loan Claims with the purpose and intent of acting as a Qualified Marketmaker for such Loan Claims shall not be required to execute and deliver a Transfer Agreement Joinder in respect of such Loan Claims if: (a) such Qualified Marketmaker subsequently transfers such Loan Claims (by purchase, sale assignment, participation, or otherwise) within five (5) Business Days of its acquisition to a transferee that is an entity that is not an affiliate, affiliated fund, or affiliated entity with a common investment advisor; (b) the transferee otherwise is a Permitted Transferee under Section 10.1; and (c) the Transfer otherwise is a Permitted Transfer under Section 10.1. To the extent that a Consenting Lender is acting in its capacity as a Qualified Marketmaker, it may Transfer (by purchase, sale, assignment, participation, or otherwise) any right, title or interests in Company Claims or Interests that the Qualified Marketmaker acquires from a holder of the Company Claims or Interests who is not a Consenting Lender without the requirement that the transferee be a Permitted Transferee.

10.5    Notwithstanding anything to the contrary in this Section 10, the restrictions on Transfer set forth in this Section 10 shall not apply to the grant of any liens or encumbrances on any claims and interests in favor of a bank or broker-dealer holding custody of such claims and interests in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such claims and interests.

**Section 11**.    **Representations and Warranties of the Consenting Lenders**.

Each Consenting Lender severally, and not jointly, represents and warrants that, as of the date such Consenting Lenders executes and delivers this Agreement:

(a)    it is the beneficial or record owner of the face amount of the Loans or is the nominee, investment manager, or advisor for beneficial holders of the Loans reflected in, and, having made reasonable inquiry, is not the beneficial or record owner of any Loan Claims other

than those reflected in, such Consenting Lender's signature page to this Agreement or a Transfer Agreement Joinder, as applicable (as may be updated pursuant to Section 10);

(b)       it has the full power and authority to act on behalf of, vote and consent to matters concerning, such Loan Claims;

(c)       such Loan Claims are free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal, or other limitation on disposition, transfer, or encumbrances of any kind, that would adversely affect in any way such Consenting Lender's ability to perform any and all of its obligations under this Agreement at the time such obligations are required to be performed;

(d)       it has the full power to vote, approve changes to, and transfer all of its Loan Claims referable to it as contemplated by this Agreement subject to applicable Law;

(e)       it has access to adequate information regarding the terms of this Agreement to make an informed and knowledgeable decision with regard to entering into this Agreement;

(f)       it has not relied upon any other Consenting Lender in deciding to enter into this Agreement and has instead made its own independent analysis and decision to enter into this Agreement; and

(g)       to the extent it holds any other Company Claims or Interests, it shall not take any action or exercise any rights inconsistent with the terms of this Agreement on account of such Company Claims or Interests.

**Section 12**.       **Mutual Representations, Warranties, and Covenants.**

Each of the RSA Parties represents, warrants, and covenants to each other RSA Party, as of the date such RSA Party executes and delivers this Agreement:

(a)       it is validly existing and in good standing under the Laws of the state of its organization, and this Agreement is a legal, valid, and binding obligation of such party, enforceable against it in accordance with its terms, except as enforcement may be limited by applicable Laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability;

(b)       except as expressly provided in this Agreement or, if applicable, the Bankruptcy Code, no consent or approval is required by any other person or entity in order for it to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement;

(c)       the entry into and performance by it of, and the transactions contemplated by, this Agreement do not, and will not, conflict in any material respect with any Law or regulation applicable to it or with any of its articles of association, memorandum of association, other applicable constitutional documents or material contracts to which it is a party;

17

(d)     except as expressly provided in this Agreement, it has (or will have, at the relevant time) all requisite corporate or other power and authority to enter into, execute, and deliver this Agreement and to effectuate the Restructuring Transactions contemplated by, and perform its respective obligations under, this Agreement; and

(e)     except as expressly provided by this Agreement, it is not party to any restructuring or similar agreements or arrangements with any other RSA Parties to this Agreement that have not been disclosed to all RSA Parties to this Agreement.

**Section 13**.     **Termination Events.**

13.1     Required Consenting Lender Termination Events. This Agreement may be terminated by the Required Consenting Lenders by the delivery of a written notice in accordance with Section 16.11 of this Agreement upon the occurrence of the following events:

(a)     The breach in any material respect by the Company of any of the representations, warranties, covenants, or commitments, including those set forth in Sections 8, 9 and 12 of this Agreement, that remains uncured (to the extent curable) for five (5) Business Days after the Required Consenting Lenders (or the Agent when directed by the Required Consenting Lenders) transmits a written notice to the other RSA Parties detailing such breach in accordance with Section 16.11 of this Agreement;

(b)     the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for five (5) Business Days after the transmission of a written notice with respect to such issuance in accordance with Section 16.11 of this Agreement;

(c)     the failure of the Company to satisfy any of the Milestones set forth in **Exhibit E** or in any of the Term Sheets;

(d)     the failure of the RSA Parties to consummate the Restructuring Transactions on or before August 30, 2024, provided that such failure to timely consummate the Restructuring Transactions is not the result of a breach of this Agreement by the Consenting Lenders or the Agent;

(e)     the Bankruptcy Court grants relief that is inconsistent with this Agreement or the Terms Sheets in any material respect or enters an order denying the Sale Motion and such order remains in effect for five (5) Business Days after entry of such order;

(f)     the entry of an order by the Bankruptcy Court, or the filing of a motion or application by the Company seeking an order (without the prior written consent of the Required Consenting Lenders), (i) converting one or more of the Chapter 11 Cases of the Company to a case under chapter 7 of the Bankruptcy Code, (ii) appointing an examiner with expanded powers

18

beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of the Company, or (iii) rejecting this Agreement;

(g)     the Bankruptcy Court grants relief terminating, annulling, or modifying the automatic stay (as set forth in section 362 of the Bankruptcy Code) with regard to any assets of the Company having an aggregate fair market value in excess of $250,000;

(h)     the Company approves an Alternative Restructuring Proposal or enters into a definitive agreement with respect to an Alternative Restructuring Proposal, or determines, pursuant to Section 9.1, that the Company or the board of directors, board of managers, restructuring committee of the board of managers or any similar governing body of the Company taking any action or refraining from taking any action with respect to the Restructuring Transactions would violate applicable Law or be in breach of its fiduciary obligations under applicable Law. Notwithstanding the foregoing sentence, the Company may approve an Alternative Restructuring Proposal or exercise its Fiduciary Out to pursue an Alternative Restructuring Proposal, *provided* that in either case, such Alternative Restructuring Proposal provides for the payment in full in cash of all obligations owed under the Credit Agreement and DIP Credit Agreement upon the earliest to occur of (i) maturity of the DIP Facility, or (ii) consummation of such Alternative Restructuring transaction, *provided further*, the Company's decision to pursue an Alternative Restructuring Proposal or exercise its Fiduciary Out shall not effect or extend any Milestone;

(i)     in the event that the Company commences the Chapter 11 Cases, the Company withdraws the Sale Motion, or publicly announces its intention to withdraw the Sale Motion;

(j)     a Default or Event of Default (as each such term is defined in the DIP Credit Agreement) occurs and is continuing;

(k)     the Bankruptcy Court enters an order invalidating, disallowing, subordinating, recharacterizing, or limiting, as applicable, any of the Loan Claims, the liens securing the Loan Claims, the DIP Facility, or the liens securing the DIP Facility; or

(l)     the Company executes, delivers, files, amends or modifies, or files a pleading seeking approval of, or authority to amend or modify, any Restructuring Document that, in any such case, is not consistent in all material respects with this Agreement or the Term Sheets or otherwise acceptable to the applicable required RSA Party set forth in Section 3.2.

13.2     <u>Company Termination Events</u>.  This Agreement may be terminated by the Company by delivery to the Agent and Consenting Lenders of a written notice in accordance with Section 16.11 of this Agreement upon the occurrence of the following events:

(a)     the failure of the RSA Parties to consummate the Restructuring Transactions on or before August 30, 2024;

(b)     the breach in any material respect by one or more of the Consenting Lenders of any provision set forth in this Agreement (i) that is materially adverse to the Company and (ii) that remains uncured for a period of five (5) Business Days after the Company delivers to the other

19

RSA Parties a written notice detailing each breach in accordance with Section 16.11 of this Agreement;

(c)       the board of directors, board of managers, restructuring committee of the board of managers or any similar governing body of the Company determines in good faith, upon the advice of outside counsel, (i) that proceeding with any of the Restructuring Transactions would violate the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal; *provided, however*, that in the event the Company desires to exercise its Fiduciary Out pursuant to this Section 13.2(c), the Company shall provide written notice to counsel to the other RSA Parties in accordance with Section 16.11 of this Agreement prior to the expiration of the Fiduciary Out Period advising such counsel that the Company intends to terminate this Agreement pursuant to the Fiduciary Out and specifying, in reasonable detail, the reasons therefor, and during the Fiduciary Out Period the Company shall, and shall cause their respective directors, managers and representatives to, negotiate with the other RSA Parties in good faith (to the extent the other RSA Parties wish to negotiate) to enable the other RSA Parties to determine whether to propose revisions to the terms of the Restructuring Transactions such that it would obviate the need for the Company to exercise its right to terminate this Agreement pursuant to the Fiduciary Out, *provided further* that if the Company exercises its Fiduciary Out to pursue an Alternative Restructuring Proposal, such Alternative Restructuring Proposal provides for the payment in full in cash of all obligations owed under the Credit Agreement and DIP Credit Agreement upon the earliest to occur of (i) maturity of the DIP Facility, or (ii) consummation of such Alternative Restructuring transaction, *provided further*, the Company's decision to pursue an Alternative Restructuring Proposal or exercise its Fiduciary Out shall not affect or extend any Milestone; or

(d)       the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final, non-appealable ruling or order that (i) enjoins the consummation of a material portion of the Restructuring Transactions and (ii) remains in effect for five (5) Business Days after the Company delivers a written notice to the other RSA Parties in accordance with Section 16.11 of this Agreement detailing any such issuance; *provided* that this termination right shall not apply to or be exercised by the Company if it sought or requested such ruling or order in contravention of any obligation or restriction set out in this Agreement.

13.3    <u>Mutual Termination</u>. This Agreement, and the obligations of all the RSA Parties hereunder, may be terminated by mutual written agreement among all of the RSA Parties.

13.4    <u>Automatic Termination</u>. This Agreement shall terminate automatically without any further required action or notice immediately upon the Effective Date.

13.5    <u>Effect of Termination</u>. After the occurrence of a Termination Event, if the RSA Party seeking to enforce this Agreement has failed to request an order within five (5) Business Days of the purported occurrence of a Termination Event from a court of competent jurisdiction finding that a Termination Event did not occur, this Agreement shall be of no further force or effect, and each RSA Party shall be released from its commitments, undertakings, and agreements under or related to this Agreement and shall have the rights and remedies that it would have had, had it not entered into this Agreement, and shall be entitled to take all actions, whether with

respect to the Restructuring Transactions or otherwise, that it would have been entitled to take had it not entered into this Agreement, including with respect to any and all Claims or Causes of Action. Nothing in this Agreement shall be construed as prohibiting any of the RSA Parties from contesting whether any such termination is in accordance with its terms or to seek enforcement of any rights under this Agreement that arose or existed before a Termination Event. Nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict any right of any RSA Party, including termination rights or claims arising under Section 13, or the ability of any RSA Party, to protect and preserve its rights (including rights under this Agreement), remedies, and interests, including its claims against any RSA Party (including the Company).

**Section 14.** **Amendments and Waivers.**

(a)     This Agreement may not be modified, amended, or supplemented, and no condition or requirement hereof may be waived, in any manner except in accordance with this Section 14.

(b)     This Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, in a writing signed by the Company and the Required Consenting Lenders.

(c)     The waiver by any RSA Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any RSA Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver of any such right, power or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power or remedy by such RSA Party preclude any other or further exercise of such right, power or remedy or the exercise of any other right, power or remedy. All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

**Section 15.** **Release.**

15.1     On the Effective Date, each Releasing Party shall be deemed to expressly and generally release, acquit, and discharge each Released Party as set forth below:

**TO THE FULLEST EXTENT PERMISSIBLE UNDER APPLICABLE LAW, EACH OF THE RELEASING PARTIES (REGARDLESS OF WHETHER A RELEASING PARTY IS A RELEASED PARTY) SHALL BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER, RELEASED AND DISCHARGED EACH OTHER RELEASED PARTY FROM ANY AND ALL CLAIMS, EQUITY INTERESTS, OBLIGATIONS, RIGHTS, SUITS, DAMAGES, CAUSES OF ACTION, REMEDIES, AND LIABILITIES WHATSOEVER, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, DIRECT OR INDIRECT, CONTINGENT OR FIXED, EXISTING OR HEREINAFTER ARISING, IN LAW, AT EQUITY, OR OTHERWISE, INCLUDING ANY DERIVATIVE CLAIMS, ASSERTED OR ASSERTABLE ON BEHALF OF ANY OF THE COMPANY, THE REORGANIZED COMPANY, EACH OTHER RELEASING PARTY OR THEIR ESTATES, THAT SUCH ENTITY WOULD HAVE BEEN LEGALLY**

ENTITLED TO ASSERT (WHETHER INDIVIDUALLY OR COLLECTIVELY), BASED ON OR RELATING TO, OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE COMPANY, THE BUSINESS OPERATIONS OF THE COMPANY, ACTIONS TAKEN BY THE COMPANY'S BOARD OF DIRECTORS, THE PURCHASE, SALE, OR RESCISSION OF THE PURCHASE OR SALE OF ANY SECURITY OF THE COMPANY OR THE REORGANIZED COMPANY, THE SUBJECT MATTER OF, OR THE TRANSACTIONS OR EVENTS GIVING RISE TO, ANY CLAIM OR EQUITY INTEREST THAT IS TREATED IN THE RESTRUCTURING TRANSACTIONS, THE BUSINESS OR CONTRACTUAL ARRANGEMENTS BETWEEN ANY RELEASING PARTY AND ANY RELEASED PARTY, THE COMPANY'S RESTRUCTURING EFFORTS, INTERCOMPANY TRANSACTIONS, ENTRY INTO THE CHAPTER 11 CASES, THE FORMULATION, PREPARATION, DISSEMINATION, OR NEGOTIATION OF THIS AGREEMENT, THE SALE, THE DIP FACILITY OR OTHER DOCUMENTS, OR ANY OTHER ACT OR OMISSION, TRANSACTION, AGREEMENT, EVENT, OR OTHER OCCURRENCE TAKING PLACE ON OR BEFORE THE EFFECTIVE DATE. ANY CONTRARY PROVISION HEREOF NOTWITHSTANDING, THE RELEASE(S) CONTAINED IN THIS SECTION 15, ANY RESTRUCTURING DOCUMENT SHALL NOT RELEASE ANY RELEASED PARTY OF OR FROM ANY CLAIMS OR LIABILITIES ARISING FROM WILLFUL MISCONDUCT OR FRAUD.

15.2    Each of the Releasing Parties shall be deemed to have granted this Release pursuant to and in accordance with this Agreement knowingly, notwithstanding that each Releasing Party may hereafter discover facts in addition to, or different from, those which either such Releasing Party now knows or believes to be true, and without regard to the subsequent discovery or existence of such different or additional facts, and each Releasing Party pursuant to and in accordance with this Agreement shall expressly waive any and all rights that such Releasing Party may have under any statute or common law principle which would limit the effect of the Release to those claims actually known or suspected to exist as of before the Effective Date.

15.3    In connection with their agreement to the foregoing Release pursuant to and in accordance with this Agreement, the Releasing Parties shall knowingly and voluntarily waive and relinquish any and all provisions, rights, and benefits conferred by any law of the United States or any state or territory of the United States, or principle of common law, which governs or limits a person's release of unknown claims, comparable or equivalent to California Civil Code § 1542, which provides:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.

Each of the Releasing Parties hereby represents and warrants that it has access to adequate information regarding the terms of this Agreement, the scope and effect of the Release, and

**all other matters encompassed by this Agreement to make an informed and knowledgeable decision with regard to entering into this Agreement. Each of the Releasing Parties further represents and warrants that it has not relied upon any other RSA Party in deciding to enter into this Agreement and has instead made its own independent analysis and decision to enter into this Agreement.**

### Section 16. Miscellaneous.

16.1 Acknowledgement. Notwithstanding any other provision of this Agreement, this Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise. Any such offer or solicitation shall be made only in compliance with all applicable securities Laws, provisions of the Bankruptcy Code, or other applicable Law.

16.2 Exhibits Incorporated by Reference; Conflicts. Each of the exhibits, annexes, signatures pages, and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes, and schedules. In the event of any inconsistency between this Agreement (without reference to the exhibits, annexes, and schedules hereto) and the exhibits, annexes, and schedules hereto, this Agreement (without reference to the exhibits, annexes, and schedules thereto) shall govern. In the event of any inconsistency between any of the Term Sheets and any Restructuring Documents, the Restructuring Documents shall govern.

16.3 Confidentiality. Absent agreement of the RSA Parties, the nature, terms, and any information provided by the RSA Parties in connection with the contemplated Restructuring Transactions is strictly confidential and shall not be shared by the RSA Parties with any other party until the commencement of the Chapter 11 Cases.

16.4 Further Assurances. Subject to the other terms of this Agreement, the RSA Parties agree to execute and deliver such other instruments and perform such acts, in addition to the matters herein specified, as may be reasonably appropriate or necessary, or as may be required by order of the Bankruptcy Court, from time to time, to effectuate the Restructuring Transactions, as applicable.

16.5 Complete Agreement. Except as otherwise explicitly provided herein, this Agreement constitutes the entire agreement among the RSA Parties with respect to the subject matter of this Agreement and supersedes all prior negotiations, understandings, and agreements, oral or written, among the RSA Parties with respect thereto, other than any Confidentiality Agreement.

16.6 GOVERNING LAW; SUBMISSION TO JURISDICTION; SELECTION OF FORUM. THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED IN SUCH STATE, WITHOUT GIVING EFFECT TO THE CONFLICT OF LAWS PRINCIPLES OF THIS AGREEMENT. Each party to this Agreement agrees that it shall bring any action or proceeding in respect of any claim arising

out of or related to this Agreement in the Chosen Court, and solely in connection with claims arising under this Agreement: (a) irrevocably submits to the exclusive jurisdiction of such court; (b) waives any objection to laying venue in any such action or proceeding in such applicable court; and (c) waives any objection that such court is an inconvenient forum or does not have jurisdiction over any party to this Agreement.

16.7    TRIAL BY JURY WAIVER. EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

16.8    Execution of Agreement. This Agreement may be executed and delivered in any number of counterparts and by way of electronic signature and delivery, each such counterpart, when executed and delivered, shall be deemed an original, and all of which together shall constitute the same agreement. Except as expressly provided in this Agreement, each individual executing this Agreement on behalf of an RSA Party has been duly authorized and empowered to execute and deliver this Agreement on behalf of said RSA Party.

16.9    Rules of Construction. This Agreement is the product of negotiations among the RSA Parties, and in the enforcement or interpretation of this Agreement is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any RSA Party by reason of that party having drafted or caused to be drafted this Agreement, or any portion of this Agreement, shall not be effective in regard to the interpretation of this Agreement. The parties hereto were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

16.10    Successors and Assigns; Third Parties. This Agreement is only intended to bind and inure to the benefit of the RSA Parties and their respective successors and permitted assigns, as applicable, and except as set forth in Section 10.1, no third party is intended to be a beneficiary of this Agreement. The rights or obligations of any party under this Agreement may not be assigned, delegated, or transferred to any other person or entity, except in accordance with Section 10 of this Agreement.

16.11    Notices. All notices hereunder shall be deemed given if in writing and delivered, by electronic mail, courier, or registered or certified mail (return receipt requested), to the following addresses (or at such other addresses as shall be specified by like notice):

(a)    If to the Company:

Red Lobster Management LLC
Attn:    Jonathan Tibus, CEO
        Nicholas Haughey, CRO
450 South Orange Avenue, Suite 800
Orlando, FL 32801
Email: jtibus@alvarezandmarsal.com
        nhaughey@alvarezandmarsal.com

with copies to:

King & Spalding LLP
Attn:   W. Austin Jowers
        Jeffrey R. Dutson
1180 Peachtree Street NE, Suite 1600
Atlanta, GA 30309
Email: ajowers@kslaw.com
        jdutson@kslaw.com

(b)     if to the Consenting Lenders, to:

Fortress Credit Corp.
c/o Fortress Investment Group
3290 Northside Parkway NW
Suite 350
Atlanta, GA 30327 USA
Attn: Morgan McClure
Email: mmcclure@fortress.com

-and-

Fortress Credit Corp.
c/o Fortress Investment Group
1345 Avenue of the Americas, 46th Fl
New York, New York 10105
Attn: General Counsel, Credit
Email: Gc.credit@fortress.com

with copies to:

Proskauer Rose LLP
One International Place
Boston, MA 02110
Attention: Charles A. Dale
           Michael M. Mezzacappa
Email: cdale@proskauer.com
        mmezzacappa@proskauer.com

Any notice given by delivery, mail, or courier shall be effective when received.

16.12   Independent Due Diligence and Decision Making. Each RSA Party hereby
confirms that its decision to execute this Agreement has been based upon its independent
investigation of the operations, businesses, financial and other conditions, and prospects of the

Company and it has been represented by counsel or other advisors (or has had ample opportunity to seek representation or advice from counsel or other advisors) in connection with this Agreement and the Restructuring Transactions.

16.13  Enforceability of Agreement. Each of the RSA Parties waives any right to assert that the exercise of termination rights under this Agreement is subject to the automatic stay provisions of the Bankruptcy Code, and expressly stipulates and consents hereunder to the prospective modification of the automatic stay provisions of the Bankruptcy Code for purposes of exercising termination rights under this Agreement, to the extent the Bankruptcy Court determines that such relief is required.

16.14  Publicity. The Company shall submit drafts to counsel to each Consenting Lenders of any press release and public documents that constitute disclosure of the existence of the terms of this Agreement or any amendment to the terms of this Agreement at least three (3) Business Days prior to making any such disclosure and shall afford them a reasonable opportunity under the circumstances to comment on such documents and disclosures, final versions of which shall be reasonably satisfactory to the Required Consenting Lenders.

16.15  Expenses.  Upon the Agreement Effective Date, and periodically during the Agreement Effective Period, the Company shall pay the reasonable and documented fees and expenses of each of the Agent, Consenting Lenders and their respective professional advisors, including Proskauer Rose LLP and Deloitte.  The Company shall pay the reasonable and documented fees and expenses of the Agent, Consenting Lenders and their professional advisors within three (3) Business Days following its receipt of invoices for same (which invoices may be redacted as appropriate).

16.16  Waiver. If the Restructuring Transactions are not consummated, or if this Agreement is terminated for any reason, the RSA Parties fully reserve any and all of their rights. Nothing herein shall be deemed an admission of any kind.  Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce its terms or the payment of damages to which a Party may be entitled under this Agreement.

16.17  Specific Performance. It is understood and agreed by the RSA Parties that money damages would be an insufficient remedy for any breach of this Agreement by any RSA Party, and each non-breaching RSA Party shall be entitled to specific performance and injunctive or other equitable relief (without the posting of any bond and without proof of actual damages) as a remedy for any such breach from a court of competent jurisdiction requiring any RSA Party to comply promptly with any and all of its obligations hereunder.

16.18  Several, Not Joint, Claims. Except where otherwise specified, the agreements, representations, warranties, and obligations of the parties under this Agreement are, in all respects, several and not joint.

16.19  Severability and Construction. If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid, or unenforceable, the remaining provisions

shall remain in full force and effect if essential terms and conditions of this Agreement for each Party remain valid, binding, and enforceable.

16.20 <u>Remedies Cumulative</u>. All rights, powers, and remedies provided under this Agreement or otherwise available in respect of this Agreement at Law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy of this Agreement by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party.

16.21 <u>Capacities</u>. Each Consenting Lender has entered into this agreement on account of all Loan Claims that it holds (directly or through discretionary accounts that it manages or advises).

16.22 <u>Email Consents</u>. Where a written consent, acceptance, approval, or waiver is required pursuant to or contemplated by this Agreement, including a written approval by the RSA Parties, such written consent, acceptance, approval, or waiver shall be deemed to have occurred if, by agreement between counsel to the party submitting and receiving such consent, acceptance, approval, or waiver, it is conveyed in writing (including electronic mail) between each such counsel without representations or warranties of any kind on behalf of such counsel.

IN WITNESS OF THIS AGREEMENT, the parties hereto have executed this Agreement on the day and year first above written.

*[Remainder of page intentionally left blank.]*

**FORTRESS CREDIT OPPORTUNITIES XVII CLO LIMITED**

By: FCO XVII CLO CM LLC, as Collateral Manager

By: _____
Name: Brad Bailey
Title: Authorized Signatory

**FLF II GMS HOLDINGS FINANCE L.P.**

By: FLF II GMS Holdings Finance CM LLC, as Servicer

By: Fortress Lending II Holdings L.P. its sole member

By: Fortress Lending Advisors II LLC, its investment manager

By: _____
Name: Brad Bailey
Title: Authorized Signatory

**FLF II MA-CRPTF HOLDINGS FINANCE L.P.**

By: FLF II MA-CRPTF Advisors LLC, its investment manager

By: _____
Name: Brad Bailey
Title: Authorized Signatory

**FLF I SECURITIES L.P.**

By: Fortress Lending I Holdings L.P., its member

By: Fortress Lending Advisors LLC, its investment
     manager

By:

Name:    Brad Bailey

Title:    Authorized Signatory

**FLF II SECURITIES L.P.**

By: Fortress Lending II Holdings L.P., its member

By: Fortress Lending Advisors LLC, its investment
     manager

By:

Name:    Brad Bailey

Title:    Authorized Signatory

**FLF II HOLDINGS FINANCE LP**

By: FLF II Holdings Finance CM LLC, as Servicer

By: Fortress Lending II Holdings L.P., its sole member

By: Fortress Lending Advisors II LLC, its investment
manager

By:

Name:    Brad Bailey

Title:    Authorized Signatory

**FORTRESS LENDING I HOLDINGS L.P.**

By: Fortress Lending Advisors LLC, its investment
    manager

By: _____
Name:   Brad Bailey
Title:   Authorized Signatory

**FORTRESS LENDING II HOLDINGS L.P.**

By: Fortress Lending Advisors II LLC, its investment
    manager

By: _____
Name:
Title:   Brad Bailey
       Authorized Signatory

**FORTRESS LENDING FUND II MA-CRPTF LP**

By: FLF II MA-CRPTF Advisors LLC, its investment
    manager

By: _____
Name:   Brad Bailey
Title:   Authorized Signatory

**DRAWBRIDGE SPECIAL OPPORTUNITIES FUND LP**

By: Drawbridge Special Opportunities GP LLC, its
     general partner

By:

Name:   Brad Bailey
        Authorized Signatory

Title:


**DBDB FUNDING LLC**

By:
Name:    Brad Bailey
Title:   Authorized Signatory

**BTC HOLDINGS FUND II LLC**

By: Blue Torch Credit Opportunities Fund II LP, its sole member

By: Blue Torch Credit Opportunities GP II LLC, its general partner

By: KPG BTC Management LLC, its sole member

By: _Kevin Genda_

Name: Kevin Genda
Title: Managing Member


**BTC HOLDINGS SBAF FUND LLC**

By: Blue Torch Credit Opportunities SBAF Fund LP, its sole member

By: Blue Torch Credit Opportunities SBAF GP LLC, its general partner

By: KPG BTC Management LLC, its sole member

By: _Kevin Genda_

Name: Kevin Genda
Title: Managing Member


**BTC HOLDINGS KRS FUND LLC**

By: Blue Torch Credit Opportunities KRS Fund LP, its sole member

By: Blue Torch Credit Opportunities KRS GP LLC, its general partner

By: KPG BTC Management LLC, its sole member

By: _Kevin Genda_

Name: Kevin Genda
Title: Managing Member


[RSA Signature Page]

**BTC OFFSHORE HOLDINGS FUND II-D LLC**

By: Blue Torch Offshore Credit Opportunities Master
    Fund II LP, its Sole Member

By: Blue Torch Offshore Credit Opportunities GP II
    LLC, its General Partner

By: KPG BTC Management LLC, its sole member

By: _Kevin Genda_____
Name: Kevin Genda
Title: Managing Member


**BTC HOLDINGS SC FUND LLC**

By: Blue Torch Credit Opportunities SC Master Fund
    LP, its sole member

By: Blue Torch Credit Opportunities SC GP LLC, its
    general partner

By: KPG BTC Management LLC, its sole member

By: _Kevin Genda_____
Name: Kevin Genda
Title: Managing Member


**BLUE TORCH CREDIT OPPORTUNITIES FUND
II LP**

By: Blue Torch Credit Opportunities GP II LLC, its
    general partner

By: KPG BTC Management LLC, its sole member

By: _Kevin Genda_____
Name: Kevin Genda
Title: Managing Member


[RSA Signature Page]

**BLUE TORCH OFFSHORE CREDIT
OPPORTUNITIES MASTER FUND II LP**

By: Blue Torch Offshore Credit Opportunities GP II
     LLC, its General Partner

By: KPG BTC Management LLC, its sole member

By: _____
Name: Kevin Genda
Title: Managing Member

**TCW WV FINANCING LLC**

By: TCW Asset Management Company LLC, its
　　Collateral Manager

By: _____
Name:　Suzanne Grosso
Title:　Managing Director

**TCW SKYLINE LENDING L.P.**

By: TCW Asset Management Company LLC, its
　　Investment Advisor

By: _____
Name:　Suzanne Grosso
Title:　Managing Director

**TCW BRAZOS FUND LLC**

By: TCW Asset Management Company LLC, its
　　Investment Advisor

By: _____
Name:　Suzanne Grosso
Title:　Managing Director

**TCW DL VII FINANCING LLC**

By: TCW Asset Management Company LLC, its
　　Collateral Manager

By: _____
Name:　Suzanne Grosso
Title:　Managing Director

**TCW DIRECT LENDING STRUCTURED
SOLUTIONS 2019 LLC**

By: TCW Asset Management Company LLC, its
    Investment Manager

By: _____

Name:  Suzanne Grosso
Title:   Managing Director

**TMD-DL HOLDINGS LLC**

By: TCW Asset Management Company LLC, its
    Investment Manager and Attorney-in-Fact

By: _____

Name:  Suzanne Grosso
Title:   Managing Director

**RELIANCE STANDARD LIFE INSURANCE
COMPANY**

By: TCW Asset Management Company LLC, its
    Investment Manager and Attorney-in-Fact

By: _____

Name:  Suzanne Grosso
Title:   Managing Director

**PHILADELPHIA INDEMNITY INSURANCE COMPANY**

By: TCW Asset Management Company LLC, its
    Investment Manager and Attorney-in-Fact

By: _Suzanne Grosso_____
Name:  Suzanne Grosso
Title:   Managing Director

**SAFETY NATIONAL CASUALTY CORPORATION**

By: TCW Asset Management Company LLC, its
    Investment Manager and Attorney-in-Fact

By: _Suzanne Grosso_____
Name:  Suzanne Grosso
Title:   Managing Director

**Red Lobster Management LLC**

By: _____
DocuSigned by:
*Jonathan Tibus*
74789D51390E4A2
Name: Jonathan Tibus
Title: Chief Executive Officer

**Red Lobster Restaurants LLC**

By: _____
DocuSigned by:
*Jonathan Tibus*
74789D51390E4A2
Name: Jonathan Tibus
Title: Chief Executive Officer

**Red Lobster Hospitality LLC**

By: _____
DocuSigned by:
*Jonathan Tibus*
74789D51390E4A2
Name: Jonathan Tibus
Title: Chief Executive Officer

**Red Lobster Sourcing LLC**

By: _____
DocuSigned by:
*Jonathan Tibus*
74789D51390E4A2
Name: Jonathan Tibus
Title: Chief Executive Officer

**Red Lobster Supply LLC**

By: _____
DocuSigned by:
*Jonathan Tibus*
74789D51390E4A2
Name: Jonathan Tibus
Title: Chief Executive Officer

**RL Kansas LLC**

By: _____
DocuSigned by:
*Jonathan Tibus*
74789D51390E4A2
Name: Jonathan Tibus
Title: Chief Executive Officer

**RL Columbia LLC**

By: _____
Name: Jonathan Tibus
Title: Chief Executive Officer

**RL Salisbury, LLC**

By: _____
Name: Jonathan Tibus
Title: Chief Executive Officer

**Red Lobster International Holdings LLC**

By: _____
Name: Jonathan Tibus
Title: Chief Executive Officer

**RLSV, Inc.**

By: _____
Name: Jonathan Tibus
Title: Chief Executive Officer

**Red Lobster Canada, Inc.**

By: _____
Name: Jonathan Tibus
Title: Chief Executive Officer

**Red Lobster of Bel Air, Inc.**

By: _____
Name: Jonathan Tibus
Title: Chief Executive Officer

[RSA Signature Page]

**RL Maryland, Inc.**

By: _Jonathan Tibus_
<br>74789D51390E4A2...

Name: Jonathan Tibus
Title: Chief Executive Officer

**RL of Frederick, Inc.**

By: _Jonathan Tibus_
<br>74789D51390E4A2...

Name: Jonathan Tibus
Title: Chief Executive Officer

**Red Lobster of Texas, Inc.**

By: _Jonathan Tibus_
<br>74789D51390E4A2...

Name: Jonathan Tibus
Title: Chief Executive Officer

**Exhibit A**

**DIP Term Sheet**

*Execution Version*

**Red Lobster Management LLC – Superpriority DIP Term Sheet**

**FOR DISCUSSION PURPOSES ONLY**

THIS TERM SHEET IS ONLY A PRELIMINARY INDICATIVE SUMMARY OF SELECTED TERMS AND IS NOT COMPLETE AND IS NOT A COMMITMENT, OFFER, OR AGREEMENT IN PRINCIPLE TO PROVIDE FINANCING. THIS TERM SHEET IS NOT BINDING ON ANY PARTY AND THE PARTIES DO NOT INTEND TO BE BOUND UNLESS AND UNTIL THEY ENTER INTO DEFINITIVE DOCUMENTATION REGARDING THE SUBJECT MATTER OF THIS TERM SHEET. EXCEPT AS REQUIRED BY LAW, NEITHER THIS PRELIMINARY INDICATIVE SUMMARY OF SELECTED TERMS NOR ITS CONTENTS SHALL BE DISCLOSED PUBLICLY OR PRIVATELY EXCEPT TO THOSE INDIVIDUALS WHO ARE OFFICERS, EMPLOYEES OR ADVISORS OF THE DEBTORS (AS DEFINED BELOW) WHO HAVE A NEED TO KNOW AS A RESULT OF POTENTIALLY BEING INVOLVED IN A TRANSACTION AND THEN ONLY ON THE CONDITION THAT SUCH MATTERS MAY NOT BE FURTHER DISCLOSED.

| | |
|---|---|
| *Borrower*: | Red Lobster Management LLC, a Delaware limited liability company, as debtor and debtor-in-possession (the "Borrower") in a bankruptcy case (the "Borrower's Case") under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code") commenced in the U.S. Bankruptcy Court for the Middle District of Florida (the "Bankruptcy Court"). The date on which the Borrower's Case is commenced is referred to as the "Petition Date". |
| *Guarantors*: | Each of (a) each subsidiary of Parent (as defined below) party to the Prepetition Credit Agreement (as defined below) as a "Guarantor", (b) any other subsidiary or affiliate (other than Parent) of the Borrower that has commenced a bankruptcy case related to the Borrower's Case (together with the Borrower and any other subsidiary of Parent that has commenced a bankruptcy case related to the Borrower's Case, collectively, the "Debtors"), each as a debtor and debtor-in-possession in a case filed under chapter 11 of the Bankruptcy Code (together with the Borrower's Case, the "Bankruptcy Cases"), commenced in the Bankruptcy Court, and (c) any other subsidiary of Parent, subject to exclusions consistent with the Prepetition Credit Agreement (collectively, the "Guarantors" and, together with the Borrower, the "Loan Parties"). |
| *Prepetition Credit Agreement*: | The Borrower is a party to that certain Financing Agreement, dated as of January 22, 2021 (as previously amended, amended and restated, supplemented or otherwise modified, the "Prepetition Credit Agreement" and the loans thereunder, the "Prepetition Loans"), by and among, *inter alia*, the Red Lobster Intermediate Holdings LLC, a Delaware limited liability company ("Parent"), the Borrower, certain other subsidiaries of the Parent, the lenders from time to time party thereto (the "Prepetition Lenders") and Fortress Credit Corp., as administrative agent and as collateral agent (the "Prepetition Agent" and, together with the Prepetition Lenders, the "Prepetition Secured Parties"). |

| | |
|---|---|
| *DIP Facility:*[1] | A superpriority debtor-in-possession multi-draw new money term loan credit facility (the "<u>DIP Facility</u>" and the obligations thereunder, the "<u>DIP Obligations</u>"), consisting of (a) new money commitments in an aggregate principal amount of up to $100 million (the "<u>DIP Term Loan Commitments</u>" and the loans pursuant thereto, the "<u>DIP Term Loans</u>"), of which up to $[$40 million] of the DIP Term Loan Commitments shall be funded upon entry of the interim order approving the DIP Facility, which order shall be reasonably satisfactory to the Required DIP Lenders (as defined below) (the "<u>Interim Order</u>"), and the remainder of the DIP Term Loan Commitments being funded upon or following entry of the final order approving the DIP Facility, which order shall be reasonably satisfactory to the Required DIP Lenders (the "<u>Final Order</u>"), (b) upon entry of the Interim Order, a deemed term loan "roll-up" of Prepetition Loans held by the DIP Lenders (or their affiliates) on a pro rata basis according to their term loan holdings under the DIP Facility, in a ratio of 1.75:1 of the DIP Term Loans advanced during the interim period upon each draw under the DIP Facility (the "<u>Interim Roll-Up</u>"), and (c) upon or following entry of the Final Order, a deemed term loan "roll-up" of Prepetition Loans held by the DIP Lenders (or their affiliates) on a pro rata basis according to their term loan holdings under the DIP Facility, in a ratio of 1.75:1 of the DIP Term Loans advanced upon each draw under the DIP Facility (together with the Interim Roll-Up, the "<u>Roll-Up Loan</u>" and, collectively with the DIP Term Loan, the "<u>DIP Loans</u>"). <br><br> The DIP Facility will be available to the Borrower in at least two draws; provided that, for the avoidance of doubt, all such draws shall be made in accordance with the Approved Budget (subject to permitted variances). |
| *DIP Lenders:* | Certain Prepetition Lenders who elect to provide DIP financing (the "<u>DIP Lenders</u>"). The Prepetition Lenders (or their affiliates) will be offered the right to participate in the DIP Facility *pro rata* with their holdings under the Prepetition Credit Agreement. |
| *DIP Agent:* | Fortress Credit Corp., a Delaware corporation (in such capacity, the "<u>DIP Agent</u>" and, together with the DIP Lenders, the "<u>DIP Secured Parties</u>"). |
| *Interest Rate:* | Adjusted Term SOFR + 10.5% per annum on the DIP Term Loan, paid in cash. <br><br> Adjusted Term SOFR + 10.5% per annum on the Roll-Up Loan, paid in kind. |
| *Security and Priority:* | The DIP Secured Parties shall be granted, pursuant to sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code, continuing, valid, binding, enforceable, non-avoidable, and automatically perfected, post-petition security interests and priming liens (the "<u>DIP Liens</u>") on all tangible, intangible, real and personal property of the Loan Parties (including, without limitation, all prepetition and post-petition property and assets of the Loan Parties and all equity interests owned by the Loan Parties), and all other |

---

[1] The parties agree that they will work together to include appropriate language in the DIP Documentation relating to the Debtor's Canadian operations which, in any event, will be in form and substance satisfactory to the DIP Agent.

|  | property of the Loan Parties of whatever kind, nature or description, whether acquired or created prepetition or post-petition to secure the DIP Obligations, and the proceeds of each of the foregoing (including, without limitation, proceeds from the disposition of real property, including non-residential leaseholds) (the "DIP Collateral").<br><br>The DIP Liens shall be subject only to (i) the Carve-Out (as defined below), and (ii) validly perfected and non-avoidable liens existing as of the Petition Date to which the liens securing the obligations under the Prepetition Credit Agreement were subject and which liens are listed on a schedule to the DIP Credit Agreement (as defined below) ("Prepetition Permitted Liens").<br><br>Notwithstanding the foregoing, the DIP Liens shall not extend to, and the DIP Collateral shall not consist of, avoidance actions brought pursuant to Chapter 5 of the Bankruptcy Code or applicable state law equivalents, but shall include the proceeds therefrom subject to entry of the Final Order.<br><br>Upon entry of the Interim Order and the Final Order and subject to the Carve-Out, all DIP Obligations shall also constitute allowed superpriority administrative expense claims (the "Superpriority Claims") in the Bankruptcy Cases and, subject to entry of the Final Order, shall have priority over all other claims and administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code. |
|---|---|
| *Carve-Out:* | The Carve-Out shall be, collectively, (a) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee (the "U.S. Trustee") pursuant to 28 U.S.C. §1930(a) *plus* interest at the statutory rate, if any, pursuant to 31 U.S.C § 3717 (without regard to the Carve-Out Trigger Notice (as defined below)), (b) reasonable fees and expenses incurred by a trustee and payable under section 726(b) of the Bankruptcy Code in an aggregate amount not to exceed $50,000 (without regard to the Carve-Out Trigger Notice), and (c) to the extent allowed at any time, all unpaid fees and expenses of the professionals retained by the Debtors and, subject to amounts set forth in the Approved Budget, any official committee of unsecured creditors (the "UCC") appointed in the Bankruptcy Cases, that (i) are incurred on or prior to the third business day succeeding the date of delivery of the Carve-Out Trigger Notice, or (ii) are incurred after the third business day succeeding the date of delivery of a Carve-Out Trigger Notice, subject to an aggregate cap of $[750,000] for the Debtors' professionals and a separate aggregate cap of $[150,000] for the UCC's professionals (the "Carve-Out").<br><br>Contemporaneously with the initial funding of the DIP Term Loans, the Debtors will transfer cash proceeds from the DIP Facility in an amount equal to the total budgeted weekly fees and expenses incurred by the Debtors' retained professionals for the first two weekly periods set forth in the Approved Budget (as defined below) and thereafter on a weekly basis until receipt of a Carve-Out Trigger Notice, in each case, excluding any success or other transaction fees of any investment banker or financial advisor of the Debtors, into an escrow account with [●] (the "Professional Fee Reserve"). Amounts funded into the Professional Fee Reserve shall be considered used |

|  | by the Debtors at such time as they are deposited into the Professional Fee Reserve for distribution to professionals in accordance with orders of the Bankruptcy Court. Any amounts remaining in the Professional Fee Reserve after payment of allowed fees and expenses shall be DIP Collateral. The Professional Fee Reserve shall not constitute a cap on the professional fees included in the Carve-Out.<br><br>"Carve-Out Trigger Notice" shall mean a written notice delivered by the DIP Agent to the Debtors' lead counsel, the U.S. Trustee, and lead counsel to the UCC, which notice may only be delivered following the occurrence and during the continuation of an event of default under the DIP Facility. |
| --- | --- |
| *Maturity Date*: | The earliest to occur of (a) the date that is 120 days after the Petition Date, (b) the date that is 30 days following the date of entry of the Interim Order if the Final Order has not been entered by the Bankruptcy Court on or prior to such date, (c) the date a sale of all or substantially all of the assets of the Debtors, taken as a whole, under section 363 of the Bankruptcy Code is consummated, (d) the effective date of a plan of reorganization, and (e) the date the DIP Obligations are accelerated pursuant to the terms of the DIP Facility (such earliest date, the "Maturity Date"). |
| *Amortization*: | None. |
| *Fees and Expenses*: | (i) An agent fee of $100,000 (the "Agent Fee"); and (ii) an upfront fee of 1.0% on the principal amount of DIP Term Loan Commitments (the "Upfront Fee"). The Agent Fee shall be fully earned upon entry of the Interim Order and netted against the initial draw on the effective date of the DIP Facility. The Upfront Fee shall be approved upon entry of the Interim Order and netted against the initial draw on the effective date of the DIP Facility.<br><br>The Debtors shall reimburse the DIP Agent and the DIP Lenders for all reasonable and documented out-of-pocket costs and expenses, including legal fees of the DIP Agent and the DIP Lenders, financial advisor fees, and other similar fees, costs and expenses incurred in connection with the DIP Facility and the Bankruptcy Cases, including, without limitation, the reasonable and documented fees and expenses of (a) counsel to the DIP Agent and the DIP Lenders (taken as a whole), (b) specialty or local counsel to the DIP Agent and the DIP Lenders (taken as a whole) in each relevant jurisdiction and (c) in the case of an actual or perceived conflict of interest with respect to any of the foregoing counsel, one additional counsel to each group of affected Lenders similarly situated and taken as a whole. |
| *Prepayment Premiums, Back-End Fees, Exit or Similar Fees*: | An exit fee of 3.0% on the principal amount of DIP Term Loan Commitments (the "Exit Fee"). The Exit Fee shall be fully earned upon entry of the Interim Order and payable in full upon the earliest to occur of (a) the payment in full of the DIP Loans, (b) the acceleration of the DIP Obligations and (c) the Maturity Date. |
| *Conditions to Effective Date*: | The effectiveness of the DIP Term Loan Commitments and the applicable DIP Documentation (as defined below) shall be conditioned upon the satisfaction (or waiver by the Required DIP Lenders in their sole discretion) |

of the conditions precedent set forth below (the date on which such conditions have been satisfied or waived, the "<u>Effective Date</u>"):

(a) The Petition Date shall have occurred.

(b) The Interim Order shall have been entered.

(c) The Asset Purchase Agreement shall have been executed and the Sale Motion (each as defined in the Restructuring Support Agreement) shall have been filed.

(d) No trustee under chapter 7 or chapter 11 shall have been appointed in the Bankruptcy Cases.

(e) All Milestones (as defined below) required to be satisfied on or prior to the Effective Date shall have been satisfied (unless waived or extended by the Required DIP Lenders).

(f) The DIP Agent shall have received, and the Required DIP Lenders shall have approved of, the Initial Budget (as defined below).

(g) Each of the representations and warranties contained in the DIP Documentation shall be true and correct in all material respects on and as of the Effective Date (other than any such representations and warranties that are made as of a specific date, which shall be true and correct in all material respects as of such date) (without duplication of any materiality qualifiers with respect to any such representation or warranty already qualified by materiality or Material Adverse Effect (as defined below)).

(h) The DIP Agent shall have received counterparts of the DIP Documentation signed by the Loan Parties and the DIP Lenders.

(i) The DIP Agent shall have received copies of organizational documents, certificates of good standing and resolutions with respect to each Loan Party and certifications with respect thereto.

(j) The DIP Agent shall have received favorable opinions from counsel to the Debtors, dated as of Effective Date, in form and substance reasonably satisfactory to the DIP Agent.

(k) The DIP Agent shall have received a closing certificate, dated as of the Effective Date, and signed by a responsible officer of the Borrower, certifying as to satisfaction of the conditions precedent set forth in clauses (c), (d) (f), (g), and (n) hereof.

(l) The DIP Agent shall have received at least three business days prior to the Effective Date all documentation and other information requested in writing by the DIP Agent at least 10 business days prior to the Effective Date required under applicable "know-your-

customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act.

(m) UCC financing statements against the Debtors suitable in form and substance shall be in place in all places required by applicable law to perfect or evidence of record the liens of the DIP Agent under the DIP Documentation and/or the Interim Order, as first priority priming liens (subject only to the Carve-Out and the Prepetition Permitted Liens (if any)), in each case, in form and substance satisfactory to the DIP Agent; provided, that the DIP Agent shall not be required to file any financing statements, mortgages, notices of lien or similar instruments in any jurisdiction or filing office or to take any other action in order to validate or perfect the liens and security interests granted by or pursuant to either or both (A) any DIP Documentation and (B) either the Interim Order or the Final Order.

(n) No default or event of default under the DIP Documentation shall result from the execution of the DIP Documentation or use of the loans made pursuant thereto.

(o) All filed first day pleadings or declarations in the Bankruptcy Cases which relate to the DIP Facility shall be in form and substance reasonably acceptable to the Required DIP Lenders, and all other filed first day pleadings or declarations in the Bankruptcy Cases shall not be inconsistent, in any material respect, with the terms of the DIP Documentation.

(p) No trustee or examiner with enlarged powers (beyond those set forth in Bankruptcy Code sections 1106(a)(3) and (4)) shall have been appointed with respect to the Debtors or their respective properties.

(q) A cash management order reasonably acceptable to the Required DIP Lenders shall be in full force and effect and shall not have been reversed, vacated, stayed or subject to appeal, and shall not have been amended, restated, amended and restated, supplemented or otherwise modified without the prior written consent of the DIP Agent.

(r) Upon entry of the Interim Order, the entry into, and performance under, the DIP Documentation shall not violate any applicable law and shall not be enjoined, temporarily, preliminarily or permanently.

(s) The Restructuring Support Agreement shall be in full force and effect as to all parties thereto and shall not have been amended, restated, amended and restated, supplemented or otherwise modified in a manner adverse to the interests of the DIP Agent or the DIP Lenders.

| *Borrowing Conditions:* | The obligation of the DIP Lenders to fund DIP Term Loans shall be conditioned upon the satisfaction (or waiver by the Required DIP Lenders in their sole discretion) of the conditions precedent set forth below:<br><br>(a)  The Effective Date shall have occurred (or, substantially concurrently with such borrowing of DIP Term Loans, shall occur).<br><br>(b)  The DIP Agent shall have received a customary notice of borrowing with respect to the requested DIP Term Loans.<br><br>(c)  Each of the representations and warranties contained in the DIP Documentation shall be true and correct in all material respects on and as of the date of such borrowing (other than any such representations and warranties that are made as of a specific date, which shall be true and correct in all material respects as of such date) (without duplication of any materiality qualifiers with respect to any such representation or warranty already qualified by materiality or Material Adverse Effect).<br><br>(d)  No default or event of default under the DIP Documentation shall have occurred and be continuing.<br><br>(e)  The Bankruptcy Cases shall not have been dismissed or converted under chapter 7 of the Bankruptcy Code.<br><br>(f)  No trustee under chapter 7 or chapter 11 shall have been appointed in the Bankruptcy Cases.<br><br>(g)  All Milestones required to be satisfied on or prior to such borrowing date shall have been satisfied (unless waived or extended by the Required DIP Lenders).<br><br>(h)  With respect to the DIP Term Loan Commitments being made available upon entry of the Final Order (the period during which such DIP Term Loan Commitments are being made available, hereinafter referred to as the "<u>Final Availability Period</u>"), the entry of the Final Order shall have occurred.<br><br>(i)  During the Final Availability Period, the Final Order and cash management order reasonably acceptable to the Required DIP Lenders shall be in full force and effect and, with respect to each, shall not have been reversed, vacated, stayed or subject to appeal, and shall not have been amended, restated, amended and restated, supplemented or otherwise modified without the prior written consent of the DIP Agent.<br><br>(j)  The Debtors shall be in compliance with the Interim Order and the Final Order, as applicable.<br><br>(k)  On each Updated Budget Delivery Date, the DIP Agent shall have received, and the Required DIP Lenders shall have approved, the relevant Updated Budget (as defined below), and such Updated Budget shall be in full force and effect and the making of any DIP Term Loans |

| | |
|---|---|
| | on the applicable borrowing date shall be in accordance with the Approved Budget. |
| *Material Adverse Effect:* | "Material Adverse Effect" means a material adverse effect on any of (a) the operations, assets, liabilities, or condition (financial or otherwise) of the Loan Parties taken as a whole, (b) the ability of the Loan Parties taken as a whole to perform any of their obligations under the DIP Documentation to which they are a party, (c) the legality, validity or enforceability of the DIP Documentation, (d) the rights and remedies (taken as a whole) of the DIP Agent or any DIP Lender under the DIP Documentation or (e) the validity, enforceability or priority of the liens purported to be created by the DIP Documentation or the Interim Order or Final Order, as applicable; provided that, solely for purposes of clause (a) above, (i) the effect of the filing of the Bankruptcy Cases and the events and conditions related to and/or leading up thereto and/or typically resulting from the filing of cases under chapter 11 of the Bankruptcy Code, (ii) any actions required to be taken under the DIP Documentation, the Interim Order or the Final Order, (iii) any matters disclosed in the DIP Documentation (including any schedules thereto and any disclosure letter) and/or publicly disclosed in any first day pleadings or declarations in the Bankruptcy Cases, and (iv) any matters that affect the restaurant industry generally and that are not disproportionately adverse to the Loan Parties, in each case, shall be disregarded in determining whether a "Material Adverse Effect" has occurred. |
| *Approved Budget:* | On or prior to the Effective Date, the Debtors shall prepare and deliver to the DIP Agent a 13-week cash flow forecast beginning with the week which includes the Petition Date through the thirteenth week thereafter showing anticipated receipts and disbursements in form and substance acceptable to the Required DIP Lenders (the "Initial Budget").<br><br>After the Effective Date, on the first Friday of each fiscal month, commencing with the first Friday of the first full fiscal month ending after the Effective Date (each such date, an "Updated Budget Delivery Date"), the Debtors shall deliver to the DIP Agent a 13-week cash flow forecast beginning with the week immediately preceding such Updated Budget Delivery Date (each, an "Updated Budget"), in form substantially consistent with the Initial Budget (or otherwise reasonably acceptable to the Required DIP Lenders) and in substance acceptable to the Required DIP Lenders. Upon (and subject to) the acceptance by the Required DIP Lenders of any Updated Budget, such Updated Budget shall constitute the Approved Budget (as defined below).<br><br>"Approved Budget" means, initially, the Initial Budget, and, thereafter, the most recent Updated Budget accepted by the Required DIP Lenders. |
| *Budget Variance Report:* | After the Effective Date, the Debtors shall deliver to the DIP Agent, on the Friday of every week, commencing with the Friday of the third full calendar week ending after the Petition Date, (each such date, a "Weekly Budget Variance Report Date") a Weekly Budget Variance Report (as defined |

|  | below) for the applicable Weekly Budget Variance Report Period (as defined below). |
|---|---|
|  | "Weekly Budget Variance Report" means, for any Weekly Budget Variance Report Period, a weekly variance report comparing for such Weekly Budget Variance Report Period the actual results against anticipated results under the Approved Budget, on an aggregate basis and in the same level of detail set forth in the applicable Approved Budget. |
|  | "Weekly Budget Variance Report Period" means the fiscal month to date period ending each Friday of the weeks preceding the applicable Budget Variance Test Date (with initial partial periods as appropriate). |
|  | "Fiscal Month Budget Variance Report" (and together with the Weekly Budget Variance Report, the "Budget Variance Reports") means, for any Budget Variance Test Period (as defined below), a variance report comparing for such Budget Variance Test Period (as defined below) the actual results against anticipated results under the Approved Budget, on an aggregate basis and in the same level of detail set forth in the applicable Approved Budget. |
|  | "Budget Variance Test Period" means, beginning with the Budget Variance Test Date occurring on June 28, 2024, the fiscal monthly periods as follows: |
|  | 1. Five-week period ending June 28, 2024; |
|  | 2. Four-week period ending July 26, 2024; |
|  | 3. Four-week period ending August 23, 2024; and |
|  | 4. Five-week period ending September 27, 2024. |
|  | "Budget Variance Test Date" shall mean the following dates: June 28, 2024; July 26, 2024; August 23, 2024; and September 27, 2024. |
| *Budget Variance Financial Covenant:* | After the Effective Date, the Budget Variance Financial Covenant shall be tested for each Budget Variance Test Period. Within five (5) business days of the Budget Variance Test Date, the Debtors shall deliver to the DIP Agent a Fiscal Month Budget Variance Report. |
|  | On each Budget Variance Test Date while any DIP Term Loans remain outstanding, the Borrower shall not permit: |
|  | (a) cumulative actual disbursements for such Budget Variance Test Period (excluding (i) estate professional fees and U.S. Trustee fees and (ii) fees and expenses payable to the DIP Agent's professionals under the DIP Documentation) to be greater than (A) for the first two Budget Variance Test Periods, 115% of the forecasted total disbursements (other than professional fee disbursements) for such Budget Variance Test Period in the applicable Approved Budget and (B) for each Budget Variance Test Period thereafter, 110% of the forecasted total disbursements for |

| | |
|---|---|
| | such Budget Variance Test Period in the applicable Approved Budget; and<br><br>(b)  cumulative actual receipts for such Budget Variance Test Period to be less than (i) for the first two Budget Variance Test Periods, 85% of the forecasted total receipts for such Budget Variance Test Period in the applicable Approved Budget and (ii) for each Budget Variance Test Period thereafter, 90% of the forecasted total receipts for such Budget Variance Test Period in the applicable Approved Budget. |
| *Milestones:* | The DIP Documentation shall require the Debtors to satisfy the milestones (the "<u>Milestones</u>") set forth in the Restructuring Support Agreement that occur on or after the Petition Date. |
| *363 Credit Bid:* | The Interim Order shall provide that the DIP Agent, at the direction of the Required DIP Lenders and on behalf of the DIP Lenders, shall be permitted to credit bid, pursuant and subject to section 363(k) of the Bankruptcy Code or applicable law, the DIP Term Loan in connection with any sale or disposition of assets in the Bankruptcy Cases. The Final Order shall provide that the DIP Agent, at the direction of the Required DIP Lenders and on behalf of the DIP Lenders, shall be permitted to credit bid (pursuant to section 363(k) of the Bankruptcy Code or applicable law) the DIP Term Loans and, subject to the expiration of any challenge period, the Roll-Up Loans and any Prepetition Loans held by the DIP Lenders in connection with any sale or disposition of assets in the Bankruptcy Cases and shall not be prohibited from making such credit bid "for cause" under section 363(k) of the Bankruptcy Code.  The Debtors will stipulate to the validity of the Prepetition Loans (the "<u>Debtor Stipulation</u>"). |
| *Use of Proceeds:* | Proceeds of the DIP Term Loans will be used in compliance with the terms of the Approved Budget (subject to permitted variances) (a) to repay the obligations under that certain Credit Agreement, dated as of January 22, 2021, by and among Wells Fargo Bank, National Association, as agent, Red Lobster Intermediate Holdings LLC and Red Lobster Management LLC, as borrowers, and the lenders from time to time party thereto, in full (including cash collateralization of letters of credit issued thereunder), (b) to pay transaction costs, fees and expenses that are incurred in connection with the DIP Facility, (c) to pay professional fees of the Debtors and their estates and the UCC, (d) for working capital and other general corporate purposes permitted by the DIP Documentation, and (e) if necessary, to fund the Excluded Cash Amount (as defined in the APA) for purposes of satisfying Post-Sale Expenses (as defined in the APA) subject to the Interim Order or Final Order, as applicable.<br><br>The deemed proceeds of the Roll-Up Loans shall be used to refinance an equal amount of the Prepetition Loans held by the DIP Lenders (or their affiliates) reducing the amount of the "Obligations" (as defined in the Prepetition Credit Agreement) by such amount. |
| *Challenge Period* | The Interim Order provides for a challenge period as follows: for all parties in interest, including the UCC (if appointed), the earlier of (i) sixty (60) |

<table>
<tr>
<td></td>
<td>calendar days after the Petition Date and (ii) the date established by the Court for the submission of Qualified Bids (as defined in the Stalking Horse Term Sheet) to purchase the Debtors' assets (the "<u>Challenge Period</u>"); provided, that the Challenge Period may be extended with respect to a particular party with the written consent of the Prepetition Agent.<br><br>A "<u>Challenge</u>" means any challenge to the findings set forth in the Interim Order or any stipulation contained in the Debtor Stipulation, including but not limited to, those in relation to (i) the amount, validity, extent, priority, or perfection of the mortgage, security interests, and liens of the Prepetition Agent with respect to prepetition collateral; (ii) the validity, allowability and priority of the Obligations (as defined in the Prepetition Credit Agreement); and (iii) any releases set forth or agreed to pursuant to the DIP Documentation (each, a "<u>Challenge</u>");</td>
</tr>
<tr>
<td>*Adequate Protection*:</td>
<td>As adequate protection for any diminution in the value of the interests of the Prepetition Secured Parties in their prepetition collateral resulting from the use of cash collateral or otherwise, the Debtors shall grant to the Prepetition Secured Parties:<br><br>(a)   subject to (i) the Carve-Out and (ii) the Prepetition Permitted Liens (if any), replacement liens and second priority liens (as applicable) on the DIP Collateral with the priorities set forth above;<br><br>(b)   superpriority administrative expense claims that shall be junior to the Superpriority Claims of the DIP Secured Parties and the Carve-Out; <u>provided</u> that the superpriority administrative expense claims have recourse to all DIP Collateral;<br><br>(c)   payment of reasonable and documented fees and out-of-pocket costs and expenses of the Prepetition Secured Parties (including legal fees of counsel to the Prepetition Secured Parties); and<br><br>(d)   interest pursuant to section 506(b) of the Bankruptcy Code.</td>
</tr>
<tr>
<td>*Documentation*:</td>
<td>The DIP Facility will be documented pursuant to a DIP credit agreement to be entered into among the DIP Secured Parties and the Guarantors (the "<u>DIP Credit Agreement</u>"), which shall contain:<br><br>(a)   representations and warranties (to be applicable to the Loan Parties and their subsidiaries) in form and substance consistent with the Prepetition Credit Agreement, subject, where applicable, to qualifications (including knowledge qualifiers), applicable legal reservations and qualifications, and limitations for materiality to be provided in the DIP Credit Agreement (including as to a Material Adverse Effect standard), in each case, to be mutually agreed by the Required DIP Lenders and the Borrower, including the following: organization and existence; power and authority; authorization; execution, delivery and enforceability of the DIP Documentation; no conflicts of the DIP Documentation with applicable law, organizational documents or material contractual obligations; capitalization of subsidiaries as of the</td>
</tr>
</table>

Effective Date; no material litigation; financial statements; no Material Adverse Effect; the Initial Budget and each Approved Budget; compliance with applicable laws and regulations, material consents and approvals; ERISA; payment of taxes; margin regulations; nature of business; compliance with permits; ownership of property; delivery of true and accurate copies of all leases and material contracts and summary of status of the same; representation that no mortgaged or leased property is in a flood hazard zone; employee and labor matters; environmental matters; insurance; use of proceeds; intellectual property; inapplicability of the Investment Company Act of 1940; sanctions, anti-bribery, anti-corruption laws and anti-money laundering laws (including FCPA, OFAC and the USA PATRIOT Act); accuracy of disclosure as of the Effective Date; and certain bankruptcy matters (including as to the Interim Order and the Final Order);

(b) affirmative covenants (to be applicable to the Loan Parties and their subsidiaries) in form and substance substantially consistent with the Prepetition Credit Agreement, including to the following: delivery of financial statements and reports, Approved Budgets and Budget Variance Reports; delivery of any new leases and notice of status of a change in the status of any lease; delivery of certificates, notices and other material information (including notices of default, litigation, ERISA events, Material Adverse Effect, any party seeking relief from the automatic stay other than as expressly permitted in the Interim Order or Final Order, as applicable); compliance with applicable laws and regulations (including environmental laws); payment of taxes; use of proceeds; preservation of existence; visitation and inspection rights; keeping of books and records; maintenance of properties and insurance coverage; covenants to guarantee obligations and give security; delivery of an Approved Budget (and supplements thereto); in advance of filing with the Bankruptcy Court or delivery thereof to a committee appointed in the Bankruptcy Cases, delivery to the DIP Agent of the Final Order and, in addition, other material proposed orders and pleadings that may be adverse to the DIP Agent or the DIP Lenders or inconsistent with the Approved Budget or terms of the DIP Documentation; delivery of all material written reports and presentations delivered by or on behalf of any Debtor to any party in interest of the Bankruptcy Cases; post-closing covenants; satisfaction of Milestones; compliance with the Interim Order, Final Order and all other orders and requirements issued by the Bankruptcy Court; continued engagement of a financial advisor reasonably satisfactory to the DIP Agent; support and use of commercially reasonable efforts to pursue the transactions contemplated pursuant to the Restructuring Support Agreement on the terms and in accordance with the Milestones, including cooperation with the DIP Lenders to obtain necessary Bankruptcy Court approvals; repatriation of cash; and further assurances, subject, where applicable, in the case of each of the foregoing covenants, to thresholds, exceptions and qualifications to be mutually agreed by the Required DIP Lenders and the Borrower;

(c) negative covenants in form and substance substantially consistent with the Prepetition Credit Agreement, subject to thresholds, exceptions and qualifications, in each case, to be mutually agreed by the Required DIP Lenders and the Borrower, including limitations with respect to the following: liens (provided that, for the avoidance of doubt, all liens will at all times be junior and subordinate to the liens granted under the DIP Documentation (other than the Carve-Out and the Prepetition Permitted Liens (if any)); indebtedness; fundamental changes and dispositions; changes in the nature of the Debtors' business; investments, loans and other disbursements (including that no disbursement shall be permitted unless it is set forth in the Approved Budget); sale and leaseback transactions; capital expenditures; restricted payments; federal reserve regulations; transactions with affiliates; dividends and other payments; negative pledges; modifications of indebtedness, organizational documents and certain other agreements; actions that would require any Debtor to become subject to the registration requirements of the Investment Company Act of 1940; actions relating to ERISA; actions breaching environmental laws; changes to the Debtors' accounting methods; anti-money laundering laws; the transfer of ownership of liquor licenses; and certain actions relating to the Bankruptcy Cases and transactions described in the Restructuring Support Agreement;

(d) indemnification, events of default and remedies in form and substance consistent with the Prepetition Credit Agreement (with such modifications as are (i) set forth herein, and (ii) usual and customary for DIP financings of this type);

it being agreed that the DIP Documentation shall not include any financial covenants other than as expressly set forth above under the heading "*Budget Variance Financial Covenant*".

The other definitive documentation with respect to the DIP Facility (together with the DIP Credit Agreement, collectively, the "DIP Documentation"), such as transaction documents, subordination agreements, intercreditor agreements, and other material agreements, shall be, in each case, usual and customary for DIP financings of this type and in form and substance substantially similar to the applicable documents entered into in connection with the Prepetition Credit Agreement.

The consent of the Required DIP Lenders will be required to make amendments to the DIP Credit Agreement; provided that (a) certain provisions customary and usual for debtor-in-possession financings of this type shall require the approval of all DIP Lenders or all DIP Lenders directly affected thereby and (b) a waiver of any condition to the borrowing of DIP Term Loans shall be subject solely to the consent of DIP Lenders holding unused DIP Term Loan Commitments representing more than 50.01% of the sum of the unused DIP Term Loan Commitments at such time, excluding any unused DIP Term Loan Commitments held by defaulting lenders.

The definition of "Required DIP Lenders", "required lenders" or any equivalent terms in the DIP Facility shall refer to DIP Lenders holding

|  | outstanding DIP Term Loans and unused DIP Term Loan Commitments representing at least 50.1% of the outstanding DIP Term Loans and unused DIP Term Loan Commitments (excluding any outstanding DIP Term Loans and unused DIP Term Loan Commitments held by defaulting lenders); <u>provided</u> that, solely for the purposes of directing the DIP Agent to credit bid on behalf of the DIP Lenders the DIP Term Loan, the Roll-Up Loans and any Prepetition Loans held by the DIP Lenders, as applicable, in connection with any sale or disposition of assets in the Bankruptcy Cases, "Required DIP Lenders", "required lenders" or any equivalent terms in the DIP Facility shall include at least two (2) DIP Lenders who are not affiliates or related funds of one another. |
|---|---|
| *Governing Law:* | State of New York, except as governed by the Bankruptcy Code. |

## <u>Exhibit B</u>

**Stalking Horse Term Sheet**

*Execution Version*

## Red Lobster Management LLC – Stalking Horse Term Sheet[1]

THIS NON-BINDING SUMMARY OF TERMS AND CONDITIONS (THIS "*STALKING HORSE TERM SHEET*") SETS FORTH THE PRINCIPAL TERMS OF A PROPOSED SALE TRANSACTION (THE "*SALE*") BETWEEN THE PARTIES DESCRIBED HEREIN. THIS STALKING HORSE TERM SHEET DOES NOT CONSTITUTE AN OFFER OR A LEGALLY BINDING OBLIGATION OF THE COMPANY, ITS AFFILIATES, THE LENDERS, OR THE DIP LENDERS, OR ANY OTHER PARTY IN INTEREST AND NO LEGALLY BINDING OBLIGATION WILL EXIST UNLESS AND UNTIL DEFINITIVE DOCUMENTS ARE EXECUTED BY AND AMONG THE APPROPRIATE PARTIES. THIS STALKING HORSE TERM SHEET IS ENTITLED TO PROTECTION FROM ANY USE OR DISCLOSURE PURSUANT TO FEDERAL RULE OF EVIDENCE 408 AND ANY OTHER RULE OF SIMILAR IMPORT. CAPITALIZED TERMS USED HEREIN BUT NOT OTHERWISE DEFINED SHALL HAVE THE MEANING ASCRIBED TO THEM LATER IN THIS STALKING HORSE TERM SHEET.[2]

| | |
|---|---|
| *Sellers* | Red Lobster Management LLC (the "<u>Company</u>") and its direct and indirect subsidiaries and affiliates that are debtors in bankruptcy cases (the "<u>Chapter 11 Cases</u>") commenced by the Company under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, et seq. (the "<u>Bankruptcy Code</u>") in the United States Bankruptcy Court for the Middle District of Florida (the "<u>Bankruptcy Court</u>") and including those borrowers or guarantors under (a) that certain Financing Agreement, dated as of January 22, 2021 (as previously amended, amended and restated, supplemented or otherwise modified, including pursuant to that certain Amendment No. 1 to the Financing Agreement dated as of September 22, 2022 and that certain Amendment No. 2 to the Financing Agreement, dated as of February 29, 2024, the "<u>Prepetition Credit Agreement</u>", and the loans thereunder, the "<u>Prepetition Loans</u>"), by and among Red Lobster Intermediate Holdings LLC ("<u>RL Intermediate</u>"), the Company, each subsidiary of RL Intermediate from time to time party thereto, the lenders from time to time party thereto (the "<u>Prepetition Lenders</u>") and Fortress Credit Corp., as administrative agent (in such capacity, the "<u>Prepetition Agent</u>" and, together with the Prepetition Lenders, the "<u>Prepetition Secured Parties</u>"), and (b) the DIP Facility (as defined in the DIP Term Sheet, and the loans pursuant thereto, the "<u>DIP Loans</u>"), provided by the lenders from time to time party thereto (the "<u>DIP Lenders</u>") to the Company, as a debtor and a debtor-in-possession (collectively, the "<u>Sellers</u>"). |
| *Purchaser* | RL Parent Holdings LLC, a newly formed entity organized and controlled by the DIP Lenders (the "<u>Purchaser</u>"). The APA will provide that such agreement (and the Purchaser's rights thereunder) shall be freely assignable by Purchaser to affiliates thereof. |
| *Purchase Price* | The aggregate consideration for the Purchased Assets (the "<u>Purchase Price</u>") shall consist of: (a) a credit bid of 100% of the DIP Loans pursuant to section 363(k) of the Bankruptcy Code (the "<u>Credit Bid Amount</u>"); (b) assumption of the Assumed Liabilities and (c) the Excluded Cash (which shall remain with the Sellers at Closing). |

---

[1] <u>Note to Draft</u>: Subject to review by Canadian counsel.
[2] For purpose hereof, "Interim Order" and "Final Order" have the meanings ascribed to those terms in the DIP Term Sheet.

| Purchased Assets | The "<u>Purchased Assets</u>" shall include substantially all of the assets of the Sellers, free and clear of all liens, claims, interests and encumbrances to the fullest extent permitted by Section 363 of the Bankruptcy Code and/or other applicable law, other than the Excluded Assets, as shall be more fully set forth in the APA, including: |
|---|---|

(i)    all cash, cash equivalents, prepayments (including all prepayments made to third party vendors), deferred assets, refunds, credits or overpayments, in each case, except for the Excluded Cash (defined below);

(ii)    all accounts receivable of the Sellers (including, without limitation, credit card receivables, funds in transit, deposits and other receivables from third party delivery services (e.g., Grubhub and DoorDash), franchisee royalty and other payments/fees, allowances due from landlords with respect to the Assigned Leases (as defined below), etc.);

(iii)    all inventory of the Sellers;

(iv)    to the extent transferable pursuant to applicable law, all insurance policies of Sellers and any claims thereunder to the extent such policies relate to the operation of the Sellers' business or to any Assumed Liabilities, other than any Excluded Insurance Policy, *provided*, that to the extent any insurance policies of Sellers cover any excluded liabilities of Sellers, including, without limitation, tort liabilities, operational liabilities, and environmental liabilities, such policies must be made available to satisfy bona fide claims of any third party that are covered by such insurance policies;

(v)    those unexpired leases specifically designated by Purchaser at least three (3) days prior to the Auction (the "<u>Assigned Leases</u>");

(vi)    those executory contracts specifically designated by the Purchaser at least three (3) days prior to the Auction ("<u>Assigned Contracts</u>");

(vii)    to the extent transferable, any security deposits held by counterparties to Assigned Leases and Assigned Contracts;

(viii)    all furniture, fixtures, equipment (including cooking and food storage equipment), marketing materials and other personal property used in the operations of the Sellers, including, to the extent transferable, all rights to any software used in any computer equipment;

(ix)    all merchandise and other personal property used in the operations of the Sellers;

(x)    to the extent transferable pursuant to applicable law, all permits required for Sellers to conduct business as currently conducted or for the ownership, operation, use, maintenance or repair of any of the Purchased Assets, including, without limitation, alcohol and liquor licenses;

(xi)    all books and records of the Sellers, other than the Excluded Books and Records, <u>provided</u> that Purchaser will provide the Sellers with reasonable access to books and records for the purposes of conducting any "wind-down" activities post-closing;

(xii)    all intellectual property of the Sellers;

(xiii)    all general intangibles associated with the Sellers' business;

(xiv)    all guarantees, representations, warranties and indemnities associated with the operation of the business to the extent related to any Purchased Assets or any Assumed Liabilities;

(xv)    all claims, causes of action, choses in action, rights of recovery, rights of set off and rights of recoupment (including all Avoidance Actions), other than counterclaims and defenses related to Excluded Assets and any proceeds thereof;

(xvi)    all prepayments, deposits, deferred assets, rights to refunds (including pre and post-bankruptcy rights to tax refunds), credits, rights to recover overpayments or other receivables, other than those related to Excluded Assets;

(xvii)    all owned real property held by Sellers, together with (to the extent of such Seller's interest therein) all improvements, facilities, fixtures, equipment (including cooking and food storage equipment), and appurtenances thereto and all rights in respect thereof and all servitudes, easements, rights-of-way and other surface use agreements and water use agreements, if any, related thereto;

(xviii)    all tax returns of or with respect to any Purchased Asset and all records (including working papers) related thereto, *provided,* that the Sellers and any court-appointed chapter 7 trustee or other fiduciary charged with winding up the affairs of the Sellers shall have reasonable access to any tax returns and working papers, as applicable, upon prior written request;

(xix)    any funds owed to any Seller in connection with the Paycheck Protection Program of the Coronavirus Aid, Relief and Economic Security Act of 2020 or any other COVID-19 relief law (including employee retention credits);

(xx)    all rights in or under employee plans of Sellers which are specifically set forth on a schedule to the APA to be provided by the Purchaser prior to the Auction and thereby designated as "Assumed Employee Plans" under the APA, if any;

(xxi)    all rights under non-disclosure or confidentiality, non-compete or non-solicitation agreements with employees and agents of any Seller or with third parties; and

(xxii)    all equity interests held by any Seller of any entity that is not a debtor, which are specifically set forth on a schedule to the APA to be provided by the Purchaser prior to the Auction, if any (collectively, the "Purchased Equity Securities").

For purposes hereof, "Auction" means the auction undertaken pursuant to the Bidding Procedures Order.

| Excluded Assets | The Purchased Assets shall not include the following assets (collectively, the "Excluded Assets"): |
| --- | --- |
| | (i)    all books and records relating solely to Excluded Assets, the organizational documentation and stock and minute books of the Sellers, and any books and records or other documents that any Seller is prohibited by applicable law or contract from delivering to Purchaser (the "Excluded Books and Records"); |
| | (ii)    equity securities in any Seller or other entity, other than the Purchased Equity Securities; |
| | (iii)    executory contracts and unexpired leases of the Sellers that are not Assigned Leases or Assigned Contracts; |
| | (iv)    any confidential personnel or other records to the extent pertaining to any current or former employee who is not a Transferred Employee; |
| | (v)    all equipment and other assets and items that are (a) owned by third parties or (b) leased to any Seller or an affiliate thereof, or are not freely assignable, saleable and transferable to the Purchaser, in each case, pursuant to a contract or agreement that is not an Assigned Lease or an Assigned Contract; |
| | (vi)    rights that accrue or will accrue to the Sellers under any of the documents with respect to the Sale; |
| | (vii)    cash on hand and cash drawn under the DIP Facility (collectively, the "Excluded Cash"), in an amount equal to (a) after taking into account any amounts held by any Sellers or estate professionals, or any funds of Sellers held in escrow or reserve with respect to the fees and expenses of any estate professionals, an amount sufficient to satisfy the estimated accrued professional fees and expenses of estate professionals as of the Closing Date, but only to the extent that such fees of such estate professionals are included in the Carve Out (as defined in the DIP Term Sheet), plus (b) an amount sufficient to pay all Seller administrative priority expenses that are accrued and unpaid as of the Closing Date in the Bankruptcy Cases, but only to the extent such expenses are (1) not Assumed Liabilities, (2) not professional fees or expenses, and (3) are included in the Approved Budget (as defined in the DIP Term Sheet), plus (c) an amount equal to $500,000 that will be used to fund the wind-down expenses (collectively, the "Post-Sale Expenses")[3]; |
| | (viii)    all director and officer insurance policies and any insurance policy (a) related solely to any Excluded Asset, (b) required to cover claims or expenses in the Chapter 11 Cases or (c) are required to be retained by Sellers in connection with the wind-down of the Sellers' bankruptcy estate following the Closing (the "Excluded Insurance Policies"); |
| | (ix)    any employee benefit plan that is not an Assumed Employee Plan and all assets of any such employee benefits plan, or any trust or other funding vehicles with respect to any such employee benefit plan; and |

---

[3] Note to Draft: TSA budget to be discussed separately.

| | |
|---|---|
| | (x) all guarantees, representations, warranties and indemnities to the extent pertaining to any Excluded Asset or rights and defenses to the extent pertaining to any Excluded Liability. |
| | The Purchaser may revise the APA to add or remove Purchased Assets (including, for the avoidance of doubt, any Assigned Lease or Assigned Contract) and Excluded Assets with no effect on the Purchase Price at any time prior to the Closing. |
| *Assumed Liabilities/Excluded Liabilities* | "<u>Assumed Liabilities</u>" shall include the following: |
| | (i) all liabilities of the Sellers relating to, or arising in respect of, the Purchased Assets arising out of or relating to (a) events, occurrences, acts or omissions occurring or existing on or after the Closing Date or (b) the operation of the Sellers' business or the Purchased Assets by Purchaser on or after the Closing Date; |
| | (ii) all liabilities of the Sellers under any Assigned Leases and Assigned Contracts (collectively, the "<u>Purchased Contracts</u>"), including amounts not to exceed the aggregate amounts to be set forth on a schedule to be agreed by Sellers and Purchaser prior to execution of the definitive purchase agreement (the "<u>Cure Costs Cap</u>") necessary to cure any defaults in connection with the assumption of any Purchased Contracts (collectively, the "<u>Cure Costs</u>"); |
| | (iii) all liabilities incurred after the Closing Date relating to the employment or performance of services, termination of employment or services of any Transferred Employee or any liabilities arising under each Assumed Employee Plan after the Closing Date; |
| | (iv) liabilities for gift cards or gift certificates issued by any Seller in the ordinary course of business prior to the Closing Date; |
| | (v) to the extent lawfully transferable, all obligations, commitments and liabilities under any permits assigned to Purchaser pursuant to the Sale; |
| | (vi) all liabilities with respect to transfer taxes arising in connection with the Sale (the "<u>Transfer Taxes</u>"); |
| | (vii) any and all costs and expenses necessary in connection with providing "adequate assurance of future performance" with respect to the Purchase Contracts (as contemplated by Section 365 of the Bankruptcy Code); |
| | (viii) liabilities for post-petition accounts payable incurred in the ordinary course of Sellers' business; and |
| | (ix) those liabilities to be mutually agreed and set forth on a schedule to the APA. |
| | All prepetition and postpetition liabilities of the Sellers, other than the Assumed Liabilities, shall be "<u>Excluded Liabilities</u>," including, without limitation: |
| | (i) any liability of any Seller to the extent arising from any Excluded Asset; |
| | (ii) any Cure Costs in excess of the Cure Costs Cap; |

(iii)    all liabilities or indebtedness for borrowed money of the Sellers (including any indebtedness or accounts payable owing from any Sellers to any affiliate of the Sellers);

(iv)    except for the Transfer Taxes, (a) all tax liabilities of the Sellers and (b) all tax liabilities relating to the Purchased Assets attributable to a taxable period (or portion thereof) ending on or before the Closing Date;

(v)    all liabilities of Sellers or any of their predecessors or their respective affiliates or ERISA Affiliates arising out of, relating to or with respect to (a) the employment or performance of services, termination of employment or services of any employee, or independent contractor or any other person who has performed services for or on behalf of any Seller or any of its affiliates on or before the close of business on the Closing Date, including any liability resulting from or related to the transactions contemplated hereby, any liability under the WARN Act or similar state, local or foreign law, with respect to COBRA or similar state, local or foreign law, (b) employment or labor liabilities accruing either directly or indirectly against the Sellers or any of their affiliates that relate to the period on or before the close of business on the Closing Date, irrespective of whether such claims are made prior to or after the Closing Date, and (c) all liabilities (including, without limitation, to the IRS or United States Department of Labor, under ERISA or the Internal Revenue Code, or otherwise) with respect to any employee benefit plan (including all assets, trusts, insurance policies and administration service contracts related thereto) sponsored, maintained or contributed to by the Sellers or any of their respective affiliates or ERISA Affiliates, or with respect to which any of them could have any liability (whether current or contingent), in each case that is not an Assumed Employee Plan;

(vi)    all liabilities relating to claims arising from or related to the rejection of a contract or lease pursuant to section 365 of the Bankruptcy Code, including any administrative expense claims arising from the rejection of contracts or leases previously assumed, unless such contract is a Purchased Contract;

(vii)    any tort liabilities of any Seller;

(viii)    all liabilities relating to the CARES Act, including, without limitation, any obligation with respect to deferred payroll taxes;

(ix)    all environmental liabilities relating to, resulting from, caused by or arising out of the ownership, operation or control of the Sellers' business, to the extent accruing, arising out of or relating to events, occurrences, acts or omissions occurring or existing prior to the Closing Date (the "Excluded Environmental Liabilities");

(x)    all actions against each Seller, any of their respective assets, their businesses and any of their past or present operations or activities (except to the extent (and only to such extent that) such actions relate to an Assumed Liability);

| | |
|---|---|
| | (xi)     any liability (whether arising before, on or after the Closing Date) with respect to any employee or former employee of the Sellers who is not a Transferred Employee; |
| | (xii)    all liabilities relating to claims for indemnification of any present or former officer, director, employee, partner or member of any Seller whether arising under bylaws, certificates of formation or other formation documents, or contract arising prior to the Closing Date; and |
| | (xiii)   all accounts payable of any Seller (except to the extent expressly assumed by Purchaser (subject to a mutually agreed cap) as a post-petition payable). |
| *Bid Procedures* | The Sellers shall file a motion (the "<u>Sale Motion</u>") seeking an order of the Bankruptcy Court approving procedures (the "<u>Bidding Procedures</u>") governing the solicitation of bids for all or some portion of the assets of the Sellers and their respective affiliates (the "<u>Bidding Procedures Order</u>") and approving the Sale (the "<u>Sale Order</u>") consistent with the following:<br><br>(i)    <u>Bidder Requirements</u>: A party must submit the following documents to be considered a "<u>Qualified Bidder</u>" and be allowed to participate in the bidding process and receive access to conduct due diligence:<br><br>     a.   An executed confidentiality agreement on terms reasonably acceptable to the Company and the Purchaser; and<br><br>     b.   Prior to the Auction, evidence by the bidder of its financial capacity to close a proposed transaction.<br><br>(ii)   <u>Bid Deadline</u>: A Qualified Bidder must, **no later than 60 days after the Petition Date** (the "<u>Bid Deadline</u>"), deliver a written and executed copy of the form of APA, including a redline showing any changes against such form, and other related Definitive Documents by which the Qualified Bidder offers to purchase all or any portion of the Sellers' assets at a purchase price and upon the terms and conditions set forth therein and which provides, or otherwise complies with, the following items (such offer, a "<u>Qualified Bid</u>"):<br><br>     a.   Constitutes a binding proposal to acquire all or some portion of the assets of the Sellers and their affiliates and the consideration to be paid;<br><br>     b.   Proposes a purchase price greater than the sum of (i) the Purchase Price proposed by the Purchaser, and (ii) $1,000,000;<br><br>     c.   Remains irrevocable until no earlier than 48 hours after the entry of the Sale Order;<br><br>     d.   Is not subject to any break-up fee, transaction fee, termination fee, or any similar type of payment or reimbursement unless subject to court approval;<br><br>     e.   Is not subject to further due diligence or financing contingencies; and |

| | |
|---|---|
| | f.  Is accompanied by a good faith deposit in the amount of 10% of the proposed purchase price (a "Good Faith Deposit"). |
| | (iii)  Credit Bidding: The Purchaser shall be considered a Qualified Bidder and shall not be required to provide a Good Faith Deposit.  Subject to any limitations established by the Bankruptcy Court as a result of a successful challenge, the Purchaser may participate in the Auction and may, pursuant to section 363(k) of the Bankruptcy Code, credit bid the DIP Loans to acquire the Purchased Assets, which credit bid shall be deemed a Qualified Bid.  Purchaser shall not be prohibited from making such credit bid "for cause" under section 363(k) of the Bankruptcy Code. |
| | (iv)  Due Diligence: The Bidding Procedures shall permit all Qualified Bidders to participate in the diligence process, subject to customary exceptions and for antitrust and other applicable law considerations. |
| | (v)  Sale Objections Deadline: The deadline for filing an objection to the Sale to Purchaser shall be **no later than 10 days before the sale hearing**. If a timely objection is filed and not withdrawn or resolved, then such objection will be considered at the sale hearing.<br><br>Auction: If more than one Qualified Bid is received by the Bid Deadline, then the Sellers shall conduct an Auction **no later than 65 days after the Petition Date**. |
| | (vi)  Sale Hearing: The sale hearing will take place **no later than 70 days after the Petition Date**. |
| | (vii)  Sale Order: The Bankruptcy Court shall have entered the Sale Order **no later than 70 days after the Petition Date**.<br><br>The Sale Motion, Bidding Procedures and Sale Order shall be in a form and substance reasonably acceptable to the Purchaser. |
| *Milestones* | The Sellers shall run a sale process under section 363 of the Bankruptcy Code in accordance with the Milestones (as defined in the RSA). |
| *Closing Conditions* | The respective obligations of the Sellers and Purchaser to consummate the Sale (the "Closing", and the date of the Closing, the "Closing Date") shall be subject to the satisfaction at or prior to the Closing Date of customary conditions, including, without limitation, the following conditions:<br><br>(i)  no temporary restraining order, preliminary or permanent injunction or other order issued by a governmental authority preventing consummation of the Sale shall be in effect;<br><br>(ii)  no law shall be in effect which prohibits the transactions contemplated by the Sale;<br><br>(iii)  no default shall have occurred and be continuing under that certain restructuring support agreement to be entered into between the Company and the Consenting Lenders (the "RSA");<br><br>(iv)  no breach of Sellers' or Purchaser's covenants and accuracy of Sellers' and Purchaser's representations and warranties as of the Closing Date |

|  | | that would not reasonably be expected to have a material adverse change (as customarily defined); |
|---|---|---|
|  | (v) | no material adverse change (as customarily defined) shall have occurred; |
|  | (vi) | the APA shall continue to remain in full force and effect; |
|  | (vii) | the Bankruptcy Court shall have entered the Bidding Procedures Order and the Sale Order, and each such order shall be a final non-appealable order reasonably acceptable to the Required DIP Lenders on behalf of the Purchaser and shall; |
|  | (viii) | all applicable waiting periods under the HSR Act shall have expired or been terminated and all other required approvals, listed on a schedule to the APA, shall have been obtained or, if applicable, shall have expired, have been waived by the applicable governmental authority or have been terminated; |
|  | (ix) | to the extent necessary to facilitate the transactions contemplated hereby, including the purchase and sale of all Purchased Assets, the parties shall enter into a transition services agreement, or other similar agreement in form and substance acceptable to Purchaser (any such agreement, a "<u>Transition Services Agreement</u>")[4]; and |
|  | (x) | subject to the applicable caps set forth above, the Sellers shall have an amount of Excluded Cash (including cash drawn under the DIP Facility) on hand necessary to pay the Post-Sale Expenses and perform the Sellers' obligations under any Transition Services Agreement. |
| *Termination* | | The APA will contain customary termination provisions, including but not limited to termination: |
|  | (i) | by the mutual written consent of the Sellers and the Purchaser; |
|  | (ii) | by the Sellers or the Purchaser if the Closing Date has not occurred within 90 days of the Petition Date; |
|  | (iii) | by the Sellers or the Purchaser, if there shall be any law that makes consummation of the Sale illegal or otherwise prohibited or if any governmental authority, including any regulatory authority or court of competent jurisdiction, issues any final, non-appealable ruling or order that (a) enjoins the consummation of the Sale and (b) remains in effect for five (5) business days after notice of such law or order has been received by the Sellers and the Purchaser; |
|  | (iv) | by the Purchaser if the Bankruptcy Court enters an order approving a transaction that represents an alternative to the transactions contemplated herein; |

---

[4] Scope of services under TSA to be mutually agreed by the parties prior to the Closing; to the extent reasonably necessary for the wind-down of the Sellers' estate, scope of services provided by Purchaser (and/or its affiliates) shall include, among other things, reasonable access to the accounting staff and accounting systems of the acquired business for as long as reasonably necessary for such wind-down.

|  | |
|---|---|
|  | (v)     by the Purchaser, if any Seller has breached the APA in a manner that causes Purchaser's condition to closing set forth in clause (iv) under Section "Closing Conditions" above not to be satisfied and such breach is not cured following five (5) business days' notice thereof; |
|  | (vi)     by the Sellers, if the Purchaser has breached the APA in a manner that causes Sellers' condition to closing set forth in clause (iv) under Section "Closing Conditions" above not to be satisfied and such breach is not cured following five (5) business days' notice thereof; |
|  | (vii)     by the Purchaser, upon a termination of the DIP Facility or upon a modification of the interim or Final Order in any material respect without the consent of the requisite DIP Lenders; |
|  | (viii)     by Purchaser or Sellers, upon a termination of the RSA, provided that such termination was not as a result of such party's default under the RSA; and |
|  | (ix)     by the Purchaser, if for any reason the Purchaser is not permitted by the Bankruptcy Court, pursuant to Bankruptcy Code section 363(k), to credit bid the DIP Loans in payment of all or any portion of the Credit Bid Amount. |
| *Releases* | The APA shall contain, subject to Closing, a customary mutual release between and among the Company, the Purchaser, and the DIP Lenders of claims and obligations arising in connection with the DIP Facility included in the Purchase Price. |
| *Confidentiality* | Prior to the filing of the Sale Motion, this Stalking Horse Term Sheet and all communications and information regarding the Sale contemplated herein, including the identity of the Purchaser, the existence, structure, terms, conditions and provisions proposed or discussed are provided for the sole and exclusive benefit of the Sellers, and, except as expressly consented to by the Purchaser in writing or as may be required or requested by any governmental authority, required by applicable law, including an order by a court of competent jurisdiction, may be not be disclosed to or shared with any person or entity other than the Sellers' and its board of directors (or similar governing body) and those of the Sellers' and its officers, directors, employees, accountants, attorneys, advisors and other representatives that are involved in the Chapter 11 Cases or the Sale on a "need to know" basis and are advised of the confidential nature of the information. |
| *Representations and Warranties* | The Sellers and the Purchaser shall make customary representations and warranties, it being understood that such representations and warranties shall not survive the Closing Date. |
| *Pre-Closing Covenants* | Sellers will make customary negative and operating covenants in the context of section 363 credit bid transactions, including, without limitation, covenants concerning: (i) conduct of the Sellers' business prior to Closing; (ii) provision of financial and operating data, and access to the personnel, facilities, books, contracts and records of the Sellers and their respective subsidiaries prior to Closing; (iii) commercially reasonable efforts to obtain approval of the Bidding Procedures and the Sale Motion and other case management undertakings; (iv) sending WARN notices to employees of the Sellers as and if required; and (v) such other covenants as Purchaser may reasonably request. |

| | Sellers and Purchaser shall use commercially reasonable efforts to obtain the necessary consents and authorizations from any third-party to consummate the Sale.<br><br>Purchaser shall agree to such other covenants as Purchaser and Sellers may agree upon in the Definitive Documents. |
|---|---|
| *Tax Treatment* | If requested by Purchaser, the Sellers shall agree to cooperate in good faith to structure the APA and related transactions in a tax efficient manner for the Purchaser. |
| *Regulatory Approvals* | Sellers and Purchaser will agree to cooperate regarding all consents and other authorizations required to be obtained from, or any filings required to be made with, any governmental authority that are necessary to consummate the transactions contemplated herein, including HSR approvals and approvals relating to alcohol and liquor licenses. |
| *Employee Matters* | [Prior to the Auction, Purchaser shall deliver a list of all of Sellers' active employees to whom the Purchaser intends to offer employment effective as of the Closing Date in its sole and absolute discretion and on such terms and conditions as Purchaser may determine in its sole and absolute discretion, which employees shall become employees of the Purchaser to the extent such employees accept Purchaser's employment offer (the "Transferred Employees").  Notwithstanding the foregoing, Purchaser shall offer employment to all Employees covered by a CBA (as defined below) that Purchaser intends to assume, and such Employees shall be offered terms and conditions as required under the applicable CBA and shall be included in Purchaser's list discussed above. Purchaser shall have no liability for any pay, benefits, severance, or similar claims of any Transferred Employees earned or accrued on or prior to the Closing Date, which liabilities constitute Excluded Liabilities, and therefore shall remain the sole responsibility of the Sellers and their respective affiliates, as applicable.  Purchaser shall have no obligation to provide any severance, payments, or benefits to any current or former employees or independent contractors of the Sellers and their respective affiliates, earned or accrued on or prior to the Closing Date.  Sellers acknowledge that Sellers and their respective affiliates, as applicable, are alone responsible for (i) issuing, serving, and delivering all orders and notices required, if any, pursuant to applicable laws, in connection with the termination of employees or contractors, and (ii) any financial obligations and liabilities in connection therewith or otherwise required in connection with the termination of such employees or contractors accrued on or prior to the Closing Date.  From and after the Closing Date, Sellers shall, except to the extent otherwise expressly provided in the APA, retain and be solely responsible for all obligations and liabilities with respect to the employment and services of all employees and independent contractors of the Sellers prior to the Closing Date.  Sellers shall be responsible for providing any notice required pursuant to the WARN Act or other similar local laws with respect to a layoff relating to Sellers' business operations that occurs on or prior to the Closing Date (including in connection with the transactions contemplated hereby), and Purchaser shall be responsible for providing any notice, or making any payments, required pursuant to the WARN Act or other similar local laws with respect to a layoff by Purchaser of any Transferred Employees that occurs after the Closing Date.][5] |
| *Collective Bargaining Agreements[6]* | [Sellers shall obtain the consent of Purchaser before extending or renewing (or permitting to be extended or renewed), the term of any Seller's collective |

---

[5] Note to Draft: Subject to review by Canadian counsel.
[6] Note to Draft: Subject to review by Canadian counsel.

| | |
|---|---|
| | bargaining agreement ("CBA") absent any Seller's ability to terminate such CBA prior to the Closing Date. Purchaser does not accept or assume any CBAs between any Seller and its Employees, and expressly declines to be bound by or accept the terms of any such CBAs. Purchaser is not obligated and does not accept or adopt any wage rates, employee benefits, employees' policies or any other terms and conditions of employment, except where provided for under any CBA that the Purchaser agrees to assume in connection with the Transferred Employees.] |
| *Definitive Documents and Due Diligence* | An asset purchase agreement ("APA") and such other definitive documents for the acquisition of the Purchased Assets and assumption of the Assumed Liabilities as the Sellers and Purchaser mutually agree upon (collectively, the "Definitive Documents") shall memorialize this Stalking Horse Term Sheet and contain such representations, warranties, covenants and releases as set forth herein or as otherwise may be acceptable to the Sellers and Purchaser. The signing of the Definitive Documents will be subject to, among other things, the negotiation by the Sellers and Purchaser of acceptable terms and conditions for the Definitive Documents as well as additional legal, accounting, financial, tax, business and regulatory due diligence. In the event of any inconsistency between this Stalking Horse Term Sheet and any Definitive Documents, the Definitive Documents shall govern. |
| *Authorization to Credit Bid* | Notwithstanding anything else herein, holders of at least 50.1% of the outstanding principal amount of the DIP Loans (including any Prepetition Loans that are rolled-up) and at least two (2) DIP Lenders who are not affiliates or related funds of one another shall have provided authorization to the DIP Agent (as defined in the DIP Term Sheet) before submitting a credit bid under section 363(k) of the Bankruptcy Code on behalf of the DIP Lenders. |

**Exhibit C**

**Restructuring Support Agreement Joinder**

## Restructuring Support Agreement Joinder

This joinder (the "Restructuring Support Agreement Joinder") to the Restructuring Support Agreement dated as of May 9, 2024 (the "Agreement") is executed and delivered by [JOINING PARTY] (the "Joining Party") as of [DATE]. Each capitalized term used herein but not otherwise defined shall have the meaning ascribed to it in the Agreement.

1.       Agreement to be Bound. The Joining Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached to this Restructuring Support Agreement Joinder as Annex A (as the same has been or may be hereafter amended, restated, or otherwise modified from time to time in accordance with the provisions thereof). The Joining Party shall hereafter be deemed to be an RSA Party for all purposes under the Agreement.

2.       Representations and Warranties. The Joining Party hereby represents and warrants to each other RSA Party that, as of the date hereof, such Joining Party (a) is the legal or beneficial holder of, and has all necessary authority (including authority to bind any other legal or beneficial holder) with respect to, the debt or equity interest identified below its name on the signature page hereof, and (b) makes, as of the date hereof, the representations and warranties set forth in Section 12 of the Agreement.

3.       Governing Law. This Restructuring Support Agreement Joinder shall be governed by and construed in accordance with the internal laws of the State of New York without regard to any conflicts of law provisions which would require the application of the law of any other jurisdiction.

4.       Notice. All notices and other communications given or made pursuant to the Agreement shall be sent to:

To the Joining Party at:

[JOINING PARTY]
[ADDRESS]
Attention:
Email:

IN WITNESS WHEREOF, the Joining Party has caused this Restructuring Support Agreement Joinder to be executed as of the date first written above.


[JOINING PARTY]


_____

By:
Name:
Title:

| *Aggregate Amounts Beneficially Owned or Managed on Account of:* | |
| --- | --- |
| Loans | $[●] |
| Shares of Existing Equity | [●] |

**<u>Exhibit D</u>**

**Provision for Transfer Agreement Joinder**

## Provision for Transfer Agreement Joinder

The undersigned ("Transferee") hereby acknowledges that it has read and understands the Restructuring Support Agreement, dated as of May 9, 2024 (the "Agreement"),[1] by and among the RSA Parties and, among other parties, the transferor of Loan Claims (each such transferor, a "Transferor"), and agrees to be bound by the terms and conditions of the Agreement to the extent the Transferor was thereby bound, and shall be deemed a "RSA Party" under the terms of the Agreement.

The Transferee specifically agrees to be bound by the terms and conditions of the Agreement and makes all representations and warranties contained therein as of the date of the Transfer, including the agreement to be bound by the vote of (or other actions taken in support of the Restructuring Transactions by) the Transferor if such vote was cast (or other action taken) before the effectiveness of the Transfer discussed herein.

Date Executed:

_____

Name:
Title:
Address:
Email address(es):

| Aggregate Amounts Beneficially Owned or Managed on Account of: | |
|---|---|
| Loan Claims | $[●] |

---

[1] Capitalized terms used but not otherwise defined herein shall having the meanings ascribed to such terms in the Agreement.

**<u>Exhibit E</u>**

**Milestones**

*Execution Version*

### Restructuring Milestones[1]

The RSA Parties agree to pursue the Restructuring pursuant to the Milestones set forth below unless such Milestones are extended or waived, in writing, by the Required Consenting Lenders:

(a)     no later than April 19, 2024, the Company or its financial advisors shall have provided an executive summary of the Company and circulated the NDA to the entities identified on the Buyers List;

(b)     no later than April 22, 2024, the Company shall have provided potential bidders who have signed a NDA with full access to a confidential virtual data room containing all necessary information needed for such potential bidder to submit a letter of intent;

(c)     no later than May 20, 2024, the Company shall have executed the Asset Purchase Agreement;

(d)     no later than May 20, 2024, the Company shall have commenced the Chapter 11 Cases;

(e)     no later than one (1) day after the Petition Date, the Company shall file with the Bankruptcy Court the Sale Motion;

(f)     no later than two (2) Business Days after the Petition Date, the Bankruptcy Court shall have entered the Financing Order on an interim basis;

(g)     no later than 30 days after the Petition Date, the Bankruptcy Court shall have entered the Financing Order on a final basis;

(h)     no later than 30 days after the Petition Date, the Bankruptcy Court shall have entered the Bidding Procedures Order;[2]

(i)     no later than 65 days after the Petition Date, the Company shall have held an auction in connection with the Sale;

(j)     no later than 70 days after the Petition Date, the Bankruptcy Court shall have entered the Sale Order; and

(k)     no later than 75 days after the Petition Date, the Restructuring shall have been consummated in accordance with the Sale Order; *provided, however*, that if the Sale Order is entered within 70 days after the Petition Date, such deadline shall be extended to 90 days after the

---

[1] Capitalized terms used but not defined herein have the meaning ascribed to them in the Restructuring Support Agreement to which this document is attached as Exhibit E.

[2] The Bidding Procedures Order shall establish a deadline for Qualified Bids not later than 60 days after the Petition Date.

1

*Execution Version*

Petition Date solely for the purpose of obtaining the regulatory approvals necessary to consummate the Restructuring.