## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION
www.flmb.uscourts.gov

| | |
|---|---|
| IN RE: | Chapter 11 Cases |
| RED LOBSTER MANAGEMENT LLC,[1] | Case No. 6:24-bk-02486-GER |
| | Jointly Administered with |
| RED LOBSTER RESTAURANTS LLC, | Case No. 6:24-bk-02487-GER |
| RLSV, INC., | Case No. 6:24-bk-02488-GER |
| RED LOBSTER CANADA, INC., | Case No. 6:24-bk-02489-GER |
| RED LOBSTER HOSPITALITY LLC, | Case No. 6:24-bk-02490-GER |
| RL KANSAS LLC, | Case No. 6:24-bk-02491-GER |
| RED LOBSTER SOURCING LLC, | Case No. 6:24-bk-02492-GER |
| RED LOBSTER SUPPLY LLC, | Case No. 6:24-bk-02493-GER |
| RL COLUMBIA LLC, | Case No. 6:24-bk-02494-GER |
| RL OF FREDERICK, INC., | Case No. 6:24-bk-02495-GER |
| RED LOBSTER OF TEXAS, INC., | Case No. 6:24-bk-02496-GER |
| RL MARYLAND, INC., | Case No. 6:24-bk-02497-GER |
| RED LOBSTER OF BEL AIR, INC., | Case No. 6:24-bk-02498-GER |
| RL SALISBURY, LLC, | Case No. 6:24-bk-02499-GER |
| RED LOBSTER INTERNATIONAL HOLDINGS LLC, | Case No. 6:24-bk-02500-GER |

Debtors.

_____/

## DISCLOSURE STATEMENT FOR THE JOINT CHAPTER 11 PLAN
## OF RED LOBSTER MANAGEMENT LLC AND ITS DEBTOR AFFILIATES

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are Red Lobster Management LLC (6889); Red Lobster Sourcing LLC (3075); Red Lobster Supply LLC (9187); RL Kansas LLC (2396); Red Lobster Hospitality LLC (5297); Red Lobster Restaurants LLC (4308); RL Columbia LLC (7825); RL of Frederick, Inc. (9184); RL Salisbury, LLC (7836); RL Maryland, Inc. (7185); Red Lobster of Texas, Inc. (1424); Red Lobster of Bel Air, Inc. (2240); RLSV, Inc. (6180); Red Lobster Canada, Inc. (4569); and Red Lobster International Holdings LLC (4661). The Debtors' principal offices are located at 450 S. Orange Avenue, Suite 800, Orlando, FL 32801.

**THIS IS A SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN IN ACCORDANCE WITH SECTION 1125 AND WITHIN THE MEANING OF THE BANKRUPTCY CODE, 11 U.S.C. §§ 1125, 1126. THIS DISCLOSURE STATEMENT HAS BEEN CONDITIONALLY APPROVED BY THE BANKRUPTCY COURT. A HEARING ON THE ADEQUACY OF THIS DISCLOSURE STATEMENT WILL BE HELD FOLLOWING SOLICITATION AND CONCURRENTLY WITH CONFIRMATION OF THE DEBTORS' JOINT CHAPTER 11 PLAN. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

**Dated: July 19, 2024**

13153938-3

**IMPORTANT NOTICES**

**THIRD-PARTY RELEASE**

**YOU ARE BEING DEEMED TO GRANT RELEASES TO THIRD PARTIES UNDER THE PLAN UNLESS YOU ARE PERMITTED TO, AND YOU FOLLOW THE APPLICABLE PROCEDURES TO, "OPT OUT" OF GRANTING THEM. PURSUANT TO <u>ARTICLE VIII.A.3</u> OF THE PLAN (A) EACH HOLDER OF A CLAIM WHO VOTES TO ACCEPT THE PLAN; (B) EACH HOLDER OF A CLAIM WHO ABSTAINS FROM VOTING BUT DOES NOT OPT OUT OF THE RELEASES PROVIDED IN THE PLAN; (C) EACH HOLDER OF A CLAIM WHO VOTES TO REJECT THE PLAN (OR IS DEEMED TO REJECT THE PLAN) BUT DOES NOT OPT OUT OF THE RELEASES PROVIDED IN THE PLAN; (D) THE DIP LENDERS AND THE DIP AGENT; (E) THE PREPETITION TERM LOAN PARTIES; (F) THE OFFICERS OF EACH OF THE DEBTORS, THE MEMBERS OF ANY BOARD OF MANAGERS OF EACH DEBTOR AND THE MANAGING MEMBERS (OR COMPARABLE GOVERNING BODIES OR PERSONS) OF ANY DEBTOR; (G) THE PURCHASER; AND (H) THE COMMITTEE AND THOSE INDIVIDUAL MEMBERS OF THE COMMITTEE, SOLELY IN THEIR CAPACATIES AS SUCH, WHO DO NOT OPT OUT OF THE RELEASE PROVIDED FOR IN THE PLAN SHALL BE DEEMED TO GRANT THE THIRD-PARTY RELEASES. THIS RELEASE IS DISCUSSED FURTHER IN <u>ARTICLE 5.5</u> OF THIS DISCLOSURE STATEMENT.**

**RECOMMENDATION BY THE DEBTORS**

**EACH DEBTOR'S BOARD OF DIRECTORS OR MANAGERS OR MANAGING MEMBER (OR COMPARABLE GOVERNING BODY), AS APPLICABLE, HAS APPROVED THE TRANSACTIONS CONTEMPLATED BY THE PLAN AND DESCRIBED IN THIS DISCLOSURE STATEMENT, AND EACH DEBTOR BELIEVES THAT THE PLAN IS FAIR AND EQUITABLE, MAXIMIZES THE VALUE OF EACH OF THE DEBTOR'S RESPECTIVE ESTATES, AND PROVIDES THE BEST RECOVERY TO STAKEHOLDERS. AT THIS TIME, EACH DEBTOR BELIEVES THAT THE PLAN AND RELATED TRANSACTIONS REPRESENT THE BEST ALTERNATIVE FOR ACCOMPLISHING THE DEBTORS' OVERALL RESTRUCTURING OBJECTIVES. EACH OF THE DEBTORS, THEREFORE, STRONGLY RECOMMENDS THAT ALL HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED SUBMIT BALLOTS TO <u>ACCEPT</u> THE PLAN BY RETURNING THEIR BALLOTS SO AS TO BE <u>ACTUALLY RECEIVED</u> BY THE SOLICITATION AGENT NO LATER THAN <u>4:00 P.M. (PREVAILING EASTERN TIME) ON AUGUST 28, 2024</u>, PURSUANT TO THE INSTRUCTIONS SET FORTH HEREIN AND IN THE BALLOTS.**

## PLAN VOTING

The voting deadline to accept or reject the Plan is 4:00 (Prevailing Eastern Time), on August 28, 2024 (the "<u>Voting Deadline</u>"), unless extended by the Debtors. The record date for determining which holders of Claims may vote on the Plan is July 28, 2024 (the "<u>Voting Record Date</u>").

For your vote to be counted, you must return your properly completed ballot in accordance with the voting instructions on the ballot so that it is <u>actually received</u> by the Debtors' Solicitation Agent before the Voting Deadline.

## DELIVERY OF BALLOTS

You may submit your vote:

( ) via the enclosed pre-paid, pre-addressed return envelope

or

( ) via first-class mail to:

<div align="center">

**Red Lobster Management LLC.**
**c/o Epiq Ballot Processing**
**P.O. Box 4422**
**Beaverton, OR 97076-4422**

</div>

or

( ) via overnight courier, or hand delivery to:

<div align="center">

**Red Lobster Management LLC.**
**c/o Epiq Ballot Processing**
**10300 SW Allen Boulevard**
**Beaverton, OR 97005**

</div>

or

( ) via the e-ballot portal using the unique e-ballot ID# on your ballot at:
https://dm.epiq11.com/case/redlobster

**PLEASE CHOOSE ONLY ONE METHOD TO RETURN YOUR BALLOT.**

**BALLOTS RECEIVED VIA ELECTRONIC MEANS (OTHER THAN E-BALLOT) WILL NOT BE COUNTED.**

13153938-3

**If you have any questions on the procedures for voting on the Plan, please contact Epiq Corporate Restructuring, LLC (the Debtors' Solicitation Agent) at:**

<div align="center">

**(888) 754-0507 (toll free)**

**(971) 257-5614 (international)**

**or via email: RedLobsterInfo@epiqglobal.com**

</div>

**Additional details on voting are discussed herein and set forth on ballots delivered to holders of Claims entitled to vote on the Plan.**

Red Lobster Management LLC, a Delaware limited liability company, and the debtors and debtors-in-possession (collectively, the "Debtors"), in the above-captioned Chapter 11 Cases (the "Chapter 11 Cases"), are providing you with the information in this Disclosure Statement because you may be a creditor of the Debtors and may be entitled to vote on the *Joint Chapter 11 Plan for Red Lobster Management LLC and its Debtor Affiliates* (including all exhibits and schedules thereto, and as may be amended, modified, or supplemented from time to time, the "Plan"). Capitalized terms used herein and not otherwise defined shall have the meanings ascribed to such terms in Article I.A of the Plan, the Restructuring Support Agreement (the "RSA"),[2] or the *Declaration of Jonathan Tibus in Support of the Debtors' Chapter 11 Petitions and First Day Relief* [Docket No. 6] (the "First Day Declaration"), as applicable.

The Debtors believe that the Plan is in the best interests of the Debtors' creditors and other stakeholders. All creditors entitled to vote on the Plan are urged to vote in favor of the Plan. A summary of the voting procedures is set forth in Article II of this Disclosure Statement. More detailed instructions are contained in the ballots distributed to the creditors entitled to vote on the Plan. To be counted, your ballot must be properly completed and returned to the Solicitation Agent in accordance with the voting instructions on such ballot and *actually received* by the Solicitation Agent by the Voting Deadline, via regular mail, overnight courier, or personal delivery at the appropriate address or via the Solicitation Agent's e-ballot upload site.

This Disclosure Statement, the Plan Supplement, and any attachments, exhibits, supplements, and annexes hereto are the only documents to be used in connection with the solicitation of votes on the Plan, and also may not be relied upon for any purpose other than to determine how to vote on the Plan. Neither the Bankruptcy Court nor the Debtors have authorized any person to give any information or to make any representation in connection with the Plan or the solicitation of acceptances of the Plan other than as contained in this Disclosure Statement, the Plan Supplement, and any attachments, exhibits, supplements, or annexes attached hereto. If given or made, such information or representation may not be relied upon as having been authorized by the Bankruptcy Court or the Debtors. The delivery of this Disclosure Statement will not under any circumstances represent that the information herein is correct as of any time after the date hereof.

---

[2] A true and correct copy of the RSA is attached as Exhibit B to the First Day Declaration.

**ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ AND CAREFULLY CONSIDER THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN <u>ARTICLE VII</u> BELOW, THE PLAN ATTACHED HERETO AS EXHIBIT A,[3] AND THE PLAN SUPPLEMENT BEFORE SUBMITTING BALLOTS IN RESPONSE TO SOLICITATION OF THE PLAN.**

The summaries of the Plan and other documents contained in this Disclosure Statement are qualified in their entirety by reference to the Plan itself, the exhibits thereto that will be included in the Plan Supplement, and documents described therein as filed prior to approval of this Disclosure Statement or subsequently as part of the Plan Supplement. In the event that any inconsistency or conflict exists between this Disclosure Statement and the Plan, the terms of the Plan will control. Except as otherwise indicated herein or in the Plan, the Debtors will file all Plan Supplement documents with the Bankruptcy Court and make them available for review at the Debtors' website located online at https://dm.epiq11.com/case/redlobster/info no later than seven (7) days before the Confirmation Hearing.

This Disclosure Statement contains, among other things, descriptions and summaries of provisions of the Plan. The Debtors reserve the right to modify the Plan consistent with section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, subject to the terms of the Plan. The statements contained in this Disclosure Statement are made only as of the date of this Disclosure Statement, and there can be no assurance that the statements contained herein will be correct at any time after this date. The information contained in this Disclosure Statement, including the information regarding the history, businesses, and operations of the Debtors, the financial information regarding the Debtors and the Liquidation Analyses relating to the Debtors, is included for purposes of soliciting acceptances of the Plan, but, as to contested matters and adversary proceedings, is not to be construed as an admission or stipulation, but rather as a statement made in settlement negotiations as part of the Debtors' attempt to settle and resolve claims and controversies pursuant to the Plan. This Disclosure Statement will not be admissible in any non-bankruptcy proceeding, nor will it be construed to be conclusive advice on the tax, securities, or other legal effects of the Plan as to holders of Claims against, or Interests in, either the Debtors or the Reorganized Debtors. Except where specifically noted, the financial information contained in this Disclosure Statement and in its exhibits has not been audited by a certified public accountant and has not been prepared in accordance with generally accepted accounting principles in the United States.

The Debtors believe that the solicitation of votes on the Plan made in connection with this Disclosure Statement is exempt from registration under the Securities Act of 1933, as amended (the "<u>Securities Act</u>") and related state statutes by reason of the exemption provided by section 1145(a)(1) of the Bankruptcy Code.

The effectiveness of the Plan is subject to material conditions precedent. *See* <u>Article IX</u> of the Plan. There is no assurance that these conditions will be satisfied or waived.

---

[3] The Plan is contemporaneously filed herewith and will be included as **<u>Exhibit A</u>** to the Disclosure Statement distributed to all parties entitled to vote to confirm the Plan.

If the Plan is confirmed by the Bankruptcy Court and the Plan Effective Date occurs, all holders of Claims against, and Interests in, the Debtors (including, without limitation, those holders of Claims who do not submit ballots to accept or reject the Plan or who are not entitled to vote on the Plan), will be bound by the terms of the Plan and the transactions contemplated thereby, including (except for those holders entitled to, and who do, opt out) the third-party releases contained therein.

## FORWARD-LOOKING STATEMENTS

This Disclosure Statement contains forward-looking statements based primarily on the current expectations of the Debtors and projections about future events and financial trends affecting the financial condition of the Debtors' businesses and assets. Forward-looking statements can often be identified by the use of terminology such as "subject to," "believe," "anticipate," "plan," "expect," "intend," "estimate," "project," "may," "will," "should," "would," "could," "can," the negatives thereof, variations thereon and similar expressions, or by discussions of strategy. These forward-looking statements are subject to a number of risks, uncertainties, and assumptions, including those described below in Article VII. In light of these risks and uncertainties, the forward-looking events and circumstances discussed in this Disclosure Statement may not occur, and actual results could differ materially from those anticipated in the forward-looking statements. The Debtors do not undertake any obligation to update or revise publicly any forward-looking statements, whether as a result of new information, future events, or otherwise.

**THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016 AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAWS. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), ANY STATE SECURITIES COMMISSION, OR ANY SECURITIES EXCHANGE OR ASSOCIATION, NOR HAS THE SEC, ANY STATE SECURITIES COMMISSION, OR ANY SECURITIES EXCHANGE OR ASSOCIATION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN**.

## QUESTIONS AND ADDITIONAL INFORMATION

If you would like to obtain copies of this Disclosure Statement, the Plan, the Plan Supplement, or any of the documents attached hereto or referenced herein, or have questions about the solicitation and voting process or the Debtors' Chapter 11 Cases generally, please contact the Debtors' Solicitation Agent, Epiq Corporate Restructuring, LLC by

( ) visiting the Debtors' document website at https://dm.epiq11.com/case/redlobster/info

( ) calling 888-754-0507 (US & Canada toll free) and +1 971-257-5614 (International), or

( ) sending an electronic message to RedLobsterInfo@epiqglobal.com.

[*Remainder of page intentionally left blank*]

13153938-3

# TABLE OF CONTENTS

Page

**ARTICLE I THE PLAN** ................................................................................................. **21**

**1.1    Treatment of Claims and Interests** ...................................................................... **21**

    (a)    Debtors' Claims and Interests ............................................................................ 21

**1.2    Plan Options** ........................................................................................................... **25**

**1.3    Reorganized Equity Sale Provisions** ................................................................... **25**

    (a)    Issuance of Reorganized Debtor Equity; Section 1145 Exemption ..................... 25
    (b)    Corporate Existence ........................................................................................... 26
    (c)    New Organizational Documents ......................................................................... 27
    (d)    Discharge ........................................................................................................... 27
    (e)    Vesting of Assets in the Reorganized Debtors and the GUC Trust...................... 27
    (f)    Directors, Managers, and Officers ...................................................................... 28

**1.4    Wind-Down and Dissolution of the Debtors** ...................................................... **28**

**1.5    The Plan Administrator** ....................................................................................... **29**

    (a)    The Plan Administrator's Rights and Powers ..................................................... 29
    (b)    Retention of the Plan Administrators' Professionals ........................................... 30
    (c)    Compensation of the Plan Administrator ............................................................ 30
    (d)    Indemnification, Insurance, and Liability Limitation .......................................... 31
    (e)    Tax Returns ........................................................................................................ 31

**1.6    Vesting of Wind-Down Assets in the Wind-Down Debtor(s) or Purchaser(s)** ........... **31**

**1.7    GUC Trust.** ............................................................................................................. **31**

    (a)    Establishment of GUC Trust............................................................................... 31
    (b)    Powers and Duties of GUC Trustee .................................................................... 34
    (c)    Retention of GUC Trust Professionals................................................................ 34
    (d)    Indemnification, Insurance, and Liability Limitation .......................................... 35

**1.8    Sources of Consideration for Plan Distributions.** .............................................. **35**

**1.9    Unclassified Claims** .............................................................................................. **35**

    (a)    Unclassified Claims Summary............................................................................ 35
    (b)    Administrative Expense Claims........................................................................... 36
    (c)    Professional Fee Claims...................................................................................... 36
    (d)    DIP Claims ......................................................................................................... 37
    (e)    Priority Tax Claims ............................................................................................. 38

13153938-3

1.10    **Statutory Fees** .......................................................................................... **38**

1.11    **Elimination of Vacant Classes** .............................................................. **39**

1.12    **Subordinated Claims** ............................................................................. **39**

1.13    **Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code** ................ **39**

1.14    **Liquidation Analysis** .............................................................................. **39**

1.15    **Feasibility** ................................................................................................ **40**

1.16    **Valuation of the Debtors** ........................................................................ **40**

**ARTICLE II VOTING PROCEDURES AND REQUIREMENTS** ................... **40**

2.1    **Voting on the Plan** ................................................................................... **40**

2.2    **Classes Entitled to Vote on the Plan** ..................................................... **41**

    (a)    Class Identification ........................................................................ 41

2.3    **Votes Required for Acceptance by a Class** ........................................... **42**

2.4    **Certain Factors to Be Considered Prior to Voting** .............................. **42**

2.5    **Solicitation Procedures** ........................................................................... **43**

    (a)    Solicitation Agent .......................................................................... 43
    (b)    Solicitation Materials ..................................................................... 43

2.6    **Voting Procedures** ................................................................................... **45**

**ARTICLE III BUSINESS DESCRIPTION** ..................................................... **46**

3.1    **The Debtors' Corporate Structure and Business Operations** ............. **46**

    (a)    Overview ......................................................................................... 46
    (b)    The Debtors' Management ............................................................. 47

3.2    **The Debtors' Prepetition Capital Structure** ........................................ **47**

3.3    **The Debtors' Board Members** ............................................................... **47**

**ARTICLE IV EVENTS LEADING TO THE CHAPTER 11 CASES And NOTABLE PREPETITION ACTIONS** .......................................................................... **48**

4.1    **Financial and Operational Challenges Leading to the Chapter 11 Cases** ................ **48**

    (a)    Flagging Performance ..................................................................... 48

10

|        | (b) | Operational Challenges | 49 |

**4.2   Prepetition Turnaround Efforts ............................................................. 50**

|        | (a) | Attempt to Restructure Out of Court | 50 |
|        | (b) | Operational Initiatives | 51 |
|        | (c) | Marketing Process, DIP Financing, and Stalking Horse Asset Purchase Agreement | 51 |

**ARTICLE V OTHER KEY ASPECTS OF THE PLAN ....................................... 53**

**5.1   Means for Implementation ...................................................................... 53**

|        | (a) | General Settlement of Claims and Interests | 53 |
|        | (b) | Restructuring Transactions | 54 |
|        | (c) | Insurance Policies | 54 |
|        | (d) | Section 1146 Exemption | 56 |
|        | (e) | Cancellation of Securities and Agreements | 56 |
|        | (f) | Effectuating Documents; Further Transactions | 57 |
|        | (g) | Preservation of Causes of Action | 57 |

**5.2   Treatment of Executory Contracts and Unexpired Leases ....................... 58**

|        | (a) | Assumption and Rejection of Executory Contracts and Unexpired Leases | 58 |
|        |     | 1.   363 Asset Sale | 58 |
|        |     | 2.   Reorganized Equity Sale | 58 |
|        | (b) | Approval of Assumption, Assignment, and Rejection | 59 |
|        | (c) | Claims Based on Rejection of Executory Contracts or Unexpired Leases | 59 |
|        | (d) | Cure of Defaults for Executory Contracts and Unexpired Leases Assumed | 60 |
|        | (e) | Pre-Existing Obligations under Executory Contracts and Unexpired Leases | 60 |
|        | (f) | Modifications, Amendments, Supplements, Restatements, or Other Agreements | 61 |
|        | (g) | Reservation of Rights | 61 |
|        | (h) | Nonoccurrence of the Plan Effective Date | 61 |

**5.3   Provisions Governing Distributions ........................................................ 61**

|        | (a) | Timing and Calculation of Amounts to Be Distributed | 61 |
|        | (b) | Delivery of Distributions | 62 |
|        |     | 1.   Persons Responsible | 62 |
|        |     | 2.   Record Date for Distribution | 62 |
|        |     | 3.   Minimum Distributions | 62 |
|        | (c) | Distributions and Undeliverable or Unclaimed Distributions | 62 |
|        | (d) | Surrender of Cancelled Instruments or Securities | 63 |
|        | (e) | Compliance with Tax Requirements | 63 |
|        | (f) | Allocations | 63 |

11

| | (g) | No Postpetition Interest on Claims | 63 |
| | (h) | Foreign Currency Exchange Rate | 64 |
| | (i) | Setoffs and Recoupment | 64 |
| | (j) | Claims Paid or Payable by Third Parties | 64 |
| | | 1. Claims Paid by Third Parties | 64 |
| | | 2. Claims Payable by Third Parties | 64 |

**5.4** **Procedures for Resolving Contingent, Unliquidated, and Disputed Claims ............ 65**

| | (a) | Allowance of Claims | 65 |
| | (b) | No Distributions Pending Allowance | 65 |
| | (c) | Claims Administration Responsibilities | 65 |
| | (d) | Estimation of Claims | 65 |
| | (e) | Time to File Objections to Claims | 66 |
| | (f) | Disallowance of Claims | 66 |
| | (g) | Distributions After Allowance | 66 |

**5.5** **Release, Injunction, and Related Provisions ........................................................ 67**

| | (a) | Plan Releases, Injunction and Related Provisions | 67 |
| | | 1. Discharge of Claims and Termination of Interests in the Debtors | 67 |
| | | 2. **Releases by the Debtors** | 67 |
| | | 3. **Releases by Holders of Claims Against the Debtors** | 68 |
| | | 4. **Exculpation from Claims Relating to the Plan** | 69 |
| | | 5. **Injunction** | 70 |
| | (b) | Protections Against Discriminatory Treatment | 71 |
| | (c) | Document Retention | 71 |
| | (d) | Term of Injunctions or Stays | 71 |
| | (e) | Unknown Claims | 71 |

**5.6** **Conditions Precedent to The Plan Effective Date ............................................... 72**

| | (a) | Conditions Precedent to the Plan Effective Date | 72 |
| | (b) | Waiver of Conditions | 73 |
| | (c) | Substantial Consummation | 73 |
| | (d) | Effect of Failure of Conditions | 73 |

**5.7** **Modification, Revocation, or Withdrawal of the Plan......................................... 74**

| | (a) | Modification and Amendments | 74 |
| | (b) | Effect of Confirmation on Modifications | 74 |
| | (c) | Revocation or Withdrawal of Plan | 74 |

**5.8** **Retention of Jurisdiction ..................................................................................... 74**

**ARTICLE VI EVENTS DURING THE CHAPTER 11 CASES ............................................. 76**

**6.1**   **Commencement of the Chapter 11 Cases and First Day Pleadings** ........................... **76**

    (a)    Debtor in Possession Financing and Cash Collateral Usage ................................ 77
    (b)    Cash Management System ............................................................................................ 77
    (c)    Taxes ................................................................................................................................ 77
    (d)    Utilities............................................................................................................................ 78
    (e)    Wages .............................................................................................................................. 78
    (f)    503(b)(9) ........................................................................................................................ 78
    (g)    Lien Claimant................................................................................................................ 78
    (h)    Insurance ........................................................................................................................ 79
    (i)    Customer Programs....................................................................................................... 79
    (j)    First and Second Lease Rejection Motions................................................................ 79
    (k)    Zurich Insurance Program Motion .............................................................................. 79

**6.2**   **Other Procedural Motions and Retention of Professionals**........................................ **80**

    (a)    Alvarez & Marsal North America, LLC .................................................................... 80
    (b)    Epiq Corporate Restructuring, LLC............................................................................ 80
    (c)    Berger Singerman LLP ................................................................................................. 80
    (d)    King & Spalding LLP ................................................................................................... 80
    (e)    Hilco Corporate Finance .............................................................................................. 81
    (f)    Blake, Cassels & Graydon LLP .................................................................................. 81
    (g)    Keen-Summit Capital Partners LLC .......................................................................... 81

**ARTICLE VII CERTAIN FACTORS TO BE CONSIDERED** ........................................ **81**

**7.1**   **General**................................................................................................................................ **81**

**7.2**   **Risks Relating to the Plan and Other Bankruptcy Law Considerations**................... **82**

    (a)    The Debtors Cannot Predict the Amount of Time Spent in Bankruptcy for the Purpose of Implementing the Plan, and a Lengthy Bankruptcy Proceeding Could Disrupt the Debtors' Business, as Well as Impair the Prospect for Reorganization on the Terms Contained in the Plan............................................... 82
    (b)    Risk of Non-Occurrence of the Plan Effective Date............................................... 82
    (c)    If the Debtors Do Not Complete the Restructuring Transactions, They May Seek Restructuring Alternatives That Result in Less Value to Holders of Claims Than They Would Receive Pursuant to the Plan ...................................... 83
    (d)    The Bankruptcy Court May Dismiss Some or All of the Chapter 11 Cases......... 83
    (e)    A Holder of a Claim or Interest May Object to, and the Bankruptcy Court May Disagree with, the Debtors' Classification of Claims and Interests ............ 83
    (f)    The Debtors May Not Be Able to Satisfy the Voting Requirements for Confirmation of the Plan............................................................................................ 83
    (g)    The Support of the Prepetition Term Loan Lenders Is Subject to the Terms of the RSA, Which Is Subject to Termination in Certain Circumstances ................. 84
    (h)    The Bankruptcy Court May Not Confirm the Plan.............................................. 84
    (i)    The Debtors May Object to the Amount or Classification of a Claim.................. 85
    (j)    Nonconsensual Confirmation..................................................................................... 85

13153938-3

(k)    Continued Risk Upon Confirmation ................................................................. 85
(l)    Contingencies May Affect Distributions to Holders of Allowed Claims ............. 86
(m)    Even if the Debtors Receive All Necessary Acceptances for the Plan to
       Become Effective, the Debtors May Fail to Meet All Conditions Precedent to
       Effectiveness of the Plan............................................................................ 86
(n)    The United States Trustee or Other Parties May Object to the Plan on
       Account of the Debtor Releases, Third-Party Releases, Exculpations, or
       Injunction Provisions ................................................................................. 86
(o)    The Debtors May Seek To Amend, Waive, Modify, or Withdraw the Plan at
       Any Time Prior to Confirmation ................................................................... 87
(p)    The Plan May Have Material Adverse Effects on the Debtors' Operations ......... 87
(q)    The Debtors' Business May Be Negatively Affected if the Debtors Are
       Unable to Assume (or Assume and Assign) Their Executory Contracts .............. 87
(r)    Material Transactions Could Be Set Aside as Fraudulent Conveyances or
       Preferential Transfers ................................................................................. 88
(s)    Certain Claims May Not Be Discharged and Could Have a Material Adverse
       Effect on the Debtors' Financial Condition and Results of Operations................ 88
(t)    The Debtors Will Be Subject to Business Uncertainties and Contractual
       Restrictions Prior to the Plan Effective Date .................................................. 88
(u)    Certain Tax Implications of the Plan............................................................. 88
(v)    Necessary Approvals May Not Be Granted ..................................................... 89

**7.3    Risks Related to the Business of the Debtors........................................................ 89**
(a)    The Debtors May Not Be Able to Repay or Refinance All of Their Post-Plan
       Effective Date Indebtedness......................................................................... 89
(b)    Operating in Bankruptcy for a Long Period of Time May Harm the Debtors'
       Business .................................................................................................... 89
(c)    Financial Results May Be Volatile and May Not Reflect Historical Trends ........ 90
(d)    The Market Value of the Debtors' Restaurant Business May Decrease ............... 90
(e)    The Debtors May Experience Operational Disruptions or Cost Increases
       Related to Their Supply Chain, Labor, or Other Causes..................................... 90
(f)    The Debtors' Business is Subject to Numerous Governmental Laws and
       Regulations That May Impose Significant Costs and Liabilities on the
       Debtors ..................................................................................................... 90
(g)    Any Significant Cyber-Attack or Interruption in Network Security Could
       Materially and Adversely Disrupt and Affect the Debtors' Operations and
       Business .................................................................................................... 91
(h)    The Debtors' Insurance May Not be Adequate in the Event of a Catastrophic
       Loss .......................................................................................................... 91
(i)    Any Default by Customers or Other Counterparties Could Have a Material
       Adverse Effect on the Debtors' Results of Operations and Financial
       Condition................................................................................................... 91

**7.4    Disclosure Statement Disclaimer ........................................................................ 91**
(a)    Information Contained Herein Is Solely for Soliciting Votes .............................. 91
(b)    Disclosure Statement May Contain Forward-Looking Statements ...................... 92

14

(c)    This Disclosure Statement Has Not Been Approved by the SEC ........................ 93

(d)    No Legal, Business, or Tax Advice Is Provided to You by This Disclosure Statement................................................................................................ 93

(e)    No Admissions Made .................................................................................... 93

(f)    Failure to Identify Litigation Claims or Projected Objections............................ 93

(g)    No Waiver of Right to Object or Right to Recover Transfers and Assets............. 93

(h)    Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors ........................................................................................ 93

(i)    The Potential Exists for Inaccuracies and the Debtors Have No Duty to Update ........................................................................................................ 94

(j)    No Representations Outside of the Disclosure Statement Are Authorized........... 94

**ARTICLE VIII CONFIRMATION PROCEDURES** ................................................................. 94

**8.1    The Confirmation Hearing**................................................................................ 94

**8.2    Confirmation Standards** .................................................................................. 95

**8.3    Best Interests Test / Liquidation Analysis** ........................................................ 96

**8.4    Feasibility** .......................................................................................................... 96

**8.5    Acceptance by Impaired Classes** ..................................................................... 97

**8.6    Confirmation Without Acceptance by All Impaired Classes** ........................ 97

(a)    No Unfair Discrimination ............................................................................. 98

(b)    Fair and Equitable Test ................................................................................. 98

**8.7    Alternatives to Confirmation and Consummation of the Plan**...................... 98

(a)    Continuation of Chapter 11 Cases ................................................................ 99

(b)    Liquidation under Chapter 7 ......................................................................... 99

(c)    Dismissal of Chapter 11 Cases...................................................................... 99

**ARTICLE IX CERTAIN TAX CONSEQUENCES OF THE PLAN** .................................. 100

**9.1    Certain U.S. Federal Income Tax Consequences of the Plan**...................... 100

(a)    Introduction................................................................................................ 100

(b)    Consequences to Debtors ............................................................................ 101

(c)    Consequences to Holders of Certain Claims ................................................ 101

(d)    Information Reporting and Backup Withholding ........................................... 103

(e)    Foreign Account Tax Compliance Act .......................................................... 103

## INTRODUCTION

This is the disclosure statement (the "Disclosure Statement") for the *Joint Chapter 11 Plan for Red Lobster Management LLC and its Debtor Affiliates*, dated July 19, 2024 (as it may be amended, the "Plan"), filed by Red Lobster Management LLC, a Delaware limited liability company ("RL Management") and the debtors and debtors-in-possession (each, a "Debtor" and collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), pending in the United States Bankruptcy Court for the Middle District of Florida (the "Bankruptcy Court"). The Debtors submit this Disclosure Statement pursuant to section 1125 of title 11 of the United States Code (the "Bankruptcy Code").[4]

*Brief Summary of the Plan*

Consistent with the Debtors' sale process that was previously approved by the Bankruptcy Court, the Plan contemplates the sale of substantially all of the Debtors' assets, either through pursuit of an asset sale transaction or, under the Plan, through a combination asset sale and sale of Reorganized Debtor equity, each at the election of the Purchaser. Depending on the outcome of the sale process, the Debtors, in consultation with the Purchaser and with the consent of the DIP Secured Parties, will determine which option to pursue.

In the event of a 363 Asset Sale, all or substantially all of the Debtors' assets will be sold to Purchaser pursuant to section 363 of the Bankruptcy Code and the Purchase Agreement. In the event of a Reorganized Equity Sale, all or substantially of the assets of RL Management and Red Lobster International Holdings LLC, a Delaware limited liability company ("RL International") and the equity interests in the other Reorganized Debtors shall be sold to Purchaser pursuant to section 1129 of the Bankruptcy Code, the Purchase Agreement, and the Plan. The DIP Secured Parties have reserved the right to credit bid their debt in connection with any such sale.

Upon the closing of the Sale Transaction, the Sale Proceeds shall first be used to satisfy Allowed DIP Claims, Other Priority Claims, and the Prepetition Term Loan Claims. The Plan also contemplates the creation of the GUC Trust, which shall be established to receive the GUC Fund and the Equityholder Litigation Claims, and to distribute proceeds thereof in accordance with the Plan. In the event of either a 363 Asset Sale or Reorganized Equity Sale, projected recoveries to general unsecured creditors of the Debtors is currently unknown and tied to litigation recoveries.

*The Debtors and Events Leading to the Chapter 11 Case*

The Debtors operate the largest North American seafood restaurant chain, known as Red Lobster.[TM] Red Lobster operates restaurants across the United States and Canada, and acts as franchisor to certain franchised locations in Mexico, Ecuador, Japan and Thailand. The Debtors serve over 64 million customers per year and account for more than half of all casual dining seafood chain locations.

---

[4] Capitalized terms used in this Disclosure Statement, but not otherwise defined herein, shall have the meanings given to them in the Plan. To the extent there are any inconsistencies between this Disclosure Statement and the Plan, the Plan shall govern.

13153938-3

As of the Petition Date, among other obligations, the Debtors had secured funded debt obligations in a principal amount of approximately $294 million, including approximately: (i) $264.7 million under the Prepetition Term Loan Facility and (ii) $29.2 million in outstanding letters of credit under the Prepetition ABL Facility—each as further described below, *see* "The Debtors' Prepetition Capital Structure" at Article 3.2.

In the period leading up to the Chapter 11 Cases, the Debtors faced a number of financial and operational challenges, including a difficult macroeconomic environment (including inflationary pressure and cost of capital increases), underperforming restaurant footprint, failed or ill-advised strategic initiatives, and increased competition within the restaurant industry. The Debtors' guest count has been in decline since 2019 with the consolidated adjusted EBITDA over the last twelve months falling by more than 60%. In the months leading up to the Chapter 11 Cases, the Debtors experienced operating cash losses of approximately $31 million from June 2023 to September 2023.

Additionally, the Debtors' financial hardship was also caused by certain structural and leadership decisions. For example, a material portion of the Company's leases are priced above market rates. On the Petition Date, the Debtors leased 687 locations and in 2023, spent approximately $190.5 million in lease obligations. Approximately $64,000,000 of the Debtors' rental obligations supported underperforming stores. As described in greater detail in the First Day Declaration, the Debtors also suffered losses due to certain marketing and management decisions. For example, the Debtors' "Ultimate Endless Shrimp" promotion created both operational and financial issues for the Debtors, costing at least $11 million and saddling the Debtors with burdensome supply obligations.

Pursuant to certain bargained-for rights under the Prepetition Term Loan Credit Agreement, the Prepetition Term Loan Agent exercised equity proxy rights in December 2023 and replaced the existing managers and directors of the Debtors with Lawrence Hirsh, an independent director with more than thirty years of restructuring experience. In the first quarter of 2024, the Debtors attempted to restructure their funded debt outside of a bankruptcy proceeding by negotiating with the Prepetition Term Loan Lenders. Those negotiations were ultimately unsuccessful and the Debtors began preparing for these Chapter 11 Cases.

*The Chapter 11 Cases*

On May 9, 2024, the Debtors and the Prepetition Term Loan Lenders entered into the RSA. A true and correct copy of the RSA is attached to the First Day Declaration as **Exhibit B**. Under the terms of that RSA, the Prepetition Term Loan Lenders agreed to provide DIP financing to the Debtors to finance operations and the costs of the Chapter 11 Cases. The Prepetition Term Loan Lenders also agreed to serve as stalking horse purchaser to allow the Debtors to conduct a fulsome sale process pursuant certain agreed-upon Milestones as set forth in the RSA.

The Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code on May 19, 2024, with the intent to conduct a sale of substantially all of the assets of the Debtors to the DIP Secured Parties or, if a superior offer emerges, to a third-party buyer. As part of an agreement to support the DIP financing, the DIP Secured Parties, the Official Committee of Unsecured Creditors (the "UCC"), and the Debtors reached a global resolution concerning the

13153938-3

Chapter 11 Cases in which the DIP Secured Parties agreed, in their capacity as stalking horse purchaser, to provide funding and other consideration for a chapter 11 plan that creates a trust for the benefit of general unsecured creditors.

**In addition, the Plan includes certain release, injunctive, and exculpatory provisions described in greater detail below.**

This Disclosure Statement sets forth certain information regarding the prepetition operating and financial history of the Debtors, the events leading up to the commencement of the Chapter 11 Cases, material events that have occurred during the Chapter 11 Cases, and the proposed transactions contemplated by the Plan. This Disclosure Statement also describes terms and provisions of the Plan, including certain effects of confirmation and effectiveness of the Plan, certain risk factors, the manner in which distributions will be made under the Plan, and certain alternatives to the Plan.

**THE BANKRUPTCY COURT'S CONDITIONAL APPROVAL OF THIS DISCLOSURE STATEMENT CONSTITUTES NEITHER A GUARANTY OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN NOR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.**

WHERE TO FIND ADDITIONAL INFORMATION: the Debtors have made the relevant documents available at https://dm.epiq11.com/case/redlobster/info.

**PLEASE TAKE NOTE OF THE FOLLOWING KEY DATES AND DEADLINES FOR THE CHAPTER 11 CASES AS SET FORTH HEREIN:[5]**

| Event | Date/Deadline | Description |
|---|---|---|
| Sale Hearing | July 29, 2024 at 1:30 pm (ET) | The final hearing approving the sale of the Debtors' assets to the Successful Bidder |
| Voting Record Date | July 28, 2024 | The date for determining (i) which holders of Claims in the Voting Classes (as defined below) are entitled to vote to accept or reject the Plan, and (ii) whether Claims have been properly assigned or transferred to an assignee under Bankruptcy Rule 3001(e) such that the assignee or transferee, as applicable, can vote to accept or reject the Plan as the holder of a Claim. |

---

[5] The following dates and deadlines may be modified or amended in accordance with the terms of the RSA, the DIP Order, or the Bidding Procedures Order, as applicable.

13153938-3

| Event | Date/Deadline | Description |
|-------|---------------|-------------|
| Entry of the Disclosure Statement Order by the Court | July 26, 2024<br><br>(*Requested by the Debtors to be not later than this date*) | Date requested by the Debtors for the Court, should the Court approve the Disclosure Statement and the relief requested in this Motion, to enter the Disclosure Statement Order. |
| Confirmation Hearing Notice Deadline | Within three (3) business days after the Court enters an order conditionally approving the Disclosure Statement and the relief requested in this Motion (expected to be July 31, 2024) | Deadline for the Debtors to distribute the Confirmation Hearing Notice to all parties listed on the Debtors' noticing matrix (the "Confirmation Hearing Notice Deadline"). |
| Solicitation Deadline | August 5, 2024 | Deadline for the Debtors to distribute, as applicable, the (i) Solicitation Packages, including the Ballots, to the holders of Claims entitled to vote to accept or reject the Plan, (ii) Non-Voting Status Notices, and (iii) the Disclosure Statement Order (the "Solicitation Deadline"). |
| Publication Notice Deadline | Within five (5) Business Days after entry of the Disclosure Statement Order (or as soon as practicable thereafter) | Date by which the Debtors arrange to have the Confirmation Hearing Notice (as modified for publication) published in THE WALL STREET JOURNAL (the "Publication Notice," and such date, the "Publication Notice Deadline"). |
| Final Fee Application Deadline | August 22, 2024 | Deadline for professionals of the Debtors and the Committee retained by Court-order in the Debtors and the Committee in the Chapter 11 Cases to file/serve their final fee applications (each, a "Final Fee Application," and the date, the "Final Fee Application Deadline"). |
| Plan Supplement Deadline | August 22, 2024 | Date by which the Debtors are to file the Plan Supplement (the "Plan Supplement Deadline"). |

| Event | Date/Deadline | Description |
|---|---|---|
| Rule 3018(a) Motion Deadline | August 26, 2024 at 4:00 p.m. (ET) | Deadline by which a creditor or a party-in-interest seeking to challenge the allowance of its alleged Claim for voting purposes on the Plan must file with the Court and properly serve a motion for an order pursuant to Bankruptcy Rule 3018(a) seeking temporary allowance of such Claim for voting purposes in a different amount (each, a "Rule 3018(a) Motion," and such date, the "Rule 3018(a) Motion Deadline")). |
| Plan Objection Deadline | August 28, 2024 at 4:00 p.m. (ET) | Date by which objections must be filed to (i) final approval of the Disclosure Statement and/or (ii) confirmation of the Plan (collectively, the "Plan Objection Deadline"). |
| Voting Deadline | August 28, 2024 at 4:00 p.m. (ET) | Deadline by which holders of Claims may vote to accept or reject the Plan, and by which all Ballots must be properly executed, completed, and received by the Solicitation Agent, as specified in the instructions on the Ballots and in compliance with the Solicitation and Voting Procedures (the "Voting Deadline"). |
| Opt-Out Deadline | August 28, 2024 at 4:00 p.m. (ET) | Deadline for the Solicitation Agent to have received either (i) a Ballot or (ii) an Opt-Out Form (defined herein), in which an Entity opts out of granting the release contained the Plan (the "Opt-Out Deadline"). |
| Deadline to File Pleadings in Support of Confirmation of the Plan | September 3, 2024 at 4:00 p.m. (ET) | Date by which the Debtors and other parties-in-interest are to file, among potential pleadings, the following in support of final approval of the Disclosure Statement and confirmation of the Plan: <ul><li>Proponent's Report and Confirmation Affidavit</li><li>Memorandum of law, and any affidavit(s)/declaration(s)</li><li>Exhibit Register</li></ul> |

| Event | Date/Deadline | Description |
|---|---|---|
| Reply Deadline | September 3, 2024 at 4:00 p.m. (ET) | Date by which the Debtors and other parties-in-interest may file a reply (each, a "Reply" and collectively, the "Replies") and any affidavit(s)/declaration(s) to any objections to final approval of the Disclosure Statement and/or confirmation of the Plan (the "Reply Deadline"). |
| Confirmation Hearing | September 5, 2024 at 10:00 a.m. (ET) | Date of the hearing at which the Court will consider, among other things, the final approval of the Disclosure Statement, the confirmation of the Plan, and the Final Fee Applications. |

## ARTICLE I
## THE PLAN

### 1.1    Treatment of Claims and Interests

The Plan establishes a comprehensive classification of Claims and Interests. The table below summarizes each Claim's and Interest's classification, treatment, and voting rights under the Plan. Except to the extent that the Debtors and a holder of an Allowed Claim or Allowed Interest agree to less favorable treatment, each holder will receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such holder's Allowed Claim or Allowed Interest. Unless otherwise indicated, the holder of an Allowed Claim or Allowed Interest, as applicable, will receive the following treatment on the Plan Effective Date, or as soon as reasonably practicable thereafter. Holders of Allowed Claims against more than one Debtor shall be treated as having a single Allowed Claim solely for purposes of any Distribution.

(a)    Debtors' Claims and Interests

| Class | Claim / Interest | Voting Rights | Treatment of Claims / Interests | Projected Amount of Asserted Claims or Interests | Projected Recovery Under the Plan |
|---|---|---|---|---|---|
| Class 1 | Miscellaneous Secured Claims | Unimpaired; Deemed to Accept | The Plan will not alter any of the legal, equitable and contractual rights of the holders of Allowed Miscellaneous Secured Claims. Each holder of an Allowed Class 1 Claim shall receive from the Debtors, subject to DIP Agent consent but otherwise in the sole discretion of the Debtors in full satisfaction, | $200,000 | 100% |

21

| Class | Claim / Interest | Voting Rights | Treatment of Claims / Interests | Projected Amount of Asserted Claims or Interests | Projected Recovery Under the Plan |
|---|---|---|---|---|---|
| | | | settlement, release, and extinguishment of such Claim: (a) Cash equal to the amount of such Allowed Miscellaneous Secured Claim solely from the Miscellaneous Secured Claim Sale Proceeds on or as soon as practicable after the latest of (i) the Plan Effective Date, (ii) the date that such Miscellaneous Secured Claim becomes Allowed, and (iii) a date agreed to by the Debtors and the holder of such Class 1 Claim; (b) the property securing such Miscellaneous Secured Claim without representation or warranty by or recourse against the Debtors; (c) such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code; or (d) such other less favorable treatment on such other terms and conditions as may be agreed upon in writing by the holder of such Claim and the Debtors; provided, however, that any Allowed Class 1 Claim that constitutes an Assumed Liability under the Purchase Agreement that remains unpaid as of the Closing Date shall be paid in full in Cash by the Purchaser in accordance with the terms of the documents or agreements memorializing the Allowed Class 1 Claim. | | |
| Class 2 | Other Priority Claims | Unimpaired; Deemed to Accept | On the Plan Effective Date, except to the extent that a holder of an Allowed Other Priority Claim has agreed to a less favorable treatment, each holder of an Allowed Other Priority Claim shall receive from the Debtors, at the option of the Debtors with the consent of the Prepetition Term Loan Agent, (a) payment in full in Cash or such other treatment that would render its Allowed Other Priority Claim Unimpaired or (b) such other less favorable treatment on such other terms and conditions as may be agreed upon in writing by the holder of such Claim and the Debtors. The WARN Action Settlement Funds shall be used by the Debtors to satisfy all, or a portion of, Allowed Other Priority Claims resulting from WARN Actions commenced against the Debtors. Allowed Other Priority Claims shall be satisfied exclusively from the Plan Funding Amount. The treatment set forth herein with respect to the holders of Allowed | $29.3 million | 100% |

| Class | Claim / Interest | Voting Rights | Treatment of Claims / Interests | Projected Amount of Asserted Claims or Interests | Projected Recovery Under the Plan |
|---|---|---|---|---|---|
| | | | Class 2 Claims shall be in full and final satisfaction of the Allowed Class 2 Claims. | | |
| Class 3 | Prepetition Term Loan Claims | Impaired; Entitled to Vote | On the Plan Effective Date and each Distribution Date thereafter, as applicable, except to the extent that a holder of any Prepetition Term Loan Claims has agreed to a less favorable treatment, each holder of a Prepetition Term Loan Claim shall (i) in the event of a Reorganized Equity Sale, receive its Pro Rata share of (a) sixty percent (60%) of all net proceeds of the Equityholder Litigation Claims from the GUC Trust and (b) the net Cash proceeds of the Sale Transaction from the Debtors (except for the Professional Fee Escrow Amount, Wind-Down Amount, and the Plan Funding Amount), and (ii) in the event of a 363 Asset Sale, receive its Pro Rata share of (y) the net Cash proceeds of the Sale Transaction from the Debtors (except for the Professional Fee Escrow Amount, Wind-Down Amount and the Plan Funding Amount) and the sale of any Wind-Down Reversionary Assets and (z) sixty percent (60%) of all net proceeds of the Equityholder Litigation Claims from the GUC Trust. Except as set forth in Article VIII of the Plan, nothing contained in the Plan, the Confirmation Order, or Definitive Documents shall compromise, modify, or affect the rights of the Prepetition Term Loan Agent and the Prepetition Term Loan Lenders to pursue additional recoveries from any Person or entity that is not a Debtor in these Chapter 11 Cases. | $79.1 million | Currently Unknown[6] |
| Class 4 | General Unsecured Claims | Impaired; Entitled to Vote | On the Plan Effective Date, each holder of an Allowed Class 4 General Unsecured Claim (except for deficiency Claims held by a holder of a Prepetition Term Loan Claim) shall receive, in accordance with the GUC Trust Documents, its Pro Rata Share of the beneficial interests in the GUC Trust and the right to receive its respective Pro Rata Share of any available GUC Litigation Proceeds or | $295.1 million | Currently Unknown[7] |

---

[6] Recoveries will be principally dependent on the outcome of the Equityholder Litigation Claims, as to which no specific value can be attributed at this time.

[7] The projected recovery to holders of Class 4 Claims will be principally dependent on the outcome of the Equityholder Litigation Claims, as to which no specific value can be attributed at this time.

13153938-3

| Class | Claim / Interest | Voting Rights | Treatment of Claims / Interests | Projected Amount of Asserted Claims or Interests | Projected Recovery Under the Plan |
|---|---|---|---|---|---|
| | | | other GUC Trust Assets, if any. Holders of Allowed General Unsecured Claims against more than one Debtor shall be treated as having a single Allowed General Unsecured Claim solely for purposes of any Distribution. The treatment set forth herein with respect to the holders of Allowed Class 4 Claims (except for deficiency Claims held by a holder of a Prepetition Term Loan Claim) shall be in full and final satisfaction of the Allowed Class 4 Claims. Notwithstanding anything to the contrary contained in the Plan, no Distributions shall be made to Prepetition Term Loan Lenders on account of Allowed Class 4 Claims. Except as set forth in Article VIII of the Plan, nothing contained in the Plan, the Confirmation Order, or Definitive Documents shall compromise, modify, or affect the rights of the Prepetition Term Loan Agent and the Prepetition Term Loan Lenders to pursue additional recoveries from any Person or entity that is not a Debtor in these Chapter 11 Cases. | | |
| Class 5 | Intercompany Claims | Not Entitled to Vote; Deemed to Reject | On the Plan Effective Date, all Intercompany Claims shall be cancelled, released, and extinguished without distribution, and will be of no further force or effect. | N/A | 0% |
| Class 6 | Interests | Not Entitled to Vote; Deemed to Reject | On the Plan Effective Date, all Interests (excluding any Sold Equity Interests) in the Debtors shall be cancelled, released and extinguished without distribution, and will be of no further force or effect. | N/A | 0% |

As described below, you are receiving this Disclosure Statement because you are a holder of a Claim entitled to vote to accept or reject the Plan. Prior to voting on the Plan, you are encouraged to read this Disclosure Statement and all documents attached to this Disclosure Statement in their entirety. As reflected in this Disclosure Statement, there are risks, uncertainties, and other important factors that could cause the Debtors' actual performance or achievements to be materially different from those they may project, and the Debtors undertake no obligation to update any such statement. Certain of these risks, uncertainties, and factors are described in Article VII of this Disclosure Statement, entitled "Certain Factors To Be Considered."

**1.2**    **Plan Options**

The Debtors, in consultation with the Purchaser, will elect whether to effectuate a 363 Asset Sale or a Reorganized Equity Sale. At this time, the Debtors do not know which option they will elect. Each option is described more fully below.

In consultation with the Purchaser, the Debtors shall be authorized to and shall consummate either the 363 Asset Sale, Reorganized Equity Sale or other Restructuring Transaction and in connection therewith, among other things, (a) the Purchased Assets (including any Executory Contracts and Unexpired Leases the applicable Purchaser wishes to assume) or (b) the New Reorganized Debtor Equity together with specified assets of RL Management and RL International, as applicable, shall be transferred to and vest in the Purchaser (or one or more designees of Purchaser) free and clear of all Liens, Claims, Interests, charges or other encumbrances, purchase rights, options or rights of first refusal, pursuant to the terms of the Purchase Agreement, applicable Sale Transaction Documents and order(s) of the Bankruptcy Court approving the Sale Transaction or other Restructuring Transactions contemplated thereby, which may be the Confirmation Order.  Following the Plan Effective Date, the Purchaser will own and may operate the Purchased Assets in the ordinary course, without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

The Confirmation Order with respect to the Plan shall authorize, pursuant to sections 363, 365, 1123(a)(5)(B), and 1123(a)(5)(D) of the Bankruptcy Code, as applicable, all actions necessary or appropriate to effectuate the Sale Transaction, including, (i) the execution and delivery of Definitive Documents, (ii) the transfer of Purchased Assets (as defined in the Purchase Agreement) and/or New Reorganized Debtor Equity, as applicable, free and clear of all Liens, Claims, charges, or other encumbrances, to the applicable Purchaser (or one or more of Purchaser's designee(s)), (iii) all transactions contemplated by the Purchase Agreement, including pursuant to sections 363, 365, 1123(a)(5)(B), and 1123(a)(5)(D) of the Bankruptcy Code, as applicable, (iv) the appointment of the Plan Administrator, (v) the execution and delivery of the Plan Administrator Agreement, and (vi) creation of the GUC Trust and appointment of the GUC Trustee.

At the Purchaser's election, the Debtor shall file an amendment to the Plan which removes RLSV as a Debtor under the Plan.

**1.3**    **Reorganized Equity Sale Provisions**

The provisions in this section shall only apply if the Purchaser elects to consummate a Reorganized Equity Sale pursuant to a Purchase Agreement.

(a)    Issuance of Reorganized Debtor Equity; Section 1145 Exemption

On the Plan Effective Date, the Reorganized Debtors shall issue the New Reorganized Debtor Equity to the Purchaser without the need for any further corporate action or further notice to, action or order of the Bankruptcy Court. The shares of the New Reorganized Debtor Equity issued under the Plan shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance of the New Reorganized Debtor Equity under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance,

which terms and conditions shall bind each Person receiving such distribution or issuance. The issuance of the New Reorganized Debtor Equity by the Reorganized Debtors shall be authorized without the need for any further corporate action or without any further action by the Debtors or Reorganized Debtors or by holders of any Claims or Interests against the Debtors, as applicable. As a condition to receiving the New Reorganized Debtor Equity, each holder entitled to a distribution of New Reorganized Debtor Equity, will be required to execute and deliver the New Organizational Documents, as applicable; provided, however, that, notwithstanding any failure to execute the New Organizational Documents, as applicable, any Person that is entitled to and accepts a distribution of New Reorganized Debtor Equity under the Plan, by accepting such distribution, will be deemed to have accepted and consented to the terms of the New Organizational Documents, without the need for execution by any party thereto. The New Reorganized Debtor Equity will not be registered under the Securities Act or listed on any exchange as of the Plan Effective Date.

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of the New Reorganized Debtor Equity after the Petition Date shall be exempt from, among other things, the registration requirements of Section 5 of the Securities Act or any similar federal, state, or local law in reliance on section 1145 of the Bankruptcy Code or, only to the extent such exemption under section 1145 of the Bankruptcy Code is not available, any other available exemption from registration under the Securities Act. Pursuant to section 1145 of the Bankruptcy Code, such New Reorganized Debtor Equity will be freely tradable in the United States without registration under the Securities Act by the recipients thereof, subject to the provisions of (1) section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in Section 2(a)(11) of the Securities Act and compliance with any applicable state or foreign securities laws, if any, and the rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments, (2) any other applicable regulatory approvals, and (3) any restrictions in the New Organizational Documents.

Any Securities distributed pursuant to Section 4(a)(2) of the Securities Act will be considered "restricted securities" as defined by Rule 144 of the Securities Act and may not be resold under the Securities Act or applicable state securities laws absent an effective registration statement, or pursuant to an applicable exemption from registration, under the Securities Act and applicable state securities laws and subject to any restrictions in the New Organizational Documents.

Notwithstanding anything to the contrary in the Plan, no Person shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the issuance of the New Reorganized Debtor Equity is exempt from the registration requirements of Section 5 of the Securities Act.

(b)     Corporate Existence

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on and after the Plan Effective Date, each Reorganized Debtor, as applicable, shall continue to exist as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be,

pursuant to the applicable law in the jurisdiction in which the particular Debtor is incorporated or formed and pursuant to their respective certificate of incorporation and bylaws (or other similar Governance Documents) in effect prior to the Plan Effective Date, except to the extent such certificate of incorporation and bylaws (or other similar Governance Documents) are amended under the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

After the Plan Effective Date, the respective certificate of incorporation and bylaws (or other formation documents) of one or more of the Reorganized Debtors may be amended or modified in accordance with their terms without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. On or after the Plan Effective Date, one or more of the Reorganized Debtors may be disposed of, dissolved, wound down, or liquidated without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

(c)     New Organizational Documents

On or immediately prior to the Plan Effective Date, the New Organizational Documents shall be adopted automatically by the Reorganized Debtors. To the extent required under the Plan or applicable non-bankruptcy law, the Reorganized Debtors shall file their respective New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in their respective states, provinces, or countries of incorporation in accordance with the corporate laws of the respective states, provinces, or countries of incorporation. The New Organizational Documents shall, among other things: (1) authorize the issuance of the New Reorganized Debtor Equity and (2) pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, include a provision prohibiting the issuance of non-voting equity securities of the Debtors. After the Plan Effective Date, each Reorganized Debtor may amend and restate its limited liability company agreement, certificate of incorporation and other formation and constituent documents as permitted by the laws of its respective jurisdiction of formation and the terms of the New Organizational Documents.

(d)     Discharge

On the Plan Effective Date, except as otherwise provided for under the Plan or in the Confirmation Order, each Reorganized Debtor will receive a discharge of all Claims in accordance with section 1141(d)(1) of the Bankruptcy Code.

(e)     Vesting of Assets in the Reorganized Debtors and the GUC Trust

Except as otherwise provided for in the Plan, under the Purchase Agreement, the Confirmation Order, or in any agreement, instrument or other document incorporated in the Plan, on the Plan Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property of each Debtor's Estate, including all Causes of Action of the Debtors' Estates (other than any Causes of Action that are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan) shall vest in the Purchaser, Reorganized Debtor, or the GUC Trust, as applicable, free and clear of all Liens, Claims, charges and/or other encumbrances, purchase rights,

options or rights of first refusal. On and after the Plan Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor, the Purchaser (and, to the extent applicable, Purchaser's designees), and the GUC Trustee may use, acquire, or dispose of property and pursue, compromise or settle any Claims, Interests, or Causes of Action with respect to the Debtors without further notice to, action, or approval of the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

(f)     Directors, Managers, and Officers

As of the Plan Effective Date, the term of each current officer, members of the boards of directors or managers or any managing member of each Debtor shall expire, and the New Board and the officers or managers of each of the Reorganized Debtors shall be appointed in accordance with the respective New Organizational Documents.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors shall disclose, in advance of the Confirmation Hearing, the identity and affiliations of any Person proposed to serve on the New Board or be an officer of any of the Reorganized Debtors. Each such director, manager and officer shall serve from and after the Plan Effective Date pursuant to the terms of the New Organizational Documents.

## 1.4     Wind-Down and Dissolution of the Debtors

To the extent there is at least one Wind-Down Debtor on the Plan Effective Date, then such Wind-Down Debtor(s) shall continue in existence after the Plan Effective Date for purposes of: (a) winding down such Debtors' businesses and affairs as expeditiously as reasonably possible and liquidating any assets held by the Wind-Down Debtor(s) after the Plan Effective Date; (b) performing the Debtors' remaining obligations under any Sale Transaction Documents, if any; (c) resolving any Disputed Claims (except General Unsecured Claims); (d) making distributions on account of Allowed Claims against the Debtors (except Allowed General Unsecured Claims) in accordance with the Plan to the extent not made on the Plan Effective Date; (e) filing appropriate tax returns, if any; and (f) administering the Plan in an efficient manner. The Wind-Down Debtor(s) shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters relating to the Wind-Down Assets, including (x) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court, and (y) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Plan Administrator to file motions or substitutions of parties or counsel in each such matter.

On the Plan Effective Date, any assets of the Debtors' Estates remaining after the closing of the Sale Transaction or other Restructuring Transaction shall vest in the Wind-Down Debtor(s) for the purpose of liquidating the Debtors' Estates and Consummation of the Plan (except for the GUC Trust Assets). Such Wind-Down Assets shall be held free and clear of all Liens, Claims, Interests, charges or other encumbrances, purchase rights, options or rights of first refusal, except as otherwise provided in the Plan. Any distributions to be made under the Plan from such assets shall be made by the Plan Administrator or its designee. The Wind-Down Debtor(s) and the Plan Administrator shall be deemed to be fully bound by the terms of the Plan and the Confirmation Order.

13153938-3

Any contrary provision of the Plan notwithstanding, following the occurrence of the Plan Effective Date and the making of distributions on the Plan Effective Date pursuant hereto, (i) any of the Debtors' Cash held by the Wind-Down Debtor(s) in excess of the Wind-Down Amount and (ii) the proceeds of any non-Cash assets of the Debtors' Estates vested in the Wind-Down Debtor(s), shall be payable in accordance with the provisions in this Plan, including Article III.B of the Plan. The Plan Administrator shall make such distributions in Cash in accordance with Article III of the Plan.

## 1.5 **The Plan Administrator**

On and after the Plan Effective Date, the Plan Administrator, shall be appointed by the Debtors with the consent of the Purchaser and Prepetition Term Loan Agent and in consultation with the Committee, to administer the Wind-Down Debtor(s). Subject to the approval of the Debtors, the Purchaser, and the Prepetition Term Loan Agent, the GUC Trustee may also be the Plan Administrator.

The Plan Administrator shall not be required to post any bond or surety or other security for the performance of its duties under the Plan unless otherwise ordered by the Bankruptcy Court. In the event that the Plan Administrator is so ordered, all costs and expenses of procuring any such bond or surety shall be paid for with Cash from the Wind-Down Assets.

The Plan Administrator may resign at any time upon thirty (30) days' written notice to the Bankruptcy Court; underlined provided that such resignation shall only become effective upon the appointment of a permanent or interim successor Plan Administrator by the Court. Upon its appointment, the successor Plan Administrator, without any further act, shall become fully vested with all of the rights, powers, duties, and obligations of its predecessor and all responsibilities of the predecessor Plan Administrator relating to the Wind-Down Debtor(s) shall be terminated.

(a)     The Plan Administrator's Rights and Powers

The powers of the Plan Administrator shall include any and all powers and authority necessary or helpful to implement and carry out the provisions of the Plan and any applicable orders of the Bankruptcy Court relating to the Wind-Down Debtors. The Plan Administrator shall be the representative of the Debtors' Estates with respect to the Wind-Down Assets appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code.

Without limiting the foregoing, the Plan Administrator shall (a) hold, liquidate, invest, supervise, and protect the Wind-Down Assets; (b) effectuate the distributions contemplated by the Plan Administrator under the Plan; (c) object to or settle Disputed Claims against the Debtors (except General Unsecured Claims); (d) prosecute any or all of the Causes of Action retained by the Wind-Down Debtors; (e) pay all reasonable fees, expenses, debts, charges, and liabilities of the Wind-Down Debtor(s); (f) file tax returns for, pay taxes of, and represent the interests of the Wind-Down Debtor(s) or the Debtors' Estates, as applicable, before any taxing authority in all matters, including any action, suit, proceeding, or audit; (g) File the operating report for the Debtors' Estates for the month in which the Plan Effective Date occurs and all subsequent quarterly reports; (h) take any action necessary to wind down the business and affairs of the Wind-Down

Debtor(s); and (i) file appropriate certificates of dissolution of the Wind-Down Debtor(s) pursuant to applicable state or provincial law.

As soon as practicable after the Plan Effective Date, the Plan Administrator shall cause the Wind-Down Debtor(s) to comply with, and abide by, the terms of the Plan and take any actions as the Plan Administrator may determine to be necessary or desirable to carry out the purposes of the Plan. Except to the extent necessary to complete the Wind-Down of any of the Debtors' remaining assets or operations from and after the Plan Effective Date, the Debtors (1) shall be deemed to have canceled pursuant to the Plan all Interests in the Debtors and (2) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Plan Effective Date. The Filing of the final monthly operating report for the Debtors' Estates (for the month in which the Plan Effective Date occurs) and all subsequent quarterly post-Confirmation reports shall be the responsibility of the Plan Administrator.

The Plan Administrator shall act for the Wind-Down Debtor(s) in the same fiduciary capacity as applicable to a board of directors, board of managers, member/manager and officers, subject to the provisions of the Plan (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same). On the Plan Effective Date, the persons acting as members, managers, officers or directors of the Debtor(s) shall be deemed to have resigned and the Plan Administrator shall be appointed as the sole manager, sole director, sole member, and sole officer of the Wind-Down Debtor(s) and shall succeed to the powers of the Debtors' directors, managers, members, and officers. From and after the Plan Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Wind-Down Debtor(s). For the avoidance of doubt, the foregoing shall not limit the authority of the Wind-Down Debtor(s) or the Plan Administrator, as applicable, to continue the employment of any former member, manager, director, or officer, including pursuant to any transition services or other agreement, in each case, to the extent permitted by applicable law.

        (b)        <u>Retention of the Plan Administrators' Professionals</u>

The Plan Administrator shall have the right to retain the services of attorneys, accountants, and other professionals that, in the discretion of the Plan Administrator, are necessary to assist the Plan Administrator in the performance of its duties. The reasonable fees and expenses of such professionals shall be paid from the Wind-Down Assets upon the monthly submission of statements to the Plan Administrator. The payment of the reasonable fees and expenses of the Plan Administrator's retained professionals shall be made in the ordinary course of business in accordance with the Wind-Down Budget and shall not be subject to the approval of the Bankruptcy Court.

        (c)        <u>Compensation of the Plan Administrator</u>

All reasonable costs, expenses, and obligations incurred by the Plan Administrator in administering the Plan, the Wind-Down Debtor(s)' Estates, or in any manner connected, incidental, or related thereto, shall be paid from the Wind-Down Assets in accordance with the Wind-Down Budget and on the terms set forth in the Plan Administrator Agreement. Except as otherwise ordered by the Bankruptcy Court, the fees and expenses incurred by the Plan Administrator on or after the Plan Effective Date (including taxes imposed on the Wind-Down Debtors) in connection

with its duties under the Plan and the Plan Administrator Agreement shall be, subject to the Wind-Down Budget, paid without any further notice to, or action, order, or approval of, the Bankruptcy Court.

(d)     Indemnification, Insurance, and Liability Limitation

The Plan Administrator and all professionals retained by the Plan Administrator, each in their capacities as such, shall be indemnified by the Wind-Down Debtor(s) to the fullest extent permitted by applicable law from any claims or Causes of Action relating to or arising in connection with the performance of its duties under the Plan or under the Plan Administrator Agreement, except for claims and Causes of Action related to any act or omission that is determined by Final Order of a court of competent jurisdiction to have constituted fraud, willful misconduct, or gross negligence. The Plan Administrator may obtain, at the expense of the Wind-Down Debtor(s) and in accordance with the Plan Administrator Agreement, commercially reasonable liability or other appropriate insurance with respect to the foregoing indemnification obligations. Any such insurance shall be paid solely from the Wind-Down Assets in accordance with the Wind-Down Budget. The Plan Administrator may rely upon all written information previously generated by the Debtors.

Notwithstanding anything to the contrary contained in the Plan, the Plan Administrator in its capacity as such, shall have no liability whatsoever to any party for the liabilities and/or obligations, however created, whether direct or indirect, in tort, contract, or otherwise, of the Wind-Down Debtor(s).

(e)     Tax Returns

The Plan Administrator shall complete and file all final or otherwise required federal, state, and local tax returns for each of the Wind-Down Debtor(s) and, pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of any Wind-Down Debtor or the Estate of its predecessor Debtor, as determined under applicable tax laws.

**1.6     Vesting of Wind-Down Assets in the Wind-Down Debtor(s) or Purchaser(s)**

Except as otherwise provided in the Plan, on the Plan Effective Date, all Wind-Down Assets shall vest in the Wind-Down Debtor(s), free and clear of all Liens, Claims, Interests, charges, or other encumbrances, purchase rights, options or rights of first refusal, unless expressly provided otherwise by the Plan or the Confirmation Order. On and after the Plan Effective Date, the Wind- Down Debtor(s) may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action that constitute Wind-Down Assets without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

**1.7     GUC Trust.**

(a)     Establishment of GUC Trust

On the Plan Effective Date, the GUC Trust shall be established to receive (i) after adequate reserve for the payment (as reasonably determined by the Debtors in consultation with the

Committee) of all Allowed Priority Tax Claims, Allowed Other Priority Claims, and Allowed Administrative Expense Claims that are not Assumed Liabilities (except for DIP Claims and Allowed Professional Fee Claims), the GUC Fund and (ii) the Equityholder Litigation Claims, the proceeds of which shall be distributed in accordance with the Plan. On the Plan Effective Date, the Debtors shall contribute the GUC Fund and Equityholder Litigation Claims to the GUC Trust. In no event shall any GUC Trust Assets of any kind be returned by, or otherwise transferred from, the GUC Trust to any Debtor.

The GUC Trust shall qualify as a liquidating trust as described in Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, and shall be treated as a grantor trust for United States federal income tax purposes. The GUC Trustee shall have the authority to manage the day-to-day operations of the GUC Trust, including, without limitation, by disposing of the assets of the GUC Trust, appearing as a party in interest, calculating distributions, paying taxes and such other matters as more particularly described in Article IV of the Plan and the GUC Trust Agreement. The reasonable expenses of the GUC Trust, including the reasonable expenses of the GUC Trustee and its representatives and professionals, will be satisfied from the GUC Fund.

On the Effective Date, the GUC Trust Assets shall vest automatically in the GUC Trust. The Plan shall be considered a motion pursuant to Sections 105, 363 and 365 of the Bankruptcy Code for such relief.  The transfer of the GUC Trust Assets to the GUC Trust shall be made for the benefit and on behalf of the holders of Allowed General Unsecured Claims in Class 4.  The assets comprising the GUC Trust Assets will be treated for tax purposes as being transferred by the Debtors to the holders of Class 4 Claims pursuant to the Plan in exchange for their Allowed Claims and then by such holders to the GUC Trust in exchange for the interests in the GUC Trust.  The holders of Allowed General Unsecured Claims shall be treated as the grantors and owners of the GUC Trust.  Upon the transfer of the GUC Trust Assets, the GUC Trust shall succeed to all of the Debtors' rights, title and interest in the GUC Trust Assets, and the Debtors will have no further interest in or with respect to the GUC Trust Assets.  In pursuing the Equityholder Litigation Claims, the GUC Trustee shall be entitled to the tolling provisions provided under section 108 of the Bankruptcy Code, and shall succeed to the Debtors' rights with respect to the time periods in which any of the Equityholder Litigation Claims may be brought under section 546 of the Bankruptcy Code.  The GUC Trust Agreement will require consistent valuation of the GUC Trust Assets by the Reorganized Debtors, the GUC Trustee, and the beneficiaries of the GUC Trust for all U.S. federal income tax and reporting purposes.  The GUC Trust will not be permitted to receive or retain cash in excess of a reasonable amount to meet claims and contingent liabilities or to maintain the value of the GUC Trust Assets.

To effectively investigate, prosecute, compromise, and/or settle the Equityholder Litigation Claims, the GUC Trustee and its counsel and representatives must have access to all documents and information relating to the Equityholder Litigation Claims and be able to exchange such information with the Plan Administrator, Reorganized Debtors and Wind-Down Debtors on a confidential basis and in common interest without being restricted by or waiving any applicable work product, attorney-client, or other privilege. Given the GUC Trust's position as successor to the Equityholder Litigation Claims, sharing such information between the Plan Administrator, Reorganized Debtors, the Wind-Down Debtors and the GUC Trustee and their counsel shall not waive or limit any applicable privilege or exemption from disclosure or discovery related to such

32

information. Accordingly, on the Plan Effective Date, the Plan Administrator, Reorganized Debtors, the Wind-Down Debtors and the GUC Trustee shall enter into the Confidentiality and Common Interest Agreement providing for, inter alia, the Plan Administrator, Reorganized Debtors and Wind-Down Debtors to provide reasonable access to, and the GUC Trust shall have the right to secure, at the GUC Trust's own expense, copies of, all of the Plan Administrator's, Wind-Down Debtors' and Reorganized Debtors' records and information relating to the Equityholder Litigation Claims including, without limitation, all electronic records or documents. The GUC Trustee shall also have full and complete access to, and the right to copy at the expense of the GUC Trust, all reports, documents, memoranda and other work product of the Debtors and the Creditors' Committee and their respective professionals and advisors related to the Equityholder Litigation Claims. From and after the Plan Effective Date, the Plan Administrator, Reorganized Debtors, Wind-Down Debtors and their officers, employees, agents, and professionals shall provide reasonable cooperation during normal business hours in responding to information requests of the GUC Trustee regarding the Equityholder Litigation Claims.  For a period of five years after the Plan Effective Date, the Plan Administrator, Reorganized Debtors and Wind-Down Debtors shall preserve all records and documents (including all electronic records or documents) related to the Equityholder Litigation Claims or, if any Equityholder Litigation Claims have been asserted in a pending action, then until such later time as the GUC Trustee notifies the Plan Administrator, Reorganized Debtors and Wind-Down Debtors in writing that such records are no longer required to be preserved. Notwithstanding anything in the foregoing, neither the Debtors, the Plan Administrator, the Wind-Down Debtors, nor the Reorganized Debtors shall be required to take any action under this paragraph that requires out-of-pocket expenditure by such entity of more than $500.00, absent reimbursement by the GUC Trust.

Except as otherwise ordered by the Bankruptcy Court, the expenses of the GUC Trust on or after the Plan Effective Date shall be paid in accordance with the GUC Trust Agreement without further order of the Bankruptcy Court.

The GUC Trust shall file annual reports regarding the liquidation or other administration of property comprising the GUC Trust Assets, the distributions made by it and other matters required to be included in such report in accordance with the GUC Trust Agreement.  In addition, the GUC Trust will file tax returns as a grantor trust pursuant to United States Treasury Regulation Article 1.671-4(a).

The interests in the GUC Trust are not intended to constitute "securities." To the extent such interests are deemed to be "securities," the issuance of such interests shall be exempt from registration under the Securities Act and any applicable state and local laws requiring registration of securities pursuant to section 1145 of the Bankruptcy Code or another available exemption from registration under the Securities Act.  If the GUC Trustee determines, with the advice of counsel, that the GUC Trust is required to comply with registration or reporting requirements under the Securities Act, the Exchange Act or other applicable law, then the GUC Trustee shall take any and all actions to comply with such registration and reporting requirements, if any, and to file reports with the SEC to the extent required by applicable law.

The GUC Trust shall be dissolved as soon as practicable after the date that is the earlier to occur of: (a) the distribution of all proceeds from the GUC Trust Assets available for distribution pursuant to the Plan, or (b) the determination of the GUC Trustee that the continued prosecution

of the Equityholder Litigation Claims is not likely to yield sufficient additional proceeds to justify further pursuit.

To the extent that the terms of the Plan with respect to the GUC Trust are inconsistent with the terms set forth in the GUC Trust Agreement, then the terms of the GUC Trust Agreement shall govern.

(b)     Powers and Duties of GUC Trustee

The GUC Trustee shall administer the GUC Trust and its assets in accordance with this Plan, the GUC Trust Agreement, and the other GUC Trust Documents and shall be responsible for, among other things, making certain Distributions required under this Plan. From and after the Plan Effective Date and continuing through the date of entry of a Final Decree, the GUC Trustee shall: (a) possess the rights of a party in interest pursuant to section 1109(b) of the Bankruptcy Code for all matters arising in, arising under, or related to the Chapter 11 Cases and, in connection therewith, shall (i) have the right to appear and be heard on matters brought before the Bankruptcy Court or other courts, (ii) be entitled to notice and opportunity for hearing on all such issues, (iii) participate in all matters brought before the Bankruptcy Court, and (iv) receive notice of all applications, motions, and other papers and pleadings filed in the Bankruptcy Court and (b) have the authority to retain such personnel or professionals (including, without limitation, legal counsel, financial advisors or other agents) as it deems appropriate and compensate such personnel and professionals as it deems appropriate in accordance with the Plan, all without prior notice to or approval of the Bankruptcy Court. Professionals and personnel retained or employed by the GUC Trust or the GUC Trustee need not be disinterested as that term is defined in the Bankruptcy Code, and may include Professionals who had been employed by the Committee or the Debtors.

The powers of the GUC Trustee shall include any and all powers and authority necessary or helpful to implement and carry out the provisions of the Plan and any applicable orders of the Bankruptcy Court relating to the GUC Trust Assets. The GUC Trustee shall be the representative of the Debtors' Estates with respect to the GUC Trust Assets appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code.

Without limiting the foregoing, the GUC Trustee shall (a) hold, liquidate, invest, supervise, and protect the GUC Trust Assets; (b) effectuate the distributions contemplated by the GUC Trustee under the Plan; (c) object to or settle Disputed General Unsecured Claims against the Debtors; (d) investigate, prosecute, or resolve the Equityholder Litigation Claims, as appropriate; (e) pay all reasonable fees, expenses, debts, charges, and liabilities of the GUC Trust; (f) file tax returns for, pay taxes of (if any), and represent the interests of the GUC Trust before any taxing authority in all matters, including any action, suit, proceeding, or audit; (g) take any action necessary to administer the GUC Trust; and (h) file appropriate certificates of dissolution of the GUC Trust, if any, pursuant to applicable state or provincial law.

(c)     Retention of GUC Trust Professionals

The GUC Trustee shall have the right to retain the services of attorneys, accountants, and other professionals that, in the discretion of the GUC Trustee, are necessary to assist the GUC Trustee in the performance of its duties and prosecution of the Equityholder Litigation Claims and administration of the other GUC Trust Assets; provided, however, that (i) the payment of such

professionals shall be made solely using the funds in the GUC Fund and (ii) the Prepetition Term Loan Agent shall have consented to the retention of any attorney retained by the GUC Trustee to prosecute the Equityholder Litigation Claims. The reasonable fees and expenses of such professionals shall be paid only from the GUC Funds upon the monthly submission of statements to the GUC Trustee. The payment of the reasonable fees and expenses of the GUC Trustee's retained professionals shall not be subject to the approval of the Bankruptcy Court.

    (d)    <u>Indemnification, Insurance, and Liability Limitation</u>

The GUC Trustee and all professionals retained by the GUC Trustee, each in their capacities as such, shall be indemnified by the GUC Trust to the fullest extent permitted by applicable law from any claims or Causes of Action relating to or arising in connection with the performance of its duties hereunder or under the GUC Trust Agreement, except for claims and Causes of Action related to any act or omission that is determined by Final Order of a court of competent jurisdiction to have constituted fraud, willful misconduct, or gross negligence. The GUC Trustee may obtain, at the expense of the GUC Trust and in accordance with the GUC Trust Agreement, commercially reasonable liability or other appropriate insurance with respect to the foregoing indemnification obligations. Any such insurance shall be paid solely from the GUC Trust Assets. The GUC Trustee may rely upon all written information previously generated by the Debtors.

Notwithstanding anything to the contrary contained herein, the GUC Trustee in its capacity as such, shall have no liability whatsoever to any party for the liabilities and/or obligations, however created, whether direct or indirect, in tort, contract, or otherwise, of the GUC Trust.

**1.8**    **<u>Sources of Consideration for Plan Distributions.</u>**

The Plan Administrator shall fund distributions under the Plan, to the extent not made on the Plan Effective Date, with the Plan Funding Amount, Sale Proceeds (if any), and proceeds of retained Causes of Action not settled, released, assigned, discharged, enjoined, or exculpated on or prior to the Plan Effective Date. The Plan Administrator shall fund payment of all Allowed Administrative Expense Claims, Priority Tax Claims and Other Priority Claims. Professional Fee Claims shall be funded from the Professional Fee Escrow Account. The GUC Trustee shall make all distributions of proceeds of the Equityholder Litigation Claims and other GUC Trust Assets in accordance with the Plan and the GUC Trust Agreement. Except for Assumed Liabilities arising under the Purchase Agreement, the Purchaser shall have no responsibility to make or liability for Distributions required under the Plan.

**1.9**    **<u>Unclassified Claims</u>**

    (a)    <u>Unclassified Claims Summary</u>

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, Professional Fee Claims, DIP Claims and Priority Tax Claims have not been classified against the Debtors.

(b)      Administrative Expense Claims

Requests for payment of Administrative Expense Claims (except for DIP Claims and Professional Fee Claims) must be Filed and served no later than the applicable Administrative Expense Claims Bar Date pursuant to the procedures specified in the Confirmation Order. Holders of Administrative Expense Claims that are required to File and serve a request for payment of such Claims that fail to do so shall be forever barred, estopped, and enjoined from asserting such Administrative Expense Claims against the Debtors, the Reorganized Debtors, the Wind-Down Debtor(s), or the GUC Trustee, as applicable, or their respective property, and such Administrative Expense Claims shall be deemed discharged as of the Plan Effective Date without the need for any objection or any notice to any Person or an order of the Bankruptcy Court.

Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to a less favorable treatment, to the extent an Allowed Administrative Expense Claim has not been paid in full or otherwise satisfied during the Chapter 11 Cases, each holder of an Allowed Administrative Expense Claim (other than Professional Fee Claims and DIP Claims) shall receive from the Debtors, in full and final satisfaction of its Allowed Administrative Expense Claim, payment in full in Cash in accordance with the following: (1) if such Administrative Expense Claim is Allowed on or prior to the Plan Effective Date, on the Plan Effective Date; (2) if such Administrative Expense Claim is not Allowed as of the Plan Effective Date, no later than thirty (30) days after the date on which such Administrative Expense Claim is Allowed; (3) if such Allowed Administrative Expense Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction or course of business giving rise to such Allowed Administrative Expense Claim; or (4) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

(c)      Professional Fee Claims

(i)      Final Fee Applications and Payment of Professional Fee Claims

In accordance with Local Rule 2016-1(c)(2)(C), all final requests for payment of Professional Fee Claims must be Filed no later than fourteen (14) days prior to the Confirmation Hearing unless ordered otherwise. The final request for payment may include an estimate of the amount of additional fees and costs to be incurred by each Professional through the Confirmation Hearing. If the actual fees for services rendered and costs incurred during the estimated period for each Professional exceed the estimate, the final application may be supplemented up to fourteen (14) days after entry of the Confirmation Order. If the actual fees for services rendered and costs incurred during the estimated period are less than the estimated amount, approval of such application authorizes payment of the actual fees and costs not to exceed the estimated amounts. The Bankruptcy Court shall determine the Allowed amounts of all Professional Fee Claims in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, Local Rules and prior Bankruptcy Court orders.

(ii)      Professional Fee Escrow Accounts

The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals in respect of Allowed Professional Fee Claims until all Allowed Professional Fee Claims have been paid in full, and the funds held in the Professional Fee Escrow Account shall not be considered property of the Debtors' Estates; provided, that when all Allowed Professional Fee Claims have been paid in full any funds remaining in the Professional Fee Reserve shall (i) in the event the Stalking Horse Bidder is the Purchaser, be disbursed to the Purchaser and (ii) in the event a party other than the Stalking Horse Bidder is Purchaser, shall be returned to the DIP Agent (excluding the Plan Funding Amount and any remaining amounts used to fund the GUC Trust Assets as set forth in the Plan). No Liens, Claims, or Interests shall encumber the Professional Fee Escrow Account or Cash held therein.

(iii)      Post-Confirmation Date/Pre-Effective Date

From and after the Confirmation Date until the Effective Date, the Debtors, without the necessity for any approval by the Bankruptcy Court, shall pay the reasonable fees and necessary and documented expenses of the Professionals during such period, up to the amount in the Professional Fee Escrow Amount.

(iv)      Post-Effective Date Fees and Expenses

Upon the Plan Effective Date, any requirement that the Reorganized Debtors', Wind-Down Debtors', or GUC Trust's Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention for services rendered after such date shall terminate, and the Reorganized Debtors, the Plan Administrator and the GUC Trustee, as applicable, may employ any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

(d)    <u>DIP Claims</u>

The DIP Claims shall be Allowed in the amount outstanding under the DIP Facility (determined as of the consummation of the Sale Transaction or other Restructuring Transaction). If a Sale Transaction is consummated pursuant to the Stalking Horse Asset Purchase Agreement, on the Closing Date (as defined in the Stalking Horse Asset Purchase Agreement), in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP Claim shall be satisfied in full through a credit bid by the Stalking Horse Bidder of all of its claim for the Purchased Assets (as defined in the Stalking Horse Asset Purchase Agreement) pursuant to the Stalking Horse Asset Purchase Agreement and in accordance with section 363(k) of the Bankruptcy Code.

If the Sale Transaction is consummated pursuant to a Purchase Agreement executed by a Bidder other than the Stalking Horse Bidder, upon closing of such Sale Transaction, except to the extent that a holder of an Allowed DIP Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP Claim, each Allowed DIP Claim shall be indefeasibly paid in full, in Cash.

If the Sale Transaction is a Reorganized Equity Sale conducted under the Plan, then on the Plan Effective Date, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP Claim shall be satisfied through the transfer of specified assets, assumption and assignment of specified contracts and leases, assumption of specified liabilities, issuance of equity in the Reorganized Debtors and issuance of Takeback Loans, all in accordance with the Purchase Agreement.

Contemporaneously with the foregoing treatment, the DIP Facility and the DIP Documents shall be deemed cancelled, all commitments under the DIP Documents shall be deemed terminated, all DIP Liens shall automatically terminate, and all collateral subject to such DIP Liens shall be automatically released, in each case without further action by the DIP Agent or the DIP Lenders. The DIP Agent and the DIP Lenders shall take all actions to effectuate and confirm such termination, release and discharge as reasonably requested by the Debtors or the Purchaser; provided that the Surviving DIP Provisions shall survive in accordance with the terms of such DIP Documents.

From and after the consummation of a Reorganized Equity Sale, the Reorganized Debtors shall, without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash the legal, professional, and other fees and expenses of the DIP Agent and Prepetition Term Loan Agent within three (3) Business Days of such parties' delivery of an invoice to the Reorganized Debtors, and such parties shall not be required to comply with the procedures set forth in paragraph 41 of the Final DIP Order with respect to such fees.

(e)    Priority Tax Claims

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, the Allowed Priority Tax Claims, each holder of an Allowed Priority Tax Claim shall receive treatment consistent with section 1129(a)(9) of the Bankruptcy Code by the applicable Debtor against which such Allowed Priority Tax Claims are validly asserted.

**1.10    Statutory Fees**

All fees due and payable by the Debtors' Estates pursuant to section 1930 of Title 28 of the U.S. Code, together with the statutory rate of interest set forth in section 3717 of Title 31 of the U.S. Code to the extent applicable ("Quarterly Fees") prior to the Plan Effective Date shall be paid by the Debtors on the Plan Effective Date. After the Plan Effective Date, the Debtors and the Reorganized Debtors shall be jointly and severally liable to pay any and all Quarterly Fees when due and payable. After the Plan Effective Date, each of the Reorganized Debtors shall File with the Bankruptcy Court separate UST Form 11-PCR reports when they become due. Each and every one of the Debtors and the Reorganized Debtors shall remain obligated to pay Quarterly Fees to the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed or converted to a case under Chapter 7 of the Bankruptcy Code. The U.S. Trustee shall not be required to File any Administrative Expense Claim in the case, and shall not be treated as providing any release under the Plan. For the avoidance of doubt, neither the GUC Trust nor GUC Trustee is responsible for the payment of any Quarterly Fees.

**1.11    Elimination of Vacant Classes**

Any Class that does not have a Claim or Interest in an amount greater than zero as of the date of the Confirmation Hearing shall be considered vacant and deemed eliminated from the Plan for all purposes.

**1.12    Subordinated Claims**

Except as expressly provided in the Plan, the allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective treatment thereof under the Plan take into account the relative priority of the Claims in each Class, whether arising under a contract, principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right to reclassify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

**1.13    Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code**

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by at least one Impaired Class of Claims entitled to vote against the Debtors. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

**1.14    Liquidation Analysis**

Often called the "best interests" test, section 1129(a)(7) of the Bankruptcy Code requires that a Bankruptcy Court find, as a condition to confirmation, that a chapter 11 plan provides, with respect to each impaired class, that each holder of a claim or an equity interest in such impaired class either (1) has accepted the plan or (2) will receive or retain under the plan property of a value that is not less than the amount that the non-accepting holder would receive or retain if the debtors liquidated under chapter 7.

The Debtors believe that the Plan provides holders of Allowed Claims and Allowed Interests the same or greater recovery as would be achieved if the Debtors were to liquidate under chapter 7 of the Bankruptcy Code. This belief is based on a number of considerations, including that: (i) it could take a significant amount of time to liquidate the Debtors' assets; (ii) substantially all of the Debtors' real estate is leased rather than owned; (iii) the Debtors' enterprise value greatly exceeds its liquidation value; (iv) the value of many of the Debtors' assets is dependent upon the Debtors continuing to operate their business as a going concern (e.g., intellectual property); (v) most or all of the proceeds from a chapter 7 liquidation would be paid to the DIP Lenders, on account of their superpriority liens, and the Prepetition Term Loan Lenders, on account of their pre-petition liens, leaving little or no funds for the payment of priority or general unsecured creditors; and (vi) there are additional Administrative Expense Claims that would be incurred if the cases were converted to a chapter 7.

The Debtors have prepared an unaudited, consolidated liquidation analysis, which is attached hereto as **Exhibit B** (the "Liquidation Analysis"), to assist holders of Claims and Interests in evaluating the Plan. The Liquidation Analysis compares the projected recoveries that would result from the liquidation of the Debtors in a hypothetical case under chapter 7 of the Bankruptcy Code with the estimated distributions to holders of Allowed Claims and Allowed Interests under the Plan. The Liquidation Analysis is based on the value of the Debtors' assets and liabilities as of a certain date and incorporates various estimates and assumptions, including a hypothetical conversion to a chapter 7 liquidation as of a certain date. Furthermore, the Liquidation Analysis is subject to potentially material changes, including with respect to economic and business conditions as well as legal rulings. Therefore, the actual liquidation value of the Debtors could vary materially from the estimate provided in the Liquidation Analysis.

## 1.15    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or reorganization is proposed in such plan of reorganization). The Plan provides for a restructuring of the Debtors' business and assets through one or more Sale Transactions, and the Debtors believe that, under either scenario, all Plan obligations will be satisfied without the need for further reorganization of the Debtors.

## 1.16    Valuation of the Debtors

Under the Bidding Procedures Order, the Debtors are pursuing a competitive sale process for their assets as contemplated by the RSA. The Debtors have, therefore, concluded that the best estimate of the going concern value of the Debtors will be revealed through the sale process.

## ARTICLE II
## VOTING PROCEDURES AND REQUIREMENTS

## 2.1    Voting on the Plan

The Disclosure Statement Order approved certain procedures governing the solicitation of votes on the Plan from holders of Claims against the Debtors, including setting the deadline for voting, which holders of Claims are eligible to receive ballots to vote on the Plan, and other voting procedures.

**YOU SHOULD READ THE DISCLOSURE STATEMENT ORDER, THE CONFIRMATION HEARING NOTICE, AND THE INSTRUCTIONS ATTACHED TO YOUR BALLOT IN CONNECTION WITH THIS SECTION BEFORE YOU CAST YOUR VOTE TO ACCEPT OR REJECT THE PLAN, AS THEY SET FORTH IN DETAIL PROCEDURES GOVERNING VOTING DEADLINES AND OBJECTION DEADLINES.**

As proposed, the Plan constitutes a joint plan for each of the foregoing entities and therefore, each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. The classifications of Claims and Interests set forth in Article III of the Plan shall be deemed to apply separately with respect to each Plan proposed by each Debtor, as

13153938-3

applicable, except as otherwise set forth in the Plan. The Plan does not contemplate substantive consolidation of any of the Debtors.

## 2.2    Classes Entitled to Vote on the Plan

Under the Bankruptcy Code, only holders of Claims in "impaired" classes are entitled to vote on the Plan (unless, for reasons discussed below, such holders are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code). Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" unless (i) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

The following table summarizes whether each Class of Claims is Impaired or Unimpaired, and which Classes are entitled to vote on the Plan. The table is qualified in its entirety by reference to the full text of the Plan.

(a)    Class Identification

| Class | Designation | Impairment | Voting Rights |
|-------|-------------|------------|---------------|
| Class 1 | Miscellaneous Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 | Prepetition Term Loan Claims | Impaired | Entitled to Vote |
| Class 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 5 | Intercompany Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 6 | Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

Accordingly, holders of record of Prepetition Term Loan Claims in Class 3 and General Unsecured Claims in Class 4 (collectively, the "Voting Classes"), as of July 28, 2024, the Voting Record Date established by the Debtors for purposes of the solicitation of votes on the Plan, are entitled to vote on the Plan. If your Claim or Interest is not in one of the Voting Classes, you are not entitled to vote on the Plan and you will not receive a ballot with this Disclosure Statement. If your Claim is in one of these Classes, you should read your ballot and follow the listed instructions carefully before casting your vote to accept or reject the Plan. Please use only the ballot that accompanies this Disclosure Statement.

13153938-3

In addition, holders of Administrative Expense Claims, DIP Claims, Priority Tax Claims, Miscellaneous Secured Claims, Other Priority Claims, Prepetition Term Loan Claims, General Unsecured Claims, Intercompany Claims, and Interests that vote to accept or do not affirmatively opt out of the releases provided by the Plan by checking the box on the applicable form indicating that they opt not to provide the releases provided by the Plan or do not object to the releases contained in the Plan shall be deemed a "Releasing Party" for purposes of the releases contained in pursuant to the Plan. The compromises and settlements implemented pursuant to the Plan preserve value by enabling the Debtors to swiftly and efficiently emerge from chapter 11.

A vote on the Plan may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not cast, solicited, or procured in good faith or in accordance with the provisions of the Bankruptcy Code. The Disclosure Statement Order also sets forth assumptions and procedures for determining the amount of Claims that each creditor is entitled to vote in these Chapter 11 Cases and how votes will be counted under various scenarios.

The Bankruptcy Code requires as a condition to confirmation of a plan of reorganization that each class that is impaired and entitled to vote under a plan votes to accept such plan, unless the plan is being confirmed under the "cramdown" provisions of section 1129(b) of the Bankruptcy Code. Section 1129(b) permits confirmation of a plan of reorganization, notwithstanding the non-acceptance of the plan by one or more impaired classes of claims or equity interests, so long as at least one impaired class of claims or interests votes to accept a proposed plan, without counting votes cast by insiders. Under that section, a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each non-accepting class. The Debtors are seeking confirmation pursuant to section 1129(b) of the Bankruptcy Code.

## 2.3    Votes Required for Acceptance by a Class

The Bankruptcy Code defines acceptance of a plan by a class of claims as acceptance by holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the claims of that class that cast ballots for acceptance or rejection of a plan. Thus, acceptance by a class of claims occurs only if at least two-thirds (2/3) in dollar amount and a majority in number of the holders of claims voting cast their ballots to accept the plan.

## 2.4    Certain Factors to Be Considered Prior to Voting

There are a variety of factors that all holders of Claims entitled to vote on the Plan should consider prior to voting to accept or reject the Plan. These factors may impact recoveries under the Plan and include, among other things:

- unless otherwise specifically indicated, the financial information contained in the Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and the Disclosure Statement;

- although the Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors can neither assure such compliance nor that the Bankruptcy Court will confirm the Plan;

- the Debtors may request Confirmation without the acceptance of the Plan by all Impaired Classes in accordance with section 1129(b) of the Bankruptcy Code; and

- any delays of either Confirmation or Consummation could result in, among other things, increased Administrative Expense Claims and Professional Fee Claims.

While these factors could affect distributions available to holders of Allowed Claims under the Plan, the occurrence or impact of such factors may not necessarily affect the validity of the vote of the Voting Classes or necessarily require a re-solicitation of the votes of holders of Claims in the Voting Classes pursuant to section 1127 of the Bankruptcy Code.

For a further discussion of risk factors, please refer to "Certain Factors to Be Considered" described in Article VII of this Disclosure Statement.

## 2.5    Solicitation Procedures

(a)    Solicitation Agent

The Debtors have retained Epiq Corporate Restructuring, LLC to act as, among other things, the Solicitation Agent in connection with the solicitation of votes to accept or reject the Plan.

(b)    Solicitation Materials

The Voting Classes will receive a solicitation package consisting of the following materials (the "Solicitation Package"):

- A copy of the notice of the Confirmation Hearing, the Confirmation Objection deadline, and the Voting Deadline (the "Confirmation Hearing Notice"), which will be served on all parties in interest in the Chapter 11 Cases by no later than July 31, 2024 (the "Confirmation Hearing Notice Deadline") (*i.e.*, twenty-nine (29) days prior to the deadline for objecting to Confirmation of the Plan ("Plan Objection Deadline");

- a copy of this Disclosure Statement together with the exhibits thereto, including the Plan;

- a copy of the Disclosure Statement Order entered by the Bankruptcy Court [Docket No. [●]] (without exhibits), which, among other things, conditionally approved this Disclosure Statement, established the Solicitation Procedures, scheduled a Confirmation Hearing, and set the Voting Deadline, the deadline to opt out of the release provisions in the Plan (the "Opt-Out Deadline") and the Plan Objection Deadline;

- a copy of the letter the Debtors will send to holders of Claims entitled to vote to accept or reject the Plan, urging parties to vote in favor of the Plan;

- a copy of the letter of the UCC that the Debtors will send to holders of claims entitled to vote to accept or reject the Plan, urging parties to vote in favor of the Plan; and

- an appropriate form of ballot, which will include appropriate instructions and provision for opting out of the release provisions in the Plan, instructions on how to complete the ballot and opt-out form, and a prepaid, pre-addressed ballot return envelope.

The Debtors will cause the Solicitation Agent to distribute the Solicitation Package to eligible holders of Claims in the Voting Classes by no later than August 5, 2024, which is twenty-four (24) days before the Voting Deadline (*i.e.*, August 28, 2024 at 4:00 p.m. (prevailing Eastern Time)).

In addition, the following materials will be sent to holders of Claims and Interests not in the Voting Classes and holders of Unclassified Claims:

- a copy of the Confirmation Hearing Notice, which will be served on all parties in interest in the Chapter 11 Cases by no later than the Confirmation Hearing Notice Deadline;

- a notice informing such holders that they are not entitled to vote under the terms of the Plan, which will include appropriate instructions and provision for opting out of the release provisions in the Plan, instructions on how to complete the opt-out form, and a prepaid, pre-addressed return envelope; and

- a copy of the Disclosure Statement Order entered by the Bankruptcy Court [Docket No. [●]] (without exhibits), which, among other things, conditionally approved this Disclosure Statement, established the Solicitation Procedures, scheduled a Confirmation Hearing, and set the Voting Deadline, the Opt-Out Deadline, and the Plan Objection Deadline.

The Solicitation Package (except the ballots), the Plan, the Disclosure Statement and, once they are filed, all exhibits to those documents (including the Plan Supplement) may also be obtained from the Solicitation Agent by: (i) calling the Solicitation Agent at (888) 754-0507 (toll free) or (971) 257-5614 (international), (ii) emailing RedLobsterInfo@epiqglobal.com, and referencing "Red Lobster Management LLC" in the subject line, (iii) visiting the Debtors' website at https://dm.epiq11.com/case/redlobster/info, and/or (iv) writing to the Solicitation Agent at Red Lobster Management LLC, c/o Epiq Ballot Processing, P.O. Box 4422, Beaverton, OR 97076-4422.

The "Plan Supplement" consists of a compilation of documents and forms of documents, agreements, schedules, and exhibits relevant to the implementation of the Plan, to be filed no later than the Plan Supplement Filing Date, as amended, modified or supplemented from time to time in accordance with the terms of the Plan and in accordance with the Bankruptcy Code, the Bankruptcy Rules, including the consent rights set forth therein, consisting of the following documents, which documents shall constitute part of the Plan: (a) the Purchase Agreement (b) New

Organizational Documents; (c) to the extent known, the identities of the members of the New Board; (d) the Schedule of Retained Causes of Action; (e) the Assumed Executory Contracts and Unexpired Leases List; (f) the form of the Plan Administrator Agreement; (g) the form of the GUC Trust Agreement; and (h) any and all other documentation that is contemplated by the Plan.

The Debtors will file the Plan Supplement with the Bankruptcy Court no later than the Plan Supplement Filing Date. If the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available on the Debtors' restructuring website. The Debtors will not serve copies of the Plan Supplement; however, parties may obtain a copy of the Plan Supplement by contacting the Solicitation Agent, as set forth above.

## 2.6    Voting Procedures

If you are entitled to vote to accept or reject the Plan, one or more ballots has been enclosed in your Solicitation Package for the purpose of voting on the Plan. Please vote and return your ballot(s) in accordance with the instructions accompanying your ballot(s).

Prior to voting on the Plan, you should carefully review (1) the Plan and the Plan Supplement, (2) this Disclosure Statement, (3) the Disclosure Statement Order, (4) the Confirmation Hearing Notice, and (5) the detailed instructions accompanying your ballot(s).

Each ballot has been coded to reflect the Class of Claims it represents. Accordingly, in voting to accept or reject the Plan, you must use only the coded ballot or ballots sent to you with this Disclosure Statement.

In order to be counted, all ballots must be properly completed in accordance with the voting instructions on the ballot and **actually received** by the Solicitation Agent no later than the Voting Deadline (i.e., **August 28, 2024 at 4:00 p.m. (prevailing Eastern Time)**) through one of the following means: (i) using the enclosed pre-paid, pre-addressed return envelope, (ii) via first class mail to Red Lobster Management LLC., c/o Epiq Ballot Processing, P.O. Box 4422, Beaverton, OR 97076-4422, (iii) via overnight courier, or hand delivery to Red Lobster Management LLC, c/o Epiq Ballot Processing, 10300 SW Allen Boulevard, Beaverton, OR 97005, or (iv) via the e-ballot portal using the Unique E-Ballot ID# on the holder's ballot at https://dm.epiq11.com/case/redlobster.

Detailed instructions for completing and transmitting ballots are included with the ballots and provided in the Solicitation Packages.

If the Solicitation Agent receives more than one timely, properly completed ballot with respect to a single Claim prior to the Voting Deadline, the vote that will be counted for purposes of determining whether sufficient acceptances required to confirm the Plan have been received will be the vote recorded on the timely, properly completed ballot, as determined by the Solicitation Agent, received last with respect to such Claim, *provided that*, if both a paper ballot and electronic ballot are submitted timely on account of the same General Unsecured Claim(s), the electronic ballot shall supersede and revoke the paper ballot.

If you are a holder of a Claim who is entitled to vote on the Plan and did not receive a ballot, received a damaged ballot, or lost your ballot, or if you have any questions concerning the

Disclosure Statement, the Plan, the ballot, or the procedures for voting on the Plan, please contact the Solicitation Agent at the phone numbers or email address listed above.

Before voting on the Plan, each holder of a Claim in Classes 3 or 4 should read, in its entirety, this Disclosure Statement, the Plan and the Plan Supplement, the Disclosure Statement Order, the Confirmation Hearing Notice, and the instructions accompanying the ballot(s). These documents contain important information concerning how Claims are classified for voting purposes and how votes will be tabulated. Holders of Claims entitled to vote are also encouraged to review the relevant provisions of the Bankruptcy Code and Bankruptcy Rules and/or consult their own attorney.

IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED UNLESS THE DEBTORS DETERMINE OTHERWISE OR AS ORDERED BY THE BANKRUPTCY COURT.

IT IS IMPORTANT THAT THE HOLDER OF A CLAIM ELIGIBLE TO VOTE IN THE VOTING CLASSES FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON SUCH HOLDER'S BALLOT AND THE ACCOMPANYING INSTRUCTIONS.

## ARTICLE III
## BUSINESS DESCRIPTION

### 3.1    The Debtors' Corporate Structure and Business Operations

(a)    Overview

Red Lobster is an international seafood restaurant chain with a history that spans over seven decades. Founded in 1968 and headquartered in Orlando, the Company has grown from a single, family-owned restaurant in Lakeland, Florida into one of the world's largest and most well-known seafood restaurant chains with approximately 565 operating restaurant locations across forty-four states and in Canada. Internationally, Red Lobster also has 27 franchised locations including Mexico, Ecuador, Japan and Thailand.[8] To support its expansive footprint, the Debtors maintain a first rate procurement program and other back-office support functions.

In 2016, Thai Union Group Public Company Limited ("Thai Union") made a $575 million strategic investment through its acquisition of a 49% stake in the Debtors. In 2020, Thai Union, former members of the Red Lobster management team, and certain investors operating under the name Seafood Alliance, acquired the remaining equity stake in the Debtors. All of the Debtors are direct or indirect subsidiaries of Red Lobster Management's ultimate non-debtor parent, Red Lobster Master Holdings, L.P. Non-debtors Thai Union, RL Management Investors LLC, RL Management Holdings LLC, and Seafood Alliance Limited are, directly or indirectly, the ultimate owners of Red Lobster Master Holdings, L.P. Thai Union indirectly holds approximately 47% of common equity interests and 100% of the preferred equity units and Seafood Alliance indirectly holds approximately 38% of the common equity interest. The remaining common equity interests

---

[8] The corporate organizational chart attached hereto as **Exhibit C** provides an overview of the current corporate organizational structure and the relationship among RL Management and its debtor affiliates.

are indirectly held by former Red Lobster management in two entities, RL Management Investors LLC and, indirectly, RL Management Holdings LLC.

    (b)    <u>The Debtors' Management</u>

The Debtors' executive leadership team is comprised of the following individuals: Jonathan Tibus as Chief Executive Officer, Nicholas Haughey as Chief Restructuring Officer, Stephanie Medley as Chief Financial officer, Sara Bittorf as Chief Experience Officer, Matt Livesay as Chief Supply Chain Officer, Susan Pavel as Chief People Officer, and Shawn Harrs as Chief Information Officer.

## 3.2    <u>The Debtors' Prepetition Capital Structure</u>

As of the Petition Date, approximately $294 million in principal amount was outstanding under the Prepetition Term Loan Credit Agreement and Prepetition ABL Facility, each as defined below.

On January 22, 2021, Debtor RL Management, Fortress Credit Corp., as administrative agent, certain other lenders thereto, each of the other co-Debtors (other than RL International), and non-debtor Red Lobster Intermediate Holdings LLC, entered into that certain Financing Agreement (as amended or otherwise modified from time to time, the "<u>Prepetition Term Loan Credit Agreement</u>") which extended loans to allow the Debtors to refinance existing indebtedness and for general working capital purposes. As of the Petition Date, approximately $264,720,000 was outstanding, which is secured by substantially all of the Debtors' assets. As of the Petition Date, the Debtors also had an asset-based loan facility (the "<u>Prepetition ABL Facility</u>") in place with an aggregate commitment of $100 million, including a $40 million sublimit for letters of credit. The administrative agent under the Prepetition ABL Facility is Wells Fargo Bank, National Association. As of the Petition Date, no loans were outstanding under the ABL Facility, however, Wells Fargo Bank, National Association has issued letters of credit with an aggregate face amount of $29,276,399 which remain outstanding. Additionally, there are approximately $1,100,000 of outstanding obligations in connection with a commercial card agreement between Wells Fargo Bank, National Association and the Debtors.

## 3.3    <u>The Debtors' Board Members</u>

As of the Petition Date, the boards of managers and boards of directors, as applicable, of each Debtor are comprised of one independent director: Lawrence Hirsh. The independent director is not affiliated with or employed by any of the Company's shareholders, lenders, or any other stakeholders.

# ARTICLE IV
## EVENTS LEADING TO THE CHAPTER 11 CASES
## AND NOTABLE PREPETITION ACTIONS

**4.1**    **Financial and Operational Challenges Leading to the Chapter 11 Cases**

The Debtors have faced a number of financial and operational challenges, including a difficult macroeconomic environment, a bloated and underperforming restaurant footprint, failed or ill-advised strategic initiatives, and increased competition within the restaurant industry.

The Debtors' financial advisors, Alvarez & Marsal ("A&M"), were retained on January 11, 2024. In addition to the retention of Jonathan Tibus as chief restructuring officer, A&M was initially tasked with performing a wholesale assessment of the Company and providing an operational improvement plan that the Company's senior leadership would implement with A&M's assistance and with the support of the Prepetition Term Loan Lenders. The key observations from A&M's financial and operational assessment are summarized below.

(a)    Flagging Performance

The Debtors' performance was deteriorating and had been doing so for several years. For example, Red Lobster's annual guest count had declined by approximately 30% since 2019 and had only marginally improved from pandemic levels seen during 2020 and 2021. Although Red Lobster's net sales increased by approximately 25% from 2021 to 2023 (which itself represents modest recoveries following the COVID-19 pandemic), net sales had begun to show material decline during the last twelve months. Similarly, the Debtors' consolidated adjusted EBITDA in the twelve months leading up to the Petition Date fell by more than 60%, which all but erased any ground Red Lobster recovered following the pandemic. The latest symptom of this decline is Red Lobster's $76 million net loss during fiscal year 2023.

This resulted in a significant decrease in the Debtors' cash position. In May 2023, the Debtors held approximately $100 million in cash. However, from June 2023 to September 2023, the Debtors experienced operating cash losses of approximately $31 million. Over this same period, the Company transitioned to a vendor-managed inventory program, which resulted in a corresponding decline in its borrowing base under the Prepetition ABL Facility. As a result, Red Lobster was forced to pay down $27 million in debt owed under the Prepetition ABL Facility. Finally, across fiscal year 2023, Red Lobster was required to make $32 million of interest payments. Over the course of approximately six months, the Debtors' cash position declined from $100 million to less than $30 million.

Due the Company's rapid loss of liquidity over this period, the Company was forced to quickly institute holds on vendor payments to maintain cash. When the Company began to hold vendor payments in 2023, it expected that the issue would resolve by December 2023, when the Company typically generates a significant amount of cash. However, by the end of 2023 it became clear that the Company's liquidity crisis would not be cured by the seasonal bump in revenue.

       (b)     <u>Operational Challenges</u>

         (i)     Inflationary Pressure

The Debtors have been impacted in recent years by prevailing negative industry trends. Casual dining restaurants are acutely impacted by consumer sensitivities to eating out versus staying in. And because of inflationary pressures, restaurant menu prices across the industry have risen significantly faster than grocery and other consumer prices. Typically, when labor inflation runs ahead of commodity inflation, restaurant prices tend to outpace grocery pricing. As a result, consumers are less inclined to eat out.

In addition to inflationary costs imposed on the labor force, 50% of states have increased minimum hourly wages in 2024. Restaurant average hourly wages have outpaced the restaurant industry's ability to increase prices, putting pressure on margins.

        (ii)     Unfavorable Leases & Underperforming Locations

A material portion of the Debtors' leases are priced above market rates. The Debtors leased approximately 687 locations (247 in master leases and 440 individual property leases) on the Petition Date. In 2023, the Debtors spent approximately $190.5 million in lease obligations, over $64,000,000 of which relate to underperforming stores. Given the Debtors' operational headwinds and financial position, payment of lease obligations associated with non-performing leases has caused significant strains on the Debtors' liquidity.

        (iii)    Marketing and Operational Missteps

Certain operational decisions by former management harmed the Debtors' financial situation in recent years. For example, historically, the Debtors' Ultimate Endless Shrimp ("<u>UES</u>") promotion was utilized as a limited-time promotion. In May 2023, however, Paul Kenny, the Debtors' former CEO,[9] made the decision to add UES as a permanent $20 item to the menu despite significant pushback from other members of the Debtors' management team. This decision created both operational and financial issues for the Debtors, costing the Debtors at least $11 million and saddling the Debtors with burdensome supply obligations, particularly with its equity sponsor, Thai Union. Throughout the course of these Chapter 11 Cases, the Debtors have continued to investigate the circumstances of these events and what, if any, claims may be asserted to recover value for the benefit of the Debtors' bankruptcy estates.

The Debtors have also been investigating whether Thai Union and Mr. Kenny encouraged excessive merchandising of the UES promotion in-store (including heavy in-store promotion), which was atypical for the Debtors. The excessive merchandising decision led to supply issues resulting in major shortages of shrimp with restaurants often going days or weeks without certain types of shrimp. Moreover, the Debtors are investigating whether Mr. Kenny's decision-making process circumvented the Debtors' normal supply chain and demand planning processes.

---

[9] At the direction of Thai Union, Mr. Kenny became acting interim CEO following the resignation of the previous permanent CEO in April 2022.

Furthermore, upon information and belief, the Debtors' supply process was strained by virtue of its relationship with Thai Union, which, in addition to being the Company's equity sponsor and 100% owner of Red Lobster Master Holdings GP, has historically been a large-scale supplier to Red Lobster. The Debtors believe that Thai Union exercised an outsized influence on the Debtors' shrimp purchasing, as indicated by, for example, Mr. Kenny's April 2023 purported direction to Thai Union to continue producing shrimp for the Debtors that did not flow through the traditional supply process or bid cycle or adhere to the Debtors' demand projections. In apparent coordination with Thai Union and under the guise of a "quality review," Mr. Kenny made a series of decisions that eliminated two of the Debtors' breaded shrimp suppliers, leaving Thai Union with an exclusive deal that led to higher costs to the Debtors.

The Debtors are exploring the impact of the control Thai Union exerted, in concert with Mr. Kenny and other Thai Union-affiliated entities and individuals, and whether actions taken in light of these parties' varying interests were appropriate and consistent with applicable duties and obligations to Red Lobster.

**4.2** **Prepetition Turnaround Efforts**

(a)    Attempt to Restructure Out of Court

In December 2023, following certain defaults under the Prepetition Term Loan Credit Agreement, the Prepetition Term Loan Agent exercised equity proxy rights granted to it by non-Debtor Red Lobster Intermediate Holdings LLC ("Holdings") in connection with the Prepetition Term Loan Agreement and related loan documents. This gave the Prepetition Term Loan Agent the contractual ability to replace the Debtors' existing directors (or managers, in the case of limited liability companies). At that time, the Prepetition Term Loan Agent removed all existing managers and directors of the Debtors and replaced them with Lawrence Hirsh, an independent director with more than thirty years of restructuring experience.

Following the appointment of Mr. Hirsh, the Debtors and the Prepetition Term Loan Lenders were engaged in discussions aimed at effectuating an out-of-court restructuring of the Debtors' capital structure. Thai Union and the Debtors (who, at that time, were advised by different professionals) engaged in negotiations with the Prepetition Term Loan Lenders to create a new equity structure in which the Prepetition Term Loan Lenders would acquire approximately 80% of the restructured company, with Thai Union retaining a minority equity interest. These negotiations were ultimately unsuccessful.

Around the same time, the Debtors' then-chief executive officer, Horace Dawson, decided to retire after more than 30 years of service to the restaurant industry, 20 of which were spent in various roles within Red Lobster. The board then asked Jonathan Tibus, who until that point had been operating in the role of chief restructuring officer, to assume the role of chief executive officer to implement the operational turnaround strategy described above, and Nicholas Haughey was subsequently appointed chief restructuring officer.

Prior to the Petition Date, the Debtors were unable to obtain additional capital from Thai Union. In February 2024, the Prepetition Term Loan Lenders made incremental loans of $20 million to the Company for working capital purposes, but without financial support from Thai

Union, the Prepetition Term Loan Lenders were not willing to make any further loans to the Debtors on an out-of-court basis. With no meaningful ability to raise fresh capital, it became evident that the Debtors needed to consider a chapter 11 process. As a result, the Debtors determined that a comprehensive operational restructuring and value maximizing sale inside of a chapter 11 process would likely be the best possible alternative under the circumstances.

(b)    Operational Initiatives

In February 2024, A&M developed a three-prong strategic priority plan designed to improve the Debtors' operations. In the months leading up to the Petition Date, the Debtors' management team began to put this strategic plan into action.

First and foremost, ensuring that Red Lobster is a great place to work remains a central focus of the Debtors' management. As part of this goal, the Debtors continues to work to develop one standard for store operations across its active stores. It is critical that the employee and customer experience is consistently excellent across all locations. The Debtors are seeking to implement, among other things, a comprehensive upgrade to their current information technology systems and targeted investments in their facilities. To help with employee culture and retention, the Debtors are redoubling their efforts to cultivate and sustain a culture of reward and recognition. This will include modernizing hiring processes and developing individualized plans for Red Lobster's directors and regional vice presidents.

Second, the Debtors are working to ensure that Red Lobster remains a great place to eat by providing consistent experiences and excellent customer service. The Debtors have begun to execute internal strategies to make its brand even more compelling by leveraging its partners to extend the Debtors' voice, presence, and impact within the market. As part of that process, the Debtors intend to simplify Red Lobster's menu by implementing a core menu that balances efficiency and appeal. Moreover, the Debtors will implement a sensible promotional calendar with fewer "limited time offers."

Third, the Debtors have already begun to reduce their cost structure without compromising quality by rationalizing the Debtors' restaurant footprint. On May 13, 2024, the Debtors made the difficult decision to close and vacate 93 stores. Where possible, Red Lobster attempted to relocate employees of closed stores to a nearby location, and reorganized mid-level management accordingly. These 93 stores were deemed to be non-performing because of rent costs and/or financial performance, such that operating those stores was deemed to be financially burdensome to the rest of the Debtors. The Debtors are also working to identify and eliminate nonproductive spending across all departments.

(c)    Marketing Process, DIP Financing, and Stalking Horse Asset Purchase Agreement

In March 2024, when it became clear that an out-of-court solution to recapitalize the Company was not feasible, the Debtors retained an investment banker, Hilco Corporate Finance ("Hilco"), to formally initiate a marketing and sale process. Hilco then commenced an extensive marketing effort and solicited indications of interest from strategic and financial buyers with the financial and operational wherewithal to complete a transaction with the Debtors.

At that same time, as the Debtors continued to review strategic alternatives, it became apparent that the commencement of these Chapter 11 Cases would likely be necessary. The Debtors, with the assistance of their advisors, first set out to develop a robust chapter 11 strategy and corresponding budget. As a result of those efforts, the Debtors determined that they needed $100 million to fund these Chapter 11 Cases to ensure that the Debtors can sustain their operations. As a result, the Debtors focused on obtaining debtor-in-possession ("DIP") financing.

To secure the necessary financing, the Debtors: (i) sought to enter into a restructuring support agreement with their Prepetition Term Loan Lenders; and (ii) pursued financing from other potential third-party sources. Ultimately, the Debtors were unable to obtain third-party financing. However, after significant negotiations, the Debtors executed the RSA with the Prepetition Term Loan Lenders on May 9, 2024.

Importantly, the RSA set forth: (i) the terms upon which the Prepetition Term Loan Lenders would provide the necessary DIP financing to the Debtors; (ii) the terms upon which the Prepetition Term Loan Lenders would serve as a stalking horse bidder for the sale of substantially all of the Debtors' assets (the "Stalking Horse Bid"); and (iii) an agreed timeline for the commencement and prosecution of these Chapter 11 Cases.

Immediately prior to commencing these Chapter 11 Cases, the Debtors: (a) finalized a DIP financing facility (the "DIP Facility") governed by that certain Secured Superpriority Debtor-in-Possession Financing Agreement (the "DIP Credit Agreement"); and (b) entered into the Stalking Horse Purchase Agreement with RL Purchaser LLC, a Delaware limited liability company (a newly formed entity organized and controlled by the Prepetition Term Loan Lenders).

Pursuant to the RSA, the Debtors targeted the following dates in order to satisfy the terms of the DIP Credit Agreement:

| Milestones | |
|---|---|
| | |
| Entry of Interim DIP Financing Order | **Tuesday, May 21, 2024**<br>(Petition Date + 2 Business Days) |
| Entry of Final DIP Financing Order | **Tuesday, June 18, 2024**<br>(Petition Date + 30 Days) |
| Entry of Bidding Procedures Order | **Tuesday, June 18, 2024**<br>(Petition Date + 30 Days) |
| Auction Held, if necessary | **Tuesday, July 23, 2024**<br>(Petition Date + 65 Days) |

| Milestones | |
|---|---|
| | |
| Entry of Sale Order | **Monday, July 29, 2024**<br>(Petition Date + 71 Days)[10] |
| Sale Consummation | **Friday, August 2, 2024**<br>(Petition Date + 75 Days)[11] |

The Debtors believe this timeline minimizes the potential adverse impact a bankruptcy may have on the Debtors' operations, vendors, and employees, while at the same time provides adequate opportunity to market the Company and secure executable bids for the Debtors' business for the highest or best value. The proposed timeline outlined above appropriately balances the Debtors' need to effectuate their sale strategy quickly with their need to adequately market test the value of their businesses and account for the benefits that will be received through the business transformation initiatives, including by rejecting or renegotiating burdensome leases.

The amount of work done prior to the Petition Date by the Debtors and their professionals in connection with the marketing process supports the ability to complete the overarching sale process on the timeframe proposed. The Debtors believe that proceeding with the marketing process is preferable to any of their other alternatives and will inure to the benefit of all constituents, including their employees, vendors, and customers.

## ARTICLE V
## OTHER KEY ASPECTS OF THE PLAN

**5.1** <u>**Means for Implementation**</u>

(a)    <u>General Settlement of Claims and Interests</u>

After the Plan Effective Date, the Plan Administrator, Reorganized Debtors the Wind-Down Debtor(s), and/or the GUC Trustee, as applicable, may compromise and settle any Claim and/or Cause of Action against the Debtors' Estate(s) without any further notice to or action, order, or approval of the Bankruptcy Court.

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, after the Plan Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors,

---

[10] The Prepetition Term Loan Lenders have agreed under the RSA to a one day extension of this milestone.

[11] Provided, however, that if the Sale Order (as defined in the Stalking Horse Purchase Agreement) is entered within 75 days after the Petition Date, such deadline shall be extended to 90 days after the Petition Date solely for the purpose of obtaining the regulatory approvals necessary to consummate the Restructuring Transactions.

their Estates, and holders of Claims and Interests and is fair, equitable, and is within the range of reasonableness. Subject to <u>Article VI</u> of the Plan, all distributions made to holders of Allowed Claims in any Class are intended to be and shall be final.

(b)    <u>Restructuring Transactions</u>

On or about the Plan Effective Date, the Debtors, the Reorganized Debtors, the Wind-Down Debtor(s), and the GUC Trustee, as applicable, may take all actions as may be necessary or appropriate to effectuate the Restructuring Transactions, including: (a) the execution and delivery of any appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, formation, organization, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law and any other terms to which the applicable Persons may agree, including the documents comprising the Plan Supplement; (b) the execution and delivery of Definitive Documents, including appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Persons agree; (c) the execution, delivery, and filing, if applicable, of appropriate certificates or articles of incorporation, formation, reincorporation, merger, amalgamation, consolidation, conversion, arrangement, continuance, or dissolution pursuant to applicable law; (d) the Sale Transaction; (e) such other transactions that are required to effectuate the Restructuring Transactions in the most efficient manner for the Debtors and the Prepetition Term Loan Agent, including in regard to tax matters and any mergers, consolidations, restructurings, conversions, dispositions, transfers, formations, organizations, dissolutions, or liquidations; (f) the selection of the New Board (if applicable); (g) the authorization, issuance, and distribution of the New Reorganized Debtor Equity and Takeback Loans; (h) the appointment of the Plan Administrator; (i) the creation of the GUC Trust and appointment of the GUC Trustee, (j) the execution, delivery, and adoption of the New Organizational Documents; and (k) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions, including making filings or recordings that may be required by applicable law.

(c)    <u>Insurance Policies</u>

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan. On the Plan Effective Date, unless an insurance policy (i) was specifically designated for assignment by the Purchaser, (ii) was rejected by the Debtors pursuant to a Bankruptcy Court order, or (iii) is the subject of a motion to reject Filed by the Debtors that remains pending on the date of the Confirmation Hearing with respect to the Plan, (a) in the event of a Reorganized Equity Sale, the Reorganized Debtors, shall be deemed to have assumed each such insurance policy and any agreements, documents, and instruments relating to coverage of all insured Claims and such insurance policy and any agreements, documents, or instruments relating thereto shall vest in the Reorganized Debtors and (b) in the event of a 363 Asset Sale, each such insurance policy and any agreements, documents, and instruments related to coverage of all insured Claims shall be either (A) rejected or (B) assumed and assigned by the Debtors to the Purchaser at the Purchaser's election.

Notwithstanding anything to the contrary in the Disclosure Statement, this Plan, Plan Supplement, the Confirmation Order, any agreement or order related to post-petition or exit financing, any bar date notice or claim objection, any notice of any cure amount or claim, any document related to any of the foregoing, or any other order of the Bankruptcy Court (including, without limitation, any other provision that purports to be preemptory or supervening, confers Bankruptcy Court jurisdiction, grants an injunction, discharge or release, or requires a party to opt out of any releases):

(i)     nothing alters, modifies or otherwise amends the terms and conditions of the Zurich Insurance Program (including any agreement to arbitrate disputes and any provisions regarding the provision, maintenance, use, nature and priority of the Zurich Collateral), except that on the earlier of (i) the consummation of the Sale Transaction and (ii) occurrence of the Plan Effective Date, the Reorganized Debtors or Purchaser, as applicable, jointly and severally shall assume the Zurich Insurance Program in its entirety pursuant to sections 105 and 365 of the Bankruptcy Code;

(ii)    nothing therein releases or discharges Zurich's security interests and liens on the Zurich Collateral;

(iii)   nothing therein releases or discharges the Zurich Claims and further, the Zurich Claims are actual and necessary expenses of the Debtors' estates (or the Reorganized Debtors or Purchaser, as applicable) and shall be paid in full in the ordinary course of business, whether as an Allowed Administrative Expense Claim under section 503(b)(1)(A) of the Bankruptcy Code or otherwise, regardless of when such amounts are or shall become liquidated, due or paid, without the need or requirement for Zurich to file or serve a request, motion, or application for payment of or proof of any proof of claim, cure claim (or any objection to cure amounts/notices), or Administrative Expense Claim (and further and for the avoidance of doubt, any claim bar date shall not be applicable to Zurich);

(iv)    neither the Purchaser nor the Reorganized Debtors, as applicable, shall sell, assign, or otherwise transfer the Zurich Insurance Program and/or any of the rights, benefits, interests, and proceeds thereunder except with the express written permission of Zurich; and

(v)     the automatic stay of Bankruptcy Code section 362(a) and the injunctions set forth in Article VIII.A of the Plan, if and to the extent applicable, shall be deemed lifted without further order of the Bankruptcy Court, solely to permit: (I) claimants with valid workers' compensation claims or direct action claims against Zurich under applicable non-bankruptcy law to proceed with their claims; (II) Zurich to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of this Bankruptcy Court, (A) all workers' compensation or direct action claims covered by the Zurich Insurance Program, (B) all claims where an order has been entered by the Bankruptcy Court granting a claimant relief

from the automatic stay or the injunctions set forth in Article VIII.A of the Plan to proceed with its claim, and (C) all costs in relation to each of the foregoing; (III) Zurich to draw against any or all of the Zurich Collateral and to hold the proceeds thereof as security for the obligations of the Debtors (or the Reorganized Debtors or Purchaser, as applicable) to Zurich and/or apply such proceeds to the obligations of the Debtors (or the Reorganized Debtors, as applicable) under the Zurich Insurance Program, in such order as Zurich may determine; and (IV) subject to the terms of the Zurich Insurance Program and/or applicable non-bankruptcy law, Zurich to (i) cancel any policies under the Zurich Insurance Program, and (ii) take other actions relating to the Zurich Insurance Program (including setoff).

(d)      Section 1146 Exemption

To the maximum extent permitted pursuant to section 1146(a) of the Bankruptcy Code, any transfer of property (whether from a Debtor to a Reorganized Debtor, the GUC Trust, or to any other Person) under, in furtherance of, or in connection with the Plan, including pursuant to any Sale Transaction or (1) the issuance, distribution, transfer, or exchange of any debt, equity Security, or other interest in the Debtors, the Reorganized Debtors, or the GUC Trust, including the New Reorganized Debtor Equity and Takeback Loans, if applicable, (2) the Restructuring Transactions; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; or (5) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any tax or governmental assessment under any law imposing a document recording tax, stamp tax, conveyance tax, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee regulatory filing or recording fee, sales and use tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment against the Debtors and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers of property without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever located and by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall forgo the collection of any such tax, recordation fee, or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. The Bankruptcy Court shall retain specific jurisdiction with respect to these matters.

(e)      Cancellation of Securities and Agreements

On the Plan Effective Date, except as otherwise specifically provided for in the Plan: (1) the obligations of the Debtors under any certificate, Security, share, note, bond, credit agreement, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly

evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligation of or ownership interest in the Debtors that are Reinstated pursuant to the Plan, if any) shall be cancelled solely as to the Debtors, and the Reorganized Debtors, the Wind-Down Debtors, and the GUC Trustee, as applicable, shall not have any continuing obligations thereunder or relating to the cancellation thereof; and (2) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of or ownership interest in such Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligation of or ownership interest in such Debtors that are specifically Reinstated pursuant to the Plan) shall be released and discharged.

(f)    Effectuating Documents; Further Transactions

On and after the Plan Effective Date, the Reorganized Debtors or Wind-Down Debtors, as applicable, the officers and members of the New Board, the Plan Administrator, or GUC Trustee, as applicable, are authorized to and may issue, execute, deliver, file, or record Definitive Documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the New Organizational Documents, the GUC Trust Documents, and the Securities issued pursuant to the Plan in the name of and on behalf of the applicable Reorganized Debtors, the Wind-Down Debtors, or the GUC Trustee, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

(g)    Preservation of Causes of Action

In accordance with section 1123(b) of the Bankruptcy Code, unless expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or assigned to the Purchaser in the Sale Transaction, the Reorganized Debtors, the Wind-Down Debtors, or the GUC Trust, as applicable, shall retain and may enforce all rights to commence or pursue any and all Causes of Action of the applicable Debtors' Estates, not otherwise so waived, relinquished, exculpated, released, compromised, settled or assigned (as the case may be), whether arising before or after the Petition Date, including, but not limited to, any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors', the Wind-Down Debtor(s)', or the GUC Trustee's rights to commence, prosecute, compromise, settle or release such Causes of Action shall be preserved notwithstanding the occurrence of the Plan Effective Date, other than the Claims and Causes of Action released pursuant to the releases and exculpations contained in Article VIII of the Plan. Unless any Cause of Action is expressly waived, relinquished, exculpated, released, compromised, or settled under the Plan or a Final Order, pursuant to section 1123(b) of the Bankruptcy Code, such Cause of Action is preserved for later adjudication, and no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to any such Cause of Action upon, after, or as a consequence of the Confirmation of the Plan or the occurrence of the Plan Effective Date. For the avoidance of doubt, any Equityholder Litigation Claims shall be contributed to the GUC Trust by the Debtors in accordance with the Plan.

The Equityholder Litigation Claims consists of claims or causes of action, if any, against (i) direct and indirect equityholders of the Debtors and (ii) former officers and directors of the Debtors (other than the officers and directors of the Debtors as of the Petition Date).

**No Person may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors, the Reorganized Debtors or the Wind-Down Debtor(s), as applicable, will not pursue any and all available Causes of Action against it. The Debtors, the Reorganized Debtors, the Wind-Down Debtor(s), and the GUC Trustee, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Person, except as otherwise expressly provided in the Plan, including Article VIII of the Plan.**

The Reorganized Debtors, the Wind-Down Debtor(s), and the GUC Trustee, as applicable, (i) reserve and shall retain all Causes of Action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan and (ii) shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

**5.2    Treatment of Executory Contracts and Unexpired Leases**

    (a)    Assumption and Rejection of Executory Contracts and Unexpired Leases

        1.    363 Asset Sale

In the event a 363 Asset Sale is consummated, upon closing of the 363 Asset Sale, (i) each Executory Contract and Unexpired Lease designated for assumption and assignment to Purchaser (or one or more of the designees of Purchaser) in accordance with the Bidding Procedures Order and the Purchase Agreement shall be assumed by the applicable Debtor and assigned to the Purchaser (or one or more of the designees of Purchaser) pursuant to the terms of the applicable Purchase Agreement and applicable orders of the Bankruptcy Court, and (ii) all Executory Contracts and Unexpired Leases not designated for assumption and assignment to the Purchaser in any Purchase Agreement, to the extent not previously rejected or terminated, shall be automatically rejected.

Each Executory Contract and Unexpired Lease assumed pursuant to Article V.A.1 of the Plan and assigned to a Purchaser (or one or more of the designees of Purchaser) shall vest in, and be fully enforceable by, the Purchaser (or to the extent applicable, the applicable designees of Purchaser) in accordance with its terms, except as such terms are modified by the provisions of the Plan or any order of the Bankruptcy Court.

        2.    Reorganized Equity Sale

In the event a Reorganized Equity Sale or other Restructuring Transaction is consummated, on the Plan Effective Date, except as otherwise provided in the Plan or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan (including, to the extent applicable, a Purchase Agreement related thereto), all Executory Contracts

and Unexpired Leases, to the extent not previously rejected or terminated, shall be deemed rejected under section 365 of the Bankruptcy Code without the need for any further notice to or action, order, or approval of the Bankruptcy Court, under section 365 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease: (1) was previously assumed by a Debtor; (2) expired or was terminated pursuant to its own terms or by agreement of the parties thereto; (3) is the subject of a motion to assume Filed by the Debtors on or before the date of entry of the applicable Confirmation Order; or (4) is listed on the Assumed Executory Contracts and Unexpired Leases List; provided, that rejections of Unexpired Leases of non-residential real property pursuant to this Plan shall be effective as of the later of (a) the Plan Effective Date and (b) the date on which the leased premises are unconditionally surrendered to the landlord under such rejected Unexpired Lease.

Each Executory Contract and Unexpired Lease assumed pursuant to Article V.A.2 of the Plan, shall re-vest in and be fully enforceable by the Purchaser or Reorganized Debtor (as applicable) in accordance with its terms, except as such terms are modified by the provisions of the Plan or any order of the Bankruptcy Court.

(b)    Approval of Assumption, Assignment, and Rejection

Entry of the Confirmation Order shall, subject to and upon the occurrence of the Plan Effective Date, constitute the Bankruptcy Court's approval of the assumptions, assignments or rejections, as applicable, of the Executory Contracts and Unexpired Leases under the Plan. Any motion of the Debtors to assume an Executory Contract or Unexpired Lease pending on the Plan Effective Date shall be subject to approval by the Bankruptcy Court by a Final Order.

Notwithstanding anything to the contrary in the Plan, the Debtors and the Reorganized Debtors, as applicable, reserve the right to amend, modify, or supplement the Assumed Executory Contracts and Unexpired Leases List to add or remove any Executory Contract or Unexpired Lease to such list at any time prior to the Plan Effective Date (or prior to such later date as may be designated in any Purchase Agreement, as applicable), subject to the consent of the Purchaser. The Debtors or the Reorganized Debtors shall provide notice of any amendments to the Assumed Executory Contracts and Unexpired Leases List to their counterparties affected thereby.

(c)    Claims Based on Rejection of Executory Contracts or Unexpired Leases

Unless otherwise provided by a Final Order, Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases pursuant to the Plan, if any, must be Filed with the Bankruptcy Court within thirty (30) days after the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (2) the effective date of such rejection, or (3) the Plan Effective Date. All Allowed Claims arising from the rejection of a Debtor's Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims against such Debtor. No non-Debtor party to a rejected Executory Contract or Unexpired Lease shall be permitted to setoff or recoup any amounts owed to the Debtors under such rejected Executory Contract or Unexpired Lease against any Allowed rejection damages.

**Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time shall be automatically Disallowed,**

**released, and discharged, and forever barred from assertion without the need for any objection or further notice to, or action, order, or approval of, the Bankruptcy Court or any other Person, any such Claim shall be released, and discharged, notwithstanding anything in the Schedules or any Proof of Claim to the contrary, and such Claim shall not be enforceable against the Debtors, the Reorganized Debtors, the Debtors' Estates, the Wind-Down Debtor(s), or the GUC Trustee, as applicable, or their respective properties.**

(d)     Cure of Defaults for Executory Contracts and Unexpired Leases Assumed

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied by the applicable Debtor(s) party to such Executory Contract or Unexpired Lease or the Purchaser as required by any Purchase Agreement, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Amount in Cash on the earlier of (i) the Plan Effective Date or (ii) the consummation of a 363 Asset Sale, if applicable, or on such other terms as the parties to such Executory Contracts or Unexpired Leases, with the consent of the Purchaser. In the event of an unresolved dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized Debtors or Purchaser(s) (as applicable) or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code), or (3) any other matter pertaining to assumption, the payment of the Cure Amount required by section 365(b)(1) of the Bankruptcy Code shall be resolved by a Final Order.

The Debtors served on the applicable counterparties notices of proposed assumption and proposed Cure Amounts pursuant to the terms of the Bidding Procedures. **Any objection by a counterparty to an Executory Contract or Unexpired Lease to the proposed assumption or Cure Amount must be Filed and served to be actually received by no later than the applicable objection deadline set forth in the Bidding Procedures Order.** Any counterparty to an Executory Contract or Unexpired Lease designated for assumption that fails to object timely to the proposed assumption, Cure Amount or adequate assurance of future performance shall be deemed to have consented to all of the foregoing.

Assumption (or assumption and assignment, as applicable) of an Executory Contract or Unexpired Lease pursuant to the Plan shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under such Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. **Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.**

(e)     Pre-Existing Obligations under Executory Contracts and Unexpired Leases

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the applicable Debtor(s) thereunder. In particular, notwithstanding any non-bankruptcy law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, outstanding Cash payments, warranties or continued maintenance

obligations on any goods previously purchased by the Debtors from a non-Debtor counterparty to a rejected Executory Contract or Unexpired Lease.

     (f)     <u>Modifications, Amendments, Supplements, Restatements, or Other Agreements</u>

Unless otherwise provided in the Plan or Confirmation Order, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to the Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Debtors' Chapter 11 Cases shall not be deemed to alter the prepetition nature of the applicable Executory Contracts or Unexpired Leases, or the validity, priority, or amount of any Claims that may arise in connection therewith.

     (g)     <u>Reservation of Rights</u>

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Assumed Executory Contracts and Unexpired Leases List, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease under the Plan.

     (h)     <u>Nonoccurrence of the Plan Effective Date</u>

In the event that the Plan Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases of nonresidential property pursuant to section 365(d)(4) of the Bankruptcy Code.

**5.3**     **<u>Provisions Governing Distributions</u>**

     (a)     <u>Timing and Calculation of Amounts to Be Distributed</u>

Unless otherwise provided in the Plan, on the Plan Effective Date (or if a Claim is not an Allowed Claim on the Plan Effective Date, on the date that such Claim becomes an Allowed Claim), each holder of an Allowed Claim shall receive, subject to the provisions of Article VI of the Plan, the full amount of the distribution that the Plan provides on account of Allowed Claims in the applicable Class. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. Except as otherwise provided in the Plan, holders of Allowed Claims shall not be entitled to interest, dividends, or accruals on the

distributions provided for in the Plan, regardless of whether such distributions are delivered on or after the Plan Effective Date.

    (b)    <u>Delivery of Distributions</u>

    1.    <u>Persons Responsible</u>

Distributions under the Plan shall be made by (i) with respect to a Distribution of proceeds of the Equityholder Litigation Claims or other GUC Trust Assets, the GUC Trustee and (ii) with respect to all remaining Distributions, the Plan Administrator. Except for Assumed Liabilities arising under the Purchase Agreement, the Purchaser (or any Affiliates or designees thereof) shall have no responsibility to make or liability for Distributions required under the Plan.

Except as otherwise provided in the Plan, all distributions shall be made to the holders of Allowed Claims at the address for each such holder as indicated in the applicable Debtor's records as of the date of the relevant distribution; provided, <u>however,</u> that the address for each holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that holder; <u>provided</u> <u>further</u>, <u>however</u>, that the manner of distributions shall be determined at the discretion of the Reorganized Debtors or the Plan Administrator, or GUC Trustee, as applicable.

    2.    <u>Record Date for Distribution</u>

On the Distribution Record Date, the Claims Register shall be closed with respect to Claims held against the Debtors and any party responsible for making distributions under the Plan shall be authorized and entitled to recognize only those record holders of such Claims that are listed on the Claims Register as of the close of business on the Distribution Record Date.

    3.    <u>Minimum Distributions</u>

Notwithstanding any other provision of the Plan, the Reorganized Debtors, the Wind-Down Debtor(s), the Plan Administrator, the GUC Trustee, or the Purchaser (including any Affiliates of Purchaser), as applicable, shall not be required to make any distributions of less than $50.00 in value (whether Cash or otherwise), and each Claim to which this limitation applies shall be discharged, and its holder shall be forever barred pursuant to Article VIII of the Plan from asserting such Claim against the Debtors, their applicable Estates, the Reorganized Debtors, the Wind-Down Debtors, the Plan Administrator, the Purchaser (including any Affiliates of Purchaser), or the GUC Trustee, as applicable, or their respective property, as applicable. If any assets remain where distributions would not be feasible, the Reorganized Debtors, the Wind-Down Debtors, or the GUC Trustee, as applicable, shall done such sums to Red Lobster Cares.

    (c)    <u>Distributions and Undeliverable or Unclaimed Distributions</u>

In the event that a distribution to any holder of an Allowed Claim is returned as undeliverable, no distribution to such holder shall be made unless and until the Reorganized Debtors, the Plan Administrator, or the GUC Trustee, as applicable, has determined the then-current address of such holder, at which time the distribution shall be made to such holder without interest; <u>provided</u>, <u>however</u>, that, at the expiration of six (6) months from the Plan Effective Date, any such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy

Code. After such date, all unclaimed property shall automatically revert to the Reorganized Debtors, the Wind-Down Debtors, or the GUC Trust, as applicable, without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any holder to such property shall be discharged and forever barred.

(d) Surrender of Cancelled Instruments or Securities

On the Plan Effective Date or as soon as reasonably practicable thereafter, each holder of a certificate or instrument evidencing a Claim or an Interest that has been cancelled in accordance with Article IV.A.5 of the Plan shall be deemed to have surrendered such certificate or instrument. Such surrendered certificate or instrument shall be cancelled solely with respect to the applicable Debtors, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis à vis one another with respect to such certificate or instrument, including with respect to any indenture or agreement that governs the rights of the holder of a Claim or Interest, which shall continue in effect for purposes of allowing holders to receive distributions under the Plan, charging liens, priority of payment, and indemnification rights. Notwithstanding anything to the contrary in the Plan, this paragraph shall not apply to certificates or instruments evidencing Claims that are Unimpaired under the Plan.

(e) Compliance with Tax Requirements

The Debtors, Reorganized Debtors, Wind-Down Debtors, or the GUC Trustee, as applicable, shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, with respect to the distributions pursuant to the Plan, and all such distributions shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors, the Plan Administrator, or the GUC Trustee, shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such compliance, or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors, the Plan Administrator, and the GUC Trustee, as applicable, reserve the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

(f) Allocations

Distributions on account of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to accrued but unpaid prepetition interest.

(g) No Postpetition Interest on Claims

Unless otherwise specifically provided for in the Plan, Confirmation Order or DIP Order, or required by applicable bankruptcy and non-bankruptcy law, postpetition interest shall not accrue

or be paid on any Claim, and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any such Claim.

(h)    Foreign Currency Exchange Rate

Except as otherwise provided in a Bankruptcy Court order, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency published in *The Wall Street Journal*, National Edition, on the Petition Date.

(i)    Setoffs and Recoupment

Except as expressly provided in the Plan, each Reorganized Debtor, Wind-Down Debtor, or the GUC Trustee, as applicable, may, pursuant to section 553 of the Bankruptcy Code, set off and/or recoup against any Plan distributions to be made on account of an Allowed Claim any and all Claims, rights, and Causes of Action that such Reorganized Debtor, Wind-Down Debtor, or the GUC Trustee, may hold against the holder of such Allowed Claim; provided, however, that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim shall constitute a waiver or release by a Reorganized Debtor, a Wind-Down Debtor or the GUC Trustee, or its successor of any and all Claims, rights, and Causes of Action that such Reorganized Debtor, Wind-Down Debtor, or the GUC Trustee, may have against the applicable claimholder. In no event shall any holder of a Claim, notwithstanding any indication in such holder's Proof of Claim that such holder asserts, has, or intends to preserve any right of setoff or recoupment pursuant to section 553 of the Bankruptcy Code or otherwise, be entitled to set off or recoup its Claim against any claim, right, or Cause of Action of the Debtor, Reorganized Debtor, Wind- Down Debtor(s), or the GUC Trustee, as applicable.

(j)    Claims Paid or Payable by Third Parties

1.    Claims Paid by Third Parties

To the extent the holder of a Claim receives payment in full on account of such Claim from a third party, such Claim shall be Disallowed and expunged from the Claims Register without an objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court. To the extent a holder of a Claim receives a distribution on account of such Claim and thereafter receives payment from a third party on account of such Claim, such holder shall, within two weeks of receipt of the latter, repay or return to the applicable Reorganized Debtor, Wind-Down Debtors, or the GUC Trustee, as applicable, the portion of the received Plan distribution, if any, by which its total recovery on account of the Claim exceeds the Allowed amount of such Claim.

2.    Claims Payable by Third Parties

The availability, if any, of any insurance policy for the satisfaction of an Allowed Claim shall be determined by the terms of the applicable Debtor(s)'s insurance policies. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part any Allowed Claim (if and to the extent adjudicated by a court of competent jurisdiction), then, immediately upon such insurers' agreement, the applicable portion of such Claim may be Disallowed and expunged from

the Claims Register without an objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

Nothing contained in the Plan shall constitute or be deemed a waiver of any Claim or Cause of Action that any Debtor or any Person may hold against any insurer under any insurance policies, nor shall anything contained in the Plan constitute a waiver by any insurer of any defenses, including coverage defenses.

**5.4    Procedures for Resolving Contingent, Unliquidated, and Disputed Claims**

(a)    Allowance of Claims

After the Plan Effective Date, the Reorganized Debtors, Wind-Down Debtors, and the GUC Trustee, as applicable, shall have and retain any and all rights and defenses the applicable Debtor had immediately before the Plan Effective Date. No Claim shall be deemed an Allowed Claim unless and until such Claim is Allowed under the Plan or under any order entered in the Chapter 11 Cases before the Plan Effective Date (including the Confirmation Order), when such order becomes a Final Order.

(b)    No Distributions Pending Allowance

If an objection to a Claim or a portion thereof is Filed, no distribution shall be made on account of such Claim or the applicable portion thereof unless and until such Disputed Claim becomes an Allowed Claim.

(c)    Claims Administration Responsibilities

Except as otherwise specifically provided in the Plan, after the Plan Effective Date, the Reorganized Debtors, the Plan Administrator, and the GUC Trustee, as applicable, shall have the authority to:  (1) File, withdraw, or litigate to judgment objections to Claims against the applicable Estate; (2) settle, compromise, or otherwise resolve Disputed Claims against the applicable Estate without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) administer and adjust the applicable Claims Register to reflect any settlements, compromises or Final Orders resolving Disputed Claims or the fact that any Claim has been paid or satisfied, or that any Proof of Claim that has been amended or superseded, cancelled or otherwise expunged (including pursuant to the Plan), in each case without any further notice to or action, order, or approval by the Bankruptcy Court. The GUC Trustee shall be primarily responsible for reconciling and objecting to General Unsecured Claims in accordance with the provisions of the Plan.

(d)    Estimation of Claims

Before or after the Plan Effective Date, the Debtors, Reorganized Debtors, Wind-Down Debtor(s), or the GUC Trustee, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to such Claim or during the appeal relating to such objection.

Notwithstanding any provision in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or that otherwise has not yet been resolved by a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), and the relevant Debtor, Reorganized Debtor, Wind-Down Debtor, or the GUC Trustee, as applicable, may elect to pursue a supplemental proceeding to object to any ultimate allowance of such Claim.

    (e)    <u>Time to File Objections to Claims</u>

Any objections to Claims shall be Filed on or before the later of (1) 180 days after the entry of the Confirmation Order and (2) such other period of limitation as may be fixed by the Bankruptcy Court. A motion to extend such deadline may be filed with the Bankruptcy Court by the Reorganized Debtors, the Wind-Down Debtors, or the GUC Trustee, as applicable, on an ex parte or expedited basis.

    (f)    <u>Disallowance of Claims</u>

Any Claims held by Persons from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code, or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Person have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, from that Person have been turned over or paid to the Reorganized Debtors, Wind-Down Debtors, or the GUC Trustee, as applicable.

All Claims against any Debtor, whether Filed or listed in any of the Debtor's Schedules, on account of an indemnification, surety and/or contribution obligation to any of the following Persons or entities shall be deemed satisfied and expunged from the Claims Register as of the Plan Effective Date, without any further notice to or action, order, or approval of the Bankruptcy Court: (i) current or former director of any Debtor, (ii) current or former officer of any Debtor; (iii) current or former employee of any Debtor; (iv) current or former insider of any Debtor; (v) holder, whether directly or indirectly, of an Interest in any Debtor; (vi) current or former operator of any Debtor; (vii) current or former project manager of any Debtor; and (viii) any Affiliate of the Persons or entities set forth in the foregoing clauses (i) through (vii); <u>provided</u>, <u>further</u>, that the holder of any such Claim shall not be entitled to any distributions under the Plan on account of such Claims.

    (g)    <u>Distributions After Allowance</u>

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as practicable after the date that the order allowing a Disputed Claim becomes a Final Order, the Reorganized Debtors, the Wind-Down Debtor(s), Plan Administrator, or the GUC Trustee, as applicable, shall provide to the holder of such Claim the distribution (if any) to which

13153938-3

such holder is entitled, without interest, dividends, or accruals to be paid on account of such Claim unless required under applicable bankruptcy law.

## 5.5    Release, Injunction, and Related Provisions

(a)    Plan Releases, Injunction and Related Provisions

1.    Discharge of Claims and Termination of Interests in the Debtors

In the event a Reorganized Equity Sale is consummated, upon the Plan Effective Date, and except as otherwise provided in the Plan, the Debtors (excluding the Wind-Down Debtors) shall be discharged to the fullest extent permitted by section 1141(d) of the Bankruptcy Code; provided, however, that such discharge shall exclude any Assumed Liabilities. The Confirmation Order shall be a judicial determination of the discharge of all Claims (other than Assumed Liabilities) against, and Interests in, the Debtors (excluding the Wind-Down Debtors) subject to the occurrence of the Plan Effective Date.

In the event a 363 Asset Sale is consummated, pursuant to the provisions of section 1141(d)(3) of the Bankruptcy Code, the Debtors shall not be entitled to a discharge and shall be wound down as set forth in the Plan and the Plan Administrator Agreement.

2.    **Releases by the Debtors**

**Notwithstanding anything in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Plan Effective Date, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released by each of the Debtors, their respective Estates, and any Person seeking to exercise the rights of any of the Debtors or their Estates (including any successors to any of the Debtors or their Estates or any Estate representatives appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code), in each case, on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Persons who may purport to assert any Cause of Action, derivatively, by, through, for, or because of any of the foregoing Persons, from any and all Claims and Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, contingent or non-contingent, in law, equity, contract, tort or otherwise, that any of the Debtors, their Estates, the Reorganized Debtors or Wind-Down Debtor(s), as applicable, or any successors to or representatives of the foregoing appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, would have been legally entitled to assert in their own right (whether individually or collectively) or that any holder of any Claim against or any Interests in, any of the Debtors could have asserted on behalf of any of the Debtors or their Estates, based on, relating to, or in any manner arising from, in whole or in part: any of the Debtors (including the capital structure, management, ownership, or operations thereof); any Security of any of the Debtors; the subject matter of, or the transactions or events giving rise to, any Claim, Cause of Action or Interest; the business or contractual arrangements between any Debtor and a Released Party; any of the Debtors' restructuring efforts; any Avoidance Actions held by any of the Debtors or their Estates; any intercompany**

transactions performed by any of the Debtors; the Debtors' Chapter 11 Cases (including the Filing thereof and any relief obtained by the Debtors therein); the formulation, preparation, dissemination, negotiation, or Filing of the Plan, the Plan Supplement, the DIP Facility, the Disclosure Statement, or the Bidding Procedures Order (and the procedures approved thereby); any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Person regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order with respect to the Plan in lieu of such legal opinion) created or entered into in connection with the Plan or the Bidding Procedures Order; the solicitation of votes on the Plan, the pursuit of Confirmation of the Plan, the pursuit of Consummation of the Plan, the implementation of the Plan, including the issuance or distribution of Securities or any other property pursuant to the Plan; or any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Plan Effective Date other than Claims and liabilities resulting therefrom arising out of or relating to any act or omission of a Released Party that constitutes actual fraud, willful misconduct, or gross negligence, in each case, solely to the extent determined by a Final Order of a court of competent jurisdiction.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post-Plan Effective Date Claims or obligations of any Person under the Plan, the Confirmation Order with respect to the Plan, any Restructuring Transaction, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or (ii) the Equityholder Litigation Claims.

3.    **Releases by Holders of Claims Against the Debtors**

Except as otherwise expressly set forth in the Plan or the Confirmation Order, on and after the Plan Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released by each Releasing Party from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, contingent or non-contingent, in law, equity, contract, tort, or otherwise, including any derivative claims asserted on behalf of the Debtors, that such Person would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part: any of the Debtors (including the capital structure, management, ownership, or operation thereof); any security of any of the Debtors or any of the Reorganized Debtors; the subject matter of, or the transactions or events giving rise to, any Claim that is treated in the Plan; the business or contractual arrangements between any Debtor and any Released Party; the assertion or enforcement of rights and remedies against any of the Debtors; the Debtors' in- or out-of- court restructuring efforts; any Avoidance Actions held by any of the Debtor(s) or their Estates; intercompany transactions between or among a Debtor and another Debtor; the Chapter 11 Cases; the Canadian Proceeding; the formulation, preparation, dissemination, negotiation, or Filing of the Disclosure Statement, the Bidding Procedures Order, the Plan, or the Plan Supplement; any Restructuring

Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the DIP Facility, the Disclosure Statement, the Bidding Procedures Order, the Plan, or the Plan Supplement; the Filing of the Debtors' Chapter 11 Cases; the Filing of the Canadian Proceeding; the Disclosure Statement, the Plan, the solicitation of votes with respect to the Plan, the pursuit of Confirmation of the Plan, the pursuit of Consummation of the Plan, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, the distribution of property under the Plan or any other related agreement, or any cancellation of debt income realized in connection with the Plan; or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Plan Effective Date, other than Claims and liabilities resulting therefrom arising out of or relating to any act or omission of a Released Party that constitutes actual fraud, willful misconduct, or gross negligence, each solely to the extent as determined by a Final Order of a court of competent jurisdiction. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any party of any obligations related to customary banking products, banking services or other financial accommodations (except as may be expressly amended or modified by the Plan or any other financing document under and as defined therein), (ii) the Equityholder Litigation Claims, or (iii) any post-Plan Effective Date obligations of any Person under the Plan, the Confirmation Order, any Stand-Alone Restructuring Transaction, any Definitive Document or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the Purchase Agreement or any Claim or obligation arising under the Plan.

ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE THIRD PARTY RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED IN THE PLAN, AND, FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD PARTY RELEASE BY THOSE CREDITORS OR INTEREST HOLDERS WHO DID NOT OPT-OUT OF THE RELEASE IS: (I) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION AND SUBSTANTIAL CONTRIBUTIONS PROVIDED BY THE RELEASED PARTIES; (II) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE THIRD PARTY RELEASE; (III) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AND INTERESTS; (IV) FAIR, EQUITABLE, AND REASONABLE; (V) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR A HEARING; AND (VI) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM RELEASED PURSUANT TO THE THIRD PARTY RELEASE.

4.    <u>Exculpation from Claims Relating to the Plan</u>

Except as otherwise specifically provided in the Plan or the Confirmation Order with respect to the Plan, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby exculpated from, any Claims and Causes of Action related to any act or omission occurring between and including the Petition Date and the Plan Effective Date in connection with, relating to, or arising out of: the Debtors' Chapter 11 Cases (including the

Filing thereof); the Canadian Proceeding (including the Filing thereof); the formulation, preparation, dissemination, negotiation, Filing, or termination of the Plan, the Disclosure Statement, the Bidding Procedures Order, the DIP Facility, or any contract, instrument, release or other agreement or document created or entered into in connection with the Debtors' Chapter 11 Cases or Canadian Proceeding, whether or not included in the Plan Supplement or constituting a Definitive Document; the Restructuring Transactions contemplated by the Plan and any prepetition transactions relating to any of the foregoing; the pursuit of Confirmation of the Plan, the pursuit of Consummation of the Plan, the administration and implementation of the Plan, including the issuance and distribution of Securities pursuant to the Plan, or the distribution of property under the Plan; the Purchase Agreement; or any other related act or omission, transaction, event, or other occurrence taking place on or before or in connection with the Plan Effective Date, except for Claims and liabilities resulting therefrom related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence by an Exculpated Party.

The Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan in all respects.

5. **Injunction**

Except as otherwise expressly provided in the Plan or the Confirmation Order with respect to the Plan, all Persons who have held, hold, or may hold any Claims or Causes of Action against, or Interests in, any of the Debtors that have been released, discharged, or are subject to release or exculpation under the Plan are permanently enjoined, from and after the Plan Effective Date, from taking any of the following actions against any of the Debtors, the Reorganized Debtors, the Wind-Down Debtor(s), the GUC Trustee, as applicable, or any of the other Exculpated Parties or any of the Released Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with any such Claim, Cause of Action or Interest; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against any of the Exculpated Parties or Released Parties on account of or in connection with any such Claim, Cause of Action or Interest; (3) creating, perfecting, or enforcing any Lien or encumbrance of any kind against any of the Exculpated Parties, Released Parties or their property on account of or in connection with or with respect to any such Claim, Cause of Action or Interest; and (4) asserting any right of setoff or subrogation against any obligation due from any of the Exculpated Parties, Released Parties or against their property on account of or in connection with any such Claim, Cause of Action or Interest unless, with respect to setoff, such holder has Filed a motion requesting the right to perform such setoff on or before the Plan Effective Date or Filed a Proof of Claim that asserts or preserves any such right, and until such motion has been granted or the Filed Proof of Claim is Allowed.

Upon entry of the Confirmation Order with respect to the Plan, all holders of Claims and Causes of Action against, and Interests in, any of the Debtors and their respective Related Parties shall be enjoined from taking any actions to interfere with the implementation of the Plan or the Sale Transaction.

70

(b)     <u>Protections Against Discriminatory Treatment</u>

To the maximum extent provided by section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Persons, including all Governmental Units, shall not discriminate against the Reorganized Debtors, Wind-Down Debtor(s), GUC Trustee, as applicable, or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, Wind-Down Debtor(s), or the GUC Trustee, as applicable, or another Person with whom the Reorganized Debtors, Wind-Down Debtor(s), or the GUC Trustee, as applicable, have been associated, solely because the relevant Debtor has been a debtor under chapter 11 of the Bankruptcy Code, was insolvent before the commencement of or during the Debtors' Chapter 11 Cases, or did not pay a debt that is discharged under the Plan.

(c)     <u>Document Retention</u>

On and after the Plan Effective Date, the Reorganized Debtors, the Wind-Down Debtor(s), and the GUC Trustee, as applicable, may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented.

(d)     <u>Term of Injunctions or Stays</u>

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court in effect on the applicable Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Plan Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

(e)     <u>Unknown Claims</u>

The waivers and releases provided in this Plan are intended to include both known and unknown Claims and Causes of Action. The Debtors and the other Releasing Parties understand that they may later discover Claims, Causes of Action or facts that may be different than, or in addition to, those which the Debtors or any other Releasing Party now knows or believes to exist with respect to the Debtors, and which, if known at the Plan Effective Date may have materially affected the decision of the Debtors and any other Releasing Party to enter into it. Nevertheless, the Debtors and the Releasing Parties hereby waive any right, Causes of Action or Claim that might arise as a result of such different or additional Claims, Causes of Action or facts. The Debtors and the Releasing Parties are aware of, read, understand and have been fully advised by their attorneys as to the contents of the provisions of California Civil Code section 1542 and any other similar state, federal or foreign law and hereby expressly waive any and all rights, benefits and protections of such section 1542 and each such other similar law, which provides:

**"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE**

**MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."**

### 5.6    Conditions Precedent to The Plan Effective Date

(a)    Conditions Precedent to the Plan Effective Date

It shall be a condition to the occurrence of the Plan Effective Date that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.B of the Plan:

1.    The Bankruptcy Court shall have approved the Disclosure Statement, which may be approved by the Confirmation Order, with respect to the Plan;

2.    The Confirmation Order approving the Plan is in form and substance reasonably acceptable to the Purchaser and Prepetition Term Loan Agent, the Debtors and the Committee and shall be a Final Order (unless otherwise waived by the Prepetition Term Loan Agent and the Committee) and shall:

(a)    Authorize the Debtors to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan;

(b)    Decree the provisions in the Confirmation Order with respect to the Plan and the Plan to be non-severable and mutually dependent;

(c)    Authorize the Reorganized Debtors, Wind-Down Debtor(s), Plan Administrator and GUC Trustee, as applicable, to: (i) implement the Sale and Restructuring Transactions; (ii) make all distributions required under the Plan, including any Cash, the New Reorganized Debtor Equity, and the GUC Trust Agreement, in each case, as applicable; and (iii) enter into any applicable agreements, transactions, and sales of property as set forth in the Plan Supplement as applicable to the Debtors and the Plan;

(d)    Provide for the Bankruptcy Court's retention of jurisdiction over implementation of the Plan and the issues set forth in Article XI of the Plan; and

(e)    Authorize the implementation of the Plan in accordance with its terms;

3.    The final version of each Definitive Document, including each document contained in the Plan Supplement, to the extent applicable to the Plan (including any exhibits, amendments, modifications, or supplements thereto) shall have been executed or deemed executed and delivered by each party thereto and any conditions precedent related thereto shall have been satisfied or waived by the applicable party or parties, if applicable;

4.      Any and all authorizations, certifications, consents, regulatory approvals, rulings, actions, documents and agreements necessary to implement, consummate and effectuate the applicable Restructuring Transactions shall have been obtained, effected and executed;

5.      In the event of a Reorganized Equity Sale, the New Reorganized Debtor Equity shall have been issued on or immediately before the Plan Effective Date;

6.      The Professional Fee Escrow Account shall have been established and funded in accordance with Article II.B of the Plan;

7.      Any Administrative Expense Claims that are not Assumed Liabilities (except for DIP Claims and Allowed Professional Fee Claims) and are known to the Debtors immediately prior to the Effective Date are paid or otherwise satisfied;

8.      The Debtors, with the consent of the Prepetition Term Loan Agent and the Committee, shall have appointed the Plan Administrator, and the Plan Administrator Agreement and other Plan Administrator Documents shall have been executed and delivered;

9.      The Debtors and the GUC Trustee selected by the Committee shall have executed and delivered the GUC Trust Agreement; and

10.     The Confirmation Order shall have been recognized in the Canadian Proceeding pursuant to Part IV of the *Companies' Creditors Arrangement Act* (Canada) thereby giving full force and recognition to the Confirmation Order in Canada.

(b)     Waiver of Conditions

The conditions to the occurrence of the Plan Effective Date set forth in Article IX of the Plan may be waived by the Debtors, with the prior written consent of the Prepetition Term Loan Agent and the Committee, without notice to, action, or approval of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan.

(c)     Substantial Consummation

Substantial Consummation of the Plan shall be deemed to occur on the Plan Effective Date.

(d)     Effect of Failure of Conditions

If the Consummation of the Plan does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any claims by the applicable Debtor or any other Person, or any Claims or Interests by any holders thereof; (2) prejudice in any manner the rights of each applicable Debtor, any holder of Claims or Interests, or any other Person; or (3) constitute an admission, acknowledgment, offer or undertaking by the applicable Debtors, any holder of Claims or Interests, or any other Person in any respect.

**5.7**    **Modification, Revocation, or Withdrawal of the Plan**

(a)    Modification and Amendments

Except as otherwise specifically provided in the Plan, the Debtors reserve the right, with the prior written consent of the Prepetition Term Loan Agent and the Committee, to (1) modify the Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and (2) subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 (as well as those restrictions on modifications set forth in the Plan), to alter, amend or modify the Plan with respect to any Debtor, one or more times, before or after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend or modify the Plan, or remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan. In accordance with, and to the extent provided by, section 1127 of the Bankruptcy Code, a holder of a Claim that has accepted this Plan shall be deemed to have accepted this Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such holder.

(b)    Effect of Confirmation on Modifications

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation of votes thereon are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation.

(c)    Revocation or Withdrawal of Plan

The Debtors reserve the right to revoke or withdraw the Plan before the Confirmation Date and to File other plan(s) of reorganization. If the Debtors revoke or withdraw the Plan or if Confirmation or Consummation of the Plan does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan, the assumption or rejection of any Executory Contracts or Unexpired Leases under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan or Disclosure Statement shall: (a) constitute a waiver or release of any claims by the applicable Debtor or any other Person, or any Claims or Interests by any holders thereof; (b) prejudice in any manner the rights of each applicable Debtor, any holder of Claims or Interests, or any other Person; or (c) constitute an admission, acknowledgment, offer or undertaking by the applicable Debtors, any holder of Claims or Interests, or any other Person in any respect.

**5.8**    **Retention of Jurisdiction**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Plan Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction after the Plan Effective Date over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.    Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of, any Claim, including the resolution of

any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims;

2.  Decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals;

3.  Resolve any matters related to: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease, the determination of any Claim arising therefrom, including the Cure Amounts, or any other matter related to Executory Contracts and Unexpired Leases; (b) the amending, modifying, or supplementing, after the Plan Effective Date, of the Assumed Executory Contracts and Unexpired Leases List; and (c) any dispute regarding whether a contract or lease is or was executory, expired, or terminated;

4.  Ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

5.  Adjudicate, decide, or resolve any motions, adversary proceedings, contested or any other matters, and grant or deny any applications pending on the Plan Effective Date or filed thereafter, including any Equityholder Litigation Claims commenced in the Bankruptcy Court;

6.  Adjudicate, decide, or resolve any and all matters related to sections 1141, 1145, and 1146 of the Bankruptcy Code;

7.  Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and of all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, including the documents comprising the Plan Supplement;

8.  Resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with Consummation or otherwise, including interpretation or enforcement of the Plan, any Person's obligations incurred in connection with the Plan, or, as applicable, the Purchase Agreement;

9.  Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Person with Consummation or enforcement of the Plan;

10. Resolve any cases, controversies, suits, disputes or Causes of Action with respect to the releases, injunctions, exculpations, and other provisions contained in Article VIII of the Plan, and enter such orders as may be necessary or appropriate to enforce or implement such releases, injunctions, exculpations, and other provisions;

11. Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

12. Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan;

13. Adjudicate any and all disputes arising from or relating to distributions under the Plan;

14. Consider any modifications of the Plan to cure any defect or omission or to reconcile any inconsistency in the Confirmation Order;

15. Determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

16. Hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, or the Restructuring Transactions, including disputes arising under agreements, documents, or instruments executed in connection with the Plan or the Restructuring Transactions, whether they arise before, on or after the Plan Effective Date;

17. Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

18. Enforce and interpret all orders entered by the Bankruptcy Court in the Chapter 11 Cases;

19. Hear any other matter not inconsistent with the Bankruptcy Code; and

20. Enter an order or final decree closing any of the Chapter 11 Cases.

**ARTICLE VI**
**EVENTS DURING THE CHAPTER 11 CASES**

**6.1    Commencement of the Chapter 11 Cases and First Day Pleadings**

In accordance with the RSA, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code on May 19, 2024. The filing of the petitions commenced the Chapter 11 Cases, at which time the Debtors were afforded the benefits, and became subject to the limitations, of the Bankruptcy Code. The Debtors have continued, and intend to continue, to operate their business in the ordinary course during the pendency of the Chapter 11 Cases as they have prior to the Petition Date.

To facilitate a prompt and efficient restructuring through the Chapter 11 Cases, the Debtors filed, on the Petition Date, a motion seeking to have the Chapter 11 Cases administered jointly. The Debtors also filed on the Petition Date several motions seeking various forms of relief from the Bankruptcy Court.

Hearings on First Day Pleadings were held on May 21, 2024 (the "First Day Hearing"). The Bankruptcy Court granted several of the "first day" motions on a final basis at the First Day Hearing, while granting interim approval for the remainder. The relief granted by the Bankruptcy Court has ensured a seamless transition between the Debtors' prepetition and postpetition business operations, facilitated a smooth reorganization through the Chapter 11 Cases, and minimized disruptions to the Debtors' operations.

The following is a brief overview of the relief that the Bankruptcy Court granted or indicated it would grant to the Debtors to maintain their operations in the ordinary course.

(a)    Debtor in Possession Financing and Cash Collateral Usage

The Debtors required immediate access to cash collateral and $100 million of new money DIP financing to preserve and maximize the value of their assets as they sought to expeditiously confirm and consummate the Plan. On the Petition Date, the Debtors sought authority from the Bankruptcy Court to, among other things, use the Cash Collateral of the DIP Secured Parties and to grant those lenders adequate protection for the use of the Cash Collateral, as well as to incur DIP financing in the amount of $100 million of new money and $175 million of rolled-up prepetition indebtedness pursuant to the terms of that DIP financing. [Docket No. 79] (the "DIP Motion"). The Bankruptcy Court entered an interim order [Docket No. 127] and a final order [Docket No. 393] granting the requested relief. The Cash Collateral and proceeds of DIP financing have been used for operations during and for the expenses of the Chapter 11 Cases.

(b)    Cash Management System

The Debtors maintain a centralized cash management system designed to receive, monitor, aggregate, and distribute cash. On the Petition Date, the Debtors sought authority from the Bankruptcy Court to continue the use of their existing cash management system, bank accounts, and related business forms to avoid a disruption in the Debtors' operations and facilitate the efficient administration of the Chapter 11 Cases. The Bankruptcy Court entered an interim order [Docket No. 126] and a final order [Docket No. 394] granting the requested relief.

(c)    Taxes

To minimize any disruption to the Debtors' operations and ensure the efficient administration of the Chapter 11 Cases, on the Petition Date, the Debtors sought authority from the Bankruptcy Court to pay all taxes, fees, and similar charges and assessments that arose prepetition, including any such amounts that become due and owing postpetition, to the appropriate taxing, regulatory, or other governmental authority in the ordinary course of the Debtors' business. The Bankruptcy Court entered an interim order [Docket No. 155] and a final order [Docket No. 383] granting the requested relief.

(d)      Utilities

In the ordinary course of business, the Debtors incur certain expenses related to essential utility services that enable the Debtors to operate each of their restaurant locations and other facilities. Accordingly, on the Petition Date, the Debtors sought (i) authority from the Bankruptcy Court to continue payments to such utility providers in the ordinary course and (ii) approval of procedures to provide such utility providers with adequate assurance that the Debtors will continue to honor the Debtors' obligations in the ordinary course. The Bankruptcy Court entered the final order [Docket No. 139] granting the requested relief.

(e)      Wages

The Debtors' employ approximately 36,000 employees which includes employees and independent contractors. Without the workforce's continued, uninterrupted services, the Debtors cannot continue to operate in a chapter 11 proceeding. The Debtors incur a number of obligations to, or on account of, their employees including those related to compensation and benefits. Accordingly, on the Petition Date, the Debtors sought authority from the Bankruptcy Court to (i) pay prepetition wages, salaries, reimbursable expenses, and other obligations in the ordinary course of business, and (ii) continue the same compensation and benefit programs during the pendency of the Chapter 11 Cases. The Bankruptcy Court entered an interim order [Docket No. 125] and a final order [Docket No. 382] granting the requested relief.

(f)      503(b)(9)

The Debtors' operation of restaurants is dependent upon vendors, suppliers, and distributors to provide the Debtors with certain perishable and nonperishable inventory and other goods. Failure to pay those vendors would have resulted in certain vendors refusing to do business with the Debtors. Accordingly, on the Petition Date, the Debtors sought authority from the Bankruptcy Court to (i) pay in the ordinary course of business prepetition amounts owed to certain vendors solely for goods delivered to the Debtors within twenty (20) days of the Petition Date and whose prepetition claims are thus entitled to administrative expense priority status under section 503(b)(9) of the Bankruptcy Code; and (ii) confirm administrative expense priority status for all undisputed obligations of the Debtors arising out of outstanding orders for goods not yet delivered as of the Petition Date. The Bankruptcy Court entered the final order [Docket No. 192] granting the requested relief.

(g)      Lien Claimant

The Debtors retain vendors to perform a number of services, including construction, installation, maintenance, servicing, delivery and/or storage of equipment, facilities, supplies, and products that are essential to the Debtors' restaurant enterprise, including warehousing of a subset of Debtors' inventory. The Debtors are also responsible for covering the costs of improvements and repairs to their properties while also relying upon vendors to service certain of their equipment used in the operation of their business. Accordingly, on the Petition Date, the Debtors sought authority to pay in the ordinary course of business, in their sole direction and based on their sound business judgment, prepetition amounts owed to Lien Claimants. The Bankruptcy Court entered the final order [Docket No. 163] granting the requested relief.

(h)    <u>Insurance</u>

The maintenance of certain insurance coverage is essential to the Debtors' operations and is required by various laws and regulations, as well as certain financing agreements, and other contracts. The Debtors believe that the satisfaction of their obligations relating to their insurance policies, whether arising pre- or postpetition, is necessary to maintain the Debtors' relationships with their insurance providers and ensure the continued availability and commercially reasonable pricing of such insurance coverage. Accordingly, on the Petition Date, the Debtors sought authority from the Bankruptcy Court to continue to pay insurance obligations that arose prepetition and to honor their obligations under their existing policies and programs in the ordinary course postpetition. The Bankruptcy Court entered the final order [Docket No. 151] granting the requested relief.

(i)    <u>Customer Programs</u>

As owners, operators or franchisors of hundreds of restaurants across the United States and around the globe, to attract new customers, the Debtors employ certain programs, promotions, and practices. The Customer Programs promote customer satisfaction and inure to the goodwill of the Debtors' business and the value of their brand. Maintaining the goodwill of their customers is critical to the Debtors' ongoing operations in these Chapter 11 Cases and necessary to maximize the value for the benefit of all of the Debtors' stakeholders. Accordingly, on the Petition Date, the Debtors sought authority to (i) continue, renew, replace, implement or terminate customer-related programs, promotions, and practices, and (ii) pay and otherwise honor the obligations thereunder, whether arising prior to or after the Petition Date, in each case as they deem appropriate and in the ordinary course of business and consistent with past practices. The Bankruptcy Court entered the final order [Docket No. 136] granting the requested relief.

(j)    <u>First and Second Lease Rejection Motions</u>

The Debtors are lessees of non-residential real estate, who have ceased operations at the subject premises and are no longer occupying and deriving any benefit from the use of such restaurants. By closing nearly 100 restaurant locations in the weeks leading up to the Petition Date, the Debtors were able to reject certain unexpired leases. Accordingly, on the Petition Date, the Debtors sought authority to (i) reject certain unexpired leases of non-residential property and (ii) abandon any personal property of the Debtors and (iii) fix a bar date for claims, if any, of the counterparties to each rejected lease. The Bankruptcy Court entered orders [Docket No. 159, 160] granting the requested relief.

(k)    <u>Zurich Insurance Program Motion</u>

The Debtors maintain numerous insurance policies which are essential to the preservation of the value of the Debtors' business, property, and assets. The applicable agreements for the Existing Insurance Program and the New Insurance Program with Zurich required that the Debtors must file the Zurich Motion as the current insurance program was set to expire on June 30, 2024 at 12:01 a.m. Failure to renew the insurance program would have left the Debtors without coverage. Accordingly, on the Petition Date the Debtors filed a motion seeking to renew the Zurich

insurance policies and the Bankruptcy Court granted the requested relief on a final basis [Docket No. 154].

## 6.2    Other Procedural Motions and Retention of Professionals

The Debtors filed several other motions that are common to chapter 11 proceedings of similar size and complexity as the Chapter 11 Cases, including applications to retain various professionals to assist the Debtors in the Chapter 11 Cases.

The following is a brief overview of the relief that the Bankruptcy Court granted or indicated it would grant to the Debtors to maintain their operations in the ordinary course.

(a)    Alvarez & Marsal North America, LLC

The Debtors retained Alvarez & Marsal North America, LLC to designate Jonathan Tibus as chief executive officer, Nicholas Haughey as chief restructuring officer and provide certain additional personnel to assist in a financial advisory capacity. With the size and complexity of the business, the Debtors determined that the services of experienced restructuring managers would substantially enhance their attempts to maximize the value of the estates. The Bankruptcy Court entered the order [Docket No. 384] authorizing the retention of Alvarez & Marsal North America, LLC.

(b)    Epiq Corporate Restructuring, LLC

The Debtors have over 100,000 potential creditors and interested parties in the current Chapter 11 Cases. With the magnitude of Debtors' creditor body, the United States Bankruptcy Court for the Middle District of Florida would have faced a significant burden to undertake the task of serving notices. To relieve the Court of such burden, the Debtors engaged Epiq Corporate Restructuring, LLC to act as the Debtors' notice, claims and solicitation agent. This would be the most effective and efficient manner of providing notice to the thousands of creditors and parties in interest of the filing of these Chapter 11 Cases and future developments. The Bankruptcy Court entered the order [Docket No. 156] authorizing the retention of Epiq Corporate Restructuring LLC.

(c)    Berger Singerman LLP

The Debtors retained Berger Singerman LLP as co-counsel in these Chapter 11 Cases. The attorneys at Berger Singerman LLP are licensed to practice in the Middle District of Florida and are qualified to advise the Debtors on their relations with, and responsibilities to, the creditors and other interested parties. The Bankruptcy Court entered the order [Docket No. 385] authorizing the retention of Berger Singerman LLP.

(d)    King & Spalding LLP

The Debtors retained King & Spalding LLP as co-counsel in these Chapter 11 Cases. King & Spalding LLP is an international law firm that offers certain legal services to the Debtors in connection with its financial and operational restructuring. The Bankruptcy Court entered the order [Docket No. 387] authorizing the retention of King & Spalding LLP.

(e)    Hilco Corporate Finance

The Debtors retained Hilco Corporate Finance as their investment banker to assist them in the critical tasks associated with guiding the Debtors through these Chapter 11 Cases. An investment banker is required to enable the Debtors to assist the Debtors in facilitating a robust marketing and sale process and in assisting in market-testing possible DIP financing options. The Bankruptcy Court entered the order [Docket No. 392] authorizing the retention of Hilco Corporate Finance.

(f)    Blake, Cassels & Graydon LLP

The Debtors retained Blakes, Cassels & Graydon LLP as special counsel for providing the Debtors with Canadian legal advice in connection with these Chapter 11 Cases, including the filing of an application for recognition under Part IV of the Companies' Creditors Arrangement Act. The Bankruptcy Court entered the order [Docket No. 391] authorizing the retention of Blake, Cassels & Graydon LLP.

(g)    Keen-Summit Capital Partners LLC

With the magnitude of leases related in these Chapter 11 Cases, Keen-Summit Capital Partners LLC was retained to advise and assist the Debtors with negotiating rent reductions, lease term modifications, lease terminations, other leasehold concessions and the disposition of leases. Keen-Summit Capital Partners LLC is a real estate brokerage and workout and advisory firm that has extensive experience in representing debtors and owners of distressed real estate assets in bankruptcy proceedings and other distressed and insolvency proceedings. The Bankruptcy Court entered the order [Docket No. 390] authorizing the retention of Keen-Summit Capital Partners LLC.

**ARTICLE VII**
**CERTAIN FACTORS TO BE CONSIDERED**

**PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS THAT ARE ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CAREFULLY CONSIDER THE FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.**

**ALTHOUGH THESE RISK FACTORS ARE MANY, THESE FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESS OR THE PLAN AND ITS IMPLEMENTATION.**

**7.1    General**

The following provides a summary of various important considerations and risk factors associated with the Plan; however, it is not exhaustive. In considering whether to vote to accept or reject the Plan, holders of Claims should read and carefully consider the factors set forth below, as

81

well as all other information set forth or otherwise incorporated by reference in this Disclosure Statement.

## 7.2    Risks Relating to the Plan and Other Bankruptcy Law Considerations

(a)    The Debtors Cannot Predict the Amount of Time Spent in Bankruptcy for the Purpose of Implementing the Plan, and a Lengthy Bankruptcy Proceeding Could Disrupt the Debtors' Business, as Well as Impair the Prospect for Reorganization on the Terms Contained in the Plan

It is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy, and the Debtors cannot be certain that the Plan will be confirmed. Even if confirmed on a timely basis, a bankruptcy proceeding to confirm the Plan could itself have an adverse effect on the Debtors' business. There is a risk, due to uncertainty about the Debtors' future that, among other things, suppliers, vendors, or other business partners could terminate their relationship with the Debtors or demand financial assurances or enhanced performance, any of which could impair the Debtors' prospects.

A lengthy bankruptcy proceeding also would involve additional expenses and divert the attention of management from the operation of the Debtors' business.

Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

The disruption that the bankruptcy process would have on the Debtors' business could increase with the length of time it takes to complete the Chapter 11 Cases. If the Debtors are unable to obtain Confirmation of the Plan on a timely basis, because of a challenge to the Plan or otherwise, the Debtors may be forced to operate in bankruptcy for an extended period of time while they try to develop a different plan of reorganization that can be confirmed. A protracted bankruptcy case could increase both the probability and the magnitude of the adverse effects described above.

(b)    Risk of Non-Occurrence of the Plan Effective Date

Although the Debtors believe that the Plan Effective Date will occur expeditiously following the Confirmation Date, there can be no assurance as to such timing or as to whether the Plan Effective Date will, in fact, occur. If such conditions precedent are not waived or met, the Plan Effective Date will not occur and the Plan will not be consummated.

13153938-3

      (c)      <u>If the Debtors Do Not Complete the Restructuring Transactions, They May Seek Restructuring Alternatives That Result in Less Value to Holders of Claims Than They Would Receive Pursuant to the Plan</u>

If the Debtors do not consummate the Restructuring Transactions, they may pursue an alternative plan or plans of reorganization. There can be no assurance that the Debtors would be able to effect any such alternative plan of reorganization or that any such alternative plan of reorganization would be on terms as favorable to the holders of Claims as the terms of the restructuring pursuant to the Plan. In addition, the Debtors' creditors may take certain legal actions against the Debtors, which could include foreclosure or liquidation of the Debtors' assets. If a liquidation or protracted reorganization of the Debtors were to occur, there is a substantial risk that the value of the Debtors' assets would be eroded to the detriment of all stakeholders.

      (d)      <u>The Bankruptcy Court May Dismiss Some or All of the Chapter 11 Cases</u>

Certain parties in interest may contest the Debtors' authority to commence and/or prosecute the Chapter 11 Cases. If, pursuant to any such proceeding, the Bankruptcy Court finds that some or all of the Debtors could not commence the Chapter 11 Cases for any reason, the Debtors may be unable to consummate the transactions contemplated by the RSA and the Plan. If some or all of the Chapter 11 Cases are dismissed, the Debtors may be forced to cease operations due to insufficient funding and/or liquidate their business in another forum to the detriment of all parties in interest.

      (e)      <u>A Holder of a Claim or Interest May Object to, and the Bankruptcy Court May Disagree with, the Debtors' Classification of Claims and Interests</u>

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Classes of Claims and Interests are substantially similar to the other Claims and Interests in each such Class. Nevertheless, a holder of a Claim or Interest could challenge the Debtors' classification. In such an event, the cost of the Chapter 11 Cases and the time needed to confirm the Plan may increase, and there can be no assurance that the Bankruptcy Court will agree with the Debtors' classification. If the Bankruptcy Court concludes that the classification of Claims and Interests under the Plan does not comply with the requirements of the Bankruptcy Code, the Debtors may need to modify the Plan. Such modification could require re-solicitation of votes on the Plan. The Plan may not be confirmed if the Bankruptcy Court determines that the Debtors' classification of Claims and Interests is not appropriate.

      (f)      <u>The Debtors May Not Be Able to Satisfy the Voting Requirements for Confirmation of the Plan</u>

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors may seek Confirmation, as promptly as practicable thereafter. Under the terms of the RSA, the holders of Class 3 and 4 Claims have agreed to vote in favor of the Plan. Nevertheless, if the RSA is properly terminated by the Prepetition Term Loan Lenders, such

holders may be freed of their obligation to vote in favor of the Plan. If the Plan does not receive the required support from Class 3 or Class 4, the Debtors may elect to, among other things, amend the Plan or seek an alternative restructuring transaction under chapter 11 of the Bankruptcy Code. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the holders of Allowed Claims and Allowed Interests as the Restructuring Transactions contemplated by the Plan.

       (g)    <u>The Support of the Prepetition Term Loan Lenders Is Subject to the Terms of the RSA, Which Is Subject to Termination in Certain Circumstances</u>

Pursuant to the RSA, the Prepetition Term Loan Lenders have agreed to support the Restructuring Transactions set forth in the Plan. Nevertheless, the RSA is subject to termination upon the occurrence of certain termination events set forth therein. Accordingly, the RSA may be terminated after the date of this Disclosure Statement, and such a termination would present a material risk to Confirmation and/or Consummation of the Plan because the Plan may no longer have the support of creditors holding Claims in number and amount sufficient to obtain Confirmation the Plan and could result in the loss of use of cash collateral by the Debtors under certain circumstances. Any such loss of support could adversely affect the Debtors' ability to confirm and consummate the Plan.

       (h)    <u>The Bankruptcy Court May Not Confirm the Plan</u>

The Debtors cannot assure you that the Plan will be confirmed by the Bankruptcy Court. Section 1129 of the Bankruptcy Code, which sets forth the requirements for confirmation of a plan of reorganization, requires, among other things, a finding by the Bankruptcy Court that the plan of reorganization is "feasible," that all claims and interests have been classified in compliance with the provisions of section 1122 of the Bankruptcy Code, and that, under the plan of reorganization, each holder of a claim or interest within each impaired class either accepts the plan of reorganization or receives or retains Cash or property of a value, as of the date the plan of reorganization becomes effective, that is not less than the value such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code. With respect to impaired classes of claims or interests that do not accept a plan of reorganization, section 1129(b) requires such plan be fair and equitable (including, without limitation the "absolute priority rule") and not discriminate unfairly with respect to such classes. There can be no assurance that the Bankruptcy Court will conclude that the feasibility test and other requirements of section 1129 of the Bankruptcy Code (including, without limitation, finding that the Plan satisfies the "new value" exception to the absolute priority rule, if applicable) have been met with respect to the Plan. If and when the Plan is filed with the Bankruptcy Court, there can be no assurance that modifications to the Plan would not be required in order to obtain Confirmation, or that such modifications would not require a re-solicitation of votes on the Plan.

If the Plan is not confirmed, the Chapter 11 Cases may be converted into cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a chapter 7 liquidation would have on the recoveries of holders of Claims and Interests and the Debtors' analysis thereof are set forth in the unaudited Liquidation Analysis, attached hereto as **<u>Exhibit B</u>**. The Debtors believe that liquidation

under chapter 7 of the Bankruptcy Code would result in, among other things, smaller distributions being made to holders of Claims and Interests than those provided for in the Plan because of:

1. the potential absence of a market for the Debtors' assets on a going concern basis;

2. additional administrative expenses involved in the appointment of a chapter 7 trustee; and

3. additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation and from the rejection of Unexpired Leases and other Executory Contracts in connection with a cessation of the Debtors' operations.

(i) <u>The Debtors May Object to the Amount or Classification of a Claim</u>

Except as otherwise provided in the RSA, DIP Order and/or Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied upon by any holder of a Claim where such Claim is subject to an objection. Any holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

(j) <u>Nonconsensual Confirmation</u>

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es). The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

(k) <u>Continued Risk Upon Confirmation</u>

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further deterioration or other changes in economic conditions, changes in the industry, potential revaluing of their assets due to the Chapter 11 Cases, changes in consumer discretionary spending (and thus demand for the services the Debtors provide), changes in the regulatory environment, and increasing expenses. *See* <u>Article 7.3</u> of this Disclosure Statement, entitled "<u>Risks Related to the Business of the Debtors</u>," which begins on page 89. Some of these concerns and effects typically become more acute when a chapter 11 case continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

Furthermore, even if the Debtors' debts are reduced and/or discharged through the Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' business after the completion of the proceedings related to the Chapter 11 Cases. Adequate funds may not be available when needed or may not be available on favorable terms.

     (l)    Contingencies May Affect Distributions to Holders of Allowed Claims

The distributions available to holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

     (m)    Even if the Debtors Receive All Necessary Acceptances for the Plan to Become Effective, the Debtors May Fail to Meet All Conditions Precedent to Effectiveness of the Plan

Although the Debtors believe that the Plan Effective Date would occur expeditiously following the Confirmation Date, there can be no assurance as to such timing.

The Confirmation and consummation of the Plan are subject to certain conditions that may or may not be satisfied. Specifically, a failure by the Debtors to meet certain Milestones set forth in the RSA, including dates for concluding a sale process and achieving confirmation of the Plan, would result in the loss of DIP financing from the lenders. The Debtors cannot assure you that all requirements for Confirmation and effectiveness required under the Plan will be satisfied, including meeting the certain Milestones. If each condition precedent to Confirmation is not met or waived, the Plan will not be confirmed, and if each condition precedent to Consummation is not met or waived, the Plan Effective Date will not occur. In the event that the Plan is not confirmed or is not consummated, the Debtors may seek Confirmation of an alternative plan of reorganization.

     (n)    The United States Trustee or Other Parties May Object to the Plan on Account of the Debtor Releases, Third-Party Releases, Exculpations, or Injunction Provisions

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party claims that may otherwise be asserted against the Debtors, Reorganized Debtors, Wind-Down Debtors, or Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain Released Parties may withdraw their support for the Plan.

The releases provided to the Released Parties and the exculpation provided to the Exculpated Parties are necessary to the success of the Debtors' reorganization because the Released Parties and Exculpated Parties have made significant contributions to the Debtors' reorganizational efforts that are important to the success of the Plan and have agreed to make further contributions, including by agreeing to massive reductions in the amounts of their Claims against the Debtors'

Estates and facilitating a critical source of post-emergence liquidity, but only if they receive the full benefit of the Plan's release and exculpation provisions.

Any party in interest, including the U.S. Trustee, could object to the Plan, including with respect to the (i) Debtor release contained in <u>Article VIII.A.2</u> of the Plan, (ii) third-party releases contained in <u>Article VIII.A.3</u> of the Plan, (iii) exculpation contained in <u>Article VIII.A.4</u> of the Plan, or (iv) the injunction contained in <u>Article VIII.A.5</u> of the Plan. Although the Debtors would certainly oppose any such objection, in response to such an objection, the Bankruptcy Court could determine that any of these provisions are not valid under the Bankruptcy Code. If the Bankruptcy Court makes such a determination, the Plan could not be confirmed without modifying the Plan to alter or remove the applicable provision. This determination could result in substantial delay in Confirmation of the Plan, the Plan not being confirmed at all, the loss of support for the Plan from the parties to the RSA, or certain Released Parties may withdraw their support for the Plan.

(o)     <u>The Debtors May Seek To Amend, Waive, Modify, or Withdraw the Plan at Any Time Prior to Confirmation</u>

The Debtors reserve the right, in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the RSA, and consistent with the terms of the Plan, to amend the terms of the Plan, with the prior written consent of the Prepetition Term Loan Agent, or waive any conditions thereto if and to the extent such amendments or waivers are consistent with the terms of the RSA and necessary or desirable to consummate the Plan. The potential impact of any such amendment or waiver on the holders of Claims and Interests cannot presently be foreseen but may include a change in the economic impact of the Plan on some or all of the proposed Classes or a change in the relative rights of such Classes. All holders of Claims and Interests will receive notice of such amendments or waivers required by applicable law and the Bankruptcy Court. If, after receiving sufficient acceptances, but prior to Confirmation of the Plan, the Debtors seek to modify the Plan, the previously solicited acceptances will be valid only if (i) all classes of adversely affected creditors and interest holders accept the modification in writing, or (ii) the Bankruptcy Court determines, after notice to designated parties, that such modification was *de minimis* or purely technical or otherwise did not adversely change the treatment of holders of accepting Claims and Interests or is otherwise permitted by the Bankruptcy Code.

(p)     <u>The Plan May Have Material Adverse Effects on the Debtors' Operations</u>

The solicitation of acceptances of the Plan and commencement of the Chapter 11 Cases could adversely affect the relationships between the Debtors and their respective vendors, partners, and other parties. Such adverse effects could materially impair the Debtors' operations.

(q)     <u>The Debtors' Business May Be Negatively Affected if the Debtors Are Unable to Assume (or Assume and Assign) Their Executory Contracts</u>

An executory contract is a contract as to which performance remains due to some extent by both contract parties. The Debtors intend to preserve as much of the benefit of their existing Executory Contracts and Unexpired Leases as possible. However, if the Debtors are unable for any reason to assume their Executory Contracts and Unexpired Leases as of the Plan Effective Date,

then they would be required to either forego the benefits offered by such contracts or to find alternative arrangements to replace them.

      (r)      <u>Material Transactions Could Be Set Aside as Fraudulent Conveyances or Preferential Transfers</u>

Certain payments received by stakeholders prior to the bankruptcy filing could be challenged under applicable debtor/creditor or bankruptcy laws as either a "fraudulent conveyance" or a "preferential transfer." A fraudulent conveyance occurs when a transfer of a debtor's assets is made with the intent to defraud creditors or in exchange for consideration that does not represent reasonably equivalent value to the property transferred. A preferential transfer occurs upon a transfer of property of the debtor while the debtor is insolvent for the benefit of a creditor on account of an antecedent debt owed by the debtor that was made on or within ninety (90) days before the petition date or one year before the petition date, if the creditor, at the time of such transfer, was an insider. If any transfer were challenged in the Bankruptcy Court and found to have occurred with regard to any of the Debtors' material transactions, the Bankruptcy Court could order the recovery of all amounts received by the recipient of the transfer. Notwithstanding the above, the Debtors do not believe they have made any transactions that constitute a fraudulent conveyance, preference, or would otherwise be subject to avoidance under the Bankruptcy Code, and, to the extent there are any such transactions, in the event the Stalking Horse Purchaser acquires the Debtors' assets or equity, the Stalking Horse Purchaser has agreed to waive any such actions against trade creditors.

      (s)      <u>Certain Claims May Not Be Discharged and Could Have a Material Adverse Effect on the Debtors' Financial Condition and Results of Operations</u>

The Bankruptcy Code provides that the confirmation of a plan of reorganization discharges a debtor from substantially all debts arising prior to confirmation. With few exceptions, all Claims that arise prior to the Petition Date or before Confirmation of the Plan (i) would be subject to compromise and/or treatment under the Plan and/or (ii) would be discharged in accordance with the terms of the Plan. Any Claims not ultimately discharged through the Plan could be asserted against the applicable Reorganized Debtors and may have an adverse effect on the Reorganized Debtors' financial condition and results of operations on a post-reorganization basis.

      (t)      <u>The Debtors Will Be Subject to Business Uncertainties and Contractual Restrictions Prior to the Plan Effective Date</u>

Uncertainty about the effects of the Plan on third parties may have an adverse effect on the Debtors. These uncertainties could cause vendors and others that deal with the Debtors to defer entering into contracts with the Debtors or making other decisions concerning the Debtors or seek to change existing business relationships with the Debtors.

      (u)      <u>Certain Tax Implications of the Plan</u>

Holders of Allowed Claims should carefully review <u>Article IX</u> of this Disclosure Statement entitled "<u>Certain Tax Consequences of the Plan</u>" which begins on page 97, to determine how the tax implications of the Plan and the Chapter 11 Cases may affect the Debtors, the Reorganized

Debtors, and holders of Claims, as well as certain tax implications of owning and disposing of the consideration to be received pursuant to the Plan.

(v)     Necessary Approvals May Not Be Granted

To complete a restructuring, the Debtors' may require certain approvals by governmental authorities, regulatory bodies, and third parties. The Debtors' inability to obtain such approvals could prevent consummation of the Plan.

**7.3     Risks Related to the Business of the Debtors**

(a)     The Debtors May Not Be Able to Repay or Refinance All of Their Post-Plan Effective Date Indebtedness

The Debtors' ability to repay or refinance their post-Plan Effective Date debt obligations depends on their financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Debtors' control. The Debtors may be unable to maintain a level of cash flow from operating activities sufficient to permit the Debtors to repay or refinance their post-Plan Effective Date indebtedness.

(b)     Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Business

The Debtors' future results will be dependent upon the successful confirmation and implementation of the Plan. A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Debtors' business, financial condition, results of operations, and liquidity. So long as the proceedings related to the Chapter 11 Cases continue, management will be required to spend a significant amount of time and effort dealing with the reorganization instead of focusing exclusively on business operations. In addition, the longer the proceedings related to the Chapter 11 Cases continue, the more likely it is that customers and suppliers will lose confidence in the Debtors' ability to reorganize their business successfully and will seek to establish alternative commercial relationships.

So long as the proceedings related to the Chapter 11 Cases continue, the Debtors may be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases. If the Chapter 11 Cases last longer than anticipated, the Debtors may require additional debtor in possession financing to fund the Debtors' operations. If the Debtors are unable obtain such financing if those circumstances arise, the chances of successfully reorganizing the Debtors' business may be seriously jeopardized, the likelihood that the Debtors will instead be required to liquidate or sell their assets may be increased, and, as a result, creditor recoveries may be significantly impaired.

Furthermore, the Debtors cannot predict the ultimate amount of all settlement terms for the liabilities that will be subject to a plan of reorganization. Even after a plan of reorganization is approved and implemented, Debtors' operating results may be adversely affected by the possible reluctance of prospective lenders and other counterparties to do business with a company that recently emerged from bankruptcy protection.

(c)    <u>Financial Results May Be Volatile and May Not Reflect Historical Trends</u>

During the Chapter 11 Cases, the Debtors expect that their financial results will continue to be volatile as restructuring activities and expenses, contract terminations and rejections, and/or claims assessments significantly impact the Debtors' consolidated financial statements. As a result, the Debtors' historical financial performance likely will not be indicative of their financial performance after the Petition Date.

In addition, if the Debtors emerge from chapter 11, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization. The Debtors also may be required to adopt "fresh start" accounting in accordance with Accounting Standards Codification 852, in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets. The Debtors' financial results after the application of fresh start accounting also may be different from historical trends.

(d)    <u>The Market Value of the Debtors' Restaurant Business May Decrease</u>

The fair market values of the Red Lobster brand that the Debtors currently own and operate may increase or decrease depending on a number of factors, many of which are beyond the Debtors' control, including the general economic and market conditions affecting the seafood and restaurant industry sectors.

(e)    <u>The Debtors May Experience Operational Disruptions or Cost Increases Related to Their Supply Chain, Labor, or Other Causes</u>

In addition, the Debtors rely on certain third parties to provide supplies and services necessary for their restaurant business, including, but not limited to, foodservice inventory as well as the Debtors' workforce to operate the restaurant locations. The failure of these suppliers to provide the materials or for the Debtors to maintain the necessary human resources required to operate the restaurant business could result in an operational disruption, leading to lost revenue. Further, because the Debtors primarily sell seafood, increased market prices and/or supply chain problems could increase their operational expenses and reduce their profitability.

(f)    <u>The Debtors' Business is Subject to Numerous Governmental Laws and Regulations That May Impose Significant Costs and Liabilities on the Debtors</u>

The Debtors' operations are subject to federal, state, and local laws and regulations that may, among other things, require them to obtain and maintain specific permits or other governmental approvals. Failure to comply with these laws and regulations may result in the assessment of financial penalties, the imposition of remedial obligations, the denial or revocation of permits or other authorizations, and the issuance of injunctions that may limit or prohibit some or all of the Debtors' operations. The application of these laws and regulations, the modification of these laws or regulations, or the adoption of new laws or regulations could materially limit future opportunities or materially increase the Debtors' costs, including their capital expenditures.

13153938-3

(g)      Any Significant Cyber-Attack or Interruption in Network Security Could Materially and Adversely Disrupt and Affect the Debtors' Operations and Business

Like all businesses, the Debtors have become increasingly dependent upon digital technologies to conduct and support their operations, and they rely on their operational and financial computer systems to conduct almost all aspects of their business. Threats to the Debtors' information technology systems associated with cybersecurity risks and incidents or attacks continue to grow. Any failure of the Debtors' computer systems, or those of their clients, vendors, or others with whom they do business, could materially disrupt their operations and could result in the corruption of data or unauthorized release of proprietary, confidential or consumer data concerning the Debtors, their business operations and activities, or customers. Computers and other digital technologies could become impaired or unavailable due to a variety of causes, including, among others, theft, cyber-attack, design defects, terrorist attacks, utility outages, human error, or complications encountered as existing systems are maintained, repaired, replaced, or upgraded. Any cyber-attack or interruption could have a material adverse effect on the Debtors' financial position, results of operations or Cash flows, and their reputation.

(h)      The Debtors' Insurance May Not be Adequate in the Event of a Catastrophic Loss

Losses caused by the occurrence of a significant event against which the Debtors are not fully insured or caused by a number of lesser events against which the Debtors are insured but are subject to substantial deductibles, aggregate limits and/or self-insured amounts, could materially increase the Debtors' costs and impair their profitability and financial position. Their policy limits for property, casualty, liability, and business interruption insurance, including coverage for severe weather, terrorist acts, war, or civil disturbances, may not be adequate should a catastrophic event occur related to their property or equipment, or the Debtors' insurers may not have adequate financial resources to sufficiently or fully pay related claims or damages. When any of the Debtors' coverage expires, adequate replacement coverage may not be available, offered at reasonable prices, or offered by insurers with sufficient financial resources.

(i)      Any Default by Customers or Other Counterparties Could Have a Material Adverse Effect on the Debtors' Results of Operations and Financial Condition

The Debtors are exposed to the risk that counterparties that owe them money or could breach their obligations. Should the counterparties to these arrangements fail to perform, the Debtors may be forced to enter into alternative arrangements at then-current market prices that may exceed their contractual prices, which would cause their financial results to be diminished, and they might incur losses. Although the Debtors' estimates take into account the expected probability of default by a counterparty, the Debtors actual exposure to a default by customers or other counterparties may be greater than the estimates predict, which could have a material adverse effect on the Debtors' results of operations and financial condition.

**7.4     Disclosure Statement Disclaimer**

(a)      Information Contained Herein Is Solely for Soliciting Votes

The information contained in this Disclosure Statement is for the purpose of soliciting acceptances of the Plan and may not be relied upon for any other purpose. Specifically, this

Disclosure Statement is not legal advice to any Person or entity. The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each reader should consult its own legal counsel and accountant with regard to any legal, tax, and other matters concerning its Claim. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote to accept or reject the Plan and whether to object to Confirmation.

(b)     Disclosure Statement May Contain Forward-Looking Statements

This Disclosure Statement may contain "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995, as amended. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward-looking terminology such as "may," "expect," "anticipate," "estimate," or "continue," the negative thereof, or other variations thereon or comparable terminology.

The Debtors consider all statements regarding anticipated or future matters, including the following, to be forward-looking statements:

1.     any future effects as a result of the filing or pendency of the Chapter 11 Cases;

2.     the Debtors' future liquidity position and future efforts to improve its liquidity position;

3.     revenue efficiency levels;

4.     market outlook;

5.     forecasts of trends;

6.     expected capital expenditures;

7.     projected costs and savings;

8.     the Debtors' business strategies and plans or objectives of management; and

9.     future contract rates.

Statements concerning these and other matters are not guarantees of the Debtors' future performance. The reader is cautioned that all forward-looking statements are necessarily speculative. The Liquidation Analysis and other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to holders of Allowed Claims may be affected by many factors that cannot be predicted. Forward-looking statements represent the Debtors' estimates and assumptions only as of the date such statements were made. There are risks, uncertainties, and other important factors that could cause the Debtors' actual performance or achievements to be materially different from those they may project, and the Debtors undertake no obligation to update any such statement.

(c)    This Disclosure Statement Has Not Been Approved by the SEC

This Disclosure Statement has not been and will not be filed with the SEC or any state regulatory authority. Neither the SEC nor any state regulatory authority has approved or disapproved of the Securities described in this Disclosure Statement or has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained in this Disclosure Statement.

(d)    No Legal, Business, or Tax Advice Is Provided to You by This Disclosure Statement

**THIS DISCLOSURE STATEMENT IS NOT LEGAL, BUSINESS, OR TAX ADVICE TO YOU.** The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each holder of a Claim should consult their own legal counsel and accountant with regard to any legal, tax, and other matters concerning their Claim. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation.

(e)    No Admissions Made

The information and statements contained in this Disclosure Statement will neither constitute an admission of any fact or liability by any entity (including, without limitation, the Debtors) nor (ii) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, holders of Allowed Claims, or any other parties-in-interest.

(f)    Failure to Identify Litigation Claims or Projected Objections

No reliance should be placed on the fact that a particular litigation Claim or projected objection to a particular Claim is, or is not, identified in this Disclosure Statement. All parties, including the Debtors, reserve the right to continue to investigate Claims and file and prosecute objections to Claims.

(g)    No Waiver of Right to Object or Right to Recover Transfers and Assets

The vote by a holder of an Allowed Claim for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtors to object to that holder's Allowed Claim, or to bring Causes of Action or recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any Claims or Causes of Action of the Debtors or their respective Estates are specifically or generally identified herein.

(h)    Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although the Debtors' counsel and restructuring advisor have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not independently verified the information contained herein.

(i)      The Potential Exists for Inaccuracies and the Debtors Have No Duty to Update

The Debtors make the statements contained in this Disclosure Statement as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since such date. Although the Debtors have used their reasonable business judgment to ensure the accuracy of all the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered by the Bankruptcy Court.

(j)      No Representations Outside of the Disclosure Statement Are Authorized

No representations concerning or relating to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. In deciding whether to vote to accept or reject the Plan, you should not rely upon any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, unless otherwise indicated herein. You should promptly report unauthorized representations or inducements to counsel to the Debtors and the U.S. Trustee.

<div align="center">

**ARTICLE VIII**
**CONFIRMATION PROCEDURES**

</div>

The following is a brief summary of the Confirmation process. Holders of Claims and Interests are encouraged to review the relevant provisions of the Bankruptcy Code and to consult with their own advisors.

## 8.1    The Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a confirmation hearing upon appropriate notice to all required parties. The Confirmation Hearing is scheduled for September 5, 2024 at 10:00 a.m. (**prevailing Eastern Time**). The Confirmation Hearing may, however, be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served in accordance with the Bankruptcy Rules, without further notice to parties in interest. The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing. Subject to section 1127 of the Bankruptcy Code and consistent with the terms of the RSA, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

Additionally, section 1128(b) of the Bankruptcy Code provides that a party in interest may object to Confirmation. The Debtors, in the same motion requesting a date for the Confirmation Hearing, will request that the Bankruptcy Court set a date and time for parties in interest to file objections to Confirmation of the Plan. An objection to Confirmation of the Plan must be filed with the Bankruptcy Court and served on the Debtors and certain other parties in interest in

accordance with the applicable order of the Bankruptcy Court so that it is actually received on or before the deadline to file such objections as set forth therein.

## 8.2   Confirmation Standards

Among the requirements for Confirmation are that the Plan (i) is accepted by all Impaired Classes of Claims and Interests or, if rejected by an Impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class; (ii) is feasible; and (iii) is in the "best interests" of holders of Claims and Interests that are Impaired under the Plan.

The following requirements must be satisfied pursuant to section 1129(a) of the Bankruptcy Code before a bankruptcy court may confirm a plan of reorganization. The Debtors believe that the Plan fully complies with all the applicable requirements of section 1129 of the Bankruptcy Code set forth below, other than those pertaining to voting, which has not yet taken place.

1.  The Plan complies with the applicable provisions of the Bankruptcy Code.

2.  The Debtors (or any other proponent of the Plan) have complied with the applicable provisions of the Bankruptcy Code.

3.  The Plan has been proposed in good faith and not by any means forbidden by law.

4.  Any payment made or to be made by the Debtors (or any other proponent of the Plan) or by a Person issuing Securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with the Chapter 11 Cases, in connection with the Plan and incident to the Chapter 11 Cases is subject to the approval of the Bankruptcy Court as reasonable.

5.  The Debtors (or any other proponent of the Plan) have disclosed or will disclose the identity of the Plan Administrator. The appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity security holders and with public policy.

6.  The Debtors (or any other proponent of the Plan) have disclosed or will disclose the identity of any insider that will be employed or retained by the Reorganized Debtors and the nature of any compensation for such insider.

7.  With respect to each holder within an Impaired Class of Claims or Interests, as applicable, each such holder (i) has accepted the Plan or (ii) will receive or retain under the Plan on account of such Claim or Interest property of a value, as of the Plan Effective Date, that is not less than the amount that such holder would so receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

8.  With respect to each Class of Claims or Interests, such Class (i) has accepted the Plan or (ii) is Unimpaired under the Plan (subject to the "cram-down" provisions discussed below); *see* Article 8.6 of this Disclosure Statement ("Confirmation Without Acceptance by All Impaired Classes").

9.      The Plan provides for treatment of Claims, as applicable, in accordance with the provisions of section 507(a) of the Bankruptcy Code.

10.     If a Class of Claims is Impaired under the Plan, at least one Class of Claims that is Impaired under the Plan has accepted the Plan, determined without including any acceptance of the Plan by any insider.

11.     Confirmation is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Reorganized Debtors, or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.

12.     All fees payable under 28 U.S.C. § 1930 have been paid or the Plan provides for the payment of all such fees on the Plan Effective Date.

13.     If applicable, the Plan provides for the continuation after its Plan Effective Date of payment of any retiree benefits, as that term is defined in section 1114 of the Bankruptcy Code, at the level established pursuant to subsection (e)(1)(B) or (g) of section 1114 of the Bankruptcy Code, at any time prior to Confirmation, for the duration of the period the applicable Debtor has obligated itself to provide such benefits. The Debtors do not believe this requirement is applicable in these Chapter 11 Cases as they do not employ individuals and have no obligations for retiree benefits.

**8.3     Best Interests Test / Liquidation Analysis**

As described above, section 1129(a)(7) of the Bankruptcy Code requires that each holder of an Impaired Claim or Interest either (i) accept the Plan or (ii) receive or retain under the Plan property of a value, as of the Plan Effective Date, that is not less than the value such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. Based on the unaudited Liquidation Analysis attached hereto as **Exhibit B**, the Debtors believe that, if the Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code, the value of any distributions would be no greater than the value of distributions under the Plan. As a result, the Debtors believe holders of Claims and Interests in all Impaired Classes will recover at least as much as a result of Confirmation of the Plan as they would recover through a hypothetical chapter 7 liquidation.

THE LIQUIDATION ANALYSIS HAS BEEN PREPARED SOLELY FOR USE IN THIS DISCLOSURE STATEMENT AND DOES NOT REPRESENT VALUES THAT ARE APPROPRIATE FOR ANY OTHER PURPOSE. NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES A CONCESSION BY OR ADMISSION OF ANY DEBTOR FOR ANY PURPOSE.

**8.4     Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan of reorganization is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor, or any successor to the debtor (unless such liquidation or

reorganization is proposed in such plan of reorganization). The Plan provides for a potential sale of the Debtors' business and assets, and the Debtors believe that, following the Sale Transaction, sufficient funds would exist to make all payments required by the Plan. Accordingly, the Debtors believe that all Plan obligations will be satisfied without the need for further reorganization of the Debtors. Thus, the Debtors believe that the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.

## 8.5    Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, except as described in the following section, that each class of claims or equity interests impaired under a plan, accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such a class is not required.[12]

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two thirds in dollar amount and more than one half in a number of allowed claims in that class, counting only those claims that have actually voted to accept or to reject the plan. Thus, a class of Claims will have voted to accept the Plan only if two thirds in amount and a majority in number of the Allowed Claims in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired equity interests as acceptance by holders of at least two thirds in amount of allowed interests in that class, counting only those interests that have actually voted to accept or to reject the plan. Thus, a Class of Interests will have voted to accept the Plan only if two-thirds in amount of the Allowed Interests in such class that vote on the Plan actually cast their ballots in favor of acceptance.

Pursuant to Article III.7 of the Plan, if a Class contains Claims eligible to vote and no holders of Claims eligible to vote in such Class vote to accept or reject the Plan, the holders of such Claims in such Class shall be deemed to have accepted the Plan.

## 8.6    Confirmation Without Acceptance by All Impaired Classes

The Bankruptcy Code permits confirmation of a plan even if it is not accepted by all impaired classes, as long as (i) the plan otherwise satisfies the requirements for confirmation, (ii) at least one impaired class of claims has accepted the plan without taking into consideration the votes of any insiders in such class and (iii) the plan is "fair and equitable" and does not "discriminate unfairly" as to any impaired class that has not accepted the plan. These so-called "cram down" provisions are set forth in section 1129(b) of the Bankruptcy Code.

---

[12] A class of claims is "impaired" within the meaning of section 1124 of the Bankruptcy Code unless the plan (a) leaves unaltered the legal, equitable and contractual rights to which the claim or equity interest entitles the holder of such claim or equity interest or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

      (a)    <u>No Unfair Discrimination</u>

The no "unfair discrimination" test applies to Classes of Claims and Interests that are of equal priority and are receiving different treatment under the Plan. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." The Debtors do not believe the Plan discriminates unfairly against any Impaired Class of Claims or Interests. The Debtors believe the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual confirmation.

      (b)    <u>Fair and Equitable Test</u>

This test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of Claims or Interests receive more than 100% of the amount of the Allowed Claims or Allowed Interests in such class. As to a dissenting class, the test sets different standards depending on the type of Claims or Interests in such class. In order to demonstrate that a plan is fair and equitable with respect to a dissenting class, the plan proponent must demonstrate the following:

- <u>Secured Creditors</u>: Each holder of a secured claim (i) retains its liens on the property, to the extent of the allowed amount of its secured claim, and receives deferred Cash payments having a value, as of the Plan Effective Date, of at least the allowed amount of such claim, (ii) has the right to credit bid the amount of its claim if its property is sold and retains its liens on the proceeds of the sale (or if sold, on the proceeds thereof), or (iii) receives the "indubitable equivalent" of its allowed secured claim.

- <u>Unsecured Creditors</u>: Either (i) each holder of an impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the non-accepting class will not receive any property under the plan.

- <u>Holders of Interests</u>: Either (i) each holder of an impaired interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled, or the value of the interest or (ii) the holders of interests that are junior to the non-accepting class will not receive or retain any property under the plan.

The Debtors believe that the Plan and treatment of all Classes of Claims and Interests therein satisfies the "fair and equitable" requirement, notwithstanding the fact that certain Classes are deemed to reject the Plan.

**8.7    <u>Alternatives to Confirmation and Consummation of the Plan</u>**

The Plan reflects a consensus among the Debtors, the DIP Secured Parties, and the UCC. The Debtors have determined that the Plan is the best alternative available for their successful emergence from chapter 11. If the Plan is not confirmed and consummated, the alternatives to the

Plan are (A) continuation of the Chapter 11 Cases, which could lead to the filing of an alternative plan of reorganization or plan of liquidation, (B) a liquidation under chapter 7 of the Bankruptcy Code, or (C) dismissal of the Chapter 11 Cases, leaving holders of Claims and Interests to pursue available non-bankruptcy remedies. These alternatives to the Plan are not likely to benefit holders of Claims and Interests.

    (a)    <u>Continuation of Chapter 11 Cases</u>

If the Plan is not confirmed, the Debtors (or, if the Debtors' exclusive period in which to file a plan of reorganization has expired, any other party in interest) could attempt to formulate a different plan. Such a plan might involve either a reorganization and continuation of the Debtors' business, or an orderly liquidation of the Debtors' assets. In addition, if the Plan is not confirmed pursuant to the terms of the RSA, the parties thereto have the right to terminate the RSA and all obligations thereunder.

    (b)    <u>Liquidation under Chapter 7</u>

If no plan can be confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, in which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution to their creditors in accordance with the priorities established by the Bankruptcy Code. The effect a chapter 7 liquidation would have on the recovery of holders of Allowed Claims and Interests is set forth in the Liquidation Analysis attached hereto as **<u>Exhibit B</u>**.

As demonstrated in the Liquidation Analysis, the Debtors believe that liquidation under Chapter 7 would result in smaller and later distributions to creditors than those provided for in the Plan because of, among other things, the Debtors' primary assets would likely need to be sold on a piecemeal basis in a chapter 7 liquidation, the Debtors' business is worth far more as a going concern than in a piecemeal liquidation, the DIP Lenders and the DIP Secured Parties have liens on all or substantially all of the Debtors' assets, there would be no money available for other creditors in a liquidation, there are the additional Administrative Expense Claims that would be incurred if the cases were converted to a chapter 7, including the appointment of a trustee and the trustee's retention of professionals.

    (c)    <u>Dismissal of Chapter 11 Cases</u>

If the Chapter 11 Cases were dismissed, holders of Claims would be free to pursue non-bankruptcy remedies in their attempts to satisfy such Claims against the Debtors. Nevertheless, in that event, holders of Claims would be faced with the costs and difficulties of attempting, each on its own, to recover on its Claims. Additionally, it could result in a race to the courthouse, whereby there may be insufficient assets to distribute assets to creditors on an equitable basis. Accordingly, the Debtors believe that the Plan will enable all creditors to realize the greatest possible recovery on their respective Claims with the least delay.

## ARTICLE IX
## CERTAIN TAX CONSEQUENCES OF THE PLAN

**9.1**     **Certain U.S. Federal Income Tax Consequences of the Plan**

(a)     <u>Introduction</u>

The following discussion is a summary of certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and to certain holders of Claims. The following summary does not address the U.S. federal income tax consequences to holders of Claims who are unimpaired, deemed to accept or reject the Plan, or otherwise entitled to payment in full in cash under the Plan.

The discussion of U.S. federal income tax consequences below is based on the Internal Revenue Code of 1986, as amended (the "<u>Tax Code</u>"), regulations promulgated by the United States Department of the Treasury under the Tax Code (the "<u>Treasury Regulations</u>"), judicial authorities, published positions of the Internal Revenue Service ("<u>IRS</u>"), and other applicable authorities, all as in effect on the date of this Disclosure Statement, and all of which are subject to change or differing interpretations (possibly with retroactive effect). The U.S. federal income tax consequences of the contemplated transactions are complex and subject to significant uncertainties. The Debtors have not requested an opinion of counsel or a ruling from the IRS with respect to any of the tax aspects of the contemplated transactions, and the discussion below is not binding upon the IRS or the courts. Accordingly, there can be no assurance that the IRS would not take a contrary position as to the U.S. federal income tax consequences described in the Plan.

This summary does not address foreign, state, local, gift, or estate tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a holder in light of its individual circumstances, or to a holder that may be subject to special tax rules (such as persons who are related to any of the Debtors within the meaning of one of various provisions of the Tax Code, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, real estate investment trusts, regulated investment companies, tax-exempt organizations, trusts, governmental authorities or agencies or entities controlled by them, dealers and traders in securities, retirement plans, individual retirement and other tax-deferred accounts, holders that are, or hold Claims through, S corporations, persons whose functional currency is not the U.S. dollar, dealers in foreign currency, holders who hold Claims as part of a straddle, hedge, conversion transaction or other integrated investment, holders using a mark-to-market method of accounting, holders of Claims who are themselves in bankruptcy, holders subject to the alternative minimum tax, or the "Medicare" tax on net investment income and holders who are accrual method taxpayers that report income on an "applicable financial statement"). In addition, this discussion does not address U.S. federal taxes other than income taxes.

Additionally, this discussion assumes that (i) the various debt and other arrangements to which any of the Debtors is a party will be respected for U.S. federal income tax purposes in accordance with their form and (ii) except where otherwise indicated, the Claims are held as "capital assets" (generally, property held for investment) within the meaning of section 1221 of the Tax Code.

The following discussion does not describe any considerations or consequences arising in connection with the formation or ownership of any holding entities or blocker entities formed as part of the Restructuring Transactions.

**THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON YOUR INDIVIDUAL CIRCUMSTANCES. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE U.S. FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.**

(b)     Consequences to Debtors

In general, a debtor will realize and recognize cancellation of debt ("COD") income upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of COD income generally is the excess of (i) the adjusted issue price of the indebtedness satisfied over (ii) the sum of (a) the amount of cash paid and (b) the fair market value of any consideration (including equity of a debtor or a party related to such debtor) given in satisfaction, or as part of the discharge, of such indebtedness at the time of the exchange. However, COD income should not arise to the extent that payment of the indebtedness would have given rise to a deduction. Under section 108 of the Tax Code, a taxpayer is not required to include COD income in gross income (i) if the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding, or (ii) to the extent that the taxpayer is insolvent immediately before the discharge. In that case, however, the taxpayer must reduce its tax attributes, such as its net operating losses, general business credits, capital loss carryforwards, and tax basis in assets, by the amount of the COD income so excluded from gross income. Generally, the reduction in the tax basis of assets cannot exceed the excess of the total basis of the debtor's property held immediately after the debt discharge over the total liabilities of the debtor immediately after the discharge. Any attribute reduction will be applied as of the first day following the taxable year in which COD income is recognized.

Furthermore, the Plan provides that no party (including Governmental Units) shall have any recourse to the Debtors, the Reorganized Debtors, the Wind-Down Debtors, the DIP Secured Parties, or any Related Party of the foregoing, on account of any COD income, whether on a theory of contribution, indemnification, or otherwise, stemming from the Restructuring Transactions.

(c)     Consequences to Holders of Certain Claims

For purposes of this discussion, a "U.S. Holder" is a holder of an Allowed Claim that is (i) an individual citizen or resident of the United States for U.S. federal income tax purposes; (ii) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof, or the District of Columbia; (iii) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (iv) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons (as defined in section 7701(a)(30) of the Tax Code) have authority to control all substantial decisions

101

of the trust, or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person. A "Non-U.S. Holder" is a holder of an Allowed Claim that is not a U.S. Holder.

If a partnership (or other entity or arrangement treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a holder of a Claim, the tax treatment of a partner (or other beneficial owner) of such partnership (or other pass-through entity or arrangement) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity. Partners (or other beneficial owners) of partnerships (or other pass-through entities or arrangements) that are holders of Claims should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

**(1)      U.S. Holders of General Unsecured Claims—Recognition of Gain or Loss**

Each U.S. Holder of Claims against the Debtors generally will recognize gain or loss in an amount equal to the difference, if any, between (i) the amount of consideration received in respect of the Claims and (ii) the holder's adjusted tax basis in the Claims exchanged therefor.

**Holders are urged to consult their own tax advisors regarding the treatment of additional post-Plan Effective Date distributions, including the potential application of the installment sale rules.**

**(2)      Character of Gain or Loss**

Where gain or loss is recognized by a U.S. Holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of such holder, whether the Claim constitutes a capital asset in the hands of such holder and how long it has been held, whether the Claim was acquired at a market discount, and whether and to what extent the holder previously claimed a bad debt deduction with respect to the Claim. In general, any gain or loss generally should be long-term capital gain or loss if the U.S. Holder held the Claim as a capital asset and such holder's holding period in the Claim is more than one year at the time of the relevant exchange. A reduced tax rate on long-term capital gain may apply to non-corporate U.S. Holders. The deductibility of capital losses is subject to significant limitations.

A U.S. Holder that purchased its Claims from a prior holder at a "market discount" (relative to the principal amount of the Claims at the time of acquisition) may be subject to the market discount rules of the Tax Code. In general, a debt instrument is considered to have been acquired with market discount if the holder's adjusted tax basis in the debt instrument is less than (i) its "stated redemption price at maturity" (which generally would be equal to the stated principal amount if all stated interest was required to be paid in cash or property at least annually) or (ii) in the case of a debt instrument issued with original issue discount ("OID"), its adjusted issue price, in each case, by more than a de minimis amount. Under these rules, any gain realized on the exchange of Claims (other than in respect of accrued but unpaid interest or OID, if any) generally will be treated as ordinary income to the extent of the market discount accrued (on a straight line

basis or, at the election of the holder, on a constant yield basis) during the holder's period of ownership, unless such holder elected to include the market discount in income as it accrued. If a U.S. Holder of a Claim did not elect to include market discount in income as it accrued and, thus, under the market discount rules, was required to defer all or a portion of any deductions for interest on debt incurred or maintained to purchase or carry its Claim, such deferred amounts would become deductible at the time of the exchange.

(d)    Information Reporting and Backup Withholding

All distributions to holders of Allowed Claims under the Plan are subject to any applicable tax withholding and information reporting requirements. Under U.S. federal income tax law, interest, dividends and other reportable payments may, under certain circumstances, be subject to "backup withholding" if a recipient of those payments fails to furnish to the payor certain identifying information, fails properly to report interest or dividends, and, under certain circumstances, fails to provide a certification that the recipient is not subject to backup withholding. Backup withholding is not an additional tax. Any amounts deducted and withheld generally should be allowed as a credit against that recipient's U.S. federal income tax, provided that appropriate proof is timely provided under rules established by the IRS. Furthermore, certain penalties may be imposed by the IRS on a recipient of payments who is required to supply information but who does not do so in the proper manner. Backup withholding generally should not apply with respect to payments made to certain exempt recipients, such as certain corporations and financial institutions. Information may also be required to be provided to the IRS concerning payments, unless an exemption applies. Holders are urged to consult their own tax advisors regarding their qualification for exemption from backup withholding and information reporting and the procedures for obtaining such an exemption.

Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of certain thresholds. Holders are urged to consult their own tax advisors regarding these regulations and whether the contemplated transactions under the Plan would be subject to these regulations and require disclosure on their tax returns.

(e)    Foreign Account Tax Compliance Act

Under the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding on the receipt of "withholdable payments." For this purpose, "withholdable payments" generally are U.S.-source payments of fixed or determinable, annual, or periodical income. Additionally, although FATCA withholding may also apply to gross proceeds of a disposition of property of a type that can produce U.S.-source interest or dividends, proposed Treasury Regulations suspend withholding on such gross proceeds payments indefinitely. FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding tax.

**THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL**

**INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

[*Remainder of This Page Intentionally Left Blank*]

13153938-3

## CONCLUSION AND RECOMMENDATION

The Debtors believe that Confirmation and Consummation of the Plan is preferable to all other alternatives. Consequently, the Debtors urge all holders of Claims entitled to vote to accept the Plan and to evidence such acceptance by returning their ballots so they will be received **by the Solicitation Agent no later than 4:00 p.m. (prevailing Eastern Time) on August 28, 2024.**

Dated this July 19, 2024

*/s/ Nicholas Haughey*
Nicholas Haughey
Chief Restructuring Officer

13153938-3

# EXHIBIT A

*Joint Chapter 11 Plan for Red Lobster Management LLC and its Debtor Affiliates*, **available at Docket Entry No. [631].**

# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION
### www.flmb.uscourts.gov

| | |
|---|---|
| IN RE: | Chapter 11 Cases |
| RED LOBSTER MANAGEMENT LLC,[1] | Case No. 6:24-bk-02486-GER |
| | Jointly Administered with |
| RED LOBSTER RESTAURANTS LLC, | Case No. 6:24-bk-02487-GER |
| RLSV, INC. | Case No. 6:24-bk-02488-GER |
| RED LOBSTER CANADA, INC., | Case No. 6:24-bk-02489-GER |
| RED LOBSTER HOSPITALITY LLC, | Case No. 6:24-bk-02490-GER |
| RL KANSAS LLC, | Case No. 6:24-bk-02491-GER |
| RED LOBSTER SOURCING LLC, | Case No. 6:24-bk-02492-GER |
| RED LOBSTER SUPPLY LLC, | Case No. 6:24-bk-02493-GER |
| RL COLUMBIA LLC, | Case No. 6:24-bk-02494-GER |
| RL OF FREDERICK, INC., | Case No. 6:24-bk-02495-GER |
| RED LOBSTER OF TEXAS, INC., | Case No. 6:24-bk-02496-GER |
| RL MARYLAND, INC., | Case No. 6:24-bk-02497-GER |
| RED LOBSTER OF BEL AIR, INC., | Case No. 6:24-bk-02498-GER |
| RL SALISBURY, LLC, | Case No. 6:24-bk-02499-GER |
| RED LOBSTER INTERNATIONAL HOLDINGS LLC, | Case No. 6:24-bk-02500-GER |

Debtors.

_____/

## JOINT CHAPTER 11 PLAN FOR
## RED LOBSTER MANAGEMENT LLC AND ITS DEBTOR AFFILIATES

> **THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED OR PRELIMINARILY APPROVED BY THE BANKRUPTCY COURT. THIS PLAN HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.**

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are Red Lobster Management LLC (6889); Red Lobster Sourcing LLC (3075); Red Lobster Supply LLC (9187); RL Kansas LLC (2396); Red Lobster Hospitality LLC (5297); Red Lobster Restaurants LLC (4308); RL Columbia LLC (7825); RL of Frederick, Inc. (9184); RL Salisbury, LLC (7836); RL Maryland, Inc. (7185); Red Lobster of Texas, Inc. (1424); Red Lobster of Bel Air, Inc. (2240); RLSV, Inc. (6180); Red Lobster Canada, Inc. (4569); and Red Lobster International Holdings LLC (4661). The Debtors' principal offices are located at 450 S. Orange Avenue, Suite 800, Orlando, FL 32801.

Dated:    July 19, 2024

W. Austin Jowers (*pro hac vice* admitted)
Jeffrey R. Dutson (*pro hac vice* admitted)
Sarah L. Primrose (FL Bar No. 98742)
Christopher K. Coleman (*pro hac vice* admitted)
Brooke L. Bean (*pro hac vice* admitted)
**KING & SPALDING LLP**
1180 Peachtree Street, NE, Suite 1600
Atlanta, GA 30309
Telephone:    (404) 572-4600
Email:    ajowers@kslaw.com
              jdutson@kslaw.com
              sprimrose@kslaw.com
              christopher.coleman@kslaw.com
              bbean@kslaw.com

– and –

Michael Fishel (*pro hac vice* admitted)
**KING & SPALDING LLP**
1100 Louisiana, Suite 4100
Houston, TX 77002
Telephone:    (713) 751-3200
Email:    mfishel@kslaw.com

Respectfully submitted,

*/s/ Paul Steven Singerman*
Paul Steven Singerman
Florida Bar No. 378860
**BERGER SINGERMAN LLP**
1450 Brickell Avenue, Suite 1900
Miami, FL 33131
Telephone:    (305) 755-9500
Email:    singerman@bergersingerman.com

- and –

Nicolette C. Vilmos
Florida Bar No. 469051
**BERGER SINGERMAN LLP**
111 North Magnolia Avenue
Suite 1450 Orlando, FL 32801
Telephone: (407) 749-7900
Email: nvilmos@bergersingerman.com

*Filer's Attestation: Pursuant to Local Rule 1001-2(g)(3) regarding signatures, Paul Steven Singerman attests that concurrence in the filing of this paper has been obtained.*

*[Counsel for Debtors and Debtors-in-Possession]*

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................................................... 1

I.    DEFINED TERMS AND RULES OF INTERPRETATION.......................................... 1
      A.    Defined Terms ......................................................................................... 1
      B.    Rules of Interpretation ............................................................................ 16
      C.    Computation of Time................................................................................ 17
      D.    Governing Law ........................................................................................ 17
      E.    Reference to Monetary Figures................................................................ 17
      F.    Controlling Document ............................................................................. 17
      G.    Consent Rights of the Consenting Lenders............................................. 18

II.   UNCLASSIFIED CLAIMS .......................................................................................... 18
      A.    Administrative Expense Claims............................................................... 18
      B.    Professional Fee Claims.......................................................................... 19
            1.    Final Fee Applications and Payment of Professional Fee Claims .......... 19
            2.    Professional Fee Escrow Accounts ................................................. 19
            3.    Post-Confirmation/Pre-Effective Date.............................................. 19
            4.    Post-Effective Date Fees and Expenses ......................................... 20
      C.    DIP Claims............................................................................................... 20
      D.    Priority Tax Claims ................................................................................. 21

III.  CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ............... 21
      A.    Classification of Claims and Interests..................................................... 21
            1.    Class Identification ......................................................................... 22
      B.    Treatment of Claims and Interests .......................................................... 22
            1.    Class 1 – Miscellaneous Secured Claims........................................ 22
            2.    Class 2 – Other Priority Claims ...................................................... 23
            3.    Class 3 – Prepetition Term Loan Claims ......................................... 23
            4.    Class 4 – General Unsecured Claims............................................... 24
            5.    Class 5 – Intercompany Claims ....................................................... 24
            6.    Class 6 – Interests in Debtors......................................................... 25
      C.    Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code .............................. 25
      D.    Subordinated Claims ............................................................................... 25
      E.    Elimination of Vacant Classes ................................................................ 25

IV.   MEANS FOR IMPLEMENTATION OF THE PLAN.................................................... 26
      A.    General...................................................................................................... 26
            1.    General Settlement of Claims and Interests..................................... 26
            2.    Restructuring Transactions .............................................................. 26
            3.    Insurance Policies ........................................................................... 26
            4.    Section 1146 Exemption ................................................................. 28
            5.    Cancellation of Securities and Agreements ..................................... 29
            6.    Effectuating Documents; Further Transactions ................................ 29
            7.    Preservation of Causes of Action.................................................... 29
      B.    Restructuring of the Debtors Effectuated Through a Sale Transaction ............. 30

|  |  | 1. | Closing of any Sale Transaction or Restructuring Transaction ............. 30 |
|  |  | 2. | Reorganized Equity Sale Provisions ............................................................. 31 |
|  |  | 3. | Wind-Down and Dissolution of the Debtors ........................................ 34 |
|  |  | 4. | The Plan Administrator ................................................................ 34 |
|  |  | 5. | Vesting of Wind-Down Assets in the Wind-Down Debtor(s) or Purchaser(s) ......................................................................... 37 |
|  |  | 6. | GUC Trust .................................................................................. 37 |
|  |  | 7. | Sources of Consideration for Plan Distributions. ................................ 41 |

V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ....... 41
    A.    Assumption and Rejection of Executory Contracts and Unexpired Leases ....... 41
        1.    363 Asset Sale ................................................................................ 41
        2.    Reorganized Equity Sale .................................................................. 41
    B.    Approval of Assumption, Assignment and Rejection ............................................. 42
    C.    Claims Based on Rejection of Executory Contracts or Unexpired Leases ......... 42
    D.    Cure of Defaults for Executory Contracts and Unexpired Leases Assumed ...... 43
    E.    Preexisting Obligations under Executory Contracts and Unexpired Leases. ..... 43
    F.    Modifications, Amendments, Supplements, Restatements, or Other Agreements ........................................................................... 44
    G.    Reservation of Rights .......................................................................... 44
    H.    Nonoccurrence of the Plan Effective Date ........................................................ 44

VI. PROVISIONS GOVERNING DISTRIBUTIONS ............................................ 44
    A.    Timing and Calculation of Amounts to Be Distributed ................................... 44
    B.    Delivery of Distributions ........................................................................ 45
        1.    Persons Responsible .................................................................... 45
        2.    Record Date for Distribution .................................................... 45
        3.    Minimum Distributions ............................................................. 45
    C.    Distributions and Undeliverable or Unclaimed Distributions .......................... 45
    D.    Surrender of Cancelled Instruments or Securities ........................................... 46
    E.    Compliance with Tax Requirements ........................................................ 46
    F.    Allocations ............................................................................................. 46
    G.    No Postpetition Interest on Claims ........................................................ 46
    H.    Foreign Currency Exchange Rate ........................................................... 47
    I.    Setoffs and Recoupment ...................................................................... 47
    J.    Claims Paid or Payable by Third Parties ................................................... 47
        1.    Claims Paid by Third Parties .................................................... 47
        2.    Claims Payable by Third Parties ............................................... 47

VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS ........................................................................ 48
    A.    Allowance of Claims ............................................................................. 48
    B.    No Distributions Pending Allowance ..................................................... 48
    C.    Claims Administration Responsibilities ................................................. 48
    D.    Estimation of Claims ............................................................................ 48
    E.    Time to File Objections to Claims ........................................................ 49
    F.    Disallowance of Claims ....................................................................... 49

G.       Distributions After Allowance ........................................................... 49

VIII.   RELEASES, INJUNCTION AND RELATED PROVISIONS ..................................... 50
     A.       Plan Releases, Injunction and Related Provisions ............................... 50
           1.     Discharge of Claims and Termination of Interests in the Debtors .......... 50
           2.     Releases by the Debtors ......................................................... 50
           3.     Releases by Holders of Claims Against the Debtors ...................... 51
           4.     Exculpation from Claims Relating to the Plan ....................... 52
           5.     Injunction ....................................................................... 53
     B.       Protections Against Discriminatory Treatment ................................. 53
     C.       Document Retention ................................................................... 54
     D.       Term of Injunctions or Stays ...................................................... 54
     E.       Unknown Claims ..................................................................... 54

IX.    CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN ..................... 55
     A.       Conditions Precedent to the Effective Date for the Plan ..................... 55
     B.       Waiver of Conditions ................................................................ 56
     C.       Substantial Consummation ......................................................... 56
     D.       Effect of Failure of Conditions ................................................... 56

X.     MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN ................. 56
     A.       Modification and Amendments ..................................................... 56
     B.       Effect of Confirmation on Modifications ....................................... 57
     C.       Revocation or Withdrawal of Plan ................................................ 57

XI.    RETENTION OF JURISDICTION ................................................................ 57

XII.   MISCELLANEOUS PROVISIONS ............................................................... 59
     A.       Immediate Binding Effect ........................................................... 59
     B.       Additional Documents ................................................................ 59
     C.       Payment of Statutory Fees .......................................................... 59
     D.       Reservation of Rights ................................................................ 60
     E.       Successors and Assigns .............................................................. 60
     F.       Notices ................................................................................. 60
     G.       Entire Agreement ..................................................................... 62
     H.       Exhibits ................................................................................. 62
     I.        Non-Severability of Plan Provisions .............................................. 62
     J.       Closing of Chapter 11 Cases ....................................................... 62
     K.       Conflicts ................................................................................ 63
     L.       Rates ..................................................................................... 63

## INTRODUCTION

Red Lobster Management LLC and the other debtors and debtors in possession in the above captioned cases (collectively, the "Debtors"), propose this joint Plan for the resolution of the outstanding Claims against and Interests in the Debtors pursuant to chapter 11 of the Bankruptcy Code. Capitalized terms used but not otherwise defined herein shall have the respective meanings ascribed to such terms in Article I.A of the Plan.

Holders of Claims and Interests should refer to the Disclosure Statement for a discussion of the Debtors' history, business, assets, results of operations, historical financial information, and projections, as well as a summary and description of the Plan and certain related matters. Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.

The Debtors shall pursue Confirmation of the Plan and a Sale Transaction that will be structured as either, at the election of the Purchaser, (i) a sale of all or substantially all of the assets of the Debtors or (ii) a sale of (a) all or substantially all of the assets of RL Management and RL International and (b) all or substantially all of the equity interests in the Reorganized Debtors, pursuant to section 1129 of the Bankruptcy Code and one or more Purchase Agreements.

**All holders of Claims entitled to vote on the Plan are encouraged to read the Plan and the Disclosure Statement in their entireties before voting to accept or reject the Plan.**

## I.   DEFINED TERMS AND RULES OF INTERPRETATION

### A.   Defined Terms

As used in the Plan, capitalized terms have the meanings set forth below.

"363 Asset Sale" means the sale to Purchaser of all or substantially all of the assets of the Debtors pursuant to section 363 of the Bankruptcy Code and the Purchase Agreement.

"510(b) Claim" means any Claim against the applicable Debtor that is subordinated pursuant to section 510(b) of the Bankruptcy Code.

"Administrative Expense Claim" means a Claim entitled to priority for costs and expenses of administration of the Debtors' Estates under sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date of preserving the applicable Estate and operating the businesses of the Debtors; (b) Allowed Professional Fee Claims in the applicable Chapter 11 Cases; and (c) all fees and charges assessed against the Debtors' Estates under chapter 11 of title 28 of the United States Code, 28 U.S.C. §§ 1911-1930.

"Administrative Expense Claims Bar Date" means the deadline for Filing requests for payment of Administrative Expense Claims (other than DIP Claims and the Professional Fee Claims, which shall be paid in accordance with the DIP Orders and the Plan, as applicable), which shall be thirty (30) days after the Plan Effective Date, except as specifically set forth to the contrary in the Plan or a Final Order.

1

"<u>Affiliate</u>" shall have the meaning set forth in section 101(2) of the Bankruptcy Code.

"<u>Allowed</u>" means with respect to a Claim, except as otherwise provided herein: (a) a Claim in a liquidated amount as to which no objection has been Filed prior to or on the applicable objection deadline and that is either evidenced by a timely Filed Proof of Claim or that is not required to be evidenced by a Proof of Claim under the Plan, the Bankruptcy Code, or a Final Order; (b) a Claim that is scheduled by the Debtors on their Schedules as neither disputed, contingent, nor unliquidated, and for which no Proof of Claim has been Filed in an unliquidated or different amount; or (c) a Claim that is deemed "Allowed" (i) pursuant to the Plan, (ii) in any stipulation approved by the Bankruptcy Court, (iii) pursuant to any contract, instrument, indenture, or other agreement entered into or assumed in connection with the Plan, or (iv) by Final Order (including any Claim to which the Debtors had objected or which the Bankruptcy Court had allowed prior to such Final Order); <u>provided</u>, that with respect to a Claim described in clauses (a) through (c) above, such Claim shall be considered Allowed only if and to the extent no objection to the allowance of such Claim has been Filed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or if such an objection had been Filed, it was overruled and such Claim was Allowed by a Final Order; <u>provided</u>, <u>further</u>, that no Claim of any Person subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Person pays in full the amount that it owes to the applicable Debtor, Reorganized Debtor, or Wind-Down Debtor, as applicable.

"<u>Assumed Executory Contracts and Unexpired Leases List</u>" means the list compiled by the Debtors, with the consent of the Purchaser, of Executory Contracts and Unexpired Leases that will (i) in the event of a Reorganized Equity Sale, be assumed by the Debtors (and, in some cases, assigned to the Purchaser) pursuant to the Plan or (ii) in the event of a 363 Asset Sale, be assumed by the Debtors and assigned to the Purchaser, in each case which list may be amended from time to time with the consent of the Purchaser.

"<u>Assumed Liabilities</u>" has the meaning set forth in the Purchase Agreement.

"<u>Assumption and Assignment Procedures</u>" has the meaning assigned to it in the Bidding Procedures Order.

"<u>Avoidance Actions</u>" means any and all actual or potential avoidance, recovery, subordination, or other Claims, Causes of Action, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including Claims, Causes of Action, or remedies under sections 502, 510, 542, 544, 545, 547 through and including 553, and 724(a) of the Bankruptcy Code or under similar local, state, federal, or foreign statutes and common law.

"<u>Bankruptcy Code</u>" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as may be amended from time to time to the extent applicable to the Chapter 11 Cases.

"<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the Middle District of Florida.

"<u>Bankruptcy Rules</u>" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of title 28 of the Judicial Code and the general, local, and chambers rules of the

Bankruptcy Court, each as it may exist on any relevant date to the extent applicable to the Chapter 11 Cases.

"Bidding Procedures" means, the sale procedures attached to the Bidding Procedures Order as Exhibit 1.

"Bidding Procedures Motion" means that certain *Motion of the Debtors for Entry of Order (I)(A) Approving Bidding Procedures for the Sale of Substantially All of the Debtors' Assets, (B) Authorizing the Debtors to Enter into Stalking Horse Agreement and to Provide Bidding Protections Thereunder, (C) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (D) Approving Assumption and Assignment Procedures, and (E) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof; (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances and (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* [ECF No. 49].

"Bidding Procedures Order" means that certain *Order (I) Approving Bidding Procedures for the Sale of Substantially All of the Debtors' Assets, (II) Authorizing the Debtors to Enter into Stalking Horse Agreement and to Provide Bidding Protections Thereunder, (III) Scheduling an Auction and Approving the Form and Manner of Notice Thereof, (IV) Approving Assumption and Assignment Procedures, (V) Scheduling a Sale Hearing and Approving the Form and Manner of Notice Thereof, and (VI) Granting Related Relief* [ECF No. 386].

"Business Day" means any day other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

"Canadian Proceeding" means that certain ancillary proceeding commenced by RL Management, in its capacity as foreign representative of the Debtors, in Canada recognizing the Chapter 11 Cases pursuant to the Companies' Creditors Arrangement Act (Canada, R.S.C. 1985, c. C-36).

"Cash" means legal tender of the United States of America and cash equivalents, including bank deposits, checks, and other similar items.

"Causes of Action" means, collectively, any and all Claims, interests, damages, remedies, demands, rights, actions, suits, claims, cross-claims, counterclaims, third-party claims, obligations, liabilities, defenses, offsets, powers, privileges, licenses, indemnities, guaranties, franchises, debts, liens, losses, costs (including attorneys' fees and costs of defense and investigation), expenses, controversies, assessments, penalties, fines, charges, promises, commitments, appeals, omissions, contingencies, sums of money, judgments, executions and causes of action of any kind, nature or character whatsoever (whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly, indirectly or derivatively, matured or unmatured, suspected or unsuspected, in contract, tort, law, equity, or otherwise). Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and Claims under contracts or for breaches of duties imposed by applicable law; (b) the right to object to or otherwise contest Claims or Interests; (c) any Claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) such Claims and defenses as fraud, mistake, duress,

3

and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any Claim under any state, federal or foreign law, including any fraudulent transfer or similar Claim or claim.

"Chapter 11 Case(s)" means, when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court, and when used with reference to all of the Debtors, the jointly administered cases pending for the Debtors under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

"Claim" means any claim, as defined in section 101(5) of the Bankruptcy Code, to the extent not paid during the course of the Chapter 11 Cases.

"Claims, Noticing, and Solicitation Agent" means Epiq Corporate Restructuring, LLC, as the noticing, claims, and solicitation agent retained by the Debtors in the Chapter 11 Cases.

"Claims Register" means the official register of Claims maintained by the Claims, Noticing, and Solicitation Agent.

"Class" means a category of Claims or Interests established for the purposes of the Plan pursuant to section 1122(a) of the Bankruptcy Code.

"Committee" means the official committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 1102(a) of the Bankruptcy Code by the United States Trustee, as the membership of such committee is from time to time constituted and reconstituted.

"Confirmation" means entry of a Confirmation Order on the docket of the Chapter 11 Cases of the Debtors within the meaning of Bankruptcy Rules 5003 and 9021.

"Confirmation Date" means a date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases of the Debtors.

"Confirmation Hearing" means a hearing before the Bankruptcy Court at which the Debtors seek entry of the Confirmation Order and final approval of the Disclosure Statement.

"Confirmation Order" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, including all exhibits, appendices, supplements and related documents, which shall be in form and substance reasonably acceptable to the Debtors, the Committee, and the Prepetition Term Loan Parties, and, absent repayment in full in Cash of the DIP Facility prior to the entry by of the Confirmation Order, the DIP Secured Parties.

"Consummation" means the occurrence of the Plan Effective Date.

"Control" (including, with its correlative meanings, "controlling," "controlled by," and "under common control with") means, with respect to any Person, the possession, directly or indirectly, of the power to direct the management and policies of such Person whether through the ownership of voting securities, by contract or otherwise.

4

"Cure Amount" means the amount, including an amount of $0.00, required to cure any monetary defaults under any Executory Contract or Unexpired Lease (or such lesser amount as may be agreed upon by the parties to such Executory Contract or Unexpired Lease) that is to be assumed by the Debtors (and, in the event of a 363 Asset Sale, potentially assigned to the Purchaser(s)) pursuant to sections 365 or 1123 of the Bankruptcy Code).

"Debtor" or "Debtors" has the meaning set forth in the Introduction.

"Definitive Documents" means all documents implementing the Plan and shall include, as applicable and dependent upon the Restructuring Transactions actually implemented: (a) all pleadings Filed by any Debtor in the Chapter 11 Cases (and related orders), including the First Day Pleadings and all proposed orders sought pursuant thereto; (b) the DIP Documents, the DIP Motion, and the DIP Orders; (c) the Plan; (d) the Disclosure Statement; (e) the Solicitation Materials as they relate to the Plan and any motion seeking approval thereof; (f) the memorandum of law in support of approval of the Disclosure Statement and Confirmation of the Plan; (g) the Confirmation Order; (h) each of the documents comprising the Plan Supplement; (i) the Bidding Procedures, the Bidding Procedures Motion and Bidding Procedures Order; (j) to the extent applicable, the Stalking Horse Asset Purchase Agreement and/or any other Purchase Agreement(s) and the order or orders approving the sale or sales contemplated thereby; (k) the Plan Administrator Agreement(s); (l) the New Organizational Documents; (m) the GUC Trust Agreement; (n) any and all filings with or notices to any governmental or regulatory authority, in each case, as may be required under applicable law in connection with the Chapter 11 Cases, the Restructuring Transactions, or the occurrence of the Plan Effective Date; and (o) any and all other Sale Transaction Documents, deeds, agreements, filings, notifications, pleadings, orders, certificates, letters, or instruments or other documents relating to the Sale Transaction or other Restructuring Transactions or reasonably desirable or necessary to consummate and document the Sale Transaction or other Restructuring Transactions, including any agreements, instruments, pleadings, orders, and/or other documentation Filed in the Chapter 11 Cases (including any exhibits, annexes, schedules, amendments, modifications, or supplements made from time to time thereto in accordance with their terms).

"DIP Agent" has the meaning set forth in the Final DIP Order.

"DIP Claims" means all Claims of the DIP Lenders and the DIP Agent derived from, based upon, relating to, or arising under the DIP Facility and Final DIP Order.

"DIP Documents" has the meaning set forth in the Final DIP Order.

"DIP Facility" has the meaning set forth in the Final DIP Order.

"DIP Lenders" has the meaning set forth in the Final DIP Order.

"DIP Motion" means that certain *Emergency Motion for Interim and Final Orders (I) Approving Postpetition Financing, (II) Authorizing the Use of Cash Collateral, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief* [ECF No. 43].

"DIP Orders" means the Interim DIP Order and the Final DIP Order.

"DIP Secured Parties" has the meaning set forth in the Final DIP Order.

"Disallowed" means, with respect to a Claim, a Claim (or portion thereof) that has been denied, dismissed, or overruled pursuant to the Plan or a Final Order.

"Disclosure Statement" means the disclosure statement for the Plan, including all exhibits and schedules thereto.

"Disputed" means, with respect to a Claim, (a) any such Claim to the extent neither Allowed nor Disallowed under the Plan or a Final Order or deemed Allowed under sections 502, 503 or 1111 of the Bankruptcy Code, or (b) any such Claim to the extent the applicable Debtors, the Plan Administrator, the GUC Trustee, or any party in interest have interposed a timely objection to such Claim before the deadlines imposed by the Confirmation Order, which objection has not been withdrawn or determined by a Final Order. To the extent only the Allowed amount of a Claim is disputed, such Claim shall be deemed Allowed in the amount not disputed, if any, and Disputed as to the balance of such Claim.

"Distribution" means any distribution by the Debtors, the Plan Administrator or GUC Trustee to a holder of an Allowed Claim.

"Distribution Date" means (a) the Initial Distribution Date, and (b) the first Business Day after the end of the months of June and December, commencing with the first such date to occur more than ninety (90) days after the Initial Distribution Date and continuing until the Final Distribution Date; provided, however, that a Distribution Date (other than the Initial Distribution Date and the Final Distribution Date) shall not occur if the aggregate value of the consideration to be distributed on account of all Allowed Claims on such Distribution Date is less than $50.00, in which case the amount to be distributed shall be retained and added to the amount to be distributed on the next Distribution Date.

"Distribution Record Date" means (i) seven (7) days prior to the Plan Effective Date; or (ii) such other date as agreed upon among the Debtors and the Prepetition Term Loan Agent.

"Equityholder Litigation Claims" means claims or causes of action, if any, against (i) direct and indirect equityholders of the Debtors and (ii) former officers and directors of the Debtors (other than the officers and directors of the Debtors as of the Petition Date), which shall in each case be vested in the GUC Trust on the Plan Effective Date.

"Estate" or "Estates" means the estate(s) of a Debtor(s) created under sections 301 and 541 of the Bankruptcy Code upon the commencement of the applicable Chapter 11 Case.

"Exculpated Parties" means (a) the directors and officers of each of the Debtors and the members of any board of managers or directors of each Debtor, and in each case, who served the Debtors in such capacities at any time between the Petition Date and the Plan Effective Date; (b) all Professionals and agents retained by the Debtors in the Debtors' Chapter 11 Cases; (c) the Committee and those individual members of the Committee who do not opt out of the release provided for herein; (d) all Professionals and agents retained by the Committee in the Debtors' Chapter 11 Cases; (e) the Plan Administrator and GUC Trustee; and (f) in each case, the respective Related Persons of each of the foregoing Persons.

13153917-2

"Executory Contract" means a contract to which one or more of the Debtors is a party and that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

"File," "Filed," or "Filing" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court (including requests for allowance of an Administrative Expense Claim) or, with respect to the filing of a Proof of Claim, the Claims, Noticing, and Solicitation Agent.

"Final DIP Order" means that certain *Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral on a Limited Basis, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying Automatic Stay, and (VI) Granting Related Relief* [ECF No. 393].

"Final Distribution Date" means the Distribution by the Plan Administrator and GUC Trustee, as applicable, that satisfies all Claims to the extent provided in accordance with this Plan.

"Final Order" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter that has not been reversed, vacated, stayed, modified, or amended, and as to which the time to appeal, seek leave to appeal, or seek certiorari has expired and no appeal or petition for certiorari or motion for leave to appeal has been timely taken, or as to which any appeal that has been taken or any petition for certiorari or motion for leave to appeal that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari or leave to appeal could be sought or the new trial, reargument, leave to appeal, or rehearing shall have been denied, resulted in no modification of such order, or has otherwise been dismissed with prejudice, *provided, however,* that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment.

"First Day Pleadings" means those certain motions, applications, and related pleadings Filed by the Debtors on or about the Petition Date.

"General Unsecured Claim" means, collectively, any Claim against one or more of the Debtors that is not a/an Assumed Liability, Administrative Expense Claim, Priority Tax Claim or Other Priority Claim, Professional Fee Claim, Intercompany Claim, Prepetition Term Loan Claim, or Miscellaneous Secured Claim. For the avoidance of doubt, Rejection Claims are General Unsecured Claims and any deficiency Claim of a holder of Prepetition Term Loan Claims are General Unsecured Claims. To the extent applicable, the limitations imposed by section 502 of the Bankruptcy Code shall apply to the relevant General Unsecured Claim, including subsection 502(b)(6) and subsection 502(b)(7) thereof.

"Governance Documents" means, with respect to any Person that is an entity, such entity's organizational and governance documents, including its certificate or articles of incorporation, certificate of formation or certificate of limited partnership, its bylaws, limited liability company agreement, operating agreement, or limited partnership agreement, and any indemnification

agreements, stockholders agreements, or registration rights agreements (or equivalent governing documents of any of the foregoing).

"Governmental Unit" has the meaning set forth in section 101(27) of the Bankruptcy Code.

"GUC Fund" means an amount equal to the Plan Funding Amount *less* the amounts needed to satisfy all Allowed Priority Tax Claims and Allowed Other Priority Claims *less* the amount of Allowed Administrative Expense Claims to the extent they are not Assumed Liabilities (except for DIP Claims and Allowed Professional Fee Claims). The GUC Fund will be funded through either Excluded Cash (as defined in the Stalking Horse Asset Purchase Agreement), DIP Loans (as defined in the DIP Motion), or, in the event a party other than the Stalking Horse Purchaser is the Purchaser, Cash proceeds from the Sale Transaction.

"GUC Litigation Proceeds" means forty percent (40%) of the net proceeds recovered by the GUC Trust from the Equityholder Litigation Claims.

"GUC Trust" the trust established in accordance with Article IV.B.6 of the Plan.

"GUC Trust Agreement" means the agreement to be executed between the GUC Trustee and the Debtors establishing the GUC Trust, which will be prepared by the Committee, filed with the Plan Supplement, and reasonably acceptable to the Committee, the Debtors and the Prepetition Term Loan Agent.

"GUC Trust Assets" means the GUC Fund, the Equityholder Litigation Claims, and the resulting GUC Litigation Proceeds, if any.

"GUC Trust Documents" means the GUC Trust Agreement and any ancillary documents relating thereto.

"GUC Trustee" means the Person to be chosen by the Committee to serve as trustee of the GUC Trust, which Person shall be identified in the Plan Supplement and be reasonably acceptable to the Prepetition Term Loan Agent and the Debtors, or any successor trustee of the GUC Trust.

"Impaired" means with respect to a Class of Claims or Interests, a Class of Claims or Interests that is impaired within the meaning of section 1124 of the Bankruptcy Code.

"Initial Distribution Date" means the Plan Effective Date or as soon as reasonably practical thereafter; provided, however, that in no event shall the Initial Distribution Date be more than thirty (30) days after the Plan Effective Date unless otherwise ordered by the Bankruptcy Court.

"Intercompany Claim" means any Claim against a Debtor held by another Debtor.

"Interest" means the rights of the holders of the common stock, membership interests or other equity interests issued by a Debtor and outstanding immediately prior to the Petition Date, including any options, warrants or other rights with respect thereto, or any other instruments evidencing an ownership interest in the applicable Debtor and the rights of any Person to purchase or demand the issuance of any of the foregoing.

"<u>Interim DIP Order</u>" means that certain *Interim Order (I) Authorizing the Debtors to Obtain Postpetition Financing, (II) Authorizing the Debtors to Use Cash Collateral on a Limited Basis, (III) Granting Liens and Providing Superpriority Administrative Expense Status, (IV) Granting Adequate Protection, (V) Modifying the Automatic Stay, (VI) Scheduling a Final Hearing, and (VII) Granting Related Relief* [ECF No. 127].

"<u>Lien</u>" has the meaning set forth in section 101(37) of the Bankruptcy Code.

"<u>Miscellaneous Secured Claim</u>" means any Secured Claim against any applicable Debtor, other than the DIP Claims and the Prepetition Term Loan Lender Claims.

"<u>Miscellaneous Secured Claims Collateral</u>" means any property subject to a Lien securing a Miscellaneous Secured Claim, which Lien is senior in priority to the Liens of the Prepetition Term Loan Parties under applicable law and the DIP Orders.

"<u>Miscellaneous Secured Claim Sale Proceeds</u>" means the net proceeds, if any, attributable to a sale of any Miscellaneous Secured Claims Collateral.

"<u>New Board</u>" means, in the event of a Reorganized Equity Sale, the respective board of managers or member managers (or other applicable governing body), as applicable, of the Reorganized Debtors immediately following the occurrence of the Plan Effective Date, to be appointed in accordance with the Plan and the New Organizational Documents.

"<u>New Organizational Documents</u>" means, collectively, the Governance Documents of the Reorganized Debtors, which shall be determined by and be acceptable in form and substance solely to the Purchaser.

"<u>New Reorganized Debtor Equity</u>" means the equity interests in the Reorganized Debtors, to be issued on the Plan Effective Date.

"<u>Other Priority Claim</u>" means any unsecured Claim other than an Administrative Expense Claim, Intercompany Claim or Priority Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

"<u>Person</u>" shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

"<u>Petition Date</u>" means May 19, 2024.

"<u>Plan</u>" means this joint plan of reorganization or liquidation, as applicable, as it pertains to the Debtors, including any supplements and exhibits hereto, as it and they may be altered, amended, modified, or supplemented from time to time in accordance with their terms.

"<u>Plan Administrator</u>" means the Person, or any successor thereto, selected by the Debtors, with the consent of the Purchaser and the Prepetition Term Loan Agent and in consultation with the Committee, to administer the Wind-Down Debtor(s), which will have all powers and authority set forth in Article IV.B.4 of the Plan.  Subject to the approval of the Debtors, the Purchaser, and the Prepetition Term Loan Agent, the GUC Trustee may also be the Plan Administrator.

"Plan Administrator Agreement" means the agreement between the Plan Administrator and the Debtors, in form and substance reasonably acceptable to the Plan Administrator, the Debtors, the Committee, the Purchaser, and the Prepetition Term Loan Agent regarding the administration of such Wind-Down Debtor(s)' assets and other matters related to their applicable Estate(s), which shall be Filed as part of the Plan Supplement.

"Plan Administrator Documents" means the Plan Administrator Agreement and related ancillary documents.

"Plan Effective Date" means the date that is the first Business Day after the Confirmation Date on which (i) no stay of the Confirmation Order is in effect and (ii) all conditions precedent to the occurrence of the Plan Effective Date set forth in Article IX.A of the Plan have been satisfied or waived in accordance with Article IX.B of the Plan. The Debtors shall File a notice of the occurrence of the Plan Effective Date on the docket of these Chapter 11 Cases.

"Plan Funding Amount" means an amount equal to (i) the sum of (a) $2,500,000, (b) any unused amounts in the Professional Fee Reserve (as defined in the Final DIP Order) allocated to payment of the fees and expenses of the Committee's professionals, and (c) any unused amounts in the Professional Fee Reserve allocated to payment of the fees and expenses of the Debtors' Professionals, provided that such amount shall not exceed $250,000, *less* (ii) the Wind-Down Amount. The "Plan Funding Amount" shall be funded through Excluded Cash (as defined in the Stalking Horse Asset Purchase Agreement), DIP Loans (as defined in the DIP Motion) or, in the event a party other than the Stalking Horse Bidder is named as Purchaser, the Cash proceeds from the Sale Transaction.

"Plan Supplement" means the compilation of documents and forms of documents, schedules and exhibits (or substantially final forms thereof), in each case as applicable and dependent upon the Restructuring Transactions actually implemented, including the following documents: (a) the Purchase Agreement; (b) the New Organizational Documents; (c) to the extent known, the identities of the members (as applicable) of the New Board; (d) the Schedule of Retained Causes of Action; (e) the Assumed Executory Contracts and Unexpired Leases List; (f) the form of the Plan Administrator Agreement; (g) the form of the GUC Trust Agreement; and (h) any and all other documentation that is contemplated by this Plan.

"Prepetition Term Loan Agent" shall have the meaning set forth in the Final DIP Order.

"Prepetition Term Loan Claims" shall mean all Claims arising in connection with the Prepetition Term Loan Facility (as defined in DIP Motion) which shall be Allowed in the principal amount of $264,720,000 *less* the Roll-Up Amount (as defined in the Final DIP Order) *plus* accrued interest, costs and expenses (including professional fees), that are payable in accordance with the Final DIP Order.

"Prepetition Term Loan Parties" shall have the meaning set forth in the Final DIP Order.

"Priority Tax Claim" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

"Pro Rata" means the proportion that an Allowed Claim or an Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that Class.

"Professional" means any Person: (a) retained pursuant to a Final Order of the Bankruptcy Court in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered prior to or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, 331, and 363 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code. For the avoidance of doubt, the "Professionals" shall include (i) King & Spalding LLP, co-counsel to the Debtors, (ii) Berger Singerman LLP, co-counsel to the Debtors, (iii) Blake, Cassels & Graydon LLP, special Canadian counsel to the Debtors, (iv) Keen-Summit Capital Partners LLC, the Debtors' real estate advisor, (v) Epiq Corporate Restructuring, LLC, the Debtors' claims agent, and (vi) Hilco Corporate Finance, LLC,  the Debtors' investment banker.

"Professional Fee Claims" means a Claim by a Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code.

"Professional Fee Escrow Account" means the Professional Fee Reserve funded by the Debtors in accordance with the Final DIP Order as well as any portion of the Cash proceeds of the Sale Transaction remitted to the Professional Fee Escrow Account on or prior to the Plan Effective Date in accordance with Article II.B of the Plan and the DIP Orders, which shall be allocated to the Debtors' Estates.

"Professional Fee Escrow Amount" means the aggregate amount of Professional Fee Claims and other fees and expenses that the Professionals estimate they have incurred or will incur in rendering services to the Debtors prior to and as of the Plan Effective Date and in accordance with the Final DIP Order, which estimates shall be delivered by the Professionals to the Debtors, the Committee, and the Prepetition Term Loan Parties as set forth in Article II.B.1 of the Plan, and which shall be allocated to the Debtors' Estates for the exclusive benefit of the Professionals (subject to the terms of the Final DIP Order).

"Proof of Claim" means a written proof of Claim Filed against a Debtor in the Chapter 11 Cases.

"Purchase Agreement" means: (a) the asset purchase agreement or equity purchase agreement executed by the Successful Bidder as approved by the Bankruptcy Court (including the Stalking Horse Purchase Agreement), or (b) any agreements, contracts, certificates or other documents executed in furtherance of the Restructuring Transactions, including a Reorganized Equity Sale.  Any Purchase Agreement shall include language that any Avoidance Actions against non-insiders of the Debtors purchased thereunder (other than the Equityholder Litigation Claims) shall be waived and extinguished.  For the avoidance of doubt, such waived Avoidance Claims shall not include any claims or causes of action against current or former equityholders of the Debtors or their Affiliates or any other Person that is the subject of the Equityholder Litigation Claims.

"Purchaser(s)" means, one or more Persons that, pursuant to the Bidding Procedures Order, either (i) purchases all or substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code (including, to the extent applicable, pursuant to the Purchase Agreement) or (ii) pursuant to this Plan, purchases (a) all or substantially all of the assets of RL Management and RL International and (b) the New Reorganized Debtor Equity.

"Qualified Bid" has the meaning set forth in the Bidding Procedures Order.

"Qualified Bidder" has the meaning set forth in the Bidding Procedures Order.

"Quarterly Fees" has the meaning set forth in Article XII.C.

"Reinstated" means, with respect to a Claim or an Interest, that such Claim or Interest shall be rendered Unimpaired under the Plan in accordance with section 1124(2) of the Bankruptcy Code.

"Rejection Claim" means claims of any non-Debtor counterparty to any unexpired lease or any executory contract arising on account of the rejection of such lease or contract during the administration of these Chapter 11 Cases under section 365 of the Bankruptcy Code or pursuant to the Plan.

"Related Party" means, each of, and in each case in its capacity as such, current and former directors, managers, officers, committee members, members of any governing body, equity holders (regardless of whether such equity interests are held directly or indirectly), affiliated investment funds or investment vehicles, managed accounts or funds, predecessors, participants, successors, assigns, subsidiaries, Affiliates, partners, limited partners, general partners, principals, members, management companies, fund advisors or managers, employees, agents, trustees, advisory board members, financial advisors, attorneys (including any other attorneys or professionals retained by any current or former director or manager in his or her capacity as director or manager of any Person), accountants, investment bankers, representatives, and other professionals and advisors, and any such Person's respective successors, assigns, heirs, executors, estates, and nominees.

"Released Party" means, in its capacity as such, each of: (a) the Debtors' Professionals; (b) the current officers of each of the Debtors and the Debtors' current manager and/or director, Mr. Lawrence Hirsch; (c) the DIP Lenders and the DIP Agent and their respective Related Parties; (d) the Prepetition Term Loan Parties and their respective Related Parties; (e) the Purchaser; (f) the Committee and those individual members of the Committee, solely in their capacities as such, who do not opt out of the release provided for herein; (g) the Committee's Professionals; (h) the Plan Administrator and GUC Trustee; and (i) in each case, the respective Related Persons of each of the foregoing Persons.

"Releasing Party" means, in its capacity as such, each of: (a) the officers of each of the Debtors, the members of any board of managers of each Debtor and the managing members (or comparable governing bodies or Persons) of any Debtor; (b) the DIP Lenders and the DIP Agent; (c) the Prepetition Term Loan Parties; (d) all holders of Claims that (A) vote to accept the Plan, (B) vote to reject the Plan and do not elect to opt out of the releases contained in Article VIII of the Plan, or (C) do not vote on the Plan and do not elect to opt out of the releases contained in

Article VIII of the Plan; (e) the Purchaser; (f) the Committee and those individual members of the Committee, solely in their capacities as such, who do not opt out of the release provided for herein; and (g) the Plan Administrator and GUC Trustee.

"Reorganized Debtors" means except for any Wind-Down Debtors, the Debtors on and after the Plan Effective Date, together with any successor or assign thereto, by merger, consolidation, reorganization, or otherwise, whether in the form of a corporation, limited liability company, partnership, or other form, as the case may be, on and after the Plan Effective Date. For the avoidance of doubt, Reorganized Debtors shall not include RL Management, RL International or RLSV, Inc.

"Reorganized Equity Sale" means the sale to Purchaser of (i) all or substantially all of the assets of Debtor RL Management and RL International and (ii) all or substantially all of the equity interests in the Reorganized Debtors, pursuant to section 1129 of the Bankruptcy Code and the Purchase Agreement.

"Restructuring Transactions" means any transactions described in, approved by, contemplated by, or necessary to effectuate the Plan.

"RL International" means Red Lobster International Holdings LLC, a Delaware limited liability company.

"RL Management" means Red Lobster Management LLC, a Delaware limited liability company.

"RLSV" means RLSV, Inc., a Florida corporation.

"Sale Proceeds" means, with respect to any Sale Transaction, the net Cash proceeds and/or other proceeds or consideration received by the Debtors or the Reorganized Debtors (whether directly or on account of the purchase of their interests in the Debtors) in connection with such Sale Transaction(s).

"Sale Transaction" means either the 363 Asset Sale or Reorganized Equity Sale.

"Sale Transaction Documents" means all documents executed and delivered by the Debtors and, as applicable, the Purchaser, in connection with the Sale Transaction or other Restructuring Transaction, which shall be reasonably acceptable to the Debtors.

"Schedule of Retained Causes of Action" means the schedule of the Causes of Action of the Debtors or the Debtors' Estates that are not released, waived, or transferred pursuant to the Plan, to be Filed as part of the Plan Supplement, as the same may be amended, modified, or supplemented from time to time by the Debtors, with the consent of the Prepetition Term Loan Parties.

"Schedules" means, the schedules of assets and liabilities and the statement of financial affairs Filed by each Debtor with the Bankruptcy Court pursuant to sections 521 and 1106(a)(2) of the Bankruptcy Code and Bankruptcy Rule 1007, as such schedules and statement may be amended or supplemented by such Debtor at any point prior to the Plan Effective Date.

"Secured Claim" means a Claim (a) secured by a Lien on property in which any of the Debtors has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Final Order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such Debtor's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) Allowed pursuant to the Plan, or separate order of the Bankruptcy Court, as a Secured Claim.

"Securities Act" means the Securities Act of 1933, as amended, 15 U.S.C. §§ 77a-77aa.

"Security" means a security, as defined in Section 2(a)(1) of the Securities Act.

"Sold Equity Interest" shall mean any Interests purchased by the Purchaser in any 363 Asset Sale.

"Solicitation Materials" means the materials to be distributed together with the Plan and Disclosure Statement to holders of Claims entitled to vote on the Plan, which shall be in form and substance reasonably acceptable to the Debtors and the Prepetition Term Loan Parties.

"Successful Bidder" has the meaning set forth in the Bidding Procedures Order.

"Surviving DIP Provisions" means any provisions of the DIP Documents governing the DIP Facility that by their terms survive the payoff and termination of the DIP Documents.

"Stalking Horse Purchase Agreement" means that certain Asset Purchase Agreement, dated as of May 19, 2024, by and between RL Management and RL Purchaser as it may be amended or modified.

"Stalking Horse Purchaser" means RL Purchaser, and (or as applicable, together with) any Affiliate (as defined in the Stalking Horse Purchase Agreement) thereof to which RL Purchaser assigns any of its rights, interests and obligations under any Purchase Agreement (including the Stalking Horse Purchase Agreement).

"Takeback Loans" means term loans issued to or guaranteed by the Purchaser (or one or more of its Affiliates, as designated by Purchaser) and Reorganized Debtors upon the Plan Effective Date in connection with a Reorganized Equity Sale or other Restructuring Transactions.

"U.S. Trustee" means the Office of the United States Trustee for the Middle District of Florida.

"Unexpired Lease" means a lease to which one or more Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

"Unimpaired" means with respect to a Class of Claims or Interests, a Class of Claims or Interests that is not Impaired within the meaning of section 1124 of the Bankruptcy Code.

"WARN Actions" means causes of actions commenced pursuant the Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq. or the state law equivalent, including

those certain adversary proceedings styled as (i) *Kyle Zakowicz v. Red Lobster Management LLC, et al.*, No. 24-02486, Adv. Pro. No. 24-00048 (Bankr. M.D. Fla. 2024); (ii) *Donna Lowe v. Red Lobster Hospitality LLC, Red Lobster Restaurants LLC and Red Lobster Seafood Co.*, No. 24-02486, Adv. Pro. No. 24-00049 (Bankr. M.D. Fla. 2024); and (iii) *George Parker v. Red Lobster Hospitality LLC, Red Lobster Restaurants LLC and Red Lobster Seafood Co., LLC*, No. 24-02486, Adv. Pro. No. 24-00050 (Bankr. M.D. Fla. 2024).

"WARN Action Settlement Funds" means an amount up to $250,000 to be used by the Wind-Down Debtors or Reorganized Debtors, as applicable, to satisfy all, or a portion of, the Allowed Other Priority Claims resulting from WARN Actions commenced against the Debtors. For the avoidance of doubt, the "WARN Action Settlement Funds" shall be included in the Plan Funding Amount.

"Wind Down" means, following the closing of the Sale Transaction, the process to wind down, dissolve and liquidate the applicable Debtors' Estates and distribute the Wind-Down Assets in accordance with Article IV.B of the Plan. With respect to Wind-Down Debtors only, a Wind Down may include conversion or dismissal of such Chapter 11 Cases.

"Wind-Down Amount" means, (i) if a 363 Asset Sale is consummated, an aggregate amount of $800,000 and (ii) if a Reorganized Equity Sale is consummated, an aggregate amount of $500,000, in each case for the reasonable activities and expenses necessary to effectuate the Wind Down of the Debtors' Estates, which budget, activities, and reasonable expenses shall be subject to the consent of the Purchaser, the Committee, and, absent repayment in full in Cash of the DIP Facility prior to the Plan Effective Date, the DIP Lenders.

"Wind-Down Assets" means, the assets of the Debtors' Estates to vest in the Wind-Down Debtors on the Plan Effective Date, which shall be administered by the Plan Administrator, including but not limited to, (i) if applicable, the Sale Proceeds to the extent not distributed on the Plan Effective Date; (ii) any Causes of Action retained by the Debtors (excluding the Equityholder Litigation Claims and the resulting GUC Litigation Proceeds, if any); and (iii) the Wind-Down Amount.

"Wind-Down Budget" means the agreed upon budget for the Wind-Down Amount, which shall be in form and substance reasonably acceptable to the Prepetition Term Loan Agent and the Committee.

"Wind-Down Debtor(s)" means, any Debtor on or after the Plan Effective Date to the extent that: (a) all or substantially all of the assets of such Debtor are acquired by the Purchaser in the Sale Transaction or Restructuring Transactions, as applicable; or (b) the Interests in such Debtor are not (i) cancelled on the Plan Effective Date or (ii) acquired directly or indirectly by the Purchaser(s) in connection with the Sale Transaction or Restructuring Transactions, as applicable. Unless otherwise determined by Purchaser in its sole discretion prior to the Confirmation Date, the Wind-Down Debtors will include RL Management, RL International and RLSV.

"Wind-Down Reversionary Assets" means, any Wind-Down Assets that remain after the Plan Administrator has implemented and completed the Wind Down, including the payment or reserving of fees incurred and unpaid in connection with the Wind Down, and subject to the Final

DIP Order, any remaining funds held in the Professional Fee Escrow after all Allowed Professional Fee Claims have been irrevocably paid in full pursuant to one or more of the Final Orders (except any remaining amounts used to fund the GUC Trust Assets as set forth in this Plan).

"Zurich" means Zurich American Insurance Company and/or any of its affiliates and each of their respective successors.

"Zurich Claims" means the claims of Zurich (including any cure amount) arising under the Zurich Insurance Program (regardless of whether all or any part of such obligations are liquidated before or after the bankruptcy petition date, confirmation of a chapter 11 plan or conversion of one or more of these chapter 11 cases to cases under chapter 7 of the Bankruptcy Code.

"Zurich Collateral" means the collateral to secure obligations under any insurance policies and/or related agreements issued and/or entered into by Zurich.

"Zurich Insurance Program" means certain insurance policies issued by Zurich to the Debtors and all agreements related thereto, including any claims handling agreement(s) and each as amended, extended, modified, supplemented or renewed and including any exhibit, endorsement, or addenda thereto.

### B.    Rules of Interpretation

For purposes of the Plan: (1) in the appropriate context, each term, whether stated in the singular or the plural, includes both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, whether or not Filed, having been Filed, or to be Filed shall mean that document, schedule, or exhibit, as it may thereafter be amended, restated, supplemented, or otherwise modified in accordance with the Plan; (4) any reference to a Person as a holder of a Claim or Interest includes that Person's successors and assigns; (5) unless otherwise specified, all references herein to "Articles" are references to Articles of the Plan; (6) unless otherwise specified, all references herein to exhibits are references to exhibits in the Plan Supplement; (7) unless otherwise specified, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (8) subject to the provisions of any contract, certificate of incorporation, bylaw, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with, applicable federal law, including the Bankruptcy Code and the Bankruptcy Rules, or, if no rule of law or procedure is supplied by federal law (including the Bankruptcy Code and the Bankruptcy Rules) or otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws; (9) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; (10) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (11) all references to docket numbers of documents Filed in the Chapter 11 Cases are references to the

16

docket numbers under the Bankruptcy Court's CM/ECF system; (12) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time and as applicable to the Chapter 11 Cases, unless otherwise stated; (13) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation"; (14) references to "Proofs of Claim," "holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interest," "holders of Interests," "Disputed Interests," and the like, as applicable; (15) any immaterial effectuating provisions may be interpreted in a manner that is consistent with the overall purpose and intent of the Plan; (16) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; (17) all references herein to consent, acceptance, or approval shall be deemed to include the requirement that such consent, acceptance, or approval be evidenced by a writing, which may be conveyed by counsel for the respective parties that have such consent, acceptance, or approval rights, including by electronic mail; and (18) any term used in capitalized form herein that is not otherwise defined herein but that is used in the Bankruptcy Code or Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

### C.    Computation of Time

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day. Subject to the requirements of any Definitive Document, any action to be taken on the Plan Effective Date may be taken on or as soon as reasonably practicable after the Plan Effective Date.

### D.    Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); provided, however, that corporate or limited liability company governance matters relating to the Debtors or the Reorganized Debtors, as applicable, shall be governed by the laws of the state of incorporation or formation of the applicable Debtor or the Reorganized Debtors, as applicable.

### E.    Reference to Monetary Figures

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

### F.    Controlling Document

In the event of an inconsistency between the Plan and the Plan Supplement with respect to the Plan, the terms of the relevant document in the Plan Supplement with respect to the Plan shall

control unless otherwise specified in such Plan Supplement document with respect to the Plan. In the event of an inconsistency between the Plan and any other instrument or document created or executed pursuant to the Plan, or between the Plan and the Disclosure Statement, the Plan shall control. The provisions of the Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effectuate the purposes of each; provided, however, that if there is determined to be any inconsistency between any provision of the Plan and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern, and any such provisions of the Confirmation Order shall be deemed a modification of the Plan.

### G.    Consent Rights of the Consenting Lenders

Notwithstanding anything in the Plan to the contrary, any and all information and consultation rights, with respect to the form and substance of the Plan, all exhibits to the Plan, and the Plan Supplement, and any other Definitive Documents, including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by reference and fully enforceable as if stated in full herein. Failure to reference the rights referred to in the immediately preceding sentence in the Plan shall not impair such rights.

The signing of the applicable Definitive Documents will be subject to, among other things, the negotiation by the Debtors, the DIP Agent, Prepetition Term Loan Agent, and, to the extent applicable, the Successful Bidder and the Plan Administrator, of acceptable terms and conditions for the Definitive Documents as well as additional legal, accounting, financial, tax, business and regulatory due diligence. The Plan, the Confirmation Order, GUC Trust Agreement, GUC Trust Documents and Plan Administrator Agreement shall be in form and substance acceptable to the Committee.

## II.    UNCLASSIFIED CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, Professional Fee Claims, DIP Claims and Priority Tax Claims have not been classified against the Debtors.

### A.    Administrative Expense Claims

Requests for payment of Administrative Expense Claims (except for DIP Claims and Professional Fee Claims) must be Filed and served no later than the applicable Administrative Expense Claims Bar Date pursuant to the procedures specified in the Confirmation Order. Holders of Administrative Expense Claims that are required to File and serve a request for payment of such Claims that fail to do so shall be forever barred, estopped, and enjoined from asserting such Administrative Expense Claims against the Debtors, the Reorganized Debtors, Wind-Down Debtor(s), or the GUC Trustee, as applicable, or their respective property, and such Administrative Expense Claims shall be deemed discharged as of the Plan Effective Date without the need for any objection or any notice to any Person or an order of the Bankruptcy Court.

Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to a less favorable treatment, to the extent an Allowed Administrative Expense Claim has not been

paid in full or otherwise satisfied during the Chapter 11 Cases, each holder of an Allowed Administrative Expense Claim (other than Professional Fee Claims and DIP Claims) shall receive from the Debtors, in full and final satisfaction of its Allowed Administrative Expense Claim, payment in full in Cash in accordance with the following: (1) if such Administrative Expense Claim is Allowed on or prior to the Plan Effective Date, on the Plan Effective Date; (2) if such Administrative Expense Claim is not Allowed as of the Plan Effective Date, no later than thirty (30) days after the date on which such Administrative Expense Claim is Allowed; (3) if such Allowed Administrative Expense Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date, in accordance with the terms and conditions of the particular transaction or course of business giving rise to such Allowed Administrative Expense Claim; or (4) at such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

### B. Professional Fee Claims

#### 1. Final Fee Applications and Payment of Professional Fee Claims

In accordance with Local Rule 2016-1(c)(2)(C), all final requests for payment of Professional Fee Claims must be Filed no later than fourteen (14) days prior to the Confirmation Hearing unless ordered otherwise. The final request for payment may include an estimate of the amount of additional fees and costs to be incurred by each Professional through the Confirmation Hearing. If the actual fees for services rendered and costs incurred during the estimated period for each Professional exceed the estimate, the final application may be supplemented up to fourteen (14) days after entry of the Confirmation Order. If the actual fees for services rendered and costs incurred during the estimated period are less than the estimated amount, approval of such application authorizes payment of the actual fees and costs not to exceed the estimated amounts. The Bankruptcy Court shall determine the Allowed amounts of all Professional Fee Claims in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules, Local Rules and prior Bankruptcy Court orders.

#### 2. Professional Fee Escrow Accounts

The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals in respect of Allowed Professional Fee Claims until all Allowed Professional Fee Claims have been paid in full, and the funds held in the Professional Fee Escrow Account shall not be considered property of the Debtors' Estates; provided, that when all Allowed Professional Fee Claims have been paid in full any funds remaining in the Professional Fee Reserve shall (i) in the event the Stalking Horse Bidder is the Purchaser, be disbursed to the Purchaser and (ii) in the event a party other than the Stalking Horse bidder is Purchaser, shall be returned to the DIP Agent (excluding the Plan Funding Amount and any remaining amounts used to fund the GUC Trust Assets as set forth in this Plan). No Liens, Claims, or Interests shall encumber the Professional Fee Escrow Account or Cash held therein.

#### 3. Post-Confirmation/Pre-Effective Date

From and after the Confirmation Date until the Effective Date, the Debtors, without the necessity for any approval by the Bankruptcy Court, shall pay the reasonable fees and necessary

and documented expenses of the Professionals during such period, up to the amount in the Professional Fee Escrow Amount.

<div align="center">4.     <u>Post-Effective Date Fees and Expenses</u></div>

Upon the Plan Effective Date, any requirement that the Reorganized Debtors', Wind-Down Debtors', or GUC Trust's Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention for services rendered after such date shall terminate, and the Reorganized Debtors, the Plan Administrator, and the GUC Trustee, as applicable, may employ any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

### C.    DIP Claims

The DIP Claims shall be Allowed in the amount outstanding under the DIP Facility (determined as of consummation of the Sale Transaction or other Restructuring Transaction). If a Sale Transaction is consummated pursuant to the Stalking Horse Asset Purchase Agreement, on the Closing Date (as defined in the Stalking Horse Asset Purchase Agreement), in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP Claim shall be satisfied in full through a credit bid by the Stalking Horse Bidder of all its claim for the Purchased Assets (as defined in the Stalking Horse Asset Purchase Agreement) pursuant to the Stalking Horse Asset Purchase Agreement and in accordance with section 363(k) of the Bankruptcy Code.

If the Sale Transaction is consummated pursuant to a Purchase Agreement executed by a Bidder other than the Stalking Horse Bidder, upon closing of such Sale Transaction, except to the extent that a holder of an Allowed DIP Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed DIP Claim, each Allowed DIP Claim shall be indefeasibly paid in full, in Cash.

If the Sale Transaction is a Reorganized Equity Sale conducted hereunder, then on the Plan Effective Date, in full and final satisfaction, settlement, release and discharge of, and in exchange for, each Allowed DIP Claim shall be satisfied through the transfer of specified assets, assumption and assignment of specified contracts and leases, assumption of specified liabilities, issuance of equity in the Reorganized Debtors and issuance of Takeback Loans, all in accordance with the Purchase Agreement.

Contemporaneously with the foregoing treatment, the DIP Facility and the DIP Documents shall be deemed cancelled, all commitments under the DIP Documents shall be deemed terminated, all DIP Liens shall automatically terminate, and all collateral subject to such DIP Liens shall be automatically released, in each case without further action by the DIP Agent or the DIP Lenders. The DIP Agent and the DIP Lenders shall take all actions to effectuate and confirm such termination, release and discharge as reasonably requested by the Debtors or the Purchaser; <u>provided</u> that the Surviving DIP Provisions shall survive in accordance with the terms of such DIP Documents.

From and after the consummation of a Reorganized Equity Sale, the Reorganized Debtors shall, without any further notice to or action, order, or approval of the Bankruptcy Court, pay in

<div align="center">20</div>

Cash the legal, professional, and other fees and expenses of the DIP Agent and Prepetition Term Loan Agent within three (3) business days of such parties' delivery of an invoice to the Reorganized Debtors, and such parties shall not be required to comply with the procedures set forth in paragraph 41 of the Final DIP Order with respect to such fees.

### D. Priority Tax Claims

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, the Allowed Priority Tax Claims, each holder of an Allowed Priority Tax Claim shall receive treatment consistent with section 1129(a)(9) of the Bankruptcy Code by the applicable Debtor against which such Allowed Priority Tax Claims are validly asserted.

## III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

### A. Classification of Claims and Interests

The Classes of Claims and Interests listed below classify Claims and Interests for all purposes, including voting on, and distributions pursuant to, the Plan in accordance with sections 1122 and 1123(a) of the Bankruptcy Code. The Plan deems a Claim or Interest to be classified in a particular Class only to the extent that (i) the Claim or Interest is an Allowed Claim or Interest and qualifies within the description of that Class and it shall be deemed classified in a different Class to the extent that it qualifies within the description of such different Class and (ii) such Allowed Claim or Allowed Interest has not been satisfied, released, or otherwise settled prior to the Plan Effective Date. Holders of Allowed Claims against more than one Debtor shall be treated as having a single Allowed Claim solely for purposes of any Distribution.

The following table designates the Classes of Claims against and Interests in the Debtors and specifies which Classes are (i) Impaired and Unimpaired under the Plan, (ii) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, and (iii) presumed to accept or deemed to reject the Plan. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, DIP Claims and Priority Tax Claims have not been classified. The classification of Claims and Interests set forth herein shall apply separately to each Debtor. Certain of the Debtors may not have Claims or Interests in a particular Class, and any such Classes shall be treated as set forth in Article III.B of the Plan.

1.     Class Identification

| Class | Designation | Impairment | Voting Rights |
|-------|-------------|------------|---------------|
| Class 1 | Miscellaneous Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 2 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) |
| Class 3 | Prepetition Term Loan Claims | Impaired | Entitled to Vote |
| Class 4 | General Unsecured Claims | Impaired | Entitled to Vote |
| Class 5 | Intercompany Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| Class 6 | Interests | Impaired | Not Entitled to Vote (Deemed to Reject) |

**B.     Treatment of Claims and Interests**

The holders of the following Claims and Interests against the Debtors shall receive the treatment described below in full and final satisfaction of such Claim or Interest.

1.     Class 1 – Miscellaneous Secured Claims

(a)     *Classification*: Class 1 consists of all Miscellaneous Secured Claims against the Debtors.

*Treatment*: The Plan will not alter any of the legal, equitable and contractual rights of the holders of Allowed Miscellaneous Secured Claims. Each holder of an Allowed Class 1 Claim shall receive from the Debtors, subject to DIP Agent consent but otherwise in the sole discretion of the Debtors in full satisfaction, settlement, release, and extinguishment of such Claim: (a) Cash equal to the amount of such Allowed Miscellaneous Secured Claim solely from the Miscellaneous Secured Claim Sale Proceeds on or as soon as practicable after the latest of (i) the Effective Date, (ii) the date that such Miscellaneous Secured Claim becomes Allowed, and (iii) a date agreed to by the Debtors and the holder of such Class 1 Claim; (b) the property securing such Miscellaneous Secured Claim without representation or warranty by or recourse against the Debtors; (c) such other treatment such that it will not be impaired pursuant to section 1124 of the Bankruptcy Code; or (d) such other less favorable treatment on such other terms and conditions as may be agreed upon in writing by the holder of such Claim and the Debtors; provided, however, that any Allowed Class 1 Claim that constitutes

22

an Assumed Liability under the Purchase Agreement that remains unpaid as of the Closing Date shall be paid in full in Cash by the Purchaser in accordance with the terms of the documents or agreements memorializing the Allowed Class 1 Claim.

(b)     *Voting*: Class 1 is Unimpaired under the Plan, and the holders of Allowed Class 1 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the holders of Allowed Claims in Class 1 are not entitled to vote to accept or reject the Plan.

2.      <u>Class 2 – Other Priority Claims</u>

(a)     *Classification*: Class 2 consists of all Other Priority Claims.

(b)     *Treatment*: On the Plan Effective Date, except to the extent that a holder of an Allowed Other Priority Claim has agreed to a less favorable treatment, each holder of an Allowed Other Priority Claim shall receive from the Debtors, at the option of the Debtors with the consent of the Prepetition Term Loan Agent, (a) payment in full in Cash or such other treatment that would render its Allowed Other Priority Claim Unimpaired or (b) such other less favorable treatment on such other terms and conditions as may be agreed upon in writing by the holder of such Claim and the Debtors. The WARN Action Settlement Funds shall be used by the Debtors to satisfy all, or a portion of, Allowed Other Priority Claims resulting from WARN Actions commenced against the Debtors.  Allowed Other Priority Claims shall be satisfied exclusively from the Plan Funding Amount. The treatment set forth herein with respect to the holders of Allowed Class 2 Claims shall be in full and final satisfaction of the Allowed Class 2 Claims.

(c)     *Voting*: Class 2 is Unimpaired under the Plan and the holders of Allowed Class 2 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the holders of Allowed Claims in Class 2 are not entitled to vote to accept or reject the Plan.

3.      <u>Class 3 – Prepetition Term Loan Claims</u>

(a)     *Classification*: Class 3 consists of all Prepetition Term Loan Claims against the Debtors.

(b)     *Treatment*: On the Plan Effective Date and each Distribution Date thereafter, as applicable, except to the extent that a holder of any Prepetition Term Loan Claims has agreed to a less favorable treatment, each holder of a Prepetition Term Loan Claim shall (i) in the event of a Reorganized Equity Sale, receive its Pro Rata share of

23

(a) sixty percent (60%) of all net proceeds of the Equityholder Litigation Claims from the GUC Trust and (b) the net Cash proceeds of the Sale Transaction from the Debtors (except for the Professional Fee Escrow Amount, Wind-Down Amount, and the Plan Funding Amount), and (ii) in the event of a 363 Asset Sale, receive its Pro Rata share of (y) the net Cash proceeds of the Sale Transaction from the Debtors (except for the Professional Fee Escrow Amount, Wind-Down Amount and the Plan Funding Amount) and the sale of any Wind-Down Reversionary Assets and (z) sixty percent (60%) of all net proceeds of the Equityholder Litigation Claims from the GUC Trust.

(c) *Voting*: Class 3 is Impaired under the Plan. Holders of Claims in Class 3 are entitled to vote to accept or reject the Plan.

4. <u>Class 4 – General Unsecured Claims</u>

(a) *Classification*: Class 4 consists of all General Unsecured Claims.

(b) *Treatment*: On the Plan Effective Date, each holder of an Allowed Class 4 General Unsecured Claim (except for deficiency Claims held by a holder of a Prepetition Term Loan Claim) shall receive, in accordance with the GUC Trust Documents, its Pro Rata Share of the beneficial interests in the GUC Trust and the right to receive its respective Pro Rata Share of any available GUC Litigation Proceeds or other GUC Trust Assets, if any. Holders of Allowed General Unsecured Claims against more than one Debtor shall be treated as having a single Allowed General Unsecured Claim solely for purposes of any Distribution.  The treatment set forth herein with respect to the holders of Allowed Class 4 Claims (except for deficiency Claims held by a holder of a Prepetition Term Loan Claim) shall be in full and final satisfaction of the Allowed Class 4 Claims. Notwithstanding anything to the contrary contained in this Plan, no Distribution shall be made to Prepetition Term Loan Lenders on account of Allowed Class 4 Claims and the Prepetition Term Loan Lenders shall not be beneficiaries of the GUC Trust.

(c) *Voting*: Class 4 is Impaired under the Plan. Holders of Claims in Class 4 are entitled to vote to accept or reject the Plan.

5. <u>Class 5 – Intercompany Claims</u>

(a) *Classification*: Class 5 consists of all Intercompany Claims.

(b) *Treatment*: On the Plan Effective Date, all Intercompany Claims shall be cancelled, released, and extinguished without distribution, and will be of no further force or effect.

24

(c)     *Voting*: Class 5 is Impaired under the Plan. Holders of Claims in Class 5 are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such holders are not entitled to vote to accept or reject the Plan.

6.     Class 6 – Interests in Debtors

(a)     *Classification*: Class 6 consists of all Interests in the Debtors.

(b)     *Treatment*: On the Plan Effective Date, all Interests (excluding any Sold Equity Interests) in the Debtors shall be cancelled, released and extinguished without distribution, and will be of no further force or effect.

(c)     *Voting*: Class 6 is Impaired under the Plan. Holders of Interests in Class 4 are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such holders are not entitled to vote to accept or reject the Plan.

Except as set forth in Article VIII of this Plan, nothing contained in this Plan, the Confirmation Order or Definitive Documents shall compromise, modify or affect the rights of the Prepetition Term Loan Agent and Prepetition Term Loan Lenders to pursue additional recoveries from any Person or entity that is not a Debtor in these Chapter 11 Cases.

**C.     Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code**

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by at least one Impaired Class of Claims entitled to vote against the Debtors. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests. The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

**D.     Subordinated Claims**

Except as expressly provided herein, the allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective treatment thereof under the Plan take into account the relative priority of the Claims in each Class, whether arising under a contract, principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right to reclassify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

**E.     Elimination of Vacant Classes**

Any Class that does not have a Claim or Interest in an amount greater than zero as of the date of the Confirmation Hearing shall be considered vacant and deemed eliminated from the Plan for all purposes.

## IV.    MEANS FOR IMPLEMENTATION OF THE PLAN

### A.    General

#### 1.    General Settlement of Claims and Interests

After the Plan Effective Date, the Plan Administrator, Reorganized Debtors, the Wind-Down Debtor(s), and/or the GUC Trustee, as applicable, may compromise and settle any Claim and/or Cause of Action against the Debtors' Estate(s) without any further notice to or action, order, or approval of the Bankruptcy Court.

#### 2.    Restructuring Transactions

On or about the Plan Effective Date, the Debtors, the Reorganized Debtors, the Wind-Down Debtor(s), and the GUC Trustee, as applicable, may take all actions as may be necessary or appropriate to effectuate the Restructuring Transactions, including: (a) the execution and delivery of any appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, formation, organization, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law and any other terms to which the applicable Persons may agree, including the documents comprising the Plan Supplement; (b) the execution and delivery of Definitive Documents, including appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Persons agree; (c) the execution, delivery, and filing, if applicable, of appropriate certificates or articles of incorporation, formation, reincorporation, merger, amalgamation, consolidation, conversion, arrangement, continuance, or dissolution pursuant to applicable law; (d) the Sale Transaction; (e) such other transactions that are required to effectuate the Restructuring Transactions in the most efficient manner for the Debtors and the Prepetition Term Loan Agent, including in regard to tax matters and any mergers, consolidations, restructurings, conversions, dispositions, transfers, formations, organizations, dissolutions, or liquidations; (f) the selection of the New Board (if applicable); (g) the authorization, issuance, and distribution of the New Reorganized Debtor Equity and Takeback Loans; (h) the appointment of the Plan Administrator; (i) the creation of the GUC Trust and appointment of the GUC Trustee, (j) the execution, delivery, and adoption of the New Organizational Documents; and (k) all other acts or actions contemplated or reasonably necessary or appropriate to promptly consummate the Restructuring Transactions, including making filings or recordings that may be required by applicable law.

#### 3.    Insurance Policies

Each of the Debtors' insurance policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan. On the Plan Effective Date, unless an insurance policy (i) was specifically designated for assignment by the Purchaser, (ii) was rejected by the Debtors pursuant to a Bankruptcy Court order, or (iii) is the subject of a motion to reject Filed by the Debtors that remains pending on the date of the Confirmation Hearing with respect to the Plan, (a) in the event of a Reorganized Equity Sale, the Reorganized Debtors shall be deemed to have assumed each such insurance policy and any agreements, documents, and

instruments relating to coverage of all insured Claims and such insurance policy and any agreements, documents, or instruments relating thereto shall vest in the Reorganized Debtors and (b) in the event of a 363 Asset Sale, each such insurance policy and any agreements, documents, and instruments related to coverage of all insured Claims shall be either (A) rejected or (B) assumed and assigned by the Debtors to the Purchaser at the Purchaser's election.

Notwithstanding anything to the contrary in the Disclosure Statement, this Plan, Plan Supplement, the Confirmation Order, any agreement or order related to post-petition or exit financing, any bar date notice or claim objection, any notice of any cure amount or claim, any document related to any of the foregoing, or any other order of the Bankruptcy Court (including, without limitation, any other provision that purports to be preemptory or supervening, confers Bankruptcy Court jurisdiction, grants an injunction, discharge or release, or requires a party to opt out of any releases):

(a)     nothing alters, modifies or otherwise amends the terms and conditions of the Zurich Insurance Program (including any agreement to arbitrate disputes and any provisions regarding the provision, maintenance, use, nature and priority of the Zurich Collateral), except that on the earlier of (i) the consummation of the Sale Transaction and (ii) occurrence of the Plan Effective Date, the Reorganized Debtors or Purchaser, as applicable, jointly and severally shall assume the Zurich Insurance Program in its entirety pursuant to sections 105 and 365 of the Bankruptcy Code;

(b)     nothing therein releases or discharges Zurich's security interests and liens on the Zurich Collateral;

(c)     nothing therein releases or discharges the Zurich Claims and further, the Zurich Claims are actual and necessary expenses of the Debtors' estates (or the Reorganized Debtors or Purchaser, as applicable) and shall be paid in full in the ordinary course of business, whether as an Allowed Administrative Expense Claim under section 503(b)(1)(A) of the Bankruptcy Code or otherwise, regardless of when such amounts are or shall become liquidated, due or paid, without the need or requirement for Zurich to file or serve a request, motion, or application for payment of or proof of any proof of claim, cure claim (or any objection to cure amounts/notices), or Administrative Expense Claim (and further and for the avoidance of doubt, any claim bar date shall not be applicable to Zurich);

(d)     neither the Purchaser nor the Reorganized Debtors, as applicable, shall sell, assign, or otherwise transfer the Zurich Insurance Program and/or any of the rights, benefits, interests, and proceeds thereunder except with the express written permission of Zurich; and

(e)     the automatic stay of Bankruptcy Code section 362(a) and the injunctions set forth in Article VIII.A of the Plan, if and to the extent

27

applicable, shall be deemed lifted without further order of the Bankruptcy Court, solely to permit: (I) claimants with valid workers' compensation claims or direct action claims against Zurich under applicable non-bankruptcy law to proceed with their claims; (II) Zurich to administer, handle, defend, settle, and/or pay, in the ordinary course of business and without further order of this Bankruptcy Court, (A) all workers' compensation or direct action claims covered by the Zurich Insurance Program, (B) all claims where an order has been entered by the Bankruptcy Court granting a claimant relief from the automatic stay or the injunctions set forth in Article VIII.A of the Plan to proceed with its claim, and (C) all costs in relation to each of the foregoing; (III) Zurich to draw against any or all of the Zurich Collateral and to hold the proceeds thereof as security for the obligations of the Debtors (or the Reorganized Debtors or Purchaser, as applicable) to Zurich and/or apply such proceeds to the obligations of the Debtors (or the Reorganized Debtors, as applicable) under the Zurich Insurance Program, in such order as Zurich may determine; and (IV) subject to the terms of the Zurich Insurance Program and/or applicable non-bankruptcy law, Zurich to (i) cancel any policies under the Zurich Insurance Program, and (ii) take other actions relating to the Zurich Insurance Program (including setoff).

4.     <u>Section 1146 Exemption</u>

To the maximum extent permitted pursuant to section 1146(a) of the Bankruptcy Code, any transfer of property (whether from a Debtor to a Reorganized Debtor, the GUC Trust, or to any other Person) under, in furtherance of, or in connection with the Plan, including pursuant to any Sale Transaction or (1) the issuance, distribution, transfer, or exchange of any debt, equity Security, or other interest in the Debtors, the Reorganized Debtors, or the GUC Trust, including the New Reorganized Debtor Equity and Takeback Loans, if applicable, (2) the Restructuring Transactions; (3) the creation, modification, consolidation, termination, refinancing, and/or recording of any mortgage, deed of trust, or other security interest, or the securing of additional indebtedness by such or other means; (4) the making, assignment, or recording of any lease or sublease; or (5) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any tax or governmental assessment under any law imposing a document recording tax, stamp tax, conveyance tax, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee regulatory filing or recording fee, sales and use tax, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment against the Debtors and accept for filing and recordation any of the foregoing instruments or other documents pursuant to such transfers of property without the payment of any such tax, recordation fee, or governmental assessment. All filing or recording officers (or any other Person with authority over any of the foregoing), wherever

located and by whomever appointed, shall comply with the requirements of section 1146(c) of the Bankruptcy Code, shall forgo the collection of any such tax, recordation fee, or governmental assessment, and shall accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax, recordation fee, or governmental assessment. The Bankruptcy Court shall retain specific jurisdiction with respect to these matters.

5.      Cancellation of Securities and Agreements

On the Plan Effective Date, except as otherwise specifically provided for in the Plan: (1) the obligations of the Debtors under any certificate, Security, share, note, bond, credit agreement, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligation of or ownership interest in the Debtors that are Reinstated pursuant to the Plan, if any) shall be cancelled solely as to the Debtors, and the Reorganized Debtors, the Wind-Down Debtors, and the GUC Trustee, as applicable, shall not have any continuing obligations thereunder or relating to the cancellation thereof; and (2) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of or ownership interest in such Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligation of or ownership interest in such Debtors that are specifically Reinstated pursuant to the Plan) shall be released and discharged.

6.      Effectuating Documents; Further Transactions

On and after the Plan Effective Date, the Reorganized Debtors or Wind-Down Debtors, as applicable, the officers and members of the New Board, the Plan Administrator or GUC Trustee, as applicable, are authorized to and may issue, execute, deliver, file, or record Definitive Documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the New Organizational Documents, the GUC Trust Documents, and the Securities issued pursuant to the Plan in the name of and on behalf of the applicable Reorganized Debtors, the Wind-Down Debtors, or the GUC Trustee, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

7.      Preservation of Causes of Action

In accordance with section 1123(b) of the Bankruptcy Code, unless expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or assigned to the Purchaser in the Sale Transaction, the Reorganized Debtors, the Wind-Down Debtors, or the GUC Trust, as applicable, shall retain and may enforce all rights to commence or pursue any and all Causes of Action of the applicable Debtors' Estates, not otherwise so waived, relinquished, exculpated, released, compromised, settled or assigned (as the case may be), whether arising before or after the Petition Date, including, but not limited to, any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors', the Wind-Down Debtor(s)', or the

29

GUC Trustee's rights to commence, prosecute, compromise, settle or release such Causes of Action shall be preserved notwithstanding the occurrence of the Plan Effective Date, other than the Claims and Causes of Action released pursuant to the releases and exculpations contained in Article VIII hereof. Unless any Cause of Action is expressly waived, relinquished, exculpated, released, compromised, or settled under the Plan or a Final Order, pursuant to section 1123(b) of the Bankruptcy Code, such Cause of Action is preserved for later adjudication, and no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to any such Cause of Action upon, after, or as a consequence of the Confirmation of the Plan or the occurrence of the Plan Effective Date. For the avoidance of doubt, any Equityholder Litigation Claims shall be contributed to the GUC Trust by the Debtors in accordance with the Plan.

**No Person may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against it as any indication that the Debtors, the Reorganized Debtors or the Wind-Down Debtor(s), as applicable, will not pursue any and all available Causes of Action against it. The Debtors, the Reorganized Debtors, the Wind-Down Debtor(s), and the GUC Trustee, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Person, except as otherwise expressly provided in the Plan, including Article VIII of the Plan.**

The Reorganized Debtors, the Wind-Down Debtor(s), and the GUC Trustee, as applicable, (i) reserve and shall retain all Causes of Action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan and (ii) shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court.

### B.    Restructuring of the Debtors Effectuated Through a Sale Transaction

The Confirmation Order with respect to the Plan shall authorize, pursuant to sections 363, 365, 1123(a)(5)(B), and 1123(a)(5)(D) of the Bankruptcy Code, as applicable, all actions necessary or appropriate to effectuate the Sale Transaction, including, (i) the execution and delivery of Definitive Documents, (ii) the transfer of Purchased Assets (as defined in the Purchase Agreement) and/or New Reorganized Debtor Equity, as applicable, free and clear of all Liens, Claims, charges, or other encumbrances, to the applicable Purchaser (or one or more of Purchaser's designee(s)), (iii) all transactions contemplated by the Purchase Agreement, including pursuant to sections 363, 365, 1123(a)(5)(B), and 1123(a)(5)(D) of the Bankruptcy Code, as applicable, (iv) the appointment of the Plan Administrator, (v) the execution and delivery of the Plan Administrator Agreement, and (vi) creation of the GUC Trust and appointment of the GUC Trustee.

At the Purchaser's election, the Debtors shall file an amendment to the Plan which removes RLSV as a Debtor under this Plan.

### 1.    Closing of any Sale Transaction or Restructuring Transaction

At the election of the Purchaser, the Debtors shall be authorized to and shall consummate

either the 363 Asset Sale, Reorganized Equity Sale or other Restructuring Transaction and in connection therewith, among other things, (a) the Purchased Assets (including any Executory Contracts and Unexpired Leases the applicable Purchaser wishes to assume) or (b) the New Reorganized Debtor Equity together with specified assets of RL Management and RL International, as applicable, shall be transferred to and vest in the Purchaser (or one or more designees of Purchaser) free and clear of all Liens, Claims, Interests, charges or other encumbrances, purchase rights, options or rights of first refusal, pursuant to the terms of the Purchase Agreement, applicable Sale Transaction Documents and order(s) of the Bankruptcy Court approving the Sale Transaction or other Restructuring Transactions contemplated thereby, which may be the Confirmation Order. Following the Plan Effective Date, the Purchaser (or one or more designees of Purchaser) will own and may operate the Purchased Assets, without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

2.      Reorganized Equity Sale Provisions

The provisions in this Article IV.B.2 shall only apply if the Purchaser elects to consummate a Reorganized Equity Sale pursuant to the Purchase Agreement.

(a)      Issuance of Reorganized Debtor Equity; Section 1145 Exemption

On the Plan Effective Date, the Reorganized Debtors shall issue the New Reorganized Debtor Equity to the Purchaser without the need for any further corporate action or further notice to, action or order of the Bankruptcy Court. The shares of the New Reorganized Debtor Equity issued under the Plan shall be duly authorized, validly issued, fully paid, and non-assessable. Each distribution and issuance of the New Reorganized Debtor Equity under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Person receiving such distribution or issuance. The issuance of the New Reorganized Debtor Equity by the Reorganized Debtors shall be authorized without the need for any further corporate action or without any further action by the Debtors or Reorganized Debtors or by holders of any Claims or Interests against the Debtors, as applicable. As a condition to receiving the New Reorganized Debtor Equity, each holder entitled to a distribution of New Reorganized Debtor Equity, will be required to execute and deliver the New Organizational Documents, as applicable; provided, however, that, notwithstanding any failure to execute the New Organizational Documents, as applicable, any Person that is entitled to and accepts a distribution of New Reorganized Debtor Equity under the Plan, by accepting such distribution, will be deemed to have accepted and consented to the terms of the New Organizational Documents, without the need for execution by any party thereto. The New Reorganized Debtor Equity will not be registered under the Securities Act or listed on any exchange as of the Plan Effective Date.

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of the New Reorganized Debtor Equity after the Petition Date shall be exempt from, among other things, the registration requirements of Section 5 of the Securities Act or any similar federal, state, or local law in reliance on section 1145 of the Bankruptcy Code or, only to the extent such exemption under section 1145 of the Bankruptcy Code is not available, any other available

exemption from registration under the Securities Act. Pursuant to section 1145 of the Bankruptcy Code, such New Reorganized Debtor Equity will be freely tradable in the United States without registration under the Securities Act by the recipients thereof, subject to the provisions of (1) section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in Section 2(a)(11) of the Securities Act and compliance with any applicable state or foreign securities laws, if any, and the rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments, (2) any other applicable regulatory approvals, and (3) any restrictions in the New Organizational Documents.

Any Securities distributed pursuant to Section 4(a)(2) of the Securities Act will be considered "restricted securities" as defined by Rule 144 of the Securities Act and may not be resold under the Securities Act or applicable state securities laws absent an effective registration statement, or pursuant to an applicable exemption from registration, under the Securities Act and applicable state securities laws and subject to any restrictions in the New Organizational Documents.

Notwithstanding anything to the contrary in the Plan, no Person shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the issuance of the New Reorganized Debtor Equity is exempt from the registration requirements of Section 5 of the Securities Act.

(b)     Corporate Existence

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on and after the Plan Effective Date, each Reorganized Debtor, as applicable, shall continue to exist as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the applicable law in the jurisdiction in which the particular Debtor is incorporated or formed and pursuant to their respective certificate of incorporation and bylaws (or other similar Governance Documents) in effect prior to the Plan Effective Date, except to the extent such certificate of incorporation and bylaws (or other similar Governance Documents) are amended under the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval (other than any requisite filings required under applicable state, provincial, or federal law).

After the Plan Effective Date, the respective certificate of incorporation and bylaws (or other formation documents) of one or more of the Reorganized Debtors may be amended or modified in accordance with their terms without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. On or after the Plan Effective Date, one or more of the Reorganized Debtors may be disposed of, dissolved, wound down, or liquidated without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

(c)     New Organizational Documents

On or immediately prior to the Plan Effective Date, the New Organizational Documents

shall be adopted automatically by the Reorganized Debtors. To the extent required under the Plan or applicable non-bankruptcy law, the Reorganized Debtors shall file their respective New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in their respective states, provinces, or countries of incorporation in accordance with the corporate laws of the respective states, provinces, or countries of incorporation. The New Organizational Documents shall, among other things: (1) authorize the issuance of the New Reorganized Debtor Equity and (2) pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, include a provision prohibiting the issuance of non-voting equity securities of the Debtors. After the Plan Effective Date, each Reorganized Debtor may amend and restate its limited liability company agreement, certificate of incorporation and other formation and constituent documents as permitted by the laws of its respective jurisdiction of formation and the terms of the New Organizational Documents.

(d)     Discharge

On the Plan Effective Date, except as otherwise provided for hereunder or in the Confirmation Order, each Reorganized Debtor will receive a discharge of all Claims in accordance with section 1141(d)(1) of the Bankruptcy Code.

(e)     Vesting of Assets in the Reorganized Debtors and the GUC Trust

Except as otherwise provided for hereunder, under the Purchase Agreement, the Confirmation Order  or in any agreement, instrument or other document incorporated in the Plan, on the Plan Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property of each Debtor's Estate, including all Causes of Action of the Debtors' Estates (other than any Causes of Action that are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan) shall vest in the Purchaser, Reorganized Debtor, or the GUC Trust, as applicable, free and clear of all Liens, Claims, charges and/or other encumbrances, purchase rights, options or rights of first refusal.  On and after the Plan Effective Date, except as otherwise provided herein, each Reorganized Debtor, the Purchaser (and, to the extent applicable, Purchaser's designees), and the GUC Trustee may use, acquire, or dispose of property and pursue, compromise or settle any Claims, Interests, or Causes of Action with respect to the Debtors without further notice to, action, or approval of the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

(f)     Directors, Managers, and Officers

As of the Plan Effective Date, the term of each current officer, members of the boards of directors or managers or any managing member of each Debtor shall expire, and the New Board and the officers or managers of each of the Reorganized Debtors shall be appointed in accordance with the respective New Organizational Documents.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors shall disclose, in advance of the Confirmation Hearing, the identity and affiliations of any Person proposed to serve on the New Board or be an officer of any of the Reorganized Debtors. Each such director, manager and officer shall serve from and after the Plan Effective Date pursuant to the terms of the New Organizational Documents.

3. <u>Wind-Down and Dissolution of the Debtors</u>

To the extent there is at least one Wind-Down Debtor on the Plan Effective Date, then such Wind-Down Debtor(s) shall continue in existence after the Plan Effective Date for purposes of: (a) winding down such Debtor's businesses and affairs as expeditiously as reasonably possible and liquidating any assets held by the Wind-Down Debtor(s) after the Plan Effective Date; (b) performing the Debtors' remaining obligations under any Sale Transaction Documents, if any; (c) resolving any Disputed Claims (except General Unsecured Claims); (d) making distributions on account of Allowed Claims against the Debtors (except Allowed General Unsecured Claims) in accordance with the Plan to the extent not made on the Plan Effective Date; (e) filing appropriate tax returns, if any; and (f) administering the Plan in an efficient manner. The Wind-Down Debtor(s) shall be deemed to be substituted as the party-in-lieu of the Debtors in all matters relating to the Wind-Down Assets, including (x) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court, and (y) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Plan Administrator to file motions or substitutions of parties or counsel in each such matter.

On the Plan Effective Date, any assets of the Debtors' Estates remaining after the closing of the Sale Transaction or other Restructuring Transaction shall vest in the Wind-Down Debtor(s) for the purpose of liquidating the Debtors' Estates and Consummation of the Plan (except for the GUC Trust Assets). Such Wind-Down Assets shall be held free and clear of all Liens, Claims, Interests, charges or other encumbrances, purchase rights, options or rights of first refusal, except as otherwise provided in the Plan. Any distributions to be made under the Plan from such assets shall be made by the Plan Administrator or its designee. The Wind-Down Debtor(s) and the Plan Administrator shall be deemed to be fully bound by the terms of the Plan and the Confirmation Order.

Any contrary provision hereof notwithstanding, following the occurrence of the Plan Effective Date and the making of distributions on the Plan Effective Date pursuant hereto, (i) any of the Debtors' Cash held by the Wind-Down Debtor(s) in excess of the Wind-Down Amount and (ii) the proceeds of any non-Cash assets of the Debtors' Estates vested in the Wind-Down Debtor(s), shall be payable in accordance with the provisions in this Plan, including Article III hereof. The Plan Administrator shall make such distributions in Cash in accordance with Article III hereof.

4. <u>The Plan Administrator</u>

On and after the Plan Effective Date, the Plan Administrator, shall be appointed by the Debtors with the consent of the Prepetition Term Loan Agent and Purchaser and in consultation with the Committee.

The Plan Administrator shall not be required to post any bond or surety or other security for the performance of its duties hereunder unless otherwise ordered by the Bankruptcy Court. In the event that the Plan Administrator is so ordered, all costs and expenses of procuring any such bond or surety shall be paid for with Cash from the Wind-Down Assets.

The Plan Administrator may resign at any time upon thirty (30) days' written notice to the Bankruptcy Court; provided that such resignation shall only become effective upon the appointment of a permanent or interim successor Plan Administrator by the Court. Upon its appointment, the successor Plan Administrator, without any further act, shall become fully vested with all of the rights, powers, duties, and obligations of its predecessor and all responsibilities of the predecessor Plan Administrator relating to the Wind-Down Debtor(s) shall be terminated.

(a)    The Plan Administrator's Rights and Powers

The powers of the Plan Administrator shall include any and all powers and authority necessary or helpful to implement and carry out the provisions of the Plan and any applicable orders of the Bankruptcy Court relating to the Wind-Down Debtors. The Plan Administrator shall be the representative of the Debtors' Estates with respect to the Wind-Down Assets appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code.

Without limiting the foregoing, the Plan Administrator shall (a) hold, liquidate, invest, supervise, and protect the Wind-Down Assets; (b) effectuate the distributions contemplated by the Plan Administrator under the Plan; (c) object to or settle Disputed Claims against the Debtors (except General Unsecured Claims); (d) prosecute any or all of the Causes of Action retained by the Wind-Down Debtors; (e) pay all reasonable fees, expenses, debts, charges, and liabilities of the Wind-Down Debtor(s); (f) file tax returns for, pay taxes of, and represent the interests of the Wind-Down Debtor(s) or the Debtors' Estates, as applicable, before any taxing authority in all matters, including any action, suit, proceeding, or audit; (g) File the operating report for the Debtors' Estates for the month in which the Plan Effective Date occurs and all subsequent quarterly reports; (h) take any action necessary to wind down the business and affairs of the Wind-Down Debtor(s); and (i) file appropriate certificates of dissolution of the Wind-Down Debtor(s) pursuant to applicable state or provincial law.

As soon as practicable after the Plan Effective Date, the Plan Administrator shall cause the Wind-Down Debtor(s) to comply with, and abide by, the terms of the Plan and take any actions as the Plan Administrator may determine to be necessary or desirable to carry out the purposes of the Plan. Except to the extent necessary to complete the Wind-Down of any of the Debtors' remaining assets or operations from and after the Plan Effective Date, the Debtors (1) shall be deemed to have canceled pursuant to the Plan all Interests in the Debtors and (2) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Plan Effective Date. The Filing of the final monthly operating report for the Debtors' Estates (for the month in which the Plan Effective Date occurs) and all subsequent quarterly post-Confirmation reports shall be the responsibility of the Plan Administrator.

The Plan Administrator shall act for the Wind-Down Debtor(s) in the same fiduciary capacity as applicable to a board of directors, board of managers, member/manager and officers, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same). On the Plan Effective Date, the persons acting as members, managers, officers or directors of the Debtor(s) shall be deemed to have resigned and the Plan Administrator shall be appointed as the sole manager, sole director, sole member and sole officer of the Wind-Down Debtor(s) and shall succeed to the powers of the Debtors' directors, managers, members and officers. From and after

the Plan Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Wind-Down Debtor(s).  For the avoidance of doubt, the foregoing shall not limit the authority of the Wind-Down Debtor(s) or the Plan Administrator, as applicable, to continue the employment of any former member, manager, director or officer, including pursuant to any transition services or other agreement, in each case, to the extent permitted by applicable law.

(b)     Retention of the Plan Administrators' Professionals

The Plan Administrator shall have the right to retain the services of attorneys, accountants, and other professionals that, in the discretion of the Plan Administrator, are necessary to assist the Plan Administrator in the performance of its duties. The reasonable fees and expenses of such professionals shall be paid from the Wind-Down Assets upon the monthly submission of statements to the Plan Administrator. The payment of the reasonable fees and expenses of the Plan Administrator's retained professionals shall be made in the ordinary course of business in accordance with the Wind-Down Budget and shall not be subject to the approval of the Bankruptcy Court.

(c)     Compensation of the Plan Administrator

All reasonable costs, expenses, and obligations incurred by the Plan Administrator in administering the Plan, the Wind-Down Debtor(s)' Estates, or in any manner connected, incidental, or related thereto, shall be paid from the Wind-Down Assets in accordance with the Wind-Down Budget and on the terms set forth in the Plan Administrator Agreement. Except as otherwise ordered by the Bankruptcy Court, the fees and expenses incurred by the Plan Administrator on or after the Plan Effective Date (including taxes imposed on the Wind-Down Debtors) in connection with its duties hereunder and the Plan Administrator Agreement shall be, subject to the Wind-Down Budget, paid without any further notice to, or action, order, or approval of, the Bankruptcy Court.

(d)     Indemnification, Insurance, and Liability Limitation

The Plan Administrator and all professionals retained by the Plan Administrator, each in their capacities as such, shall be indemnified by the Wind-Down Debtor(s) to the fullest extent permitted by applicable law from any claims or Causes of Action relating to or arising in connection with the performance of its duties hereunder or under the Plan Administrator Agreement, except for claims and Causes of Action related to any act or omission that is determined by Final Order of a court of competent jurisdiction to have constituted fraud, willful misconduct, or gross negligence. The Plan Administrator may obtain, at the expense of the Wind-Down Debtor(s) and in accordance with the Plan Administrator Agreement, commercially reasonable liability or other appropriate insurance with respect to the foregoing indemnification obligations. Any such insurance shall be paid solely from the Wind-Down Assets in accordance with the Wind-Down Budget. The Plan Administrator may rely upon all written information previously generated by the Debtors.

Notwithstanding anything to the contrary contained herein, the Plan Administrator in its capacity as such, shall have no liability whatsoever to any party for the liabilities and/or obligations, however created, whether direct or indirect, in tort, contract, or otherwise, of the Wind-

36

Down Debtor(s).

(e)     Tax Returns

The Plan Administrator shall complete and file all final or otherwise required federal, state, and local tax returns for each of the Wind-Down Debtor(s) and, pursuant to section 505(b) of the Bankruptcy Code, may request an expedited determination of any unpaid tax liability of any Wind-Down Debtor or the Estate of its predecessor Debtor, as determined under applicable tax laws.

5.     Vesting of Wind-Down Assets in the Wind-Down Debtor(s) or Purchaser(s)

Except as otherwise provided herein, on the Plan Effective Date, all Wind-Down Assets shall vest in the Wind-Down Debtor(s), free and clear of all Liens, Claims, Interests, charges, or other encumbrances, purchase rights, options or rights of first refusal, unless expressly provided otherwise by the Plan or the Confirmation Order. On and after the Plan Effective Date, the Wind-Down Debtor(s) may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action that constitute Wind-Down Assets without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

6.     GUC Trust.

(a)     Establishment of GUC Trust

On the Plan Effective Date, the GUC Trust shall be established to receive (i) after adequate reserve for the payment (as reasonably determined by the Debtors in consultation with the Committee) of all Allowed Priority Tax Claims, Allowed Other Priority Claims and Allowed Administrative Expense Claims that are not Assumed Liabilities (except for DIP Claims and Allowed Professional Fee Claims), the GUC Fund and (ii) the Equityholder Litigation Claims, the proceeds of which shall be distributed in accordance with the Plan. On the Plan Effective Date, the Debtors shall contribute the GUC Fund and Equityholder Litigation Claims to the GUC Trust. In no event shall any GUC Trust Assets of any kind be returned by, or otherwise transferred from, the GUC Trust to any Debtor.

The GUC Trust shall qualify as a liquidating trust as described in Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, and shall be treated as a grantor trust for United States federal income tax purposes. The GUC Trustee shall have the authority to manage the day-to-day operations of the GUC Trust, including, without limitation, by disposing of the assets of the GUC Trust, appearing as a party in interest, calculating distributions, paying taxes and such other matters as more particularly described in Article IV of the Plan and the GUC Trust Agreement. The reasonable expenses of the GUC Trust, including the reasonable expenses of the GUC Trustee and its representatives and professionals, will be satisfied from the GUC Fund.

On the Effective Date, the GUC Trust Assets shall vest automatically in the GUC Trust. The Plan shall be considered a motion pursuant to Sections 105, 363 and 365 of the Bankruptcy Code for such relief. The transfer of the GUC Trust Assets to the GUC Trust shall be made for the benefit and on behalf of the holders of Allowed General Unsecured Claims in Class 4. The

assets comprising the GUC Trust Assets will be treated for tax purposes as being transferred by the Debtors to the holders of Class 4 Claims pursuant to the Plan in exchange for their Allowed Claims and then by such holders to the GUC Trust in exchange for the interests in the GUC Trust. The holders of Allowed General Unsecured Claims shall be treated as the grantors and owners of the GUC Trust. Upon the transfer of the GUC Trust Assets, the GUC Trust shall succeed to all of the Debtors' rights, title and interest in the GUC Trust Assets, and the Debtors will have no further interest in or with respect to the GUC Trust Assets. In pursuing the Equityholder Litigation Claims, the GUC Trustee shall be entitled to the tolling provisions provided under section 108 of the Bankruptcy Code, and shall succeed to the Debtors' rights with respect to the time periods in which any of the Equityholder Litigation Claims may be brought under section 546 of the Bankruptcy Code. The GUC Trust Agreement will require consistent valuation of the GUC Trust Assets by the Reorganized Debtors, the GUC Trustee, and the beneficiaries of the GUC Trust for all U.S. federal income tax and reporting purposes. The GUC Trust will not be permitted to receive or retain cash in excess of a reasonable amount to meet claims and contingent liabilities or to maintain the value of the GUC Trust Assets.

To effectively investigate, prosecute, compromise, and/or settle the Equityholder Litigation Claims, the GUC Trustee and its counsel and representatives must have access to all documents and information relating to the Equityholder Litigation Claims and be able to exchange such information with the Plan Administrator, Reorganized Debtors and Wind-Down Debtors on a confidential basis and in common interest without being restricted by or waiving any applicable work product, attorney-client, or other privilege. Given the GUC Trust's position as successor to the Equityholder Litigation Claims, sharing such information between the Plan Administrator, Reorganized Debtors, the Wind-Down Debtors and the GUC Trustee and their counsel shall not waive or limit any applicable privilege or exemption from disclosure or discovery related to such information. Accordingly, on the Plan Effective Date, the Plan Administrator, Reorganized Debtors, the Wind-Down Debtors and the GUC Trustee shall enter into the Confidentiality and Common Interest Agreement providing for, inter alia, the Plan Administrator, Reorganized Debtors and Wind-Down Debtors to provide reasonable access to, and the GUC Trust shall have the right to secure, at the GUC Trust's own expense, copies of, all of the Plan Administrator's, Wind-Down Debtors' and Reorganized Debtors' records and information relating to the Equityholder Litigation Claims including, without limitation, all electronic records or documents. The GUC Trustee shall also have full and complete access to, and the right to copy at the expense of the GUC Trust, all reports, documents, memoranda and other work product of the Debtors and the Creditors' Committee and their respective professionals and advisors related to the Equityholder Litigation Claims. From and after the Plan Effective Date, the Plan Administrator, Reorganized Debtors, Wind-Down Debtors and their officers, employees, agents, and professionals shall provide reasonable cooperation during normal business hours in responding to information requests of the GUC Trustee regarding the Equityholder Litigation Claims. For a period of five years after the Plan Effective Date, the Plan Administrator, Reorganized Debtors and Wind-Down Debtors shall preserve all records and documents (including all electronic records or documents) related to the Equityholder Litigation Claims or, if any Equityholder Litigation Claims have been asserted in a pending action, then until such later time as the GUC Trustee notifies the Plan Administrator, Reorganized Debtors and Wind-Down Debtors in writing that such records are no longer required to be preserved. Notwithstanding anything in the foregoing, neither the Debtors, the Plan Administrator, the Wind-Down Debtors, nor the Reorganized Debtors shall be required to take any action under this paragraph that requires out-of-pocket expenditure by such

entity of more than $500.00, absent reimbursement by the GUC Trust.

Except as otherwise ordered by the Bankruptcy Court, the expenses of the GUC Trust on or after the Plan Effective Date shall be paid in accordance with the GUC Trust Agreement without further order of the Bankruptcy Court.

The GUC Trust shall file annual reports regarding the liquidation or other administration of property comprising the GUC Trust Assets, the distributions made by it and other matters required to be included in such report in accordance with the GUC Trust Agreement. In addition, the GUC Trust will file tax returns as a grantor trust pursuant to United States Treasury Regulation Article 1.671-4(a).

The interests in the GUC Trust are not intended to constitute "securities." To the extent such interests are deemed to be "securities," the issuance of such interests shall be exempt from registration under the Securities Act and any applicable state and local laws requiring registration of securities pursuant to section 1145 of the Bankruptcy Code or another available exemption from registration under the Securities Act. If the GUC Trustee determines, with the advice of counsel, that the GUC Trust is required to comply with registration or reporting requirements under the Securities Act, the Exchange Act or other applicable law, then the GUC Trustee shall take any and all actions to comply with such registration and reporting requirements, if any, and to file reports with the SEC to the extent required by applicable law.

The GUC Trust shall be dissolved as soon as practicable after the date that is the earlier to occur of: (a) the distribution of all proceeds from the GUC Trust Assets available for distribution pursuant to the Plan, or (b) the determination of the GUC Trustee that the continued prosecution of the Equityholder Litigation Claims is not likely to yield sufficient additional proceeds to justify further pursuit.

To the extent that the terms of the Plan with respect to the GUC Trust are inconsistent with the terms set forth in the GUC Trust Agreement, then the terms of the GUC Trust Agreement shall govern.

(b)      Powers and Duties of GUC Trustee

The GUC Trustee shall administer the GUC Trust and its assets in accordance with this Plan, the GUC Trust Agreement, and the other GUC Trust Documents and shall be responsible for, among other things, making certain Distributions required under this Plan. From and after the Plan Effective Date and continuing through the date of entry of a Final Decree, the GUC Trustee shall: (a) possess the rights of a party in interest pursuant to section 1109(b) of the Bankruptcy Code for all matters arising in, arising under, or related to the Chapter 11 Cases and, in connection therewith, shall (i) have the right to appear and be heard on matters brought before the Bankruptcy Court or other courts, (ii) be entitled to notice and opportunity for hearing on all such issues, (iii) participate in all matters brought before the Bankruptcy Court, and (iv) receive notice of all applications, motions, and other papers and pleadings filed in the Bankruptcy Court and (b) have the authority to retain such personnel or professionals (including, without limitation, legal counsel, financial advisors or other agents) as it deems appropriate and compensate such personnel and professionals as it deems appropriate in accordance with the Plan, all without prior notice to or

approval of the Bankruptcy Court. Professionals and personnel retained or employed by the GUC Trust or the GUC Trustee need not be disinterested as that term is defined in the Bankruptcy Code, and may include Professionals who had been employed by the Committee or the Debtors.

The powers of the GUC Trustee shall include any and all powers and authority necessary or helpful to implement and carry out the provisions of the Plan and any applicable orders of the Bankruptcy Court relating to the GUC Trust Assets. The GUC Trustee shall be the representative of the Debtors' Estates with respect to the GUC Trust Assets appointed pursuant to section 1123(b)(3)(B) of the Bankruptcy Code.

Without limiting the foregoing, the GUC Trustee shall (a) hold, liquidate, invest, supervise, and protect the GUC Trust Assets; (b) effectuate the distributions contemplated by the GUC Trustee under the Plan; (c) object to or settle Disputed General Unsecured Claims against the Debtors; (d) investigate, prosecute, or resolve the Equityholder Litigation Claims, as appropriate; (e) pay all reasonable fees, expenses, debts, charges, and liabilities of the GUC Trust; (f) file tax returns for, pay taxes of (if any), and represent the interests of the GUC Trust before any taxing authority in all matters, including any action, suit, proceeding, or audit; (g) take any action necessary to administer the GUC Trust; and (h) file appropriate certificates of dissolution of the GUC Trust, if any, pursuant to applicable state or provincial law.

(c)     Retention of GUC Trust Professionals

The GUC Trustee shall have the right to retain the services of attorneys, accountants, and other professionals that, in the discretion of the GUC Trustee, are necessary to assist the GUC Trustee in the performance of its duties and prosecution of the Equityholder Litigation Claims and administration of the other GUC Trust Assets; provided, however, that (i) the payment of such professionals shall be made solely using the funds in the GUC Fund and (ii) the Prepetition Term Loan Agent shall have consented to the retention of any attorney retained by the GUC Trustee to prosecute the Equityholder Litigation Claims. The reasonable fees and expenses of such professionals shall be paid only from the GUC Funds upon the monthly submission of statements to the GUC Trustee. The payment of the reasonable fees and expenses of the GUC Trustee's retained professionals shall not be subject to the approval of the Bankruptcy Court.

(d)     Indemnification, Insurance, and Liability Limitation

The GUC Trustee and all professionals retained by the GUC Trustee, each in their capacities as such, shall be indemnified by the GUC Trust to the fullest extent permitted by applicable law from any claims or Causes of Action relating to or arising in connection with the performance of its duties hereunder or under the GUC Trust Agreement, except for claims and Causes of Action related to any act or omission that is determined by Final Order of a court of competent jurisdiction to have constituted fraud, willful misconduct, or gross negligence. The GUC Trustee may obtain, at the expense of the GUC Trust and in accordance with the GUC Trust Agreement, commercially reasonable liability or other appropriate insurance with respect to the foregoing indemnification obligations. Any such insurance shall be paid solely from the GUC Trust Assets. The GUC Trustee may rely upon all written information previously generated by the Debtors.

Notwithstanding anything to the contrary contained herein, the GUC Trustee in its capacity as such, shall have no liability whatsoever to any party for the liabilities and/or obligations, however created, whether direct or indirect, in tort, contract, or otherwise, of the GUC Trust.

       7.     <u>Sources of Consideration for Plan Distributions.</u>

The Plan Administrator shall fund distributions under the Plan, to the extent not made on the Plan Effective Date, with the Plan Funding Amount, Sale Proceeds (if any), and proceeds of retained Causes of Action not settled, released, assigned, discharged, enjoined, or exculpated on or prior to the Plan Effective Date. The Plan Administrator shall fund payment of all Allowed Administrative Expense Claims, Priority Tax Claims and Other Priority Claims.  Professional Fee Claims shall be funded from the Professional Fee Escrow Account.  The GUC Trustee shall make all distributions of proceeds of the Equityholder Litigation Claims and other GUC Trust Assets in accordance with the Plan and the GUC Trust Agreement.  Except for Assumed Liabilities arising under the Purchase Agreement, the Purchaser shall have no responsibility to make or liability for Distributions required under the Plan.

## V.     TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.    Assumption and Rejection of Executory Contracts and Unexpired Leases

       1.     <u>363 Asset Sale</u>

In the event a 363 Asset Sale is consummated, upon closing of the 363 Asset Sale, (i) each Executory Contract and Unexpired Lease designated for assumption and assignment to Purchaser (or one or more of the designees of Purchaser) in accordance with the Bidding Procedures Order and the Purchase Agreement shall be assumed by the applicable Debtor and assigned to the Purchaser (or one or more of the designees of Purchaser) pursuant to the terms of the applicable Purchase Agreement and applicable orders of the Bankruptcy Court, and (ii) all Executory Contracts and Unexpired Leases not designated for assumption and assignment to the Purchaser (or one or more of the designees of Purchaser) in any Purchase Agreement, to the extent not previously rejected or terminated, shall be automatically rejected.

Each Executory Contract and Unexpired Lease assumed pursuant to this Article V.A.1 and assigned to Purchaser (or one or more of the designees of Purchaser) shall vest in, and be fully enforceable by, the Purchaser (or one or more of the designees of Purchaser) in accordance with its terms, except as such terms are modified by the provisions of the Plan or any order of the Bankruptcy Court.

       2.     <u>Reorganized Equity Sale</u>

In the event a Reorganized Equity Sale or other Restructuring Transaction is consummated, on the Plan Effective Date, except as otherwise provided in the Plan or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan (including, to the extent applicable, a Purchase Agreement related thereto), all Executory Contracts and Unexpired Leases, to the extent not previously rejected or terminated, shall be deemed rejected under section 365 of the Bankruptcy Code without the need for any further notice to or action, order, or approval of the Bankruptcy Court, under section 365 of the Bankruptcy Code, unless such

<div align="center">41</div>

Executory Contract or Unexpired Lease: (1) was previously assumed by a Debtor; (2) expired or was terminated pursuant to its own terms or by agreement of the parties thereto; (3) is the subject of a motion to assume Filed by the Debtors on or before the date of entry of the applicable Confirmation Order; or (4) is listed on the Assumed Executory Contracts and Unexpired Leases List; provided, that that rejections of Unexpired Leases of non-residential real property pursuant to this Plan shall be effective as of the later of (a) the Plan Effective Date and (b) the date on which the leased premises are unconditionally surrendered to the landlord under such rejected Unexpired Lease.

Each Executory Contract and Unexpired Lease assumed pursuant to this Article V.A.2 of the Plan, shall re-vest in, and be fully enforceable by, the Purchaser or Reorganized Debtor (as applicable) in accordance with its terms, except as such terms are modified by the provisions of the Plan or any order of the Bankruptcy Court.

## B.    Approval of Assumption, Assignment and Rejection

Entry of the Confirmation Order shall, subject to and upon the occurrence of the Plan Effective Date, constitute the Bankruptcy Court's approval of the assumptions, assignments or rejections, as applicable, of the Executory Contracts and Unexpired Leases under the Plan. Any motion of the Debtors to assume an Executory Contract or Unexpired Lease pending on the Plan Effective Date shall be subject to approval by the Bankruptcy Court by a Final Order.

Notwithstanding anything to the contrary in the Plan, the Debtors and the Reorganized Debtors, as applicable, reserve the right to amend, modify, or supplement the Assumed Executory Contracts and Unexpired Leases List to add or remove any Executory Contract or Unexpired Lease to such list at any time prior to the Plan Effective Date (or prior to such later date as may be designated in any Purchase Agreement, as applicable), subject to the consent of the Purchaser. The Debtors or the Reorganized Debtors shall provide notice of any amendments to the Assumed Executory Contracts and Unexpired Leases List to their counterparties affected thereby.

## C.    Claims Based on Rejection of Executory Contracts or Unexpired Leases

Unless otherwise provided by a Final Order, Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases pursuant to the Plan, if any, must be Filed with the Bankruptcy Court within thirty (30) days after the later of (1) the date of entry of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection, (2) the effective date of such rejection, or (3) the Plan Effective Date. All Allowed Claims arising from the rejection of a Debtor's Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims against such Debtor. No non-Debtor party to a rejected Executory Contract or Unexpired Lease shall be permitted to setoff or recoup any amounts owed to the Debtors under such rejected Executory Contract or Unexpired Lease against any Allowed rejection damages.

**Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time shall be automatically Disallowed, released, and discharged, and forever barred from assertion without the need for any objection or further notice to, or action, order, or approval of, the Bankruptcy Court or any**

**other Person, any such Claim shall be released, and discharged, notwithstanding anything in the Schedules or any Proof of Claim to the contrary, and such Claim shall not be enforceable against the Debtors, the Reorganized Debtors, the Debtors' Estates, the Wind-Down Debtor(s), or the GUC Trustee, as applicable, or their respective properties.**

### D.    Cure of Defaults for Executory Contracts and Unexpired Leases Assumed

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied by the applicable Debtor(s) party to such Executory Contract or Unexpired Lease or the Purchaser as required by any Purchase Agreement, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Amount in Cash on the earlier of (i) the Plan Effective Date or (ii) the consummation of a 363 Asset Sale, if applicable, or on such other terms as the parties to such Executory Contracts or Unexpired Leases, with the consent of the Purchaser. In the event of an unresolved dispute regarding (1) the amount of any payments to cure such a default, (2) the ability of the Reorganized Debtors or Purchaser(s) (as applicable) or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code), or (3) any other matter pertaining to assumption, the payment of the Cure Amount required by section 365(b)(1) of the Bankruptcy Code shall be resolved by a Final Order.

The Debtors served on the applicable counterparties notices of proposed assumption and proposed Cure Amounts pursuant to the terms of the Bidding Procedures. **Any objection by a counterparty to an Executory Contract or Unexpired Lease to the proposed assumption or Cure Amount must be Filed and served to be actually received by no later than the applicable objection deadline set forth in the Bidding Procedures Order.** Any counterparty to an Executory Contract or Unexpired Lease designated for assumption that fails to object timely to the proposed assumption, Cure Amount or adequate assurance of future performance shall be deemed to have consented to all of the foregoing.

Assumption (or assumption and assignment, as applicable) of an Executory Contract or Unexpired Lease pursuant to the Plan shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under such Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. **Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.**

### E.    Preexisting Obligations under Executory Contracts and Unexpired Leases.

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the applicable Debtor(s) thereunder. In particular, notwithstanding any non-bankruptcy law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide, outstanding Cash payments, warranties or continued

maintenance obligations on any goods previously purchased by the Debtors from a non-Debtor counterparty to a rejected Executory Contract or Unexpired Lease.

### F. Modifications, Amendments, Supplements, Restatements, or Other Agreements

Unless otherwise provided in the Plan or Confirmation Order, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to the Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Debtors' Chapter 11 Cases shall not be deemed to alter the prepetition nature of the applicable Executory Contracts or Unexpired Leases, or the validity, priority, or amount of any Claims that may arise in connection therewith.

### G. Reservation of Rights

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Assumed Executory Contracts and Unexpired Leases List, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Reorganized Debtors, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease under the Plan.

### H. Nonoccurrence of the Plan Effective Date

In the event that the Plan Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases of nonresidential property pursuant to section 365(d)(4) of the Bankruptcy Code.

## VI. PROVISIONS GOVERNING DISTRIBUTIONS

### A. Timing and Calculation of Amounts to Be Distributed

Unless otherwise provided in the Plan, on the Plan Effective Date (or if a Claim is not an Allowed Claim on the Plan Effective Date, on the date that such Claim becomes an Allowed Claim), each holder of an Allowed Claim shall receive, subject to the provisions of this Article VI hereof, the full amount of the distribution that the Plan provides on account of Allowed Claims in the applicable Class. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. Except as otherwise provided in the Plan,

holders of Allowed Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or after the Plan Effective Date.

## B.    Delivery of Distributions

### 1.    Persons Responsible

Distributions under the Plan shall be made by (i) with respect to a Distribution of proceeds of the Equityholder Litigation Claims or other GUC Trust Assets, the GUC Trustee and (ii) with respect to all remaining Distributions, the Plan Administrator.  Except for Assumed Liabilities arising under the Purchase Agreement, the Purchaser (or any Affiliates or designees thereof) shall have no responsibility to make or liability for Distributions required under the Plan.

Except as otherwise provided herein, all distributions shall be made to the holders of Allowed Claims at the address for each such holder as indicated in the applicable Debtor's records as of the date of the relevant distribution; provided, however, that the address for each holder of an Allowed Claim shall be deemed to be the address set forth in any Proof of Claim Filed by that holder; provided further, however, that the manner of distributions shall be determined at the discretion of the Reorganized Debtors, the Plan Administrator, or GUC Trustee, as applicable.

### 2.    Record Date for Distribution

On the Distribution Record Date, the Claims Register shall be closed with respect to Claims held against the Debtors and any party responsible for making distributions under the Plan shall be authorized and entitled to recognize only those record holders of such Claims that are listed on the Claims Register as of the close of business on the Distribution Record Date.

### 3.    Minimum Distributions

Notwithstanding any other provision of the Plan, the Reorganized Debtors, the Wind-Down Debtor(s), the Plan Administrator, or the GUC Trustee, as applicable, shall not be required to make distributions of less than $50.00 in value (whether Cash or otherwise), and each Claim to which this limitation applies shall be discharged, and its holder shall be forever barred pursuant to Article VIII of the Plan from asserting such Claim against the Debtors, their applicable Estates, the Reorganized Debtors, the Wind-Down Debtors, the GUC Trustee, as applicable, or their respective property, as applicable.  If any assets remain where distributions would not be feasible, the Reorganized Debtors, the Wind-Down Debtors, or the GUC Trustee, as applicable, shall donate such sums to Red Lobster Cares.

## C.    Distributions and Undeliverable or Unclaimed Distributions

In the event that a distribution to any holder of an Allowed Claim is returned as undeliverable, no distribution to such holder shall be made unless and until the Reorganized Debtors, the Plan Administrator, or the GUC Trustee, as applicable, has determined the then-current address of such holder, at which time the distribution shall be made to such holder without interest; provided, however, that, at the expiration of six (6) months from the Plan Effective Date, any such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy

Code. After such date, all unclaimed property shall automatically revert to the Reorganized Debtors, the Wind-Down Debtors, or the GUC Trust, as applicable, without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any holder to such property shall be discharged and forever barred.

### D.    Surrender of Cancelled Instruments or Securities

On the Plan Effective Date or as soon as reasonably practicable thereafter, each holder of a certificate or instrument evidencing a Claim or an Interest that has been cancelled in accordance with Article IV.A.5 hereof shall be deemed to have surrendered such certificate or instrument. Such surrendered certificate or instrument shall be cancelled solely with respect to the applicable Debtors, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis à vis one another with respect to such certificate or instrument, including with respect to any indenture or agreement that governs the rights of the holder of a Claim or Interest, which shall continue in effect for purposes of allowing holders to receive distributions under the Plan, charging liens, priority of payment, and indemnification rights. Notwithstanding anything to the contrary herein, this paragraph shall not apply to certificates or instruments evidencing Claims that are Unimpaired under the Plan.

### E.    Compliance with Tax Requirements

The Debtors, Reorganized Debtors, Wind-Down Debtors, or the GUC Trustee, as applicable, shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, with respect to the distributions pursuant to the Plan, and all such distributions shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors, the Plan Administrator, or the GUC Trustee shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such compliance, or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors, the Plan Administrator, and the GUC Trustee, as applicable, reserve the right to allocate all distributions made under the Plan in compliance with applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

### F.    Allocations

Distributions on account of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to accrued but unpaid prepetition interest.

### G.    No Postpetition Interest on Claims

Unless otherwise specifically provided for in the Plan, Confirmation Order or DIP Order, or required by applicable bankruptcy and non-bankruptcy law, postpetition interest shall not accrue

or be paid on any Claim, and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any such Claim.

**H.     Foreign Currency Exchange Rate**

Except as otherwise provided in a Bankruptcy Court order, any Claim asserted in currency other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency published in *The Wall Street Journal*, National Edition, on the Petition Date.

**I.     Setoffs and Recoupment**

Except as expressly provided in the Plan, each Reorganized Debtor, Wind-Down Debtor, or the GUC Trustee, as applicable, may, pursuant to section 553 of the Bankruptcy Code, set off and/or recoup against any Plan distributions to be made on account of an Allowed Claim any and all Claims, rights, and Causes of Action that such Reorganized Debtor, Wind-Down Debtor, or the GUC Trustee may hold against the holder of such Allowed Claim; provided, however, that neither the failure to effectuate a setoff or recoupment nor the allowance of any Claim shall constitute a waiver or release by a Reorganized Debtor, a Wind-Down Debtor, the GUC Trustee, or its successor of any and all Claims, rights, and Causes of Action that such Reorganized Debtor, Wind-Down Debtor, or the GUC Trustee may have against the applicable claimholder. In no event shall any holder of a Claim, notwithstanding any indication in such holder's Proof of Claim that such holder asserts, has, or intends to preserve any right of setoff or recoupment pursuant to section 553 of the Bankruptcy Code or otherwise, be entitled to set off or recoup its Claim against any claim, right, or Cause of Action of the Debtor, Reorganized Debtor, Wind- Down Debtor(s), or the GUC Trustee, as applicable.

**J.     Claims Paid or Payable by Third Parties**

1.     Claims Paid by Third Parties

To the extent the holder of a Claim receives payment in full on account of such Claim from a third party, such Claim shall be Disallowed and expunged from the Claims Register without an objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court. To the extent a holder of a Claim receives a distribution on account of such Claim and thereafter receives payment from a third party on account of such Claim, such holder shall, within two weeks of receipt of the latter, repay or return to the applicable Reorganized Debtor, Wind-Down Debtors, or the GUC Trustee, as applicable, the portion of the received Plan distribution, if any, by which its total recovery on account of the Claim exceeds the Allowed amount of such Claim.

2.     Claims Payable by Third Parties

The availability, if any, of any insurance policy for the satisfaction of an Allowed Claim shall be determined by the terms of the applicable Debtor(s)'s insurance policies. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part any Allowed Claim (if and to the extent adjudicated by a court of competent jurisdiction), then, immediately upon such insurers' agreement, the applicable portion of such Claim may be Disallowed and expunged from

47

the Claims Register without an objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

Nothing contained in the Plan shall constitute or be deemed a waiver of any Claim or Cause of Action that any Debtor or any Person may hold against any insurer under any insurance policies, nor shall anything contained herein constitute a waiver by any insurer of any defenses, including coverage defenses.

## VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS

### A. Allowance of Claims

After the Plan Effective Date, the Reorganized Debtors, Wind-Down Debtors, and the GUC Trustee, as applicable, shall have and retain any and all rights and defenses the applicable Debtor had immediately before the Plan Effective Date. No Claim shall be deemed an Allowed Claim unless and until such Claim is Allowed under the Plan or under any order entered in the Chapter 11 Cases before the Plan Effective Date (including the Confirmation Order), when such order becomes a Final Order.

### B. No Distributions Pending Allowance

If an objection to a Claim or a portion thereof is Filed, no distribution shall be made on account of such Claim or the applicable portion thereof unless and until such Disputed Claim becomes an Allowed Claim.

### C. Claims Administration Responsibilities

Except as otherwise specifically provided in the Plan, after the Plan Effective Date, the Reorganized Debtors, the Plan Administrator, and the GUC Trustee, as applicable, shall have the authority to: (1) File, withdraw, or litigate to judgment objections to Claims against the applicable Estate; (2) settle, compromise, or otherwise resolve Disputed Claims against the applicable Estate without any further notice to or action, order, or approval by the Bankruptcy Court; and (3) administer and adjust the applicable Claims Register to reflect any settlements, compromises or Final Orders resolving Disputed Claims or the fact that any Claim has been paid or satisfied, or that any Proof of Claim that has been amended or superseded, cancelled or otherwise expunged (including pursuant to the Plan), in each case without any further notice to or action, order, or approval by the Bankruptcy Court. The GUC Trustee shall be primarily responsible for reconciling and objecting to General Unsecured Claims in accordance with the provisions of this Plan.

### D. Estimation of Claims

Before or after the Plan Effective Date, the Debtors, Reorganized Debtors, Wind-Down Debtor(s), or the GUC Trustee, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the

litigation of any objection to such Claim or during the appeal relating to such objection. Notwithstanding any provision in the Plan, a Claim that has been expunged from the Claims Register, but that either is subject to appeal or that otherwise has not yet been resolved by a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), and the relevant Debtor, Reorganized Debtor or Wind-Down Debtor, or the GUC Trustee, as applicable, may elect to pursue a supplemental proceeding to object to any ultimate allowance of such Claim.

### E.    Time to File Objections to Claims

Any objections to Claims shall be Filed on or before the later of (1) 180 days after the entry of the Confirmation Order and (2) such other period of limitation as may be fixed by the Bankruptcy Court.  A motion to extend such deadline may be filed with the Bankruptcy Court by the Reorganized Debtors, the Wind-Down Debtors, or the GUC Trustee, as applicable, on an ex parte or expedited basis.

### F.    Disallowance of Claims

Any Claims held by Persons from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code, or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Person have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, from that Person have been turned over or paid to the Reorganized Debtors, Wind-Down Debtors, or the GUC Trustee, as applicable.

All Claims against any Debtor, whether Filed or listed in any of the Debtor's Schedules, on account of an indemnification, surety and/or contribution obligation to any of the following Persons or entities shall be deemed satisfied and expunged from the Claims Register as of the Plan Effective Date, without any further notice to or action, order, or approval of the Bankruptcy Court: (i) current or former director of any Debtor, (ii) current or former officer of any Debtor; (iii) current or former employee of any Debtor; (iv) current or former insider of any Debtor; (v) holder, whether directly or indirectly, of an Interest in any Debtor; (vi) current or former operator of any Debtor; (vii) current or former project manager of any Debtor; and (viii) any Affiliate of the Persons or entities set forth in the foregoing clauses (i) through (vii); provided, further, that the holder of any such Claim shall not be entitled to any distributions under the Plan on account of such Claims.

### G.    Distributions After Allowance

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan. As soon as practicable after the date that the order allowing a Disputed Claim becomes a Final Order, the Reorganized Debtors, the Wind-Down Debtor(s), Plan Administrator, or the GUC Trustee, as applicable, shall provide to the holder of such Claim the distribution (if any) to which

13153917-2

such holder is entitled, without interest, dividends, or accruals to be paid on account of such Claim unless required under applicable bankruptcy law.

## VIII.   RELEASES, INJUNCTION AND RELATED PROVISIONS

### A.   Plan Releases, Injunction and Related Provisions

#### 1.   Discharge of Claims and Termination of Interests in the Debtors

In the event a Reorganized Equity Sale is consummated, upon the Plan Effective Date, and except as otherwise provided in the Plan, the Debtors (excluding the Wind-Down Debtors) shall be discharged to the fullest extent permitted by section 1141(d) of the Bankruptcy Code; provided, however, that such discharge shall exclude any Assumed Liabilities. The Confirmation Order shall be a judicial determination of the discharge of all Claims (other than Assumed Liabilities) against, and Interests in, the Debtors (excluding the Wind-Down Debtors) subject to the occurrence of the Plan Effective Date.

In the event a 363 Asset Sale is consummated, pursuant to the provisions of section 1141(d)(3) of the Bankruptcy Code, the Debtors shall not be entitled to a discharge and shall be wound down as set forth in the Plan and the Plan Administrator Agreement.

#### 2.   Releases by the Debtors

**Notwithstanding anything in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Plan Effective Date, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released by each of the Debtors, their respective Estates, and any Person seeking to exercise the rights of any of the Debtors or their Estates (including any successors to any of the Debtors or their Estates or any Estate representatives appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code), in each case, on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Persons who may purport to assert any Cause of Action, derivatively, by, through, for, or because of any of the foregoing Persons, from any and all Claims and Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, contingent or non-contingent, in law, equity, contract, tort or otherwise, that any of the Debtors, their Estates, the Reorganized Debtors or Wind-Down Debtor(s), as applicable, or any successors to or representatives of the foregoing appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, would have been legally entitled to assert in their own right (whether individually or collectively) or that any holder of any Claim against or any Interests in, any of the Debtors could have asserted on behalf of any of the Debtors or their Estates, based on, relating to, or in any manner arising from, in whole or in part: any of the Debtors (including the capital structure, management, ownership, or operations thereof); any Security of any of the Debtors; the subject matter of, or the transactions or events giving rise to, any Claim, Cause of Action or Interest; the business or contractual arrangements between any Debtor and a Released Party; any of the Debtors' restructuring efforts; any Avoidance Actions held by any of the Debtors or their Estates; any intercompany**

transactions performed by any of the Debtors; the Debtors' Chapter 11 Cases (including the Filing thereof and any relief obtained by the Debtors therein); the formulation, preparation, dissemination, negotiation, or Filing of the Plan, the Plan Supplement, the DIP Facility, the Disclosure Statement, or the Bidding Procedures Order (and the procedures approved thereby); any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Person regarding any transaction, contract, instrument, document or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order with respect to the Plan in lieu of such legal opinion) created or entered into in connection with the Plan or the Bidding Procedures Order; the solicitation of votes on the Plan, the pursuit of Confirmation of the Plan, the pursuit of Consummation of the Plan, the implementation of the Plan, including the issuance or distribution of Securities or any other property pursuant to the Plan; or any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Plan Effective Date other than Claims and liabilities resulting therefrom arising out of or relating to any act or omission of a Released Party that constitutes actual fraud, willful misconduct, or gross negligence, in each case, solely to the extent determined by a Final Order of a court of competent jurisdiction.

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post-Plan Effective Date Claims or obligations of any Person under the Plan, the Confirmation Order with respect to the Plan, any Restructuring Transaction, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or (ii) the Equityholder Litigation Claims.

3.    Releases by Holders of Claims Against the Debtors

Except as otherwise expressly set forth in the Plan or the Confirmation Order, on and after the Plan Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Released Party is, and is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably and forever, released by each Releasing Party from any and all Causes of Action, whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, contingent or non-contingent, in law, equity, contract, tort, or otherwise, including any derivative claims asserted on behalf of the Debtors, that such Person would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part: any of the Debtors (including the capital structure, management, ownership, or operation thereof); any security of any of the Debtors or any of the Reorganized Debtors; the subject matter of, or the transactions or events giving rise to, any Claim that is treated in the Plan; the business or contractual arrangements between any Debtor and any Released Party; the assertion or enforcement of rights and remedies against any of the Debtors; the Debtors' in- or out-of- court restructuring efforts; any Avoidance Actions held by any of the Debtor(s) or their Estates; intercompany transactions between or among a Debtor and another Debtor; the Chapter 11 Cases; the Canadian Proceeding; the formulation, preparation, dissemination, negotiation, or Filing of the Disclosure Statement, the Bidding Procedures Order, the Plan, or the Plan Supplement; any Restructuring

13153917-2

Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the DIP Facility, the Disclosure Statement, the Bidding Procedures Order, the Plan, or the Plan Supplement; the Filing of the Debtors' Chapter 11 Cases; the Filing of the Canadian Proceeding; the Disclosure Statement, the Plan, the solicitation of votes with respect to the Plan, the pursuit of Confirmation of the Plan, the pursuit of Consummation of the Plan, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, the distribution of property under the Plan or any other related agreement, or any cancellation of debt income realized in connection with the Plan; or upon any other act or omission, transaction, agreement, event, or other occurrence related or relating to any of the foregoing taking place on or before the Plan Effective Date, other than Claims and liabilities resulting therefrom arising out of or relating to any act or omission of a Released Party that constitutes actual fraud, willful misconduct, or gross negligence, each solely to the extent as determined by a Final Order of a court of competent jurisdiction. Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any party of any obligations related to customary banking products, banking services or other financial accommodations (except as may be expressly amended or modified by the Plan or any other financing document under and as defined therein), (ii) the Equityholder Litigation Claims, or (iii) any post-Plan Effective Date obligations of any Person under the Plan, the Confirmation Order, any Stand-Alone Restructuring Transaction, any Definitive Document or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan, including the Purchase Agreement or any Claim or obligation arising under the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the third party release, which includes by reference each of the related provisions and definitions contained in the Plan, and, further shall constitute the Bankruptcy Court's finding that the third party release by those creditors or interest holders who did not opt-out of the release is: (I) the good and valuable consideration and substantial contributions provided by the Released Parties; (II) a good faith settlement and compromise of the Claims released by the third party release; (III) in the best interests of the Debtors and all holders of Claims and Interests; (IV) fair, equitable and reasonable; (V) given and made after due notice and opportunity for a hearing; and (IV) a bar to any of the Releasing Parties asserting any Claim released pursuant to the third party release.

4.      Exculpation from Claims Relating to the Plan

Except as otherwise specifically provided in the Plan or the Confirmation Order with respect to the Plan, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby exculpated from, any Claims and Causes of Action related to any act or omission occurring between and including the Petition Date and the Plan Effective Date in connection with, relating to, or arising out of: the Debtors' Chapter 11 Cases (including the Filing thereof); the Canadian Proceeding (including the Filing thereof); the formulation, preparation, dissemination, negotiation, Filing, or termination of the Plan, the Disclosure Statement, the Bidding Procedures Order, the DIP Facility, or any contract, instrument, release or other agreement or document created or entered into in connection with the Debtors' Chapter 11 Cases or Canadian Proceeding, whether or not included in the Plan

52

Supplement or constituting a Definitive Document; the Restructuring Transactions contemplated by the Plan and any prepetition transactions relating to any of the foregoing; the pursuit of Confirmation of the Plan, the pursuit of Consummation of the Plan, the administration and implementation of the Plan, including the issuance and distribution of Securities pursuant to the Plan, or the distribution of property under the Plan; the Purchase Agreement; or any other related act or omission, transaction, event, or other occurrence taking place on or before or in connection with the Plan Effective Date, except for Claims and liabilities resulting therefrom related to any act or omission that is determined in a Final Order by a court of competent jurisdiction to have constituted actual fraud, willful misconduct, or gross negligence by an Exculpated Party.

The Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan in all respects.

5.    Injunction

Except as otherwise expressly provided in the Plan or the Confirmation Order with respect to the Plan, all Persons who have held, hold, or may hold any Claims or Causes of Action against, or Interests in, any of the Debtors that have been released, discharged, or are subject to release or exculpation hereunder are permanently enjoined, from and after the Plan Effective Date, from taking any of the following actions against any of the Debtors, the Reorganized Debtors, the Wind-Down Debtor(s), the GUC Trustee, as applicable, or any of the other Exculpated Parties or any of the Released Parties: (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with any such Claim, Cause of Action or Interest; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against any of the Exculpated Parties or Released Parties on account of or in connection with any such Claim, Cause of Action or Interest; (3) creating, perfecting, or enforcing any Lien or encumbrance of any kind against any of the Exculpated Parties, Released Parties or their property on account of or in connection with or with respect to any such Claim, Cause of Action or Interest; and (4) asserting any right of setoff or subrogation against any obligation due from any of the Exculpated Parties, Released Parties or against their property on account of or in connection with any such Claim, Cause of Action or Interest unless, with respect to setoff, such holder has Filed a motion requesting the right to perform such setoff on or before the Plan Effective Date or Filed a Proof of Claim that asserts or preserves any such right, and until such motion has been granted or the Filed Proof of Claim is Allowed.

Upon entry of the Confirmation Order with respect to the Plan, all holders of Claims and Causes of Action against, and Interests in, any of the Debtors and their respective Related Parties shall be enjoined from taking any actions to interfere with the implementation of the Plan or the Sale Transaction.

B.    **Protections Against Discriminatory Treatment**

To the maximum extent provided by section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, all Persons, including all Governmental Units, shall not discriminate against the Reorganized Debtors, Wind-Down Debtor(s), GUC Trustee, as

applicable, or deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, the Reorganized Debtors, Wind-Down Debtor(s), or GUC Trustee, as applicable, or another Person with whom the Reorganized Debtors, Wind-Down Debtor(s), or GUC Trustee, as applicable, have been associated, solely because the relevant Debtor has been a debtor under chapter 11 of the Bankruptcy Code, was insolvent before the commencement of or during the Debtors' Chapter 11 Cases, or did not pay a debt that is discharged hereunder.

### C.    Document Retention

On and after the Plan Effective Date, the Reorganized Debtors, the Wind-Down Debtor(s), and the GUC Trustee, as applicable, may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented.

### D.    Term of Injunctions or Stays

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court in effect on the applicable Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the Plan Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

### E.    Unknown Claims

The waivers and releases provided in this Plan are intended to include both known and unknown Claims and Causes of Action. The Debtors and the other Releasing Parties understand that they may later discover Claims, Causes of Action or facts that may be different than, or in addition to, those which the Debtors or any other Releasing Party now knows or believes to exist with respect to the Debtors, and which, if known at the Plan Effective Date may have materially affected the decision of the Debtors and any other Releasing Party to enter into it. Nevertheless, the Debtors and the Releasing Parties hereby waive any right, Causes of Action or Claim that might arise as a result of such different or additional Claims, Causes of Action or facts. The Debtors and the Releasing Parties are aware of, read, understand and have been fully advised by their attorneys as to the contents of the provisions of California Civil Code section 1542 and any other similar state, federal or foreign law and hereby expressly waive any and all rights, benefits and protections of such section 1542 and each such other similar law, which provides:

**"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."**

## IX.    CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

### A.    Conditions Precedent to the Effective Date for the Plan

It shall be a condition to the occurrence of the Plan Effective Date that the following conditions shall have been satisfied or waived pursuant to the provisions of Article IX.B hereof:

1.    The Bankruptcy Court shall have approved the Disclosure Statement, which may be approved by the Confirmation Order, with respect to the Plan;

2.    The Confirmation Order approving the Plan is in form and substance reasonably acceptable to the Purchaser and Prepetition Term Loan Agent, the Debtors and the Committee and shall be a Final Order (unless otherwise waived by the Prepetition Term Loan Agent and the Committee) and shall:

(a)    Authorize the Debtors to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan;

(b)    Decree the provisions in the Confirmation Order with respect to the Plan and the Plan to be non-severable and mutually dependent;

(c)    Authorize the Reorganized Debtors, Wind-Down Debtor(s), Plan Administrator and GUC Trustee, as applicable, to: (i) implement the Sale and Restructuring Transactions; (ii) make all distributions required under the Plan, including any Cash, the New Reorganized Debtor Equity, and the GUC Trust Agreement, in each case, as applicable; and (iii) enter into any applicable agreements, transactions, and sales of property as set forth in the Plan Supplement as applicable to the Debtors and the Plan;

(d)    Provide for the Bankruptcy Court's retention of jurisdiction over implementation of the Plan and the issues set forth in Article XI of the Plan; and

(e)    Authorize the implementation of the Plan in accordance with its terms;

3.    The final version of each Definitive Document, including each document contained in the Plan Supplement, to the extent applicable to the Plan (including any exhibits, amendments, modifications, or supplements thereto) shall have been executed or deemed executed and delivered by each party thereto and any conditions precedent related thereto shall have been satisfied or waived by the applicable party or parties, if applicable;

4.    Any and all authorizations, certifications, consents, regulatory approvals, rulings, actions, documents and agreements necessary to implement, consummate and effectuate the applicable Restructuring Transactions shall have been obtained, effected and executed;

5.    In the event of a Reorganized Equity Sale, the New Reorganized Debtor Equity shall have been issued on or immediately before the Plan Effective Date;

6.      The Professional Fee Escrow Account shall have been established and funded in accordance with Article II.B hereof;

7.      Any Administrative Expense Claims that are not Assumed Liabilities (except for DIP Claims and Allowed Professional Fee Claims) and are known to the Debtors immediately prior to the Effective Date are paid or otherwise satisfied;

8.      The Debtors, with the consent of the Prepetition Term Loan Agent and the Committee, shall have appointed the Plan Administrator, and the Plan Administrator Agreement and other Plan Administrator Documents shall have been executed and delivered;

9.      The Debtors and the GUC Trustee selected by the Committee shall have executed and delivered the GUC Trust Agreement; and

10.     The Confirmation Order shall have been recognized in the Canadian Proceeding pursuant to Part IV of the *Companies' Creditors Arrangement Act* (Canada) thereby giving full force and recognition to the Confirmation Order in Canada.

### B.      Waiver of Conditions

The conditions to the occurrence of the Plan Effective Date set forth in this Article IX may be waived by the Debtors, with the prior written consent of the Prepetition Term Loan Agent and the Committee, without notice to, action, or approval of the Bankruptcy Court or any formal action other than proceeding to confirm or consummate the Plan.

### C.      Substantial Consummation

Substantial Consummation of the Plan shall be deemed to occur on the Plan Effective Date.

### D.      Effect of Failure of Conditions

If the Consummation of the Plan does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any claims by the applicable Debtor or any other Person, or any Claims or Interests by any holders thereof; (2) prejudice in any manner the rights of each applicable Debtor, any holder of Claims or Interests, or any other Person; or (3) constitute an admission, acknowledgment, offer or undertaking by the applicable Debtors, any holder of Claims or Interests, or any other Person in any respect.

## X.      MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN

### A.      Modification and Amendments

Except as otherwise specifically provided in the Plan, the Debtors reserve the right, with the prior written consent of the Prepetition Term Loan Agent and the Committee, to (1) modify the Plan, whether such modification is material or immaterial, and seek Confirmation consistent with the Bankruptcy Code and (2) subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 (as well as those restrictions on

56

modifications set forth in the Plan), to alter, amend or modify the Plan with respect to any Debtor, one or more times, before or after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend or modify the Plan, or remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan. In accordance with, and to the extent provided by, section 1127 of the Bankruptcy Code, a holder of a Claim that has accepted this Plan shall be deemed to have accepted this Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such holder.

### B.  Effect of Confirmation on Modifications

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation of votes thereon are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or re-solicitation.

### C.  Revocation or Withdrawal of Plan

The Debtors reserve the right to revoke or withdraw the Plan before the Confirmation Date and to File other plan(s) of reorganization. If the Debtors revoke or withdraw the Plan or if Confirmation or Consummation of the Plan does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan, the assumption or rejection of any Executory Contracts or Unexpired Leases under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan or Disclosure Statement shall: (a) constitute a waiver or release of any claims by the applicable Debtor or any other Person, or any Claims or Interests by any holders thereof; (b) prejudice in any manner the rights of each applicable Debtor, any holder of Claims or Interests, or any other Person; or (c) constitute an admission, acknowledgment, offer or undertaking by the applicable Debtors, any holder of Claims or Interests, or any other Person in any respect.

## XI.  RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Plan Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction after the Plan Effective Date over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.  Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of, any Claim, including the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims;

2.  Decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals;

3.  Resolve any matters related to: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease, the determination of any Claim arising

therefrom, including the Cure Amounts, or any other matter related to Executory Contracts and Unexpired Leases; (b) the amending, modifying, or supplementing, after the Plan Effective Date, of the Assumed Executory Contracts and Unexpired Leases List; and (c) any dispute regarding whether a contract or lease is or was executory, expired, or terminated;

4.      Ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

5.      Adjudicate, decide, or resolve any motions, adversary proceedings, contested or any other matters, and grant or deny any applications pending on the Plan Effective Date or filed thereafter, including any Equityholder Litigation Claims commenced in the Bankruptcy Court;

6.      Adjudicate, decide, or resolve any and all matters related to sections 1141, 1145, and 1146 of the Bankruptcy Code;

7.      Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and of all contracts, instruments, releases, and other agreements or documents created in connection with the Plan, including the documents comprising the Plan Supplement;

8.      Resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with Consummation or otherwise, including interpretation or enforcement of the Plan, any Person's obligations incurred in connection with the Plan, or, as applicable, the Purchase Agreement;

9.      Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Person with Consummation or enforcement of the Plan;

10.     Resolve any cases, controversies, suits, disputes or Causes of Action with respect to the releases, injunctions, exculpations, and other provisions contained in Article VIII of the Plan, and enter such orders as may be necessary or appropriate to enforce or implement such releases, injunctions, exculpations, and other provisions;

11.     Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

12.     Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan;

13.     Adjudicate any and all disputes arising from or relating to distributions under the Plan;

14.     Consider any modifications of the Plan to cure any defect or omission or to reconcile any inconsistency in the Confirmation Order;

15.    Determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

16.    Hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, or the Restructuring, including disputes arising under agreements, documents, or instruments executed in connection with the Plan or the Restructuring, whether they arise before, on or after the Plan Effective Date;

17.    Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

18.    Enforce and interpret all orders entered by the Bankruptcy Court in the Chapter 11 Cases;

19.    Hear any other matter not inconsistent with the Bankruptcy Code; and

20.    Enter an order or final decree closing any of the Chapter 11 Cases.

## XII.    MISCELLANEOUS PROVISIONS

### A.    Immediate Binding Effect

Subject to Article IX and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Plan Effective Date, the terms of the Plan and the documents contained in the Plan Supplement, shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, the Wind-Down Debtor(s), and the GUC Trustee, as applicable, and any and all holders of Claims against and Interests in the Debtors (irrespective of whether their Claims or Interests are Allowed or whether they have accepted the Plan), all Persons that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Person acquiring property under the Plan and any and all non-Debtor counterparties to the Executory Contracts and Unexpired Leases.

### B.    Additional Documents

On or before the Plan Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors, the Reorganized Debtors, the Wind-Down Debtor(s), or the GUC Trustee, as applicable, all holders of Allowed Claims receiving distributions under the Plan, and all other parties in interest may, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

### C.    Payment of Statutory Fees

All fees due and payable by the Debtors' Estates pursuant to section 1930 of Title 28 of the U.S. Code, together with the statutory rate of interest set forth in section 3717 of Title 31 of the U.S. Code to the extent applicable ("Quarterly Fees") prior to the Plan Effective Date shall be paid by the Debtors on the Plan Effective Date. After the Plan Effective Date, the Debtors and the

Reorganized Debtors shall be jointly and severally liable to pay any and all Quarterly Fees when due and payable. After the Plan Effective Date, each of the Reorganized Debtors shall File with the Bankruptcy Court separate UST Form 11-PCR reports when they become due. Each and every one of the Debtors and the Reorganized Debtors shall remain obligated to pay Quarterly Fees to the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed or converted to a case under Chapter 7 of the Bankruptcy Code. The U.S. Trustee shall not be required to File any Administrative Expense Claim in the case, and shall not be treated as providing any release under the Plan. For the avoidance of doubt, neither the GUC Trust nor GUC Trustee is responsible for the payment of any Quarterly Fees.

### D.    Reservation of Rights

Except as expressly set forth herein, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order confirming the Plan and the Confirmation Order shall have no force or effect if the Plan Effective Date does not occur. None of the Filing of the Plan, any statement or provision contained in the Plan or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor or any holder of a Claim or Interest unless and until the Plan Effective Date has occurred.

### E.    Successors and Assigns

The rights, benefits, and obligations of any Person named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiary, or guardian, if any, of any such Person.

### F.    Notices

To be effective, all notices, requests and demands shall be in writing (including by e-mail or facsimile transmission), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by fascimile transmission, when received and telephonically confirmed, addressed to the following:

1.    <u>If to the Debtors, to</u>:

Red Lobster Management LLC
450 S. Orange Avenue, Suite 800
Orlando, Florida 32801

with copies to:

King & Spalding LLP
1180 Peachtree Street, NE
Atlanta, Georgia 30309
Attention:
W. Austin Jowers, Esq.
Jeffrey R. Dutson, Esq.

13153917-2

E-mail:
ajowers@kslaw.com
jdutson@kslaw.com

- and -

King & Spalding LLP
1100 Louisiana Street, Suite 4100
Houston, Texas 77002
Attention: Michael Fishel, Esq.
E-mail: mfishel@kslaw.com

- and -

Berger Singerman LLP
1450 Brickell Avenue, Suite 1900
Miami, Florida 33131
Attention: Paul Steven Singerman, Esq.
E-mail: singerman@bergersingerman.com

2.    <u>If to the DIP Secured Parties or Prepetition Term Loan Agent, to</u>:

Proskauer Rose LLP
One International Place
Boston, Massachusetts 02110
Attention: Charles A. Dale, Esq.
Email: cdale@proskauer.com

- and -

Proskauer Rose, LLP
Eleven Times Square
New York, New York 10036
Attention:
Megan Volin, Esq.
Dylan J. Marker, Esq.
Email:
mvolin@proskauer.com
dmarker@proskauer.com

- and -

Trenam, Kemker, Scharf, Barkin, Frye, O'Neill and Mullis, P.A.
101 E Kennedy Boulevard, Suite 2700
Tampa, Florida 33602
Attention: Lara Roeske Fernandez, Esq.
Email: lfernandez@trenam.com

13153917-2

3.      If to the Committee or the GUC Trustee:

Pachulski Stang Ziehl & Jones LLP
919 North Market Street, 17th Floor
Wilmington, DE 19801
Attention:
Bradford J. Sandler, Esq.
Email: bsandler@pszjlaw.com

If a Person wishes to continue to receive notices or documents after the Plan Effective Date, such Person must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Plan Effective Date, the Reorganized Debtors, the Wind-Down Debtor(s), or the GUC Trustee, as applicable, are authorized to limit the list of Persons receiving documents pursuant to Bankruptcy Rule 2002 to those Persons who have Filed such renewed requests in the applicable Chapter 11 Cases.

### G.      Entire Agreement

Except as otherwise indicated, the Plan, the Plan Supplement, the Definitive Documents (in their final forms) and the Confirmation Order supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on the subjects covered thereby, all of which have become merged and integrated into the Plan and the Confirmation Order.

### H.      Exhibits

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan, as applicable, as if set forth in full in the Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the website of the Debtors' notice, claims, and balloting agent at https://dm.epiq11.com/redlobster or the Bankruptcy Court's website at http://www.flmb.uscourts.gov/. To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

### I.      Non-Severability of Plan Provisions

The provisions of the Plan, including its release, injunction, exculpation and compromise provisions, are mutually dependent and non- severable, other than as described below. The Confirmation Order shall constitute a judicial determination, and shall provide, that each term and provision of the applicable Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors, consistent with the terms set forth herein; and (3) non-severable and mutually dependent.

### J.      Closing of Chapter 11 Cases

The Reorganized Debtors or the Plan Administrator, as applicable, shall, promptly after the

full administration of the Chapter 11 Cases, and with the consent of the GUC Trustee, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order necessary to close the Chapter 11 Cases.

### K.    Conflicts

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement, the Plan Supplement, or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control. In the event of an inconsistency between the Confirmation Order and the Plan, the Confirmation Order shall control.

### L.    Rates

The Plan does not provide for the change of any rate that is within the jurisdiction of any governmental regulatory commission after the occurrence of the Plan Effective Date.

*[Remainder of Page Left Intentionally Blank]*

Dated this July 19, 2024

*/s/ Nicholas Haughey*
Nicholas Haughey
Chief Restructuring Officer

# EXHIBIT B

**Unaudited, Consolidated Liquidation Analysis and
Financial Projections of the Debtors**

**[TO BE FILED]**

# EXHIBIT C

**Corporate Organizational Chart**

THAI UNION GROUP PUBLIC COMPANY LIMITED (TH)
Reg. No. 0107537000891
THAI UNION NORTH AMERICA (US-CA)
THAI UNION INVESTMENTS NORTH AMERICA LLC (US-DE)
GGCOF RL BLOCKER LLC (US-DE)
SEAFOOD ALLIANCE LIMITED (HK)
RL CO-INVESTOR BLOCKER LLC (US-DE)
RL MANAGEMENT INVESTORS LLC (US-DE)
RL MANAGEMENT HOLDINGS LLC (US-DE)
EMPLOYEE SHARE TRUST (US-DE)
Legend
Debtor
Non-Debtor [1]
Thai Union Entities
Seafood Alliance Entities
Borrower Under Term Loan and ABL
Guarantor Under Term Loan and ABL
[1]The depiction of the non-Debtor entities is based on the Debtors' knowledge and belief as of May 19, 2024.
Red Lobster Master Holdings GP LLC (US-DE)
GP
Red Lobster Master Holdings, LP (US-DE)
Red Lobster Seafood Co., LLC (US-DE)
Red Lobster Holdings LLC (US-DE)
Red Lobster Intermediate Holdings LLC (US-DE)
Red Lobster Management LLC (US-DE)
Non-Consolidated Corps:
Red Lobster Cares, Inc. (US-FL)
RL Billings, Inc. (US-MT)
RL of Jonesboro Inc. (US-AR)
Red Lobster Sourcing LLC (US-DE)
RL Kansas LLC (US-KS)
Red Lobster Hospitality LLC (US-DE)
Red Lobster Restaurants LLC (US-DE)
RLSV, Inc. (US-FL)
Red Lobster Canada, Inc. (US-DE)
Red Lobster International Holdings LLC (US-DE)
Red Lobster Supply LLC (US-DE)
Foreign Subsidiaries
90%
RL Columbia LLC (US-MD)
RL of Frederick, Inc. (US-MD)
Red Lobster of Texas, Inc. (US-TX)
96%
RL Maryland, Inc. (US-MD)
70%
Red Lobster of Bel Air, Inc. (US-MD)
20%
RL Salisbury, LLC (US-MD)

